**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| SAMSON RESOURCES CORPORATION, | Case No. 15-11934 (BLS) |
| Reorganized Debtor. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST; | |
| Plaintiff, | Adv. Pro. No. 17-51524 (BLS) |
| v. | |
| SAMSON ENERGY COMPANY, LLC, *et al.*, Defendants. | |

**OPPOSITION OF SAMSON SETTLEMENT TRUST TO MOTION OF DEFENDANTS
STACY FAMILY TRUST, SFT (DELAWARE) MANAGEMENT, LLC,
ST 2008 (DELAWARE) MANAGEMENT, LLC,
SCHUSTERMAN 2008 DELAWARE TRUST, STACY FAMILY DELAWARE TRUST,
SAMSON EXPLORATION, LLC, SAMSON OFFSHORE, LLC,
AND SAMSON ENERGY COMPANY, LLC
<u>FOR SUMMARY JUDGMENT BASED ON PLAN RELEASE</u>**

Dated: June 29, 2018

J. Christopher Shore (*pro hac vice*)
Michele J. Meises (*pro hac vice*)
John J. Ramirez (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113
cshore@whitecase.com
michele.meises@whitecase.com
john.ramirez@whitecase.com

*Of Counsel:*
Craig H. Averch
Ronald K. Gorsich
Mark E. Gustafson
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433

**FARNAN LLP**
Joseph J. Farnan, Jr. (Bar No. 100245)
Joseph J. Farnan, III (Bar No. 3945)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
farnan@farnanlaw.com
jjfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Thomas E Lauria (*pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:     (305) 371-2700
Facsimile:     (305) 358-5744
tlauria@whitecase.com
*Attorneys for the Settlement Trustee*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

SUMMARY OF THE ARGUMENT ............................................................................. 1

COUNTERSTATEMENT OF MATERIAL FACTS ................................................... 7

    A.    The LBO ............................................................................................... 7

    B.    The Prepetition RSA, the First Plan, and the First Day Hearing .................... 8

    C.    The Second Plan ................................................................................. 11

    D.    The Exclusivity Dispute ...................................................................... 11

    E.    The Committee's Motion for Standing ................................................ 12

    F.    The Plan Support Agreement and the Third Plan ............................... 13

    G.    Termination of Exclusive Periods and the Committee Plan .............. 14

    H.    The Mediation ..................................................................................... 15

    I.    The Fourth and Fifth Plans and the Joint Disclosure Statement ...... 17

    J.    The Settlement Plan and Its Confirmation ........................................ 19

    K.    The Plan Supplement/Settlement Trust Retained Causes of Action ...... 23

    L.    The Commencement of the Adversary Proceeding ........................... 24

ARGUMENT .................................................................................................................. 26

SUMMARY JUDGMENT STANDARDS .................................................................. 26

I.    THE CONFIRMATION ORDER CONTROLS AND MAKES CLEAR THAT
    MOVANTS WERE NOT INCLUDED IN THE ESTATE'S RELEASES OF
    AVOIDANCE ACTIONS ................................................................................. 28

    A.    A Release of Movants Is Not "an Essential Provision of the Plan" ........... 31

    B.    Movants' Expansive Interpretation Is Not "Appropriately Tailored" ........ 32

    C.    Movants Gave No "Good and Valuable Consideration" .............................. 32

    D.    Movants Did Not Participate in a "Good Faith Settlement" ........................ 33

    E.    A Release of Movants Was Not in the "Best Interests of the Estates" ........ 34

F.      A Release of Movants Is Not "Fair, Equitable, or Reasonable" ................................... 34

II.     ANY LEGITIMATE TEXTUAL ANALYSIS OF THE DEFINITION OF
        "RELEASED PARTY" IN THE CONFIRMATION ORDER AND THE
        SETTLEMENT PLAN ESTABLISHES  THAT IT DOES NOT DESCRIBE ANY OF
        THE MOVANTS ................................................................................................................ 36

A.      A Plain Reading of "Released Party" Does Not Apply to the Selling Shareholders or
        Their Own Equity Holders ........................................................................................ 38

B.      A Plain Reading of "Released Party" does Not Apply to Any of the Gulf Coast and
        Offshore Entities ...................................................................................................... 41

        1.      Samson Exploration ........................................................................................ 41

        2.      Samson Energy .............................................................................................. 42

        3.      The Bankruptcy Code's Definition of "Affiliate" is Irrelevant ....................... 43

        4.      The Applicable Definitions of "Affiliate" Require Control ............................ 43

                i.      Movants Have Not Established that They Controlled Samson Energy
                        and the Debtors at the Same Time ....................................................... 45

        5.      Samson Offshore, LLC .................................................................................. 46

C.      If Any Ambiguity Exists in the Definition of "Released Party," All Extrinsic Evidence
        Supports a Denial of the Motion ................................................................................ 46

III.    DISMISSAL OF ANY COUNT AT THIS TIME WOULD BE PREMATURE .................... 48

CONCLUSION ............................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

In re Am. Home Mortg. Inv. Trust 2005-2,
   No. 14 Civ. 2494, 2014 U.S. Dist. LEXIS 111867 (S.D.N.Y. July 24, 2014).................................49

In re Am. Int'l Grp., Inc. Sec. Litig.,
   No. 04-CV-8141, 2014 U.S. Dist. LEXIS 185757 (S.D.N.Y. Dec. 3, 2014) ..................................43

In re AMR Corp.,
   562 B.R. 20 (Bankr. S.D.N.Y. 2016) ...........................................................................................37

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)...............................................................................................................26, 27

In re Appliance Now, Inc.,
   568 B.R. 843 (Bankr. M.D. Fla. 2017) ........................................................................................50

Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.,
   247 F.3d 79 (3d Cir. 2001).........................................................................................................40

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)...................................................................................................................26

Centro Empresarial Cempresa S.A. v. America Movil,
   S.A.B. de C.V., 952 N.E.2d 995 (N.Y. 2011) ..............................................................................49

Doe v. Abington Friends Sch.,
   480 F.3d 252 (3d Cir. 2007).......................................................................................................27

In re Drexel Burnham Lambert Grp.,
   134 B.R. 493 (Bankr. S.D.N.Y. 1991).........................................................................................33

Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.,
   375 F. Supp. 2d 257 (S.D.N.Y. 2005).........................................................................................36

In re Energy Future Holdings Corp.,
   540 B.R. 96 (Bankr. D. Del. 2015) (Sontchi, J.)..........................................................................47

Ford Motor Co. v. Summit Motor Prods.,
   Inc., 930 F.2d 277 (3d Cir. 1991) ..............................................................................................29

Forklift LP Corp. v. iS3C, Inc. (In re Forklift LP Corp.),
   363 B.R. 388 (Bankr. D. Del. 2007) ...........................................................................................29

*Golden Pac. Bancorp v. FDIC*,
   273 F.3d 509 (2d Cir. 2001)............................................................... 36

*Greenwich Capital Fin. Prods., Inc. v Negrin*,
   903 N.Y.S.2d 346 (N.Y. App. Div. 2010) .......................................... 40

*Gross v. Sweet*,
   49 N.Y.2d 102 (N.Y. 1979) ......................................................... 36, 37

*Hatco Corp. v. W.R. Grace & Co.*,
   59 F.3d 400 (3d Cir. 1995)............................................................... 47

*Hellstrom v. U.S. Dep't of Veterans Affairs*,
   201 F.3d 94 (2d Cir. 2000)............................................................... 27

*Hersh v. Allen Prods. Co.*,
   789 F.2d 230 (3d Cir. 1986).............................................................. 26

*Horowitz v. Fed. Kemper Life Assur. Co.*,
   57 F.3d 300 (3d Cir. 1995)............................................................... 27

*In re House Nursery, Ltd.*,
   No. 13-60690, 2016 Bankr. LEXIS 409 (Bankr. E.D. Tex. Feb. 9, 2016) ............................. 31, 37

*Knights of Columbus v. Bank of N.Y. Mellon*,
   No. 651442/2011, 2015 N.Y. Misc. LEXIS 2626 (N.Y. Sup. Ct. July 10, 2015) ......................... 40

*In re Lazy Days' RV Ctr. Inc.*,
   724 F.3d 418 (3d Cir. 2013).............................................................. 29

*In re Lipper Holdings, LLC*,
   766 N.Y.S.2d 561 (N.Y. Sup. Ct. 2003) ......................................... 34, 40

*Macy v. United States*,
   557 F.2d 391 (3d Cir. 1977).............................................................. 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................... 26

*In re Musicland Holding Corp.*,
   374 B.R. 113 (Bankr. S.D.N.Y. 2007)................................................ 47

*Nat'l Union Fire Ins. Co. v. Beelman Truck Co.*,
   203 F. Supp. 3d 312 (S.D.N.Y. 2016)................................................ 43

*Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.)*,
   580 B.R. 652 (Bankr. W.D. Pa. 2017) .............................................. 50

*Rochez Bros., Inc. v. Rhoades*,
  527 F.2d 880 (3d Cir. 1975) ......................................................................................... 44, 49

*Salus Capital Partners, LLC v. Standard Wireless Inc. (In re RadioShack Corp.)*,
  550 B.R. 700 (Bankr. D. Del. 2016) (Shannon, J.) ........................................................ 47

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ........................................................................................ 44

*Shaw Group Inc. v. SWE&C Liquidating Trust (In re Stone & Webster, Inc.)*,
  No. 00-2142 PJW, 2009 Bankr. LEXIS 257 (Bankr. D. Del. Feb. 18, 2009) ................. 27

*Shelton v. Bledsoe*,
  775 F.3d 554 (3d Cir. 2015) ............................................................................................ 27

*Spectrum Standards, Inc. v. Telnetex, Ltd.*,
  576 N.Y.S.2d 474 (N.Y. App. Div. 1991) ...................................................................... 38

*Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*,
  422 B.R. 612 (Bankr. N.D. Tex. 2010) ........................................................................... 37

*Travelers Indem. Co. v. Bailey*,
  557 U.S. 137 (2009) .................................................................................................. 29, 31

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ............................................................................... 32

*United States v. Corr*,
  543 F.2d 1042 (2d Cir. 1976) .......................................................................................... 44

*United States v. Motor Vehicles Manufacturers' Ass'n*,
  643 F.2d 644 (9th Cir. 1981) .......................................................................................... 29

*United States v. Sepulveda*,
  15 F.3d 1161 (1st Cir. 1993) ........................................................................................... 29

*Waldman v. Riedinger*,
  423 F.3d 145 (2d Cir. 2005) ...................................................................................... 43, 44

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ............................................................................... 32

*Wells Fargo Bank N.A. v. Sovereign Bank, N.A.*,
  44 F. Supp. 3d 394 (S.D.N.Y. 2014) .............................................................................. 49

*Zazzali v. Wavetronix LLC (In re DBSI, Inc.)*,
  No. 08-12687 PJW, 2011 Bankr. LEXIS 2069 (Bankr. D. Del. May 27, 2011) ............ 27

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ........................................................................... 32, 33

## STATUTES AND RULES

11 U.S.C. § 101(2)(B) ..................................................................................................... 42, 43

Del. Code Ann. Title 8, §§ 203(c)(1), 251(h)(6)(a) ............................................................ 44

Fed. R. Bankr. P. 7056 ......................................................................................................... 26

Fed. R. Civ. P. 56 ................................................................................................................. 26

Fed. R. Civ. P. 56(a) ............................................................................................................ 26

Securities Act of 1933 .......................................................................................................... 43

Securities Exchange Act of 1934 .......................................................................................... 43

17 C.F.R. § 230.405 ........................................................................................................ 43, 44

17 C.F.R. § 240.12b–2 ......................................................................................................... 43

## MISCELLANEOUS

Black's Law Dictionary (10th ed. 2014) ................................................................ 39, 43, 40, 44

## INTRODUCTION

Peter Kravitz, as Settlement Trustee of and on behalf of the Samson Settlement Trust (the "**Settlement Trust**") established pursuant to the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (with Technical Modifications)* [D.I. 2009] (the "**Settlement Plan**") files this Opposition (the "**Opposition**")[1] to the *Motion of Defendants Stacy Family Trust, SFT (Delaware) Management, LLC, ST 2008 (Delaware) Management, LLC, Schusterman 2008 Delaware Trust, Stacy Family Delaware Trust, Samson Exploration, LLC, Samson Offshore, LLC, and Samson Energy Company, LLC for Summary Judgment Based on Plan Release* [Adv. Pro. D.I. 45] (the "**Motion**").[2]

## SUMMARY OF THE ARGUMENT

There is no dispute that the Movants received cash payments totaling more than $6 billion under the 2011 LBO that levered up the Debtors' balance sheets and ultimately led to these Chapter 11 Cases. Nor is there any dispute that, from the first day of the Chapter 11 Cases through the Effective Date of the Settlement Plan, the Debtors and the Committee, and every other party in the Case who spoke on the topic, noted that the LBO-related claims against the Movants were estate assets that would be preserved for assertion post-exit. And finally, there is no dispute that the Movants never appeared in these Chapter 11 Cases, never engaged in any negotiations regarding the terms of the Settlement Plan, and never provided any consideration in any form to the Debtors' chapter 11 estates in connection with the Settlement Plan or otherwise.

