**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>SAMSON RESOURCES CORPORATION,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 15-11934 (BLS) |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST;<br><br>Plaintiff,<br>v.<br><br>SAMSON ENERGY COMPANY, LLC, *et al.*,<br>Defendants. | Adv. Pro. No. 17-51524 (BLS) |

**OMNIBUS DECLARATION OF JOHN RAMIREZ IN SUPPORT OF (I) OPPOSITION OF SAMSON SETTLEMENT TRUST TO STACY SCHUSTERMAN'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS III, IV AND CORRELATIVE PORTIONS OF COUNT V OF THE COMPLAINT AND (II) OPPOSITION OF SAMSON SETTLEMENT TRUST TO MOTION OF DEFENDANTS STACY FAMILY TRUST, SFT (DELAWARE) MANAGEMENT, LLC, ST 2008 (DELAWARE) MANAGEMENT, LLC, SCHUSTERMAN 2008 DELAWARE TRUST, STACY FAMILY DELAWARE TRUST, SAMSON EXPLORATION, LLC, SAMSON OFFSHORE, LLC, AND SAMSON ENERGY COMPANY, LLC FOR SUMMARY JUDGMENT BASED ON PLAN RELEASE**

       1.      I, John J. Ramirez, am over 18 years of age and am able to testify to the matters stated herein of my own experience and knowledge.

       2.      I am an attorney with the law firm of White & Case LLP, counsel to Peter Kravitz as Settlement Trustee (the "**Settlement Trustee**") of and on behalf of the Samson Settlement Trust (the "**Settlement Trust**") in this matter. Pursuant to Federal Rule of Civil Procedure 56(d), as incorporated by Bankruptcy Rule 7056, I submit this declaration in support of the Settlement Trustee's (i) opposition (the "**550 Opposition**") to Stacy Schusterman's *Motion for*

*Summary Judgment as to Counts III, IV and Correlative Portions of Count V of the Complaint* (the "**550 Motion**") and (ii) opposition (the "**Plan Release Opposition**")[1] to the *Motion of Defendants Stacy Family Trust, SFT (Delaware) Management, LLC, ST 2008 (Delaware) Management, LLC, Schusterman 2008 Delaware Trust, Stacy Family Delaware Trust, Samson Exploration, LLC, Samson Offshore, LLC, and Samson Energy Company, LLC for Summary Judgment Based on Plan Release* (the "**Plan Release Motion**" and together with the 550 Motion, the "**Motions**"). Except as otherwise provided as background, I have personal knowledge on the matters set forth in this Declaration.

3. On September 15, 2017 the Settlement Trustee initiated the above-captioned adversary proceeding (the "**Adversary Proceeding**") by filing a complaint against the Defendants seeking to avoid and recover the transfers made in association with the Leveraged Buyout of Samson Investment Company (the "**LBO**") and the spin-off of Samson Investment Company's Gulf Coast and Offshore Assets (the "**Spin-Off**").

4. On May 8, 2018, the Settlement Trustee and ten of the individual defendants entered into a stipulation pursuant to which the parties agreed to dismiss such individual defendants from the Adversary Proceeding without prejudice. [Adv. Pro. D.I. 41]. Attached thereto were executed declarations from each defendant swearing to the absence of any direct or indirect transfers of property from the Selling Shareholders.

5. On January 12, 2018, the Defendants filed a motion to dismiss seeking to dismiss Counts I, II, and IV of the Complaint (the "**Motion to Dismiss**").[2]

---

1     Capitalized terms not defined herein shall have the meaning set forth in the Plan Release Opposition.

2     The Motion to Dismiss Count I was withdrawn on March 12, 2018 [Adv. Pro. D.I. 31].

6.     On March 23, 2018, Ms. Schusterman filed the 550 Motion and the Movants filed the Plan Release Motion.

7.     At the hearing on the Motion to Dismiss, the Defendants stated that they only wished to exchange initial disclosures but that discovery should not commence until after the pending motions for summary judgment were decided. *See* 5/31/2018 *Hr'g Tr.* 105:2-7 (D. Stern).[3]

8.     On June 11, 2018, the Court held a telephonic hearing on the Motion to Dismiss whereby the Court dismissed Counts II and IV granting the Settlement Trustee leave to replead. An order was entered on the Motion to Dismiss on June 15, 2018.

9.     The Defendants have not yet answered.

10.    Discovery has not yet commenced.

## A. Need for Additional Discovery

11.    In order to oppose the 550 Motion on the merits, the Settlement Trustee will require discovery on specific questions of ownership, subsequent transfers, financial records, value, and benefits received by Ms. Schusterman. Specifically, the Settlement Trustee needs to uncover, among other things:

(a)    the extent of the Ms. Schusterman's ownership interests in the Schusterman Entities;

(b)    whether Ms. Schusterman received any benefit, monetary or otherwise, after 2011 from any of the Schusterman Entities;

(c)    what value the Schusterman Entities received from the Spin-Off;

(d)    what value the Schusterman Entities received from the "returned capital" of $512 million;

(e)    whether Samson Energy made any transfers after the Spin-Off and the value and transferee(s) of any such transfers; and

---

[3]    Attached hereto as Exhibit 23.

(f)     whether Ms. Schusterman is a trustee of the Stacy Family Delaware Trust and the Schusterman 2008 DE Trust.  Both the Stacy Family Delaware Trust and the Schusterman 2008 Delaware Trust are owners of the pass through entities ST 2008 (Delaware) Management, LLC and SFT (Delaware) Management, LLC, respectively.

12.     Document and deposition discovery of the foregoing information is central to the opposition to the 550 Motion as Ms. Schusterman has alleged that she was not a transferee of the Spin-Off, she did not receive any dividends from Samson Energy Corporation, and did not benefit from the Spin-Off.  The information the Settlement Trustee seeks will inform the Court as to whether a claim against Ms. Schusterman pursuant to section 550(a) of the Bankruptcy Code will be successful.

13.     In addition, in order to oppose the Plan Release Motion, the Settlement Trustee requires discovery on, among other things:

(a)     whether any Movant ever owned, controlled, or had exercised legal rights Preferred Interests at any point in time during the period December, 2011 to present;

(b)     the extent to which any of the Debtors exercised control over the Movants prior to the LBO;

(c)     the extent to which the Selling Shareholders exercised control over the Debtors during the Executory Period; and

(d)     to the extent Court finds that any of the Movants meets the definition of a Released Party, the nature and extent of the Movants communications with the Debtors regarding: (i) the releases under the Settlement Plan, (ii) the LBO, (iii) the Standing Motion; (iv) the Chapter 11 Cases; (v) the negotiation history of the plan release provisions in the Debtors' First Plan and thereafter; and (vi) the actual intent of the drafters of the Debtors' First Plan and subsequent plans.

14.     The Settlement Trustee believes this information is critical to its opposition to the Plan Release Motion as the Movants  have alleged that (i) neither SFTDM nor ST 2008 ever held Preferred Interests, (ii) Samson Exploration, LLC is a former affiliate of the various Debtors and Non-Debtor Subsidiaries, (iii) Samson Offshore, LLC is a former affiliate of the various Debtors and Non-Debtor Subsidiaries, and (iv) Samson Energy, LLC is a former affiliate of the various

Debtors and Non-Debtor Subsidiaries. The information the Settlement Trustee seeks would be relevant to the Court's determination of whether or not these entities are Released Parties.

15.     The discovery phase of this litigation has yet to commence, therefore the Motions are premature.

16.     Without discovery, the Settlement Trustee believes it cannot present facts essential to justify its opposition to the Motions.

**B. Documents in Support of the Plan Release Opposition**

17.     An excerpt of a true and correct copy of the Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions, dated Sept. 17, 2015 [D.I. 2] is attached hereto as Exhibit 1. The complete copy can be found at D.I. 2.

18.     An excerpt of a true and correct copy of the Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates [D.I. 1858] is attached hereto as Exhibit 2. The complete copy can be found at D.I. 1858.

19.     An excerpt of a true and correct copy of the Prepetition Restructuring Support Agreement Entered Into Between the Debtors, the Sponsors, and Certain Holders of the Debtors' Second Lien Term Loan [D.I. 2-3] is attached hereto as Exhibit 3. The complete copy can be found at [D.I. 2-3].

20.     An excerpt of a true and correct copy of the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated September 17, 2015 [D.I. 15] is attached hereto as Exhibit 4. The complete copy can be found at D.I. 15.

21.     An excerpt of a true and correct copy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

dated September 17, 2015 [D.I. 16] is attached hereto as Exhibit 5.  The complete copy can be found at D.I. 16.

22.     An excerpt of a true and correct copy of the transcript from the hearing dated September 18, 2015 [D.I. 82] is attached hereto as Exhibit 6.  The complete copy can be found at D.I. 82.

23.     An excerpt of a true and correct copy of the Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated May 17, 2016 [D.I. 960] is attached hereto as Exhibit 7.  The complete copy can be found at D.I. 960.

24.     An excerpt of a true and correct copy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated May 17, 2016 [D.I. 961] is attached hereto as Exhibit 8.  The complete copy can be found at D.I. 961.

25.     An excerpt of a true and correct copy of the Debtors' (I) Objection to Creditors' Committee's Motion to Terminate Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan and (II) Brief in Support of Debtors' Motion (A) to Extend the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan; (B) To Strike Committee's Motion; and (C) For Other Sanctions the Court Deems Appropriate [D.I. 1026] is attached hereto as Exhibit 9.  The complete copy can be found at D.I. 1026.

26.     An excerpt of a true and correct copy of the Motion of The Official Committee of Unsecured Creditors for Entry of Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims and Causes of Action on Behalf of Debtors' Estates [D.I. 1248] is attached hereto as Exhibit 10.  The complete copy can be found at D.I. 1248.

27. An excerpt of a true and correct copy of the Debtors' Objection to Creditors' Committee's Motion for Standing [D.I. 1360] is attached hereto as Exhibit 11. The complete copy can be found at D.I. 1360. This document has been filed under seal.

28. An excerpt of a true and correct copy of the Notice of Filing Plan Support Agreement [D.I. 1290] is attached hereto as Exhibit 12. The complete copy can be found at D.I. 1290.

29. An excerpt of a true and correct copy of the Second Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated September 2, 2016 [D.I. 1316] is attached hereto as Exhibit 13. The complete copy can be found at D.I. 1316.

30. An excerpt of a true and correct copy of the Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated September 2, 2016 [D.I. 1317] is attached hereto as Exhibit 14. The complete copy can be found at D.I. 1317.

31. An excerpt of a true and correct copy of the Order Denying Debtors' Second Motion to Extend Exclusive Periods [D.I. 1411] is attached hereto as Exhibit 15.

32. An excerpt of a true and correct copy of the Joint Chapter 11 for Samson Resources Corporation and Its Debtor Affiliates Proposed by Official Committee of Unsecured Creditors dated October 18, 2016 [D.I. 1522] is attached hereto as Exhibit 16. The complete copy can be found at D.I. 1522.

33. An excerpt of a true and correct copy of the Disclosure Statement for Joint Chapter 11 for Samson Resources Corporation and Its Debtor Affiliates Proposed by Official

Committee of Unsecured Creditors [D.I. 1644] is attached hereto as Exhibit 17. The complete copy can be found at D.I. 1644.

34.     A true and correct copy of the Order (A) Approving a Mediator, and (B) Granting Related Relief [D.I. 1716] is attached hereto as Exhibit 18.

35.     A true and correct copy of the E-mail from L. Park to J. Ramirez, dated April 5, 2017, 3:32 p.m., with attachments, is attached hereto as Exhibit 19.

36.     An excerpt of a true and correct copy of the Third Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated December 12, 2016 [D.I. 1762] is attached hereto as Exhibit 20. The complete copy can be found at D.I. 1762.

37.     An excerpt of a true and correct copy of the Joint Disclosure Statement for (I) Third Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates Proposed By the Debtors and (II) Joint Chapter 11 Plan for Samson Resources Corporation and Its Debtor Affiliates Proposed By Official Committee of Unsecured Creditors [D.I. 1764] is attached hereto as Exhibit 21. The complete copy can be found at D.I. 1764.

38.     An excerpt of a true and correct copy of the Fourth Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated December 31, 2016 [D.I. 1822] is attached hereto as Exhibit 22. The complete copy can be found at D.I. 1822.

39.     An excerpt of a true and correct copy of the transcript from the hearing dated May 31, 2018, is attached hereto as Exhibit 23.

40.     An excerpt of a true and correct copy of the Stipulation and Agreement Regarding (I) Global Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Related Matters [D.I. 1857] is attached hereto as Exhibit 24.  The complete copy can be found at D.I. 1857.

41.     A true and correct copy of the Order dated January 12, 2017 Approving Stipulation and Agreement Regarding (I) Global Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Related Matters [D.I. 1875] is attached hereto as Exhibit 25.

42.     An excerpt of a true and correct copy of the transcript from the hearing dated January 12, 2017 [D.I. 1889] is attached hereto as Exhibit 26.  The complete copy can be found at D.I. 1889.

43.     An excerpt of a true and correct copy of the Declaration of Alan B. Miller in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization [D.I. 1994] is attached hereto as Exhibit 27.   The complete copy can be found at D.I. 1994.

44.     An excerpt of a true and correct copy of the Debtors' Memorandum of Law In Support of Confirmation of Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates and Omnibus Reply to Objections Thereto [D.I. 2004] is attached hereto as Exhibit 28.  The complete copy can be found at D.I. 2004.

45.     An excerpt of a true and correct copy of the Notice of Filing of Amendment to the Plan Supplement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates [D.I. 2061] is attached hereto as Exhibit 29.  The complete copy can be found at D.I. 2061.

46.     An excerpt of a true and correct copy of the Amended Schedule C-2 to the Plan Supplement [D.I. 2291] is attached hereto as Exhibit 30.  The complete copy can be found at D.I. 2291.

47.     An excerpt of a true and correct copy of the Findings of Fact, Conclusions of Law, and Order Confirming Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates dated February 13, 2017 [D.I. 2019] is attached hereto as Exhibit 31.  The complete copy can be found at D.I. 2019.

48.     An excerpt of a true and correct copy of the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (With Technical Modifications) dated February 12, 2007 [D.I. 2009] is attached hereto as Exhibit 32. The complete copy can be found at D.I. 2009.

49.     An excerpt of a true and correct copy of the Stock Purchase Agreement, dated November 21, 2011 [Adv. Pro. D.I. 22-A], is attached hereto as Exhibit 33.  The complete copy can be found at Adv. Pro. D.I. 22-A.

Executed on this 29th day of June, 2018 in New York, NY.


*/s/ John J. Ramirez*
John J. Ramirez

## **EXHIBIT 1**

Excerpt of Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF PHILIP COOK IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Philip Cook, hereby declare under penalty of perjury:

1.      I am an Executive Vice President and the Chief Financial Officer of Samson

Resources Corporation, a corporation organized under the laws of Delaware and one of the

above-captioned debtors and debtors in possession.

### Introduction

2.      Oil and gas companies across the United States and around the world are feeling

the pressure from the downward spiral in commodity prices, and the fate of many of these

companies is yet to be determined.   Access to capital is the lifeblood of exploration and

production companies.   With increasing leverage because of a constant need for capital, together

with the recent rising cost of capital in the industry, operating in the current environment has

been—and likely will remain—challenging.   In addition to being capital intensive, there are

several requirements associated with maintaining an oil and gas business, including an inventory

of economic wells to drill, a consistent drilling program to offset the natural declines in

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:   Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).   The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:   Two West Second Street, Tulsa, Oklahoma 74103.

12.     After months of diligence, negotiations, debate, and deliberation, Samson determined to proceed with the second-lien transaction, which will reduce the first lien indebtedness and cancel the outstanding second lien indebtedness, unsecured indebtedness, the preferred equity, and the equity interests of Samson's owners—including those whose representatives also serve on Samson's board of directors.  Even though the noteholder-led alternative would have preserved an option for existing equity to potentially recover if commodity prices significantly rebounded, the unsecured exchange alternative simply was not feasible.  Thus, notwithstanding threats of litigation from the noteholders if Samson did not agree to effectuate the noteholder-led proposal, Samson, with the support of certain of its existing equity owners who stood to lose their entire $4.1 billion investment in any alternative other than the noteholder-led proposal, made the decision that was in the best interest of the enterprise.

13.     The noteholders' proposal necessitated satisfaction of several significant contingencies.  These included, among others:  obtaining consent to the exchange from holders of at least 95 percent of the unsecured notes (the proposing group held only approximately 56 percent); reaching an agreement with the existing first lien lenders or a replacement lender to allow for the contemplated layering under Samson's existing credit documents; ensuring that any arrangement fit squarely within the existing intercreditor arrangement in place with the second lien lenders; and securing an agreement with members of the Schusterman family, the original founders of Samson (together with certain related parties, the "Schustermans") in their capacities as holders of preferred shares in Samson.  Furthermore, proceeding with the noteholders' proposal was subject to risk and delay given the second lien lenders' contentions that the transaction violated terms of the second lien term loan facility documents and intercreditor agreement.



Monthly Henry Hub Natural Gas Prices ($/bbl)

### 3. Private Acquisition

37.     On November 23, 2011, following a competitive marketing process and competing proposals, Kohlberg Kravis Roberts & Co. L.P. (together with its affiliates, "KKR") and a group of investors, including Crestview Partners ("Crestview," and together with KKR, the "Sponsors"), ITOCHU Corporation, and Natural Gas Partners agreed to acquire Samson Investment Company from the Schustermans for approximately $7.2 billion, excluding fees and expenses. The investor group provided approximately $4.1 billion in equity investments as part of the purchase price. The transaction, which resulted in the acquisition of substantially all of Samson's onshore domestic assets, closed in December 2011. The only assets not included in the 2011 acquisition were the onshore Gulf Coast and deep-water Gulf of Mexico assets, which assets remain under the ownership of the Schustermans. The Schustermans also received approximately $180 million in preferred stock in Samson in connection with the acquisition.

38.     At the time of the 2011 acquisition, Samson had nearly 1,200 employees and owned interests in over 10,000 wells in the United States (operating 4,000 of them), including

- approximately $1.0 billion in principal amount of obligations under Samson's second lien term loan; and

- approximately $2.25 billion in principal amount of senior unsecured notes.

### a.    First Lien Revolving Credit Facility

51.    Samson maintains a reserve-based revolving credit facility with a borrowing base of approximately $942 million under the Credit Agreement dated December 21, 2011 (as amended, the "First Lien Credit Agreement"), with JP Morgan Chase Bank, N.A. serving as agent, and the lenders party thereto.  The First Lien Credit Agreement is subject to a borrowing base that may be adjusted by the agent and lenders based on the value of Samson's oil and gas reserves.

52.    The First Lien Credit Agreement has been amended five times, including most recently on March 18, 2015.  As of the Petition Date, the borrowing base under the first lien credit facility is approximately $942 million, and the facility is approximately fully drawn.  The first lien credit facility bears interest at a floating rate; for the six months ended June 30, 2015, the weighted average interest rate was 3.5 percent.  The first lien credit facility matures in 2016.

53.    The first lien credit facility is guaranteed by each of the Debtors and is secured by a first priority lien and security interests on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including a security interest in Samson's approximately $129.5 million in cash on hand and real property mortgages on at least 95 percent of the Debtors' oil and gas properties.

54.    The First Lien Credit Agreement is also affected by Samson's hedging program.  Samson routinely enters into hedging arrangements with certain counterparties to provide partial protection against declines in oil and natural gas prices.  Samson's hedging strategy is based on a view of existing and forecasted production volumes, budgeted drilling projections, and current

### d.    Senior Unsecured Notes

59.    On February 8, 2012, Samson issued $2.25 billion in principal amount of 9.75% senior unsecured notes under the Indenture dated February 8, 2012 (the "Senior Notes Indenture") by and among Samson Investment Company, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, National Association, as trustee.  Proceeds from the issuance of senior unsecured notes were used to repay borrowings under a bridge facility associated with the 2011 buyout.

60.    The interest rate under the Senior Notes Indenture and the senior unsecured notes is 9.75% per annum, payable semi-annually in February and August, subject to a 30-day grace period.  The notes are guaranteed by all of the Debtors.  Samson did not make the approximately $110 million interest payment on the notes due on August 17, 2015.

## II.    Events Leading Up to the Restructuring

61.    Given its significant debt obligations and the state of the pricing environment for hydrocarbons at the end of 2014, Samson faced immediate challenges.  With liquidity under severe pressure from lower pricing and revenues, Samson faced an interest payment of approximately $110 million under its senior unsecured notes due on February 17, 2015. Additionally, a redetermination of the borrowing base under its first lien credit facility was scheduled for April 1, 2015 (which likely would reduce (significantly) availability given the decline in oil and gas prices).

62.    Samson took aggressive and proactive steps—from significant cost-cutting measures (including the suspension of all drilling activity, a significant reduction in work force, and a shut-in well project to increase cash flow) and performance improvement initiatives to select asset sales and an in-depth strategic review of all assets and operations—to address these challenges immediately.  In addition, in December 2014, Samson hired K&E and Blackstone to

interest payment on August 17, 2015, and utilize the corresponding 30-day grace period to fully document the restructuring transaction.

81.    Since signing the Restructuring Support Agreement, Samson has in fact documented the terms of the prearranged restructuring, including the chapter 11 plan of reorganization filed with this declaration.  At the time of execution, the Restructuring Support Agreement had support from holders of approximately 45.5 percent of the outstanding second lien obligations.  As of the Petition Date, second lien lenders, including additional second lien lenders who subsequently executed the Restructuring Support Agreement, represent holdings over 68 percent of the outstanding loans and obligations under the Second Lien Credit Agreement.  As a result of this level of support from the class of second lien claims, Samson and the requisite second lien lenders have waived compliance with all sale-related milestones in the Restructuring Support Agreement. The plan effectuates a debt-for-equity conversion and rights offering, which will significantly reduce long-term debt and annual interest payments and result in a stronger balance sheet for Samson.  The key terms of the plan include the following:

- *New Money Investment.*  A new money investment of a minimum of $450 million, consisting of a minimum amount of $325 million in new common equity in the reorganized company and a maximum of $125 million of new second lien debt of the reorganized company, to be raised through a rights offering available to all second lien lenders.  If the company's projected liquidity is projected to be less than $350 million as of the effective date, an accordion provides for an additional investment of new common equity and new second lien debt of $35 million by the second lien lenders who elect to participate in the rights offering.  The aggregate new money investment (i.e., $450 or $485 million) under the rights offering will be backstopped by certain of the second lien lenders.

- *Exit First Lien Credit Facility.*  The exit first lien revolving credit facility will be a reserve-based revolving credit facility with a borrowing base of at least $750 million on the Effective Date, and such other terms reasonably acceptable to the Samson and the required backstop parties, which may either be an amended and restated First Lien Credit Agreement or a new facility.

- *Recovery to Second Lien Lenders.*  The second lien lenders will receive all of the new common equity in the reorganized company, less the new common equity issued to the

32

rights offering participants, the backstop parties, and the holders of allowed general unsecured claims (subject to dilution by new common equity issued in connection with the management incentive plan).

- ***Recovery to Holders of Unsecured Claims.***  Holders of allowed general unsecured claims (including claims under the senior unsecured notes) will receive 1.0 percent of the reorganized common equity if they vote for the plan and 0.5 percent if they do not (subject to dilution on account of the management incentive program).

- ***Releases.***  The plan includes certain releases that are consistent with the releases contained in the Restructuring Support Agreement.  The releases in the Restructuring Support Agreement provide, in consideration for the Sponsors' agreement to support the plan and restructuring (including by cooperating to preserve the debtor's valuable tax attributes) a mutual release between the second lien lenders that signed the agreement and the Sponsors (in each case including certain related parties as well) and a release of the Sponsors by Samson (again including certain related parties).

- ***Preservation of Tax Attributes.***  The plan will preserve Samson's valuable tax attributes to defray cancellation of debt income and for future offsets against income tax obligations.  More specifically, the Sponsors have agreed, in consideration of the releases included in the plan, not to

> pledge, encumber, assign, sell or otherwise transfer, including by the utilization of a worthless stock deduction, offer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in [Samson] to the extent it will impair any of [Samson's] tax attributes.

Importantly, if the Sponsors validly terminate the Restructuring Support Agreement, the parties have agreed that they maintain the immediate right to move for relief to take any of the actions otherwise proscribed by the Restructuring Support Agreement (with all parties reserving rights to oppose any such relief).

82.    Preserving Samson's valuable tax attributes—specifically, approximately $1.4 billion of net operating losses ("NOLs") as of December 31, 2014 and certain other tax attributes that can offset current and future gains or operating income if the plan is structured as a taxable sale of assets or tax-free reorganization—is critical to any restructuring and was a component of the discussions with the second lien lenders.  Before the Petition Date, certain direct and indirect holders of common stock approached Samson and the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in

2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering an ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

83.     To ensure that the valuable NOLs are preserved and can be utilized by Samson, the second lien transaction was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the Restructuring Support Agreement not to sell or transfer any of their equity interests in Samson (including by utilization of a worthless stock deduction) to the extent it would impair any of Samson's tax attributes.  I have been advised that the releases granted pursuant to the Restructuring Support Agreement are consistent with the findings of an in-depth review and analysis of potential claims that Samson might possess against third parties, including the existing sponsors and any claims arising out of the 2011 leveraged buyout and the 2012 second lien loan as against the sponsors.  This investigation was commenced in anticipation of any potential in or out-of-court restructuring and is being conducted by Samson's counsel, K&E.  The investigation also includes all potential claims and causes of action associated with the 2011 leveraged buyout against other parties that are reserved under the plan.  I understand that K&E has collected and reviewed thousands of potentially relevant documents from Samson and the Sponsors in the course of its investigation.  I also understand that K&E interviewed a number of personnel of Samson and the Sponsors regarding the 2011 leveraged buyout, second lien term loan facility, and other matters.  Based on consultation with counsel, Samson concluded that it was in its best interests to provide releases in connection with an agreed-upon consensual

restructuring.  Most notably, the Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase Samson from the Schustermans.  As part of the 2011 buyout and related equity investment, the Sponsors, KKR and Crestview, received certain fees of approximately $68.1 million and $9.3 million, respectively.  Since the 2011 acquisition, the owners invested significant time and energy in Samson.  Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 sale transaction, KKR and Crestview have received advisory fees totaling approximately $33.5 million and $4.9 million, respectively, through the end of 2014.  Following the significant decline in the price of oil in late 2014, combined with the deterioration in Samson's asset base as reported in early 2015, Samson and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

84.    While the Sponsors could have pursued the noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that was achievable and in the best interests of Samson.  This will result in the cancellation of all existing equity interests.  In addition, the Sponsors are willing to forgo an immediate worthless stock deduction (that could have been taken in the weeks leading up to the filing of these chapter 11 cases) in return for the releases and other terms included in the Restructuring Support Agreement and the chapter 11 plan.

85.    It is important to note that Samson maintains a broad "fiduciary out" under the Restructuring Support Agreement.  Specifically, section 29 of the Restructuring Support Agreement provides, in part, that nothing will prevent Samson from "taking or refraining from taking any action (including, without limitation, terminating this Agreement under

## EXHIBIT 2

Excerpt of Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE
## GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (Del. Bar No. 3989)
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (215) 568-6603

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
J. Christopher Shore (admitted *pro hac vice*)
Michele J. Meises (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036
Telephone:      (212) 891-8200
Facsimile:      (212) 354-8113

**FARNAN LLP**
Joseph J. Farnan, Jr. (Del. Bar No. 100245)
Joseph J. Farnan, III (Del. Bar. No. 3945)
Michael J. Farnan (Del. Bar. No. 5165)
919 North Market Street
Suite 1200
Wilmington, Delaware 19801
Telephone:      (302) 777-0300
Facsimile:      (302) 777-0301

*Co-Counsel to the Official Committee of Unsecured Creditors*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

Although the parties agreed that this distribution would be available if all outstanding plan issues were resolved, they had not agreed on other key terms, including certain terms related to the implementation of the deal.  On December 28, 2016, the Committee filed an amended plan [Docket No. 1812] (the "Committee's Plan") incorporating the economic terms outlined above and reflecting the means for implementation that it supported.  The Debtors and the Second Lien Steering Committee filed a statement in opposition to the Committee's Plan.

On December 31, 2016, the Debtors filed a further amended plan [Docket No. 1822], which provided for the Debtors' reorganization and incorporated the majority of the economic terms agreed among the parties.  However, the full distribution to unsecured creditors was subject to certain potential reductions.

After the Debtors and the Committee had filed these amended plans, all parties continued settlement discussions regarding the implementation of the economic terms that had been previously agreed.  Ultimately, the parties reached agreement on all terms of the Plan, as further described herein and in the Plan.

The release provisions in the Plan have not changed from the previously filed plans and are fully supported by the First Lien Agent, the Second Lien Steering Committee, the Committee, and the Sponsors.  The Debtors believe that the Sponsors, the First Lien Lenders, and the Second Lien Lenders have provided valuable consideration for releases under the Plan, including by, among other things: preserving the Debtors' valuable tax attributes and agreeing to assign (or release) claims for management fees to the benefit of unsecured creditors, in the case of the Sponsors; agreeing to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders; and agreeing to receive a recovery largely comprised of equity in any reorganized business and agreeing to fund the Rights Offering under the Plan, in the case of the Second Lien Lenders.  The Committee believes the Debtors' estates have valuable causes of action against the First Lien Lenders, Second Lien Lenders, and the Sponsors.  The Debtors and other parties disagree and opposed the Committee's efforts to pursue such claims, but the Plan settles causes of action and such settlements provide significant recoveries to holders of General Unsecured Claims.  The parties' important concessions are needed for the confirmation of the Plan on the proposed terms.  The Debtors strongly believe that the Plan, including each of its terms, is in the best interests of the Debtors' estates, represents the best available alternative to successfully complete the Debtors' restructuring, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

## III.    OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments, resulting in a stronger, de-levered balance sheet for the Debtors. The Plan preserves the equity value upside of the Debtors as a reorganized company and provides improved recoveries for unsecured creditors.  Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion and the distribution of Cash proceeds of certain Asset Sales.  The key terms of the Plan are as follows:

### A.    Exit Facility

On the Final Effective Date, the Reorganized Debtors shall enter into the Exit Facility.  The terms of the Exit Facility will be set forth in the Exit Facility Documents.

The Exit RBL Facility shall be a reserve-based, first-lien, first-out revolving credit facility on the terms set forth in the Exit Facility Documents, which shall include, without limitation, the documentary terms and conditions set forth in the Exit Facility Terms, with an initial borrowings equal to the lesser of

**E.    Contribution of the Settlement Trust Assets and Calculation of the Settlement Trust Cash Amount**

On the Initial Effective Date, the Debtors shall transfer one hundred percent (100%) of the Settlement Trust Unencumbered Cash, the Contingent Value Right, and the Settlement Trust Causes of Action to the Settlement Trust for the benefit of holders of Allowed General Unsecured Claims, which assets shall vest in the Settlement Trust.  The Debtors shall not use the Settlement Trust Unencumbered Cash for any other purpose.  On the Initial Effective Date, the Settlement Trust shall be authorized to make distributions to holders of Allowed General Unsecured Claims and may commence prosecution of the Settlement Trust Causes of Action.

On the Final Effective Date, the Reorganized Debtors shall transfer the remainder of the Settlement Trust Cash Amount that is due (less the face amount of any Settlement Trust Letter of Credit delivered on the Final Effective Date) to the Settlement Trust.  Notwithstanding anything in the Plan to the contrary, the right of the Settlement Trust to receive Cash in the full amount of the Settlement Trust Cash Amount shall not be defeased, regardless of whether the Final Effective Date has occurred.

The Settlement Trust shall be administered in accordance with the Settlement Trust Agreement and shall have the standing and authority to enforce any obligations to it under the Plan; provided that the costs of administering the Settlement Trust and all fees and expenses incurred by and on behalf of the Settlement Trust shall be charged against the Settlement Trust Assets subject to the terms of the Settlement Trust Agreement.  Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall have no obligation to provide any funds or financing to the Settlement Trust, other than the obligation to contribute the Settlement Trust Assets, and under no circumstances will the expenses of the Settlement Trust be paid or reimbursed by the Debtors or the Reorganized Debtors, as applicable.

All documents relating to recoveries to holders of Allowed General Unsecured Claims, including the Settlement Trust Agreement, shall be subject to approval of the Committee.  Any trustee(s) of the Settlement Trust shall be selected by the Committee.

If the Settlement Trust Unencumbered Cash on the Initial Effective Date is greater than the Settlement Trust Cash Amount, the Cash in excess of such amount shall be retained by the Debtors or the Reorganized Debtors, as applicable.

The Settlement Trust Cash Amount, which is to be included in the Settlement Trust Assets, means Cash in an amount equal to $168,500,000, less the amount of the Settlement Trust Letter of Credit (if any); provided that, in the event the full Settlement Trust Cash Amount has not been contributed to the Settlement Trust prior to June 30, 2017, the Settlement Trust Cash Amount shall mean Cash in an amount equal to $180,000,000, and any unpaid amount shall accrue simple interest beginning on June 30, 2017, at the rate of ten percent (10%) per annum until paid in full.  For the avoidance of doubt, the Settlement Trust Cash Amount shall be funded, in part or in whole, from the Settlement Trust Unencumbered Cash as provided in the Plan.

Also included in the Settlement Trust Assets is the Contingent Value Right.  The Contingent Value Right is the right to receive the first Net Sale Proceeds in excess of $350,000,000, up to $11,500,000, if (a) on or before June 30, 2017, an agreement is reached to sell directly or indirectly all or substantially all of the Reorganized Debtors' assets, (b) such agreement is consummated, and (c) such agreement produces Net Sale Proceeds to the Reorganized Debtors in excess of $350,000,000.00.

