IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*, | Case No. 15-11934 (BLS) Jointly Administered |
| Debtor. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51524 (BLS) |
| v. | |
| SAMSON ENERGY COMPANY, LLC, *et al.,* | |
| Defendants. | |

## REPLY IN FURTHER SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT BASED ON PLAN RELEASE

David M. Stern (admitted *pro hac vice*)
David M. Guess (admitted *pro hac vice*)
**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, CA  90067-6049
(310) 407-4000

Sabin Willett (admitted *pro hac vice*)
Andrew J. Gallo (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110
(617) 341-7700

Michael R. Nestor (No. 3526)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square, 1000 North King Street
Wilmington, DE  19801
(302) 571-6699

Dated: July 17, 2018

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

I.    THE PLAN AND THE CONFIRMED ORDER ARE BINDING, AND MUST BE ENFORCED ACCORDING TO THEIR UNAMBIGUOUS TERMS. ........................................................................................................ 1

II.    THE TRUSTEE'S TEXTUAL ARGUMENTS ARE MERITLESS.................... 7

    A.    The Selling Shareholders and their Equity Holders.................................. 7

        1.    "Former Affiliates" and "Former Equity Holders" Includes *All* Five Former Direct and Indirect Owners of SIC...................... 8

        2.    "Former" Affiliates and Equity Holders Means *All* Previous Equity Holders and Affiliates. .................................................... 12

        3.    Preferred Interest Holders Means Actual Holders of the Preferred Interests. ..................................................................... 13

        4.    The Plan Controls over Exhibits C-1 and C-2 of the Plan Supplement. ................................................................................ 15

    B.    The Gulf Coast and Offshore Entities...................................................... 16

        1.    Samson Offshore and Samson Exploration Are Not Successors to Affiliates of the Debtors, But Even If They Were, They Would Be Covered by the Plain Language of the Release. ................................................................................... 16

        2.    Samson Energy Is a Released Party Because It Was the Current Equity Holder of Samson Offshore and Samson Exploration as of the Date of the Plan Release............................ 17

        3.    Because SFTDM Controlled Debtor SIC and Samson Energy at the Same Time, Samson Energy Is a Former Affiliate of Debtor SIC. ............................................................. 18

    C.    "Affiliates" Includes Limited Liability Companies................................ 18

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
  562 B.R. 20 (Bankr. S.D.N.Y. 2016) ........................................................................5

*Brainard v. N.Y. Cent. R.R. Co.*,
  151 N.E. 152 (N.Y. 1926) ............................................................................................4

*In re Brooke Corp.*,
  506 B.R. 560 (Bankr. D. Kan. 2014) .......................................................................19

*Christopher v. Am. Universal Ins. Group, Inc.* (*In re Christopher*),
  148 B.R. 832, 837 (Bankr. N.D. Tex. 1992), *aff'd*, 28 F.3d 512 (5th Cir. 1994) .....................4

*In re Dorset*,
  No. 08-12339 BLS, 2012 WL 5389649 (Bankr. D. Del. Nov. 2, 2012) ...................................3

*Dube v. Horowitz*,
  258 A.D.2d 724 (N.Y. App. Div. 1999) ...................................................................6

*In re Fesq*,
  153 F.3d 113 (3d Cir. 1998) ......................................................................................1, 3

*In re FFS Data, Inc.*,
  776 F.3d 1299 (11th Cir. 2015) .................................................................................3

*In re Fundacion Dr. Manuel De La Pila Iglesias, Inc.*,
  No. BAP PR 10-041, 2011 WL 4592058 (B.A.P. 1st Cir. Mar. 22, 2011) ..............................3

*Gilliam v. Speier* (*In re KRSM Props., LLC*),
  318 B.R. 712 (B.A.P. 9th Cir. 2004) .......................................................................19

*Gross v. Sweet*,
  400 N.E.2d 306 (N.Y. 1979) .......................................................................................6

*Guardian Life Ins. Co. v. Schaefer*,
  519 N.E.2d 288 (N.Y. 1987) .......................................................................................6

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009) .......................................................................................5

*Monarch Life Ins. Co. v. Ropes & Gray*,
  65 F.3d 973 (1st Cir. 1995) .......................................................................................6

*Mt. Read Terminal, Inc. v. Le Chase Constr. Corp.*,
   396 N.Y.S.2d 959 (N.Y. App. Div. 1977) ...........................................................6

*N.Y. Tile Wholesale Corp. v. Thomas Fatato Realty Corp.*,
   951 N.Y.S.2d 87 (N.Y. Sup. Ct. 2012) ...........................................................5

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988)...........................................................4

*In re Residential Capital, LLC*,
   508 B.R. 838 (Bankr. S.D.N.Y. 2014)...........................................................4

*SEC v. Platforms Wireless Intern. Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ...........................................................9, 10

*In re Skyport Glob. Commc'ns, Inc.*,
   No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011), *aff'd*, 528
   B.R. 297 (S.D. Tex. 2015), *aff'd in part* 642 F. App'x 301 (5th Cir. 2016),
   *aff'd* 661 F. App'x 853 (5th Cir. 2016)...........................................................13

*Smith v. Charter Commc'ns, Inc. (St. Louis)*,
   467 F. App'x 742 (9th Cir. 2012) ...........................................................4

*Stoll v. Gottlieb*,
   305 U.S. 165 (1938)...........................................................3

*Trulis v. Barton*,
   107 F.3d 685 (9th Cir. 1995) ...........................................................2, 3

*U.S. v. Corr*,
   543 F.2d 1042 (2d Cir. 1976)...........................................................9, 10

*United States v. Motor Vehicle Manufacturers Association*,
   643 F. 2d 644 (9th Cir. 1981) ...........................................................5

*United States v. Sepulveda*,
   15 F. 3d 1161 (1st Cir. 1993)...........................................................5

*United Student Aid Funds, Inc. v. Espinosa*,
   559 U.S. 260 (2010)...........................................................2

*In re Varat Enters., Inc.*,
   81 F.3d 1310 (4th Cir. 1996) ...........................................................4

*In re Victory Market, Inc.*,
   221 B.R. 298 (B.A.P. 2d Cir. 1998)...........................................................5

*Waldman v. Riedinger*,
    423 F. 3d 145 (2d Cir. 2005), Opp. 43-44 ............................................................................10

*In re WCI Cmtys, Inc.*,
    No. 08-11643, 2012 WL 1981713 (Bankr. D. Del. June 1, 2012).............................................2

*Westview Assocs. v. Guar. Nat'l Ins. Co.*,
    740 N.E.2d 220 (N.Y. 2000)....................................................................................................13

*In re Woodbridge Grp. of Cos., LLC*,
    No. 17-12560, 2018 WL 3131127 (Bankr. D. Del. June 20, 2018)..........................................11

**Statutes**

11 U.S.C. §101(2) ........................................................................................................................11, 12

11 U.S.C. § 101(2)(B)...................................................................................................................18, 19

11 U.S.C. § 101(9) .............................................................................................................................18

11 U.S.C. § 1127 .................................................................................................................................2

11 U.S.C. § 1144.............................................................................................................................1, 2

**Regulations**

17 C.F.R. § 230.405 ........................................................................................................................8, 18

17 C.F.R. § 240.12b-2........................................................................................................................18

**Other Authorities**

Black's Law Dictionary .....................................................................................................................8

The Moving Defendants [1] reply to Plaintiff's *Opposition to Motion for Summary Judgment Based on Plan Release* [Dkt. No. 64] ("Opposition" or "Opp.").

## INTRODUCTION

Nowhere in bankruptcy practice is finality more important than with regard to orders confirming plans of reorganization. The confirmation order in *In re Samson Resources Corp. et al.* was preceded by more than two thousand docket entries. Absent plan finality, there might be two thousand more.

Not far beneath his textual arguments – addressed in detail below – lies the Trustee's real argument, laid out over thirty pages in the brief: that there has been a mistake, and the Plan drafters did not mean what they wrote, and the Court did not mean to order what it ordered. Were these assertions material, there would be no point in contesting them on summary judgment, for they invite the Court into a saga of plan negotiations. But they are not material.

## I.    THE PLAN AND THE CONFIRMED ORDER ARE BINDING, AND MUST BE ENFORCED ACCORDING TO THEIR UNAMBIGUOUS TERMS.

The Trustee's core argument is that the Debtor and Official Committee and other Plan constituents did not mean what they wrote, but that contention, even if true, is of no moment. It is black letter law that, a confirmation order may not be disturbed after its entry due to mistake. *See* 11 U.S.C. § 1144; *In re Fesq*, 153 F.3d 113, 119-20 (3d Cir. 1998) (stating that section 1144

---

[1]    This reply uses defined terms in the *Memorandum in Support of Motion for Summary Judgment Based on Plan Release* [Dkt. No. 46] ("Br."). For ease of reference, we attach relevant pages of the Confirmation Order in **Exhibit A**, of the Plan in **Exhibit B**, and of the Purchase Agreement [Dkt. No. 22-1] in **Exhibit C**.

is not permissive, and that fraud is the single ground for relief).[2]  No doubt realizing this problem, the Trustee strains to find a foothold within the four corners of the Confirmation Order. He examines paragraph 34 microscopically, arguing that the Court's findings of fact cannot be reconciled with a broad reading of the releases, given what he asserts the factual circumstances to have been.  *See* Opp. 2-3, 30-35.  However, an argument that the Court's unambiguous order (in the form of the releases) conflicts with the Court's factual findings is simply an argument that the order was legally erroneous.  If there were error -- factual, legal or otherwise -- in the operative language of the releases, the place to raise it was on direct appeal in the reorganization case, and the time for raising it has passed.  *See, e.g., Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (affirming summary judgment to defendants released pursuant to a reorganization plan and reasoning the "[d]efendants were entitled to summary judgment because [plaintiff] failed to challenge the Joint Plan on direct appeal and *res judicata* principles preclude collateral attack"); *In re WCI Cmtys, Inc.*, No. 08-11643, 2012 WL 1981713, at *7 n.24 (Bankr. D. Del. June 1, 2012) (refusing to dismiss civil contempt action brought against creditor pursuing released claims and reasoning, in part, that arguments by the creditor that "the consideration given in exchange for the Release was inadequate and that the Release is too broad" were "untimely" and "should have been raised as confirmation issues").