---

[1] Concurrently with this Opposition, the Settlement Trust filed the *Omnibus Declaration of John Ramirez in Support of (i) Opposition of Samson Settlement Trust to Stacy Schusterman's Motion for Summary Judgment as to Counts III, IV and Correlative Portions of Count V of the Complaint and (ii) Opposition of Samson Settlement Trust to the Motion of Defendants Stacy Family Trust, SFT (Delaware) Management, LLC, ST 2008 (Delaware) Management, LLC, Schusterman 2008 Delaware Trust, Stacy Family Delaware Trust, Samson Exploration, LLC, Samson Offshore, LLC, and Samson Energy Company, LLC for Summary Judgment Based on Plan Release* (the "**Ramirez Declaration**").
[2] Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Motion; capitalized terms in the Summary of Argument are defined below. Exhibit citations "Ex. _" refer to exhibits to the Ramirez Declaration.

Nevertheless, according to the Movants, the Settlement Plan somehow released them from all LBO-related claims.  Their thesis in this regard is found on page 1 of the Movants' Memorandum of Law:  "The 'Global Settlement Joint Chapter 11 Plan' filed by [the Debtors] is the source of all claims asserted by the plaintiff . . . in the Complaint, but the same Plan releases each Moving Defendant from all such claims."  The Movants have it entirely wrong.  They are not even starting with the right document.

As set forth in Section I, Judge Sontchi's Confirmation Order defines who is and is not a "Released Party" entitled to avail itself of the Debtors' estate releases.  That Order, by its terms, explicitly controls over the Settlement Plan.  Thus, the proper question for this Court is not necessarily what the Debtors and their creditors agreed to in their Settlement Plan, but rather what persons and entities Judge Sontchi intended to treat as "Released Parties" in his Confirmation Order and what "Causes of Action" he was permitting the Debtors to compromise and release.  Fortunately for this Court, Judge Sontchi made his thinking clear and unambiguous within the four corners of his Order.  Based on his "due deliberation" over all evidence, including taking judicial notice of "all pleadings," "all evidence," and "all arguments" made "during the pendency of these Chapter 11 Cases," Judge Sontchi made an express finding of fact in paragraph 34 of the Confirmation Order, entitled "Releases by the Debtors."  That finding lays out a clear roadmap for determining what releases he approved.  First, the releases he approved were found to be "an essential provision of the Plan."  There is no dispute that Movants here played absolutely no role in the formation, prosecution, or confirmation of the Settlement Plan, were not parties-in-interest in the Chapter 11 Cases, and did not vote on the Settlement Plan.  Second, the approved releases were "appropriately tailored."  Movants' rendering of the definition of "Released Parties" is so inappropriately expansive that it would cover any person or entity that, from the beginning of time, ever had any overlapping ownership with any Debtor entity or any former affiliate of any Debtor entity.  Third, paragraph 34

explains that the approved releases were given "in exchange for good and valuable consideration provided by the Released Parties." There is zero evidence in the Motion or in the record of these Chapter 11 Cases that any of the Movants provided any consideration to the Debtors' estates in exchange for the release of billions of dollars of claims against them.

Fourth, the approved releases represent "a good faith settlement and compromise of the claims released by such releases." There is zero evidence in the Motion or the record of these Chapter 11 Cases that Movants ever discussed, much less negotiated, with the Debtors or any creditor over any release. They were not mediation parties before Judge Gross, and the claims against them were key considerations in that process. Fifth, the approved releases were found to be "in the best interests of the Debtors and all holders of Claims and Interests." Again, there is zero evidence in the Motion or the record of these Chapter 11 Cases that a free release of Movants would benefit anyone other than Movants (who asserted no Claims or Interests in the Chapter 11 Cases). Sixth, the approved releases were "fair, equitable, and reasonable." Movants do not even attempt to justify the fairness, equity, or reasonability of their including being deemed a "Released Party." Simply put, it is impossible to square any of Judge Sontchi's explicit findings with any of Movants' contentions here that their "releases" were approved.

Movants' contentions also ignore the specific history of the release provisions at issue, including explicit statements to Judge Sontchi about the meaning of those provisions on the very first day of these Chapter 11 Cases. As laid out in the Counterstatement below, on September 16, 2015, the Debtors filed their petitions along with an initial chapter 11 plan (the "**First Plan**") and a proposed disclosure statement. That First Plan, Debtors' counsel explained to Judge Sontchi at the first day hearings, embodied the terms of a prepetition restructuring support agreement that had been negotiated with various secured parties and insiders, portending a "swift and smooth" balance sheet restructuring. In a strategic move that drew an immediate outcry from their unsecured creditors, who

3

were slated to receive as little as $6 million in satisfaction of more than $2.25 billion in debt, the First Plan proposed to provide full estate releases to the Debtors' Sponsors – KKR, Itochu, and Crestview. These First Plan releases were necessary and appropriate, the Debtors explained, in order to convince the Sponsors to forego a worthless stock deduction which could have theoretically impacted the value of the Debtors' NOLs.

All was not lost for the unsecureds, however, as the Debtors further advocated at the first day hearings (and would repeatedly advocate to the Court thereafter).  The First Plan specifically provided that "unless otherwise released pursuant to the Restructuring Support Agreement or the Plan**, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition.**"  As Debtors' counsel said in the very first discussion with the Court on the provisions, the First Plan on file "**reserved**" causes of action against "**the parties that sold the company**."  This explicit reservation was embodied in a definition of "Released Party" that remained substantially unchanged through the confirmation of the Settlement Plan seventeen months later.  Simply put, the very same release language on which Movants now rely – with references to "affiliates," "equity holders, and "holders of Preferred Interests" – was specifically described to the Court at the very first hearing as structured to "reserve" claims against the "sellers" in the LBO.   More specifically, the phrase "holders of Preferred Interests," which Movants now say unambiguously does not apply to any of them, was clearly represented to Judge Sontchi at the first days as applying to the "**Schustermans**," a group of companies and entities who were described monolithically as "**holders of the preferred shares**" and the parties who collectively "**received $180 million in preferred stock in Samson**."

Throughout the record of the Chapter 11 Cases, in various iterations described more fully below, the Debtors and their creditors repeatedly expressed to Judge Sontchi that, based on the various plans' standardized definition of "Released Party," all claims against the pre-2011

4

owners/sellers were being preserved for post-confirmation litigation.  The Debtors, for example, told the Court that their Second Plan "**preserves claims against certain parties – including the owners, directors and officers before 2011** – for the ultimate benefit of the unsecured creditors." Amplifying that point, the Debtors later made clear to the Court that their prepetition secured lenders would waive the "right to share in proceeds of litigation **against the Debtors' pre-2011 equity owners and current preferred equity owners**."  Indeed, the "proceeds of [such] litigation" against the pre-2011 owners were a key form of currency that led to the global settlement mediated by Judge Gross.  An exhibit to the Plan Supplement, which is noticeably absent from the Motion, specifically lists three of the Movants as potential preference defendants against whom the Settlement Trust <u>could</u> assert Causes of Action.  Despite that record, not once in the two years between the Petition Date and the effective date of the Settlement Plan did anyone tell Judge Sontchi, the Debtors, or the creditor body that any claims against any of the Movants were "Released Parties."

By the Motion, Movants seek to have this Court ignore everything about the actual record of the Confirmation Order, even though Judge Sontchi specifically entered it based on his having taken actual judicial notice of <u>all</u> pleadings filed, <u>all</u> evidence provided, and <u>all</u> arguments made to him during the Chapter 11 Cases.  According to Movants, what Judge Sontchi was told over the course of the Cases is all irrelevant – even if he never understood that the Debtors would be releasing the Movants of $6+ billion in litigation claims, he put his signature on an order and, therefore, his (and now this Court's) hands are tied.  Not only does this argument seek to strip this Court of the interpretive deference afforded to bankruptcy courts interpreting confirmation orders, the express words of the Confirmation Order do not actually support the relief sought by Movants.

Section II(A), *infra*, addresses the textual arguments of the "Selling Shareholders," essentially all of the trusts other than the Charles and Lynn Schusterman Family Foundation (the "**Foundation**") which tendered their shares in the LBO.  As their primary basis for seeking summary judgment, these

Defendants claim that they fit the definition of "former … equity holders" of the Debtors.  While the formulation of the release provision in the Confirmation Order and the Settlement Plan is plainly convoluted, in context, it is most properly read as applying to the equity holders of the Debtors as of the Petition Date (*i.e.*, the Sponsors), not to anyone who throughout history might have held a share of stock in a Debtor or any affiliate or former affiliate thereof.  Further, the definition of "Released Party" has, from day one, expressly carved out "holders of the Preferred Interests."  Under the terms of the LBO Stock Purchase Agreement (the "**SPA**"), Movants readily concede that each of them was, in fact, entitled to receive their share of 180,000 shares of Preferred Interests.[3]  "GOTCHA!," say the Movants.  Because they claim to have made a pre-closing reallocation of LBO consideration to the Foundation, only the Foundation actually received any of the Preferred Interests (obviously begging the question, "If there was only ever one 'holder,' why then does the Order refer to 'holders' in the plural?").  In making this argument, Movants choose to ignore the statements the Debtors made to Judge Sontchi that plainly demonstrate that "holders of Preferred Interests" was being used as a short-hand description of the Shustermans.  In any event, even if this Court were to take Movants up on their textual sophistry, each of the Movants was, in fact, a "holder of Preferred Interests" within the plain meaning of the Confirmation Order and the Settlement Plan.

Section II(B), *infra*, addresses the textual arguments of the "Gulf and Offshore Entities" – the three vehicles created by the Schustermans to receive certain LBO transfers.  As their sole basis for seeking dismissal, these entities claim that each is technically a "former … affiliate" of the Debtors, even though they were created to take transfers <u>from</u> the Debtors.  The actual definition of "Released Party" contained in the Confirmation Order (which again expressly controls over the definition contained in the Settlement Plan) does not support Movants' contention.  There is simply not a single

---

[3] The Court may recall from the hearing on Movants' motion to dismiss that, as alleged in the Complaint, as a result of negotiations between the signing of the SPA and the Closing, the Selling Shareholders agreed to take some Preferred Interests in exchange for less cash consideration.  (*See* Complaint ¶ 38.)

interpretive aid by which this Court can conclude that its Confirmation Order expressly or even impliedly treated any of the Gulf and Offshore Entities as "affiliates" under common control with the Debtors.

Finally, as set forth in Section III, *infra*, were this Court to determine (which it should not) that any of the Movants could potentially meet the technical definition of "Released Party," there remain a number of key factual issues relating to ownership, control, and share possession that must be subjected to the discovery process which has not yet begun in this proceeding.    Further, an issue would also remain as to what further proceedings might be necessary to address the appropriate remedy for what by all accounts may be a mistake in the Confirmation Order and the Settlement Plan.

In sum, for the reasons as set forth in more detail below, the Court should deny the Motion in its entirety.

## COUNTERSTATEMENT OF MATERIAL FACTS

The Settlement Trustee denies the "Summary of Undisputed Facts" contained in the Motion and respectfully presents the following as its counterstatement of material facts:

### A.    The LBO

1.    In 2011, a consortium of investors led by the KKR Group (collectively, the "**Sponsors**") acquired 100% of the outstanding common stock of Samson Investment Company from SFTDM, ST 2008, and the Charles and Lynn Schusterman Family Foundation (collectively, the "**Selling Shareholders**") for approximately $7.2 billion, excluding fees and expenses (the "**LBO**"). (Ex. 1, Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions ¶ 37, dated Sept. 17, 2015 [D.I. 2]) (the "**First Day Declaration**").  The LBO was financed in part by the incurrence of over $3.25 billion in new debt.  (*Id.* ¶¶ 51, 59.)  As alleged in the Complaint, the effect of the Sponsors' decision to lever-up the Debtors was immediate and disastrous, as Samson's ability to pay debts as they came due deteriorated to the point where the Debtors were forced to commence

these Chapter 11 Cases.  The Debtors' financial condition was so dire that general unsecured creditors ultimately would receive a 7.0-%-7.5% recovery on more than $2.4 billion in prepetition unsecured claims.  (Ex. 2, Disclosure Statement for the Global Settlement Plan at 21 [D.I. 1858].)  This litigation represents the only material opportunity for the Debtors' general unsecured creditors to claw back any of the ninety-plus cents of remaining losses occasioned by the wrongful transfers to the Defendants in connection with the LBO.

**B.     The Prepetition RSA, the First Plan, and the First Day Hearing**

2.     On September 16, 2015 (the "**Petition Date**"), the Debtors commenced the chapter 11 cases (the "**Chapter 11 Cases**").   Simultaneously therewith, the Debtors filed (i) a prepetition restructuring support agreement (the "**First RSA**") entered into between the Debtors, the Sponsors, and certain holders of the Debtors' second lien term loan (the "**Second Lien Lenders**"), (ii) the First Plan, which was a prearranged chapter 11 plan that was supported by the aforementioned parties, and (iii) a disclosure statement for the First Plan.  (Exs. 3, 4, and 5.)

3.     With the exception of certain additional language immaterial to the disposition of this Motion, the definition of "Released Party" contained in the First Plan remained identical to the definition of "Released Party" contained in the confirmed Settlement Plan.  (Ex. 4, Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates, Art. I.A.111 [D.I. 15].)   While the First Plan provided for full releases of the Sponsors, the Debtors repeatedly represented to this Court and their creditor body that the "Schustermans" as "sellers" in the LBO were not being released in the Plan.