### F.    Sponsor Management Fee Claims

On the Initial Effective Date, at the prior written election of the Committee, all Sponsor Management Fee Claims shall either be (a) waived and released by the applicable Sponsors or (b) allowed as General Unsecured Claims and contributed by the Sponsors to the Settlement Trust; *provided* that the Sponsors shall not be entitled to any recovery and shall receive no distribution on account of the Sponsor Management Fee Claims.

### G.    Distributions

Holders of Allowed First Lien Secured Claims shall receive a Pro Rata distribution of either the Exit RBL Facility or the Exit Term Loan.  Each holder of an Allowed Second Lien Secured Claim shall receive its Pro Rata distribution of 100 percent of the New Common Stock (subject to dilution for the Management Incentive Plan).  Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the beneficial interests in the Settlement Trust, entitling such holder to receive Settlement Trust Recovery Proceeds on account of such interests; *provided* that, on the Initial Effective Date, each holder of a Second Lien Deficiency Claim shall be deemed to have waived any recovery from the Settlement Trust on account of and receive no distribution under the Plan with respect to such Second Lien Deficiency Claim; *provided further* that the Sponsors shall not be entitled to any recovery under the Plan and shall receive no distribution on account of the Sponsor Management Fee Claims, which Sponsor Management fee Claims shall either be (i) waived and released by the applicable Sponsors or (ii) Allowed as General Unsecured Claims and contributed by the Sponsors to the Settlement Trust.

### H.    Releases

The Plan contains certain releases (as described more fully in Article IV.AA hereof), including mutual releases between Debtors, on the one hand, and (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, provided that, for the avoidance of doubt the forgoing exception shall not include any of the Sponsors or any of their respective current and former equity holders), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, provided that, for the avoidance of doubt the forgoing exception shall not include any of the Sponsors or any of their respective current and former equity holders), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (l) the DTC; *provided* that the foregoing shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

The Debtors believe that all of the Released Parties, in particular the Sponsors, the First Lien Lenders, and the Second Lien Lenders, have provided valuable consideration for releases under the Plan, including by, among other things:  preserving the Debtors' valuable tax attributes and agreeing to waive

| | | **SUMMARY OF EXPECTED RECOVERIES** | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims[4]** | **Projected Recovery Under the Plan** |
| | | settlement, release, and discharge of and in exchange for each Allowed Second Lien Secured Claim, each holder of an Allowed Second Lien Secured Claim shall receive its Pro Rata distribution of: (i) 100 percent of the New Common Stock (subject to dilution for the Rights Offering Stock, the Backstop Fee, and the Management Incentive Plan); and (ii) the Rights to participate in the Rights Offering. | | |
| 5 | General Unsecured Claims | On the Initial Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the beneficial interests in the Settlement Trust, entitling such holder to receive Settlement Trust Recovery Proceeds on account of such interests; *provided* that, on the Initial Effective Date, each holder of a Second Lien Deficiency Claim shall be deemed to have waived any recovery from the Settlement Trust on account of and receive no distribution under the Plan with respect to such Second Lien Deficiency Claim; *provided further* that the Sponsors shall not be entitled to any recovery under the Plan and shall receive no distribution on account of the Sponsor Management Fee Claims, which Sponsor Management fee Claims shall either be (i) waived and released by the applicable Sponsors or (ii) Allowed as General | [$2,423,818,350[6]] | [7.0% - 7.5%] |

---

[6]    Excludes second lien deficiency claims, which claims are included in the Second Lien Secured Claims' recovery for purposes of this table.  Includes Sponsor Management Fee Claim, which will be waived or assigned to the Settlement Trust under the Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[4] | Projected Recovery Under the Plan |
| | | Unsecured Claims and contributed by the Sponsors to the Settlement Trust. | | |
| 6 | Section 510(b) Claims | On the Final Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $0 | 0% |
| 7 | Intercompany Claims | Intercompany Claims may be Reinstated as of the Final Effective Date or, at the Debtors' or the Reorganized Debtors' option, in consultation with the First Lien Agent and the Second Lien Steering Committee, be cancelled, and no distribution shall be made on account of such Claims. | $7,896,830,000 | 0%-100% |
| 8 | Intercompany Interests | Intercompany Interests may be Reinstated as of the Final Effective Date or, at the Debtors' or the Reorganized Debtors' option, in consultation with the First Lien Agent and the Second Lien Steering Committee, be cancelled, and no distribution shall be made on account of such Interests. | N/A | 0%-100% |
| 9 | Interests in Parent | On the Final Effective Date, existing Interests in the Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in the Parent on account of such Interests. | N/A | 0% |

**E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

**F.    Are any regulatory approvals required to consummate the Plan?**

No. There are no known regulatory approvals that are required to consummate the Plan.

## EXHIBIT 3

Excerpt of Prepetition Restructuring Support Agreement entered into between the Debtors, the Sponsors, and certain holders of the Debtors' Second Lien Term Loan

<u>**EXHIBIT C**</u>

**Restructuring Support Agreement**

*EXECUTION VERSION*

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits and attachments hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of August 14, 2015, is entered into by and among:  (a) Samson Resources Corporation ("Samson") and certain of its subsidiaries, including Samson Investment Company (collectively, the "Company");[1] (b) the Sponsors (as defined below); (c) the Backstop Parties (as defined below); and (d) certain holders of Second Lien Loans (as defined below) party hereto from time to time (together with their respective successors and permitted assigns, the "Consenting Lenders").  The Company, each Sponsor, each Backstop Party, each Consenting Lender, and any person or entity that subsequently becomes a party hereto in accordance with the terms of this Agreement are referred to herein collectively as the "Parties" and individually as a "Party."  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Term Sheet (as defined below).

**WHEREAS**, as of the date hereof, the Backstop Parties, which directly or indirectly (through funds and accounts they manage or advise) hold or control the voting power with respect to approximately 45.5 percent of Second Lien Loans, have executed a term sheet with Samson, a copy of which is annexed hereto as **Exhibit A** (the "Term Sheet"), which sets forth, *inter alia*, the principal terms of a proposed $450 million gross new money investment (the "New Money Investment") to be funded pursuant to a proposed rights offering for (i) new common stock in the reorganized Company (the "New Common Stock", and the rights offering for such New Common Stock, the "Equity Offering") and new second lien term loans to the Company (the "New Debt," and the rights offering for such New Debt, the "Debt Offering", and together with the Equity Offering, the "Rights Offering"), all in connection with a restructuring (including, to the extent applicable, a 363 Sale (as defined below) consistent with the terms hereof, the "Restructuring Transaction") to be implemented pursuant to a joint plan of reorganization for the Company constituting an Acceptable Plan within the meaning set forth herein under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), and as part of voluntary chapter 11 cases (the "Chapter 11 Cases") to be commenced in a United States Bankruptcy Court having jurisdiction (the "Bankruptcy Court");

**WHEREAS,** pursuant to the Acceptable Plan, the Rights Offering will be offered to the holders of Second Lien Loans;

**WHEREAS,** subject to the terms and conditions contained in this Agreement and the Term Sheet, the Backstop Parties have committed to backstop the Rights Offering;

**WHEREAS**, upon a 363 Sale Triggering Event (as defined below), the Company will pursue a sale of substantially all of its assets pursuant to section 363 of the Bankruptcy Code in

---

[1]    The subsidiaries included in the "Company" are:  Geodyne Resources, Inc.; Samson Contour Energy Co.; Samson Contour Energy E&P, LLC; Samson Holdings, Inc.; Samson-International, Ltd.; Samson Lone Star, LLC; SGH Enterprises, Inc.; and Samson Resources Company.

<u>**EXHIBIT 4**</u>

Excerpt of Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation
and Its Debtor Affiliates

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ryan J. Dattilo (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

-and-

Morton Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (215) 568-6603

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

103.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance reasonably acceptable to the Debtors, the Sponsors (solely with respect to the Sponsor Consent Right), and the Required Backstop Parties (as amended, supplemented, or modified from time to time with the reasonable consent of the Required Backstop Parties and the Sponsors (solely with respect to the Sponsor Consent Right) in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), to be Filed by the Debtors no later than 10 days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, including the following, as applicable:  (a) New Organizational Documents; (b) Exit First Lien Credit Agreement; (c) New Second Lien Credit Agreement; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) Management Incentive Plan; (g) a document listing the members of the New Boards; (h) the Stockholders Agreement; and (i) the New Intercreditor Agreement.   The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date with the reasonable consent of the Sponsors (solely with respect to the Sponsor Consent Right) and the Required Backstop Parties.

104.     "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

105.     "*Preferred Interests*" means the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011.

106.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

107.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

108.     "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

109.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

110.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

111.     "*Released Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Lenders; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Backstop Parties; (g) the Consenting Lenders; (h) the Non-Debtor Subsidiaries; and (i) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (h), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals; and (j) DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

112.     "*Releasing Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Lenders; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Backstop Parties; (g) the Consenting Lenders; (h) all holders of Claims and Interests that are deemed to accept the Plan; (i) all holders of Claims and Interests who vote to accept the Plan; (j) all holders in voting Classes who abstain

**reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Restructuring Support Agreement or the Plan or a Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against an Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

L.    *Release of Avoidance Actions*

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition. No Avoidance Actions shall revert to creditors of the Debtors.

M.    *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

N.    *Management Incentive Plan*

On the Effective Date, equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and employees of the Reorganized Debtors, on terms to be negotiated with certain material terms included in the Plan Supplement. On or as soon after the Effective Date as is reasonably practicable, five percent of the New Common Stock will be preliminarily granted to Management Incentive Plan participants, which grants shall be subject to ratification by the New Board of the Reorganized

## EXHIBIT 5

Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of
Samson Resources Corporation and Its Debtor Affiliates

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (___) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON
RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ryan J. Dattilo (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

-and -

Morton Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (215) 568-6603

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**P.    How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided that* unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition.  No Avoidance Actions shall revert to creditors of the Debtors.

**Q.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors, the Backstop Parties, and the Sponsors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.  Preserving the Debtors' valuable tax attributes—specifically, $1.4 billion of net operating losses ("NOLs") that can offset current and future tax obligations—is critical to any restructuring and was a component of the discussions with the Backstop Parties.  Preservation of the NOLs would not be possible without the support of the Sponsors.  Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and certain of the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering an ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

To ensure that the valuable NOLs are preserved and can be utilized by Samson, the second lien transaction was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the Restructuring Support Agreement not to sell or transfer any of their equity interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.

The Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase the Debtors.  As part of the 2011 buyout and related equity investment, the Sponsors received certain fees of approximately $77.4 million.  Since the 2011 acquisition, the owners invested significant time and energy in the Debtors.  Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 sale transaction, the Sponsors have received advisory fees totaling approximately $38.4 million through the end of 2014. Following the significant decline in the price of oil in late 2014, combined with the deterioration in the Debtors' asset base as reported in early 2015, the Debtors and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

While the Sponsors could have pursued the noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that

was achievable and in the best interests of the Debtors.  This will result in the cancellation of all existing equity interests.  In addition, the Sponsors are willing to forgo an immediate worthless stock deduction (that could have been taken in the weeks leading up to the filing of these chapter 11 cases) in return for the releases and other terms included in the Restructuring Support Agreement and the Plan.

The Plan will preserve the Debtors' valuable tax attributes to offset gains in the event the Plan is structured as a taxable sale of assets or to offset future operating income in the event the Plan is structured as a tax-free reorganization.  More specifically, the Sponsors have agreed subject to the terms of the Restructuring Support Agreement, in consideration of the releases included in the Restructuring Support Agreement and the Plan, not to pledge, encumber, assign, sell, or otherwise transfer, including by the utilization of a worthless stock deduction, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of their right, title, or interests in any of their shares, stock, or other interests in the Debtors to the extent it will impair any of the Debtors' tax attributes.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Each holder of a Claim or Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1)    *Release of Liens*

Except as otherwise specifically provided in the Plan, the New Credit Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the New Credit Facilities Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the First Lien Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the New Credit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

**EXHIBIT 6**

Excerpt of transcript from the hearing dated September 18, 2015

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                          :

                                      :    Chapter 11

6    SAMSON RESOURCES CORPORATION    :

                                      :    Case No. 15-11934-CSS

7                                     :

              Debtors.                :    (Jointly Administered)

8    _____     :

9

10

11

12

13                              United States Bankruptcy Court

14                              824 North Market Street

15                              Wilmington, Delaware

16                              September 18, 2015

17                              3:06 PM - 5:57 PM

18

19

20

21    B E F O R E :

22    HON CHRISTOPHER S. SONTCHI

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO OPERATOR:  LESLIE MURIN

Page 35

```
1    admission of the declaration of Philip Cook, executive vice-

2    president and chief financial officer of the company.  He's

3    been introduced.  He's in the courtroom today.  That was

4    filed at Docket Number Two in support of the pleadings.

5              Exhibit A to Mr. Cook's declaration details, we

6    believe provides the factual support for the various relief

7    that we're seeking here today on an interim basis.  And

8    again -- and I think the declaration makes it clear -- we

9    are today seeking relief that we believe is absolutely

10   critical and consistent with the bankruptcy rules of

11   providing relief that would result in immediate and

12   irreparable harm.

13             THE COURT:  Does anyone object to the admission of

14   the declaration?  Mr. Shore?

15             MR. SHORE:  Mr. Shore, from White & Case, on

16   behalf of the group of ad hoc -- or an ad hoc group of

17   unsecured noteholders of Samson.  We'd object to entry of

18   the affidavit in wholesale without the witness subject to

19   cross-examination.  We can handle the cross-examination in

20   connection with various motions as they come up.  But I

21   guess we would like to know the order they're coming up so

22   we know how to handle the examination.

23             THE COURT:  Well, certainly you'll have the

24   opportunity to cross-examine the witness, even if the

25   declaration is admitted.  So, I'll admit the declaration,
```

1    subject to cross-examination.  And we'll figure out how --

2    your right to do that as we go forward is fully preserved.

3           MR. SHORE:  Can I ask one other question that

4    wasn't asked?  How long does Your Honor have today?

5           THE COURT:  Until we're done.

6           MR. SHORE:  All right.

7           MR. SUSSBERG:  Your Honor?

8           THE COURT:  Again, no time Monday.  I've got other

9    matters.  And I've got no time Tuesday.  And -- well, and

10   then Wednesday is the holiday.  So, we'll finish.

11          MR. SUSSBERG:  Your Honor, as far as the order, to

12   Mr. Shore's comment, what I thought would make sense is to

13   address the motions for which there have been objections.

14   That would be cash collateral, the lien motion, and then

15   cash management.  And then we could proceed with the rest of

16   the agenda thereafter, if that's okay with Your Honor and

17   Mr. Shore.

18          And, Your Honor, I'm sorry; I would like to start

19   with joint administration.  Hopefully that's not an issue.

20          MR. SHORE:  I am so tempted, but I'll sit down.

21          THE COURT:  That's not a problem.  Agenda item

22   three, I believe, correct?

23          MR. SUSSBERG:  Yes, Your Honor.

24          THE COURT:  I don't need a presentation on that.

25   Does anyone have any objection to it?  All right.  I looked

Page 69

1    alternative.  But that's how we got comfortable with that

2    relief, Your Honor.

3              And, Your Honor, if I may, just one other point.

4    Mr. Shore, in the context of cash collateral, talked about

5    avoidance actions, and investigations, and potential claims,

6    and who gets the benefit of these claims, where they're

7    reserved, and the like.  All for another day.  The avoidance

8    action proceeds and the liens are at the final hearing.  But

9    I do want to note, Your Honor, there has been an

10   investigation.  It's an ongoing investigation.  We were

11   engaged in discussions and negotiations with our key

12   stakeholders.  We were hoping to achieve an out-of-court

13   restructuring with the very people that are objecting.  But

14   in anticipation of either an in-court or an out-of-court

15   restructuring, it was prudent to do that investigation.  We

16   brought on an independent director to continue to review and

17   commence and complete that investigation.  It relates to the

18   2011 LBO and the causes of action that are reserved under

19   the plan, as it relates to the parties that sold the

20   company.  And it's an investigation that's ongoing.  It's an

21   investigation that will be conducted by Mr. Miller, who is

22   referenced in the declaration, who has retained the law firm

23   of Skadden, Arps.  That's for another day, but I wanted to

24   make sure that was clear, Your Honor.

25              THE COURT:  What money to either the RBL or the

**EXHIBIT 7**

Excerpt of Amended Joint Chapter 11 Plan of Reorganization of
Samson Resources Corporation and Its Debtor Affiliates

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934  (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

-and-

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-2700
Facsimile:        (215) 568-6603

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

110.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

111.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

112.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

113.    "*Released Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (l) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

114.    "*Releasing Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) all holders of Claims and Interests that are deemed to accept the Plan; (j) all holders of Claims and Interests who vote to accept the Plan; (k) all holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (l) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; and (m) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (l), such Entities' current and former affiliates' and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals,  managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

115.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

116.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

117.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit B</u> to the Disclosure Statement.

118.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

119.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule, in form and substance acceptable to the Debtors and the First Lien Agent (including any amendments or modifications thereto) of certain Executory Contracts and Unexpired Leases, if any, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time prior to the Confirmation Date with the consent of the First Lien Agent.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

N.      *Release of Avoidance Actions*

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition. No Avoidance Actions shall revert to creditors of the Debtors.

O.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code, except to the extent any such policies require payment of any premiums, deductibles or any other amounts by the Reorganized Debtors. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect, but in no event shall be responsible for paying any premiums, self-insured retentions, deductibles or other amounts that may be due or otherwise become due under such policy (including as a result of any such claim against the policy) and the liability of the Debtors under the operation of the D&O Liability Insurance Policy (including such tail coverage liability insurance), and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

P.      *Management Incentive Plan*

On the Effective Date, equity grants equal to up to ten percent (10%) of the New Common Stock (on a fully diluted basis) shall be reserved for awards to management of the Reorganized Debtors and the New Board of the Reorganized Parent, on terms to be negotiated with certain material terms included in the Plan Supplement. On or as soon after the Effective Date as is reasonably practicable, five percent (5%) of the New Common Stock will be preliminarily granted to Management Incentive Plan participants in consultation with the Chief Executive Officer of Reorganized Parent, which grants shall be subject to ratification by the New Board of the Reorganized Parent, and the remaining up to five percent (5%) of the New Common Stock shall be awarded at the discretion of the New Board of the Reorganized Parent. The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent.

## EXHIBIT 8

Excerpt of Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of
Samson Resources Corporation and Its Debtor Affiliates

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON
RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
*Co-Counsel to the Debtors and Debtors in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

-and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-2700
Facsimile:    (215) 568-6603

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

**P.     How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Plan (including, against any Released Party), the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition, other than against any Released Party.   No Avoidance Actions shall revert to creditors of the Debtors.

**Q.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides releases to the Released Parties and exculpates the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Restructuring Transactions contemplated by the Plan and the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors, the Backstop Parties, and the Sponsors in obtaining their support for the Plan pursuant to the terms of the prepetition restructuring support agreement.   Preserving the Debtors' valuable tax attributes—specifically, $1.4 billion of net operating losses ("NOLs") that can offset current and future tax obligations—is critical to any restructuring.   Preservation of the NOLs would not be possible without the support of the Sponsors. Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and certain of the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015.   These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering any ownership change.   Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.   Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

To ensure that the valuable NOLs are preserved and can be utilized by Samson, the transaction contemplated by the prepetition restructuring support agreement was structured to include certain agreements with the Sponsors.   More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the prepetition restructuring support agreement not to sell or transfer any of their equity interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.

The Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase the Debtors.   As part of the 2011 buyout and related equity investment, the Sponsors received certain fees of approximately $77.4 million.   Since the 2011 Acquisition, the owners invested significant time and energy in the Debtors.   Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 Acquisition, the Sponsors received advisory fees totaling approximately $38.4 million through the end of 2014.   Following the significant decline in the price of oil in late 2014, combined with the deterioration in the Debtors' asset base as reported in early 2015, the Debtors and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

While the Sponsors could have pursued the prepetition noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that was achievable and in the best interests of the Debtors.   This will result in the cancellation of all existing equity interests.   In addition, the Sponsors are willing to forgo an immediate worthless

**EXHIBIT 9**

Excerpt of Debtors' (I) Objection to Creditors' Committee's Motion to Terminate Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan and (II) Brief in Support of Debtors' Motion (A) to Extend the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan; (B) To Strike Committee's Motion; and (C) For Other Sanctions the Court Deems Appropriate

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | Case No. 15-11934 (CSS) |
| Debtors. | (Jointly Administered) |

## DEBTORS' (I) OBJECTION TO CREDITORS' COMMITTEE'S MOTION TO TERMINATE EXCLUSIVE PERIODS TO FILE AND SOLICIT ACCEPTANCES OF A CHAPTER 11 PLAN AND (II) BRIEF IN SUPPORT OF DEBTORS' MOTION (A) TO EXTEND THE EXCLUSIVE PERIODS TO FILE AND SOLICIT ACCEPTANCES OF A CHAPTER 11 PLAN; (B) TO STRIKE COMMITTEE'S MOTION; AND (C) FOR OTHER SANCTIONS THE COURT DEEMS APPROPRIATE

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

1

the automatic stay." (Termination Mot. ¶ 57.)  This is incorrect.  The sponsors had the option to take the deduction *before* the Debtors commenced these cases.  Indeed, certain of the Debtors' equity holders actually did take worthless stock deductions prepetition, as the Debtors have previously disclosed.[6]

33.     Second, the Committee's suggestion that "the Debtors' estates have valuable Avoidance Actions against the Sponsors to avoid payments made to the Sponsors at the time of, and following" the 2011 acquisition is wrong for all the same reasons its theories about the first lien lenders are wrong.  To avoid any payments the Debtors have made to the sponsors, the Committee would have to show that the Debtors were insolvent in 2011, when the Debtors entered into the relevant agreements.  *See In re Central Ill. Energy Coop.*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) ("It is widely recognized by courts that where a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation."); *In re TSIC, Inc.*, 428 B.R. 103, 110–11, 114 (Bankr. D. Del. 2010) (holding relevant transaction for fraudulent conveyance inquiry was execution of severance agreement, not actual severance payment).  But those agreements cannot be avoided because the Debtors were plainly solvent at the time of and for several years after the acquisition.  Thus, the plan's releases cost the estates nothing in exchange for the numerous valuable contributions the

---

[6]     [*See* Docket No. 2, ¶ 82.]  Prepetition, those holders approached the Debtors and the sponsors seeking to have their interests repurchased so that they could take a worthless stock deduction in 2015.  These transactions were carefully considered and then approved and executed so as to avoid triggering any ownership change that might jeopardize the Debtors' NOLs.  In all likelihood, any such transaction involving the sponsors would have impaired those NOLs.

18

sponsors have made and continue to make to the Debtors and their restructuring. These releases clearly satisfy applicable legal standards—a point the Debtors will prove at confirmation.[7]

### 5.   The Committee's Alternate Plan Is Not Viable.

34.     The Committee's alternate plan is predicated on the first lien lenders receiving a fraction of the value of their rightful secured claims. The only way to make that plan viable is to accept as truth the Committee's theories either about the Debtors' alleged claims against the first lien lenders and about valuation of the Debtors' business. As discussed extensively herein, those theories are not valid.

35.     Despite these problems, the Committee has refused to engage with the Debtors on plan terms under any other plan construct, whether using the Debtors' plan as a baseline or otherwise. The Debtors have offered to discuss equity splits, the mix of assets that could be used to fund a trust for the benefit of unsecured creditors, and the merits of the Committee's lien challenges, among others, but the Committee has demurred at each turn, opting instead for threats, in no uncertain terms, to mire these cases in months of litigation if its proposal is not accepted.[8] Surely, this sort of threat cannot justify terminating exclusivity. *Cf. In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 410 (E.D.N.Y. 1989) (denying committee's appeal and affirming bankruptcy court's extension of exclusivity where debtor made "continued attempts to negotiate with the creditor's committee" despite "recalcitrance of the creditors and their intent to liquidate rather than negotiate with the debtor to agree" on a plan).

---

[7]     *See U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan . . . if the release . . . is fair, reasonable, and in the best interests of the estate."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (release of claims against non-debtors proper where non-debtor makes "substantial contribution" to restructuring).

[8]     (*See* Termination Mot. ¶ 12 (threatening "crushing administrative costs associated with a six month confirmation process").)

<u>**EXHIBIT 10**</u>

Excerpt of Motion of The Official Committee of Unsecured Creditors for Entry of Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims and Causes of Action on Behalf of Debtors' Estates

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | **Objection Deadline:  August 26, 2016 at 4:00 p.m. ET** |
| | ) | **Hearing Date and Time: September 7, 2016 at 10:00 a.m. ET** |

**NOTICE OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR ENTRY OF ORDER GRANTING EXCLUSIVE STANDING AND AUTHORITY TO
COMMENCE, PROSECUTE, AND SETTLE CERTAIN CLAIMS
AND CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES**

**PLEASE TAKE NOTICE** that on August 12, 2016, the *Motion of the Official Committee of Unsecured Creditors for Entry of Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claims and Causes of Action on Behalf of Debtors' Estate* (the "Motion") was filed with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that any objection or response to the Motion must be filed with the Bankruptcy Court on or before **AUGUST 26, 2016, AT 4:00 P.M. PREVAILING EASTERN TIME.**

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also serve a copy of the response or objection upon:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).

**EXHIBIT 11**

Excerpt of Debtors' Objection to Creditors' Committee's Motion for Standing

REDACTED

## **EXHIBIT 12**

Excerpt of Notice of Filing Plan Support Agreement

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administered) |
| | ) | |
| | ) | **Re: Docket No. 961** |

**NOTICE OF FILING PLAN SUPPORT AGREEMENT**

1.      On August 26, 2016, the above-captioned debtors and debtors in possession (collectively, the "Debtors") entered into a plan support agreement with certain of the lenders under their second lien term loan, collectively holding approximately 39 percent of the second lien loan claims.

2.      The plan support agreement provides for the terms of an amended chapter 11 plan that, among other things, will provide a full recovery to the Debtors' first lien lenders and a distribution of substantially all equity in the reorganized Debtors to the second lien lenders.  In addition, the plan will place substantially all unencumbered assets in trust for the ultimate benefit of unsecured creditors to the extent of available proceeds.

3.      The restructuring support agreement is attached hereto as **Exhibit A**.  The Debtors intend to file a further amended plan of reorganization and disclosure statement consistent with the plan support agreement in the near term.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

| | |
|---|---|
| **& Contracts** | Designated Asset Sales, the Debtors may not assume, assume and assign, or reject any executory contracts or unexpired leases without the prior written consent of the Second Lien Steering Committee, which consent shall not be unreasonably withheld. |
| **Other** | ■ The Plan will include customary releases and exculpations for the First Lien Agent, the other First Lien Secured Parties, the Second Lien Agent, the Second Lien Lenders, the sponsors listed in Exhibit D to the August 14, 2015 Restructuring Support Agreement, each of the foregoing parties' respective current and former officers, directors, advisors and other representatives, and the Debtors' current and former officers, directors, advisors and other representatives, and in all cases consistent with the release and exculpation provisions set forth in the plan filed by the Debtors on September 17, 2015.<br><br>■ The Plan will include indemnification provisions consistent with the indemnification provisions set forth in the plan filed by the Debtors on September 17, 2015. |
| **Implementation** | ■ As soon as practicable, the Debtors and the Second Lien Steering Committee will sign a restructuring support agreement incorporating the terms set forth in this Plan Term Sheet.<br><br>■ The Debtors will file a revised plan and disclosure statement consistent with this Plan Term Sheet and the restructuring support agreement on or before August 31, 2016.<br><br>■ The Debtors will provide summary information related to asset sale bids and agree on related cleansing materials to be included in the disclosure statement. |

## EXHIBIT 13

Excerpt of Second Amended Joint Chapter 11 Plan of Reorganization of
Samson Resources Corporation and Its Debtor Affiliates

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934  (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

-and-

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:        (215) 569-2700
Facsimile:        (215) 568-6603

*Co-Counsel to the Debtors and Debtors in Possession*

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

which amendments shall be reasonably acceptable to the First Lien Agent and the Second Lien Agent (in consultation with the Second Lien Steering Committee), and the final versions of all such documents and exhibits shall be Filed by no later than the Effective Date.

100.    "*Plan Support Agreement*" means the Plan Support Agreement, dated as of August 26, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit A</u> to the *Notice of Filing Plan Support Agreement* [Docket No. 1290].

101.    "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

102.    "*Preferred Interests*" means the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011.

103.    "*Prepetition Collateral*" means the First Lien Collateral and the Second Lien Collateral.

104.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105.    "*Pro Forma Cash*" means the Debtors' Cash available on the Effective Date, excluding Accrued Professional Compensation, the First Lien Secured Parties' and Second Lien Secured Parties' outstanding professional fees, other backend fees and holdbacks as of the Effective Date (which estimate shall be calculated in good faith by the Debtors prior to the Effective Date, in consultation with the First Lien Agent and the Second Lien Steering Committee), and financial and business restructuring costs that have been realized or are reasonably expected to be realized within six months of the Effective Date, assuming a status quo operation of the Company (i.e., no acquisitions or divestitures), which amounts shall be consistent with the requirements of the Exit Facility Terms.

106.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

107.    "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

108.    "*Professional Fee Escrow*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors or the Reorganized Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Court.

109.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

110.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

111.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

112.    "*Released Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the

Senior Notes Indenture Trustee; (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

113.    "*Releasing Party*" means each of the following in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) all holders of Claims and Interests that are deemed to accept the Plan; (j) all holders of Claims and Interests who vote to accept the Plan; (k) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (l) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan and who do not opt out of the releases provided by the Plan; and (m) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (l), such Entities' current and former affiliates' and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals,  managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

114.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

115.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

116.    "*Required Consenting Lenders*" means, as of any date of determination, Consenting Lenders holding a majority of the aggregate outstanding principal amount of the Second Lien Claims held by Consenting Lenders.

117.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as Exhibit B to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 16].

118.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

119.    "*Retention Option Assets*" means the Unencumbered Assets that the Debtors determine, in consultation with the Second Lien Steering Committee, are necessary or appropriate for continued use by the Reorganized Debtors after the Effective Date.  The Debtors expect the Retention Option Assets to include certain land and buildings or fixtures related to field offices and certain other Unencumbered Assets of de minimis value.

120.    "*Retention Option Payment*" means Cash in an amount equal to the fair market value of the Retention Option Assets.

121.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule, in form and substance reasonably acceptable to the Debtors (including any amendments or modifications thereto) and the Second Lien Steering Committee, in consultation with the First Lien Agent, of certain Executory Contracts and Unexpired Leases, if any, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as

# EXHIBIT 14

Excerpt of Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE SECOND
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

-and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (215) 568-6603

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

following the Petition Date, domestic crude oil prices continued falling, dropping to approximately $26 per barrel in early February 2016, the lowest price since 2002. Natural gas prices declined over 40 percent, to historic lows of less than $1.50 per MMBtu on March 4, 2016. Additionally, the Debtors, the Second Lien Lenders, and the First Lien Lenders had not reached agreement on financing before other factors made the second-lien-led restructuring unworkable. Finally, continued objections from the unsecured creditors' committee (the "Committee") and the delays related thereto caused the Debtors to miss multiple milestones in the restructuring support agreement. As a result, the Second Lien Lenders that had agreed to backstop the Debtors' proposed $450 million rights offering, in January 2016 indicated they could no longer pursue the negotiated restructuring.

During this time (September–December 2015), the Debtors engaged in discussions with and took steps to address significant objections from the Committee largely related to the Debtors' use of cash collateral. More specifically, the Committee took issue with the Debtors' prepetition valuation analysis (including value associated with encumbered and unencumbered assets) and the specific terms on which the Debtors were permitted to use cash on hand. Rather than engage in expensive and time-consuming litigation regarding cash collateral, which involved issues that would largely be resolved in the context of confirmation of any chapter 11 plan, the Debtors, the Committee, and the First Lien Lenders and Second Lien Lenders agreed to adjourn the Court's final approval of the cash collateral arrangement and operate under a series of interim orders, without prejudice to any party's rights, arguments, or litigation position.

With the second lien lenders no longer willing to fund the significant investment contemplated by the restructuring support agreement, in January 2016 the Debtors re-started discussions with their other major creditor constituencies regarding a new restructuring path, all while the price of natural gas and oil continued to fall.

Among other things, the Debtors entered into discussions with the First Lien Agent and a steering committee of First Lien Lenders regarding a stand-alone reorganization. The steering committee indicated that it wanted the Debtors to pursue near-term asset sales to monetize their collateral and provide for a cash recovery. The Debtors, however, did not believe that isolated asset sales would maximize value. Instead, the Debtors held firm in their view that any asset sales needed to be conducted with a "backstop" restructuring agreed upon and in place, such that the asset sale proceeds, if any, would be distributed through a plan. The First Lien Lenders ultimately agreed to proceed with the Debtors' proposed approach. Accordingly, in February 2016, the Debtors commenced the marketing process, contacting over 550 potential buyers, and executing non-disclosure agreements with more than 180 potential purchasers. Parties that executed non-disclosure agreements were granted access to a data room and provided with significant diligence information regarding the Debtors' assets.