Arguments that negotiation history and an order's generic recitals cause an order's release to mean something other than what the words say, are simply an assertion that the order is legally erroneous.  Here, they amount to a collateral attack on the order barred by principles of claim preclusion.  An order confirming a reorganization plan operates as a final judgment binding (among others) the Debtor and its successors.  *United Student Aid Funds, Inc. v.*

---

[2]      Even if mistake were a legitimate ground to challenge the confirmation order as written, the time for doing so has long since passed.

*Espinosa*, 559 U.S. 260, 270-72, 275 (2010) (a confirmed plan is binding on all parties in interest, provided the plan proponent afforded such parties adequate notice, even if the plan violates the Bankruptcy Code).[3] Thus a confirmation order containing an improper release – even a release beyond the Court's jurisdiction – cannot be collaterally attacked. *See Stoll v. Gottlieb*, 305 U.S. 165, 176-77 (1938); *In re Fundacion Dr. Manuel De La Pila Iglesias, Inc.*, No. BAP PR 10-041, 2011 WL 4592058, at *4 (B.A.P. 1st Cir. Mar. 22, 2011) ("[A]n order confirming a plan is a judgment *in rem* in the sense that it is a determination of the rights and liabilities created by the plan, binding upon all parties in interest, whether or not they have chosen to appear in the case. In this sense, the plan is binding on the world, to the extent it touches the debtor, its rights, assets or obligations as of the confirmation date.") (internal quotation and citation omitted); *see also Fesq*, 153 F.3d at 120 ("the protection of the finality of Chapter 13 confirmation orders [is] more important than the obligation of the bankruptcy court and the trustee to ensure that a plan complied with the Code") (citing *In re Szostek,* 886 F.2d 1405, 1408-13 (3d Cir. 1989). As the Court remarked in *Trulis,* "[o]nce a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." 107 F.3d at 691; *see also In re Dorset*, No. 08-12339 BLS, 2012 WL 5389649, at *2 (Bankr. D. Del. Nov. 2, 2012) ("a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation") (quoting *Szostek,* 886 F.2d at 1408).

The preclusive effect of a plan and confirmation order is a familiar principle. In *In re FFS Data, Inc.*, 776 F.3d 1299, 1306 (11th Cir. 2015), the court stated that "[a] reorganization

---

[3]     The Plan provides that its terms would bind "all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan." *See* Exhibit B at 10 (Plan, Art. XII.A).

plan that is incorporated into a confirmation order has the same res judicata effect" and held that plaintiff's claims were barred by *res judicata* and the plan release. *See Smith v. Charter Commc'ns, Inc. (St. Louis)*, 467 F. App'x 742, 744 (9th Cir. 2012) ("[b]ecause [plaintiff's] claims fall within the scope of the [plan] releases, and [plaintiff] is barred by *res judicata* from challenging the validity of the releases, the district court correctly dismissed this case"); *In re Varat Enters., Inc.,* 81 F.3d 1310, 1315 (4th Cir. 1996); *In re Residential Capital, LLC*, 508 B.R. 838, 846 (Bankr. S.D.N.Y. 2014) (stating that "[c]onfirmation of a plan operates as a final judgment for *res judicata* purposes" and holding that *res judicata* and a plan release precluded creditor who had not filed a proof of claim from bringing claim against debtor and its parent). *See generally, Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("A strong interest to achieve finality pervades Chapter 11 arrangements…. [C]onfirmation of a plan acts to bar attempts by the parties to relitigate any of the matters that could have been raised during the bankruptcy proceedings."); *Christopher v. Am. Universal Ins. Grp., Inc.* (*In re Christopher*), 148 B.R. 832, 837 (Bankr. N.D. Tex. 1992) ("A strong policy favors enforcement of the plan of reorganization because … too many interests have relied on the finality of the confirmation order…. Once the plan is confirmed, the property rights of many of these interests are adjusted thereby creating a new status which is important to preserve."), *aff'd*, 28 F.3d 512 (5th Cir. 1994). Thus this case turns on the Confirmation Order.

Much is made in the Trustee's brief about "intent," but "intent" is not determined by archeological digs into negotiation history. Under New York law,[4] "[t]he intention of the parties is found in the language used to express such intention. [] If the court finds as matter of law that the contract is unambiguous, evidence of the intention and acts of the parties plays no part in the

---

[4]         The Parties agree that New York law applies. *See* Br. 8; Opp. 36 n.13.

decision of the case." *Brainard v. N.Y. Cent. R.R. Co.*, 151 N.E. 152, 154 (N.Y. 1926) (citation

omitted); *N.Y. Tile Wholesale Corp. v. Thomas Fatato Realty Corp.*, 951 N.Y.S.2d 87, at *11

(N.Y. Sup. Ct. 2012) ("The parties' intention should be determined from the language employed,

and where the language is clear and unambiguous, interpretation is a matter of law to be

determined solely by the court."), *aff'd* 115 A.D.3d 829 (N. Y. 2014).  "Intent" means that which

is expressed in the text of the Plan and Confirmation Order:

> Section 1141(a) of the Bankruptcy Code establishes the general
> rule that "the provisions of a confirmed plan bind the debtor, any
> entity issuing securities under the plan, any entity acquiring
> property under the plan, and any creditor, equity security holder, or
> general partner in the debtor..." For this reason, a confirmed plan
> holds the status of a binding contract as between the debtor and its
> creditors.  []  As with any contract, the starting point for review of
> a plan is its plain language.

*In re Victory Markets, Inc.,* 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) (applying New York law;

citations and quotations omitted).  "Unless some ambiguity is to be found within the plan itself,

the Court has no basis to look beyond its text. . . .   Where the language of the plan is

unequivocal, therefore, a *Court must adopt the plain and natural meaning only of the words

contained within the text of the instrument itself.*"  *Id.* (emphasis added).  Plan language "does

not become ambiguous merely because the parties urge different interpretations."  *JA Apparel

Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (applying New York law; internal quotation

and citation omitted).   Whether a Plan (or confirmation order) contains an ambiguity is a

question of law for the Court.  *Id.*[5]

---

[5]    The Trustee's citations are remarkable.  He cites *United States v. Sepulveda*, 15 F. 3d 1161 (1st Cir. 1993) regarding how the Court should "interpret[] a confirmation order."  Opp. 29.  *The case was an appeal from criminal drug trafficking convictions*.  He says this Court must "take into consideration its own findings, *i.e.*, in this case, whether or not it found a legal basis to grant a release to the Movants," *id.*, citing *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir. 1991), a case that had nothing to do with bankruptcy, and addressed "findings" *in assessing a Rule 59 motion for new trial in a civil case.  United States v. Motor Vehicle*

Taken together, the Trustee's arguments suggest an ambiguity in the confirmation order based upon the breadth of the release provision.  But breadth does not equal ambiguity. *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st Cir. 1995) (Plan proponent's subjective construction of injunction provision in confirmation order more narrowly than written does not create an ambiguity as doing so "mischaracterizes the *obvious breadth* of the confirmation order as *ambiguity*.") (emphasis in original).  "When the words of the release are of general effect the release is to be construed most strongly against the releasor." *Mt. Read Terminal, Inc. v. Le Chase Constr. Corp.*, 58 A.D.2d 1034, 1035 (N.Y. App. Div. 1977).[6]  As we will show below, there is no ambiguity in the text of the Confirmation Order, nor of the Plan that it incorporates.  Thus "the Court has no basis to look beyond its text," *Victory Markets, Inc.,* 221 B.R. at 303, and "the Court is not to consider any extrinsic evidence as to the parties' intentions." *JA Apparel Corp.,* 568 F.3d at 397 (citation omitted).[7]

---

*Manufacturers Association*, 643 F. 2d 644 (9th Cir. 1981), had nothing to do with bankruptcy either.  The question was how to construe an ambiguous consent decree.  And while *In re AMR Corp.*, 562 B.R. 20 (Bankr. S.D.N.Y. 2016), *see* Opp. 37, was at least a bankruptcy case, it does not help the Trustee.  There, creditors moved for additional distributions under a plan, based on a complex formula that turned on post-confirmation events.  The dispute concerned a true-up provision that each side appeared to concede was ambiguous.  *See id.* at 27-28.  Nothing in any of these cases suggests, even remotely, that a Court should not construe a plan's release provisions according to their plain terms.

[6]     The Trustee cites *Gross v. Sweet*, 400 N.E.2d 306, 308-10 (N.Y. 1979).  *Gross* held overbroad a form release signed by an injured student of a parachuting school, contrasting the "exacting standard" for form negligence releases from agreements "negotiated at arm's length between sophisticated business entities."  The Moving Defendants summarized New York law governing releases in their opening brief.  *See* Br. 8-9.