4.     For example, in the First Day Declaration, the Debtors' Chief Financial Officer testified that (i) under the First Plan, the Sponsors and Second Lien Lenders were being granted

releases and (ii) such parties had provided valuable consideration in exchange for such releases.[4]  (Ex. 1, First Day Declaration ¶ 81.)  Specifically, Mr. Cook testified that the First Plan includes releases that are "consistent with the releases contained in the Restructuring Support Agreement.  The releases in the RSA provide, in consideration for the Sponsors' agreement to support the plan and restructuring (including by cooperating to preserve the debtor's valuable tax attributes) a mutual release between the second lien lenders that signed the agreement and the Sponsors (in each case including certain related parties as well) and a release of the Sponsors by Samson (again including certain related parties)."  (Id.)  Mr. Cook continued that the "releases granted pursuant to the Restructuring Support Agreement are consistent with the findings of an in-depth review and analysis of potential claims that Samson might possess against third parties, including the existing sponsors and any claims arising out of the 2011 leveraged buyout and the 2012 second lien loan as against the Sponsors. . . .  The investigation also includes **all potential claims and causes of action associated with the 2011 leveraged buyout against other parties that are reserved under the plan**."  (Id. ¶ 83 (emphasis added).)  Debtors' counsel confirmed at the first day hearing that the Independent Director's investigation related to "**the 2011 LBO and the causes of action that are reserved under the plan, as it relates to the parties that sold the company**."  (Ex. 6, 09/18/15 Hr'g Tr. 69:18-20 (J. Sussberg) (emphasis added).)

5.      Consistent with the delineation of estate claims against the parties to the RSA (being released) and estate claims against "the parties that sold the Company" in the LBO (being reserved), the First Plan unequivocally provided that "unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the **Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition**."  (Ex. 4, First Plan Art. IV.L (emphasis added).)  And, consistent

---

[4] The First Day Declaration was offered, and entered, into evidence at the first day hearing.  (Ex. 6, 9/18/15 Hr'g Tr. 35:23-25; 36:1-2 (Sontchi, J.).)

with this fundamental and critical premise, the First Plan carves out from the definition of "Released Party" "the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests." (*Id*. Art. 1.A.111.)  "Preferred Interests" was defined in that First Plan (and all others) as "the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011." (*Id*. Art. 1.A.105.)

6.      The First Day Declaration shed additional light on the wording of this carve-out.  In his testimony, Mr. Cook referenced various potential prepetition workouts, including one that would have necessitated "securing an agreement with members of the Schusterman family, the original founders of Samson (together with certain related parties, the "Schustermans") in their capacities as holders of preferred shares in Samson." (Ex. 1, First Day Declaration ¶ 13.)   The First Day Declaration then goes on to state, in reference to the LBO:  "The only assets not included in the 2011 acquisition were the onshore Gulf Coast and deep-water Gulf of Mexico assets, which assets remain under the ownership of the Schustermans.  The Schustermans also received approximately $180 million in preferred stock in Samson in connection with the acquisition." (*Id*. ¶ 37.)  This passage alone should put to rest any issue as to what "holders of Preferred Interests" means.  It was always ever just a shorthand for "the Schustermans," which itself was an expansive term intended to apply to the various persons and entities who sold the company in the LBO.

7.      The contemporaneous Disclosure Statement for the Debtors' First Plan echoed the delineations between what was being released and what was being "reserved":  "unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition." (Ex. 5, Disclosure Statement for First Plan at 16 [D.I. 16].)  The Disclosure Statement goes on to explain the rationale behind the releases that were being given:  "The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring

10

efforts and were an essential element of the negotiations between the Debtors, the Backstop Parties, and the Sponsors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement." (*Id*.)  Movants were not parties to the First RSA and are not included in the list of negotiating parties.  The Disclosure Statement continues:  "All of the Released Parties . . . have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan . . . .  Accordingly, each of the Released Parties . . . warrants the benefits of the release . . . provisions. . . .  The releases represent an integral element of the Plan."  (*Id*. at 17.) Again, there were no references in that pleading to any "negotiations" with Movants or any "consideration" that any Movant was providing to the estates in order to become a "Released Party."

###    C.    The Second Plan

8.    The Debtors filed an amended plan on May 17, 2016 (Ex. 7 [D.I. 960]) (the "**Second Plan**").  That Plan introduced the concept of a settlement trust to hold retained causes of action and provided that "unless otherwise released pursuant to the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition."  (*Id.* Art. IV.N.)  The definition of "Released Party" similarly excluded "the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests."  (*Id*. Art. I.A.113.)

9.    The Disclosure Statement for the Second Plan (Ex. 8 [D.I. 961]) followed the earlier pleading's description of the estate releases, but added a new parenthetical:  "unless otherwise released pursuant to the Plan (***including, against any Released Party***), the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition").  (*Id*. at 22 (emphasis added).)  That parenthetical made clear that, absent an express release in the Plan, the Debtors were not releasing any Avoidance Actions arising out of or related to the LBO – even against a Released Party.   Again, no mention was made of any of the Movants in this pleading.

###    D.    The Exclusivity Dispute

11

10.    In connection with the Committee's motion to terminate exclusivity, the Debtors once again evidenced their intention to keep the estate releases tailored to the parties to the RSA.   For example, in their opposition, the Debtors stated that "the plan's releases cost the estates nothing in exchange for the numerous valuable contributions the sponsors have made and continue to make to the Debtors and their restructuring.   These releases clearly satisfy applicable legal standards – a point the Debtors will prove at confirmation."   (Ex. 9, Debtors' Objection to Creditors'  Committee's Motion to Terminate Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan ¶ 33 [D.I. 1026].)  Even though a release of Movants would have a significant "cost," there is no mention in this pleading of the Movants or of any contributions they might make to the Debtors' restructuring that would offset that cost.

### E.    The Committee's Motion for Standing

11.    On August 12, 2016, the Official Committee of Unsecured Creditors (the "**Committee**") filed the *Motion of The Official Committee of Unsecured Creditors for Entry of Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims and Causes of Action on Behalf of Debtors' Estates* (Ex. 10 [D.I. 1248]) (the "**Standing Motion**"), which sought entry of an order granting the Committee derivative standing to pursue certain causes of action arising from the LBO against the Debtors' secured creditors related to the LBO.   The Debtors responded by filing, under seal, a detailed objection to the Standing Motion (Ex. 11, Debtors' Objection to Creditors' Committee's Motion for Standing [D.I. 1360]) (the "**Debtors' Objection to the Standing Motion**").[5]  ██████████████████████████

██████████████████████████████████████████

---

[5] Pursuant to paragraph 32 of the Confirmation Order, as part of the global settlement, the "Standing Motion shall be deemed withdrawn" and "any objection or response to the Standing Motion . . . shall be deemed withdrawn."  (Ex. 31 Confirmation Order ¶ 32.)  Thus, while the substance of the Debtors' Objection to the Standing Motion has no continuing legal effect, the Debtors' Objection nonetheless represents what the Court was told with respect to the Debtors' intended preservation of claims.

12

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

### F.    The Plan Support Agreement and the Third Plan

12.    On August 26, 2016, the Debtors entered into a plan support agreement with certain additional lenders under their second lien term loans to provide for an amended plan that would (i) provide a full recovery to the Debtors' first lien lenders, (ii) distribute substantially all equity in the reorganized Debtors to the second lien lenders, and (iii) "place substantially all unencumbered assets in trust for the ultimate benefit of unsecured creditors to the extent of available proceeds." (Ex. 12, Notice of Filing Plan Support Agreement ¶ 2, dated Aug. 26, 2016 [D.I. 1290].)  The restructuring support agreement was attached thereto, and the term sheet annexed to the restructuring support agreement provided:  "The Plan will include customary releases and exculpations for the First Lien Agent, the other First Lien Secured Parties, the Second Lien Agent, the Second Lien Lenders, the sponsors listed in Exhibit D to the August 14, 2015 Restructuring Support Agreement, each of the foregoing parties' respective current and former officers, directors, advisors and other representatives, and the Debtors' current and former officers, directors, advisors and other representatives, **and in all cases consistent with the release and exculpation provisions set forth in the plan filed by the Debtors on September 17, 2015**."  (*Id.* Ex. A at 6 (emphasis added).)  In other words, the Debtors

13

bound themselves in this Plan Support Agreement to maintaining the release language from the First Plan, explaining why that never changed through various Debtor plans.

13.     The Debtors subsequently filed their second amended plan on September 2, 2016 (Ex. 13 [D.I. 1316]) (the "**Third Plan**"), which, consistent with the RSA, contained release provisions identical to those in the Second Plan.  (*Id.* Art. I.A.112 ("the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests").)

14.     As with the disclosure statements for the First Plan and the Second Plan, the Disclosure Statement for the Third Plan provided that the releases "shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests" and that all of the Released Parties provided valuable consideration for the releases under the Third Plan. (Ex. 14 at 14, 24 [D.I. 1317].)   It further explained that "unless otherwise released pursuant to the Plan (including, against any Released Party), the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition, other than against any Released Party." (*Id.* at 23-24.) Justifications for the releases were further laid out, again with no mention of the Movants. (*Id.* at 24-25.)

### G.     Termination of Exclusive Periods and the Committee Plan

15.     On September 27, 2016, the Court denied the Debtors' second motion to extend the exclusive periods, enabling the Committee to file its own chapter 11 plan. (Ex. 15 [D.I. 1411].) On October 18, 2016, the Committee filed a Joint Chapter 11 for Samson Resources Corporation and Its Debtor Affiliates (the "**Committee Plan**"). (Ex. 16 [D.I. 1552].)   Notably, the Disclosure Statement accompanying the Committee Plan (the "**Committee Disclosure Statement**") discussed that the Committee Plan is "preserving Causes of Action against the Selling Shareholders" and explained various differences between the Committee Plan and that of the Debtors:

Another fundamental difference between the Debtors' Plan and the Committee's Plan

14

is that the Committee's Plan preserves all Causes of Action of the Debtors' estates (other than against parties being released under the Committee's Plan), while the Debtors' Plan releases all Causes of Action against the First Lien Secured Parties, the Second Lien Secured Parties, and the Sponsors for no tangible value to the Debtors' estates.[6]

- The Committee believes that the Debtors' estates have valuable Causes of Action against the Selling Shareholders (i.e., the Schusterman family and certain related investment vehicles) arising out of the approximately $7 billion they received from the Debtors in connection with the failed 2011 leveraged buyout (the "**2011 Acquisition**"), which will constitute a major driver of value for holders of Allowed Claims after the Effective Date. . . .

(Ex. 17 at 7 [D.I. 1644].)  Furthermore, the Committee Plan provided for a proposed settlement of causes of action against the Sponsors, but made clear that such "compromise and settlement shall not apply to, and shall not release any member of the Schusterman family or any Selling Shareholder, or any other Entity in which any of them hold, or ever held, a direct or indirect ownership or beneficial interest or over which they have, or ever had, a direct or indirect controlling interest, regardless of whether they are a holder of Equity Interests in the Parent." (*Id*. at 9.)  The Committee explained: "In the course of investigating the 2011 Acquisition, the Committee concluded that the payments made to the Selling Shareholders in connection with the 2011 Acquisition are avoidable pursuant to sections 544, 550, and 551 of the Bankruptcy Code and applicable state fraudulent transfer law.  The Committee's Plan provides that the Plan Administrator, or, if the Acceptance Event occurs, the Settlement Trust, has the authority to prosecute such Causes of Action." (*Id.* at 33.)

### H.    The Mediation

16.    The dueling plan scenario that ensued with the filing of the Committee Plan portended to cause significant litigation and delays in the confirmation schedule.  On December 5, 2016, Judge Sontchi therefore appointed Judge Gross to mediate certain plan related issues among the Debtors' primary stakeholders (the "**Mediation Order**").  (Ex. 18 [D.I. 1716].)  The Mediation Order required

---

[6] Notably, the Committee Disclosure Statement did not state that another difference between the Committee Plan and that of the Debtors would be a release of the Selling Shareholders.

the "Mediation Parties," which included the Debtors, the Committee, the first lien agent, and the second lien agent, to attend mandatory mediation on or prior to December 8, 2016.  The Mediation Order further required the Mediation Parties to attempt to resolve, among other things, "all issues with respect to the Debtors' chapter 11 plan . . . and the creditors' committee's chapter 11 plan . . . , including all arguments in support and in opposition thereof."  (*Id.* ¶ 5.)  The Sponsors and their counsel were later invited to attend mediation for the purposes of resolving the Committee's fraudulent conveyance claims in respect thereof.  The Mediation Order did *not* direct Movants to attend the mediation, nor did they or their representatives attend any mediation session before Judge Gross.

17.    Obviously because the Debtors' plan on file at the time of the mediation would have released the first lien parties, the second lien parties, and the Sponsors, and the Committee Plan would not have, the Court specifically directed all these parties to attend mediation.  Movants, who now contend that they were unambiguously being absolved from any and all liability related to the LBO under the Debtors' plan, were not directed to attend these mediation sessions.  In other words, under Movants' theory of intent, their purported releases were so universally understood and accepted by Judge Sontchi and the settlement parties that their presence at the mediation sessions was completely unnecessary.  That, of course, was not true.