At the same time as the marketing process was unfolding, the Debtors continued discussions with the Committee and its advisors regarding a potential restructuring to be sponsored by unsecured creditors and supported by the First Lien Lenders. Importantly, any unsecured-led restructuring that contemplated a distribution or recovery to the First Lien Lenders in equity (in addition to any cash or debt instrument) would require the support of the First Lien Lenders. In February 2016, advisors to the Committee provided the Debtors and the First Lien Agent with a term sheet setting forth a proposed concept for a potential restructuring. The Committee term sheet contemplated a restructuring led by certain Senior Noteholders through the backstop of a new money investment (of at least $100 million). While the advisors to the First Lien Agent indicated a willingness to discuss a restructuring transaction and new money investment by unsecured creditors (with a potential paydown), no committed transaction was available as of February 2016. Moreover, the advisors to the First Lien Agent indicated that their view on value differed significantly from that shared by the advisors to the Committee.

8

### F.    Releases

The Plan contains certain releases (as described more fully in Article IV.Q hereof), including mutual releases between Debtors, on the one hand, and (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (l) the DTC; *provided* that the foregoing shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

The Debtors believe that all of the Released Parties, in particular the Sponsors, the First Lien Lenders, and the Second Lien Lenders, have provided valuable consideration for releases under the Plan, including by, among other things:  preserving the Debtors' valuable tax attributes, in the case of the Sponsors; agreeing to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders; and agreeing to receive a recovery largely comprised of equity in any reorganized business and agreeing to fund certain administrative expenses under the Plan, in the case of the Second Lien Lenders. The parties' important concessions are needed for the confirmation of the Plan on the proposed terms. The Debtors strongly believe that the Plan, including each of its terms, is in the best interests of the Debtors' estates, represents the best available alternative to successfully complete the Debtors' restructuring, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

The Plan also provides that each holder of a Claim or an Interest that (1) votes to accept or is deemed to accept the Plan or (2) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  These releases are integral to the Restructuring Transactions contemplated by the Plan.

Mr. Alan Miller serves as the Debtors' independent director to, among other things, review and determine the appropriateness of the releases included in the Plan.

### G.    Management Incentive Plan

The Plan contemplates the implementation of the Management Incentive Plan, the terms of which shall be negotiated by the Debtors and the Second Lien Steering Committee and included with the Plan Supplement.  If the Management Incentive Plan is an equity-based award plan, up to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for awards to management of the Reorganized Debtors and the New Board of the Reorganized Parent under the Management Incentive Plan.  The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent, as set forth in the Plan Supplement.  The New Common Stock issued pursuant to the Management Incentive Plan will dilute the pro rata ownership of other holders of New Common Stock.

14

**N.** **How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

The Debtors' estimate that General Unsecured Claims total approximately $3.5 billion, which includes estimated Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases. To the extent that the actual amount of rejection damages claims changes, the value of recoveries to holders of Claims in Class 5 could change as well, and such changes could be material.

**O.** **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Articles IV.C, Article IV.M, and Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court (or any other court of competent jurisdiction), the Debtors or the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity, other than those released pursuant to the Plan, shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**P.** **How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Plan (including, against any Released Party), the Debtors shall not release any Avoidance Actions arising out of or related

23

to the 2011 Acquisition, other than against any Released Party.  No Avoidance Actions shall revert to creditors of the Debtors.

> **Q.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides releases to the Released Parties and exculpates the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Restructuring Transactions contemplated by the Plan and the Debtors' overall restructuring efforts.  All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Plan will preserve the Debtors' valuable tax attributes to offset gains in the event the Plan is structured as a taxable sale of assets or to offset future operating income in the event the Plan is structured as a tax free reorganization.  Preserving the Debtors' valuable tax attributes—specifically, $1.4 billion of net operating losses ("NOLs") that can offset current and future tax obligations—is critical to any restructuring.  Preservation of the NOLs would not be possible without the support of the Sponsors. Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and certain of the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering any ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

To ensure that the valuable NOLs are preserved and can be utilized by Samson, the transaction contemplated by the prepetition restructuring support agreement was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the prepetition restructuring support agreement not to sell or transfer any of their equity interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.  While the Sponsors could have pursued the prepetition noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that was achievable and in the best interests of the Debtors.

The Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase the Debtors.  As part of the 2011 buyout and related equity investment, the Sponsors received certain fees of approximately $77.4 million.  Since the 2011 Acquisition, the owners invested significant time and energy in the Debtors.  Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 Acquisition, the Sponsors received advisory fees totaling approximately $38.4 million through the end of 2014.  Following the significant decline in the price of oil in late 2014, combined with the deterioration in the Debtors' asset base as reported in early 2015, the Debtors and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

Each holder of a Claim or Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan will

24

be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1.    Release of Liens

Except as otherwise specifically provided in the Plan, the Exit Credit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Credit Facility Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. In addition, the First Lien Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Exit Credit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto. It is expected that the First Lien Agent and the First Lien Lenders will retain their existing mortgages and liens, in addition to all other collateral protections the First Lien Lenders will be afforded, in respect of the Exit RBL Facility and the Exit Term Loan.

### 2.    Debtor Release

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, the Released Parties are deemed expressly, unconditionally, generally, and individually and collectively, acquitted, released and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such releasing party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of, or any other transaction relating to any security of the Debtors, the subject matter of, or the

25

**<u>EXHIBIT 15</u>**

Excerpt of Order Denying Debtors' Second Motion to Extend Exclusive Periods

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 15-11934 CSS) |
| SAMSON RESOURCES | ) | |
| CORPORATION, et al., | ) | |
| | ) | Docket Nos.: 976, 977 and 1028 |
| Debtors. | ) | |
| | ) | |

## ORDER

Upon consideration of the Motion of the Official Committee of Unsecured

Creditors for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R.

Bankr. P. 9018 Authorizing Filing of Certain Information Under Seal in Connection

with Its Motion for Entry of Order Pursuant to 11 U.S.C. §1121(d) Terminating

Debtors' Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof

[D.I. 976] filed on May 24, 2016; the Motion of the Official Committee of Unsecured

Creditors for Entry of Order pursuant to 11 U.S.C. §1121(d) Terminating Debtors'

Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof [D.I. 977]

filed on May 24, 2016; and Debtors' Motion (I) to Extend the Exclusive Periods to

File and Solicit Acceptances of a Chapter 11 Plan; (II) to Strike Committee's Motion;

and (III) for Other Sanctions the Court Deems Appropriate [D.I. 1028] filed June 8,

2016 (the "Motions"); the Court having reviewed the Motions and the objections

thereto; the Court having heard the statements of counsel and parties in interest

regarding the Motions at a hearing before the Court on September 27, 2016 (the

"Hearing"); the Court having found that (i) the Court has jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) notice of the Motions and the Hearing were sufficient notice under the circumstances; and (iv) the Court has judicial power to enter a final order.

IT IS HEREBY ORDERED THAT:

1)    The Motion of the Official Committee of Unsecured Creditors of Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing Filing of Certain Information Under Seal in connection with Its Motion for Entry of Order Pursuant to 11 U.S.C. §1121(d) Termination Debtors' Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof is denied as moot.

2)    The Motion of the Official Committee of Unsecured Creditors for Entry of Order pursuant to 11 U.S.C. §1121(d) Terminating Debtors' Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof is denied as moot.

3)    The Debtors' Motion (I) to Extend the Exclusive Periods to File and Solicit Acceptances of a Chapter 11 Plan; (II) to Strike Committee's Motion; and (III) for Other Sanctions the Court Deems Appropriate is denied for the reasons set forth on the record at the hearing.

Christopher S. Sontchi, Judge
United States Bankruptcy Court

Dated: September 27, 2016

## EXHIBIT 16

Excerpt of Joint Chapter 11 for Samson Resources Corporation and Its Debtor Affiliates Proposed by Official Committee of Unsecured Creditors

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | **Chapter 11** |
| | ) | |
| **SAMSON RESOURCES CORPORATION,** *et al.,***[1]** | ) | **Case No. 15-11934  (CSS)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

---

## JOINT CHAPTER 11 PLAN FOR SAMSON RESOURCES CORPORATION
## AND ITS DEBTOR AFFILIATES
### PROPOSED BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

FARNAN LLP
Joseph J. Farnan, Jr. (Bar No. 100245)
Joseph J. Farnan, III (Bar No. 3945)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone:  (302) 777-0300
Facsimile:  (302) 777-0301
farnan@farnanlaw.com
jjfarnan@farnanlaw.com
mfarnan@farnanlaw.com

WHITE & CASE LLP
Thomas E Lauria (pro hac vice)
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
tlauria@whitecase.com

Glenn M. Kurtz (pro hac vice)
J. Christopher Shore (pro hac vice)
Michele J. Meises (pro hac vice)
Thomas MacWright (pro hac vice)
John J. Ramirez (pro hac vice)
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
gkurtz@whitecase.com
cshore@whitecase.com
michele.meises@whitecase.com
tmacwright@whitecase.com
john.ramirez@whitecase.com

*Co-Counsel to the Official Committee of Unsecured*
*Creditors*

---

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

**EXHIBIT 17**

Excerpt of Disclosure Statement for Joint Chapter 11 for Samson Resources Corporation and Its Debtor Affiliates Proposed by Official Committee of Unsecured Creditors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN
### FOR SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES
### PROPOSED BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

Thomas E Lauria (admitted *pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:     (305) 371-2700
Facsimile:     (305) 358-5744

-and-

Glenn M. Kurtz (admitted *pro hac vice*)
J. Christopher Shore (admitted *pro hac vice*)
Michele J. Meises (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
**WHITE & CASE LLP**
1155 Avenue of the Americas
New York, NY 10036
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113

Joseph J. Farnan, Jr. (DE Bar No. 100245)
Joseph J. Farnan, III (DE Bar No. 3945)
Michael J. Farnan (DE Bar No. 5165)
**FARNAN LLP**
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone:     (302) 777-0300
Facsimile:     (302) 777-0301

*Co-Counsel to The Official Committee of Unsecured Creditors*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE COMMITTEE'S PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

which is $[●] million *less than* the sale proceeds the Committee anticipates will be obtained for the Remaining Asset Packages. As such, the Committee believes that the sale of the Remaining Asset Packages as proposed in the Committee's Plan maximizes the value distributable to all holders of allowed claims.

In addition to this fundamental difference between the Debtors' Plan and the Committee's Plan, the Debtors' Plan effectively gives all distributable value associated with operating the Remaining Asset Packages to holders of Second Lien Secured Claims by giving them all of the equity interests in the reorganized Debtors (subject to dilution for a management incentive plan). In essence, the Debtors' Plan sells all of the equity in the Remaining Asset Packages to the holders of Second Lien Secured Claims without requiring them to credit bid (which they would have the ability to do if they had valid secured claims) for such assets and without an auction process. Additionally, the difference between the projected sale value of the Remaining Asset Packages and the projected going concern value of the Remaining Asset Packages is approximately $[●] million, which strongly suggests that holders of Second Lien Secured Claims will seek to sell the Remaining Asset Packages shortly after the effective date of the Debtors' Plan. Any and all upside from such post-effective date sale would only inure to the benefit of holders of Second Lien Claims and to the Debtors' management (as the Debtors' Plan offers management up to 10% of the equity in the reorganized Debtors); none of it would inure to the benefit of holders of General Unsecured Claims. The sale of the Remaining Asset Packages as set forth in the Committee's Plan, however, avoids such inequitable results.

Another fundamental difference between the Debtors' Plan and the Committee's Plan is that the Committee's Plan preserves all Causes of Action of the Debtors' estates (other than against parties being released under the Committee's Plan), while the Debtors' Plan releases all Causes of Action against the First Lien Secured Parties, the Second Lien Secured Parties, and the Sponsors[2] for no tangible value to the Debtors' estates.

- The Committee believes that the Debtors' estates have valuable Causes of Action against the Selling Shareholders (i.e., the Schusterman family and certain related investment vehicles) arising out of the approximately $7 billion they received from the Debtors in connection with the failed 2011 leveraged buyout (the "**2011 Acquisition**"), which will constitute a major driver of value for holders of Allowed Claims after the Effective Date. The 2011 Acquisition saddled the Debtors with more than $3.7 billion of debt (an increase in debt leverage over 4 times the Debtors' pre-2011 Acquisition debt levels) and left the Debtors highly leveraged as compared to their peers. At or around the Petition Date (less than four years after the 2011 Acquisition), the Debtors indicated that the enterprise value of the Debtors was just $1.275 billion. This amount (which the Committee believes was inflated) is *less than one fifth of the amount paid to the Selling Shareholders for their shares in the Debtors in the 2011 Acquisition*. The precipitous decline in the alleged value of the Debtors' assets over that time period far exceeds the decline in commodity prices over the same period, as discussed below.

- In addition to preserving Causes of Action against the Selling Shareholders, the Committee's Plan preserves (or otherwise settles for meaningful value, as applicable) Causes of Action against the First Lien Secured Parties, the Second Lien Secured Parties, the Debtors' current and former equity holders (including the Sponsors of the 2011 Acquisition), and the Debtors' current and former directors and officers.

- With respect to the valuable Causes of Action against the First Lien Secured Parties and the Second Lien Secured Parties, the Committee has filed a motion with the Bankruptcy Court seeking exclusive

---

[2] Sponsors include Kohlberg Kravis Roberts & Co. L.P., Crestview Advisors, L.L.C., NGP Energy Capital Management, ITOCHU Corporation, and each of their respective affiliates.

cash (in addition to payments they had received from the Debtors in the Chapter 11 Cases pursuant to the Cash Collateral Orders, which amount is estimated to be $10 million through March 1, 2017), (b) be entitled to receive twenty percent (20%) of any recovery from certain Causes of Actions against the Sponsors and the Selling Shareholders (with such recovery not being subject to any cap), and (c) be granted releases to the fullest extent legally permitted.  Under this compromise and settlement, the holders of Second Lien Secured Claims will not be entitled to an unsecured deficiency claim.  The impact of this compromise and settlement is similar to the settlement with the First Lien Secured Parties in that the Committee's Plan *does not cap* the actual amount of contingent recoveries to be provided to holders of Allowed Second Lien Secured Claims.  While the Committee believes that the Second Lien Secured Parties will be bound by the stipulations agreed to by the First Lien Secured Parties and the Committee (if holders of First Lien Secured Claims vote to accept the Committee's Plan and do not accept the Debtors' Plan), this compromise and settlement provides a premium to holders of Second Lien Secured Claims vis a vis holders of General Unsecured Claims to account for any argument by the Second Lien Secured Parties that they are not bound by such stipulations.

- <u>Equity Interests in Parent Settlement.</u>  If holders of Equity Interests in Parent as a Class  vote to accept the Committee's Plan (and do not accept the Debtors' Plan), and agree to pay $40 million to the Parent, such holders (and any former holder of an Equity Interest in Parent that contributes to such $40 million payment) will receive releases from (a) all Causes of Action of the Debtors, and (b) all Causes of Action of the Debtors' creditors related to the Debtors, to the extent permitted by law.  This compromise and settlement shall not apply to, and shall not release any member of the Schusterman family or any Selling Shareholder, or any other Entity in which any of them hold, or ever held, a direct or indirect ownership or beneficial interest or over which they have, or ever had, a direct or indirect controlling interest, regardless of whether they are a holder of Equity Interests in the Parent.  The Committee believes that the $40 million payment is a reasonable settlement of the valuable Causes of Action against the Sponsors arising from the Sponsors' receipt of more than $160 million in potentially avoidable transfers, as discussed below.

In sum, the Committee's Plan obtains value *now* for *all* holders of Allowed Claims.  It converts the Debtors' assets to cash in what is currently a favorable commodity price environment when compared to earlier this year.  In the event the market retreats again, were the Debtors to continue to operate as contemplated in the Debtors' Plan, distributable value could diminish to an amount that would result in holders of First Lien Secured Claims being significantly undersecured on their exit financing loans under the Debtors' Plan, while holders of Second Lien Secured Claims may be obligated to allocate portions of the distributions they receive on account of their unsecured deficiency Claims to satisfy certain liquidity requirements of the reorganized Debtors in the event of a Minimum Liquidity Shortfall, thereby potentially losing all of such distributions.  The Committee's Plan eliminates these risks, locks in value for the benefit of all creditors, and distributes this value in an equitable manner.

**B.   Overview of Treatment of Claims and Equity Interests and 9019 Settlements**

A general overview of the treatment of Claims and Equity Interests that are entitled to vote on the Committee's Plan and the proposed 9019 Settlements that will resolve certain Causes of Action are set forth below.

### 1.   Treatment of Claims and Equity Interests

The following chart compares potential recoveries to holders of Allowed Claims and Equity Interests under the Committee's Plan and the Debtors' Plan (the "**Recovery Analysis**"):[3]

---

[3]   A more in depth analysis is set forth in the Recovery Analysis attached hereto as **Exhibit C**.

| Lien Determination Complaint[14] | | | |
|---|---|---|---|
| Count Number | Defendant | Cause of Action | Potential Recovery to Debtors' Estates |
| Count XIII | Second Lien Secured Parties | Disgorgement of fees and expenses paid to the Second Lien Secured Parties as adequate protection payments under the Interim Cash Collateral Orders pursuant to sections 105(a), 549, and 550 of the Bankruptcy Code or, in the alternative, recharacterization of interest, fees, expenses, and any other payment made to the First Lien Secured Parties as adequate protection under the Interim Cash Collateral Orders as payments of principal | TBD |
| Count XIV | Second Lien Secured Parties | Disallowance of the Second Lien Loans that carry OID as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code | Confidential |
| Count XV | All Defendants | Disallowance of Defendants' claims asserted in the Chapter 11 Cases pursuant to sections 502 and 506 of the Bankruptcy Code until the order of the Bankruptcy Court entering judgment on the Lien Determination Complaint becomes a Final Order | NA |
| Count XVI | All Defendants | Recovery of all reasonable, necessary costs and expenses of preserving, or disposing of, Defendants' Collateral pursuant to section 506(c) of the Bankruptcy Code | TBD |
| Counts I-XVI | | | Confidential |
| Total Fraudulent Conveyance Complaint and Lien Determination Complaint | | | Up to $1.5 billion |

### B. Causes of Action Against the Selling Shareholders

In the course of investigating the 2011 Acquisition, the Committee concluded that the payments made to the Selling Shareholders in connection with the 2011 Acquisition are avoidable pursuant to sections 544, 550, and 551 of the Bankruptcy Code and applicable state fraudulent transfer law. The Committee's Plan provides that the Plan Administrator has the authority to prosecute such Causes of Action. Moreover, the Committee's Plan provides that the Plan Administrator has authority to recover as preferential transfers any fees received by the Selling Shareholders within ninety days prior to the Petition Date, or up to one year prior to the Petition Date if the Selling Shareholders qualify as insiders.

### C. Causes of Action Against the Sponsors

The Committee believes that, at the time of and after the 2011 Acquisition, the Debtors transferred over $100 million in various fees to the Sponsors, which transfers would constitute constructive fraudulent transfers that are avoidable pursuant to sections 544, 548, 550, and 551 of the Bankruptcy Code and applicable state fraudulent transfer law. Moreover, the Committee concluded from its investigation that the fees paid to the Sponsors within one year of the Petition Date under a consulting agreement that was entered into with the Debtors on December 21, 2011, constitute preferential transfers subject to avoidance pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code. The Committee's Plan provides that the Plan Administrator has authority to prosecute such Causes of Action.

### D. Preferential Transfers

In addition to the preferential transfers made by the Debtors to the First Lien Secured Parties, the Second Lien Secured Parties, the Sponsors, and the Selling Shareholders described above, the Committee believes that there may be other transfers by the Debtors to creditors, which may constitute preferential

## EXHIBIT 18

Order (A) Approving a Mediator, and (B) Granting Related Relief

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1442** |

## ORDER (A) APPOINTING A MEDIATOR, AND (B) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) appointing a mediator to oversee the negotiation of issues in connection with the Debtors' chapter 11 plan and scheduling mediation; and (b) granting related relief; all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Upon entry of this Order, the Mediation Parties shall submit to mediation as set forth herein.

3. The mediator shall be Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware (the "Mediator").

4. The Mediation Parties may (or at the direction of the Court shall) meet and confer with the Mediator to establish procedures for and timing of the mediation, *provided* that mediation shall be scheduled to commence before December 8, 2016, in accordance with the Mediator's availability, and shall continue, if necessary, from time to time until the Mediation Parties either reach a resolution of the issues to be mediated or have spent at least two days in mediation.

5. The issues to be mediated shall include all issues with respect to the Debtors' chapter 11 plan [Docket No. 1316] and the creditors' committee's chapter 11 plan [Docket No. 1552], including all arguments in support and in opposition thereof.

6. Without limiting Local Rule 9019-3 or 9019-5, all (a) discussions among any of the parties in the mediation, including discussions with or in the presence of the Mediator, (b) any mediation statements and any other documents or information provided to the Mediator

or the parties in the mediation in the course of the mediation, and (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the mediation shall be strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party, including the Mediator, participating in the mediation, whether a direct participant or member of a committee or group, including counsel for any parties to the mediation or any any other party, shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation settlement, other document or information, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure or as authorized by this Court; *provided* that, notwithstanding the foregoing, the Mediator shall be permitted to report to the Court, on a confidential basis, solely as to (y) whether the mediation was successful and (z) whether each Mediation Party participated in good faith.

7.    The terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___12/5___, 2016  
          Wilmington, Delaware

_____  
HONORABLE CHRISTOPHER S. SONTCHI  
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT 19**

E-mail from L. Park to J. Ramirez, dated April 5, 2017, 3:32 p.m.

| | |
|---|---|
| **From:** | Park, Liz <Liz.Park@FTIConsulting.com> |
| **Sent:** | Wednesday, April 5, 2017 3:32 PM |
| **To:** | Ramirez, John |
| **Cc:** | Diaz, Matt; Chiun, Clement; Meises, Michele |
| **Subject:** | Samson Final C-2 Exhibit |
| **Attachments:** | Final Exhibit 30 Day Review_04-05-2017.pdf |

John, please find attached our summary and analysis of the revised exhibit C2 on Settlement Trust retained actions. I think it might make sense to have a quick call to go through between us. Let us know when you have about 30 min.

High level, the Debtors propose to remove 434 entities from what was filed on the eve of the Effective Date. Of these 434 entities, we found two that were also on our preference list. These entities had significant 90 day payments – McElvain Energy ($714.9K) and Trade Star ($218.6K). We asked A&M for copies of actual contracts or agreements that will evidence their on-going business with the Reorganized Company. We are waiting to hear back. If we don't hear back in time for us to get comfortable with these entities, then we may want to pull these entities out for now until we can get comfortable.

The Debtors categorized these 434 entities into six different reasons for being removed from the settlement trust list.

- <u>RemainCo well interest owners (218 entities):</u> The Company represented that these parties are current interest owners in RemainCo wells. A&M sent us an excel database of RemainCo's current interest owners with about 18K parties. We did not independently verify this database. A&M suggested that we compare these 218 entities against the plan notice parties, but that method did not seem relevant. Let us know if you want us to do further work on this. Assuming we are ok with the database, then we do not have issues with removing these entities, except for the preference vendor (Mcelvain Energy $715K), which we are doing further work on.

- <u>Vendors paid in 2017 (125 entities):</u> These are vendors that received payments from Samson in the ordinary course of business in 2017, with the rationale that if Samson is making payments to them in 2017, it must be doing business with them going forward. The Debtors also represented in a separate email that these vendors "meet the Plan requirements that the Company will be doing business with them going forward and that they are costly or burdensome to replace." We asked for actual disbursements by party so we can confirm the payments were sizeable, but the Company said it cannot prepare the data quickly. We question whether receiving payment in 2017 automatically qualifies a vendor as a go-forward vendor as defined by the plan. Let us know your thoughts on this. There is one preference vendor in this list (Trade Star with $218K).

- <u>Party to RemainCo agreement (46):</u> These are vendors who have an agreement with RemainCo. A&M sent us an excel database of RemainCo's active contract list and counter parties. We did not independently verify this database. We cross referenced the 46 entities against the Debtors' contract assumption list, and some are on this assumption list and some aren't. With respect to the entities not on the assumption list, it is possible that the debtors rejected their contract and entered into a new one. The Debtors represented that all 46 vendors are working with the Debtors going forward. Let us know if you want us to do further work on this. Assuming we are ok with the database, then we do not have issues with removing these entities.

- <u>Remitted funds to Debtors within the past year (35):</u> These are counterparties that remitted revenue funds to Samson in the past year for wells in RemainCo. A&M provided us with a list of close to 300 counterparties that fall within this category.

- <u>Release party – lending group (7):</u> These are lenders that arguably were released under the Plan. They all look like banks and financial institutions. We are checking the credit agreement to see if these entities are signatories.

- <u>Samson entity (3):</u> These are related corporate entities, but non-Debtors in the bankruptcy cases.

**Confidentiality Notice:**
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

**Samson Resources**
**Settlement Trust Retained Actions**
*Company Proposed Adjustments/Removals*

| | | | | Detail of Removed Parties | | | | | | | | Overlap with | |
| | | | | Remainco Well Interest Owners | Vendors paid w/in 90 days | Party to RemainCo agreement | Remitted funds to Debtors w/in past year | Released Party - lending group | Samson entity | Total | | Preference | |
| Description | Total | Remove | Adj. | A | B | C | D | E | F | | | # | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REJECTED | 5,500 | (35) | 5,465 | 6 | 14 | 1 | 4 | 7 | 3 | 35 | | 1 | - |
| ASSIGNED | 2,849 | (340) | 2,509 | 196 | 105 | 21 | 18 | - | - | 340 | | 2 | 933,573 |
| Land | 458 | (29) | 429 | 15 | - | 13 | 1 | - | - | 29 | | - | - |
| AR Balance | 54 | (23) | 31 | 1 | 6 | 4 | 12 | - | - | 23 | | - | - |
| Other | 45 | (7) | 38 | - | - | 7 | - | - | - | 7 | | - | - |
| DEPOSIT | 1 | - | 1 | - | - | - | - | - | - | - | | - | - |
| UTILITY DEPOSIT | 1 | - | 1 | - | - | - | - | - | - | - | | - | - |
| | 8,908 | (434) | 8,474 | 218 | 125 | 46 | 35 | 7 | 3 | 434 | | 3 | 933,573 |

| AR Balance Amount | $ 355,395 | $ (244,177) | $ 111,218 |
|---|---|---|---|

A: Interest owners in wells that have not been sold and remain in the reorganized business.
B: Trade vendors that were paid during the past 90 days (i.e., the Reorg Debtors are doing business with them).
C: Counterparties that are on the RemainCo's active agreement list (i.e., the Reorg Debtors are doing business with them). Includes one entity that will be added to the Company's vendor list.
D: Counterparties that remitted revenue funds to Samson in the past year for wells that remain in the reorganized business.
E: Banks and other financial institutions that were released under the plan.
F: Counterparties are related corporate entities to Samson, but were non-Debtors in the bankruptcy cases.

**Overlap with Preference**

| # | Vendor Name | Preference Amount ($) | Description | Detail of Removed Parties |
|---|---|---|---|---|
| 1 | ENDURO OPERATING LLC | n/a | REJECTED | Remitted funds to Debtors w/in past year |
| 2 | MCELVAIN ENERGY INC | 714,929.76 | ASSIGNED | Remainco Well Interest Owners |
| 3 | TRADE STAR LLC | 218,642.94 | ASSIGNED | Vendors paid w/in 90 days |
| | Total | 933,572.70 | | |

Samson Resources
A: Remainco Well Interest Owners

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | ABIGAIL IRREVOCABLE TRUST | TULSA | OK | 74119 | REJECTED |
| 2 | EXCALIBUR ENERGY COMPANY | DALLAS | TX | 75251 | REJECTED |
| 3 | HANNAH IRREVOCABLE TRUST | TULSA | OK | 74119 | REJECTED |
| 4 | MEITAR IRREVOCABLE TRUST | TULSA | OK | 74119 | REJECTED |
| 5 | RACHEL IRREVOCABLE TRUST | TULSA | OK | 74119 | REJECTED |
| 6 | RAT HOLE DRILLING | MILLS | WY | 82644 | REJECTED |
| 7 | MCELVAIN ENERGY INC | DENVER | CO | 80265 | ASSIGNED |
| 8 | MEITAR IRREVOCABLE TRUST | TULSA | OK | 74101-0699 | ASSIGNED |
| 9 | ABIGAIL IRREVOCABLE TRUST | TULSA | OK | 74101-0699 | ASSIGNED |
| 10 | RACHEL IRREVOCABLE TRUST | TULSA | OK | 74101-0699 | ASSIGNED |
| 11 | HANNAH IRREVOCABLE TRUST | TULSA | OK | 74101-0699 | ASSIGNED |
| 12 | LAUREN L. SCHUSTERMAN | TULSA | OK | 74101-0699 | ASSIGNED |
| 13 | HALEY P. SCHUSTERMAN | TULSA | OK | 74101-0699 | ASSIGNED |
| 14 | B.H.C.H. MINERAL LTD | SAN ANTONIO | TX | 78209-5709 | ASSIGNED |
| 15 | CHESAPEAKE PRODUCTION CORP | OKLAHOMA CITY | OK | 73154-0756 | ASSIGNED |
| 16 | EXCALIBUR ENERGY COMPANY | ALBUQUERQUE | NM | 87125 | ASSIGNED |
| 17 | TWE MINERAL PARTNERSHIP, L.P. | DALLAS | TX | 75283-0308 | ASSIGNED |
| 18 | COBRA PETROLEUM COMPANY LP | FT WORTH | TX | 76136 | ASSIGNED |
| 19 | E. G. COLTON JR., TRUSTEE | OKLAHOMA CITY | OK | 73112 | ASSIGNED |
| 20 | TRIMBLE PROPERTIES | EL DORADO | AR | 71730 | ASSIGNED |
| 21 | MILLSPAUGH INVESTMENTS, LLC | WEATHERFORD | OK | 73096-4246 | ASSIGNED |
| 22 | HUNTINGTON RESOURCES, INC. | TULSA | OK | 74170 | ASSIGNED |
| 23 | MEAGHER OIL/GAS PROPERTIES,INC | ENGLEWOOD | CO | 80155-4782 | ASSIGNED |
| 24 | JAS OIL & GAS PARTNERSHIP,LTD. | WICHITA FALLS | TX | 76307-8546 | ASSIGNED |
| 25 | SOUTHWEST PETROLEUM COMPANY LP | DALLAS | TX | 75370-2377 | ASSIGNED |
| 26 | STACY SCHUSTERMAN REVOC TRUST | TULSA | OK | 74101-0699 | ASSIGNED |
| 27 | PAR OIL COMPANY, INC. | DENVER | CO | 80201 | ASSIGNED |
| 28 | MARSHALL & WINSTON INC | MIDLAND | TX | 79710-0880 | ASSIGNED |
| 29 | CHEVRON U.S.A., INC. | HOUSTON | TX | 77252-2100 | ASSIGNED |
| 30 | JAN OIL COMPANY | OKLAHOMA CITY | OK | 73102-7167 | ASSIGNED |
| 31 | BMNW RESOURCES LLC | DALLAS | TX | 75218-0573 | ASSIGNED |
| 32 | ELIZABETH KEY SMITH | MARSHALL | TX | 75671-1213 | ASSIGNED |
| 33 | LORENTZ OIL & GAS, L.L.C. | EDMOND | OK | 73034-7266 | ASSIGNED |
| 34 | CASILLAS PETROLEUM CORP. | TULSA | OK | 74101-3411 | ASSIGNED |
| 35 | ROCK ISLAND RESOURCES CO, INC | DALLAS | TX | 75219 | ASSIGNED |
| 36 | NANCY BRYAN | GRAHAM | TX | 76450-4016 | ASSIGNED |
| 37 | REMORA OIL COMPANY | GLENDALE | CO | 80246-2531 | ASSIGNED |
| 38 | BP PROD. CORP. | RICHARDSON | TX | 75083-6075 | ASSIGNED |
| 39 | BRIER OIL COMPANY, NOMINEE FOR | GLENDALE | CO | 80246-2531 | ASSIGNED |
| 40 | ROEC, INC. | SANTA FE | NM | 87594-3440 | ASSIGNED |
| 41 | PENWELL PROPERTIES, LLC | DALLAS | TX | 75219 | ASSIGNED |
| 42 | WILDCARD FAMILY LIMITED PTSP | DALLAS | TX | 75254-2919 | ASSIGNED |
| 43 | COASTAL MANAGEMENT TRUST | PORTER | TX | 77365 | ASSIGNED |
| 44 | FREEMAN INVESTMENTS, A PTSP | ENGLEWOOD | CO | 80113-7611 | ASSIGNED |
| 45 | YOUNGBLOOD LTD | MILLSAP | TX | 76066-0730 | ASSIGNED |
| 46 | L & M OIL, INC. | TYLER | TX | 75111 | ASSIGNED |
| 47 | SISBRO OIL & GAS, LLLP | DENVER | CO | 80237-3400 | ASSIGNED |
| 48 | BLACK STONE MINERALS CO, L.P. | HOUSTON | TX | 77002 | ASSIGNED |
| 49 | NOBLE ENERGY INC | ARDMORE | OK | 73402-0909 | ASSIGNED |
| 50 | KUDO PETROLEUM LLC | DALLAS | TX | 75360-0490 | ASSIGNED |
| 51 | FINLEY RESOURCES INC | FORT WORTH | TX | 76102-4505 | ASSIGNED |
| 52 | LANDCASTER RESOURCES LLC | JENKS | OK | 74037-0220 | ASSIGNED |
| 53 | DEVON ENERGY PRODUCTION CO, LP | OKLAHOMA CITY | OK | 73102-5010 | ASSIGNED |
| 54 | JERRY SKINNER | WICHITA FALLS | TX | 76309 | ASSIGNED |
| 55 | LARRY O HULSEY & CO | GRAHAM | TX | 76450 | ASSIGNED |
| 56 | HERSCHEL C FERGUSON III | HOUSTON | TX | 77024-6305 | ASSIGNED |
| 57 | ACCIPITER, L.L.C. | TULSA | OK | 74119-1310 | ASSIGNED |
| 58 | NEWFIELD EXPLORATION | TULSA | OK | 74172 | ASSIGNED |
| 59 | PROVIDENCE MINERALS LLC | DALLAS | TX | 75248-2609 | ASSIGNED |
| 60 | OTTER CREEK LLC | SEALY | TX | 77474 | ASSIGNED |
| 61 | NATIONAL XP COMPANY, LTD. | DALLAS | TX | 75225-1409 | ASSIGNED |
| 62 | KNG-CENTRAL, L.L.C. | HAYS | KS | 67601 | ASSIGNED |
| 63 | HOG PARTNERSHIP, LP | DALLAS | TX | 75235-6803 | ASSIGNED |
| 64 | CHEVRON MIDCONTINENT LP | HOUSTON | TX | 77252-2100 | ASSIGNED |
| 65 | NANCY MELISSA KEY | MARSHALL | TX | 75670 | ASSIGNED |
| 66 | PHILIP KNOX KEY | AUSTIN | TX | 78703-1503 | ASSIGNED |
| 67 | TBS EXPLORATION INC | LAFAYETTE | LA | 70503-3639 | ASSIGNED |
| 68 | PETRO PARTNERS LIMITED | ARLINGTON | TX | 76096-0694 | ASSIGNED |