[7]     If there were ambiguity, it would be construed against the draftsperson.  *Guardian Life Ins. Co. v. Schaefer*, 519 N.E.2d 288, 289 (N.Y. 1987) ("ambiguities in contracts must be construed against the drafter"); *Dube v. Horowitz*, 258 A.D.2d 724, 725 (N.Y. App. Div. 1999) (same, non-insurance case).

Finally, to the extent germane, see Opp. 34-35, enforcement of the Confirmation Order is equitable. All of the Moving Defendants are also bound by it. Each is not only a Released Party, but also a *Releasing* Party. Article I.A.125 of the Plan contains the definition of "Releasing Party." Sub-clause (n) mirrors sub-clause (k) of the "Released Party" definition, thereby encompassing the Moving Defendants. *See* Exhibit B at 4 (Plan, Art. I.A.125).

## II.   THE TRUSTEE'S TEXTUAL ARGUMENTS ARE MERITLESS

Only nine of the 50 pages in the Opposition brief address the text. *See* Opp. 38-46. The Trustee appears to concede that the scope of released claims covers all counts of the Complaint, and limits his textual arguments to the question of *who* is released. The Plan answers that question by setting out a bespoke "Released Party" definition. This definition contains an exquisitely detailed list of categories of "Released Part[ies]." "Entities" are identified in separate sub-clauses (a) through (j). Exhibit B at 3-4 (Plan, Art. I.A.124). In sub-clause (k), the definition then adds to the Released Parties the "current and former affiliates" of each Debtor and listed Entity, and current and former equity holders of each of *those* entities.

These words are broad and plain.[8] The Trustee's brief never explains how the Court is to reconcile them with his theory.

### A.   The Selling Shareholders and their Equity Holders

Several textual arguments are advanced that the Selling Shareholders (SFTDM and ST 2008)[9] and their equity holders (Stacy Family Delaware Trust and Schusterman 2008 Delaware

---

[8]      Their significance is unmistakable. *See* Exhibit A at 4 (Confirmation Order ¶ 76) ("No Claims or Causes of Action, whether existing, alleged, or otherwise, against any of the Released Parties shall be transferred to the Settlement Trust, or otherwise constitute or be subject to a Settlement Trust Cause of Action or a Settlement Trust Retained Cause of Action.").

[9]      The third Selling Shareholder – the Charles and Lynn Schusterman Family Foundation – is not a Released Party and therefore is not a Moving Defendant. *See* Br. 3, 5.

Trust) and former equity holder Stacy Family Trust are not Released Parties.  The Trustee argues first that "former" equity holders must mean something less than all former equity holders, Opp. 38-39, and second that "Preferred Interest Holders" must mean something more than all those who hold the Preferred Interests.  Opp. 39-40.  While it is less than clear, the Trustee also seems to be saying that affiliate status required "control," and that the Selling Shareholders and their equity holders lacked that control.  Opp. 38.  He also tries to build an argument from a schedule to a plan supplement.  The Moving Defendants address these points below.

> 1.   **"Former Affiliates" and "Former Equity Holders" Includes *All* Five Former Direct and Indirect Owners of SIC.**

The Trustee argues that the Bankruptcy Code definition of "affiliate" does not apply, and that the Court should instead apply the definitions set out in the 1933 and 1934 Acts and Black's Law Dictionary.  Opp. 43.  This requires his concession that "affiliate" embraces any "person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."  *Id.*  The Trustee invokes 17 C.F.R. § 230.405 (to which neither the Plan nor the Confirmation Order refers) to define control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person."  But it does not matter whether the use of the lower-case "affiliate" was meant to signify a difference, *see* Br. 13-15, for the ordinary meaning of the term embraces every Moving Defendant.

Each Selling Shareholder, each owner of a Selling Shareholder, and the Stacy Family Trust formerly held a controlling interest, directly or indirectly, in SIC (among other Debtors) and in each of the Non-Debtor Subsidiaries.  A Moving Defendant's former affiliation with even one Debtor or Non-Debtor Subsidiary is sufficient to render it a Released Party.  As former affiliates of all of the Debtors (except SRC) and of the Non-Debtor Subsidiaries, SFTDM, ST

2008, Schusterman 2008 Delaware Trust, Stacy Family Delaware Trust, and Stacy Family Trust are Released Parties. *See* Br. 16-18.

The first argument the Trustee appears to advance to the contrary is that, following the execution of the Purchase Agreement, these parties no longer had control of SIC.[10]   But he concedes that prior to the execution of the Purchase Agreement, each had control (direct or indirect) of SIC. *See* Opp. 45 n.18.   That alone is enough to make each a "former affiliate" and "former equity holder" of a Debtor, and therefore a Released Party.

Executing the Purchase Agreement did not cause these entities to lose control or their affiliate status.   While the Trustee tries to diminish the importance of stock ownership, the authorities he cites do not support the effort.   Quite the contrary, they show that one may possess control *despite minimal or no stock ownership.   See U.S. v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (rejecting defendant's contention that he lacked control because he did not own more than 50% of outstanding stock and reasoning that the "*concept [of control] is not a narrow one*") (emphasis added); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1087-88 (9th Cir. 2010) (concluding that the defendant, an officer of a company, had control despite the fact that he owned no interest in the company, reasoning that "it is not necessary that one be a[] . . . shareholder to be a controlling person" and rejecting defendant's "argu[ment] that the transfer of ownership [] from [defendant] to his former wife raises a genuine factual issue of control" and

---

[10]      It is unclear whether the Trustee makes this argument solely as to SFTDM, in its capacity as holder of the membership interests in Samson Energy, or whether he asserts it as to all of the Selling Shareholders and their equity holders.   The Trustee states "[the Selling Shareholders] argue that they are 'former affiliates' of the Debtors.   All 'affiliate' arguments are addressed in subsection (B) below.   In short, none of the Selling Shareholders are affiliates. They are shareholders."   Opp. 38.   Subsection (B), however, does not address the Selling Shareholders at all; it addresses the Gulf Coast and Offshore Entities.   Thus, the Opposition does not squarely assert any affiliate-related arguments with respect to any Moving Defendants other than Samson Energy, Samson Offshore, and Samson Exploration. *See* Opp. 41-46.

instead affirming summary judgment to the SEC).    That is, while stock ownership is not necessary to establish control, it is sufficient.    *Platforms Wireless Int'l*, 617 F.3d at 1088 ("[o]wnership is one means of control, but it is not the only means") (emphasis added); *Corr,* 543 F.2d at 1050 ("[c]ontrol may be exerted in other ways than by vote").

The Trustee's reliance on *Waldman v. Riedinger*, 423 F. 3d 145 (2d Cir. 2005), Opp. 43-44, serves him no better.    There, the issue was whether a co-trustee of a trust created by a will was an affiliate of two defendants in a securities fraud class action.    The Second Circuit concluded that the co-trustee lacked control (and therefore was not an affiliate) because the founder's will "effectively afforded [the wife] absolute control over all [] stock" in the founder's estate.    *Waldman*, 423 F.3d at 152.    The court noted further that "Riedinger's lack of potential power parallel[ed] the absence of any evidence that he actually exercised control over any defendant," including the company.    *Id.*    He was "never consulted as to the actions of the trust or even informed as to any of the meetings of the trustees."    *Id.*    The will in *Waldman* simultaneously appointed the co-trustee and limited his voting rights.    Nothing in the present record suggests that any shareholder's right of control was similarly constrained by others. *Waldman* is simply inapposite.

Had the Selling Shareholders not retained corporate control over SIC prior to the closing, they could not have promised in Article VI of the Purchase Agreement to exercise their control in a particular manner.    The Article VI provisions do not strip the Selling Shareholders of control, nor delegate control to the buyer.    The Selling Shareholders did not "los[e] [their] ability to appoint or remove officers[,] dispose of assets, and terminate key relationships."    *See* Opp. 45. They retained the power to do all of those things.    Had they done them, they might have been in *breach*, giving the buyer an excuse not to close, but there was no surrender of control itself

before the closing.  The consent rights to which the Opposition refers, *see* Exhibit C at 5-7 (Purchase Agreement § 6.2), were no different.  Taking certain steps with consent was not a breach; taking them without consent was a breach – but that breach did not give any power to control.[11]  Only a closing would do that.

The very fact that each Selling Shareholder was a necessary party to the Purchase Agreement shows that only the Selling Shareholders had the power to limit the activities of the corporation during the brief period between the execution of the Purchase Agreement and the closing.  *See* Exhibit C at 3-4 (Purchase Agreement § 4.2) ("Each Selling Stockholder hereby represents, severally and not jointly, to Purchaser that … [s]uch Selling Stockholder has all requisite … power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by such Selling Stockholder in connection with the consummation of the transactions contemplated by this Agreement [], and to consummate the transactions contemplated hereby and thereby.").[12]  Without the Selling Shareholders' exercise of control, the Purchase Agreement could never have been consummated and the 2011 Acquisition could never have closed.

The same result as to affiliates, former affiliates and their equity holders would obtain were the Court to read "affiliate" in the "Released Party" definition as defined by section 101(2) of the Bankruptcy Code.  *See* Br. 13-15.  It would be normal for a bankruptcy plan and confirmation order to be read as using Bankruptcy Code definitions absent clear evidence to the

---

[11]     For a recent case turning on the distinction between power to act (in that case to assign a claim) and the right to do so, *see In re Woodbridge Grp. of Cos., LLC*, No. 17-12560, 2018 WL 3131127, at *3-4 (Bankr. D. Del. June 20, 2018).