I.        **The Fourth and Fifth Plans and the Joint Disclosure Statement**

18.      On December 12, 2016, the Debtors filed their third amended plan (Ex. 20 [D.I. 1762])

(the "**Fourth Plan**").  As with the First, Second, and Third Plans, the definition of Released Party

excluded "the Debtors' directors or officers before the 2011 Acquisition or the holders of the

Preferred Interests."  (*Id.* Art. I.114.)  The Fourth Plan, however, introduced the term "Preferred

Equityholder Claims," which were defined as "any Claims and Causes of Action the Debtors hold

against the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred

Interests (in their capacity as such, in their capacity as former common equity owners of Parent, or in

any other capacity)."  (*Id.* Art. I. 103.)  It also introduced the term "Settlement Trust Assets," which

was defined to include, among others, the Settlement Trust Causes of Action and the Preferred

Equityholder Claims.  (*Id*. Art. I.150.)  "Settlement Trust Causes of Action" was defined to include

"all Claims and Causes of Action held by or on behalf of any Debtor . . . concerning, or on account

of, the 2011 Acquisition and/or any transfer of an interest of any Debtor in property provided for

thereunder, including . . . Avoidance Actions, and/or other similar Claims concerning the 2011

Acquisition; provided that the Settlement Trust Causes of Action shall not include (and shall

expressly exclude) any Claims or Causes of Action that may be brought against any Released Party . .

. ."  (*Id*. Art. I.152.)    The Fourth Plan nonetheless provided once again that "unless otherwise

released pursuant to the Plan, the Debtors shall not release any Avoidance Actions arising out of or

related to the 2011 Acquisition."  (*Id*. Art. IV.N.)

19.      On December 12, 2016, the Debtors and the Committee filed a joint disclosure

statement for the Debtors' Fourth Plan and for the Committee Plan.  (Ex. 21[D.I. 1764]) (the "**Joint**

**General Disclosure Statement**").)  The Joint General Disclosure Statement is consistent with the

parties' understandings throughout the Chapter 11 Cases set forth in the Debtors' prior disclosure

statements.  It explains that "[i]n December 2011, as part of the 2011 Acquisition, Samson Resources

Corporation issued 180,000 shares of cumulative redeemable preferred stock to the Debtors' former

equity holders." (*Id*. at 11.)  Again, the Debtors' reference was to a plural number of entities, not just

the Foundation.   Attached to the Joint General Disclosure Statement was the Debtors' Specific

Disclosure Statement for the Debtors' Fourth Plan (the "**Debtors' Specific Disclosure Statement**").

That pleading contained the same statements as the Debtors' prior disclosure statements with respect

to the releases.  (*See id*. Addendum A at 11 (mediation resulted in Second Lien Lenders waiving

"their right to recover any portion of the proceeds of any litigation against the Debtors' pre-2011

equity owners and current preferred equity owners"); *id.* at 13-14 ("holders of Allowed Second Lien

Deficiency Claims shall be deemed to waive any and all right to distributions from the monetization

of the Preferred Equityholder Claims"); *id*. at 14  (releases "shall not include the Debtors' directors or

officers before the 2011 Acquisition or the holders of Preferred Interests").)   It also described the

releases in its earlier plans.  (*Id*. at 9 (Debtors' plan filed on May 16, 2016 provided for "releases of

claims against the Debtors, the Reorganized Debtors, the First Lien Agent, the First Lien Lenders, the

Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Debtors' non-Debtor

subsidiaries, the Committee and any member thereof, the Senior Noteholders, the Senior Notes

Indenture Trustee, and certain affiliates and related parties of each of the foregoing.")  Movants were

not included in this list.

20.    Significantly, the Debtors' Specific Disclosure Statement provides:

The release provisions have not changed from previously filed plans.  The Debtors believe
that the Sponsors, the First Lien Lenders, and the Second Lien Lenders have provided
valuable consideration for releases under the Debtors' Plan, including by, among other
things:  preserving the Debtors' valuable tax attributes, in the case of the Sponsors; agreeing
to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders;
and agreeing to receive a recovery largely comprised of equity in any reorganized business
and agreeing to fund certain administrative expenses under the Debtors' Plan, in the case of
the Second Lien Lenders.   The parties' important concessions are needed for the
confirmation of the Debtors' Plan on the proposed terms.

18

(*Id.* at 10.)  The specific statement then goes on to repeat the same statements describing the releases as the Debtors' prior disclosure statements.  (*See id.* at 14 (releases "shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests"; "all of the Released Parties . . . have provided valuable consideration for releases").)  It further explained that "unless otherwise released pursuant to the Debtors' Plan (including, against any Released Party), the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition, other than against any Released Party." (*Id.* at 23.)  Justifications for the releases were further laid out, with no mention of the Movants, as with the prior Disclosure Statements.  (*Id.* at 23-24.)

21.    On December 31, 2016, the Debtors filed their fourth amended chapter 11 plan (Ex. 22 [D.I. 1822]) (the "**Fifth Plan**"), which did not change any of the Fourth Plan's provisions relevant to the Motion.

**J.    The Settlement Plan and Its Confirmation**

22.    By the end of 2016, the parties had still not settled on which Plan would proceed – the Fifth Plan or the Committee Plan.  In finalizing the terms of a single "Global Settlement Plan" that could be supported by all creditors, counsel to the Debtors and the Committee engaged in discussions regarding economic terms, which made clear that both parties intended the Debtors' claims against the Movants to be transferred to the Settlement Trust.

23.    Ultimately, as with the First, Second, Third, Fourth, and Fifth Plan, the Settlement Plan provided that "the Released Parties shall not include the Debtors' directors and officers before the 2011 Acquisition or the holders of the Preferred Interests."  (Ex. 32, Art. I.A.124 [D.I. 2009].)  Specifically, the definition of "Released Party" in the Settlement Plan is as follows:

"*Released Party*" means each of the following, in their capacity as such: (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior

19

Notes Indenture Trustee; (j) the Backstop Parties; and (k) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.

The Settlement Plan defined Settlement Trust Causes of Action as "all Claims and Causes of Action held by or on behalf of any Debtor . . . against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) concerning, or on account of, the 2011 Acquisition and/or any transfer of an interest of any Debtor in property provided for thereunder, including . . . similar Claims concerning the 2011 Acquisition."  (*Id*. Art. I.A. 171.)  The Global Settlement Plan further provides that the Debtors "shall release any and all Avoidance Actions, except for the Settlement Trust Causes of Action." (*Id*. Art.IV.O.)

24.    On January 11, 2017, the Debtors filed the Disclosure Statement for the Settlement Plan (Ex. 2 [D.I. 1858]), which described the release provisions, including the exclusion from the definition of Released Party of "the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests," *id*. at 15, and the other statements set forth above, including

The release provisions have not changed from the previously filed plans and are fully

20

supported by the First Lien Agent, the Second Lien Steering Committee, the Committee, and the Sponsors. The Debtors believe that the Sponsors, the First Lien Lenders, and the Second Lien Lenders have provided valuable consideration for releases under the Plan, including by, among other things: preserving the Debtors' valuable tax attributes and agreeing to assign (or release) claims for management fees to the benefit of unsecured creditors, in the case of the Sponsors; agreeing to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders; and agreeing to receive a recovery largely comprised of equity in any reorganized business and agreeing to fund the Rights Offering under the Plan, in the case of the Second Lien Lenders. The Committee believes the Debtors' estates have valuable causes of action against the First Lien Lenders, Second Lien Lenders, and the Sponsors. The Debtors and other parties disagree and opposed the Committee's efforts to pursue such claims, but the Plan settles causes of action and such settlements provide significant recoveries to holders of General Unsecured Claims. The parties' important concessions are needed for the confirmation of the Plan on the proposed terms.

*Id*. at 12.

25.     That same day, the Debtors filed a Stipulation and Agreement Regarding (I) Global Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Related Matters among the Debtors, the Committee, the Sponsors, and other signatories thereto (the "**Settling Parties**") (the "**Stipulation**"). (Ex. 24 [D.I. 1857].) The Stipulation provides that the Settling Parties agreed to global settlement as set forth in, among other things, the Plan Support Agreement between the Debtors and the Second Lien Steering Committee, annexed to the Stipulation as Exhibit A, which, as discussed above, provides that the plan include releases "consistent with the release . . . provisions set forth in the plan filed by the Debtors on September 17, 2015." The Stipulation was approved by the Court on January 12, 2017. (Ex. 25 [D.I. 1875].) At that hearing, Tom Lauria, counsel for the Committee, explained to Judge Sontchi the history of the settlement process:

What we agreed to initially in the mediation that was conducted by Judge Gross, was that we would receive a cash payment of $167.5 million if the reorganization was accomplished in a reasonable time and *we would also receive for the benefit of unsecured creditors all the litigation rights against everybody but the first liens and the second liens. And that's where we got into a little bit of a sticking point. People felt that a -- that it was beneficial to try to work towards a complete resolution which would include claims against the sponsors as well* and under Judge Gross' guidance and at times, arm twisting, we got to -- to step two of the (indiscernible) deal which was to agree that the cash number would be increased to the 168.5 and that the sponsors would either assign for the benefits of the other unsecured creditors or waive all of their claims against the Debtors. And the benefit of that, we believe,

21

is another about a million, five to $2 million of -- of value from that claim waiver or assignment.

. . . .

The firsts, the seconds and the sponsors will get their releases.

(Ex. 26, 01/12/17 Hr'g Tr. 14:12-25, 15:1-4, 17:1-2 (T. Lauria) (emphasis added).)   No one contradicted Mr. Lauria's statements or represented to the Court that any other entity was "getting their release" for LBO-related conduct.

26.    In connection with confirmation of the Global Settlement Plan, the Debtors also submitted a declaration of their independent director, Alan Miller (the "**Miller Declaration**").  (Ex. 27 [D.I. 1994].)  Mr. Miller sought to provide evidence to the Court that the releases provided in the Plan were in exchange for "valuable consideration" provided by "certain sponsors, the first lien lenders, and the second lien lenders."  (*Id*. ¶ 14.)  There is absolutely no mention of any of the Movants in the Miller Declaration.  Significantly, no party introduced any evidence at the confirmation hearing to support an estate release of any of the Movants.

27.    Finally, the Debtors' memorandum of law in support of confirmation (the "**Debtors' Confirmation Brief**") (Ex. 28, [D.I. 2004]) makes no mention of the Movants in their discussion of the appropriateness of the release provisions in the Global Settlement Plan.  Rather they state that "each of the Released Parties has made substantial contributions to the Debtors and their Estates, and aided in the reorganization process.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a global settlement."  (*Id*. ¶ 66.)

28.    Based on all of the foregoing disclosures, the Debtors' stakeholders overwhelmingly voted to accept the Plan.  Creditors holding approximately $3.79 billion of claims, representing approximately 99% by amount and over 96% by number voted to accept.  (*Id*. ¶¶ 8-9),  As the

22

Debtors noted:  "given the critical nature of the Debtor Releases, this degree of consensus evidences the Debtors' stakeholders' support for the Debtor Releases and the Plan."  (*Id*. ¶ 66.)  The voting creditors had no reason to believe, however, that any of the Movants was a Released Party.   At no time during the Chapter 11 Cases did any party represent to the Court that any of the Movants were to receive an estate release.  Indeed, the docket of the Chapter 11 Cases established that not one of the Movants appeared generally in the Chapter 11 Cases, and none appeared specifically at the hearing to consider confirmation of the Settlement Plan.

29.    The Court held its hearing on confirmation on February 13, 2017.  As set out in the order confirming the Settlement Plan (the "**Confirmation Order**"), the Court accepted into evidence, among other things, the Miller Declaration and the Debtors' Confirmation Brief (Ex. 31, Confirmation Order at 4 [D.I. 2019].)  The Confirmation Order was then entered on February 23, 2017 (Ex. 31 [D.I. 2019].)

**K.    The Plan Supplement/Settlement Trust Retained Causes of Action**

30.    As part of the Settlement Plan, the Debtors filed the Plan Supplement and multiple amendments thereof leading up to and after confirmation of the Settlement Plan.  Exhibit C-1 and C-2 of the Plan Supplement lists the entities that may be pursued by the Settlement Trust with respect to the "Settlement Trust Retained Causes of Action."  (Ex. 29 [D.I. 2061].)  The Settlement Trust Retained Causes of Action are a subset of the Settlement Trust Causes of Action and include Avoidance Actions, such as preference actions, and other Causes of Action not related to the LBO or the Spin-Off.  Exhibit C-1 lists potential Avoidance Actions, including preference actions, and Exhibit C-2 lists other potential Causes of Action.  No "Released Party" could ever appear on those lists – the Settlement Plan specifically defines the Settlement Trust Retained Causes of Action as: "all Claims and Causes of Action (including Avoidance Actions) held by or on behalf of any Debtor against any Entity (**except for any Claims or Causes of Action, alleged or otherwise, against the**

23

**Released Parties**), excluding any Entity intended to do business with the Reorganized Debtors that the Debtors or the Reorganized Debtors (as applicable) identify as being costly or burdensome to replace in writing to the Committee on or before the Initial Effective Date."[7]  (Ex. 32 Art.I.A.174 (emphasis added).)  Exhibit C-2 of the Plan Supplement filed on March 1, 2017 explicitly included three of the Movants – Samson Energy Company, LLC, Samson Exploration, LLC, and the Stacy Family Trust.[8]  (Ex. 29 at 158, 162, 262.)  The Settlement Plan incorporates by reference "the documents comprising the Plan Supplement."  (Ex. 32 at 5.)  In other words, the Settlement Plan, which Movants claim unambiguously identifies them as Released Parties, in fact, explicitly treats three of them as non-Released Parties.[9]

### L.    The Commencement of the Adversary Proceeding

31.    The Settlement Plan went effective on March 1, 2017.  On September 15, 2017, the Settlement Trustee filed the Complaint in this Court.  [Adv. Pro. D.I. 1.]  On November 7, 2017, the Complaint was unsealed.  [Adv. Pro. D.I. 8.]