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 69 | PLAINS PRODUCTION INC | EDMOND | OK | 73013-6620 | ASSIGNED |
| 70 | JMAC RESOURCES, LLC | HIGHLANDS RANCH | CO | 80126 | ASSIGNED |
| 71 | NICO RESOURCES LLC | LITTLETON | CO | 80120-5648 | ASSIGNED |
| 72 | S & C PROPERTIES | DALLAS | TX | 75360-1295 | ASSIGNED |
| 73 | MICHAEL CHRISTOPHER FINSETH | FORT LAUDERDALE | FL | 33305-2601 | ASSIGNED |
| 74 | THE NINETY-SIX CORPORATION | MIDLAND | TX | 79701 | ASSIGNED |
| 75 | FUEL PRODUCTS, INC. | MIDLAND | TX | 79702 | ASSIGNED |
| 76 | J.M. GAHR | MIDLAND | TX | 79702 | ASSIGNED |
| 77 | LARRY BRAZILE | FORT WORTH | TX | 76107 | ASSIGNED |
| 78 | BIRD 2000 LIMITED PARTNERSHIP | FORT WORTH | TX | 76102-4919 | ASSIGNED |
| 79 | GAHR ENERGY COMPANY | MIDLAND | TX | 79702 | ASSIGNED |
| 80 | HAP BAGGETT | FORT WORTH | TX | 76177-0091 | ASSIGNED |
| 81 | MARCIA-JOHN, LTD. | MIDLAND | TX | 79702 | ASSIGNED |
| 82 | ANTHONY ENERGY, LTD. | GRANBURY | TX | 76049 | ASSIGNED |
| 83 | ALBERT WATKINS KEY JR | MOBILE | AL | 36602-2917 | ASSIGNED |
| 84 | ALICE AVENT KEY | FAIRHOPE | AL | 36532-6667 | ASSIGNED |
| 85 | CARRIE SWANN KEY WICKER | JEFFERSON | TX | 75657 | ASSIGNED |
| 86 | ELIZABETH MURRAY KEY ANDERTON | FAIRHOPE | AL | 36532-6326 | ASSIGNED |
| 87 | HOBART REID KEY | POINT CLEAR | AL | 36564-1545 | ASSIGNED |
| 88 | RICHARD GARRETT KEY | AUSTIN | TX | 78703-2519 | ASSIGNED |
| 89 | RICHARD MURRAY KEY | POINT CLEAR | AL | 36564-0768 | ASSIGNED |
| 90 | THOMAS FISHER KEY | SEATTLE | WA | 98102-1217 | ASSIGNED |
| 91 | THOMAS RUTHERFORD KEY | FAIRHOPE | AL | 36532-6662 | ASSIGNED |
| 92 | DAVID BLACKSHEAR KEY | POINT CLEAR | AL | 36564-0768 | ASSIGNED |
| 93 | LIGHT CAHILL ROYALTIES | DALLAS | TX | 75001 | ASSIGNED |
| 94 | CHEROKEE MINERALS, LP | LONGVIEW | TX | 75606 | ASSIGNED |
| 95 | CHEVRON NORTH AMERICA | HOUSTON | TX | 77252-2100 | ASSIGNED |
| 96 | TRUNK BAY ROYALTY PARTNERS LTD | DALLAS | TX | 75367 | ASSIGNED |
| 97 | CONSUL PROPERTIES LLC | OKLAHOMA CITY | OK | 73116-4229 | ASSIGNED |
| 98 | CLEMENT RESOURCES LLC | EDMOND | OK | 73083-7735 | ASSIGNED |
| 99 | CHEW MINERALS LLC | TULSA | OK | 74101-0489 | ASSIGNED |
| 100 | EL CHAROLYN PROPERTIES LLC | GREAT BEND | KS | 67530-2028 | ASSIGNED |
| 101 | LEGACY RESERVES OPERATING LP | SAINT LOUIS | MO | 63195-2532 | ASSIGNED |
| 102 | OATES OIL COMPANY INC | DALLAS | TX | 75205-2726 | ASSIGNED |
| 103 | GASCO LIMITED PARTNERSHIP | CHARLESTON | WV | 25324-0969 | ASSIGNED |
| 104 | CBM GAS COMPANY LLC | DEWEY | OK | 74029-0579 | ASSIGNED |
| 105 | OXY USA, INC | HOUSTON | TX | 77227-7570 | ASSIGNED |
| 106 | KAISER-FRANCIS ANADARKO | TULSA | OK | 74121-1468 | ASSIGNED |
| 107 | TRIPLE T RESOURCES LP | DALLAS | TX | 75205-3553 | ASSIGNED |
| 108 | FOCUS ENERGY LLC | DENVER | CO | 80202-3529 | ASSIGNED |
| 109 | MJ&E LLC | ELK CITY | OK | 73648-1397 | ASSIGNED |
| 110 | ISRAMCO RESOURCES LLC | HOUSTON | TX | 77027-4214 | ASSIGNED |
| 111 | J & L EXPLORATION COMPANY | EDMOND | OK | 73083-1308 | ASSIGNED |
| 112 | SOURCE ROCK MINERALS LP | DALLAS | TX | 75367-0713 | ASSIGNED |
| 113 | DEVON ENERGY PRODUCTION CO LP | OKLAHOMA CITY | OK | 73102-5010 | ASSIGNED |
| 114 | MHM RESOURCES LP | MIDLAND | TX | 79710-1570 | ASSIGNED |
| 115 | NOBLE ROYALTIES ACCESS | ADDISON | TX | 75001-6098 | ASSIGNED |
| 116 | JOHNSON-BOUNDS LLC | ELK CITY | OK | 73648-0769 | ASSIGNED |
| 117 | WYNN-CROSBY PARTNERS II LTD | DALLAS | TX | 75254-2919 | ASSIGNED |
| 118 | SYDTRAN LP | HOUSTON | TX | 77094-7549 | ASSIGNED |
| 119 | JJS WORKING INTERESTS LLC | HOUSTON | TX | 77027-2951 | ASSIGNED |
| 120 | M D KEYES LIVING TRUST | HOUSTON | TX | 77094-8251 | ASSIGNED |
| 121 | JAMESTOWN RESOURCES LLC | HOUSTON | TX | 77002-3009 | ASSIGNED |
| 122 | T&KJ LLC | ELK CITY | OK | 73648-1405 | ASSIGNED |
| 123 | HAROLD WAYNE HIGHTOWER JR | HOUSTON | TX | 77057-2267 | ASSIGNED |
| 124 | MARTHA HIGHTOWER REYES | FREDERICKSBURG | TX | 78624-5338 | ASSIGNED |
| 125 | RANDAL D HALEY | EL RENO | OK | 73036-0716 | ASSIGNED |
| 126 | STEPHENS PRODUCTION COMPANY | FORT SMITH | AR | 72902-2407 | ASSIGNED |
| 127 | J HIRAM MOORE LTD | DALLAS | TX | 75248-2643 | ASSIGNED |
| 128 | SYDHAN LP | AUSTIN | TX | 78709-2349 | ASSIGNED |
| 129 | ORTHWEIN ENERGY LP | OKLAHOMA CITY | OK | 73113-0180 | ASSIGNED |
| 130 | EXCALIBUR ENERGY COMPANY | ALBUQUERQUE | NM | 87125-0045 | ASSIGNED |
| 131 | JOURNEY ENERGY LLC | EDMOND | OK | 73083-2647 | ASSIGNED |
| 132 | WARWICK-ARES LLC | OKLAHOMA CITY | OK | 73116-7395 | ASSIGNED |
| 133 | MAXWELL RESOURCES CORPORATION | TULSA | OK | 74104-4925 | ASSIGNED |
| 134 | SPINDLETOP EXPLORATION CO.INC. | DALLAS | TX | 75225 | ASSIGNED |
| 135 | RUTTER & WILBANKS | MIDLAND, | TX | 79701 | ASSIGNED |
| 136 | CHRISTOPHER EDWARDS | OKLAHOMA CITY | OK | 73156-1270 | ASSIGNED |

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 137 | GRIFFIN PETROLEUM COMPANY | MIDLAND | TX | 79705-6628 | ASSIGNED |
| 138 | BEVO PRODUCTION CO. | AMARILLO | TX | 79101 | ASSIGNED |
| 139 | JACO PRODUCTION CO. | BAKERSFIELD | CA | 93380-2515 | ASSIGNED |
| 140 | B N C INC | EDMOND | OK | 73013-6307 | ASSIGNED |
| 141 | TRIPOWER RESOURCES LLC | ARDMORE | OK | 73402 | ASSIGNED |
| 142 | BERENERGY CORP | DENVER | CO | 80217 | ASSIGNED |
| 143 | EDMUND RICHARD WOOD | MARSHALL | TX | 75670 | ASSIGNED |
| 144 | JOHN PAUL BURTON JR. | SANTA FE | NM | 87505-5442 | ASSIGNED |
| 145 | EDMOND KEY BURTON | MARSHALL | TX | 75671-8363 | ASSIGNED |
| 146 | HOBART KEY BURTON | COLORADO SPRINGS | CO | 80906-7648 | ASSIGNED |
| 147 | SCOTT KEY WOOD | AUSTIN | TX | 78763-0527 | ASSIGNED |
| 148 | GEORGE G. VAUGHT JR. | DENVER | CO | 80201 | ASSIGNED |
| 149 | COBRA OIL & GAS CORP. | WICHITA FALLS | TX | 76307-8206 | ASSIGNED |
| 150 | CHAPARRAL ENERGY, LLC. | OKLAHOMA CITY | OK | 73114 | ASSIGNED |
| 151 | ALBERT WATKINS KEY | POINT CLEAR | AL | 36564-0768 | ASSIGNED |
| 152 | J HIRAM MOORE LTD | DALLAS | TX | 75248-2643 | ASSIGNED |
| 153 | PRIME ENERGY CORPORATION | HOUSTON | TX | 77024-1218 | ASSIGNED |
| 154 | WELLSTAR CORPORATION | NORTHGLENN | CO | 80233 | ASSIGNED |
| 155 | FRONTIER DRILLING PROGRAM LTD | OKLAHOMA CITY | OK | 73134 | ASSIGNED |
| 156 | PRICE OIL & GAS COMPANY | OKLAHOMA CITY | OK | 73114 | ASSIGNED |
| 157 | SETH W. HERNDON, JR. | TULSA | OK | 74170-0000 | ASSIGNED |
| 158 | ANN WORDEN MUELLER ESLICK | TULSA | OK | 74105-2726 | ASSIGNED |
| 159 | JOHN R BUCKTHAL | AMARILLO | TX | 79101-3638 | ASSIGNED |
| 160 | CHERYL L MELLENTHIN | CAT SPRING | TX | 78933-5306 | ASSIGNED |
| 161 | PINTAIL PRODUCTION CO., INC. | FT WORTH | TX | 76132 | ASSIGNED |
| 162 | DAVID FELTON WILLIAMS | DALLAS | TX | 75225-0087 | ASSIGNED |
| 163 | ASHER RESOURCES | BOERNE | TX | 78006-3312 | ASSIGNED |
| 164 | FREDERICA H MAYER TRUST | ENGLEWOOD | CO | 80112-5908 | ASSIGNED |
| 165 | J. B. FRANKLIN CORP | AMARILLO | TX | 79105-9613 | ASSIGNED |
| 166 | MUIRFIELD PRODUCTION CO | TULSA | OK | 74101-3166 | ASSIGNED |
| 167 | SMITH OIL COMPANY, INC. | DALLAS | TX | 75219 | ASSIGNED |
| 168 | AMERICAN INNOVATIVE ROYALTY | COTTER | AR | 72626 | ASSIGNED |
| 169 | RICHARD CLARK | HOUSTON | TX | 77079-6810 | ASSIGNED |
| 170 | SAGE ENERGY, INC. | MANTER | KS | 67862 | ASSIGNED |
| 171 | JEFF G. SLADE | PRATT | KS | 67124 | ASSIGNED |
| 172 | PETRO EAGLE, L.C. | WICHITA FALLS | TX | 76308-1061 | ASSIGNED |
| 173 | 4-JW, LTD. | SAN ANTONIO | TX | 78209 | ASSIGNED |
| 174 | LOIN ENERGY, INC. | LAGRANGE | TX | 78945 | ASSIGNED |
| 175 | STROUBE ENERGY CORPORATION | DALLAS | TX | 75252-6007 | ASSIGNED |
| 176 | JOSEPH F. MUELLER, JR. | PASADENA | CA | 91101 | ASSIGNED |
| 177 | FLOYD OIL COMPANY AGENCY | DALLAS | TX | 75283-2407 | ASSIGNED |
| 178 | PARADIS INVESTMENTS LLC | HOUSTON | TX | 77251-1364 | ASSIGNED |
| 179 | RIALTO PRODUCTION COMPANY | HOUSTON | TX | 77098-8028 | ASSIGNED |
| 180 | HERITAGE PARTNERS | CYPRESS | TX | 77433-4063 | ASSIGNED |
| 181 | BDT OIL & GAS LP | FORT WORTH | TX | 76102-4505 | ASSIGNED |
| 182 | GRASSLANDS ENERGY LP | FORT WORTH | TX | 76102-4505 | ASSIGNED |
| 183 | METCALFE OIL LP | FORT WORTH | TX | 76102-4505 | ASSIGNED |
| 184 | FINLEY PRODUCTION CO LP | FORT WORTH | TX | 76102-4505 | ASSIGNED |
| 185 | IRVIN WALL ESTATE | AMARILLO | TX | 79101-3520 | ASSIGNED |
| 186 | PATRIOT ENERGY LP | BRECKENRIDGE | TX | 76424-0548 | ASSIGNED |
| 187 | R GREGORY PITZER | BRECKENRIDGE | TX | 76424-3266 | ASSIGNED |
| 188 | MATAGORDA B1 LP | HOUSTON | TX | 77002-6715 | ASSIGNED |
| 189 | DAVID SADOFF & MARY K HEFLIN JTWROS | CHEVY CHASE | MD | 20815-5514 | ASSIGNED |
| 190 | ENERVEST (EEIF XIII-WIB LP) | HOUSTON | TX | 77002-6707 | ASSIGNED |
| 191 | ENERVEST (EEIF XIII-A LP) | HOUSTON | TX | 77002-6707 | ASSIGNED |
| 192 | ENERVEST (EEIF XIII-WIC LP) | HOUSTON | TX | 77002-6707 | ASSIGNED |
| 193 | FOURPOINT ENERGY LLC | DENVER | CO | 80206-5140 | ASSIGNED |
| 194 | TRINITY LAND & MINERALS LP | FORT WORTH | TX | 76102-6902 | ASSIGNED |
| 195 | H. G. PINION ESTATE | TULSA | OK | 74103-3703 | ASSIGNED |
| 196 | WHITE ROCK OIL & GAS GP I LLC | DALLAS | TX | 75261-2184 | ASSIGNED |
| 197 | WHITE ROCK OIL & GAS I-B LP | DALLAS | TX | 75261-2184 | ASSIGNED |
| 198 | VANGUARD OPERATING LLC | HOUSTON | TX | 77210-6094 | ASSIGNED |
| 199 | BASIN ACQUISITION FUND LP | FORT WORTH | TX | 76107-8060 | ASSIGNED |
| 200 | BASIN CO-INVESTMENT II, LP | FORT WORTH | TX | 76107-8060 | ASSIGNED |
| 201 | URBAN FUND II LP | PLANO | TX | 75074-6214 | ASSIGNED |
| 202 | URBAN OIL & GAS PARTNERS B-1 LP | PLANO | TX | 75074-6214 | ASSIGNED |
| 203 | CHESAPEAKE ENERGY MARKETING LLC | | | | $        555.40 |
| 204 | Anadarko Land & Exploration Co., et al | | | | Land |

Samson Resources
A: Remainco Well Interest Owners

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 205 | Apache Exploration Corporation, et al | | | | Land |
| 206 | Apache Oil Corporation, et al | | | | Land |
| 207 | BP AMERICA PRODUCTION COMPANY, INC. | | | | Land |
| 208 | BP America Production Company, Inc., et al | | | | Land |
| 209 | CABOT PETROLEUM CORPORATION | | | | Land |
| 210 | Chesapeake Exploration, LLC, et al | | | | Land |
| 211 | CHESAPEAKE EXPLORATION, LLC., ET AL | | | | Land |
| 212 | Chesapeake Investment Company, et al | | | | Land |
| 213 | Chesapeake Operating, Inc., et al | | | | Land |
| 214 | Chevron Oil Company, et al | | | | Land |
| 215 | Chevron U.S.A. Inc, | | | | Land |
| 216 | Phillips Petroleum Company | | | | Land |
| 217 | Phillips Petroleum Company, et al | | | | Land |
| 218 | Phillips Petroleum Company, et al. | | | | Land |

Samson Resources
B: Vendors paid w/in 90 days

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | ACME TRUCK LINE INC | HARVEY | LA | 70059 | REJECTED |
| 2 | BANK OF AMERICA | CHARLOTTE | NC | 28202 | REJECTED |
| 3 | BANK OF MONTREAL | MONTREAL | QC | H2Y 1L6 | REJECTED |
| 4 | GYRO TECHNOLOGIES, INC. | CORPUS CHRISTI | TX | 78426 | REJECTED |
| 5 | JASON M ABRAHAM | CANADIAN | TX | 79014 | REJECTED |
| 6 | LINN ENERGY HOLDINGS LLC | HOUSTON | TX | 77002 | REJECTED |
| 7 | MCINTYRE TRANSPORTS INC | ERICK | OK | 73645 | REJECTED |
| 8 | MERRION OIL & GAS | FARMINGTON | NM | 87401 | REJECTED |
| 9 | MK HAULING | MINDEN | LA | 71055 | REJECTED |
| 10 | PERMIAN ENTERPRISES LTD | ODESSA | TX | 79763 | REJECTED |
| 11 | PLASTER & WALD CONSULTING CORP | MUSTANG | OK | 73064 | REJECTED |
| 12 | POWER TORQUE SERVICES LLC | BOURG | LA | 70343 | REJECTED |
| 13 | SMITH INTERNATIONAL INC | HOUSTON | TX | 77032 | REJECTED |
| 14 | WATERGATOR INC | GLADEWATER | TX | 75647 | REJECTED |
| 15 | TRADE STAR LLC | ST GEORGE | UT | 84770 | ASSIGNED |
| 16 | ENABLE MIDSTREAM PARTNERS LP | TULSA | OK | 74103 | ASSIGNED |
| 17 | DEAN BROWN | NORMAN | OK | 73072-7661 | ASSIGNED |
| 18 | M. T. CHARLTON ESTATE | HOUSTON | TX | 77057 | ASSIGNED |
| 19 | FIELD-MCGRADY SPECIAL PTSP | HOUSTON | TX | 77058-2529 | ASSIGNED |
| 20 | RITA JACOBS HEINEMANN | PITTSBURGH | PA | 15241-3998 | ASSIGNED |
| 21 | DISCOVERY OPERATING INC. | MIDLAND | TX | 79701-3382 | ASSIGNED |
| 22 | DAVID LAWSON | EDMOND | OK | 73025-2638 | ASSIGNED |
| 23 | DONALD G. PARSONS | RENO | NV | 89511 | ASSIGNED |
| 24 | EUREKA RESOURCES L L C | ALBUQUERQUE | NM | 87125 | ASSIGNED |
| 25 | BUCCANEER ENERGY COMPANY | HOUSTON | TX | 77241-1106 | ASSIGNED |
| 26 | UNIT PETROLEUM COMPANY | TULSA | OK | 74170 | ASSIGNED |
| 27 | JAMES F. O'CONNELL | AMARILLO | TX | 79114-7006 | ASSIGNED |
| 28 | FRANK INGRAHAM | HOUSTON | TX | 77024 | ASSIGNED |
| 29 | MUSTANG FUEL CORPORATION | OKLAHOMA CITY | OK | 73114-7406 | ASSIGNED |
| 30 | WARD PETROLEUM CORP | ENID | OK | 73702-6237 | ASSIGNED |
| 31 | SWEETWATER EXPLORATION | NORMAN | OK | 73072 | ASSIGNED |
| 32 | CARL E GUNGOLL EXPLORATION LLC | OKLAHOMA CITY | OK | 73154-0466 | ASSIGNED |
| 33 | CHARLES ANDREW SPRADLIN | KILGORE | TX | 75662 | ASSIGNED |
| 34 | SND ENERGY ACQUISITION, L.P. | DALLAS | TX | 75206-1839 | ASSIGNED |
| 35 | R R COTTRILL REVOC LOVING TRST | TULSA | OK | 74136-7099 | ASSIGNED |
| 36 | ZENERGY INC | TULSA | OK | 74136 | ASSIGNED |
| 37 | ELM RIDGE EXPLORATION CO, LLC | DALLAS | TX | 75243-9362 | ASSIGNED |
| 38 | RAN RICKS PRODUCTION, LLC | OKLAHOMA CITY | OK | 73112 | ASSIGNED |
| 39 | PHOENIX OIL & GAS, LTD, LLP | SHREVEPORT | LA | 71106-1533 | ASSIGNED |
| 40 | JEMAN, LTD. | BEAUMONT | TX | 77706-7746 | ASSIGNED |
| 41 | R M TAYLOR WHITEMAN | GUTHRIE | OK | 73044-1572 | ASSIGNED |
| 42 | EUGENE A SCHNELL MARITAL TRUST | LONGBOAT KEY | FL | 34228 | ASSIGNED |
| 43 | JMA ENERGY COMPANY, L.L.C. | OKLAHOMA CITY | OK | 73118-6039 | ASSIGNED |
| 44 | DON BOYD | EDMOND | OK | 73013 | ASSIGNED |
| 45 | CIMAREX ENERGY CO | TULSA | OK | 74103-3001 | ASSIGNED |
| 46 | GAYNELLE L. CROWNOVER | BRISCOE | TX | 79011-3218 | ASSIGNED |
| 47 | CRAWLEY PETROLEUM CORP. | OKLAHOMA CITY | OK | 73102-4803 | ASSIGNED |
| 48 | SINGER OIL COMPANY, LLC | HENNESSEY | OK | 73742 | ASSIGNED |
| 49 | ALAN D BROWN, SHARE | SARASOTA | FL | 34231-4729 | ASSIGNED |
| 50 | SANGUINE GAS EXPLORATION, LLC | TULSA | OK | 74170-0720 | ASSIGNED |
| 51 | DAN FILLINGIM | ELK CITY | OK | 73644 | ASSIGNED |
| 52 | THOMAS C. WELFELT DBA | DALLAS | TX | 75254 | ASSIGNED |
| 53 | ANN ARRINGTON WEBB FAMILY | PAMPA | TX | 79066-1520 | ASSIGNED |
| 54 | JONES ENERGY LTD | AUSTIN | TX | 78746 | ASSIGNED |
| 55 | WILD WEST JOINT VENTURE | GREELEY | CO | 80634 | ASSIGNED |
| 56 | MALCOLM E. A. MCCOY | HIGHLANDS RANCH | CO | 80130-6995 | ASSIGNED |
| 57 | RAY A BOISVERT | OKLAHOMA CITY | OK | 73134-1021 | ASSIGNED |
| 58 | J&L RESOURCES INC | EDMOND | TX | 73013-5308 | ASSIGNED |
| 59 | KH LLC | ARDMORE | OK | 73402-2518 | ASSIGNED |
| 60 | PEP LLC | TULSA | OK | 74120-6216 | ASSIGNED |
| 61 | JOHN FITZPATRICK | ASPEN | CO | 81611-3399 | ASSIGNED |
| 62 | LINN ENERGY HOLDINGS LLC | HOUSTON | TX | 77002-3092 | ASSIGNED |
| 63 | JAMES BRADLEY | PAMPA | TX | 79065-1778 | ASSIGNED |
| 64 | NAJA ENERGY COMPANY, LLC | DALLAS | TX | 75225-6226 | ASSIGNED |
| 65 | ASARCO OIL & GAS CO., INC. | TUCSON | AZ | 85711 | ASSIGNED |
| 66 | PABLO ENERGY II LLC | AMARILLO | TX | 79105-2945 | ASSIGNED |
| 67 | DON O & WINELLE H LEONHART,TTE | PLANO | TX | 75023-3234 | ASSIGNED |
| 68 | FRANCINE LEBOW 1996 LIVING TRT | AUSTIN | TX | 78704-0030 | ASSIGNED |

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE | |
|---|---|---|---|---|---|---|
| 69 | SANDRIDGE EXPLORATION & | OKLAHOMA CITY | OK | 73102-6406 | ASSIGNED | |
| 70 | SHERIDAN PRODUCTION CO LLC | HOUSTON | TX | 77046-0922 | ASSIGNED | |
| 71 | SHERRY LYNN DAVIS LIV TR DTD 10/23/ | MOORE | OK | 73160-2903 | ASSIGNED | |
| 72 | THOMAS A MORGAN | BAYFIELD | CO | 81122-8733 | ASSIGNED | |
| 73 | HURRICANE HOLE LTD | AMARILLO | TX | 79106-4158 | ASSIGNED | |
| 74 | THE RESERVE PETROLEUM COMPANY | OKLAHOMA CITY | OK | 73116-9037 | ASSIGNED | |
| 75 | ANGEL PEAK HOLDINGS LLC | DURANGO | CO | 81301-5930 | ASSIGNED | |
| 76 | NADEL & GUSSMAN ANADARKO LLC | TULSA | OK | 74103-4340 | ASSIGNED | |
| 77 | WARWICK ASSOCIATES LC | OKLAHOMA CITY | OK | 73154-0405 | ASSIGNED | |
| 78 | WARRCO MINERALS LLC | ENID | OK | 73701-9760 | ASSIGNED | |
| 79 | TOKLAN OIL & GAS CORPORATION | TULSA | OK | 74136-7029 | ASSIGNED | |
| 80 | PAULETTE BERNARD PINION | BROUSSARD | LA | 70518-4619 | ASSIGNED | |
| 81 | MELISSA PICKETT | SANTA FE | NM | 87505-6436 | ASSIGNED | |
| 82 | MARK JAMES WILLIAMS | ISSAQUAH | WA | 98027-5626 | ASSIGNED | |
| 83 | CLARENCE L MAHER & JANE S | CHICKASHA | OK | 73018-2634 | ASSIGNED | |
| 84 | ADW PETROLEUM LP | DES MOINES | NM | 88418-0037 | ASSIGNED | |
| 85 | LE NORMAN OPERATING LLC | OKLAHOMA CITY | OK | 73142-1839 | ASSIGNED | |
| 86 | PEGGY D RAY | DENVER | CO | 80247-6813 | ASSIGNED | |
| 87 | WILLIAM C RAY | LITCHFIELD PARK | AZ | 85340-6136 | ASSIGNED | |
| 88 | PATRICK P RAY | SCOTTSDALE | AZ | 85255-7407 | ASSIGNED | |
| 89 | DIVIDE RESOURCES | BILLINGS | MT | 59102-7411 | ASSIGNED | |
| 90 | STAFFORD FAMILY | EDMOND | OK | 73013-6463 | ASSIGNED | |
| 91 | BASEMENT EXPLORATION LLC | EDMOND | OK | 73013-9016 | ASSIGNED | |
| 92 | BOUNTIFUL LP | DALLAS | TX | 75206-4021 | ASSIGNED | |
| 93 | VITRUVIAN II WOODFORD LLC | THE WOODLANDS | TX | 77380-2692 | ASSIGNED | |
| 94 | FRED MAILAND | FLOWER MOUND | TX | 75022-8036 | ASSIGNED | |
| 95 | AMY E JONES | CORPUS CHRISTI | TX | 78411-1525 | ASSIGNED | |
| 96 | JOHN G HARRIS | MAINEVILLE | OH | 45039-8161 | ASSIGNED | |
| 97 | ROMAYNE LUKKEN WARREN | PLANO | TX | 75025-0821 | ASSIGNED | |
| 98 | FIFTEEN BELOW, LTD. | OKLAHOMA CITY | OK | 73112 | ASSIGNED | |
| 99 | SPESS OIL COMPANY | CLEVELAND | OK | 74020-4653 | ASSIGNED | |
| 100 | GREEN BAY PACKAGING INC | GREEN BAY | WI | 54307-9017 | ASSIGNED | |
| 101 | PETRO-HUNT, L.L.C. | DALLAS | TX | 75201-7201 | ASSIGNED | |
| 102 | BRITZ INC. | FRESNO | CA | 93790 | ASSIGNED | |
| 103 | NICKY FRANCIS DARNELL | BOYNTON BEACH | FL | 33436-8944 | ASSIGNED | |
| 104 | TRIPCO INC. | OKLAHOMA CITY | OK | 73156 | ASSIGNED | |
| 105 | CIRRUS PRODUCTION CO. | ENID | OK | 73702 | ASSIGNED | |
| 106 | BLACKWOOD FAMILY PTSP | OKLAHOMA CITY | OK | 73120-4503 | ASSIGNED | |
| 107 | LINK OIL PROPERTIES | DUNCAN | OK | 73533-0000 | ASSIGNED | |
| 108 | THE BALDWIN FAM TR UDA 7/14/00 | MARSHALL | TX | 75670-5247 | ASSIGNED | |
| 109 | KATHY E. MEEK | CANYON | TX | 79015-0000 | ASSIGNED | |
| 110 | DONNA L. LAMBORN REVOCABLE | MOUNDS | OK | 74047-4991 | ASSIGNED | |
| 111 | ROBERT L WICKSER TRUST | AUSTIN | TX | 78704-0016 | ASSIGNED | |
| 112 | BURMAN ENERGY LLC | HOCKLEY | TX | 77447 | ASSIGNED | |
| 113 | O.O.P.S., INC. | HOUSTON | TX | 77056-1408 | ASSIGNED | |
| 114 | WILLIAM R. ALBRACHT LIVING TRT | AUSTIN | TX | 78735-1652 | ASSIGNED | |
| 115 | BETSY EUBANKS WILDER | EDMOND | OK | 73034-9120 | ASSIGNED | |
| 116 | TOUCHSTONE OIL CORP | OKLAHOMA CITY | OK | 73113-0176 | ASSIGNED | |
| 117 | TAPSTONE ENERGY LLC | OKLAHOMA CITY | OK | 73101-1608 | ASSIGNED | |
| 118 | CHARLES V SULLIVAN III | COLLEYVILLE | TX | 76034-7701 | ASSIGNED | |
| 119 | ALLUVIUM PARTNERS LLC | CARROLLTON | TX | 75007-2468 | ASSIGNED | |
| 120 | ENABLE EAST | | | | $ | 41,160.92 |
| 121 | WYNN-CROSBY OPERATING LTD | | | | $ | 12,737.05 |
| 122 | EAGLE EXPLORATION PRODUCTION LLC | | | | $ | 12,033.96 |
| 123 | WESTERN OIL & GAS DEV CORP | | | | $ | 1,042.43 |
| 124 | NATURAL GAS ANADARKO | | | | $ | 530.78 |
| 125 | GILLILAND OIL & GAS, INC. | | | | $ | 446.34 |