[12]     *See also* Exhibit C at 4 (Purchase Agreement § 4.5): "Such Selling Stockholder has the … power and authority to sell, transfer, assign and deliver such Shares as provided in this Agreement, and the sale, transfer, assignment and delivery of the Purchased Shares will convey to Purchaser good title to the Purchased Shares, free and clear of any and all Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws)."

contrary.  Certainly the Plan does *not* "state[] that the Bankruptcy Code's definition of 'affiliate' is applicable only when such term is capitalized," as the Trustee contends at Opp. 43 n.17.  The Plan states that the capitalized term "shall have the meaning set forth in section 101(2) of the Bankruptcy Code," see Exhibit B at 2 (Plan, Art. I.A.5), but is silent as to what un-capitalized "affiliate" means.

In short, under either the Bankruptcy Code or the common-law definition, the five former direct or indirect equity holders of Debtor SIC are "former affiliates" within the scope of the release.

### 2. "Former" Affiliates and Equity Holders Means *All* Previous Equity Holders and Affiliates.

The Trustee then suggests that the word "former" contains a hidden time limitation.  Of course it does not, and SFTDM, ST 2008, Schusterman 2008 Delaware Trust, and Stacy Family Delaware Trust were hardly ancient affiliates.  Each was a direct or indirect equity holder of SIC until the closing of the 2011 Acquisition.[13]  The Trustee never provides an intelligible basis for distinguishing some "former affiliates" from others:  Which others?  Nor does he explain why reading the word "former" literally, to mean *any previous* affiliate or equity holder, is not the plain meaning.  The point of a release is to cut off claims.  Most practitioners recall the familiar "from the beginning of the world" phrase in classic release language, and there is nothing in the text here to suggest that that is not exactly what the word, "former" means.   The language is not ambiguous.  All those who formerly held any sort of equity control are released.  *See* Opp. 38.

The Trustee's attempt to redefine the word "former" also conflicts with the text carving "the holders of the Preferred Interests" out from the release.  That carve-out exists only because any "holder of the Preferred Interests" otherwise *would* be a Released Party.  This is compelling

---

[13]     Stacy Family Trust held equity in Debtor SIC until 2010.

evidence that the parties understood that the release language covered former equity holders and former affiliates of the Debtors, as otherwise the Preferred Interests carve-out would have been unnecessary. *See In re Skyport Glob. Commc'ns, Inc.*, No. 08-36737, 2011 WL 111427, at *22 (Bankr. S.D. Tex. Jan. 13, 2011) ("the canons of construction require this Court to interpret its orders in a way that would avoid making any language in the Confirmation Order mere surplusage"), *aff'd*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part*, 642 F. App'x 301 (5th Cir. 2016), and 661 F. App'x 835 (5th Cir. 2016); *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 740 N.E.2d 220, 222 (N.Y. 2000) ("[D]efendant's interpretation would render the umbrella policy's specific exclusions mere surplusage, a result to be avoided."). Each of SFTDM, ST 2008, Schusterman 2008 Delaware Trust, and Stacy Family Delaware Trust held equity (directly or indirectly) in, and were affiliated with Debtor SIC (as well as other debtors and the non-debtor subsidiaries) at the time of the 2011 Acquisition and before. Stacy Family Trust was a former affiliate. As parties not carved out from the definition of Released Parties, each is released.[14]

In short, there is no basis for the Trustee's contention that "former" does not encompass the five Moving Defendants that are former direct or indirect equity holders and former affiliates of Debtor SIC or its affiliates. Each is a Released Party.

### 3. Preferred Interest Holders Means Actual Holders of the Preferred Interests.

Only one of the three parties that sold shares to the KKR Group has ever been a "holder of the Preferred Interests." Struggling to overcome the words of the carve-out, the Trustee makes his strangest argument: that a defendant that never held any Preferred Interest is nevertheless a "holder" because it once shared a contractual *right to designate* who would receive them. *See* Opp. 40.

---

[14] As we show below, the construction errors concerning "former" and "affiliate" apply equally to the various Moving Defendants that became subsidiaries of Samson Energy.

The Trustee cites no authority for this peculiar idea, and for good reason. "Holder" is a familiar noun in bankruptcy plans and confirmation orders. This very Plan gave voting rights to "holders" of allowed claims in Classes 4, 5 and 6 of the Plan. Exhibit B at 6-9 (Plan, Arts. III.A., III.B.1-6). As everyone understood, others may previously have held a claim, or had the right to hold it, but only one party could vote that claim: he who *held* legal title to the claim on the record date. The same obvious meaning pertains here. And it really was *obvious:* the Foundation filed a notice in October 2015 stating that it held all of the Preferred Interests. Then it filed another one. Bankr. Dkt. 245, 247; *see also* Br. 5 & n.7. The Trustee asserts that the bankruptcy court took judicial notice of "all pleadings." Opp. 2, 5. Evidently that includes these two notices, as well as the precise reference in the Plan and Confirmation Order to "holders of the Preferred Interests." [15]

Last, the Trustee points to the use of the plural – "the holder*s* of the Preferred Interests" – and argues that the plural reference must mean that the carve-out referred to all three Selling Shareholders (and their equity holders). *See* Opp. 6 (emphasis added). But the words plainly signify something else: any and all who hold the Preferred Interests are carved out from the release. The Plan expressly provides that there is no distinction between singular and plural. *See*

---

[15]     In an argument that one struggles to follow, the Trustee asserts that the Selling Shareholders' respective equity holders *also* fall within the Preferred Interest holders carve-out. *See* Opp. 40 & n.15. But the Purchase Agreement did not grant Stacy Family Delaware Trust or Schusterman 2008 Delaware Trust even an optional "legal right to possess" the Preferred Interests. *See* Exhibit C at 2 (Purchase Agreement §2.2(a)) ("Purchaser and the Company, pursuant to Section 2.1 hereof, will collectively pay and deliver the Net Share Consideration *to the Selling Stockholders*, with the allocation of the Net Share Consideration (including as between cash and shares of Senior Redeemable Preferred Stock) *as designated in writing by the Selling Stockholders* to the Purchaser….") (emphasis added). The Trustee's theory appears to be that because the two former shareholder LLCs are "are pass-through entities owned by the Stacy Family Delaware Trust and the Schusterman 2008 DE Trust," Opp. 40 n.15, their owners became holders through a hypothetical pass-through right. The argument ignores both the law of entity separateness and the fact that neither of the two LLCs ever actually held the Preferred Interests.

Exhibit B at 5 (Plan, Art. I.B.) ("[f]or purposes herein . . . in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural . . . .").

### 4.    The Plan Controls over Exhibits C-1 and C-2 of the Plan Supplement.

Straining to avoid the plain text, the Trustee points to Exhibits C-1 and C-2 to the Plan Supplement, which, he says, list "the entities that may be pursued by the Settlement Trust with respect to the 'Settlement Trust Retained Causes of Action.'"  Opp. 23.  The Trustee contends that "[n]o 'Released Party' could ever appear on those lists," *id.*, and the inclusion of the Stacy Family Trust on Exhibit C-2 proves that the Equity Holder Moving Defendants are not Released Parties.  Opp. 38.

The two exhibits were filed on March 1, 2017, after the Plan was filed and the Confirmation Order had entered.  *See* Opp. 23.  While the Plan incorporates by reference the Plan Supplement, the Court made clear that Exhibits C-1 and C-2 cannot be read to alter anything in the Plan.  Paragraph 68 of the Confirmation Order provides: "In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control." Exhibit A at 2-3 (Confirmation Order ¶ 68).  The exhibits themselves confirm this.  The introductory language provides, "*Unless otherwise released by the Plan*, the Avoidance Actions to be transferred to the Settlement Trust include, but are not limited to, the Avoidance Actions set forth in Exhibit C-1 attached hereto," and "*Unless otherwise released by the Plan*, the Claims and Causes of Action, other than Avoidance Actions, to be transferred to the Settlement Trust include, but are not limited to, the Claims and Causes of Action set forth in Exhibit C-2 attached hereto."  Ramirez Decl. Ex. 29 (Bankr. Dkt. 2061) at 7 (emphasis added).  The Trustee argues that a Moving Defendant's appearance in Exhibit C-1 or C-2 while simultaneously being a Released Party is a "metaphysical impossibility."  *See* Opp. 42.  That puts unusual weight on computer schedules (not to mention metaphysics), but the problem is an invented one.  The

Confirmation Order and the Plan Supplement each make clear that nothing in any schedule can alter the provisions in the Plan and Confirmation Order that define the Released Parties.[16]

## B.    The Gulf Coast and Offshore Entities.

### 1.    Samson Offshore and Samson Exploration Are Not Successors to Affiliates of the Debtors, But Even If They Were, They Would Be Covered by the Plain Language of the Release.

With respect to Samson Exploration[17] and Samson Offshore, the Trustee appears to concede that each *would be* a former affiliate of the Debtors and Non-Debtor Subsidiaries and therefore a Released Party, if changes to their name or corporate form in connection with the 2011 Acquisition had not rendered it a "successor" to its predecessor entity.  *See* Opp. 41-42, 46. The Trustee contends that the Released Party definition does not cover "successors."  *Id.*  But the Trustee is mistaken:

> *"Released Party"* means each of the following, in their capacity as such: (a) . . .
>
> ***
>
> …and (k) **with respect to each of the Debtors** . . . and each of the foregoing Entities in clauses (a) through (j), **such Entity's current and former affiliates and such Entity's and such affiliates'** current . . . equity holders, …predecessors, **successors** and assigns,

---

16    The Trustee's reliance on Exhibits C-1 and C-2 is remarkable for another reason. Exhibit C-1 covers "Avoidance Actions," while Exhibit C-2 covers "Other Claims and Causes of Action."  The Trustee seems to imply that certain Moving Defendants appear on both, but *none of the Moving Defendants appears on Exhibit C-1,* which lists the potential Avoidance Action defendants.  *Compare* Dkt. No. 2061 at 10-41 (Exhibit C-1, omitted from the Ramirez Declaration), *with* Ramirez Decl., Ex. 29 (Exhibit C-2).  All of the claims asserted in this action are Avoidance Actions.  Were inferences from these schedules germane, the obvious one would be that the Plan parties did not intend to preserve avoidance actions against the Moving Defendants.  Exhibit C-2 has no relevance, as the Trustee concedes in note 8 of the Opposition, by indicating that the removal of Samson Exploration from that exhibit had no effect on the Trustee's ability to assert the claims here.