32.    The Complaint asserts various causes of action against the following Defendants:

- The Selling Shareholders, who collectively held 100% of the outstanding common stock of Samson Investment Company immediately prior to the LBO;
- The Stacy Family Trust, SFT (Delaware), the Stacy Family Delaware Trust, and the Schusterman 2008 Delaware Trust, who hold interests in the Selling Shareholders. Additionally, some of these entities redeemed their shares of Samson Investment

---

[7] This provision contains a subsequent clarification for ordinary course postpetition operations.

[8] The Reorganized Debtors were given thirty days after the Final Effective Date to correct the Plan Supplement, including removing entities from the Settlement Trust Retained Causes of Action.  As part of this process, Samson Exploration was removed from Exhibit C-2 of the Plan Supplement.  (Ex. 19.)  The Reorganized Debtors provided six grounds for removing entities from Exhibit C-1 and C-2 of the Plan Supplement:  (i) current interest owners in the Reorganized Debtors' wells; (ii) vendors that received payments in the ordinary course; (iii) vendors that have agreements with the Reorganized Debtors; (iv) counterparties that remitted revenue funds to the Debtors; (v) Released Parties; or (vi) affiliates. (Id.)  Samson Exploration was removed from Exhibit C-2 because it was a vendor that has agreements with the Reorganized Debtors.  (Id.)  Entities also were removed if they were Released Parties or affiliates.  (Id.)  The removal of Samson Exploration from the Settlement Trust Retained Causes of Action had the effect of prohibiting the Settlement Trust from pursuing Samson Exploration with respect to the Settlement Trust Retained Causes of Action, but not with respect to the LBO and the Spin-Off.

[9] Two of the Movants – Samson Energy Company, LLC and the Stacy Family Trust – remained listed on the final version of Exhibit C-2 of the Plan Supplement.  (Ex. 30, Ex. C-2 of Plan Supplement [D.I. 2291].  The very first sentence of the Settlement Plan states that the documents comprising the Plan Supplement (as defined in the Settlement Plan) are expressly incorporated into the Plan.  (Ex. 32, Settlement Plan at 5.)

Company prior to the LBO;

- Samson Energy Company, LLC, a wholly-owned subsidiary of SFTDM, who obtained the Debtors' valuable Gulf Coast and Offshore Assets by acquiring the equity of Defendants Samson Exploration, LLC and Samson Offshore, LLC;
- Stacy Schusterman, a control person of the Debtors prior to the LBO; and
- Various individuals who may have received subsequent transfers in connection with the LBO.

Count I of the Complaint alleges that the transfers made to the Selling Shareholders, their equity holders, and Stacy Schusterman, in connection with the LBO, constituted constructive fraudulent transfers. Count II alleges that the transfers made to the Selling Shareholders, their equity holders, and Stacy Schusterman, in connection with the LBO, were actual fraudulent transfers. Count III alleges that the Spin-Off (as defined herein) of the Gulf Coast and Offshore assets was a constructively fraudulent transfer. Count IV alleges that the Spin-Off was an actual fraudulent transfer. Count V seeks to recover from all defendants any subsequent transfers such defendants may have received in connection with the LBO and/or the Spin-Off. In total, the Complaint seeks in excess of $6.3 billion in cash damages from the Selling Shareholders as well as the value of the assets transferred in connection with the Spin-Off. (Complaint ¶¶ 110, 122, 138, 153, 168.)

33. On January 12, 2018, various defendants filed Motions to Dismiss. [Adv. Pro. D.I. 20]. On March 12, 2018, Movants and certain other defendants voluntarily withdrew their motions to dismiss the constructive fraudulent transfer claims. [Adv. Pro. D.I. 31]. On May 23, 2018, Movants filed the Motion. [Adv. Pro. D.I. 45]. On June 15, 2018, the Court entered an order granting the Motion to Dismiss Counts II, IV, and the correlative portions of Count V of the Complaint. The Settlement Trustee was granted leave to replead Counts II and IV of the Complaint. [Adv. Pro. D.I. 61]. In light of this order, the Settlement Trustee will not address arguments relating to Count V. Further, in reliance on statements by Defendants' counsel on the hearing on the motion to dismiss regarding future potential pleading amendments based on newly discovered facts (*see* Ex. 23, 5/31/18 Hr'g Tr. 26:3-10 (S. Willett)), the Settlement Trustee presently anticipates that he will not be seeking

to replead the intentional fraudulent conveyance claims, but will be reserving all rights with respect to the June 15 order.  To date, none of the Movants has answered the Complaint.  Further, no party has taken discovery from the other with respect to the subject matter of the Motion.  Rather, the parties anticipate having a preliminary conference with this Court to discuss an appropriate discovery schedule for the remaining Counts.  At the hearing to consider the motion to dismiss the Complaint, Movants did not request that discovery be taken with respect to the Motion. (Ex. 23, 5/31/18 Hr'g Tr. 113:11-25.)

## ARGUMENT

### SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.  R. Civ. P. 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, summary judgment may be entered only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment under Fed. R. Civ. P. 56 bears the initial burden of demonstrating the absence of a disputed issue of fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The party opposing the motion is entitled to all reasonable inferences from the evidence that could be drawn in its favor by the fact finder.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that all reasonable inferences must be drawn in favor of the non-moving party). A disputed fact becomes one that is genuine, such that it prohibits summary judgment, when reasonable minds could disagree on the result.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, summary judgment is precluded unless the evidence and the reasonable inference from that evidence could not support a verdict by the finder of fact in favor of the non-moving party. *See Hersh v. Allen Prods. Co.,* 789 F.2d 230, 234 n.2 (3d Cir. 1986).  In making its

determination, the Court cannot weigh the credibility of the evidence and witnesses. *See Anderson*, 477 U.S. at 255.  If credibility of evidence and witnesses must be determined, summary judgment is not appropriate, but must be decided at trial. *See Horowitz v. Fed. Kemper Life Assur. Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

The Motion in its entirety pertains to the Movants' contentions that (1) there is no genuine dispute of material fact that each of the Movants meets the definition of a "Released Party" under the Plan, (2) each of the Movants therefore may assert an affirmative defense of release, and (3) before this Court permits discovery or conducts any inquiry into their conduct this Court must credit that affirmative defense and dismiss all of the Counts asserted against them in the Complaint.

None of the Movants has yet answered the Complaint.  In this pre-answer procedural posture, summary judgment should "be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." *Anderson*, 477 U.S. at 250 n.5.  A court "'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" *Shelton v. Bledsoe*, 775 F.3d 554, 565 (3d Cir. 2015) (quoting *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007)).  "[G]enerally courts are careful not to prematurely consider motions for summary judgment, especially when little or no discovery has been conducted." *Shaw Group Inc. v. SWE&C Liquidating Trust (In re Stone & Webster, Inc.)*, No. 00-2142 PJW, 2009 Bankr. LEXIS 257, at *16 (Bankr. D. Del. Feb. 18, 2009); *Zazzali v. Wavetronix LLC (In re DBSI, Inc.)*, No. 08-12687 PJW, 2011 Bankr. LEXIS 2069, at *7 (Bankr. D. Del. May 27, 2011) (same).  The practice of denying summary judgment motions is "particularly true when there are discovery requests outstanding or where relevant facts are under control of the party moving for summary judgment." *Shelton*, 775 F.3d at 568.  "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000).  As set forth in Section III, *infra*, to the extent that

27

this Court were to credit Movants' textual construction, there will be material facts relevant to the Motion that are in the possession of Movants. Further, given that Movants have not formally denied any allegations in the Complaint, those allegations should in fairness be accepted as true when deciding the Motion. In other words, in assessing Movants' arguments that the Confirmation Order and the Settlement Plan unambiguously release them, the Court should view the Motion from the perspective of the Movants' having actually received a multibillion dollar fraudulent transfer in connection with the LBO.

## I.    THE CONFIRMATION ORDER CONTROLS AND MAKES CLEAR THAT MOVANTS WERE NOT INCLUDED IN THE ESTATE'S RELEASES OF AVOIDANCE ACTIONS

As noted above, the estate release provisions applicable to the Motion appear in two operative documents in the record: (1) the Confirmation Order entered by Judge Sontchi on February 13, 2017 (Ex. 31) and (2) the Settlement Plan (Ex. 32). Paragraph 137 of the Confirmation Order provides: "In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control." (Ex. 31 at 67.) Given this provision, all parties in interest in the Chapter 11 Cases, as well as Movants (if they were even following along), understood that the Debtors were submitting to Judge Sontchi's jurisdiction to have him resolve all issues relating to the meaning and scope of the release language included in the Confirmation Order. That, of course, should be the result – whatever release language that debtors and creditors might agree to in a plan of reorganization, their agreements mean nothing without the imprimatur of the bankruptcy judge that signs the confirmation order. So, for example, in the purely hypothetical situation in which one draftsperson for the Debtors here actually intended for the Plan to release the Movants for free and intentionally wrote the Plan release provision to effectuate that result, and then hid the ball for two years, that "intent" would have no legal effect unless it was then approved in the Confirmation Order. That is why, in paragraph 119 of the Confirmation Order, the Court makes clear that, if the release of

a Settlement Trust Cause of Action against an Entity is not approved, the claim "shall vest" with the Settlement Trust (Ex. 31 ¶ 119.)

There is no dispute that a bankruptcy judge has discretion to interpret his or her own order and its intent. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). As the United States Court of Appeals for the Third Circuit articulated, a bankruptcy court is "well suited to provide the best interpretation of its own order" due to its familiarity with the underlying commercial context of the case. *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 423 (3d Cir. 2013); *Travelers*, 557 U.S. at 151 ("Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders").

When interpreting a confirmation order, the Court's interpretation should track not only the plain language of the order, but also the actual sequence of events pertaining to the order. *See United States v. Sepulveda*, 15 F.3d 1161, 1177 (1st Cir. 1993). The Court also must take into consideration its own findings, *i.e.*, in this case, whether or not it found a legal basis to grant a release to the Movants. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 286 (3d Cir. 1991). In that regard, the Third Circuit has instructed that "if the judgment fails to express the rulings in the case with clarity or accuracy, reference may be had to the findings and the entire record for the purpose of determining what was decided." *Id.* (emphasis added). In *Ford Motor*, the Third Circuit cited the Ninth Circuit's decision, *United States v. Motor Vehicles Manufacturers' Ass'n*, 643 F.2d 644, 650-52 (9th Cir. 1981) with approval, where the court emphasized that "[w]hile the district court is bound to construe the judgment by the meaning to be found within its 'four corners,' the court may also consider the surrounding circumstances at formation as aids in construing the judgment." Finally, any confirmation order should be interpreted in a manner consistent with the policies underlying the Bankruptcy Code. *See Forklift LP Corp. v. iS3C, Inc. (In re Forklift LP Corp.)*, 363 B.R. 388, 394 (Bankr. D. Del. 2007).

29

With these rules of interpretation in hand, the fundamental question before this Court is: What does the Confirmation Order, as supplemented by the entire record of the Chapter 11 Cases, say about the Court's intent to release Movants? Paragraph 98(a) of the Confirmation Order recites what the Court approved as the proper scope of the Debtors' estate releases of "Released Parties." (Ex. 31.) That paragraph contains language that tracks the Settlement Plan language relied upon by the Movants in the Motion. The Confirmation Order does not explicitly contain the definition of "Released Parties," but, by virtue of paragraph 68, it "incorporates by reference" "the terms of the Plan." (*Id*. ¶ 68.)

Those release provisions were the subject of a series of findings of fact contained in paragraph 34 of the Confirmation Order. That paragraph states as follows:

> Releases by the Debtors.   The release, set forth in Article VIII.E of the Plan (the "Debtor Release"), is an essential provision of the Plan. The scope of the Debtor Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases. The Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) is a good faith settlement and compromise of the claims released by such releases; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such release.

(*Id*. ¶ 17.) The Confirmation Order explicitly describes the basis for the findings of fact. Paragraph (w) through (cc) on 4 of the Order lists the relevant materials considered by the Court, including (x) its review of "all pleadings, exhibits, statements, responses and comments regarding Confirmation" and (cc) its taking "judicial notice of all papers and pleadings filed in these Chapter 11 Cases and all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases." (*Id*. at 4.)   These explicit references to the record of the Chapter 11 Cases belie the notion advanced by the Movants that this Court is somehow barred from

examining what might otherwise be considered "extrinsic evidence" to discern Judge Sontchi's intent – the cited evidence is not extrinsic to the order, it is made an express part of it.[10]

Consistent with the authorities discussed *supra*, paragraph 34 provides this Court with dispositive evidence of what the Debtors, who proposed the finding, the creditors, who signed off on the finding, and Judge Sontchi, who approved the finding, intended with respect to the scope of the Debtor releases. It lists at least six salient characteristics of the estate releases that Judge Sontchi approved. All six apply to and support the Settlement Trust's interpretation of the Confirmation Order and the Settlement Plan – that not one of the Movants is a "Released Party." Not one of the factors laid out in paragraph 34 applies to Movants' post-confirmation contention that they unambiguously fit within the "Released Party" definition.