Samson Resources
C: Party to RemainCo agreement

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | WREN OILFIELD SERVICES, INC. | WHITE OAK | TX | 75693 | REJECTED |
| 2 | ENBRIDGE | HOUSTON | TX | 77002 | ASSIGNED |
| 3 | FLOOS, INC. | HOBBS | NM | 88241 | ASSIGNED |
| 4 | BEREN CORPORATION | WICHITA | KS | 67206-1094 | ASSIGNED |
| 5 | VERDUGO INVESTMENT COMPANY LLC | LOS ANGELES | CA | 90071-1448 | ASSIGNED |
| 6 | MERIT MANAGEMENT PARTNERS I LP | DALLAS | TX | 75240-7312 | ASSIGNED |
| 7 | PABLO OIL & GAS LP | AMARILLO | TX | 79105-2010 | ASSIGNED |
| 8 | ATLAS OBO ENERGY LP | HOUSTON | TX | 77090-3655 | ASSIGNED |
| 9 | GREENLEAF ENERGY CORPORATION | OKLAHOMA CITY | OK | 73102 | ASSIGNED |
| 10 | PALEO, INC. | OKLAHOMA CITY | OK | 73112-1411 | ASSIGNED |
| 11 | STEVE BROWNE | OKLAHOMA CITY | OK | 73102-2250 | ASSIGNED |
| 12 | MUIRFIELD RESOURCES COMPANY | TULSA | OK | 74101-3166 | ASSIGNED |
| 13 | CLUB OIL & GAS, LTD. | OKLAHOMA CITY | OK | 73102 | ASSIGNED |
| 14 | BRG PRODUCTION COMPANY | TULSA | OK | 74136 | ASSIGNED |
| 15 | MARY HOBART KEY | AUSTIN | TX | 78703 | ASSIGNED |
| 16 | RESOURCE STRATEGIES | GOLDEN | CO | 80401 | ASSIGNED |
| 17 | NORTHERN ENERGY CORPORATION | BISMARCK | ND | 58502 | ASSIGNED |
| 18 | LMD PETROLEUM CORPORATION | LAKE CHARLES | LA | 70601-8576 | ASSIGNED |
| 19 | PETRA TRUST I | TULSA | OK | 74119 | ASSIGNED |
| 20 | PETRA TRUST II | TULSA | OK | 74119 | ASSIGNED |
| 21 | BETH PARKER | TULSA | OK | 74137-7002 | ASSIGNED |
| 22 | REMORA PETROLEUM LP | AUSTIN | TX | 78703-4789 | ASSIGNED |
| 23 | MAGNUM ENERGY, INC. | | | | $          646.69 |
| 24 | SAMSON EXPLORATION, LLC | | | | $           65.14 |
| 25 | FOREST OIL CORPORATION | | | | $            0.00 |
| 26 | LION OIL COMPANY | | | | $         (953.06) |
| 27 | DYCO PETROLEUM CORPORATION | | | | |
| 28 | GRACE PETROLEUM CORPORATION | | | | |
| 29 | HBOP, LTD. | | | | |
| 30 | USA OK NM A 36629 | | | | |
| 31 | DYCO PETROLEUM CORPORATION, ET AL | | | | |
| 32 | Amoco Production Company, et al | | | | Land |
| 33 | An-Son Corporation, et al | | | | Land |
| 34 | Apache Corporation, et al | | | | Land |
| 35 | Champlin Petroleum Company, et al | | | | Land |
| 36 | Cimarex Energy Co., et al | | | | Land |
| 37 | Eason Oil Company, et al | | | | Land |
| 38 | Exxon Corporation, et al | | | | Land |
| 39 | Getty Oil Company, et al | | | | Land |
| 40 | Magnolia Petroleum Company | | | | Land |
| 41 | Robert G. Anderson | | | | Land |
| 42 | SOUTHLAND ROYALTY COMPANY | | | | Land |
| 43 | TXO Production Corp., et al | | | | Land |
| 44 | ZEPHYR OPERATING CO., LLC | | | | Land |
| 45 | Maxus Exploration Company | | | | |
| 46 | USA OK NM A 60377 | | | | |

Samson Resources
D: Remitted funds to Debtors w/in past year

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | BAYTEX ENERGY USA LTD | DENVER | CO | 80202 | REJECTED |
| 2 | CIMAREX ENERGY | TULSA | OK | 74103-3001 | REJECTED |
| 3 | ENDURO OPERATING LLC | FORT WORTH | TX | 76102 | REJECTED |
| 4 | CRESCENT POINT ENERGY U S CORP | DENVER | CO | 80202 | REJECTED |
| 5 | ENERVEST | HOUSTON | TX | 77002 | ASSIGNED |
| 6 | ONEOK | TULSA | OK | 74102 | ASSIGNED |
| 7 | DCP MIDSTREAM | TULSA | OK | 74136 | ASSIGNED |
| 8 | REGENCY ENERGY PARTNERS LP | HOUSTON | TX | 77002 | ASSIGNED |
| 9 | CENTERPOINT ENERGY ENTEX | HOUSTON | TX | 77210-4981 | ASSIGNED |
| 10 | YALE OIL ASSOCIATION INC | OKLAHOMA CITY | OK | 73105-1404 | ASSIGNED |
| 11 | DUNCAN OIL PROPERTIES, INC | OKLAHOMA CITY | OK | 73102-8602 | ASSIGNED |
| 12 | HUNTINGTON ENERGY L.L.C. | OKLAHOMA CITY | OK | 73116-7402 | ASSIGNED |
| 13 | MUREX PETROLEUM CORP. | HOUSTON | TX | 77060 | ASSIGNED |
| 14 | SANDRIDGE EXPLORATION AND | OKLAHOMA CITY | OK | 73102-6406 | ASSIGNED |
| 15 | CRESCENT POINT ENERGY U S CORP | CALGARY | AB | T2P 3Y6 | ASSIGNED |
| 16 | F HOWARD WALSH JR AGENCY LTD | FORT WORTH | TX | 76102-4773 | ASSIGNED |
| 17 | T K DRILLING CORP | TULSA | OK | 74145 | ASSIGNED |
| 18 | ARBUCKLE ENTERPRISES, INC. | EDMOND | OK | 73083-5250 | ASSIGNED |
| 19 | PLYMOUTH RESOURCES INC | TULSA | OK | 74135-2282 | ASSIGNED |
| 20 | CHACO ENERGY CO. | DENVER | CO | 80201 | ASSIGNED |
| 21 | DUNCAN OIL PROPERTIES INC | OKLAHOMA CITY | OK | 73101-0467 | ASSIGNED |
| 22 | MGE RESOURCES, INC. | PERRYTON | TX | 79070 | ASSIGNED |
| 23 | GULFMARK ENERGY, INC. | | | | $ 188,635.47 |
| 24 | PRIME OPERATING COMPANY | | | | $ 712.36 |
| 25 | D & J OIL CO. | | | | $ 142.13 |
| 26 | OKLAND OIL COMPANY | | | | $ 114.53 |
| 27 | PELICO PIPELINE LLC AS AGENT | | | | $ 0.00 |
| 28 | WILDHORSE RESOURCES LLC | | | | $ 0.00 |
| 29 | OIL PRODUCERS INC. | | | | $ 0.00 |
| 30 | TRIANGLE USA PETROLEUM CORPORATION | | | | $ 0.00 |
| 31 | SULPHUR RIVER EXPLORATION INC | | | | $ 0.00 |
| 32 | ROCK OIL II INC | | | | $ (1,072.09) |
| 33 | ENTERPRISE CRUDE OIL LLC | | | | $ (6,245.20) |
| 34 | SILVER CREEK RESOURCES LLC | | | | $ (6,375.61) |
| 35 | Ardmore Production & Exploration Company, et al | | | | Land |

**Samson Resources**
**E: Released Party - lending group**

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | BARCLAYS BANK PLC | LONDON | | E14 5HP | REJECTED |
| 2 | CITIBANK, N.A. | NEW YORK | NY | 10022-4617 | REJECTED |
| 3 | ING CAPITAL MARKETS LLC | | | 1102 MG | REJECTED |
| 4 | RBC CAPITAL MARKETS LLC | NEW YORK | NY | 10281-8098 | REJECTED |
| 5 | ROYAL BANK OF CANADA | TORONTO | ON | M5J 2J5 | REJECTED |
| 6 | THE TORONTO-DOMINION BANK | TORONTO | ON | M5K 1A2 | REJECTED |
| 7 | WELLS FARGO SECURITIES | CHARLOTTE | NC | 28202-4000 | REJECTED |

Samson Resources
E: Samson entity

| # | COUNTERPARTY | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|
| 1 | CIMARRON ACID & FRAC LLC | TULSA | OK | 74107 | REJECTED |
| 2 | CIMARRON FIELD SERVICES, INC. | BEDFORD | TX | 76022 | REJECTED |
| 3 | CIMARRON OIL FIELD SUPPLY, LLC | Norman | OK | 73070 | REJECTED |

## EXHIBIT 20

Excerpt of Third Amended Joint Chapter 11 Plan of Reorganization of
Samson Resources Corporation and Its Debtor Affiliates

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| | ) |
| In re: | )   Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | )   Case No. 15-11934 (CSS) |
| | ) |
| Debtors. | )   (Jointly Administered) |
| | ) |

### THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
### OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

Domenic E. Pacitti (Del. Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:   (302) 426-1189
Facsimile:   (302) 426-9193

-and-

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:   (215) 569-2700
Facsimile:   (215) 568-6603

*Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

101.    "*Plan Support Agreement*" means the Plan Support Agreement, dated as of August 26, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit A</u> to the *Notice of Filing Plan Support Agreement* [Docket No. 1290].

102.    "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

103.    "*Preferred Equityholder Claims*" means any Claims and Causes of Action the Debtors hold against the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests (in their capacity as such, in their capacity as former common equity owners of Parent, or in any other capacity).

104.    "*Preferred Interests*" means the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011.

105.    "*Prepetition Collateral*" means the First Lien Collateral and the Second Lien Collateral.

106.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

107.    "*Pro Forma Cash*" means the Debtors' Cash available on the Effective Date, excluding Accrued Professional Compensation, the First Lien Secured Parties' and Second Lien Secured Parties' outstanding professional fees, other backend fees and holdbacks as of the Effective Date (which estimate shall be calculated in good faith by the Debtors prior to the Effective Date, in consultation with the First Lien Agent and the Second Lien Steering Committee), and financial and business restructuring costs that have been realized or are reasonably expected to be realized within six months of the Effective Date, assuming a status quo operation of the Company (i.e., no acquisitions or divestitures), which amounts shall be consistent with the requirements of the Exit Facility Terms.

108.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

109.    "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

110.    "*Professional Fee Escrow*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors or the Reorganized Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Court.

111.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

112.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

113.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

114.    "*Released Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the

Senior Notes Indenture Trustee; (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.

115.    "*Releasing Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) all holders of Claims and Interests who are deemed to accept the Plan; (j) all holders of Claims and Interests who vote to accept the Plan; (k) all holders in voting Classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (l) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan and who do not opt out of the releases provided by the Plan; and (m) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (l), such Entities' current and former affiliates and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals,  managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

116.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

117.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

118.    "*Required Consenting Lenders*" means, as of any date of determination, Consenting Lenders holding a majority of the aggregate outstanding principal amount of the Second Lien Claims held by Consenting Lenders.

119.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as Exhibit B to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 16].

120.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

121.    "*Retention Option Assets*" means the Unencumbered Assets that the Debtors determine, in consultation with the Second Lien Steering Committee, are necessary or appropriate for continued use by the Reorganized Debtors after the Effective Date.  The Debtors expect the Retention Option Assets to include certain land and buildings or fixtures related to field offices and certain other Unencumbered Assets of de minimis value.

122.    "*Retention Option Payment*" means Cash in an amount equal to the fair market value of the Retention Option Assets.

137.    "*Section 510(b) Claims*" means any Claims arising from (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, (b) purchase or sale of such a security or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

138.    "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

139.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

140.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

141.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as amended.

142.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

143.    "*Senior Noteholders*" means the holders of Senior Notes Claims.

144.    "*Senior Notes*" means the 9.750 percent Senior Notes Due 2020, issued in the original principal amount of $2,250,000,000 pursuant to the Senior Notes Indenture.

145.    "*Senior Notes Claims*" means all Claims against the Debtors arising under the Senior Notes Indenture, which shall be Allowed in the aggregate principal amount of $[2,250,000,000], plus any accrued but unpaid interest payable thereon, as calculated in accordance with the Senior Notes Indenture (estimated to be $[129,439,629] as of the Petition Date).

146.    "*Senior Notes Indenture*" means that certain Indenture, dated as of February 8, 2012, between Samson Investment Company, as issuer, certain of the Debtors as guarantors, and the Senior Notes Indenture Trustee (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance of 9.750 percent Senior Notes Due 2020.

147.    "*Senior Notes Indenture Trustee*" means Wells Fargo Bank, National Association, solely in its capacity as indenture trustee under the Senior Notes Indenture.

148.    "*Settlement Trust*" means the trust or other legal entity established on the Effective Date in accordance with the terms of this Plan and the Settlement Trust Agreement to, among other things:  (a) directly or indirectly acquire the Settlement Trust Assets; (b) issue beneficial interests in the Settlement Trust to be distributed pursuant to this Plan; and (c) make certain distributions in accordance with this Plan.

149.    "*Settlement Trust Agreement*" means that certain trust agreement forming the Settlement Trust, which agreement shall be in form and substance reasonably acceptable to the Debtors and the Second Lien Steering Committee.

150.    "*Settlement Trust Assets*" means, collectively, the Settlement Trust Causes of Action, the Settlement Trust Cash Amount, the Settlement Trust Other Assets, the Preferred Equityholder Claims, and (only if Class 5 votes to accept the Plan by the Voting Deadline) the General Unsecured New Common Stock Recovery; *provided* that, for the avoidance of doubt, the Second Lien Deficiency Claim shall not receive any distributions on account of the General Unsecured New Common Stock Recovery.

151.    "*Settlement Trust Cash Amount*" means Cash in an amount equal to (a) the Unencumbered Asset Sale Proceeds, plus (b) the Retention Option Payment.

152.    "*Settlement Trust Causes of Action*" means all Claims and Causes of Action held by or on behalf of any Debtor (or any assignee of any Debtor) against any Entity (except for any alleged Claims against the Released Parties) concerning, or on account of, the 2011 Acquisition and/or any transfer of an interest of any Debtor in property provided for thereunder, including any Claims to recover the value of such transferred property, Claims arising under the Bankruptcy Code, state fraudulent transfer statutes and claims arising under state law based upon negligence, breach of fiduciary duty, lender liability, Avoidance Actions, and/or other similar Claims concerning the 2011 Acquisition; *provided* that the Settlement Trust Causes of Action shall not include (and shall expressly exclude) any Claims or Causes of Action that may be brought against any Released Party or any other Claims or Causes of Action otherwise released or waived under the Plan.

153.    "*Settlement Trust Other Assets*" means any Unencumbered Assets not sold as part of the Asset Sales, other than the Retention Option Assets.

154.    "*Settlement Trust Recovery Proceeds*" means the net Cash proceeds (after payment and/or reimbursement of the Settlement Trust's and Reorganized Debtors' administrative costs) of any liquidation or monetization of the Settlement Trust Assets.

155.    "*Sponsors*" means:  (a) Crestview Advisors, L.L.C.; (b) Crestview Offshore Holdings II (892 Cayman), L.P.; (c) Crestview Offshore Holdings II (Cayman), L.P.; (d) Crestview Offshore Holdings II (FF Cayman), L.P.; (e) Crestview Partners (Cayman), LTD.; (f) Crestview Partners II (892 Cayman), L.P.; (g) Crestview Partners II (Cayman), L.P.; (h) Crestview Partners II (FF Cayman), L.P.; (i) Crestview Partners II (FF), L.P.; (j) Crestview Partners II (TE), L.P.; (k) Crestview Partners II CWGS (Cayman), L.P.; (l) Crestview Partners II CWGS (FF Cayman), L.P.; (m) Crestview Partners II GP, L.P.; (n) Crestview Partners II, L.P.; (o) Crestview Tulip Credit, LLC; (p) Crestview Tulip Holdings LLC; (q) Crestview Tulip Investors LLC; (r) Crestview, L.L.C.; (s) Kohlberg Kravis Roberts & Co. L.P.; (t) KKR 2006 Fund, L.P.; (u) KKR Samson Investors L.P.; (v) KKR Samson Investors GP LLC; (w) KKR 2006 Fund (Samson) L.P.; (x) KKR Samson SA Blocker L.P.; (y) KKR Fund Holdings L.P.; (z) KKR Partners III, L.P.; (aa) Operf Co-Investment LLC; (bb) Samson Aggregator GP LLC; (cc) Samson Aggregator L.P.; (dd) Samson Co-Invest I L.P.; (ee) Samson Co-Invest II L.P.; and (ff) Samson Co-Invest III L.P.

156.    "*Stockholders Agreement*" means one or more stockholders agreement(s) or limited liability company membership agreement(s), as applicable, with respect to the New Common Stock, substantially in the form to be included in the Plan Supplement and in form and substance acceptable to the Debtors and the Second Lien Steering Committee.

157.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

158.    "*Unencumbered Asset*" means any asset of a Debtor that is not Prepetition Collateral.

159.    "*Unencumbered Asset Sale Proceeds*" means Cash proceeds from any sale of Unencumbered Assets occurring on or prior to the Effective Date, net of the costs of such sale, with such costs including, but not limited to, as applicable, any purchase price adjustment, cure costs with respect to transferred contracts, transfer taxes, filings fees with respect to real property assignments, the costs of satisfying any lien on such Unencumbered Assets, or any other costs of such sale.

160.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

161.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

162.    "*Voting Deadline*" means the deadline to submit ballots to accept or reject the Plan established by the order of the Court approving the Disclosure Statement.

N.      *Release of Avoidance Actions*

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition. No Avoidance Actions shall revert to creditors of the Debtors.

O.      *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code, except to the extent any such policies require payment of any premiums, deductibles or any other amounts by the Reorganized Debtors. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect, but in no event shall be responsible for paying any premiums, self-insured retentions, deductibles or other amounts that may be due or otherwise become due under such policy (including as a result of any such claim against the policy) and the liability of the Debtors under the operation of the D&O Liability Insurance Policy (including such tail coverage liability insurance), and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

P.      *Management Incentive Plan; Performance Award Program*

The Plan Supplement will include the terms of a Management Incentive Plan, to be negotiated by the Debtors and the Second Lien Steering Committee. If the Management Incentive Plan is an equity-based award plan, [10 percent] of the New Common Stock (on a fully diluted basis) shall be reserved for awards to management of the Reorganized Debtors and the New Board of the Reorganized Parent. The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent.

Confirmation of the Plan shall authorize the Debtors to make all payments pursuant to the Performance Award Program for the first calendar quarter of 2017, and, on the Effective Date or such other date contemplated by the Performance Award Program, the Reorganized Debtors shall make all such payments. The performance metrics, targets, and award opportunities for the Performance Award Program for the first calendar quarter of 2017 are set forth in the Disclosure Statement. The Plan constitutes a motion to approve the first calendar quarter of 2017 Performance Award Program. Any earned and unpaid Performance Award Program award shall be deemed due and payable in accordance with the Performance Award Program, and all such amounts shall constitute Allowed Administrative Claims without the need for any participant to File and serve a request for payment of such Administrative Claim pursuant to Article II of the Plan.

## EXHIBIT 21

Excerpt of Joint Disclosure Statement for (I) Third Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates Proposed By the Debtors and (II) Joint Chapter 11 Plan for Samson Resources Corporation and Its Debtor Affiliates Proposed By Official Committee of Unsecured Creditors

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT DISCLOSURE STATEMENT FOR (I) THIRD AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON RESOURCES
CORPORATION AND ITS DEBTOR AFFILIATES PROPOSED BY THE DEBTORS
AND (II) JOINT CHAPTER 11 PLAN FOR SAMSON RESOURCES CORPORATION
AND ITS DEBTOR AFFILIATES PROPOSED
BY OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF ANY PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS JOINT DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS JOINT DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED, BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS JOINT DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS JOINT DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

### 2.     Second Lien Term Loan

On September 25, 2012, the Debtors entered into the Second Lien Credit Agreement.  The term loan under the Second Lien Credit Agreement totals approximately $1.0 billion in principal amount and matures in 2018.  It bears interest at a floating rate; for the six months ended March 31, 2015, the weighted average interest rate was 5.0%.

The Debtors and the Second Lien Agent agree that the obligations under the Second Lien Credit Agreement are guaranteed by all of the Debtors and secured by a second lien on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including real property mortgages on at least 95% of the Debtors' oil and gas properties.  The Committee has challenged the validity of the claims and liens issued in connection with the Second Lien Credit Agreement.  An intercreditor agreement governs the relative rights of the First Lien Lenders and the Second Lien Lenders and provides other protections for the benefit of such parties.

### 3.     Senior Unsecured Notes

On February 8, 2012, Samson Investment Company issued $2.25 billion in principal amount of 9.75% Senior Notes Due 2020 under the Indenture, dated as of February 8, 2012, between Samson Investment Company, as issuer, certain of the Debtors, as guarantors, and the Indenture Trustee. Proceeds from the issuance of the Notes were used to repay borrowings under a bridge facility associated with the 2011 Acquisition.

The interest rate under the Indenture and the Notes is 9.75%, payable semi-annually in February and August, subject to a thirty-day grace period.  The Senior Notes are guaranteed by all of the Debtors. The Debtors did not make the approximately $110 million interest payment on the Senior Notes due on August 17, 2015.

### 4.     Preferred Stock

In December 2011, as part of the 2011 Acquisition, Samson Resources Corporation issued 180,000 shares of cumulative redeemable preferred stock to the Debtors' former equity holders.  The shares are redeemable at Samson Resources Corporation's option at any time at a per share redemption price equal to the liquidation amount of the share plus any accrued and unpaid dividends compounded quarterly to the date of redemption and are mandatorily redeemable on the earliest to occur of July 1, 2022, or the consummation of an initial public equity offering or a change in control.

## IV.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

*The following summary of the events leading to the commencement of the Debtors' Chapter 11 Cases was prepared by the Debtors, with input from the Committee.*

### A.     Commodity Price Decline

Over the course of the last five years, several factors have made it difficult for the Debtors to support their leveraged debt obligations.  After the 2011 Acquisition, already-low natural gas prices continued their decline – materially reducing the cash flows the Debtors had to meet their interest payment burden and invest in developing their oil, natural gas, and natural gas liquids assets.  At the same time, overall oil and gas drilling activity in North America continued to rise, putting pressure on service costs due to high demand for oilfield services.

**Addendum A**

**Debtors' Specific Disclosure Statement**

- the First Lien Lenders receiving a $525 million term loan on account of Secured First Lien Secured Claims, which new loan would be paid down immediately on the plan effective date by $225 million;

- a $150 million rights offering for a combination of convertible unsecured notes and preferred stock, with interest and dividends (respectively) payable at 11 percent payment-in-kind;

- the new money providers receiving majority control of the Reorganized Debtors;

- unsecured creditors (including First Lien Lenders with respect to their deficiency claims, the Second Lien Lenders, and the Senior Noteholders) that are "accredited investors" under securities laws receiving common equity and rights to participate in the rights offering;

- establishment of a litigation trust for general unsecured creditors (other than the First Lien Lenders); and

- all other unsecured creditors (including Second Lien Lenders and Senior Noteholders that are not "accredited investors") receiving their Pro Rata share of the unsecured creditors' trust described above plus cash in an amount equal to 20 percent of their allowed claims.

On May 11, 2016, the Debtors and their advisors met with the Committee and its advisors, the First Lien Agent and its advisors, and certain members of the steering committee of First Lien Lenders to discuss the First Lien Lenders' proposal and the Committee's alternative proposal. At that meeting, the Debtors and the First Lien Lenders indicated that the Committee proposal was not acceptable. Also at the meeting, the Committee advised the Debtors and the First Lien Lenders that the First Lien Lenders' proposal was not acceptable to the Committee.

At the May 11 meeting, the Debtors and the First Lien Lenders suggested that the Committee reformulate a proposal using the structure in the First Lien Lenders' proposal and agreed to conduct follow-up discussions or meetings with the Committee. The Committee agreed to provide the Debtors and the First Lien Lenders with a reformulated proposal and meet with the Debtors and the First Lien Lenders in an attempt to settle issues relating to the First Lien lenders' proposal. On May 16, 2016, the Debtors filed a plan and disclosure statement reflecting their negotiated restructuring that was supported by the First Lien Lenders.

This amended plan contemplated:

- an exchange of First Lien Secured Claims for new first lien debt (including commitments under a new reserve-based revolving credit facility), Cash (including proceeds from Asset Sales, if any), and new common equity;

- resolution of the First Lien Lenders' adequate protection claims such that the Allowed amount of such claims will be materially less than that which the First Lien Lenders likely could assert based on the diminution in value of their cash collateral to date, even assuming no further adequate protection is awarded to them for diminution of their other collateral;

- distribution to holders of general unsecured claims of their pro rata share of up to five percent of new common stock in the reorganized company and proceeds of certain unencumbered assets;

- at least $100 million of liquidity available to the Reorganized Debtors as of the Effective Date, including Cash and availability under the new first lien debt; and

- releases of claims against the Debtors, the Reorganized Debtors, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Debtors' non-Debtor subsidiaries, the Committee and any member thereof, the Senior Noteholders, the Senior Notes Indenture Trustee, and certain affiliates and related parties of each of the foregoing.

In parallel with these plan negotiations, the Debtors continued their marketing process. On May 27, 2016, the Debtors received non-binding indications of interest from 57 individual bidders for some or all of the Debtors' assets. In light of the level of interest in the Debtors' assets which implied an enterprise value of the Debtors in excess of the First Lien Lenders' claims, and the expected potential proceeds from asset sales, the Debtors reengaged with all stakeholders regarding revisions to the May 2016 plan.

Specifically, the Debtors and certain Second Lien Lenders discussed an alternative proposal that delivered all equity in the Reorganized Debtors to holders of Second Lien Secured Claims and created a trust that will hold and monetize substantially all unencumbered assets and distribute proceeds in accordance with a waterfall, including ultimate distributions to holders of Allowed General Unsecured Claims. The Debtors and their advisors met with and negotiated the terms of this alternative proposal with the second lien steering committee over the course of several weeks. Ultimately, the Debtors and the second lien steering committee finalized the terms of this alternate proposal, and executed a new plan support agreement on August 26, 2016.

On September 2, 2016, consistent with the August 26 plan support agreement, the Debtors filed the Debtors' Plan and disclosure statement in support thereof, which incorporates the terms of the plan support agreement attached hereto as **Exhibit E**. The plan support agreement was subsequently amended to extend the milestone for approval of this Specific Disclosure Statement from October 31, 2016 to November 30, 2016 and confirmation of the Debtors' Plan from December 21, 2016 to January 31, 2017. The Debtors and Second Lien Steering Committee are in the process of negotiating a further amendment to incorporate the most recent Plan amendments and extend milestones consistent with the confirmation schedule proposed by the Debtors and/or established by the Court.

The release provisions have not changed from the previously filed plans. The Debtors believe that the Sponsors, the First Lien Lenders, and the Second Lien Lenders have provided valuable consideration for releases under the Debtors' Plan, including by, among other things: preserving the Debtors' valuable tax attributes, in the case of the Sponsors; agreeing to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders; and agreeing to receive a recovery largely comprised of equity in any reorganized business and agreeing to fund certain administrative expenses under the Debtors' Plan, in the case of the Second Lien Lenders. The parties' important concessions are needed for the confirmation of the Debtors' Plan on the proposed terms. The Debtors strongly believe that the Debtors' Plan, including each of its terms, is in the best interests of the Debtors' estates, represents the best available alternative to successfully complete the Debtors' restructuring, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

The Debtors have continued to engage all parties in settlement discussions in hopes of resolving plan issues amicably. On October 4, 2016, the Debtors filed a motion seeking to appoint a mediator in hopes of resolving the lien validity issues and moving these chapter 11 cases toward a successful resolution [Docket No. 1442].

On November 17, 2016, the Debtors proposed a settlement to the parties. The Second Lien Steering Committee and the Creditors' Committee also made settlement proposals in November 2016, including during settlement conferences with the Debtors, the Second Lien Steering Committee, and the Creditors' Committee.

On December 5, 2016, the honorable Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware was appointed as the mediator to mediate plan issues among the parties [Docket No. 1716]. The Debtors, the First Lien Agent, the Second Lien Steering Committee, and the Creditors' Committee met with Judge Gross on December 6 and December 8, 2016. Mediation did not result in a consensual resolution among all parties.

Following the mediation, the Debtors and the Second Lien Steering Committee continued to discuss potential settlement proposals in the context of potential plan amendments. The Second Lien Steering Committee proposed, and the Debtors agreed, to modify the Debtors Plan to substantially improve the treatment of General Unsecured Claims under the Plan, including: (a) a compromise of the Second Lien Adequate Protection Claims, which will no longer be payable from the Settlement Trust Assets; (b) removal of the requirement that Settlement Trust Assets bear the cost of the Creditors' Committee's professional fees; and (c) if Class 5 accepts the Debtors Plan, additional consideration to holders of Allowed General Unsecured Claims (other than Second Lien Deficiency Claims) consisting of five percent of new common stock in the Reorganized Debtors (subject to dilution for the Management Incentive Plan) and waiver by the Second Lien Lenders of their right to recover any portion of the proceeds of any litigation against the Debtors' pre-2011 equity owners and current preferred equity owners.

Prior to these negotiations, on October 18, 2016, the Committee filed a competing chapter 11 plan [Docket No. 1552] (the "Committee Plan"). The Committee Plan contemplates a liquidation of all of the Debtors' assets and distribution to creditors of the proceeds thereof.

The Debtors believe that the Committee Plan is inherently inferior to the Debtors' Plan because the distributable value available to creditors under the Committee Plan is approximately $216 million less than the distributable value available to creditors under the Debtors' Plan. The substantial difference in distributable value is attributable to several factors, including the substantial value of non-producing oil and gas assets in a going concern that would not be realized in a liquidation scenario, the substantial wind-down costs required to wind-down the Debtors' business, and the Committee's unsupported assumption that the stakeholders, including the Debtors' equity owners, will fund $40 million for distribution to creditors.

The Debtors believe that the Reorganized Debtors should be valued on both the value of their developed reserves ("PDP") and undeveloped reserves, because the Reorganized Debtors would have the ability to drill undeveloped wells and realize that undeveloped reserve value. The Reorganized Debtors will have approximately 1,500 undrilled wells with a return profile in excess of 20–30 percent, plus internal rates of return at current strip pricing. In a liquidation scenario, such as that contemplated by the Committee Plan, all of the Debtors' oil and gas assets will be sold to third party buyers. Based upon the results of the marketing process that the Debtors just conducted, all but one asset package was valued at or slightly above the value of the Debtors' PDP properties with little value ascribed to Samson's valuable undeveloped reserves.

The Committee Plan assumes the Debtors' remaining assets, which the Committee intends to sell under its plan, are worth approximately $500 million. This assumes that each of these unsold asset packages would be sold at the highest of each non-binding, third-party bid received by the Debtors for such assets pursuant to the marketing process. However, none of the bids were binding, putting into question the accuracy of such values. Additionally, and perhaps more importantly, each of the bids was premised on a transaction effective date as of July 1, 2016, approximately four months prior to the filing of this Specific Disclosure Statement. Since that time, the Debtors have extracted approximately

### B.    Asset Sales

The Debtors pursued Asset Sales based on market feedback and bids, and in consultation with the First Lien Agent, the second lien steering committee, and the Committee.  The Asset Sales ultimately resulted in over $650 million in Cash proceeds.  The Reorganized Debtors shall use the net Cash proceeds of such Asset Sales to fund distributions to certain holders of Claims against the Debtors.  The net Cash proceeds of the Prepetition Collateral including in the Asset Sales will be used:  (1) to satisfy the First Lien Cash Recovery; (2) to make other Cash payments under the Debtors' Plan, including payments to fund the Professional Fee Escrow; (3) to fund the payment of the Retention Option Payment (if any); and (4) for working capital purposes of the Reorganized Debtors.  The Unencumbered Asset Sale Proceeds shall be applied towards the Settlement Trust Cash Amount.

### C.    Issuance and Distribution of New Common Stock

On the Effective Date, the Reorganized Debtors shall issue New Common Stock.  The issuance of the New Common Stock, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any further action by the holders of Claims or Interests; *provided* that the Management Incentive Plan shall be determined by the Reorganized Parent's board of directors following the Effective Date.

All of the shares of New Common Stock issued pursuant to the Debtors' Plan shall be duly authorized, validly issues, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Debtors' Plan shall be governed by the terms and conditions set forth in the Debtors' Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### D.    Liquidation and Monetization of Settlement Trust Assets

On the Effective Date, the Reorganized Debtors shall contribute the Settlement Trust Assets to the Settlement Trust.  The Settlement Trust shall be administered by the Reorganized Debtors, which shall be reimbursed for any out-of-pocket expenses incurred in such administration from the cash proceeds of the liquidation or monetization of the Settlement Trust Assets prior to distribution of any such proceeds.  The Reorganized Debtors shall have the authority and right to take any action necessary or appropriate to liquidate and monetize the Settlement Trust Assets and distribute the Settlement Trust Recovery Proceeds.

### E.    Distributions

Holders of Allowed First Lien Secured Claims shall receive a Pro Rata distribution of either the Exit RBL Facility or the Exit Term Loan.  Each holder of an Allowed Second Lien Secured Claim shall receive its Pro Rata distribution of 100 percent of the New Common Stock (subject to dilution for the Management Incentive Plan); *provided* that, if Class 5 votes to accept the Plan by the Voting Deadline, each such holder shall receive its Pro Rata distribution of 95 percent of the New Common Stock (subject to dilution for the Management Incentive Plan).  Each holder of an Allowed General Unsecured Claim (other than holders of Second Lien Deficiency Claims) shall receive its Pro Rata distribution of the beneficial interests in the Settlement Trust, entitling such holder to receive Settlement Trust Recovery Proceeds on account of such interests; *provided* that, if the Minimum Liquidity Shortfall occurs, any amounts distributable to the holders of Second Lien Deficiency Claims on account of such Claims shall be distributed to the Reorganized Debtors to the extent of the Minimum Liquidity Shortfall Amount; *provided further* that, if Class 5 votes to accept the Plan by the Voting Deadline, the Settlement Trust Assets shall include the General Unsecured New Common Stock Recovery; and holders of Allowed

Second Lien Deficiency Claims shall be deemed to waive any and all right to distributions from the monetization of the Preferred Equityholder Claims or from the General Unsecured New Common Stock Recovery.