17    The Trustee also contends that the fact Samson Exploration appeared on Plan Supplement Exhibit C-2 compels the conclusion that it is not a Released Party.  *See* Opp. 41. This argument fails for the reasons set forth in section II.A.4.

> … and **each of their respective current** and former **equity holders** . . . .

(emphasis added).  This text makes a "successor" of a "former affiliate" of a Debtor a Released Party.  Even if Samson Exploration's simple name change (from Samson Lone Star, LLC to Samson Exploration, LLC shortly after the close of the 2011 Acquisition), or Samson Offshore, LLC's conversion from a corporation to an LLC (prior to the closing of the 2011 Acquisition, as required by the Purchase Agreement), made the resulting entities "successor" entities, they would still be "Released Parties" as successors of former affiliates of the Debtors and Non-Debtor Subsidiaries.

> **2.      Samson Energy Is a Released Party Because It Was the Current Equity Holder of Samson Offshore and Samson Exploration as of the Date of the Plan Release.**

The Plan definition of "Released Party" encompasses each Debtor's "former affiliates and . . . such affiliates' *current . . . equity holders . . .*"  *See* Br. 20; Exhibit B at 3-4 (Plan, Art. I.A.124) (emphasis added).   As noted above, the definition of "Released Party" also encompasses the current equity holders of *successors* of former affiliates.  *See* Exhibit B at 3-4 (Plan, Art. I.A.124).  Thus, Samson Energy, as a current equity holder of Samson Exploration and Samson Offshore at the date of the Plan Release, is a Released Party, regardless of whether Samson Exploration and Samson Offshore are regarded as former affiliates or as successors of former affiliates of the Debtors and Non-Debtor Subsidiaries.  The Trustee's contention to the contrary is without merit.  *See* Opp. 46 n.20.

### 3.    Because SFTDM Controlled Debtor SIC and Samson Energy at the Same Time, Samson Energy Is a Former Affiliate of Debtor SIC.

As noted above, Samson Energy is a Released Party because at the time of the Plan Release it was the current equity holder of Samson Exploration.[18]  *See supra*, II.B.2; Br. 20. That fact alone is sufficient to bring Samson Energy within the plain scope of the Plan Release.

It is unclear whether the Trustee's arguments concerning "control" were limited to the release of SFTDM, as a control party of Samson Energy.  Those arguments are disposed of in section II.A.1, above.  As a result of the fact that SFTDM is a Released Party, Samson Energy is a Released Party for an additional reason.  It was a wholly-owned subsidiary of SFTDM at the same time that SFTDM owned over 37% of the outstanding shares of Debtor SIC.  *See* Br. 17, 20; Release Decl. ¶ 18.  Thus, Samson Energy and SIC were under common control and thus affiliates.  *See* Br. 17, 20; *see* 17 C.F.R. § 230.405 ("An 'affiliate' of . . . a specified person, is a person that . . . is under common control with, the person specified."); 17 C.F.R. § 240.12b-2 (same); *see also* Br. 14 n.14.

### C.    "Affiliates" Includes Limited Liability Companies.

The Trustee contends that if the Bankruptcy definition were applied, only corporations would qualify as affiliates under section 101(2)(B) (which defines "affiliates"), and because Samson Energy and Samson Exploration (and perhaps other Moving Defendants) are limited liability companies, they would not be "affiliates" under the Bankruptcy Code definition.  *See* Opp. 42 n.16, 46 n.19.  The Trustee is again mistaken.  Although section 101(2)(B) refers to "corporations," the Code defines "corporation" expansively to include a wide range of business entities beyond corporations in the literal sense.  *See* 11 U.S.C. § 101(9).  Limited liability

---

[18]    The Trustee also contends that the fact Samson Energy appeared on Exhibit C-2 compels the conclusion that it is not a Released Party.  *See* Opp. 42.  This argument fails for the reasons set forth in Section II.A.4.

companies fall within this definition, including for purposes of the definition of "affiliate" in section 101(2)(B).  *See, e.g., In re Brooke Corp.*, 506 B.R. 560, 566-72 (Bankr. D. Kan. 2014) (addressing the issue whether an LLC is a "corporation" and therefore an "affiliate," surveying relevant case law concluding that "an LLC . . . fit[s] within the definition of a 'corporation,'" and holding that an LLC is a "corporation" for purposes of the definition of "affiliate" set forth in 11 U.S.C. § 101(2)(B)); *Gilliam v. Speier (In re KRSM Props., LLC)*, 318 B.R. 712, 717 (B.A.P. 9th Cir. 2004).  Samson Energy and Samson Exploration, and all other Moving Defendants that are LLCs, fall within the Bankruptcy Code definition of "corporation," and are "affiliates" of the Debtors and Non-Debtor Subsidiaries under section 101(2)(B) of the Bankruptcy Code.

## CONCLUSION

The motion for Summary Judgment should be granted.

Respectfully submitted,

David M. Stern (admitted pro hac vice)
David M. Guess (admitted pro hac vice)
**KLEE, TUCHIN, BOGDANOFF & STERN LLP**
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, CA  90067-6049
(310) 407-4000

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square, 1000 North King Street
Wilmington, DE  19801
(302) 571-6699

Sabin Willett (admitted pro hac vice)
Andrew J. Gallo (admitted pro hac vice)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110
(617) 341-7700

July 17, 2018

*Counsel for the Moving Defendants*

**Exhibit A:**
**Relevant Pages from the Confirmation Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 1882** |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

having:[2]

a.  commenced, on September 16, 2015 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b.  continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.  filed, on January 11, 2017, the *Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 1858] (as may be amended, supplemented, or modified from time to time, and including all exhibits and supplements thereto, the "Disclosure Statement");

d.  obtained, on January 12, 2017, entry of the *Order Approving (I) Disclosure Statement for the Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates, (II) Solicitation Procedures, (III) Voting Instructions, (IV) Forms of Ballots and Notices in*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

[2]  Unless otherwise noted herein, capitalized terms not defined in these findings of fact, conclusions of law, and order (collectively, this "Confirmation Order") shall have the meanings ascribed to them in the Plan (as defined herein). The rules of interpretation set forth in Article I.B of the Plan shall apply to this Confirmation Order.

KE 41769032.32

at arm's-length, are in the best interests of the Debtors, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.

**U.    Objections**

67.    All parties have had a full and fair opportunity to litigate all issues raised in the objections to Confirmation of the Plan, or which might have been raised, and the objections have been fully and fairly litigated or resolved, including by agreed-upon reservations of rights as set forth in this Confirmation Order.

## II. ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

**A.    Order.**

68.    The Plan, attached hereto as **Exhibit A**, is approved in its entirety and confirmed under section 1129 of the Bankruptcy Code.    The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Confirmation Order.    The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto), and the execution, delivery, and performance thereof, are authorized and approved as finalized, executed, and delivered.    The failure to include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document or exhibit does not impair the effectiveness of that article, section, or provision; it being the intent of the Court that the Plan, the Plan Supplement, and any related document or exhibit are approved and confirmed in their entirety.    The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents shall be

KE 41769032.32
Ex. A - 2

effective and binding as of the Initial Effective Date or the Final Effective Date, as applicable. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**B.      Objections.**

69.     All objections to Confirmation of the Plan have been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order. To the extent that any objections (including any reservations of rights contained therein) to Confirmation of the Plan (including the payment or amount of the cure amounts with respect to any Assumed Contract, or the assumption by the Debtors of any of the Assumed Contracts) have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein, or otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, all such objections (including any reservations of rights contained therein) are overruled on the merits.

**C.      Amendment of the Plan.**

70.     The Debtors reserve the right to modify the Plan (*provided* that such modifications are in form and substance acceptable to the First Lien Agent and the Second Lien Steering Committee, and, to the extent such modification may impact recoveries to holders of General Unsecured Claims, the Committee and the Settlement Trust, as applicable, and to the extent such modification modifies the definition of "Released Parties" or Article VIII of the Plan, the Sponsors) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions

Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to such transfer, assignment, and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan or this Confirmation Order.

75.    Notwithstanding the foregoing, on and as of the Initial Effective Date, the Settlement Trust Unencumbered Cash, the Contingent Value Right, the Sponsor Management Fee Claims (to the extent so elected by the Committee), and the Settlement Trust Causes of Action shall, pursuant to the Plan and the Settlement Trust Agreement, vest in the Settlement Trust, free and clear of all Liens, Claims against, charges or other encumbrances and shall be deemed transferred by the respective Debtor to the Settlement Trust (in each case, except as otherwise provided in the Plan).  On and as of the Final Effective Date, the remainder of the Settlement Trust Assets shall, pursuant to the Plan and the Settlement Trust Agreement, vest in the Settlement Trust, free and clear of all Liens, Claims against, charges or other encumbrances and shall be deemed transferred by the respective Debtor to the Settlement Trust (in each case, except as otherwise provided in the Plan).