### A.    A Release of Movants Is Not "an Essential Provision of the Plan"

The Confirmation Order does not specify what is and what is not an "essential provision" in the Settlement Plan. There can be no material dispute of fact, however, regarding the absence of any "need" to release Movants as part of any plan. None of the Movants appeared in the Chapter 11 Cases. (*See supra* ¶ 28.) None filed proofs of claim. (*See id.*) None were solicited or entitled to vote on the Settlement Plan. (*See id.*) Neither the Debtor nor any of their creditors expressly advocated that the Movants should, much less must, be released. (*Id.* ¶¶ 19, 20, 26, 27.) Movants played no role in the drafting of the Plan or the Settlement Order. (*Id.* ¶ 28.) Further, Movants have offered no explanation as to why the Debtors, their creditors, any party-in-interest, or this Court would have had any objection to a full reservation of all claims against them, much less the type of objection that would undermine the Settlement Plan.

---

[10] Movants cite to *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) for the proposition that a court should enforce an order according to its unambiguous terms. But courts have expanded this view: "The factual background derived from the public record . . . that led to the confirmation of the . . . Plan . . . is not forbidden extrinsic evidence, but rather a survey of objective surrounding circumstances derived from the Court's docket that inform the proper interpretation of the resulting contractual text. *In re House Nursery, Ltd.*, No. 13-60690, 2016 Bankr. LEXIS 409, at *17 (Bankr. E.D. Tex. Feb. 9, 2016).

## B.    Movants' Expansive Interpretation Is Not "Appropriately Tailored"

Movants do argue that, consistent with the Court's finding in paragraph 34, the release provisions in the Settlement Plan are "appropriately tailored." (Mov. Mem. of Law at 4.)  They then go on, however, to describe releases that are so broad as to reach through time and space to include entities as diverse as a pre-LBO shareholder of an affiliate of an affiliate of a Debtor.  Obviously, one could theoretically craft a more expansive release than contained in the Settlement Plan – releasing, for example, any person or entity who ever conducted more than $1 of business with Samson Resources during its entire existence.  But, the Court here was practically required to scrutinize the release provisions consistent with existing Third Circuit precedent which prohibits open-ended, non-specific releases in plans of reorganization.  *In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011) (court may only approve debtor releases of nondebtors if certain factors are met); *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (same); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (same).  This Court should not interpret the Confirmation Order in a manner that would have required Judge Sontchi to commit a reversible error of law.  *Id.*

## C.    Movants Gave No "Good and Valuable Consideration"

One of the factors that any bankruptcy court must consider in approving any estate release of a claim or cause of action is the amount of the settlement consideration relative to the size and strength of the claim.  *See Zenith*, 241 B.R. at 111 (approving plan releases where "all the Releasees have made substantial contributions to the reorganization").  A debtor simply cannot abandon a litigation asset.  Here, the Settlement Trust has asserted claims against the Movants seeking in excess of $6 billion in damages for constructive fraudulent transfers.  (*See supra* ¶ 32).  Those claims have now survived a motion to dismiss.  (*Id.* ¶ 33).  In exchange for their purported release of all claims, however, Movants have provided the Debtors' estates with zero consideration – good, valuable or otherwise.  More to the point, there was no evidence submitted to Judge Sontchi during the course of

the Chapter 11 Cases describing any consideration tendered by any of the Movants to the Debtors.

### D.    Movants Did Not Participate in a "Good Faith Settlement"

As this Court knows, the Settlement Plan was the direct result of the herculean efforts of Judge Gross, the appointed plan mediator.  One of the issues specifically addressed in the mediation was any conflict between the two plans on file.  (*See supra* ¶¶ 16-17.)  The Mediation Order specifically directed who should appear before Judge Gross to discuss that issue – the Debtors, the Committee, the First Lien Agent, the Second Lien Agent, and later the Sponsors.  (*Id.* ¶ 16.)  There was never any direction or even request that any of the Movants participate, and they in fact did not participate.  (*Id.*)  The obvious reason they were not invited is that both the Debtors' Plan and the Committee Plan were not in conflict – equally preserving all claims against Movants.  Again, Movants seek to have this Court interpret Judge Sontchi's Confirmation Order as unambiguously approving a free release of all claims against the transferees of a fraudulent conveyance, when that same jurist forced the lender and Sponsor participants in that conveyance to settle the avoidance claims in good faith.  Looking beyond the mediation process, there is no evidence in the record that Movants discussed or negotiated with the Debtors or any creditor regarding the release of the claims against them.  As such, there is simply no basis from which Judge Sontchi could have concluded that there was ever a "settlement" with Movants or that it was reached "in good faith."  *See In re Drexel Burnham Lambert Grp.*, 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991) (in determining whether 9019 settlement is "fair and equitable," courts consider whether it is product of arm's-length bargaining); *Ad Hoc Comm. of Equity Holders of Republic Airways Holdings Inc. (In re Republic Airways Holdings Inc.)*, No. 16-cv-3315, 2016 U.S. Dist. LEXIS 60316, at *10 (S.D.N.Y. May 6, 2016) (9019 settlement was result of "intense negotiations"); *Macy v. United States*, 557 F.2d 391, 394 (3d Cir. 1977) (under federal tort statute, to qualify as a release, there had to be compromise or settlement reached by meeting of minds).

33

### E.    A Release of Movants Was Not in the "Best Interests of the Estates"

On the issue of best interests of the estates, the Motion is entirely silent as to what interest of the Debtors could or would have been benefitted by releasing the Movants for free. Indeed, each of the First Lien Creditors, the Second Lien Creditors and the Sponsors compromised their prepetition claims for value in order to obtain their inclusion in the estate releases. (*See supra* ¶ 24.) Movants, however, seek to convince this Court that the "intent" of the Debtors, the creditors voting on the Settlement Plan and Judge Sontchi was to simultaneously release the parties who actually received the $6+ billion in fraudulent transfers without anyone ever even approaching them to discuss the issue. That contention is simply not credible.

### F.    A Release of Movants Is Not "Fair, Equitable, or Reasonable"

Finally, the Confirmation Order makes clear that, in approving the estate releases, Judge Sontchi took into consideration the very thing that Movants now so desperately seek to have this Court ignore – the equities of the estates' purported release of them.   As a practical matter, the Movants have to restrict this Court's inquiry. Any review of the facts and circumstances described *supra* establish conclusively that to release any Movants would be neither fair, equitable, or reasonable. From the perspective of Movants, their worst result here is that will not be able to assert a release that they never bargained for, never paid for, never voted for, never advocated for, and probably never thought that they were getting or would get. (It also seems odd that, were the Court to grant the Motion, the only Defendant that would remain exposed is the not-for-profit charity while the for-profit trusts are dismissed from the action.)[11]   From the perspective of the parties who actually bargained for the right to be designated a "Released Party" of estate claims related to their

---

[11] In interpreting a contract under New York law, a court should avoid an interpretation that leads to an absurd result. *See In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561 (N.Y. Sup. Ct. 2003).  In *Lipper*, the court construed certain limited partnership agreements so as not to bestow a windfall on certain parties. *Id.* at 561. Here, finding that for-profit entities are released from billions of dollars of liability and that the not-for-profit foundation is the only party that may be pursued by the Settlement Trust would lead to an absurd result.

participation in the LBO (i.e., the first and second lien lenders and the Sponsors), it is certainly unfair that they would have to earn, pay for, and justify their releases as mere participants in that transaction, while the actual transferees of more than $6 billion in value get off scot free.  From the perspective of the Debtors, by expanding the definition of "Released Party" to include Movants, despite their repeated representations to the Court that all claims against the "owners" and "sellers" were being "reserved," at best exposes them to criticism for a failure to accurately commit their expressed intent to paper.  Finally, from the perspective of the unsecured creditors, they suffer all forms of inequities should the Court read the Confirmation Order as Movants now advocate.  Unsecured creditors immediately protested any releases related to the LBO, but were mollified by assurances that claims against the "sellers" were being "reserved."  (*See supra* ¶ 4.)   The Committee then sought standing to bring LBO claims on behalf of unsecureds only to be met by further assurances that the claims against the "sellers" were already being preserved for the unsecureds' benefit in a post-confirmation trust. (*Id.* ¶ 11.).   The Committee was then sent to a mediation to resolve claims related to the LBO, and the Movants were not even directed to attend.  (*Id.* ¶ 16.).  Finally, and most important, granting a release would cause a material reduction in the unsecured creditors' potential recoveries without any compensation whatsoever from the parties that are alleged to have caused the impairment of their claims in the first place.  It may be, at the end of the day that the claims at issue are not established in this adversary proceeding, but there is no rational way to interpret Judge Sontchi's Confirmation Order as predetermining that result.

*** 

In sum, if this Court undertakes the task of divining Judge Sontchi's intent in his Confirmation Order, as it must, the only rational result is a finding that none of the Movants is a "Released Party" and that the estates therefore have preserved for the benefit of the Settlement Trust all of the claims asserted against Movants in the Complaint.

35

## II.    ANY LEGITIMATE TEXTUAL ANALYSIS OF THE DEFINITION OF "RELEASED PARTY" IN THE CONFIRMATION ORDER AND THE SETTLEMENT PLAN ESTABLISHES  THAT IT DOES NOT DESCRIBE ANY OF THE MOVANTS

As noted above, Movants take a drastically different tack.  In an attempt to brush aside the Confirmation Order and the actual record created relating to the release provisions in it, Movants argue that the only issue here concerns the words in the definition of "Released Party" out of all context.  According to them, this Court is bound to apply that definition no matter the consequences to the actual creditors of the Debtors.  (Motion at 9.)  This deflection is not unexpected – to the extent that this Court takes even a peek outside the written definition of "Released Party" in the Settlement Plan, there is not one single fact – material, immaterial, disputed, or undisputed – that supports any of the relief sought in the Motion.  Their "blind reliance" legal theory, however, is simply wrong.

Before addressing the actual text of the Plan, it bears noting that Movants bear a heightened burden of proof on any affirmative defense of release.[12]  Under New York law,[13] any party claiming to be released from a cause of action bears a substantial burden of demonstrating that the alleged release contains an "'explicit, unequivocal statement of a present promise to release [a party] from liability.'"  *Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 266 (S.D.N.Y. 2005) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 515 (2d Cir. 2001)).  The "Released Party" definition must reveal an "unmistakable intent of the parties" to release the causes of action asserted in the Complaint.  *Id.*  Any release purporting to excuse a party from its misconduct must survive "close judicial scrutiny."  *Gross v. Sweet*, 49 N.Y.2d 102, 106 (N.Y. 1979).  The New York Court of Appeals has instructed that "[n]ot only does this stringent standard require that the drafter of

---

[12] In their Motion, Movants raise a potential defense of standing, arguing that, to the extent a Cause of Action was released against a Released Party, the Settlement Trust never came into possession of such claims.  (Mov. Mem. of Law at 11.)  To the extent that the Court, however, were to find that each of the Movants is not a Released Party, then any Causes of Action against such Movants were in fact transferred to the Settlement Trust per the terms of the Confirmation Order.  (Ex. 31, Confirmation Order ¶ 73.)

[13] Article I.D of the Settlement Plan provides that the laws of the State of New York shall govern the construction of the Settlement Plan and its provisions therein.  (Ex. 32, Settlement Plan, Art.I.D.)

36

such an agreement make its terms unambiguous, but it mandates that the terms be understandable as well." *Id.* at 107. Moreover, "[u]nlike the typical scenario in which parties create a contract by reaching a proverbial 'meeting of the minds' based upon their own private interests, there is no binding contract in the plan confirmation context without the approval of the bankruptcy court." *House Nursery*, at *16. "[O]bjective construction principles, particularly those which endorse the consideration of the surrounding circumstances in order to give context to the contract interpretation, are particularly relevant to the construction of the terms of a confirmed Chapter 11 plan." *Id.* "[S]pecific clauses of a contract are to be read consistently with the overall manifest purpose of the parties' agreement." *In re AMR Corp.*, 562 B.R. 20, 29 (Bankr. S.D.N.Y. 2016). The "factual background derived from the public record . . . that led to the confirmation of the . . . plan . . . is not forbidden extrinsic evidence, but rather a survey of objective, surrounding circumstances derived from the Court's docket that inform the proper interpretation of the resulting contextual text." *House Nursery*, at *18. The Court may also consider, to the extent they pertain to the same transaction, all writings respecting that transaction. Thus, "in a bankruptcy case, a plan and disclosure statement may be considered together to determine the intent of the parties." *Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*, 422 B.R. 612, 629-30 (Bankr. N.D. Tex. 2010).

With those principles in mind, even if this Court were to focus solely on the text of one provision in the Settlement Plan to define the scope of who is receiving any estate release, the Movants cannot satisfy their burden of establishing an "unmistakable intent" to release them. Subsection (A) concerns those Movants which tendered their shares in the LBO – *i.e.*, the "Selling Shareholders." Subsection (B) concerns the other Movants – Samson Exploration, Samson Offshore, LLC, and Samson Energy (collectively, the "**Gulf Coast and Offshore Entities**") – which received the assets of the Spin-Off.