### F.    Releases

The Debtors' Plan contains certain releases (as described more fully in Article IV.Q hereof), including mutual releases between Debtors, on the one hand, and (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (i), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (l) the DTC; *provided* that the foregoing shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

The Debtors believe that all of the Released Parties, in particular the Sponsors, the First Lien Lenders, and the Second Lien Lenders, have provided valuable consideration for releases under the Debtors' Plan, including by, among other things:  preserving the Debtors' valuable tax attributes, in the case of the Sponsors; agreeing to commit to fund the Debtors' new Exit RBL Facility, in the case of the First Lien Lenders; and agreeing to receive a recovery largely comprised of equity in a reorganized business and agreeing to fund certain administrative expenses under the Debtors' Plan, in the case of the Second Lien Lenders.  The parties' important concessions are needed for the confirmation of the Debtors' Plan on the proposed terms.  The Debtors strongly believe that the Debtors' Plan, including each of its terms, is in the best interests of the Debtors' estates, represents the best available alternative to successfully complete the Debtors' restructuring, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

The Debtors' Plan also provides that each holder of a Claim or an Interest that (1) votes to accept or is deemed to accept the Debtors' Plan or (2) votes to reject the Debtors' Plan, is deemed to reject the Debtors' Plan, or is in a voting Class that abstains from voting on the Debtors' Plan but does not elect to opt out of the release provisions contained in Article VII of the Debtors' Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  These releases are integral to the Restructuring Transactions contemplated by the Debtors' Plan.

Prior to commencing these chapter 11 cases, the Debtors entered into a services agreement with Mr. Alan B. Miller pursuant to which Mr. Miller serves as the Debtors' independent director to, among other things, review and consider certain results of the investigation undertaken by Kirkland & Ellis LLP and the related report and underlying materials, including the appropriateness of the releases in the Debtors' Plan, and to consider the fairness of any plan or plans proposed by the Debtors or other parties. In connection with his appointment, Mr. Miller entered into a services agreement that provided for an annual retainer of $60,000 and compensation of $833 per hour.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims[3] | Projected Recovery Under the Debtors' Plan |
| | | compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the beneficial interests in the Settlement Trust, entitling such holder to receive Settlement Trust Recovery Proceeds on account of such interests; *provided* that, if the Minimum Liquidity Shortfall occurs, any amounts distributable to the holders of Second Lien Deficiency Claims on account of such Claims shall be distributed to the Reorganized Debtors to the extent of the Minimum Liquidity Shortfall Amount; *provided further* that, if Class 5 votes to accept the Plan by the Voting Deadline, the Settlement Trust Assets shall include the General Unsecured New Common Stock Recovery; and holders of Allowed Second Lien Deficiency Claims shall be deemed to waive any and all right to distributions from the monetization of the Preferred Equityholder Claims or from the General Unsecured New Common Stock Recovery. | | |
| 6 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $0 | 0% |
| 7 | Intercompany Claims | Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, in consultation with the First Lien Agent and the second lien steering committee, be cancelled, and no distribution shall be made on account of such Claims. | $7,896,830,000 | 0%-100% |
| 8 | Intercompany Interests | Intercompany Interests may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, in consultation with the First Lien Agent and the second lien steering committee, be cancelled, and no distribution shall be made | N/A | 0%-100% |

19

| | | | Projected | Projected Recovery |
| | Claim/Equity | | Amount of | Under the Debtors' |
| Class | Interest | Treatment of Claim/Equity Interest | Claims[3] | Plan |
|---|---|---|---|---|

| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
|---|---|---|---|---|
| | | | Projected Amount of Claims[3] | Projected Recovery Under the Debtors' Plan |
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | | |
| | | on account of such Interests. | | |
| 9 | Interests in Parent | On the Effective Date, existing Interests in the Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in the Parent on account of such Interests. | N/A | 0% |

**B.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Debtors' Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Debtors' Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Debtors' Plan.

**C.    Are any regulatory approvals required to consummate the Debtors' Plan?**

No.  There are no known regulatory approvals that are required to consummate the Debtors' Plan.

**D.    What happens to my recovery if the Debtors' Plan is not confirmed or does not go effective?**

In the event that the Debtors' Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative, including a potential sale under section 363 of the Bankruptcy Code may provide holders of Claims and Interests with less than they would have received pursuant to the Debtors' Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "Confirmation of the Debtors' Plan - Best Interests of Creditors/Liquidation Analysis," which begins on page 50 of this Specific Disclosure Statement, and the Liquidation Analysis attached as **Exhibit F**.

**E.    If the Debtors' Plan provides that I get a distribution, do I get it upon Confirmation or when the Debtors' Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Debtors' Plan refers to approval of the Debtors' Plan by the Bankruptcy Court.  Confirmation of the Debtors' Plan does not guarantee that you will receive the distribution indicated under the Debtors' Plan.  After Confirmation of the Debtors' Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Debtors' Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Debtors' Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Debtors' Plan.

Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**M.    How will the release of Avoidance Actions affect my recovery under the Debtors' Plan?**

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided* that unless otherwise released pursuant to the Debtors' Plan (including, against any Released Party), the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition, other than against any Released Party.  No Avoidance Actions shall revert to creditors of the Debtors.

**N.    Will there be releases and exculpation granted to parties in interest as part of the Debtors' Plan?**

Yes, the Debtors' Plan provides releases to the Released Parties and exculpates the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Debtors' Plan are an integral part of the Restructuring Transactions contemplated by the Debtors' Plan and the Debtors' overall restructuring efforts.  All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Debtors' Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtors' Plan will preserve the Debtors' valuable tax attributes to offset gains in the event the Debtors' Plan is structured as a taxable sale of assets or to offset future operating income in the event the Debtors' Plan is structured as a tax free reorganization.  Preserving the Debtors' valuable tax attributes—specifically, $1.4 billion of net operating losses ("NOLs") that can offset current and future tax obligations—is critical to any restructuring.  Preservation of the NOLs would not be possible without the support of the Sponsors.  Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and certain of the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering any ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

To ensure that the valuable NOLs are preserved and can be utilized by Samson, the transaction contemplated by the prepetition restructuring support agreement was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the prepetition restructuring support agreement not to sell or transfer any of their equity interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.  While the Sponsors could have pursued the prepetition noteholder-led transaction to preserve their 85 percent equity interests and hope

for a turnaround, the Sponsors instead determined to support the transaction that was achievable and in the best interests of the Debtors.

The Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase the Debtors. As part of the 2011 buyout and related equity investment, the Sponsors received certain fees of approximately $77.4 million. Since the 2011 Acquisition, the owners invested significant time and energy in the Debtors. Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 Acquisition, the Sponsors received advisory fees totaling approximately $38.4 million through the end of 2014. Following the significant decline in the price of oil in late 2014, combined with the deterioration in the Debtors' asset base as reported in early 2015, the Debtors and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

Each holder of a Claim or Interest that (i) votes to accept or is deemed to accept the Debtors' Plan or (ii) votes to reject the Debtors' Plan, is deemed to reject the Debtors' Plan, or is in a voting Class that abstains from voting on the Debtors' Plan but does not elect to opt out of the release provisions contained in Article VII of the Debtors' Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases represent an integral element of the Debtors' Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Debtors' Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1. Release of Liens

Except as otherwise specifically provided in the Plan, the Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors. In addition, the First Lien Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Exit Facility to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto. For the avoidance of doubt, all expenses incurred by the First Lien Agent or the Second Lien Agent in connection with the foregoing shall be paid or reimbursed by the Reorganized Debtors.

### 2. Debtor Release

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, the Released Parties are deemed expressly,

# **EXHIBIT 22**

Excerpt of Fourth Amended Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

Domenic E. Pacitti (Del. Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:       (302) 426-1189
Facsimile:       (302) 426-9193

-and-

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:       (215) 569-2700
Facsimile:       (215) 568-6603

*Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.    THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

115.    "*Released Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; (j) the Backstop Parties; and (k) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.

116.    "*Releasing Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) the Backstop Parties; (j) all holders of Claims and Interests that are deemed to accept the Plan; (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (m) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (m), such Entities' current and former affiliates' and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals,  managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

117.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

118.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

119.    "*Required Backstop Parties*" means, as of any date of determination, Backstop Parties committed to providing a majority of the aggregate backstop commitments pursuant to the Backstop Commitment Agreement.

120.    "*Required Consenting Lenders*" means, as of any date of determination, Consenting Lenders holding a majority of the aggregate outstanding principal amount of the Second Lien Claims held by Consenting Lenders.

121.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit B</u> to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 16].

122.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

123.    "*Rights*" means the rights distributed to the Rights Offering Participants to purchase Rights Offering Units at the applicable Rights Exercise Price, pursuant to the Rights Offering Procedures.

## EXHIBIT 23

Excerpt of transcript from the hearing dated May 31, 2018

1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4  In re:

5

6  SAMSON RESOURCES                Chapter 11

7  CORPORATION,                    Case No. 15-11934(BLS)

8

9         Reorganized Debtor.

10 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 PETER KRAVITZ, AS SETTLEMENT

12 TRUSTEE OF AND ON BEHALF OF

13 THE SAMSON SETTLEMENT

14 TRUST,

15         Plaintiff,

16         v.                      Adv. Pro. No. 17-51524(BLS)

17 SAMSON ENERGY COMPANY, LLC,

18 ET AL.,

19         Defendants.

20 - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21                                 United States Bankruptcy Court

22                                 824 North Market Street

23                                 Wilmington, Delaware

24

25

1   the weight of this charge hanging around her neck unless can

2   make it out in a complaint.

3         And the third thing I'd point out about the

4   gatekeeper role is that there is a safety valve.  I mean we

5   get to discovery on constructive fraudulent transfer and

6   they turn up the smoking gun they'd be in here in ten

7   minutes with a motion to amend and you'll grant it.

8         So it's not like that we're imposing some hardship

9   on the trustee here by following the Supreme Court's

10  dictates.

11        I leave the Court -- well I definitely want to

12  invite any questions you have.

13        THE COURT:  You'll have an opportunity to reply,

14  so --

15        MR. WILLETT:  Okay.

16        THE COURT:  -- you don't need to return to that.

17        MR. WILLETT:  This is not Twine's case, you know?

18  This is not what the drafts persons of the --

19        THE COURT:  But Sheep case, right?

20        MR. WILLETT:  The Sheep case.  We weren't hiding

21  sheep because the (indiscernible) owed a debt.  This is not

22  what the Uniform Fraudulent Transfer Act had in mind, and if

23  this case, this arms length, third-party sale, lots of smart

24  people kicking tires, looking at it, not an ounce of fraud

25  alleged, if this can be unwound with the majesty of

1  and again we've got the -- the summary judgment motions are

2  clearly in prospect now and we'll move forward with them.

3         And you can memorialize this or if we're all on the

4  same page, then that's fine.  I'll take an order under

5  certification or, again, as to scheduling amongst

6  yourselves, that's fine with me.

7         MR. STERN:  I think we would be happy to rely upon

8  what we've said on the record and the word of our co -- of

9  our colleagues.

10         THE COURT:  Of course.

11         MR. SHORE:  Well, let me just now address that

12  because now you've raised the concept of get started with

13  the process.  They're proposing two things.  Right.  They're

14  proposing in the interim --

15         THE COURT:  Right.

16         MR. SHORE:  -- that we take limited discovery on

17  the motion for summary judgment, that the parties do.  It's

18  not --

19         MR. STERN:  I'm sorry.  I didn't --

20         MR. SHORE:  It's all right.  Go ahead.

21         MR. STERN:  That was not -- you misread me.  I was

22  not proposing that.

23         MR. SHORE:  Okay.

24         THE COURT:  Yeah.  I didn't think I understood it

25  to be --

**EXHIBIT 24**

Excerpt of Stipulation and Agreement Regarding (I) Global Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Related Matters

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**STIPULATION AND AGREEMENT REGARDING (I) GLOBAL SETTLEMENT
OF MATTERS RELATED TO CHAPTER 11 PLAN,
(II) CHAPTER 11 PLAN SUPPORT, AND (III) RELATED MATTERS**

This stipulation and agreement (the "Stipulation")[2] is made and entered into as of January 11, 2017, by and among the Debtors, the Committee, the Sponsors, and the other signatories hereto, if any (each, a "Party," collectively, the "Parties," and together with the Second Lien Steering Committee (and the First Lien Agent, if not a signatory hereto), the "Settling Parties").[3]

**WHEREAS**, the Settling Parties have negotiated and agreed to a global settlement regarding all open and disputed issues between and among them, as set forth in and as contemplated by (a) this Stipulation, (b) the Plan Support Agreement, dated August 26, 2016, as amended by the first amendment thereto, dated September 30, 2016, and the second amendment thereto, dated January [11], 2017, by and among the Debtors and the Second Lien Steering Committee, a copy of which is attached hereto as **Exhibit A** (the "Second Lien PSA"), (c) the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

[2] Terms not otherwise defined herein shall have the same meanings as set forth in the Global Settlement Plan (as hereinafter defined).

[3] For the purposes of this Stipulation, the term "Party" in regards to the First Lien Lenders shall mean the business unit defined in the signature blocks appended hereto for such Lenders.

| & Contracts | Designated Asset Sales, the Debtors may not assume, assume and assign, or reject any executory contracts or unexpired leases without the prior written consent of the Second Lien Steering Committee, which consent shall not be unreasonably withheld. |
|---|---|
| **Other** | ■ The Plan will include customary releases and exculpations for the First Lien Agent, the other First Lien Secured Parties, the Second Lien Agent, the Second Lien Lenders, the sponsors listed in Exhibit D to the August 14, 2015 Restructuring Support Agreement, each of the foregoing parties' respective current and former officers, directors, advisors and other representatives, and the Debtors' current and former officers, directors, advisors and other representatives, and in all cases consistent with the release and exculpation provisions set forth in the plan filed by the Debtors on September 17, 2015.<br><br>■ The Plan will include indemnification provisions consistent with the indemnification provisions set forth in the plan filed by the Debtors on September 17, 2015. |
| **Implementation** | ■ As soon as practicable, the Debtors and the Second Lien Steering Committee will sign a restructuring support agreement incorporating the terms set forth in this Plan Term Sheet.<br><br>■ The Debtors will file a revised plan and disclosure statement consistent with this Plan Term Sheet and the restructuring support agreement on or before August 31, 2016.<br><br>■ The Debtors will provide summary information related to asset sale bids and agree on related cleansing materials to be included in the disclosure statement. |

**EXHIBIT 25**

Order dated January 12, 2017 Approving Stipulation and Agreement Regarding (I) Global Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Related Matters

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 1857, ____** |

## ORDER APPROVING STIPULATION AND AGREEMENT REGARDING (I) SETTLEMENT OF MATTERS RELATED TO CHAPTER 11 PLAN, (II) CHAPTER 11 PLAN SUPPORT, AND (III) OTHER RELATED MATTERS

Upon the *Stipulation and Agreement Regarding (I) Settlement of Matters Related to Chapter 11 Plan, (II) Chapter 11 Plan Support, and (III) Other Related Matters* (the "Stipulation")[2] by and among the Debtors, the Committee, the Sponsors, and the other signatories thereto, if any, it is HEREBY ORDERED THAT:

1.      The Stipulation is hereby approved.

2.      The Parties are hereby authorized to take any and all actions reasonably necessary to effectuate the terms of the Stipulation.

3.      The terms of the Stipulation are incorporated herein by reference and will be of the same force and effect as if fully set forth herein.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

[2]    Terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

4.    The fourteen (14) day stay period set forth in Bankruptcy Rule 6004(h) is waived and this Order shall be effective immediately upon its entry.


Dated: _January 13_, 2017
Wilmington, Delaware

HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 26

Excerpt of transcript from the hearing dated January 12, 2017

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4

5    In re:                        :

                                   :    Chapter 11

6    SAMSON RESOURCES             :

     CORPORATION, et al.,          :    Case No. 15-11934 (CSS)

7                                  :

              Debtors.             :    (Jointly Administered)

8    _____:

9

10

11                               United States Bankruptcy Court

12                               824 North Market Street

13                               Wilmington, Delaware

14                               January 12, 2017

15                               1:07 p.m. – 2:07 p.m.

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1      this case.

2              And that would be including the second lien

3      deficiency claim, which would be roughly 20 percent of the

4      entire unsecured creditor pot.  So that would yield a

5      recovery to unsecured creditors of somewhere on the order of

6      $180 million in cash and that was really our ultimate target

7      for resolution in these cases.

8              So to accommodate a deal that permitted a going

9      concern reorganization which has been the stated objective

10     of the Debtors and the second lien holders and which was

11     kind of put forth as a do or die line in the sand.  What we

12     agreed to initially in the mediation that was conducted by

13     Judge Gross, was that we would receive a cash payment of

14     $167.5 million if the reorganization was accomplished in a

15     reasonable time and we would also receive for the benefit of

16     unsecured creditors all the litigation rights against

17     everybody but the first liens and the second liens.

18             And that's where we got into a little bit of a

19     sticking point.  People felt that a -- that it was

20     beneficial to try to work towards a complete resolution

21     which would include claims against the sponsors as well and

22     under Judge Gross' guidance and at times, arm twisting, we

23     got to -- to step two of the (indiscernible) deal which was

24     to agree that the cash number would be increased to the

25     168.5 and that the sponsors would either assign for the

1    benefits of the other unsecured creditors or waive all of

2    their claims against the Debtors.  And the benefit of that,

3    we believe, is another about a million, five to $2 million

4    of -- of value from that claim waiver or assignment.

5            So I think it -- at this point, I should make sure

6    on the record that we thank Judge Gross for his time and

7    effort.  I know that it was a delight for him in dealing

8    with this group and we -- we are thankful for his support, I

9    put quotes around the word "support" in getting to that

10   first step of the resolution.

11           Now, the interesting thing is that in hindsight,

12   that turned out to be the easy part of the deal.  The hard

13   part was figuring out the mechanics that would both lock in

14   the unsecured agreed recovery while also giving the Debtors

15   and the second liens appropriate flexibility to achieve the

16   going concern reorganization that they think will maximize

17   the recovery for them.

18           So, and I guess I should, by way of footnotes, say

19   that the deal that we struck had a number of components to

20   it to get us to our $168.5 million of cash.  That, including

21   the $100 million of unencumbered cash that's in the estate

22   right now; the second liens we're -- we're committing to

23   backstop a rights offering to other second lien holders to

24   raise another $45 million.  Unencumbered assets would be

25   sold to raise another $15 million and, as a consequence of

1    the workings of the proposed exit facility, there would be

2    another $8.5 million of cash that would be available for

3    distribution to unsecured creditors.

4              Now, the problem, of course, is that it wasn't

5    clear when all of those other things would be completed as

6    opposed to what was in effect, a liquidating plan from the

7    perspective of the unsecured creditors, so we had to kind of

8    separate those two pieces which is -- which is remarkably

9    what we -- what we've been able to accomplish here through

10   the plan and the stipulation.

11             Those two documents really work together to lock

12   in the unsecured creditor deal and, at the same time, give

13   the Debtors and the 2Ls the flexibility they need to try to

14   get this -- this reorg accomplished.

15             So what we -- it's kind of -- it's kind of an

16   oddity.  I can't say that I've done this before, but, you

17   know, what -- what the heck.

18             We have a plan that has two effective dates.

19   There's an initial effective date which will occur as soon

20   as possible after the entry of the confirmation order and at

21   that time the creditor trust will receive the unencumbered

22   cash and the unreleased estate claims and causes of action.

23   The seconds will release their adequate protection claim and

24   their deficiency claim and the sponsors will assign or waive

25   their claims as determined by the committee for the benefit

1    of the other unsecured creditors.  And the first, the

2    seconds and the sponsors will get their releases.

3             And what we wanted -- we wanted that to be done

4    and locked in as early as possible and then kind of leave

5    the field open for the -- the reorganization to be

6    completed.  So we had to create flexibility in the plan that

7    allowed people to -- to make changes as events unfolded to

8    get that reorganization completed, which is what we've done.

9    And the key things that have to occur to affect the going

10   concern part of this plan is the rights offering has to be

11   completed and funded; the exit financing has to be completed

12   and ready to -- to go; and, the second liens have to then

13   equitize their recovery.

14            Now, there's some notion that, that precise

15   reorganization structure may need to change as events

16   unfold.  Perhaps, for example, if the firsts are unwilling

17   to complete the exit financing, as contemplated, the seconds

18   and the Debtors want to be able to go out to a third party

19   source and get the financing needed to complete the

20   repayment of the first lien claim.  It may be that more

21   liquidity is needed, so I think they want to be able to

22   upsize the rights offering if -- if that's called for and

23   there may be other changes that need -- may need to be made

24   along the way, but failing all that, the plan also permits

25   ultimately, an orderly disposition of the remaining assets

# **EXHIBIT 27**

Excerpt of Declaration of Alan B. Miller in Support of Confirmation of
Debtors' Joint Chapter 11 Plan of Reorganization

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF ALAN B. MILLER IN
SUPPORT OF CONFIRMATION OF DEBTORS' JOINT
CHAPTER 11 PLAN OF REORGANIZATION**

I, Alan B. Miller, declare as follows:

1.      I am the independent director of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). Prior to my appointment as independent director on the date of the commencement of the Debtors' chapter 11 cases, I did not have any relationship whatsoever with any of the Debtors or the other members of their boards of directors or their executive management team.

2.      I have submitted a declaration previously in these chapter 11 cases, the *Declaration of Alan B. Miller in Support of Debtors' Objection to Acting United States Trustee's Motion for an Order Directing the Appointment of an Examiner* [Docket No. 532]. I have also submitted a sealed report detailing the conclusions of an investigation I conducted into certain potential estate claims and causes of action, and reviewed a report prepared by Kirkland & Ellis LLP analyzing such claims. I am authorized to submit this declaration in support of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

has a high likelihood of success, and will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

## II.    The Settlements, Releases, and Injunctions in the Plan Are Appropriate

13.    The Plan includes certain release, exculpation, and injunction provisions, all of which are integral to the overall global settlement and all of which are appropriate, reasonable, and supported by good consideration.

### A.    The Plan's Debtor Release and Third Party Release Are Necessary and Appropriate.

14.    Article VIII.E of the Plan provides for debtor releases and Article VIII.F of the Plan provides for certain third party releases. The releases are the product of arm's-length negotiations, are in exchange for substantial consideration, and were critical to obtaining support for the Plan from various parties in interest. Specifically, certain sponsors, the first lien lenders, and the second lien lenders (and all of their advisors, employees, representatives, and other related parties) in particular have provided valuable consideration for releases under the Plan, including by, among other things:

- in the case of such sponsors, preserving the Debtors' valuable tax attributes and agreeing to waive or assign the sponsor management fee claims;

- in the case of the first lien lenders, agreeing to commit to fund the Debtors' new exit RBL facility (and agreement to include important concessions in the terms of the exit RBL facility); and

- in the case of the second lien lenders, agreeing to fund (through the Plan's rights offering) the necessary new money investment to fund the settlement payment for unsecured creditors (and other obligations of the Debtors under the Plan and going forward), as well as agreeing to receive a recovery comprised of equity in a reorganized business.

15.    Without the contributions by each of these parties, the Plan and the global settlement contemplated thereby would not be possible.

**EXHIBIT 28**

Excerpt of Debtors' Memorandum of Law In Support of Confirmation of Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates and Omnibus Reply to Objections Thereto

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES AND
OMNIBUS REPLY TO OBJECTIONS THERETO**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

II.      **Voting Results.**

7.      In accordance with the Bankruptcy Code, only holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[5]  Holders of Claims and Interests were not entitled to vote if their rights are:  (a) Unimpaired by the Plan; or (b) Impaired by the Plan such that they will receive no distribution of property under the Plan.  As a result, the following Classes of Claims and Interests were ***not*** entitled to vote on the Plan, and the Debtors did not solicit votes from holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 6 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Claims | Un/Impaired | Presumed to Accept/Deemed to Reject |
| 8 | Intercompany Interests | Un/Impaired | Presumed to Accept/Deemed to Reject |
| 9 | Interests in Parent | Impaired | Deemed to Reject |

8.      Accordingly, the Debtors only solicited votes on the Plan from holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5]      *See* 11 U.S.C. § 1126.

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 – First Lien Secured Claims (All Debtors) | $945,831,990.20 100.00% | 19 100.00% | $0.00 0.00% | 0 0.00% |
| Class 4 – Second Lien Secured Claims (All Debtors) | $889,797,847.91 100.00% | 118 100.00% | $0.00 0.00% | 0 0.00% |
| Class 5 – General Unsecured Claims (Samson Resources Corporation) | $1,949,259,372.55 99.84% | 225 89.29% | $3,056,976.04 0.16% | 27 10.71% |
| Class 5 – General Unsecured Claims (Geodyne Resources, Inc.) | $1,915,008,544.00 99.85% | 156 95.71% | $2,903,004.00 0.15% | 7 4.29% |
| Class 5 – General Unsecured Claims (Samson Contour Energy Co.) | $1,915,008,544.00 99.85% | 156 95.71% | $2,903,004.00 0.15% | 7 4.29% |
| Class 5 – General Unsecured Claims (Samson Contour Energy E&P, LLC) | $1,915,633,389.76 99.85% | 156 93.41% | $2,903,008.00 0.15% | 11 6.59% |
| Class 5 – General Unsecured Claims (Samson Holdings, Inc.) | $1,915,008,543.00 99.85% | 155 96.27% | $2,903,003.00 0.15% | 6 3.73% |
| Class 5 – General Unsecured Claims (Samson-International, Ltd.) | $1,915,008,543.00 99.85% | 155 96.27% | $2,903,003.00 0.15% | 6 3.73% |
| Class 5 – General Unsecured Claims (Samson Investment Company) | $1,915,510,729.84 99.85% | 162 95.29% | $2,903,005.00 0.15% | 8 4.71% |
| Class 5 – General Unsecured Claims (Samson Lone Star) | $1,915,343,320.16 99.81% | 179 91.79% | $3,720,726.15 0.19% | 16 8.21% |
| Class 5 – General Unsecured Claims (Samson Resources Company) | $1,918,370,322.73 99.84% | 208 90.83% | $2,996,719.96 0.16% | 21 9.17% |

9.     In sum, creditors representing approximately 99 percent by amount of voted claims and over 96 percent by number in the aggregate voted to accept the Plan.  As set forth above and in the Voting Report, all of the Impaired Classes entitled to vote on the Plan (Classes 3, 4, and 5) voted to accept the Plan for each Debtor.

**III.    Plan Modifications.**

10.    The Debtors will file a revised Plan with technical modifications, including to resolve objections or concerns raised by various parties and to reflect finalized restructuring documentation (including certain documents included in the Plan Supplement), all in accordance with section 1127(a) of the Bankruptcy Code.  None of the Plan modifications will adversely affect the treatment of those Classes of Claims that voted to accept the Plan.[6]  Therefore, such

---

[6]    *See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and

66.     As described in the Miller Declaration,[96] and as an analysis of the *Master Mortgage* factors demonstrates, the Debtors' releases embodied in Article VIII.F of the Plan should be approved.

- *First*, an identity of interest exists between the Debtors and the parties to be released. Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.[97]

- *Second*, each of the Released Parties has made substantial contributions to the Debtors and their Estates, and aided in the reorganization process. The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a global settlement.   As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[98]   Here, the value contributed by the Released Parties is certainly substantial.

    Specifically, in addition to providing non-monetary value, (a) the Sponsors agreed to preserve $1.4 billion of net operating losses that can offset current and future tax obligations and agreed to waive or assign the Sponsor management fee claims; (b) the First Lien Lenders agreed to fund the Debtors' new Exit Facility; and (c) the Second Lien Lenders agreed to fund (through the Rights Offering) a new money investment to fund the settlement payment for unsecured creditors and to receive a recovery comprised of equity in a reorganized business. Without the contributions of each of these parties, the Plan and the global settlement contemplated therein would not be possible.

- *Third*, the releases are essential to the Plan because they allow the Debtors to move forward with the restructuring and fully and consensually resolve lengthy and

---

[96]  Miller Declaration ¶¶ 13–15.

[97]  *See In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting that an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement"); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[98]  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. 314, 347 (Bankr. D. Del. 2011) (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [plan of reorganization] or to creditors")*; Zenith* 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

complex litigation.[99]  As noted above, the Debtor Releases were necessary to build the support for the Plan that was ultimately achieved.  The releases are an integral component of a global settlement encompassing compromises and contributions by all parties.  In light of the foregoing, the Debtors believe that the record of these Chapter 11 Cases fully supports the essential nature of these releases.

- **Fourth**, as evidenced by the Voting Report and noted herein, the Debtors' stakeholders overwhelmingly support the Plan.  Every single Voting Class voted to accept the Plan.[100]  In sum, creditors holding approximately $33,794,819,852.03 of Claims entitled to vote accepted the Plan, representing approximately 99 percent by amount and over 96 percent by number.[101]  Given the critical nature of the Debtor Releases, this degree of consensus evidences the Debtors' stakeholders' support for the Debtor Releases and the Plan.

- **Fifth**, the Plan provides for meaningful recoveries for all classes affected by the releases.  Under the Plan, unsecured creditors will receive their their *pro rata* share of beneficial interests in the Settlement Trust, entitling them to Settlement Trust Recovery Proceeds on account of such interests.  The Debtors' reorganization will also return meaningful value to their prepetition lenders.  Furthermore, as noted above, these affirmative releases are supported by the Voting Classes on a near-unanimous basis.

67.    For the reasons set forth above, the Court should approve the Debtor Releases in the Plan.

## 2.    The Third Party Releases in the Plan Are Appropriate

68.    The third party releases outlined in Article VIII.F of the Plan are consensual, consistent with established Third Circuit law, and should be approved.[102]  As set forth in the Miller Declaration, the third party releases are the product of extensive negotiations between the Debtors and the major stakeholders, are narrowly tailored, were a necessary component of the global settlement, and are supported by all of the Debtors' major stakeholders. [103]  With the

---

[99]   *See In re Key3Media Grp., Inc.*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (approving a settlement based in part on the complexity of the litigation); *see Wash. Mut.*, 442 B.R. at 348 (holding the releases were reasonable because in light "of the complex and interrelated claims that the Debtors, JPMC and the FDIC have to virtually every asset in the Debtors' estates, it is hard to imagine what plan the Debtors could propose without the resolution of those claims first").

[100]  *See generally* Voting Report.

[101]  *Id.*

**EXHIBIT 29**

Excerpt of Notice of Filing of Amendment to the Plan Supplement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF FILING OF AMENDMENT TO THE PLAN SUPPLEMENT FOR THE GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on January 13, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 1882] (as may be modified, amended, or supplemented, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtors filed the Plan Supplement with the Court on January 25, 2017 [Docket No. 1927]. The filed Plan Supplement contains, among other documents, the Retained Causes of Action.

**PLEASE TAKE FURTHER NOTICE** that the Plan (including the Plan Supplement) was confirmed by the Honorable Judge Christopher S. Sontchi in the United States Bankruptcy Court for the District of Delaware on February 13, 2017 [Docket Nos. 2019].

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby amend the Plan Supplement. Attached hereto as **Exhibit 1** is the amended Plan Supplement Exhibit C (Retained Causes of Action).

**PLEASE TAKE FURTHER NOTICE** that if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Garden City Group, LLC, the voting and claims agent retained by the Debtors in the Chapter 11 Cases (the "Voting and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at 888-547-8096; (b) visiting the Debtors' restructuring website at:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

[2] Capitalized terms not otherwise defined herein shall have the same meanings set forth in the Plan.

**EXHIBIT C**

**LISTS OF SETTLEMENT TRUST RETAINED CAUSES OF ACTION AND
REORGANIZED DEBTOR RETAINED CAUSES OF ACTION[1]**

This **Exhibit C** sets forth the Settlement Trust Retained Causes of Action and the Reorganized Debtor Retained Causes of Action. **Exhibits C-1** and **C-2** set forth the Causes of Action to be transferred to the Settlement Trust, as contemplated by the Plan. **Exhibits C-3** through **C-7** set forth the Causes of Action to be retained by the Reorganized Debtors, as contemplated by the Plan. The Settlement Trust Retained Causes of Action include, but are not limited to, the Claims and Causes of Action set forth in **Exhibits C-1** and **C-2** herein. The Causes of Action set forth on **Exhibits C-3** through **C-7** shall be deemed to be the Reorganized Debtor Retained Causes of Action and shall satisfy the Debtors' obligation to identify the Reorganized Debtor Retained Cause of Action on or before the Initial Effective Date of the Plan.

Article IV.N of the Plan provides as follows:

> In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IV.B, Article IV.O, and Article VIII hereof, the Reorganized Debtors (or the Settlement Trust, as applicable) shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Initial Effective Date or the Final Effective Date. The Reorganized Debtors (or the Settlement Trust, as applicable) may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and,

---

[1]   Capitalized terms used but undefined herein shall have the meanings ascribed to them in the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 1882] (as amended from time to time, the "Plan").

therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity (including, for the avoidance of doubt, any claim which remains if a Plan release is not approved by the Confirmation Order), shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

Notwithstanding and without limiting the generality of Article IV.N of the Plan, unless otherwise released by the Plan, the Debtors expressly reserve their rights with respect to all Causes of Action, including, for the avoidance of doubt, all claims, defenses, cross claims, and counterclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, regardless of whether such Entity is included on the lists accompanying this **Exhibit C**. The Plan and/or the lists of Settlement Trust Retained Causes of Action and Reorganized Debtor Retained Causes of Action may be amended in accordance with the Plan.