76.    No Claims or Causes of Action, whether existing, alleged, or otherwise, against any of the Released Parties shall be transferred to the Settlement Trust, or otherwise constitute or be subject to a Settlement Trust Cause of Action or a Settlement Trust Retained Cause of Action.

G.    **Approval of Restructuring Transactions.**

77.    From and after the Initial Effective Date, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect the Restructuring Transactions.  All such actions to effectuate the Plan shall be taken in consultation with the First Lien Agent, the Second Lien Steering Committee, and (without limiting the Debtors' obligations under Article IV.W of

**Exhibit B:**
**Relevant Pages from the Plan**

*CONFIRMATION VERSION*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | Case No. 15-11934 (CSS) |
| Debtors. | (Jointly Administered) |

## GLOBAL SETTLEMENT JOINT CHAPTER 11 PLAN
## OF REORGANIZATION OF SAMSON RESOURCES CORPORATION
## AND ITS DEBTOR AFFILIATES (WITH TECHNICAL MODIFICATIONS)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (Del. Bar No. 3989)
919 N. Market Street
Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-2700
Facsimile:    (215) 568-6603

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
J. Christopher Shore (admitted *pro hac vice*)
Michele J. Meises (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
1155 Avenue of the Americas
New York, New York 10036
Telephone:    (212) 891-8200
Facsimile:    (212) 354-8113

*Co-Counsel to the Official Committee of Unsecured Creditors*

**FARNAN LLP**
Joseph J. Farnan, Jr. (Del. Bar No. 100245)
Joseph J. Farnan, III (Del. Bar. No. 3945)
Michael J. Farnan (Del. Bar No. 5165)
919 North Market Street
Suite 1200
Wilmington, Delaware 19801
Telephone:    (302) 777-0300
Facsimile:    (302) 777-0301

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

## INTRODUCTION

Samson Resources Corporation ("Samson") and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this global settlement joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    *"2011 Acquisition"* means the December 2011 buyout of the Debtors.

2.    *"Accrued Professional Compensation"* means, at any given time, all accrued, contingent, and/or unpaid fees and expenses (including success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330, or 331 of the Bankruptcy Code or otherwise rendered allowable before (a) the Initial Effective Date, for Professionals retained by the Committee, or (b) the Final Effective Date, for other Professionals, by any retained estate Professional in the Chapter 11 Cases, (y) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (z) after applying any retainer that has been provided to such Professional. To the extent that the Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation. For the avoidance of doubt, Accrued Professional Compensation includes unbilled fees and expenses incurred on account of services provided by Professionals that have not yet been submitted for payment, except to the extent that such fees and expenses are either denied or reduced by a Final Order by the Court or any higher court of competent jurisdiction.

3.    *"Administrative Claim"* means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Initial Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

4.    *"Administrative Claims Bar Date"* means the first Business Day that is 30 days following the Initial Effective Date, except as specifically set forth in the Plan or a Final Order.

5.    *"Affiliate"* shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    *"Allowed"* means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as

5

Agreement, the Committee, and the final versions of all such documents and exhibits shall be Filed by no later than the Final Effective Date (or, with respect to the Settlement Trust Agreement, the Initial Effective Date).

113.    "*Plan Support Agreement*" means the Plan Support Agreement, dated as of August 26, 2016, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit A</u> to the *Notice of Filing Plan Support Agreement* [Docket No. 1290]. The Debtors will not agree to any modifications of the Plan Support Agreement which may impact the amount or priority of recovery of holders of General Unsecured Claims under the Plan without the written express consent of the Committee.

114.    "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

115.    "*Preferred Interests*" means the 180,000 shares of cumulative redeemable preferred stock of Parent issued in December 2011.

116.    "*Prepetition Collateral*" means the First Lien Collateral and the Second Lien Collateral.

117.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

118.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

119.    "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

120.    "*Professional Fee Escrow*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors or the Reorganized Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Initial Effective Date solely for the purpose of paying all remaining Allowed and unpaid Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Court.

121.    "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

122.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

123.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

124.    "*Released Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) each of the Sponsors; (f) the Non-Debtor Subsidiaries; (g) the Committee and any member thereof; (h) the Senior Noteholders; (i) the Senior Notes Indenture Trustee; (j) the Backstop Parties; and (k) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (j), such Entity's current and former affiliates and such Entity's and such affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but *except* for any former equity holder in Parent (regardless of whether such interests were held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), predecessors, successors and assigns, subsidiaries, managed accounts or funds, and each

15

of their respective current and former equity holders (*except* for any former equity holder in Parent (regardless of whether such interests are held directly or indirectly) that transferred or redeemed its equity interests for the purpose of taking a worthless stock deduction prior to the Petition Date, *provided* that, for the avoidance of doubt, the foregoing exception shall not include any of the Sponsors or any of their respective current and former equity holders or affiliates), officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, each in their capacity as such; and (k) the DTC; *provided* that the Released Parties shall not include the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.

125.    "*Releasing Party*" means each of the following, in their capacity as such:  (a) the First Lien Agent; (b) the First Lien Secured Parties; (c) the Second Lien Agent; (d) the Second Lien Lenders; (e) the Sponsors; (f) the Committee and any member thereof; (g) the Senior Noteholders; (h) the Senior Notes Indenture Trustee; (i) the Backstop Parties; (j) all holders of Claims and Interests that are deemed to accept the Plan; (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (m) all holders of Claims and Interests who vote to reject or are deemed to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; and (n) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (m), such Entities' current and former affiliates' and such Entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers consultants, representatives, management companies, fund advisors and other professionals.

126.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Final Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

127.    "*Reorganized Debtor Retained Causes of Action*" means all Claims and Causes of Action (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) that are not Settlement Trust Retained Causes of Action.  For the avoidance of doubt, the Reorganized Debtor Retained Causes of Action will include all Claims and Causes of Action (a) against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) on account of or arising under any contract or lease entered into after the Petition Date, (c) on account of any of the Debtors' postpetition ordinary-course-of-business accounts receivable, (d) against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) that are based solely on postpetition conduct, give rise to postpetition damages, and have not yet been discovered by the Debtors.

128.    "*Reorganized Parent*" means Parent, or any successors thereto, by merger, consolidation, or otherwise, on and after the Final Effective Date, including any new holding company formed pursuant to the Restructuring Transactions to indirectly acquire the assets or equity of the Debtors.

129.    "*Required Backstop Parties*" means, as of any date of determination, Backstop Parties committed to providing at least two-thirds of the aggregate backstop commitments pursuant to the Backstop Commitment Agreement.

130.    "*Required Consenting Lenders*" means, as of any date of determination, Consenting Lenders holding a majority of the aggregate outstanding principal amount of the Second Lien Claims held by Consenting Lenders.

131.    "*Restructuring Support Agreement*" means the Restructuring Support Agreement, dated as of August 14, 2015, as amended, supplemented, or otherwise modified from time to time in accordance with its terms, a copy of which is attached as <u>Exhibit B</u> to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates* [Docket No. 16].

179.    "*Status Conference*" shall have the meanings ascribed to it in Article IV.C of the Plan.

180.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

181.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

182.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

183.    "*Voting Deadline*" means the deadline to submit ballots to accept or reject the Plan established by the order of the Court approving the Disclosure Statement.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

C.    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Initial Effective Date shall be paid by the Debtors. On and after the Initial Effective Date, the Debtors or the Reorganized Debtors, as applicable shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

Claims and Interests, except for Administrative Claims, Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Initial Effective Date or the Final Effective Date (as applicable).

Except as provided below, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 8 shall be deemed to apply to each Debtor, except for Class 9, which only applies to Parent. If substantive consolidation is ordered pursuant to Article IV.U of the Plan, each Class with respect to the Debtors shall vote as set forth in Article III of the Plan. If substantive consolidation is not ordered, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable, and each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each of the Debtors.

1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Secured Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

24

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 9 | Interests in Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

    1.    Class 1 – Other Priority Claims

        a.    *Classification*: Class 1 consists of all Allowed Other Priority Claims.

        b.    *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall receive payment in full, in cash, of the unpaid portion of its Allowed Other Priority Claim on the Final Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Allowed Other Priority Claim and the Debtors.

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Each holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan.

    2.    Class 2 – Other Secured Claims

        a.    *Classification*: Class 2 consists of all Allowed Other Secured Claims.

        b.    *Treatment*: On the Final Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall receive either (i) payment in full in cash of the unpaid portion of its Allowed Other Secured Claim on the Final Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

        c.    *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Allowed Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan.