**A.    A Plain Reading of "Released Party" Does Not Apply to the Selling Shareholders or Their Own Equity Holders**

The Selling Shareholders make two arguments as to why they believe the Settlement Plan plainly and unambiguously includes them in the definition of a "Released Party."  One, they argue that they are "former affiliates" of the Debtors. (Mov. Mem. of Law at 12-13.)   All "affiliate" arguments are addressed in subsection (B) below.   In short, none of the Selling Shareholders are affiliates.   They are shareholders.   Two, the Selling Shareholders argue that they are "direct or indirect equity holders" of Debtors, Non-Debtor Subsidiaries and/or their former affiliates.

First, the Selling Shareholders' explication as to which entities will actually fit into the list of "Released Parties" is anything but "narrowly tailored."   Under Movants' interpretation, any entity that held a share of equity in the Debtors or the Non-Debtor Subsidiaries at any point in time since 1971 (when Samson was founded), is released under the Settlement Plan.   Taking it a step further, Movants interpret the Settlement Plan to release any entity that was, at any point in time since 1971, a holder of more than 20% of the stock of any other entity.[14]   Movants provide the Court with no limiting principle to which "equity holders" are released and which are not.   Nor do they disclose to the Court, or explain in any fashion, the inclusion of the "Stacy Family Trust" as an entity against whom the Debtors specifically reserved the right to assert a Cause of Action.   A Court should give effect to all provisions of a plan in a manner that does not create a conflict.   *Spectrum Standards, Inc. v. Telnetex, Ltd.*, 576 N.Y.S.2d 474, 475 (N.Y. App. Div. 1991)("Where there is an apparent repugnancy between two clauses of a contract, the court has a duty to reconcile them, if possible, so as to give effect to all of the provisions of the contract.   Therefore, it is the court's province to find harmony between apparently conflicting provisions.").   With that principle in mind, there is clearly something wrong

---

[14] For example, under Movants' interpretation, if the Selling Shareholders or their equity holders held 20% of the equity in Apple at any point in time from 1971 to 2011, we wouldn't of course be here, but Apple would be released under the Settlement Plan.  Further, under Movants' interpretation, anyone that ever held even one share of Apple, at any point in time, would be released under the Settlement Plan.  There are currently 4.92 billion outstanding shares of Apple.

with Movants' contention that they are unambiguously Released Parties when, at the same time, Causes of Action against the Stacy Family Trust are preserved in the Plan Supplement incorporated into the same Plan.

Second, the Selling Shareholders' protest that they are not included in the carve-out at the end of the definition of "Released Party" rings hollow. The phrase "holders of Preferred Interests" has no common understanding in the E&P industry or in the bankruptcy world. There is no defined term in the Settlement Plan that specifies which entities fit within that phrase. There is no temporal qualifier such as "current" or "former" that would let anyone know exactly who might fit in the definition. As noted above, the record establishes that the phrase was created and existed as a shorthand designation of a group of entities (plural) that the Debtors described to the Court on day one as the "parties that sold the company." (*See supra* ¶ 4.)

Even if one were to limit the textual inquiry to one phrase on one page to the exclusion of everything else, Movants still lose. Black's Law Dictionary defines a "holder" as: "1. Someone who has legal possession of a negotiable instrument and is entitled to receive payment on it. 2. A person with ***legal possession of*** a document of title or an ***investment security***. 3. Someone who possesses or uses property." *Holder*, Black's Law Dictionary (10th ed. 2014) (emphasis added). "Investment Security" is defined as "[a]n instrument issued in bearer or registered form as a type commonly recognized as a medium for investment and evidencing a share or other interest in the property or enterprise of the issuer." *Investment security*, Black's Law Dictionary (10th ed. 2014).

Movants contend that, because the Foundation is the only Selling Shareholder or affiliate thereof who has physical possession of Preferred Interests, the Foundation is the only entity subject to the Carve-Out. However, Movants conveniently omit to draw the distinction between "legal possession" and "legal ownership," which is a fatal flaw to their argument. A "legal possessor" is defined as "*[o]ne with the legal right to possess property*, such as a buyer under a conditional sales

contract, ***as contrasted with the legal owner who holds legal title***.”  *Legal possessor*, <u>Black's Law Dictionary</u> (10th ed. 2014) (emphasis added).

The SPA unambiguously provided that both SFTDM, ST 2008 and their equity holders were granted the "legal right to possess" the Preferred Interests.[15]  Section 2.2(a) of the SPA explicitly provided that the *Selling Shareholders* would receive the Net Share Consideration (as defined in the SPA), which specifically included the Preferred Interests.  (<u>Ex</u>. 33, Purchase Agreement ¶ 2.2(a).) Crucially, the SPA provided SFTDM and ST 2008 with this right – not just the Foundation.  This same section provided that the Selling Shareholders, and only the Selling Shareholders, shall have the sole and absolute right to control the allocation of the Preferred Interests.  (*Id*.)  Consequentially, each Selling Shareholder, and every equity holder thereof, was a holder of Preferred Interests, as defined in the Plan, because each such entity once had the legal right in the SPA to possess the Preferred Interests.

Based on the above record, it would simply be absurd to interpret the Settlement Plan and the Confirmation Order in a manner that would preserve claims against one entity who tendered its shares in the LBO – the Foundation – and at the same time release every other entity who tendered.  It is well established that under New York law, a contract should not be read to produce a result that is absurd, unreasonable, or contrary to the commercial expectations of the parties thereto.  *Greenwich Capital Fin. Prods., Inc. v Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010)(citing *Lipper Holdings, LLC v. Trident Holdings*, LLC, 766 N.Y.S.2d 561 (N.Y. App. Div. 2003)); *Knights of Columbus v. Bank of N.Y. Mellon*, No. 651442/2011, 2015 N.Y. Misc. LEXIS 2626, at *3 (N.Y. Sup. Ct. July 10, 2015); *see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 96 (3d Cir. 2001) ("a court can consider an alternative interpretation of a facially unambiguous contract term

---

[15] SFT (Delaware) Management LLC and ST 2008 (Delaware) Management LLC are pass-through entities owned by the Stacy Family Delaware Trust and the Schusterman 2008 DE Trust.

when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome").

### B.    A Plain Reading of "Released Party" does Not Apply to Any of the Gulf Coast and Offshore Entities

The Gulf Coast and Offshore Entities fare no better in their textual analysis of the Settlement Plan.  These Movants contend that, as a technical matter, they are "former…affiliates" of certain Debtors and/or Non-Debtor Subsidiaries, thereby making each a "Released Party."  Specifically, the Movants assert that each was a former affiliate of the Debtors (or a former affiliate of a former affiliate) (1) by operation of the Debtors' former equity ownership interest in such entity or (2) by operation of the Movants' ownership interest in such entity prior to the closing of the SPA.   These assertions are incorrect.  None of the Gulf and Offshore entities constitutes a "former affiliate" of the Debtors within the meaning of "Released Party."

#### 1.    Samson Exploration

Samson Exploration appeared on Exhibit C-2, evidencing an obvious intent that it was not to be treated as a "Released Party."  (*See supra* ¶ 30.)  Movants nonetheless contend that such entity is a "former affiliate" because of the ownership interests the Debtors held in Samson Lone Star, LLC. Upon information and belief, Samson Exploration was formed *after* the Closing Date and is the successor entity to Samson Lone Star, LLC and Samson Concorde, LLC.  Therefore, the Debtors never had an ownership interest in (or control of, which is the relevant inquiry as discussed below) Samson Exploration.  Moreover, because Samson Exploration did not exist until after the Closing Date, the Movants never could have had ownership interests in Samson Exploration at the same time they had ownership interests in the Debtors and Non-Debtor Subsidiaries.

The Movants deflect and imply that the Debtors' had historical control of Samson Lone Star, LLC, which they claim is sufficient for the Court to conclude that Samson Exploration is a former

affiliate of the Debtors.  (Mov. Mem. of Law at 19 n.17.)  This position is entirely inconsistent with

the language of the Settlement Plan, which patently delineates between provisions that are intended to

apply to specific entities and provisions that are intended to apply to an entity's predecessors or

successors.  (*Compare* Ex. 32, Settlement Plan Art.I.A.51 (definition of "Exculpated Parties" includes

former affiliates of the Debtors *and their predecessors, successors and assigns*") *with id.* Art.I.A.124

(definition of "Released Party" ***does not include*** successors, predecessors and assigns of former

affiliates of the Debtors).   In other words, successors of former affiliates would not be Released

Parties.  This reading is also consistent with the history of these Chapter 11 Cases, and it is absurd for

the Movants, a non-party to the Chapter 11 Cases, to assert that the actual parties to the Plan

negotiations meant otherwise.[16]  As such, Samson Exploration must stay in the proceeding.

### 2.    Samson Energy

Samson Energy is explicitly listed on Exhibit C-2 to the Plan Supplement as a party against

whom the Settlement Trust has Causes of Action.   Again, Exhibit C-2 cannot contain any Released

Parties per Article I.A. of the Settlement Plan.   If the Court is even willing to entertain the

metaphysical impossibility that an entity can be a Released Party and not a Released Party at the same

time (it should not), Samson Energy still fails the textual analysis.

Because the Debtors never had any ownership interests in Samson Energy, the only argument

available to the Movants is that, by operation of their ownership interests in Samson Energy at the

same time they held ownership interest in the Debtors (for approximately 30 days), Samson Energy is

---

[16] Even if the Court choses to apply the Bankruptcy Code's definition of "control," Movants have failed to establish that Samson Exploration is a former affiliate of the Debtors or Non-Debtor Subsidiaries, as there is no evidence in the record that any of these entities ever held 20% or more of the voting stock of Samson Exploration.  Furthermore, even if there were evidence that any Debtor or Non-Debtor Subsidiary held 20% or more of the voting securities of Samson Exploration, a non-debtor subsidiary is only deemed to be an affiliate of a Debtor if such subsidiary is a corporation.  11 U.S.C. § 101(2)(B) (defining affiliate, among other things, as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . .").  Because Samson Exploration is a limited liability company, it cannot fall under this definition of affiliate.

a "former … affiliate" of the Debtors.  However, the real test for whether Samson Energy is a former affiliate of the Debtors is not who owned what and when, but rather whether Samson Energy and the Debtors were under common control at the same time.  They were not.

### 3.    The Bankruptcy Code's Definition of "Affiliate" is Irrelevant

When contracts fail to define the term "affiliate," courts look to the plain meaning of the word as defined by dictionaries and/or applicable statutes and regulations.[17]  *Nat'l Union Fire Ins. Co. v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 319–20 (S.D.N.Y. 2016) ("The contracts do not contain a definition of 'affiliate.'  The Court therefore looks to the plain or ordinary meaning of the term.").  In that vein, courts often look to sources such as (i) the Securities Act of 1933 (the "**33 Act**"), (ii) the Securities Exchange Act of 1934 (the "**34 Act**"), and (iii) Black's Law Dictionary.  *See Waldman v. Riedinger*, 423 F.3d 145, 151 (2d Cir. 2005) (applying definitions set forth in the 33 Act and the 34 Act); *In re Am. Int'l Grp., Inc. Sec. Litig.*, No. 04-CV-8141, 2014 U.S. Dist. LEXIS 185757, at *4–5 (S.D.N.Y. Dec. 3, 2014) (relying on Black's Law Dictionary).  Here, if the Court's analysis is limited to isolated text of the Plan, the Court should look to the definitions set forth in the 33 Act, the 34 Act, and Black's Law Dictionary.

### 4.    The Applicable Definitions of "Affiliate" Require Control

Rules 405 and 12b-2 of the 33 Act and 34 Act respectively define "affiliate" as a "person that directly, or indirectly through one or more intermediaries, ***controls or is controlled by, or is under common control with, the person specified***."  17 C.F.R. § 230.405; 17 C.F.R. § 240.12b–2 (emphasis added).  Black's Law Dictionary defines the term as "1. A corporation that is related to another corporation by shareholdings or ***other means of control***; a subsidiary, parent, or sibling corporation.

---

[17] In numerous instances, Movants seek to apply the Bankruptcy Code's definition of "affiliate" in determining whether an entity is a Released Party.  In doing so, they rely heavily on the Bankruptcy Code's provision deeming any entity whose voting stock is held by a debtor, in an amount exceeding 20%, to be an "affiliate."  *See* 11 U.S.C. § 101(2)(B).  However, the Plan expressly indicates where the Bankruptcy Code's definition of the term "affiliate" applies and where it does not.  Specifically, the Plan states that the Bankruptcy Code's definition of "affiliate" is applicable only when such term is capitalized.  (Ex. 32, Settlement Plan, Art. I.A.5.)

2. *Securities*.   Someone who controls, is controlled by, or is under common control with an issuer of a security."  *Affiliate*, <u>Black's Law Dictionary</u> (10th ed. 2014)(emphasis added); accord Del. Code Ann. tit. 8, §§ 203(c)(1), 251(h)(6)(a) (emphasis added).

Here, the term "control" is at the core of the analysis, and is defined under Rule 405 as follows:

> The term *control* (including the terms *controlling*, *controlled by* and *under common control with*) means the possession, direct or indirect, of the ***power to direct or cause the direction of the management and policies of a person***, whether through the ***ownership of voting securities***, by contract, or otherwise.