As described in more detail below, the Settlement Trust Retained Causes of Action are all Claims and Causes of Action (including Avoidance Actions) held by or on behalf of any Debtor against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties), excluding any Entity intended to do business with the Reorganized Debtors that the Debtors or the Reorganized Debtors (as applicable) identify as being costly or burdensome to replace in writing to the Committee on or before the Initial Effective Date. For the avoidance of doubt, the Settlement Trust Retained Causes of Action shall not include Claims or Causes of Action that are (a) are against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) are on account of or arising under any contract or lease entered into after the Petition Date, (c) are on account of any of the Debtors' postpetition ordinary-course-of-business accounts receivable, (d) are against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) are based solely on postpetition conduct, give rise to post petition damages, and have not yet been discovered by the Debtors. The Claims and Causes of Action transferred to the Settlement Trust include, but are not limited to, those set forth in **Exhibit C-1** and **Exhibit C-2** attached hereto.

2

As described in more detail below, the Reorganized Debtor Retained Causes of Action are all Claims and Causes of Action (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) that are not Settlement Trust Retained Causes of Action. For the avoidance of doubt, the Reorganized Debtor Retained Causes of Action will include all Claims and Causes of Action (a) against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) on account of or arising under any contract or lease entered into after the Petition Date, (c) on account of any of the Debtors' postpetition ordinary-course-of-business accounts receivable, (d) against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) that are based solely on postpetition conduct, give rise to postpetition damages, and have not yet been discovered by the Debtors. The Claims and Causes of Action retained by the Reorganized Debtors include, but are not limited to, those set forth in **Exhibit C-3** through **Exhibit C-7** attached hereto.

1.      **Settlement Trust Retained Avoidance Actions.**

Unless otherwise released by the Plan, the Avoidance Actions to be transferred to the Settlement Trust include, but are not limited to, the Avoidance Actions set forth in **Exhibit C-1** attached hereto.

2.      **Settlement Trust Retained Other Claims and Causes of Action.**

Unless otherwise released by the Plan, the Claims and Causes of Action, other than Avoidance Actions, to be transferred to the Settlement Trust include, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-2** attached hereto.  The Debtors, the Committee, and the Settlement Trustee have agreed that the Debtors or the Reorganized Debtors, as the case may be, will have thirty (30) days after the Initial Effective Date to remove an entity listed on **Exhibit C-2** if it is determined that the Reorganized Debtors intend to do business with such entity and the Debtors or the Reorganized Debtors identify that replacing such entity is costly or burdensome; *provided* that the Debtors or the Reorganized Debtors, as the case may be, shall remove any such entity only with the consent of the Settlement Trustee or if it is determined by the Court that the Reorganized Debtors intend to do business with such entity and that replacing such entity would be costly or burdensome, and upon which removal any such entity shall be included on the appropriate Reorganized Debtor Retained Causes of Action exhibit in **Exhibit C**.

3.      **Reorganized Debtor Retained Causes of Action Regarding Contract Parties.**

Unless otherwise released by the Plan, the Reorganized Debtors shall retain all Claims and Causes of Action against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code or on account of or arising under any contract or lease entered into after the Petition Date, including, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-3** attached hereto.

**4.      Reorganized Debtor Retained Causes of Action Regarding Other Business Parties.**

Unless otherwise released by the Plan, the Reorganized Debtors shall retain all Claims and Causes of Action against any Entity with which the Reorganized Debtors intend to do business and that is costly or burdensome to replace, including, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-4** attached hereto.

**5.      Reorganized Debtor Retained Claims Related to Tax Refunds.**

Unless otherwise released by the Plan, the Debtors shall retain all Claims or Causes of Action against against any Governmental Unit (including, without limitation, on account of tax refunds), including, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-5** attached hereto.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors owe taxes to them.

**6.      Reorganized Debtor Retained Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings.**

Unless otherwise released by the Plan, the Debtors shall retain all Claims or Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit or collateral, including, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-6** attached hereto.

**7.      Reorganized Debtor Retained Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Potential Litigation.**

Unless otherwise released by the Plan, the Debtors shall retain all Claims or Causes of Action against any Entity with which the Reorganized Debtors intend to do business and that is costly or burdensome to replace and which is a party or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial including, but are not limited to, the Claims and Causes of Action set forth in **Exhibit C-7** attached hereto.

.

| COUNTERPARTY | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|---|---|
| SAFETY MANAGEMENT SYSTEMS, LLC | Attn: Kristi Chandler | PO Box 98000 | | Lafayette | LA | 70509 | REJECTED |
| WELL TESTING WIRE LINE SERVICE CO. (WIRE LINE SERVICES LTD. DBA) | 415 West Wall, Suite 1600 | NULL | | Midland | tx | 79701 | REJECTED |
| TECHNICAL SERVICES, INC. | P.O. Box 414 | NULL | | Hobbs | NM | 88241 | REJECTED |
| SOUTHWEST OILFIELD SERVICE | P. O. BOX 230 | NULL | | WEATHERFORD | OK | 73096 | REJECTED |
| ROYAL BANK OF CANADA | 8TH FLOOR, SOUTH TOWER | 200 BAY STREET | ROYAL BANK PLAZA | TORONTO | ON | M5J 2J5 | REJECTED |
| WILKERSON TRANSPORTATION, INC. | PO Box 456 | NULL | | Cameron | LA | 70631 | REJECTED |
| THE COMPLIANCE GROUP | Attn: KW Patchett | 14884 Hwy 105 West, Suite 100 | | Montgomery | TX | 77356 | REJECTED |
| THE CLEANING LADY | P.O. Box 69673 | NULL | | Odessa | TX | 79769 | REJECTED |
| RWT LAND SERVICES, LLC | 415 SOUTH WHITE OAK RD. | | | WHITE OAK | TX | 75693 | REJECTED |
| SOONER PRODUCTION SERVICES, INC. | P. O. BOX 1659 | NULL | | WOODWARD | OK | 73802 | REJECTED |
| RYAN DIRECTIONAL SERVICES, INC. | 15700 INTERNATINAL PLAZA DR., SUITE 150 | | | HOUSTON | TX | 77032 | REJECTED |
| RYAN SERVICES INC | ATTN: HIDEE BEDDES | 3699 E. 200 W | | RIGBY | ID | 83442 | REJECTED |
| TAYLOR OILFIELD SERVICES | P.O. Box 248 | NULL | | Canadian | TX | 79014 | REJECTED |
| ROMEO PAPA L.L.C. | 313 Safety Road | NULL | | Houma | LA | 70363 | REJECTED |
| ROMESBERG TRUCKING INC. DBA R.T.I. | Attn:  Roger L. Romesberg, Jr. | 1822 Salco Rd. | | Berlin | PA | 15530 | REJECTED |
| S & R EQUIPMENT INC | 4234 S JACKSON AVE SUITE 300 | | | TULSA | OK | 74107-7038 | REJECTED |
| SHIVERS ENTERPRISES, INC. | P. O. BOX 357 | NULL | | HULL | TX | 77564 | REJECTED |
| SAFETY TEK INDUSTRIES, INC. | ATTN: JAMES BOWERS | 3510 ALLEN RD., #101 | | BAKERSFIELD | CA | 93314 | REJECTED |
| SAKAKAWEA VENTURES LLC | ATTN: JACK ROE | 1830 BLAKE ST. | | DENVER | CO | 80202 | REJECTED |
| TRINITY DISPOSAL AND TRUCKING, L.L.C. | 220 TRAVIS STREET, SUITE 501 | NULL | | SHREVEPORT | LA | 71101 | REJECTED |
| SAMSON ENERGY COMPANY LLC | STACY H. SCHUSTERMAN | C/O SAMSON ENERGY COMPANY LLC | 110 WEST 7TH STREET | TULSA | OK | 74119 | REJECTED |
| S & J ANCHOR SERVICES | Rt. 3, Box 12 | NULL | | Okarche | OK | 73762 | REJECTED |
| SATCOM GLOBAL INC | 3130 N ARIZONA AVE STE 105 | | | CHANDLER | AZ | 85225-7163 | REJECTED |
| THE TURBULATOR COMPANY, LLC | 1341 S.W. 106 Place | NULL | | Oklahoma City | OK | 73170 | REJECTED |
| RELIENT EMISSIONS TESTING, INC. | Attn: Ross Thompson | 4413 82nd St., Suite 107 | | Lubbock | TX | 79424 | REJECTED |
| RELIANT DRILLING SYSTEMS, INC. | 950 Birdsong Rd. | NULL | | Lafayette | LA | 70507 | REJECTED |
| SCANDRILL INC. | 11777 KATY FREEWAY, SUITE 470 | | | HOUSTON | TX | 77079 | REJECTED |
| SCAN-X, LLC | Attn: John Lotrano | 1165 W 780 N | | Orem | UT | 84057 | REJECTED |
| SCARBROUGH'S EXCAVATION & SERVICES | Attn: Ken Landon | PO Box 208 | | Howe | OK | 74940 | REJECTED |
| TWO RIVERS PIPELINE & CONSTRUCTION CO. INC. | Attn:  Tommy Cronk | PO Box 11189 | | Odessa | TX | 79760 | REJECTED |
| SCHWITZER'S NIGHT & DAY TRUCKING, INC. | ATTN: CINDY SCHWITZER | 3193 STAKE HWY 89 N. | | EVANSTON | WY | 82930 | REJECTED |
| SNIKA ENTERPRISES INC. DBA SCT | PO Box 61483 | NULL | | Midland | TX | 79711-1483 | REJECTED |

| COUNTERPARTY | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|---|---|
| SPARLIN HOT OIL SERVICE, INC. | P. O. BOX 615 | | | MADILL | OK | 73446 | REJECTED |
| WELL SITE RENTAL, INC. | P. O. BOX 811 | NULL | | WOODWARD | OK | 73802 | REJECTED |
| SUTTLES LOGGING, INC. | P.O. Box 10725 | NULL | | Midland | TX | 79702 | REJECTED |
| S & M CONSTRUCTION, INC. | P.O. Box 2606 | NULL | | Gillette | WY | 82717 | REJECTED |
| SPECIAL CORE ANALYSIS LABS INC | P.O. BOX 9730 | | | MIDLAND | TX | 79708 | REJECTED |
| WARD, KEN | P.O. Box 155 | NULL | | Wamsutter | WY | 82336 | REJECTED |
| SVS WELL SERVICE, LLC | P.O. Box 322 | NULL | | Stamps | AR | 71860 | REJECTED |
| SPRINGFIELD OIL COMPANY | 27619 BROOK DR. | | | HOT SPRINGS | SD | 57747 | REJECTED |
| SPRINGPOINT TECHNOLOGIES | PO BOX 720804 | | | NORMAN | OK | 73070-4624 | REJECTED |
| RITTER DIRT WORKS | Mike Ritter | 316 CR 278 | | Carthage | TX | 75633 | REJECTED |
| STACY FAMILY TRUST | STACY H. SCHUSTERMAN | C/O SAMSON ENERGY COMPANY LLC | 110 WEST 7TH STREET | TULSA | OK | 74119 | REJECTED |
| STAF TEK | 4870 S LEWIS AVE | | | TULSA | OK | 74105 | REJECTED |
| STAFFING HEADQUARTERS LLC | 1333 W MCDERMOTT DR #200 | | | ALLEN | TX | 75013 | REJECTED |
| S K & S OILFIELD SERVICES, INC. | PO Box 1797 | NULL | | Williston | ND | 58802-1797 | REJECTED |
| S W CONSULTANTS | 2050 Arkla Plant Road | NULL | | Haughton | LA | 71037 | REJECTED |
| S. A. HOLDITCH | 900 Southwest Parkway E. | Suite 200 | | College Station | TX | 77840 | REJECTED |
| STANDARD TUBULAR SERVICES INC | ATTN: JACK IBISON | 2707 WINGATE | | COLLEGE STATION | TX | 77845 | REJECTED |
| STIM-COIL | P. O. BOX 1171 | 1121 NORTH LONGVIEW | | KILGORE | TX | 75662 | REJECTED |
| STIMULATION SERVICES, LLC | P. O. BOX 1806 | NULL | | KILGORE | TX | 75663 | REJECTED |
| STANFORD ENTERPRISES, LLC | ATTN: ROGER STANFORD | PO BOX 325 | | ERICK | OK | 73645 | REJECTED |
| STOCKTON TRANSPORTS, INC. | P. O. BOX 554 | NULL | | FAIRVIEW | OK | 73737 | REJECTED |
| SPENCER'S COATING SPECIALIST CO. | P.O. Box 565 | NULL | | Big Spring | TX | 79721 | REJECTED |
| VALLEY TESTING SERVICES, LLC | P.O. Box 2308 | NULL | | Edinburg | TX | 78540 | REJECTED |
| UNITED DRILLING LLC | Attn:  David Rodgers | 1 Natchitoches St., #203 | | West Monroe | LA | 71291 | REJECTED |
| RAYDON, INC. | P.O. Box 671 | NULL | | Breckenridge | TX | 76424 | REJECTED |
| RAYMOND CONSTRUCTION, INC. | P.O. Box 1017 | NULL | | Kaikaska | MI | 49646 | REJECTED |
| STEVENS CONSULTING | ATTN: BRAD STEVENS | 121 GARLAND PONDER RD. | | MENDENHALL | MS | 39114 | REJECTED |
| R & S SERVICE | P. O. BOX 1141 | NULL | | DENVER CITY | TX | 79323 | REJECTED |
| STEVENS TRUCKING CO. | P. O. BOX 19608 | | | OKLAHOMA CITY | OK | 73144 | REJECTED |
| S & B CONSTRUCTION, INC. | 184 Meecher Rd. | P.O. Box 2108 | | Gaylord | MI | 49734 | REJECTED |
| STEVE'S WELDING & CONSTRUCTION, INC. | ATTN: STEPHEN GESSEN | ROUTE 1, BOX 310 | | FAY | OK | 73646 | REJECTED |
| TARPLEY ENGINEERING (JOHN L. TARPLEY DBA) | P.O.Box 6946 | NULL | | Tyler | TX | 75711 | REJECTED |

| COUNTERPARTY | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|---|---|
| CIRCLE H RESOURCES LLC | 5804 LINCOLN GREEN CT | | | MIDLAND | TX | 79707 | ASSIGNED |
| GULFMARK ENERGY, INC. | | | | | | | 188635.4713 |
| SUPERIOR PIPELINE CO., L.L.C. | | | | | | | 55545.6018 |
| ENABLE EAST | | | | | | | 41160.91955 |
| LAREDO PETROLEUM INC | | | | | | | 37493.06377 |
| WYNN-CROSBY OPERATING LTD | | | | | | | 12737.0474 |
| EAGLE EXPLORATION PRODUCTION LLC | | | | | | | 12033.95787 |
| BLAKE PRODUCTION CO. INC. | | | | | | | 9614.393379 |
| TRACE OIL & GAS LP | | | | | | | 3958.450368 |
| CONTINENTAL OPERATING CO. | | | | | | | 3501.068127 |
| STRAT LAND EXPLORATION CO. | | | | | | | 3432.524434 |
| WHITE STAR PETROLEUM HOLDINGS LLC | | | | | | | 1750.481761 |
| P O & G OPERATING LLC | | | | | | | 1295.23591 |
| GLOBAL COMPANIES LLC | | | | | | | 1115.060872 |
| HOGE OIL & GAS EXPL INC | | | | | | | 1100.583615 |
| WESTERN OIL & GAS DEV CORP | | | | | | | 1042.432512 |
| PRIME OPERATING COMPANY | | | | | | | 712.3603995 |
| MAGNUM ENERGY, INC. | | | | | | | 646.69248 |
| CP ENERGY, LLC | | | | | | | 577.092086 |
| CHESAPEAKE ENERGY MARKETING LLC | | | | | | | 555.3963192 |
| NATURAL GAS ANADARKO | | | | | | | 530.7790473 |
| GILLILAND OIL & GAS, INC. | | | | | | | 446.335437 |
| SUNDOWN ENERGY, INC. | | | | | | | 280.6224961 |
| ROX EXPLORATION INC | | | | | | | 261.4324655 |
| FREMONT EXPLORATION INC | | | | | | | 240.3615638 |
| BLUE DOLPHIN PROD, LLC | | | | | | | 207.6782261 |
| TOMMY YOUNG OIL INC. | | | | | | | 181.4503107 |
| ANADARKO WATER RESOURCE MANAGEMENT LLC | | | | | | | 142.3451189 |
| D & J OIL CO. | | | | | | | 142.1267334 |
| OKLAND OIL COMPANY | | | | | | | 114.5310782 |
| EQT CORPORATION | | | | | | | 109.4787574 |
| SAMSON EXPLORATION, LLC | | | | | | | 65.137116 |

## **EXHIBIT 30**

Excerpt of Amended Schedule C-2 to the Plan Supplement

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (BLS) |
|  | ) |  |
| Reorganized Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF AMENDMENT TO THE PLAN SUPPLEMENT FOR THE GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on January 13, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 1882] (as may be modified, amended, or supplemented, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Debtors filed the Plan Supplement with the Court on January 25, 2017 [Docket No. 1927]. The filed Plan Supplement contains, among other documents, the Retained Causes of Action.

**PLEASE TAKE FURTHER NOTICE** that the Plan (including the Plan Supplement) was confirmed by the Honorable Judge Christopher S. Sontchi in the United States Bankruptcy Court for the District of Delaware on February 13, 2017 [Docket Nos. 2019].

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby amend the Plan Supplement. Attached hereto as **Exhibit 1** is the amended Plan Supplement Exhibit C-2 (Settlement Trust Retained Other Causes of Action).

**PLEASE TAKE FURTHER NOTICE** that if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Garden City Group, LLC, the voting and claims agent retained by the Debtors in the Chapter 11 Cases (the "Voting and Claims Agent"), by: (a) calling the Debtors' restructuring hotline at

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: 15 East 5th Street, Suite 1000 Tulsa, Oklahoma 74103.

[2] Capitalized terms not otherwise defined herein shall have the same meanings set forth in the Plan.

| COUNTERPARTY | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|---|---|
| SAMSON ENERGY COMPANY LLC | STACY H. SCHUSTERMAN | C/O SAMSON ENERGY COMPANY LLC | 110 WEST 7TH STREET | TULSA | OK | 74119 | REJECTED |
| S & J ANCHOR SERVICES | Rt. 3, Box 12 | NULL | | Okarche | OK | 73762 | REJECTED |
| SATCOM GLOBAL INC | 3130 N ARIZONA AVE STE 105 | | | CHANDLER | AZ | 85225-7163 | REJECTED |
| THE TURBULATOR COMPANY, LLC | 1341 S.W. 106 Place | NULL | | Oklahoma City | OK | 73170 | REJECTED |
| RELIENT EMISSIONS TESTING, INC. | Attn:  Ross Thompson | 4413 82nd St., Suite 107 | | Lubbock | TX | 79424 | REJECTED |
| RELIANT DRILLING SYSTEMS, INC. | 950 Birdsong Rd. | NULL | | Lafayette | LA | 70507 | REJECTED |
| SCANDRILL INC. | 11777 KATY FREEWAY, SUITE 470 | | | HOUSTON | TX | 77079 | REJECTED |
| SCAN-X, LLC | Attn:  John Lotrano | 1165 W 780 N | | Orem | UT | 84057 | REJECTED |
| SCARBROUGH'S EXCAVATION & SERVICES | Attn: Ken Landon | PO Box 208 | | Howe | OK | 74940 | REJECTED |
| TWO RIVERS PIPELINE & CONSTRUCTION CO. INC. | Attn:  Tommy Cronk | PO Box 11189 | | Odessa | TX | 79760 | REJECTED |
| SCHWITZER'S NIGHT & DAY TRUCKING, INC. | ATTN: CINDY SCHWITZER | 3193 STAKE HWY 89 N. | | EVANSTON | WY | 82930 | REJECTED |
| SNIKA ENTERPRISES INC. DBA SCT | PO Box 61483 | NULL | | Midland | TX | 79711-1483 | REJECTED |
| SCIENTIFIC DRILLING INTERNATIONAL, INC. | ATTN: DENNIS BANDERA | 1100 RANKIN ROAD | | HOUSTON | TX | 77073 | REJECTED |
| UPDIKE BROTHERS, INC. | P.O. Box 610 | NULL | | Newcastle | WY | 82701 | REJECTED |
| RANGER PUMP-OK | 348 E. CORNELL | NULL | | ENID | OK | 73701 | REJECTED |
| SCOTIA WATEROUS USA INC | 711 LOUISIANA ST STE 1400 | | | HOUSTON | TX | 77002-2847 | REJECTED |
| SCOTT LEGERSKI | P.O. BOX 50897 | | | CASPER | WY | 82605-0897 | REJECTED |
| SKIDGEL ENTERPRISES INC. (SKIDGEL ELECTRIC) | Attn:  Thomas L. Skidgel | 1310 Bonanza | | Rawlins | WY | 82301 | REJECTED |
| ROJO SUPPLY, LLC | Attn:  Jesus Salazar | 5900 Indian School Rd NE | | Albuquerque | NM | 87110 | REJECTED |
| ROKKON ENGINEERING AND INSPECTION LLC | Attn:  Ryan Malone | 2550 La Plata Hwy, Bldg. A | | Farmington | NM | 87401 | REJECTED |
| SDS PETROLEUM CONSULTANTS LLC | 336 FOREST HILLS | | | HALLSVILLE | TX | 75650 | REJECTED |
| SEAGIL SOFTWARE COMPANY | 6020 PARKWAY NORTH DRIVE, SUITE #900 | | | CUMMING | GA | 30040 | REJECTED |
| SEIDEL TECHNOLOGIES LLC | ATTN: FRANK SEIDEL | 896 PARKCLIFF LN | | CASTLE ROCK | CO | 80108 | REJECTED |
| SUPERIOR WELDING SERVICE | P. O. BOX 5251 | NULL | | CARLSBAD | NM | 88220 | REJECTED |
| SEGUIN CONSTRUCTION (1979) LTD | Bag Service 10 | NULL | | Silver Lake, AB | Canada | T0G 2A0 | REJECTED |
| SEIFERT WELDING & CONSTRUCTION, INC. | P.O. Box 247 | NULL | | Bay City | TX | 77404-0247 | REJECTED |
| SELECT ENGINEERING, INC. | 324 S. MAIN | SUITE 411 | | TULSA | OK | 74103 | REJECTED |
| STOCKS SANDBLASTING & PAINTING, INC. | 1501 STOCKS ROAD | NULL | | FAYETTE | AL | 35555 | REJECTED |
| SERCO FENCING INC | ATTN: TED SERNA | 55 CR 4800 | | BLOOMFIELD | NM | 87413 | REJECTED |
| SG INTEREST | 100 WAUGH DRIVE | | | HOUSTON | TX | 77007 | REJECTED |
| SGW CONTRACT PUMPING LLC | ATTN: STEVE WELLS | 1269 N. ADKINS HILL RD., #4 | | NORMAN | OK | 73072 | REJECTED |
| TRI-STATE ENVIRONMENTAL SERVICES LLC | Attn:  Robert Carter | 4890 B. Hwy 29 South | | Petal | MS | 39465 | REJECTED |

| COUNTERPARTY | ADDRESS 1 | ADDRESS 2 | ADDRESS 3 | CITY | STATE | ZIP | DESCRIPTION / AR BALANCE |
|---|---|---|---|---|---|---|---|
| TSWS WELL SERVICE LLC | Attn: Kay Wolfe | PO Box 1299 | | Gainesville | TX | 76241-1299 | REJECTED |
| TUBE TECH SERVICES, INC. | P. O. BOX 68 | NULL | | SCOTT | LA | 70583 | REJECTED |
| TUBING N TOOLS LLC | Attn: Bob Burgetort | PO Box 394 | | Arnett | OK | 73832 | REJECTED |
| TUBOSCOPE VETCO INTERNATIONAL, INC. | 2835 Holmes Road | NULL | | Houston | TX | 77051 | REJECTED |
| TUBULAR SERVICES INC. | Attn: Jay DeCourt | PO Box 10206 | | New Iberia | LA | 70562-0206 | REJECTED |
| TUBULAR TECHNOLOGY, INC. | P.O. Box 54501 | NULL | | Oklahoma City | OK | 73154 | REJECTED |
| SPARKS ENTERPRISES, LLC | ATTN: BRAD SPARKS | PO BOX 412 | | CROSBY | ND | 58730 | REJECTED |
| TFH LTD CO. | P.O. Box 132 | NULL | | Hobbs | NM | 88241 | REJECTED |
| SPARKS ENVIRONMENTAL SERVICES INC. | ATTN: JERRY SPARKS | PO BOX 591 | | LENOIR | NC | 28645 | REJECTED |
| SPARKS, MIKE | 420 E. OKLAHOMA STREET | | | HENNESSEY | OK | 73742 | REJECTED |
| TORNADO TRUCKING INC. | Attn: Jodie Kurtz | 7104 US Hwy 59N | | Victoria | TX | 77904 | REJECTED |
| SPARLIN HOT OIL SERVICE, INC. | P. O. BOX 615 | | | MADILL | OK | 73446 | REJECTED |
| WELL SITE RENTAL, INC. | P. O. BOX 811 | NULL | | WOODWARD | OK | 73802 | REJECTED |
| SUTTLES LOGGING, INC. | P.O. Box 10725 | NULL | | Midland | TX | 79702 | REJECTED |
| S & M CONSTRUCTION, INC. | P.O. Box 2606 | NULL | | Gillette | WY | 82717 | REJECTED |
| SPECIAL CORE ANALYSIS LABS INC | P.O. BOX 9730 | | | MIDLAND | TX | 79708 | REJECTED |
| WARD, KEN | P.O. Box 155 | NULL | | Wamsutter | WY | 82336 | REJECTED |
| SVS WELL SERVICE, LLC | P.O. Box 322 | NULL | | Stamps | AR | 71860 | REJECTED |
| SPRINGFIELD OIL COMPANY | 27619 BROOK DR. | | | HOT SPRINGS | SD | 57747 | REJECTED |
| SPRINGPOINT TECHNOLOGIES | PO BOX 720804 | | | NORMAN | OK | 73070-4624 | REJECTED |
| RITTER DIRT WORKS | Mike Ritter | 316 CR 278 | | Carthage | TX | 75633 | REJECTED |
| STACY FAMILY TRUST | STACY H. SCHUSTERMAN | C/O SAMSON ENERGY COMPANY LLC | 110 WEST 7TH STREET | TULSA | OK | 74119 | REJECTED |
| STAF TEK | 4870 S LEWIS AVE | | | TULSA | OK | 74105 | REJECTED |
| STAFFING HEADQUARTERS LLC | 1333 W MCDERMOTT DR #200 | | | ALLEN | TX | 75013 | REJECTED |
| S K & S OILFIELD SERVICES, INC. | PO Box 1797 | NULL | | Williston | ND | 58802-1797 | REJECTED |
| S W CONSULTANTS | 2050 Arkla Plant Road | NULL | | Haughton | LA | 71037 | REJECTED |
| S. A. HOLDITCH | 900 Southwest Parkway E. | Suite 200 | | College Station | TX | 77840 | REJECTED |
| STANDARD TUBULAR SERVICES INC | ATTN: JACK IBISON | 2707 WINGATE | | COLLEGE STATION | TX | 77845 | REJECTED |
| STIM-COIL | P. O. BOX 1171 | 1121 NORTH LONGVIEW | | KILGORE | TX | 75662 | REJECTED |
| STIMULATION SERVICES, LLC | P. O. BOX 1806 | NULL | | KILGORE | TX | 75663 | REJECTED |
| STANFORD ENTERPRISES, LLC | ATTN: ROGER STANFORD | PO BOX 325 | | ERICK | OK | 73645 | REJECTED |
| STOCKTON TRANSPORTS, INC. | P. O. BOX 554 | NULL | | FAIRVIEW | OK | 73737 | REJECTED |

## EXHIBIT 31

Excerpt of Findings of Fact, Conclusions of Law, and Order Confirming Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket No. 1882** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

having:[2]

a. commenced, on September 16, 2015 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b. continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c. filed, on January 11, 2017, the *Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 1858] (as may be amended, supplemented, or modified from time to time, and including all exhibits and supplements thereto, the "Disclosure Statement");

d. obtained, on January 12, 2017, entry of the *Order Approving (I) Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates, (II) Solicitation Procedures, (III) Voting Instructions, (IV) Forms of Ballots and Notices in*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

[2] Unless otherwise noted herein, capitalized terms not defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein).  The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

or modified from time to time, and including all exhibits and supplements thereto, the "Plan"); and

v.  filed, on February 12, 2017, amended Exhibit B-1, Exhibit B-2, Exhibit C, and Exhibit H-2 to the Plan Supplement [Docket No. 2011];

This Court having:

w.  set February 13, 2017 at 12:00 noon (prevailing Eastern Time) as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

x.  reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Voting Report, the Arnett Declaration, the Stuart Declaration, the O'Hara Declaration, the Miller Declaration, the Friske Declaration, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases;

y.  held the Confirmation Hearing;

z.  heard the statements, arguments, and objections made by counsel in respect of Confirmation;

aa.  considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

bb.  overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn; and

cc.  taken judicial notice of all papers and pleadings filed in these Chapter 11 Cases and all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases.

NOW, THEREFORE, the Court having found that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation having been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby; and the record of these Chapter 11 Cases and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing, including, but not limited to, the Arnett Declaration, the Stuart Declaration, the O'Hara Declaration, the Miller Declaration, and the Friske Declaration establish

30.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults in connection with the respective Executory Contract or Unexpired Lease that is assumed, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.

###### (b)     Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action.

31.     **Compromise and Settlement.**  Except as otherwise adjudicated by the Court with respect to any Claims, Interests, or controversies in connection with Confirmation, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest, or any distribution to be made on account of such Claim or Interest.

32.     The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Initial Effective Date, the Reorganized Debtors or the Settlement Trust (solely with respect to General Unsecured Claims) may compromise and settle

Claims against, and Interests in, the Debtors and their Estates and any Cause of Action other than any Cause of Action released pursuant to the Plan against other Entities. Without limiting the foregoing, the Plan constitutes a good-faith compromise and settlement of (a) all Claims, Causes of Action, and controversies asserted or otherwise raised by the Committee against any of the Released Parties and (b) any and all Claims, Causes of Action, disputes, and controversies related to the valuation of and allocation of value among the encumbered assets and unencumbered assets held by the Debtors raised by the Committee against the Debtors' Estates, the First Lien Agent, the First Lien Lenders, the Second Lien Lenders, the Second Lien Agent, the Second Lien Steering Committee, or the Debtors' assets (other than the Settlement Trust Assets) for the benefit of the holders of General Unsecured Claims, including, in each case for the avoidance of doubt, in connection with the Standing Motion or the Committee Plan. On the Initial Effective Date, the Standing Motion shall be deemed withdrawn with prejudice; *provided* that, within two (2) Business Days of such withdrawal, any objection or response to the Standing Motion (including any other pleadings(s) related thereto) filed by any party shall be deemed withdrawn.

33. **Subordinated Claims; Classification.** The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, the Committee, or the Settlement Trust, as applicable, will be

16

deemed to have expressly reserved the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  The Debtors, the Reorganized Debtors, the Committee, or the Settlement Trust, as applicable, may seek reclassification of any Disputed Claim pursuant to section 507 of the Bankruptcy Code or otherwise.

34.     **Releases by the Debtors.**  The release, set forth in Article VIII.E of the Plan (the "Debtor Release"), is an essential provision of the Plan.  The scope of the Debtor Release is appropriately tailored under the facts and circumstances of these Chapter 11 Cases.  The Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by such releases; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such release.

35.     **Third-Party Release**.  The release, set forth in Article VIII.F of the Plan (the "Third-Party Release"), is an essential provision of the Plan.  The scope of the Third-Party Release in the Plan is appropriately tailored under the facts and circumstances of these Chapter 11 Cases, and parties received due and adequate notice of the Third-Party Release and the opportunity to opt out of the Third-Party Release, as applicable.  The Third-Party Release is: (a) consensual; (b) in exchange for the good and valuable consideration provided by the Released Parties; (c) a good faith settlement and compromise of the claims released by such releases; (d) in the best interests of the Debtors and all holders of Claims and Interests; (e) fair, equitable,

at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

**U.      Objections**

67.      All parties have had a full and fair opportunity to litigate all issues raised in the objections to Confirmation of the Plan, or which might have been raised, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

## II. ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**A.      Order.**

68.      The Plan, attached hereto as **Exhibit A**, is approved in its entirety and confirmed under section 1129 of the Bankruptcy Code.   The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.   The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto), and the execution, delivery, and performance thereof, are authorized and approved as finalized, executed, and delivered.   The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Court that the Plan, the Plan Supplement, and any related document or exhibit are approved and confirmed in their entirety.   The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents shall be

KE 41769032.32

effective and binding as of the Initial Effective Date or the Final Effective Date, as applicable. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## B.    **Objections**.

69.    All objections to Confirmation of the Plan have been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order. To the extent that any objections (including any reservations of rights contained therein) to Confirmation of the Plan (including the payment or amount of the cure amounts with respect to any Assumed Contract, or the assumption by the Debtors of any of the Assumed Contracts) have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein, or otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, all such objections (including any reservations of rights contained therein) are overruled on the merits.