    3.    Class 3 – First Lien Secured Claims

        a.    *Classification*: Class 3 consists of all Allowed First Lien Secured Claims.

        b.    *Allowance*: The First Lien Secured Claims shall be Allowed in the aggregate amount equal to $945,831,987.70, not subject to any counterclaim, defense, offset, or reduction of any kind (except for valid setoffs under the First Lien Loan Documents), consisting of $942,812,113.37 in principal amount drawn under the First Lien Credit Agreement, $0 in face amount of undrawn Letters of Credit issued <u>plus</u> $3,019,876.33 in obligations to Hedge Banks (through January 11, 2017) and any accrued but unpaid interest (at the non-

25

default contract rate), expenses, and any and all other obligations due or recoverable under the First Lien Credit Agreement payable thereon, as calculated in accordance with the First Lien Credit Agreement; *provided* that such amount shall be reduced by (i) valid setoffs under the First Lien Loan Documents and (ii) any amounts previously paid to the Holders of the First Lien Secured Claims on account of such Claims.

c.    *Treatment*: On the Final Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Secured Claim, each holder of an Allowed First Lien Secured Claim shall receive its Pro Rata distribution of:

    i.    the First Lien Cash Recovery; and

    ii.    (a) if such holder (x) votes to accept the Plan by the Voting Deadline or (y) votes to reject the Plan by the Voting Deadline and elects to receive its Pro Rata share in the Exit RBL Facility, then its Pro Rata share of the Exit Facility will be in the Exit RBL Facility; or

        (b) if such holder (u) votes to reject the Plan by the Voting Deadline and elects to receive its Pro Rata share in the Exit Term Loan, (v) votes to reject the Plan by the Voting Deadline and makes no election as to whether to receive its Pro Rata share in the Exit RBL Facility or the Exit Term Loan, or (w) fails to properly submit a ballot by the Voting Deadline, then its Pro Rata share of the Exit Facility will be in the Exit Term Loan.

d.    *Voting*: Class 3 is Impaired under the Plan. Each holder of an Allowed First Lien Secured Claim will be will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Second Lien Secured Claims</u>

a.    *Classification*: Class 4 consists of all Second Lien Secured Claims.

b.    *Allowance*: The Second Lien Secured Claims shall be Allowed in the aggregate amount equal to $1,011,527,778, not subject to any counterclaim, defense, offset, or reduction of any kind, or such other amount as determined by the Court in connection with Confirmation.

c.    *Treatment*: On the Final Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Secured Claim, each holder of an Allowed Second Lien Secured Claim shall receive its Pro Rata distribution of:

    i.    100 percent of the New Common Stock (subject to dilution for the Rights Offering Stock, the Backstop Fee, and the Management Incentive Plan); and

    ii.    the Rights to participate in the Rights Offering.

d.    *Voting*: Class 4 is Impaired under the Plan. Each holder of an Allowed Second Lien Secured Claim will be entitled to vote to accept or reject the Plan.

5.    Class 5 – General Unsecured Claims

    a.    *Classification*: Class 5 consists of all Allowed General Unsecured Claims.

    b.    *Treatment*: On the Initial Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the beneficial interests in the Settlement Trust, entitling such holder to receive Settlement Trust Recovery Proceeds on account of such interests; *provided* that, on the Initial Effective Date, each holder of a Second Lien Deficiency Claim shall be deemed to have waived any recovery from the Settlement Trust and Settlement Trust Assets on account of and receive no distribution under the Plan with respect to such Second Lien Deficiency Claim; *provided, further*, that the Sponsors shall not be entitled to any recovery under the Plan and shall receive no distribution on account of the Sponsor Management Fee Claims, which Sponsor Management Fee Claims shall either be (i) waived and released by the applicable Sponsors or (ii) Allowed as General Unsecured Claims and contributed by the Sponsors to the Settlement Trust.

    c.    *Voting*: Class 5 is Impaired under the Plan. Each holder of a General Unsecured Claim will be entitled to vote to accept or reject the Plan.

6.    Class 6 – Section 510(b) Claims

    a.    *Classification*: Class 6 consists of all Section 510(b) Claims.

    b.    *Treatment*: On the Final Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery.

    c.    *Voting*: Class 6 is Impaired under the Plan. Each holder of a 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a 510(b) Claim will not be entitled to vote to accept or reject the Plan.

7.    Class 7 – Intercompany Claims

    a.    *Classification*: Class 7 consists of all Intercompany Claims.

    b.    *Treatment*: Intercompany Claims may be Reinstated as of the Final Effective Date or, at the Debtors' or the Reorganized Debtors' option, in consultation with the First Lien Agent and the Second Lien Steering Committee, be cancelled, and no distribution shall be made on account of such Claims.

    c.    *Voting*: Holders of Intercompany Claims are either Unimpaired, and such holders of Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including, without limitation, distributions under the Settlement Trust;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.    hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Initial Effective Date or the Final Effective Date;

21.    enforce all orders previously entered by the Court;

22.    hear any other matter not inconsistent with the Bankruptcy Code;

23.    enter an order concluding or closing the Chapter 11 Cases;

24.    enforce all orders previously entered by the Court, resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of any contract, instrument, release, or other agreement or document that is entered into or delivered pursuant thereto or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents; and

25.    enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

As of the Final Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Facility Documents shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Initial Effective Date or the Final Effective Date, as applicable, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, or the Settlement Trust, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Final Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other

**Exhibit C:**
**Relevant Pages from the Purchase Agreement**

**Execution Copy**

STOCK PURCHASE AGREEMENT

dated as of November 22, 2011

among

TULIP ACQUISITION CORPORATION,

a Delaware corporation,

SAMSON INVESTMENT COMPANY,

a Nevada corporation,

and

THE SELLING STOCKHOLDERS NAMED HEREIN

## ARTICLE II

## SALE AND PURCHASE OF SHARES

2.1     Sale and Purchase of Shares; Redemption of Shares.   Upon the terms and subject to the conditions contained herein, at the Closing:

(a)     each Selling Stockholder agrees to transfer, free and clear of any Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws), to the Company in redemption of such Shares, a portion of the Shares (such portion to be notified to the Selling Stockholders and the Company by the Purchaser not later than five (5) Business Days prior to the Closing) owned by such Selling Stockholder as set forth opposite such Selling Stockholder's name on Annex A hereto, and the Company shall redeem such Shares; and

(b)     each Selling Stockholder agrees to sell, free and clear of any Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws), to Purchaser, and Purchaser agrees to purchase from each Selling Stockholder, the remaining Shares owned by such Selling Stockholder set forth opposite such Selling Stockholder's name on Annex A hereto and not redeemed pursuant to Section 2.1(a) (the "Purchased Shares.")

2.2     Closing Date Payments.  At the Closing:

(a)     Purchaser and the Company, pursuant to Section 2.1 hereof, will collectively pay and deliver the Net Share Consideration to the Selling Stockholders, with the allocation of the Net Share Consideration (including as between cash and shares of Senior Redeemable Preferred Stock) as designated in writing by the Selling Stockholders to the Purchaser not later than five (5) Business Days prior to Closing. The Net Share Consideration shall be paid at Closing by the Purchaser and the Company by wire transfer of immediately available United States funds into accounts designated by the Selling Stockholders, which such account designations shall be made in writing to the Purchaser not later than five (5) Business Days prior to Closing;

(b)     the Company will pay and deliver the Jefferies Payments;

(c)     to the extent not repaid prior to Closing, the Company will pay in full all Indebtedness outstanding under the Credit Facility and the Private Placement Notes; and

(d)     Purchaser shall issue the Senior Redeemable Preferred Stock to the Selling Stockholders free and clear of any Liens or restrictions on transfer (other than any restrictions on transfer or voting included in the certificate of designations attached hereto as Annex C or restrictions on transfer arising under applicable securities Laws) as the Selling Stockholders shall direct in writing to Purchaser not later than five (5) Business Days prior to Closing.

2.3     Stock Appreciation Rights.

(a)     At the Closing, concurrently with the consummation of the purchase, sale and redemption of the Shares, each outstanding SAR granted under the SAR Plan, whether or not then vested, shall fully vest and shall be cancelled and terminated by the Company.

the Company or any Subsidiary of the Company, other than ownership of a passive investment of not more than five percent (5%) of any security traded on a national securities exchange, (ii) owns, directly or through another Person, or has any interest in any property (real or personal, tangible or intangible) that the Company or any Subsidiary of the Company uses in the operation of its business in the ordinary course of business, (iii) has any business dealings or a financial interest in any transaction with the Company or any Subsidiary of the Company or involving any of their assets or property, other than business dealings or transactions conducted in the ordinary course of business at prevailing market prices and on prevailing market terms, (iv) is employed by the Company or any Subsidiary of the Company or (v) is otherwise party to a contract between the Company and its Subsidiaries on the one hand and such Person on the other hand.

3.24    Sufficiency of Assets.    After giving effect to the Gulf Coast and Offshore Reorganization and the Selling Stockholder Transactions, the Company and its Subsidiaries will own or have the valid right to use all of the property and assets necessary to the conduct of the business (other than the Offshore Division business and the Gulf Coast Division business) of the Company and its Subsidiaries as it has been conducted immediately prior to the date hereof, including the properties and assets reflected on the Audited Financial Statements (other than the properties and assets of the Offshore Division business and Gulf Coast Division business and the assets identified on Schedule 10.9 of the Disclosure Schedule).

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE
## SELLING STOCKHOLDERS

Each Selling Stockholder hereby represents, severally and not jointly, to Purchaser that:

4.1    Organization and Standing.    Such Selling Stockholder is a trust, limited liability company or non-profit corporation, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite trust, limited liability company or corporate power and authority to own, lease and operate its properties and to carry on its business.

4.2    Power and Authority; Valid and Binding Agreement.    Such Selling Stockholder has all requisite trust, limited liability company or corporate power, authority and legal capacity to execute and deliver this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by such Selling Stockholder in connection with the consummation of the transactions contemplated by this Agreement (together with this Agreement, the "Selling Stockholder Documents"), and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and each of the Selling Stockholder Documents and the consummation by such Selling Stockholder of the transactions contemplated hereby and thereby have been duly authorized by all required trust, limited liability company or corporate action on the part of such Selling Stockholder.  This Agreement has been, and each of the Selling Stockholder Documents will be at or prior to the Closing, duly and validly executed and delivered by such Selling Stockholder, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement, constitutes, and each Selling Stockholder Document, when

32

so executed and delivered, will constitute, the legal, valid and binding obligation of such Selling Stockholder, enforceable against such Selling Stockholder in accordance with its terms, subject to the Bankruptcy Exception.