17 C.F.R. § 230.405.   "Voting securities" means "securities the holders of which are presently entitled to vote for the election of directors."  *Id.*

Courts have noted that the issue of control is "a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved."  *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087 (9th Cir. 2010) ("'Control' is not to be determined by artificial tests, but is an issue to be determined from the particular circumstances of the case"); *see also Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975) (Under Rule 12, "[m]any factors are involved in determining if one is a 'controlling person.'   In making this determination, the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof").   Under all of these definitions, stock ownership is "only one aspect of control."   *Corr*, 543 F.2d at 1050; *see also Waldman*, 423 F.3d at 152 (owning an equity position between 37.0% and 43.5% not automatically sufficient to establish control).   Further, the Second Circuit has held that a large equity stake in an issuer is insufficient to establish control when another shareholder possesses veto rights over corporate governance actions.   *Waldman*, 423 F.3d at 152.   This was precisely the situation with

44

respect to all of the Gulf Coast Entities during the lead-up to the Closing Date, as the KKR Group

possessed a number of veto rights with respect to the business affairs of Samson Investment and all of

its subsidiaries.

### i.     Movants Have Not Established that They Controlled Samson Energy and the Debtors at the Same Time

As noted above, Samson Energy was formed during the period between execution of the SPA

and the closing of the LBO.   Article VI of the Purchase Agreement, titled "Conduct of Business

Pending Closing," placed severe restrictions on the Selling Shareholders' ability to "direct or cause

the direction of the management and policies" of Samson Investment and its subsidiaries during this

"Executory Period."   (Ex. 33, Purchase Agreement.)   For example, section 6.1, titled "Conduct and

Preservation of Business" reads as follows:

> Except as expressly required or permitted by this Agreement, during the period from
> the date of this Agreement to the Closing Date, *the Company will*, and will cause each
> of its Subsidiaries to, *conduct its operations in the ordinary course* thereof consistent
> in all material respects with past practice and *use its reasonable best efforts to
> preserve substantially intact the business organization and assets of the respective
> entities, keep available the services of its current officers, employees and
> consultants*, and preserve its current relationships with customers, suppliers,
> Governmental Authorities and other Persons with whom it has significant business
> relations or regulatory compliance requirements.

(*Id*. § 6.1 (emphasis added).)   In other words, during the Executory Period, SFTDM was divested of

its ability to manage Samson Investment or is subsidiaries outside of the ordinary course of

business.[18]   By losing its ability to appoint or remove officers dispose of assets, and terminate key

relationships, SFDTM no longer possessed the "power to direct or cause the direction of the

management and policies" of Samson Investment and its subsidiaries."   Rather, section 6.1 had the

effect of eliminating SFDTM's managerial discretion, a fact which is highlighted by numerous

consent rights granted to KKR set forth in Ex. 33, Purchase Agreement § 6.2.   Ultimately, Section 6.2

---

[18] For the avoidance of doubt, it is the Settlement Trustee's position that the Selling Shareholders controlled the Debtors
with respect to entering into the SPA.  Once the SPA was executed, KKR controlled the Debtors.

divested the Selling Shareholders of control over the Debtor and the Debtors' control over their subsidiaries during the Executory Period.[19]

### 5.      Samson Offshore, LLC

Movants contend that Samson Offshore, LLC is a "former affiliate" because of the ownership interests the Debtors held in "Samson Offshore Company."   Samson Offshore Company was converted to a limited liability company pursuant to the terms of the SPA and became Samson Offshore, LLC.   This conversion did not occur until *after* the Execution Date.   (Ex. 33, Purchase Agreement § 7.1(b).)   Through a calculated sleight of hand, Movants blur the distinction between Samson Offshore, LLC and Samson Offshore Company in order to argue that the Debtors exercised control over Samson Offshore, LLC.   This maneuver both undermines the plain language of the Plan which, as discussed above, does not release successors to former affiliates and also conceals the fact that the Debtors *never* exercised control over Samson Offshore, LLC.   Specifically, on the Execution Date, similar to the change of control that occurred with the Debtors to KKR, control of Samson Offshore Company and, subsequently, Samson Offshore, LLC was transferred to the Selling Shareholders.   In other words, at the time Samson Offshore, LLC was created, the Debtors did not have control over such entity and, therefore, Samson Offshore, LLC is not a "former . . . affiliate" of the Debtors.[20]

### C.      If Any Ambiguity Exists in the Definition of "Released Party," All Extrinsic Evidence Supports a Denial of the Motion

---

[19] The same rationale applies with respect to the Bankruptcy Code's common control test.  Although SFTDM held over 20% of the outstanding shares of Samson Investment, (i) SFTDM lacked the sole discretionary power to vote these securities and (ii) Samson Energy is not a corporation.  Therefore, the Court should conclude that there is a dispute of material fact over whether Samson Energy is a former affiliate of any Debtor or Non-Debtor Subsidiary, irrespective of which definition is applied.

[20] Movants assert that as a current equity holder of two former affiliates (Samson Exploration and Samson Offshore, LLC), Samson Energy is a Released Party under the Plan.  As argued above, the Settlement Trustee submits that Samson Exploration and Samson Offshore, LLC were never affiliates of the Debtors and/or Non-Debtor subsidiaries.  Therefore, the Court cannot conclude, based on the record presented at this juncture, that Samson Energy is a current equity holder of former affiliates.

As set forth above, even if one myopically restricts the inquiry on the Motion to just the "Released Party" definition, the Settlement Trust has multiple valid textual arguments as to why Movants are not "Released Parties." Movants claim that they do as well. An agreement is ambiguous if "'it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract[] and knows the customs, practices, usages and terminology generally understood in the particular trade of business.'" *Salus Capital Partners, LLC v. Standard Wireless Inc. (In re RadioShack Corp.)*, 550 B.R. 700, 711 (Bankr. D. Del. 2016) (Shannon, J.) (quoting *In re Musicland Holding Corp.*, 374 B.R. 113, 120 (Bankr. S.D.N.Y. 2007); *see also In re Energy Future Holdings Corp.*, 540 B.R. 96, 103-04 (Bankr. D. Del. 2015) (Sontchi, J.)(same). The definition of "Released Party" that the Debtors insisted on using in the Settlement Plan is not a model of tight drafting and has led to the present debate over what is and is not an "affiliate," how far "former" retreats into the past, whether "holders" can mean only one "holder," and how many steps can one be removed in the equity chain to constitute an "Equity Holder." If the Court believes that any of the Movants' readings of the Settlement Plan are objectively reasonable (and it should not), then there is a clear ambiguity and the Court can and should look to extrinsic evidence to determine the intent of the Debtors and the Settlement Parties in the Plan. *See Hatco Corp. v. W.R. Grace & Co.*, 59 F.3d 400, 407 (3d Cir. 1995)("When a writing is ambiguous New York cases require the admission of extrinsic evidence to establish or disprove the intent of the parties"). As set forth, *supra*, in the Counterstatement of Material Facts, every iota of "extrinsic" evidence in the record of statements made to the Court unmistakably establishes that the clear intent of the Debtors was to release the first lien lenders, second lien lenders, and the Sponsors, but to reserve all claims against the Movants.[21]

---

[21] As noted above, the issue of what constitutes extrinsic evidence with respect to a confirmation order and associated plan, as well as the issue of whose intent actually matters, is an elastic concept in the case law. Because the issue here

On the other side of the ledger, the Movants have adduced not one shred of evidence in the Motion that any participant in the Chapter 11 Cases, much less Judge Sontchi, discussed, considered, debated, or actually intended to release them.  In fact, there are absolutely no statements made on the record nor any evidence presented to Judge Sontchi at all during the course of the Chapter 11 Cases that indicates any intention on the part of the Debtors to release the Movants.  If such an intent existed, it should have been expressed to the Court, particularly in light of the dozens of contrary statements that were made on the record.

## III.    DISMISSAL OF ANY COUNT AT THIS TIME WOULD BE PREMATURE

To the extent that this Court finds that, based on Movants' proffers, one or more Movants fit within the definition of "Released Party," the Settlement Trustee respectfully requests that the Court nonetheless deny the Motion on the grounds that there are material disputes as to whether Movants meet that definition as a matter of fact.

First, the Court should not accept Movants' blind assertions in their supporting declaration that SFTDM and ST 2008 never owned Preferred Interests until the Settlement Trustee has had ample opportunity to conduct discovery and determine whether this contention is accurate.  In light of the fact that each and every one of the Movants, save for the Gulf Coast and Offshore Entities, has historically played a significant role with respect to the Debtors, the Settlement Trust has ample cause to believe that SFTDM and ST 2008 had direct or indirect rights with respect to Preferred Interests at some point in time.

Second, and as discussed in detail above, the issue of whether or not the Gulf Coast and Offshore Entities are "former . . . affiliates" of the Debtors may hinge entirely on whether the

---

concerns operative language specifically included in the Confirmation Order, the Settlement Trustee has provided the Court with an expansive record of statements made to Judge Sontchi during the Chapter 11 Cases with respect to the releases under the Plan.  To the extent this Court is inclined to consider discussions between the parties that negotiated the Settlement Plan to determine their subjective intent as well, the Settlement Trust is aware of a significant trove of additional expressions of intent not addressed herein (*i.e.*, intercreditor and Debtor correspondence).  Expanding the intent inquiry to include this material will, however, require additional discovery.

Debtors ever exercised control over these entities.  The Settlement Trustee respectfully requests that the Court deny the Motion and reserve the issue of control for trial.  Because Congress "indicat[ed] its desire to have the courts construe the applicable provisions of the [applicable control statutes] along with the evidence adduced at trial," the Settlement Trustee respectfully represents that Movants have failed to meet their burden of establishing that no dispute of material fact remains with regard to the issue of control.  *Rochez Bros.*, 527 F.2d at 890-91.

Third, were this Court to find that any of the Movants meets the definition of a "Released Party," the issue still remains as to how it came to be that the record made both in and out of the courtroom regarding the actual intent to preserve claims against the Defendants was so inaccurately recorded in the text of the Settlement Plan.  In that regard, there can be no genuine dispute that the expressed intent of the unsecured creditors – the actual beneficiaries of the claims – intended that the Plan would preserve all claims against the Movants.  (*See supra* ¶ 15.)  As to the Debtors' intent, the obvious explanation is that, in the context of preparing to file a complex, fast-moving case, the Debtors simply failed to translate their actual intent into the words of the First Plan and then bound themselves in their RSA to maintain their imprecise language in all subsequent plans.  "A release may be invalidated . . . for any of the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake."  *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 952 N.E.2d 995 (N.Y. 2011).  Further, under New York law, "'the doctrine of scrivener's error allows contracts to be reformed when there is a mistake in the writing that memorialized the contract.  Where there is no mistake about the agreement and the only mistake is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.'"  *Wells Fargo Bank N.A. v. Sovereign Bank, N.A.*, 44 F. Supp. 3d 394, 407 (S.D.N.Y. 2014) (quoting *In re Am. Home Mortg. Inv. Trust 2005-2*, No. 14 Civ. 2494, 2014 U.S. Dist. LEXIS 111867, at *56-57 (S.D.N.Y. July 24, 2014)).  Where there is

49

scrivener's error in a Plan, a bankruptcy court can correct the error. *See In re Appliance Now, Inc.*, 568 B.R. 843 (Bankr. M.D. Fla. 2017) (creditors were not entitled to pursue claims under language in confirmed plan allowing claims for gross negligence or willful misconduct, which appeared to be scrivener's error; improperly inserted phrase that arguably allowed claim to survive was inconsistent with plan and other provisions of confirmation order and thus was stricken from confirmation order); *Prithvi Catalytic, Inc. v. Microsoft Corp. (In re Prithvi Catalytic, Inc.)*, 580 B.R. 652 (Bankr. W.D. Pa. 2017) (court struck provision of confirmed plan by separate order as a scrivener's error).    In order to prove a basis for invalidating the release, the parties to this proceeding would have to take discovery on, among other things, Debtors' counsel and/or conversations and correspondence between the Debtors and Movants regarding:  (i) the releases under the Plans, (ii) the LBO, (iii) the Standing Motion; (iv) the Chapter 11 Cases; (v) the negotiation history of the Plan release provisions; and (vi) the actual intent of the drafters of the First Plan and subsequent Plans.    To be clear, the Settlement Trust is not asking that the Court address any mutual mistake now – that would, in fairness, permit the Settlement Trust and the Movants to take discovery from the Debtor drafters of the Plan to confirm the facts establishing any mistake.    Rather, the Settlement Trust is asking the Court to recognize that there is a pervasive futility in allowing Movants to pursue a "gotcha" at this stage of the proceedings before discovery has run its course.

## <u>CONCLUSION</u>

For the aforementioned reasons, the Settlement Trustee respectfully requests that the Court deny the Motion.

Dated: June 29, 2018

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Joseph J. Farnan, Jr. (Bar No. 100245)
Joseph J. Farnan, III (Bar No. 3945)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
farnan@farnanlaw.com
jjfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Thomas E Lauria (*pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:      (305) 371-2700
Facsimile:      (305) 358-5744
tlauria@whitecase.com

*Of Counsel:*

Craig H. Averch
Ronald K. Gorsich
Mark E. Gustafson
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
Telephone:      (213) 620-7700
Facsimile:      (213) 452-2329
caverch@whitecase.com
rgorsich@whitecase.com
mgustafson@whitecase.com

J. Christopher Shore (*pro hac vice*)
Michele J. Meises (*pro hac vice*)
John J. Ramirez (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:      (212) 819-8200
Facsimile:      (212) 354-8113
cshore@whitecase.com
michele.meises@whitecase.com
john.ramirez@whitecase.com

*Attorneys for the Settlement Trustee*

51