## C.    **Amendment of the Plan**.

70.    The Debtors reserve the right to modify the Plan (*provided* that such modifications are in form and substance acceptable to the First Lien Agent and the Second Lien Steering Committee, and, to the extent such modification may impact recoveries to holders of General Unsecured Claims, the Committee and the Settlement Trust, as applicable, and to the extent such modification modifies the definition of "Released Parties" or Article VIII of the Plan, the Sponsors) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions

New Board of the Reorganized Parent; (d) implementation of the Restructuring Transactions; (e) the execution and delivery of the Exit Facility Documents; (f) the Rights Offering; and (g) all other actions contemplated by the Plan (whether to occur before, on, or after the Final Effective Date). Upon the Initial Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors. On or (as applicable) before the Initial Effective Date, the appropriate officers of the Debtors, Reorganized Parent, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Parent and the other Reorganized Debtors, including the Exit Facility Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court. The authorizations and approvals contemplated by Article IV.G of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**N.** **The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

98.     The release, exculpation, discharge, injunction and related provisions set forth in Article VIII of the Plan shall be, and hereby are, approved and authorized in their entirety, including, but not limited to:

a.     **Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Initial Effective Date (or, as to Claims or Causes of Action set forth in the Plan arising

after the Initial Effective Date and on or before the Final Effective Date, the Final Effective Date), the Released Parties are deemed expressly, unconditionally, generally, and individually and collectively, acquitted, released and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such releasing party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of, or any other transaction relating to any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors, on the one hand, and the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, or the Backstop Parties, on the other hand, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan Support Agreement, the Exit Facility Credit Agreement, the Plan, the Plan Supplement, the Disclosure Statement or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Initial Effective Date (or, as to Claims or

Causes of Action set forth in the Plan arising after the Initial Effective Date and on or before the Final Effective Date, the Final Effective Date) related or relating to any of the foregoing, except for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors.    Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Initial Effective Date (or, as to obligations set forth in the Plan arising after the Final Effective Date, post-Final Effective Date) obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

b.    **Third Party Releases.** Except as otherwise provided in the Plan, as of the Initial Effective Date (or, as to Claims or Causes of Action set forth in the Plan arising after the Initial Effective Date and on or before the Final Effective Date, the Final Effective Date) and to the fullest extent authorized by applicable law, each Releasing Party expressly, unconditionally, generally and individually and collectively releases, acquits and discharges the Debtors, Reorganized Debtors, and Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or thereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, or any other transaction relating to any security of the Debtors, or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors, on the one hand, and the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, or the Backstop Parties, on the other hand, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan Support Agreement, the Exit Facility Credit Agreement, the Plan, the Plan Supplement, the Disclosure Statement or any

KE 41769032.32

related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the Exit Facility, the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Initial Effective Date (or, as to Claims or Causes of Action set forth in the Plan arising after the Initial Effective Date and on or before the Final Effective Date, the Final Effective Date) related or relating to any of the foregoing, except for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Initial Effective Date (or, as to obligations set forth in the Plan arising after the Final Effective Date, post-Final Effective Date) obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding any language in the Plan to the contrary, nothing in the Plan is intended to or shall release any obligations arising under or that become due under the Exit Facility Documents.

c.    **Exculpation.**    Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim; *provided* that the exculpation set forth in the Plan shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted gross negligence or willful misconduct. The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws.

In addition, and notwithstanding anything to the contrary in the Plan, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Second Lien Agent and the Backstop Parties and their current and former Affiliates, and their Affiliates' current and former directors, managers, officers, principals, members, employees, equity holders, predecessors, successors and assigns, subsidiaries, managed accounts or funds, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives,

absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

119.    In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity (including, for the avoidance of doubt, any claim which remains if a Plan release is not approved by the Confirmation Order), shall vest in the Reorganized Debtors, as applicable. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

## X.    Certain Governmental Matters.

120.    Nothing in the Confirmation Order or the Plan discharges, releases, precludes, or enjoins:  (a) any liability to any Governmental Unit that is not a Claim; (b) any Claim of a

KE 41769032.32

136.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and the Exit Facility and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, the Exit Facility Documents, the Rights Offering Documents, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

## JJ.    **Effect of Conflict Between Plan and Confirmation Order.**

137.    In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## KK.    **Reservation of Rights.**

138.    Prior to the Final Effective Date, except as provided for in Article IX.F of the Plan, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, this Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

## LL.    **Injunctions and Automatic Stay.**

139.    Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise in existence on the Confirmation Date shall remain in full

## EXHIBIT 32

Excerpt of Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (With Technical Modifications)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934  (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN
### OF REORGANIZATION OF SAMSON RESOURCES CORPORATION
### AND ITS DEBTOR AFFILIATES (WITH TECHNICAL MODIFICATIONS)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (Del. Bar No. 3989)
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:      (302) 426-1189
Facsimile:      (302) 426-9193

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:      (215) 569-2700
Facsimile:      (215) 568-6603

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
J. Christopher Shore (admitted *pro hac vice*)
Michele J. Meises (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036
Telephone:      (212) 891-8200
Facsimile:      (212) 354-8113

**FARNAN LLP**
Joseph J. Farnan, Jr. (Del. Bar No. 100245)
Joseph J. Farnan, III (Del. Bar. No. 3945)
Michael J. Farnan (Del. Bar. No. 5165)
919 North Market Street
Suite 1200
Wilmington, Delaware 19801
Telephone:      (302) 777-0300
Facsimile:      (302) 777-0301

*Co-Counsel to the Official Committee of Unsecured Creditors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

**INTRODUCTION**

Samson Resources Corporation ("Samson") and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this global settlement joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*2011 Acquisition*" means the December 2011 buyout of the Debtors.

2.    "*Accrued Professional Compensation*" means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330, or 331 of the Bankruptcy Code or otherwise rendered allowable before (a) the Initial Effective Date, for Professionals retained by the Committee, or (b) the Final Effective Date, for other Professionals, by any retained estate Professional in the Chapter 11 Cases, (y) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (z) after applying any retainer that has been provided to such Professional. To the extent that the Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation. For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Court or any higher court of competent jurisdiction.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Initial Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

4.    "*Administrative Claims Bar Date*" means the first Business Day that is 30 days following the Initial Effective Date, except as specifically set forth in the Plan or a Final Order.

5.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as

51.    "*Exculpated Parties*" means each of:   (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and any member thereof; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's current and former affiliates, and such Entity's and such affiliates' current and former equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; *provided* that Exculpated Parties shall not include any of the Debtors' directors or officers before the 2011 Acquisition or the holders of Preferred Interests.

52.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

53.    "*Exit Facility*" means, collectively, the Exit RBL Facility and the Exit Term Loan, plus any hedges, swaps, or other instruments entered into with any lenders (or affiliates as may be permitted) under the Exit RBL Facility.

54.    "*Exit Facility Credit Agreement*" means the credit agreement, to be dated as of the Initial Effective Date, providing for the Exit Facility.

55.    "*Exit Facility Documents*" means, in connection with the Exit Facility, the Exit Facility Credit Agreement and other loan documents, related to or evidencing the loans and obligations thereunder, to be dated as of the Final Effective Date, governing the Exit Facility, each in form and substance acceptable to the Reorganized Debtors, the First Lien Agent, and the Second Lien Steering Committee on the terms set forth in the Exit Facility Credit Agreement.

56.    "*Exit RBL Facility*" means a reserve-based first lien, first-out revolving credit facility under and on the terms set forth in the Exit Facility Credit Agreement.

57.    "*Exit Term Loan*" means a first-lien, last-out term loan (if any) under and on the terms set forth in the Exit Facility Credit Agreement.

58.    "*Federal Leases*" means the Debtors' interest in the contracts, leases, covenants, operating rights agreements, rights-of-use and easements, and rights-of-way or other interests or agreements with the United States involving (a) federal lands or Hydrocarbon Interests; (b) lands or Hydrocarbon Interests held in trust for Indian Landowners; or (c) lands or Hydrocarbon Interests held by such Indian Landowners in fee with federal restrictions on alienation, including those listed on **<u>Exhibit A</u>** to the Plan to be assumed by the Debtors.

59.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

60.    "*Fee Claim*" means a Claim for Accrued Professional Compensation.

61.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

62.    "*Final Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors with the consent (which may not be unreasonably withheld) of the First Lien Agent and the Second Lien Steering Committee on which:   (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.C have been satisfied or waived (in accordance with Article IX.D); and (c) the Final Effective Date is declared to have occurred; *provided* that the Final Effective Date may occur by (i) Consummation of the Restructuring Transactions set forth in the Plan, (ii) Consummation of a reorganization of the Debtors other than as set forth in the Plan; or (iii) the commencement of liquidation of the Debtors, in consultation with the First Lien Agent, and the Second Lien Steering Committee.

Agreement, the Committee, and the final versions of all such documents and exhibits shall be Filed by no later than the Final Effective Date (or, with respect to the Settlement Trust Agreement, the Initial Effective Date).

113. "*Plan Support Agreement*" means the Plan Support Agreement, dated as of August 26, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit A</u> to the *Notice of Filing Plan Support Agreement* [Docket No. 1290]. The Debtors will not agree to any modifications of the Plan Support Agreement which may impact the amount or priority of recovery of holders of General Unsecured Claims under the Plan without the written express consent of the Committee.

114. "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

115. "*Preferred Interests*" means the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011.

116. "*Prepetition Collateral*" means the First Lien Collateral and the Second Lien Collateral.

117. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

118. "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

119. "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

120. "*Professional Fee Escrow*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors or the Reorganized Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Initial Effective Date solely for the purpose of paying all remaining Allowed and unpaid Fee Claims. Such Cash shall remain subject to the jurisdiction of the Court.

121. "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

122. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

123. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

124. "*Released Party*" means each of the following, in their capacity as such: (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; (j) the Backstop Parties; and (k) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each

of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.

125.    "*Releasing Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) the Backstop Parties; (j) all holders of Claims and Interests that are deemed to accept the Plan; (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (m) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (m), such Entities' current and former affiliates' and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals,  managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

126.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Final Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

127.    "*Reorganized Debtor Retained Causes of Action*" means all Claims and Causes of Action (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) that are not Settlement Trust Retained Causes of Action.  For the avoidance of doubt, the Reorganized Debtor Retained Causes of Action will include all Claims and Causes of Action (a) against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) on account of or arising under any contract or lease entered into after the Petition Date, (c) on account of any of the Debtors' postpetition ordinary-course-of-business accounts receivable, (d) against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) that are based solely on postpetition conduct, give rise to postpetition damages, and have not yet been discovered by the Debtors.

128.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Final Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

129.    "*Required Backstop Parties*" means, as of any date of determination, Backstop Parties committed to providing at least two-thirds of the aggregate backstop commitments pursuant to the Backstop Commitment Agreement.

130.    "*Required Consenting Lenders*" means, as of any date of determination, Consenting Lenders holding a majority of the aggregate outstanding principal amount of the Second Lien Claims held by Consenting Lenders.

131.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit B</u> to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 16].

163.     "*Senior Notes*" means the 9.750 percent Senior Notes Due 2020, issued in the original principal amount of $2,250,000,000 pursuant to the Senior Notes Indenture.

164.     "*Senior Notes Claims*" means all Claims against the Debtors arising under the Senior Notes Indenture, which shall be Allowed in the aggregate principal amount of $2,250,000,000, plus any accrued but unpaid interest payable thereon, as calculated in accordance with the Senior Notes Indenture (estimated to be $129,439,629 as of the Petition Date).

165.     "*Senior Notes Indenture*" means that certain Indenture, dated as of February 8, 2012, between Samson Investment Company, as issuer, certain of the Debtors as guarantors, and the Senior Notes Indenture Trustee (as amended, restated, supplemented, or otherwise modified from time to time), providing for the issuance of 9.750 percent Senior Notes Due 2020.

166.     "*Senior Notes Indenture Trustee*" means Wilmington Trust, National Association, solely in its capacity as indenture trustee under the Senior Notes Indenture.

167.     "*Settlement Trust*" means the trust or other legal entity established on the Initial Effective Date in accordance with the terms of this Plan and the Settlement Trust Agreement to, among other things:  (a) directly or indirectly acquire the Settlement Trust Assets; (b) issue beneficial interests in the Settlement Trust to be distributed pursuant to this Plan; and (c) make certain distributions in accordance with this Plan; *provided* that any trustee(s) of the Settlement Trust shall be selected by the Committee and identified in the Plan Supplement (in the Settlement Trust Agreement or otherwise).

168.     "*Settlement Trust Agreement*" means that certain trust agreement forming the Settlement Trust, which agreement shall be subject to the approval of the Committee and in form and substance reasonably acceptable to the Debtors.

169.     "*Settlement Trust Assets*" means, collectively, the Settlement Trust Causes of Action, the Settlement Trust Cash Amount (including a Claim by the Settlement Trust for any shortfall of the Settlement Trust Cash Amount), the Settlement Trust Letter of Credit, the Contingent Value Right, and the Sponsor Management Fee Claims (to the extent the Committee elects to have the Sponsor Management Fee Claims assigned to the Settlement Trust under the Plan).  For the avoidance of doubt, the Settlement Trust Assets shall not include the Reorganized Debtor Retained Causes of Action.

170.     "*Settlement Trust Cash Amount*" means Cash in an amount equal to $168,500,000, less the amount of the Settlement Trust Letter of Credit (if any); *provided* that, in the event the full Settlement Trust Cash Amount has not been contributed to the Settlement Trust prior to June 30, 2017, the Settlement Trust Cash Amount shall mean Cash in an amount equal to $180,000,000, and any unpaid amount shall accrue simple interest beginning on June 30, 2017, at the rate of ten percent (10%) per annum until paid in full.  For the avoidance of doubt, the Settlement Trust Cash Amount shall be funded, in part or in whole, from the Settlement Trust Unencumbered Cash as provided in the Plan.

171.     "*Settlement Trust Causes of Action*" means (a) all Claims and Causes of Action held by or on behalf of any Debtor (or any assignee of any Debtor) against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) concerning, or on account of, the 2011 Acquisition and/or any transfer of an interest of any Debtor in property provided for thereunder, including any Claims to recover the value of such transferred property, Claims arising under the Bankruptcy Code, state fraudulent transfer statutes and claims arising under state law based upon negligence, breach of fiduciary duty, lender liability, Avoidance Actions, and/or other similar Claims concerning the 2011 Acquisition, and (b) the Settlement Trust Retained Causes of Action.

172.     "*Settlement Trust Letter of Credit*" means the irrevocable letter of credit (if any) issued on the Final Effective Date in favor of the Settlement Trust, in an amount equal to the lesser of (a) $15,000,000 and (b) the difference (if any) between $168,500,000 and the Settlement Trust Cash Amount, which letter of credit may be drawn in the event the Debtors or the Reorganized Debtors, as applicable, do not pay to the Settlement Trust the difference (if any) between $168,500,000 and the Settlement Trust Cash Amount on or before April 30, 2017.

173.    "*Settlement Trust Recovery Proceeds*" means the net Cash proceeds (after payment and/or reimbursement of the Settlement Trust's and Reorganized Debtors' administrative costs) of any liquidation or monetization of the Settlement Trust Assets.

174.    "*Settlement Trust Retained Causes of Action*" means all Claims and Causes of Action (including Avoidance Actions) held by or on behalf of any Debtor against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties), excluding any Entity intended to do business with the Reorganized Debtors that the Debtors or the Reorganized Debtors (as applicable) identify as being costly or burdensome to replace in writing to the Committee on or before the Initial Effective Date.  For the avoidance of doubt, the Settlement Trust Retained Causes of Action shall not include Claims or Causes of Action that are (a) are against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) are on account of or arising under any contract or lease entered into after the Petition Date, (c) are on account of any of the Debtors' postpetition ordinary-course-of-business accounts receivable, (d) are against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) are based solely on postpetition conduct, give rise to pose petition damages, and have not yet been discovered by the Debtors.

175.    "*Settlement Trust Unencumbered Cash*" means Cash held by the Debtors as of the Initial Effective Date in a segregated account to be established at a bank or financial institution that is not (and agrees not to become) a lender (or agent for lenders) to the Debtors and that is acceptable to the Committee and the U.S. Trustee, constituting proceeds of unencumbered assets, which shall be in an amount of at least $100,000,000 and no greater than the Settlement Trust Cash Amount.  One hundred percent (100%) of the Settlement Trust Unencumbered Cash shall be transferred by the Debtors on the Initial Effective Date to the Settlement Trust for the benefit of holders of Allowed General Unsecured Claims, and the Debtors shall not use or disburse any Settlement Trust Unencumbered Cash for any other purpose.  Until the Final Effective Date, any additional Cash proceeds from the sale of unencumbered assets (less any professional fees and transaction costs payable in connection therewith) before or after the Initial Effective Date shall be added into the segregated account and subject to the same restrictions.

176.    "*Sponsors*" means:  (a) Crestview Advisors, L.L.C.; (b) Crestview Offshore Holdings II (892 Cayman), L.P.; (c) Crestview Offshore Holdings II (Cayman), L.P.; (d) Crestview Offshore Holdings II (FF Cayman), L.P.; (e) Crestview Partners (Cayman), LTD.; (f) Crestview Partners II (892 Cayman), L.P.; (g) Crestview Partners II (Cayman), L.P.; (h) Crestview Partners II (FF Cayman), L.P.; (i) Crestview Partners II (FF), L.P.; (j) Crestview Partners II (TE), L.P.; (k) Crestview Partners II CWGS (Cayman), L.P.; (l) Crestview Partners II CWGS (FF Cayman), L.P.; (m) Crestview Partners II GP, L.P.; (n) Crestview Partners II, L.P.; (o) Crestview Tulip Credit, LLC; (p) Crestview Tulip Holdings LLC; (q) Crestview Tulip Investors LLC; (r) Crestview, L.L.C.; (s) Kohlberg Kravis Roberts & Co. L.P.; (t) KKR 2006 Fund, L.P.; (u) KKR Samson Investors L.P.; (v) KKR Samson Investors GP LLC; (w) KKR 2006 Fund (Samson) L.P.; (x) KKR Samson SA Blocker L.P.; (y) KKR Fund Holdings L.P.; (z) KKR Partners III, L.P.; (aa) Operf Co-Investment LLC; (bb) Samson Aggregator GP LLC; (cc) Samson Aggregator L.P.; (dd) Samson Co-Invest I L.P.; (ee) Samson Co-Invest II L.P.; and (ff) Samson Co-Invest III L.P.

177.    "*Sponsor Management Fee Claims*" means any Claims held by the applicable Sponsors arising under that certain consulting agreement, dated as of December 21, 2011, by and among Samson Resources Corporation, Kohlberg Kravis Roberts & Co. L.P., NGP Energy Capital Management, L.L.C., Crestview Advisors, L.L.C., and JD Rockies Resources Limited (as amended, modified, or supplemented from time to time), for any Advisory Fee" (as defined therein); *provided* that,  on the Initial Effective Date, at the prior written election of the Committee, all Sponsor Management Fee Claims shall either be (a) waived and released by the applicable Sponsors or (b) Allowed as General Unsecured Claims and contributed by the Sponsors to the Settlement Trust; *provided further* that the Sponsors shall not be entitled to any recovery and shall receive no distribution under the Plan on account of the Sponsor Management Fee Claims.

178.    "*Standing Motion*" means the *Motion of the Official Committee of Unsecured Creditors for Entry of Order Granting Exclusive Standing and Authority to Commence, Prosecute, and Settle Certain Claim and Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1250].

179.    "*Status Conference*" shall have the meanings ascribed to it in Article IV.C of the Plan.

180.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

181.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

182.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

183.    "*Voting Deadline*" means the deadline to submit ballots to accept or reject the Plan established by the order of the Court approving the Disclosure Statement.

B.      *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity (including, for the avoidance of doubt, any claim which remains if a Plan release is not approved by the Confirmation Order), shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

O.      *Release of Avoidance Actions; Validity of Liens*

On the Initial Effective Date, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions, except for the Settlement Trust Causes of Action, and the Debtors and the Reorganized Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all such released Avoidance Actions.

P.      *Director and Officer Liability Insurance*

As of the Initial Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Initial Effective Date pursuant to section 365(a) of the Bankruptcy Code; *provided* that, for the avoidance of doubt, there are no Cure Claims payable in connection with any D&O Liability Insurance Policies related to unpaid premiums. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

Before the Petition Date, the Debtors obtained tail coverage (i.e., director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers (the "D&O Tail Coverage"). After the Final Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such D&O Tail Coverage) in effect, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Initial Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Initial Effective Date of the Plan subject to the terms and conditions of such insurance coverage. Notwithstanding anything to the contrary in this paragraph, (a) under no circumstances shall Insurers be required to pay any amounts within a self-insured retention except in accordance with the applicable Insurance Contract, and (b) subject to and without limiting the Indemnification Obligations, in no event shall the Reorganized Debtors be responsible for paying any premiums, self-insured retentions, deductibles or other amounts that may be due or otherwise become due under such D&O Tail Coverage (including as a result of any such claim against the policy) or the liability of the Debtors under the operation of the D&O Tail Coverage.

Q.      *Management Incentive Plan; Performance Award Program*

The Plan Supplement will include the terms of a Management Incentive Plan, to be negotiated by the Debtors and the Second Lien Steering Committee. If the Management Incentive Plan is an equity-based award plan, up to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for awards to management of the Reorganized Debtors and the New Board of the Reorganized Parent. The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent.

Confirmation of the Plan shall authorize the Debtors to make all payments pursuant to the Performance Award Program for the first calendar quarter of 2017, and, on the Final Effective Date or such other date contemplated by the Performance Award Program, the Reorganized Debtors shall make all such payments. The

## **EXHIBIT 33**

Excerpt of Stock Purchase Agreement

**Execution Copy**

STOCK PURCHASE AGREEMENT

dated as of November 22, 2011

among

TULIP ACQUISITION CORPORATION,

a Delaware corporation,

SAMSON INVESTMENT COMPANY,

a Nevada corporation,

and

THE SELLING STOCKHOLDERS NAMED HEREIN

**EXHIBIT A**

## ARTICLE II

## SALE AND PURCHASE OF SHARES

2.1     <u>Sale and Purchase of Shares; Redemption of Shares</u>.   Upon the terms and subject to the conditions contained herein, at the Closing:

(a)     each Selling Stockholder agrees to transfer, free and clear of any Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws), to the Company in redemption of such Shares, a portion of the Shares (such portion to be notified to the Selling Stockholders and the Company by the Purchaser not later than five (5) Business Days prior to the Closing) owned by such Selling Stockholder as set forth opposite such Selling Stockholder's name on Annex A hereto, and the Company shall redeem such Shares; and

(b)     each Selling Stockholder agrees to sell, free and clear of any Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws), to Purchaser, and Purchaser agrees to purchase from each Selling Stockholder, the remaining Shares owned by such Selling Stockholder set forth opposite such Selling Stockholder's name on Annex A hereto and not redeemed pursuant to Section 2.1(a) (the "<u>Purchased Shares</u>.")

2.2     <u>Closing Date Payments</u>.  At the Closing:

(a)     Purchaser and the Company, pursuant to Section 2.1 hereof, will collectively pay and deliver the Net Share Consideration to the Selling Stockholders, with the allocation of the Net Share Consideration (including as between cash and shares of Senior Redeemable Preferred Stock) as designated in writing by the Selling Stockholders to the Purchaser not later than five (5) Business Days prior to Closing.  The Net Share Consideration shall be paid at Closing by the Purchaser and the Company by wire transfer of immediately available United States funds into accounts designated by the Selling Stockholders, which such account designations shall be made in writing to the Purchaser not later than five (5) Business Days prior to Closing;

(b)     the Company will pay and deliver the Jefferies Payments;

(c)     to the extent not repaid prior to Closing, the Company will pay in full all Indebtedness outstanding under the Credit Facility and the Private Placement Notes; and

(d)     Purchaser shall issue the Senior Redeemable Preferred Stock to the Selling Stockholders free and clear of any Liens or restrictions on transfer (other than any restrictions on transfer or voting included in the certificate of designations attached hereto as Annex C or restrictions on transfer arising under applicable securities Laws) as the Selling Stockholders shall direct in writing to Purchaser not later than five (5) Business Days prior to Closing.

2.3     <u>Stock Appreciation Rights</u>.

(a)     At the Closing, concurrently with the consummation of the purchase, sale and redemption of the Shares, each outstanding SAR granted under the SAR Plan, whether or not then vested, shall fully vest and shall be cancelled and terminated by the Company.

(c)    None of the Company, any Selling Stockholder or any Person acting on its behalf has made any representations, warranties or other statements or disclosures on which Purchaser has relied as to any matter relevant to the transactions contemplated hereby and the documents referred to herein except as expressly set forth herein.

5.11    <u>Financial Advisors</u>.  There is no financial advisor, investment banker, broker, finder, agent or other Person has been retained by or is authorized to act on behalf of Purchaser who is entitled to any financial advisor's, investment banking, brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement and for which any Selling Stockholder could have any liability.

5.12    <u>Capitalization</u>.

(a)    Immediately after the Closing, the authorized capital stock of Purchaser will consist of (i) shares of common stock, par value $0.01 per share, (ii) the Senior Redeemable Preferred Stock issued to the Selling Stockholders pursuant to Section 2.2(d) hereof and (iii) at the Purchaser's election, additional shares of capital stock ranking junior to the Preferred Stock. All outstanding shares of Senior Redeemable Preferred Stock will be duly authorized, validly issued, fully paid, nonassessable and free of any preemptive rights or other restriction on the right to vote, sell or otherwise dispose of such shares other than any restrictions on transfer or voting included in the certificate of designations attached hereto as Annex C, pursuant to which the Senior Redeemable Preferred Stock is issued.

(b)    Except as set forth in Section 5.12(a), immediately after the Closing there will be (i) no outstanding shares of capital stock of the Purchaser that rank senior or pari passu to the Senior Redeemable Preferred Stock, (ii) no outstanding securities of Purchaser convertible into or exchangeable for shares of capital stock that would rank senior or pari passu to the Senior Redeemable Preferred Stock, (iii) no outstanding options, warrants, rights or other commitments or agreements to acquire from Purchaser, or that obligate the Purchaser to issue, any capital stock, or any securities convertible into or exchangeable for shares of capital stock in Purchaser, in each case to the extent that such capital stock would rank senior or pari passu to the Senior Redeemable Preferred Stock.

## ARTICLE VI

## CONDUCT OF BUSINESS PENDING CLOSING

6.1    <u>Conduct and Preservation of Business</u>.  Except as expressly required or permitted by this Agreement, during the period from the date of this Agreement to the Closing Date, the Company will, and will cause each of its Subsidiaries to, conduct its operations in the ordinary course thereof consistent in all material respects with past practice and use its reasonable best efforts to preserve substantially intact the business organization and assets of the respective entities, keep available the services of its current officers, employees and consultants, and preserve its current relationships with customers, suppliers, Governmental Authorities and other Persons with whom it has significant business relations or regulatory compliance requirements.

6.2     Restrictions on Certain Actions.  Without limiting the generality or effect of Section 6.1, except as described in Article VII and Section 10.9, from and after the date of this Agreement and prior to the Closing, the Company will not, and will cause each of its Subsidiaries not to, take any of the following actions without the prior written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed in respect of the matters in clauses (f) through (r)):

(a)     amend its Governing Documents;

(b)     issue, sell or deliver any Company Securities or Subsidiary Securities;

(c)     redeem, purchase or otherwise acquire any of the Shares or any other outstanding Company Securities or Subsidiary Securities or declare, set aside, make or pay any dividend or other distribution, whether payable in cash, stock, property or otherwise, in respect of the Shares or any other Company Securities or Subsidiary Securities, other than in connection with the settlement of outstanding SARs granted under the SAR Plan to the extent any payments to settle such outstanding SARs are included in clause (i) of the definition of "Adjustments to Purchase Price";

(d)     adjust, split, combine, subdivide or reclassify the Shares or any other Company Securities or Subsidiary Securities;

(e)     enter into any agreement with respect to the sale, voting, registration or repurchase of the  Shares or any other Company Securities or Subsidiary Securities;

(f)     (i) (A) create, incur, guarantee or assume any indebtedness for borrowed money or (B) otherwise become liable or responsible for the obligations of any other Person, other than in the ordinary course of business, (ii) make any loans, advances or capital contributions to, or investments in, any other Person, other than employee advances in the ordinary course of business, (iii) pledge or otherwise encumber shares of capital stock or other equity securities of the Company or any Subsidiary of the Company, (iv) mortgage or pledge any of the assets, tangible or intangible, of the Company or any Subsidiary of the Company (except for customary Liens contained in or arising under Oil and Gas Agreements binding on the Company or any Subsidiary of the Company with respect to amounts not yet due or not yet delinquent, and statutory Liens for amounts not yet due or not yet delinquent) or (v) enter into any new, or terminate any existing, Hedge arrangements except as otherwise agreed by Purchaser in writing;

(g)     (i) except as may be required by applicable Law or the terms of the applicable Employee Benefit Plan, amend in any material respect or terminate any Employee Benefit Plan or adopt any material bonus, profit sharing, compensation, severance, termination, stock option, stock appreciation right, restricted stock, performance unit, stock equivalent, stock purchase, pension, retirement, deferred compensation, employment, or other employee benefit agreement, trust, plan, fund or other arrangement for the benefit or welfare of any director, officer or employee, (ii) materially increase in any manner the compensation or fringe benefits of any director, officer or employee, (iii) pay to any director, officer or employee any material benefit not required by any Employee Benefit Plan or other agreement as in effect on the date hereof or

39

(iv) lower the retirement age for any employee for purposes of the Company's retiree welfare programs;

(h)      acquire, sell, lease, transfer or otherwise dispose of, directly or indirectly, any assets, except for (i) sales of Hydrocarbons, entering into Leases, or acquisitions or sales of Properties, in each case, in the ordinary course of business consistent with past practices, (ii) purchase or sales of inventory or equipment in the ordinary course of business; (iii) sales of excess or obsolete assets in the ordinary course of business; (iv) acquisitions of seismic, geophysical, geotechnical or similar data; and (v) acquisitions, sales, leases, transfers or dispositions of any other assets not exceeding $10 million in the aggregate;

(i)      acquire (by merger, consolidation or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or any division thereof;

(j)      except for capital expenditures related to an Emergency, an event of Force Majeure, or as required on a non-discretionary basis pursuant to the terms of any Lease or Oil and Gas Agreement, make any capital expenditure which is in excess of the amount contemplated by the 2012 capital expenditures budget and updates thereto through the date of this Agreement, as included in Section 6.2(j) of the Disclosure Schedule, by $10 million individually or $25 million in the aggregate;

(k)      make, change or revoke any Tax election except elections consistent with past practices and which are required to be made in connection with Tax Returns filed for any Tax period ending prior to the Closing Date, adopt or change an annual accounting period, adopt or change any accounting method with respect to Taxes, file any amended Tax Return, enter into any closing agreement, settle or compromise any Proceeding with respect to any Tax claim or assessment relating to the Company or any Subsidiary of the Company, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period with respect to Taxes;

(l)      change any of the accounting principles or practices used by it, except for any change required by reason of a concurrent change in generally accepted accounting principles;

(m)      except in the ordinary course of business consistent with past practice (but only after consulting with Purchaser), enter into, renew, extend, amend in any material respect, or terminate any Material Contract or any contract that would be a Material Contract if in existence on the date hereof;

(n)      waive, release, assign, settle or compromise any claim, action or proceeding, other than waivers, releases, assignments, settlements or compromises not exceeding the amount for which an accounting reserve has been established by the Company, or that involve only the payment of monetary damages not in excess of (i) the amount accrued in respect thereof in the Audited Financial Statements or (ii) if not so accrued, $2.5 million individually or $10 million in the aggregate (excluding amounts to be paid under insurance policies);

(o)      except as herein contemplated, adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of such entity;

40

(p)     with respect to any material Lease or Well, voluntarily resign or transfer operatorship, except in connection with dispositions of Leases or Wells;

(q)     make any transfers of property or assets to any Affiliate of the Company, other than (i) intercompany transfers of properties and assets among the Company and its Subsidiaries (excluding Lone Star, Offshore and Concorde), (ii) transfers of cash among the Company and its Subsidiaries in the ordinary course of business consistent with past practice, and (iii) transfers in accordance with or related to the Gulf Coast and Offshore Reorganization and the Selling Stockholder Transaction, including settlement of any outstanding intercompany account balances;

(r)     authorize or propose, or agree, in writing or otherwise, to take any of the actions described in this Section 6.2; or

(s)     intentionally take or omit any action that would (i) cause any representation or warranty made by the Company in this Agreement to be untrue, (ii) result in a breach of any covenant made by the Company in this Agreement, or (iii) have a Material Adverse Effect

6.3     <u>Additional Actions</u>.    Except for actions required under the terms of this Agreement, none of the parties hereto shall intentionally take or permit any of its Affiliates to take any action that is reasonably likely to prevent or delay in any material respect the consummation of the transactions contemplated hereby.

## ARTICLE VII

## GULF COAST AND OFFSHORE REORGANIZATION

The assets and liabilities of the Company's Offshore Division and Gulf Coast Division, to the extent referenced in Section 7.1 of the Disclosure Schedule, including the equity interests in Offshore, Lone Star and Concorde, shall be and are excluded from the transactions contemplated by this Agreement.  Prior to Closing, the Gulf Coast and Offshore Reorganization transactions between the Company, its Subsidiaries and Schusterman shall occur as set forth in this Article VII.

7.1     <u>Corporate Actions</u>.

(a)     <u>Newco</u>.    Prior to Closing, the Company shall cause Samson Holdings Inc. and Samson Resources Company to form a new Delaware limited liability company ("<u>Newco</u>") under the name "Samson LS, LLC" with Samson Holdings Inc. holding 99% of the membership interests in Newco and Samson Resources Company holding 1% of the membership interests in Newco.  Samson Holdings Inc. and Samson Resources Company shall contribute their interests in Lone Star to Newco.

(b)     <u>Offshore</u>.    Prior to the Closing, the Company shall cause Offshore to be converted from an Oklahoma corporation to an Oklahoma limited liability company.

(c)     <u>Concorde</u>.    Prior to Closing, the Company shall cause Concorde to be converted from a Delaware corporation to a Delaware limited liability company.

41