4.3    Non-Contravention.    None of the execution and delivery by such Selling Stockholder of this Agreement or the Selling Stockholder Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by such Selling Stockholder with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under, any provision of (i) the trust or limited liability company agreement, charter or bylaws, or other applicable constituent documents of such Selling Stockholder; (ii) any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which such Selling Stockholder is a party or by which any of the properties or assets of such Selling Stockholder are bound, or (iii) assuming compliance with the matters referred to in Section 4.4, any applicable Law binding upon such Selling Stockholder, except in the case of each of clauses (ii) and (iii) above, for any such conflicts, violations, defaults, terminations, or cancellations that would, individually or in the aggregate, prevent or materially delay the consummation of the transactions contemplated by the Selling Stockholder Documents or the ability of such Selling Stockholder to fully perform its covenants and obligations under the Selling Stockholder Documents.

4.4    Required Governmental Consents.    No Consent of any Governmental Authority is required on the part of such Selling Stockholder in connection with the execution, delivery by the Company of the Selling Stockholder Documents and the consummation of the transactions contemplated hereby and thereby, except compliance with any applicable requirements of the HSR Act.

4.5    Ownership and Transfer of Shares.    Such Selling Stockholder is the record and beneficial owner of the Shares indicated as being owned by such Selling Stockholder on Annex A, free and clear of any and all Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws).    Such Selling Stockholder has the trust, limited liability company or corporate power and authority to sell, transfer, assign and deliver such Shares as provided in this Agreement, and the sale, transfer, assignment and delivery of the Purchased Shares will convey to Purchaser good title to the Purchased Shares, free and clear of any and all Liens or restrictions on transfer (other than restrictions on transfer arising under applicable securities Laws).

4.6    Litigation.    There are no Proceedings pending or, to the Knowledge of such Selling Stockholder, threatened that would, individually or in the aggregate, prevent or materially delay the consummation of the transactions contemplated by the Selling Stockholder Documents or the ability of such Selling Stockholder to fully perform its covenants and obligations under the Selling Stockholder Documents.

4.7    Financial Advisors.    No financial advisor, investment banker, broker, finder, agent or other Person has been retained by or is authorized to act on behalf of such Selling Stockholder who is entitled to any financial advisor's, investment banking, brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement.

DLI-6376668v14

6.2     Restrictions on Certain Actions.  Without limiting the generality or effect of Section 6.1, except as described in Article VII and Section 10.9, from and after the date of this Agreement and prior to the Closing, the Company will not, and will cause each of its Subsidiaries not to, take any of the following actions without the prior written consent of Purchaser (which consent will not be unreasonably withheld, conditioned or delayed in respect of the matters in clauses (f) through (r)):

(a)     amend its Governing Documents;

(b)     issue, sell or deliver any Company Securities or Subsidiary Securities;

(c)     redeem, purchase or otherwise acquire any of the Shares or any other outstanding Company Securities or Subsidiary Securities or declare, set aside, make or pay any dividend or other distribution, whether payable in cash, stock, property or otherwise, in respect of the Shares or any other Company Securities or Subsidiary Securities, other than in connection with the settlement of outstanding SARs granted under the SAR Plan to the extent any payments to settle such outstanding SARs are included in clause (i) of the definition of "Adjustments to Purchase Price";

(d)     adjust, split, combine, subdivide or reclassify the Shares or any other Company Securities or Subsidiary Securities;

(e)     enter into any agreement with respect to the sale, voting, registration or repurchase of the Shares or any other Company Securities or Subsidiary Securities;

(f)     (i) (A) create, incur, guarantee or assume any indebtedness for borrowed money or (B) otherwise become liable or responsible for the obligations of any other Person, other than in the ordinary course of business, (ii) make any loans, advances or capital contributions to, or investments in, any other Person, other than employee advances in the ordinary course of business, (iii) pledge or otherwise encumber shares of capital stock or other equity securities of the Company or any Subsidiary of the Company, (iv) mortgage or pledge any of the assets, tangible or intangible, of the Company or any Subsidiary of the Company (except for customary Liens contained in or arising under Oil and Gas Agreements binding on the Company or any Subsidiary of the Company with respect to amounts not yet due or not yet delinquent, and statutory Liens for amounts not yet due or not yet delinquent) or (v) enter into any new, or terminate any existing, Hedge arrangements except as otherwise agreed by Purchaser in writing;

(g)     (i) except as may be required by applicable Law or the terms of the applicable Employee Benefit Plan, amend in any material respect or terminate any Employee Benefit Plan or adopt any material bonus, profit sharing, compensation, severance, termination, stock option, stock appreciation right, restricted stock, performance unit, stock equivalent, stock purchase, pension, retirement, deferred compensation, employment, or other employee benefit agreement, trust, plan, fund or other arrangement for the benefit or welfare of any director, officer or employee, (ii) materially increase in any manner the compensation or fringe benefits of any director, officer or employee, (iii) pay to any director, officer or employee any material benefit not required by any Employee Benefit Plan or other agreement as in effect on the date hereof or

(iv) lower the retirement age for any employee for purposes of the Company's retiree welfare programs;

(h)    acquire, sell, lease, transfer or otherwise dispose of, directly or indirectly, any assets, except for (i) sales of Hydrocarbons, entering into Leases, or acquisitions or sales of Properties, in each case, in the ordinary course of business consistent with past practices, (ii) purchase or sales of inventory or equipment in the ordinary course of business; (iii) sales of excess or obsolete assets in the ordinary course of business; (iv) acquisitions of seismic, geophysical, geotechnical or similar data; and (v) acquisitions, sales, leases, transfers or dispositions of any other assets not exceeding $10 million in the aggregate;

(i)    acquire (by merger, consolidation or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or any division thereof;

(j)    except for capital expenditures related to an Emergency, an event of Force Majeure, or as required on a non-discretionary basis pursuant to the terms of any Lease or Oil and Gas Agreement, make any capital expenditure which is in excess of the amount contemplated by the 2012 capital expenditures budget and updates thereto through the date of this Agreement, as included in Section 6.2(j) of the Disclosure Schedule, by $10 million individually or $25 million in the aggregate;

(k)    make, change or revoke any Tax election except elections consistent with past practices and which are required to be made in connection with Tax Returns filed for any Tax period ending prior to the Closing Date, adopt or change an annual accounting period, adopt or change any accounting method with respect to Taxes, file any amended Tax Return, enter into any closing agreement, settle or compromise any Proceeding with respect to any Tax claim or assessment relating to the Company or any Subsidiary of the Company, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period with respect to Taxes;

(l)    change any of the accounting principles or practices used by it, except for any change required by reason of a concurrent change in generally accepted accounting principles;

(m)    except in the ordinary course of business consistent with past practice (but only after consulting with Purchaser), enter into, renew, extend, amend in any material respect, or terminate any Material Contract or any contract that would be a Material Contract if in existence on the date hereof;

(n)    waive, release, assign, settle or compromise any claim, action or proceeding, other than waivers, releases, assignments, settlements or compromises not exceeding the amount for which an accounting reserve has been established by the Company, or that involve only the payment of monetary damages not in excess of (i) the amount accrued in respect thereof in the Audited Financial Statements or (ii) if not so accrued, $2.5 million individually or $10 million in the aggregate (excluding amounts to be paid under insurance policies);

(o)    except as herein contemplated, adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of such entity;

40

(p)    with respect to any material Lease or Well, voluntarily resign or transfer operatorship, except in connection with dispositions of Leases or Wells;

(q)    make any transfers of property or assets to any Affiliate of the Company, other than (i) intercompany transfers of properties and assets among the Company and its Subsidiaries (excluding Lone Star, Offshore and Concorde), (ii) transfers of cash among the Company and its Subsidiaries in the ordinary course of business consistent with past practice, and (iii) transfers in accordance with or related to the Gulf Coast and Offshore Reorganization and the Selling Stockholder Transaction, including settlement of any outstanding intercompany account balances;

(r)    authorize or propose, or agree, in writing or otherwise, to take any of the actions described in this Section 6.2; or

(s)    intentionally take or omit any action that would (i) cause any representation or warranty made by the Company in this Agreement to be untrue, (ii) result in a breach of any covenant made by the Company in this Agreement, or (iii) have a Material Adverse Effect

6.3    Additional Actions.    Except for actions required under the terms of this Agreement, none of the parties hereto shall intentionally take or permit any of its Affiliates to take any action that is reasonably likely to prevent or delay in any material respect the consummation of the transactions contemplated hereby.

## ARTICLE VII

## GULF COAST AND OFFSHORE REORGANIZATION

The assets and liabilities of the Company's Offshore Division and Gulf Coast Division, to the extent referenced in Section 7.1 of the Disclosure Schedule, including the equity interests in Offshore, Lone Star and Concorde, shall be and are excluded from the transactions contemplated by this Agreement. Prior to Closing, the Gulf Coast and Offshore Reorganization transactions between the Company, its Subsidiaries and Schusterman shall occur as set forth in this Article VII.

7.1    Corporate Actions.

(a)    Newco.    Prior to Closing, the Company shall cause Samson Holdings Inc. and Samson Resources Company to form a new Delaware limited liability company ("Newco") under the name "Samson LS, LLC" with Samson Holdings Inc. holding 99% of the membership interests in Newco and Samson Resources Company holding 1% of the membership interests in Newco. Samson Holdings Inc. and Samson Resources Company shall contribute their interests in Lone Star to Newco.

(b)    Offshore.    Prior to the Closing, the Company shall cause Offshore to be converted from an Oklahoma corporation to an Oklahoma limited liability company.

(c)    Concorde.    Prior to Closing, the Company shall cause Concorde to be converted from a Delaware corporation to a Delaware limited liability company.

41