## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORP., *et al[1]* Reorganized Debtors. | Case No. 15-11934 (BLS) |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST Plaintiff, v. SAMSON ENERGY CO., LLC, *et al.* Defendants. | Adv. Pro. No. 17-51524 (BLS) Re: D.I. 193, 207 |

## OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT UNDER 11 U.S.C. § 546(e)

Before the Court are the Samson Defendants' Motion for Summary Judgment

Under Bankruptcy Code Section 546(e)[2] and the Cross-Motion for Summary

Judgment filed by Peter Kravitz, as Settlement Trustee (the "Trustee") of the Samson

Settlement Trust (the "Trust").[3]  The Samson Defendants assert that § 546(e)

---

[1] The Reorganized Debtors in these chapter 11 cases include: Geodyne Resources, Inc., Samson Contour Energy Co., Samson Contour Energy E&P, LLC, Samson Holdings, Inc., Samson-International, Ltd., Samson Investment Company, Samson Lone Star, LLC, Samson Resources Company, and Samson Resources Corporation.

[2] Adv. D.I. 193 (the "Summary Judgment Motion").  The "Samson Defendants" are defined in footnote 1 of the Samson Defendants' Answer and Specific Defenses (Adv. D.I. 80).  The Court granted summary judgment and dismissed two of those defendants:  Stacy Family Delaware Trust and Schusterman 2008 Delaware Trust by Order Granting in Part and Denying in Part Moving Defendants' Motion for Summary Judgment (Adv. D.I. 86).

[3] Adv. D.I. 207 (the "Cross-Motion").

provides a safe harbor to prevent the Trustee from avoiding alleged constructively fraudulent transfers. In response, the Trustee seeks to dismiss the Samson Defendants' affirmative defense based on § 546(e) on the theory that the safe harbor is not available to debtors.

"Section 546(e) shields certain securities transactions from the trustee's avoidance powers for the purpose of promoting stability and finality in the securities markets."[4] "Congress's intent to minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries . . . reflected a larger purpose memorialized in the . . . broad statutory language defining the transactions covered. That larger purpose was to promot[e] finality . . . and certainty' for investors, by limiting circumstances, e.g., to cases of intentional fraud, under which securities transactions could be unwound."[5]

In *Merit Management*, the Supreme Court recognized Congress's expansion of 546(e) over time, writing:

> Congress amended the securities safe harbor exception over the years, each time expanding the categories of covered transfers or entities. In 1982, Congress expanded the safe harbor to protect margin and settlement payments "made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency." § 4, 96 Stat. 236, codified at 11 U.S.C. § 546(d). Two years later Congress added "financial institution" to the list of protected entities. See § 461(d), 98 Stat. 377, codified at 11 U.S.C. § 546(e). In 2005, Congress

---

[4] *EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 322 (Bankr. D. Del. 2012) (citing *Off'l Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp. (In re Hechinger Co. of Del.)*, 274 B.R. 71, 83-84 (D. Del. 2002)).

[5] *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 92 (2d Cir. 2019) (citing *In re Quebecor World (USA) Inc.*, 719 F.3d 94, 100 (2d Cir. 2013) *abrogated by Merit Mgmt. Grp, LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 200 L.Ed. 2d 183 (2018); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 n. 10 (10th Cir. 1991) *abrogated by Merit Mgmt. Grp, LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 200 L.Ed. 2d 183 (2018) (*quoting* H.Rep. No. 484, 101st Cong. 2d Sess. 2 (1990) *reprinted in* 1990 U.S.C.C.A.N. 223, 224) (internal quotation marks omitted)).

again expanded the list of protected entities to include a "financial participant" (defined as an entity conducting certain high-value transactions). See § 907(b), 119 Stat. 181–182; 11 U.S.C. § 101(22A). And, in 2006, Congress amended the provision to cover transfers made in connection with securities contracts, commodity contracts, and forward contracts. § 5(b)(1), 120 Stat. 2697–2698. The 2006 amendment also modified the statute to its current form by adding the new parenthetical phrase "(or for the benefit of)" after "by or to," so that the safe harbor now covers transfers made "by or to (or for the benefit of)" one of the covered entities. *Id.,* at 2697.[6]

The Trustee here has argued that the safe harbor is intended to protect entities who transact *with* debtors prior to bankruptcy and should not be enlarged to allow a debtor to take refuge therein.  But the above commentary and legislative history instead show that the safe harbor's purpose is to protect securities and commodities markets in certain circumstances regardless of whether the transfers targeted for avoidance were made by creditors or debtors.  A debtor may be a "financial participant" for purposes of § 546(e).  However, the record is not sufficiently developed here to permit the Court to definitively answer whether the specific transfers at issue in this adversary proceeding fall within the safe harbor of § 546(e).  For the reasons set forth herein, the Samson Defendants' Summary Judgment Motion will be granted, in part, and denied, in part.  The Cross-Motion will be denied.

## BACKGROUND AND UNDISPUTED FACTS

From 1971 to 2011, Samson Investment Company and its related entities ("Samson") were a family-owned, Oklahoma-based oil and gas company.  On or about

---

[6] *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 889-90, 200 L.Ed.2d 183 (2018) (footnote omitted).

November 22, 2011, Samson's controlling shareholders entered into a Stock Purchase Agreement (the "SPA") to sell the company via a leveraged buyout (the "LBO"). The SPA was between (i) a newly formed entity, Samson Resources Corporation ( f/k/a Tulip Acquisition Corp. – referred to as "Samson Tulip" herein), owned by the purchasers (a group of investors led by Kohlberg Kravis Roberts & Co. ("KKR")), and (ii) Samson's selling shareholders.

On September 16, 2015 - - nearly four years after the LBO - - Samson Tulip and related entities filed petitions under chapter 11 of the Bankruptcy Code. On February 13, 2017, the Bankruptcy Court entered the Order Confirming Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (the "Plan").[7]

The Plan established the Samson Settlement Trust. Peter Kravitz was appointed Settlement Trustee and tasked with maximizing recoveries for unsecured creditors asserting more than $3 billion of substantially unpaid claims.[8]

On September 15, 2017, the Trustee filed this adversary complaint under Bankruptcy Code § 544 and § 550 to avoid fraudulent transfers made in connection with the LBO.[9]  Those transfers fall into three categories:

a.   **Redemption Cash Transfers**: Debtor, Samson Investment, transferred $2.75 billion in cash to defendants ST, SFT, and the

---

[7] The Order is Main Case D.I. 2019.  The Plan is Main Case D.I. 2005.

[8] Complaint ¶ 1.

[9] By Order dated June 15, 2018, the Court dismissed the counts in the Complaint asserting claims predicated upon intentional fraudulent transfers. Adv. D.I. 61.  By Opinion dated August 30, 2018, the Court granted partial summary judgment and held that certain defendants were released from liability in this adversary proceeding pursuant to the release language in the Plan.  Adv. D.I. 82.

Foundation (the "Selling Shareholders")[10] in partial redemption of their shares.

(b) **Purchase Cash Transfers** – Debtor Samson Tulip transferred $3.5 billion in cash to the Selling Shareholders in consideration of their simultaneous transfer to Samson Tulip of the remaining shares of Samson Investment.

(c) **Asset Transfers**: Samson Investment's divestiture of the Company's Gulf Coast and Offshore Assets and the Selling Shareholder Transaction Assets through a series of transactions whereby three of Samson Investment's subsidiaries (Samson Exploration, Samson Offshore and Samson Concorde) acquired the Gulf Coast and Offshore Assets;[11] Samson Energy then acquired ownership of those three entities and the Selling Shareholder Transaction assets in exchange for the Selling Shareholders' discharge of certain subordinated notes payable to them by Samson Investment.[12]

---

[10] The Selling Shareholders listed in the Complaint are ST 2008 (Delaware) Management LLC ("ST"); SFT (Delaware) Management LLC ("SFT"); and the Charles and Lynn Schusterman Family Foundation (the "Foundation"). Complaint ¶ 11.

[11] The Debtor-transferors included Samson Resources Company, Samson Holdings, Inc., Samson Contour Energy Co., Samson Contour Energy E&P, LLC, Samson LS, LLC, Geodyne Resources, Inc. and Samson-International, Ltd. In their brief, the Samson Defendants argue that Samson Investment should be considered the "actual transferor" of those assets that were divested in the Asset Transfers, even though Samson Investment apparently did not hold title to those assets at the time of the transfer. The Samson Defendants' claim is based on language in the SPA directing Samson Investment to "cause" the transfer of the assets and the argument that if a debtor controls the disposition of assets in the hands of a third party, then those assets may be considered property of the estate. The Samson Defendants, however, provide no convincing reason why a "transferor" under the Code's avoidance sections would be an entity *other than* the one that engages in the act of transferring the assets.

[12] Complaint, ¶ 62.

On August 14, 2018, the Defendants filed their Answer and Specific Defenses, which included the affirmative defense that "[s]ome or all of the transfers sought to be avoided by the [Trustee] are protected from avoidance under 11 U.S.C. § 546(e).[13]

On December 20, 2019, the Samson Defendants filed a motion for leave to file a summary judgment motion.[14] On March 6, 2020, the Court granted that motion and on March 9, 2020, the Defendants filed the Summary Judgment Motion.

On March 30, 2020, the Court entered the Order Approving Stipulation Establishing Briefing Schedule.[15] On October 29, 2020, the Court heard oral argument on the Summary Judgment Motion and Cross-Motion. The motions were taken under advisement.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the cross-motions for summary judgment constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(H) and (O).

## STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

---

[13] Adv. D.I. 80. *See* Ninth Specific and Affirmative Defense. *Id.* at 27.

[14] At the hearing on a previous summary judgment motion in this adversary, the parties entered into a negotiated, proposed case management order providing, in relevant part, that further dispositive motions would require leave of Court. Adv. D.I. 76. This requirement remains in place in the current case management order. Adv. D.I. 250.

[15] Adv. D.I. 204.

fact and the movant is entitled to judgment as a matter of law."[16]  At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[17]

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[18] And "[w]hen the moving party has carried its burden . . .the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*."[19] The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.[20]

## THE PARTIES' ARGUMENTS

The Samson Defendants argue that the transfers are not avoidable because they fall within the safe harbor of § 546(e).  That section provides, in relevant part, as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, **the trustee may not avoid** . . . **a transfer made by ... a ... financial participant ... in connection with a securities contract**, as defined in section 741(7) ... **that is made before the commencement of the case**, except under section 548(a)(1)(A).

---

[16] Fed. R. Civ. P. 56(a).

[17] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[18] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553,  91 L.Ed.2d 265 (1986).

[19] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original) (internal quotation omitted).

[20] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The Samson Defendants claim that each of the transfers were made by a *financial participant* in connection with a *securities contract*. The Defendants assert that Samson Investment is a financial participant, as that term is defined in the Bankruptcy Code, by virtue of its own swap agreements, and the other transferors are financial participants by virtue of their guarantee of Samson Investment's swap agreements.

Further, the Samson Defendants point out that all of the transfers were made in connection with the SPA, which is a securities contract. Sections 2.1 and 2.2 of the SPA contain the parties' promise to sell the Shares upon a defined date (the "Closing") in consideration of the "Cash Transfers." The Asset Transfers were made pursuant to Article VII of the SPA as a condition precedent to completing the Cash Transfers provided for in Article II.

In response, the Trustee argues:

(1)     That Samson Investment and the other debtor transferors cannot be "financial participants" because the Bankruptcy Code's definition of financial participant in § 101(22A) does not include debtors;

(2)     That the transferors have not shown that they were financial participants on the transfer dates;

(3)     That the transferors (other than Samson Investment) cannot be "financial participants" based on their guarantees of the swap agreements; and

(4)     That there are material facts in dispute regarding whether Samson Investment had the requisite amount of qualifying transactions (i.e., agreements of a total gross dollar value of not less than $1 billion in notational or actual principal amount outstanding (aggregated across counterparties), or had gross mark-to-market positions of not less than $100 million (aggregated across counterparties) at the relevant time).

<u>DISCUSSION</u>

(A)    <u>Can a debtor be a financial participant?</u>

The definition of financial participant found in Bankruptcy Code § 101(22A)

can be broken down as follows:

[A]    any entity that

[B.1]    at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, OR

[B.2]    at the time of the date of the filing of the petition,

[C]    has one or more agreements or transactions described in § 561(a):

- [(1) securities contracts, as defined in §741(7),

- (2) commodity contracts, as defined in § 761(4),

- (3) forward contracts,

- (4) repurchase agreements,

- (5) swap agreements,[21] or

- (6) master netting agreements]

[D]    with the debtor or any other entity (other than an affiliate)

[E.1]    of a total gross dollar value of not less than $1,000,000,000 in notational or actual principal amount outstanding (aggregated across counterparties) . . . OR

---

[21] The Samson Defendants assert that it is undisputed that "the Debtors routinely entered into hedging arrangements with certain counterparties to provide partial protection against declines in oil and natural gas prices." Disclosure St. at 35. "[S]uch hedging arrangements often took the form of oil and natural gas price collars and swap agreements." *Id.*; Randolph Decl. ¶ 18. The Samson Defendants further claim that, at all times pertinent to this Motion, Samson Investment's swap agreements consisted of commodity swaps and commodity options. Randolph Decl. ¶ 18, 20. The Defendants assert that the swap agreement counterparties or their affiliates were all lenders on the Debtors' First Lien Credit Facility. Kidder Decl. ¶ 20.

[E.2]   has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) …

[E.3]   at such time [see B.1 or B.2 above] OR on any day during the 15-month period preceding the date of the filing of the petition.

Answering the legal issue of whether a *debtor* can be a financial participant under this definition requires the Court to parse the statutory language.  In short, a financial participant is [A] an entity, [C] who has one or more required agreements [E] in the required amounts, [D] with the debtor or any other entity (other than an affiliate).

The Trustee argues that if a debtor can be a financial participant (i.e., the entity in part [A] of the definition), the language "with the debtor" in the part [D] is redundant or superfluous because Congress only needed to state that the agreements could be "with any other entity."  The court in the *Tribune Fraudulent Conveyance Litigation* agreed with this analysis, writing:

> The Shareholders contend that this definition [in §101(22A] covers any "entity" - - including the debtor - - who enters into a covered transaction with "any other entity."  If the "entity" described in the first part of the definition could include the "debtor," the inclusion of the term "debtor" in the second part would be puzzling.  It would be unusual if not impossible for the debtor to enter into the covered transactions with itself, and the Shareholders have not identified an example of a covered transaction in which that may occur.  Further, if the term "entity" is meant to include the debtor, then it would be redundant to refer to the "the debtor," distinguishing it from "any other entity" in the second part of the definition.  "It is one of the most basic interpretive canons that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[22]

---

[22] *In re Tribune Co. Fraudulent Conveyance Litig.*, 2019 WL 1771786, *9 (S.D.N.Y. Apr. 23, 2019) (quoting *Hedges v. Obama*, 724 F.3d 170, 189 (2nd Cir. 2013)).

On the other hand, the Samson Defendants argue that reading §101(22A) to exclude debtors seeks to rewrite part [A] by adding language (i.e., "an entity *other than the debtor*") or ignores the plain language in [D] that the entity may have the required agreements "with the debtor *or any other entity (other than an affiliate.).*" Another court considering the definition of financial participant in connection with the safe harbor of §546(g)[23] rejected an argument similar to that asserted by this Trustee, writing:

> The key failure of the Trustee's argument is that there is no express language in §101(22A)(A) indicating the definition includes only entities other than the debtor. Put directly, a "financial participant" is "an entity" that has sufficient qualifying transactions "with the debtor or any other entity." . . . The Trustee asks the Court to impute language that does not exist, but the Court is without authority to do so.[24]

Interpreting § 101(22A) begins "where all such inquiries must begin: with the language of the statute itself."[25] "If the text is clear and unambiguous, [the] Court must simply apply it."[26] Two courts have interpreted the definition of financial participant in different ways. Yet, "just because a particular provision may be, by itself, susceptible to differing constructions does not mean that the provision is therefore ambiguous."[27] As the Third Circuit has instructed:

---

[23] Section 546(g) provides: "Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A)."

[24] *Luria. v. Hicks (In re Taylor Bean & Whitaker Mtg. Corp.),* 2017 WL 4736682, *6 (Bankr. M.D. Fla. Mar. 14, 2017) (citing *Puerto Rico v. Franklin California Tax-Free Trust,* 136 S.Ct. 1938, 1949 (2016)).

[25] *In re Denby-Peterson,* 941 F.3d 115, 124 (3d Cir. 2019) (citing *Ransom v. FIA Card Servs., N.A.,* 562 U.S. 61, 69, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011) (internal quotation marks omitted)).

[26] *In re KB Toys Inc.,* 736 F.3d 247, 251 (3d Cir. 2013).

[27] *Price v. Delaware State Police Federal Credit Union (In re Price),* 370 F.3d 362, 369 (3d Cir. 2004) (superseded by statute on other grounds as stated in *In re Miller,* 443 B.R. 54 (Bankr. D. Del. 2011)).

[A]mbiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error.  Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous.[28] **"Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive.[29]** In such situations of unclarity, "[w]here the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived," including pre-Code practice, policy, and legislative history.".[30]

Yet policy, pre-Code practice, and such other tools of construction are to be relied upon only when, ultimately, the meaning of a provision is not plain. When, however, we can arrive at a natural reading of a Code provision, informed not only by the language of the provision itself but also by its context, the burden to persuade us to adopt a different reading is "exceptionally heavy."[31]

The Samson Defendants' argument follows the plain language and context of the statute. Congress has demonstrated repeatedly in the Bankruptcy Code that it knows how to exclude the debtor from defined terms when intended; for example, the definitions of "swap participant".[32] and "repo participant".[33] both require the participant to have the requisite agreements *with the debtor*.  The definition of "financial participant," added in 2005,[34] includes that same language, but expands that language to include entities who have requisite agreements "with the debtor *or*

---

[28] *Price*, 370 F.3d at 369 (citing *Lamie v. United States Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 1031, 157 L.Ed.2d 1024 (2004)).

[29] *Id.* (emphasis added).

[30] *Id.* (quoting *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C.J.)).

[31] *Id.* (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 9, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)).

[32] 11 U.S.C. § 101(53C) ("The term "swap participant" means an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor.").

[33] 11 U.S.C. § 101(46) ("The term 'repo participant' means an entity that, at any time before the filing of the petition, has an outstanding repurchase agreement with the debtor.").

[34] H.R. REP. NO. 109-31(I), 130-31, 2005 U.S.C.C.A.N. 88, 191-92 (Apr. 8, 2005).

*any other entity* (other than an affiliate)."[35] A natural reading of this language

supports a broad interpretation that allows debtors to be included in the definition.

Accordingly, the Court concludes that the plain text and structure of the Code's

definition of financial participant does not exclude debtors.[36]

(B)    Does Samson Investment have agreements in the requisite amount to be a financial participant?

To qualify as a financial participant under the definition in § 101(22A), an

entity must have one or more agreements or transactions:

[E.1]    of a total gross dollar value of not less than $1,000,000,000 in notational or actual principal amount outstanding (aggregated across counterparties) . . .

            OR

---

[35] 11 U.S.C. § 101(22A) (emphasis added).

[36] While the inquiry can end with a natural reading of the text of the statute, it is worth noting that the legislative history and policy underlying § 546(e) do not alter this result. The legislative history of § 101(22A) provides in part that this section:

> adds a new definition of 'financial participant' to limit the potential impact of insolvencies upon other major market participants ... This change will help prevent systemic impact upon the markets from a single failure.

H.R. Rep. No. 109-31(I), 130-31, 2005 U.S.C.C.A.N. 88, 191-92 (Apr. 8, 2005). The Trustee argues that using the phrase "*other* major market participants" demonstrates Congress' intent that the term "financial participant" applies only to creditors – or non-debtors. Those comments specifically discuss adding financial participant to Code sections 362(b)(6), 555, and 556. Congress, however, also added the term "financial participant" to § 546(e), and when that section was enacted in 1982, Congress wrote of its "immediate concern of creditors of bankrupt brokers seeking to unwind payments *by the bankrupt firm* to other brokers" since "[s]uch actions were perceived as creating a danger of 'a ripple effect,' a chain of bankruptcies among brokers disrupting the securities market generally." *Tribune*, 946 F.3d at 92 citing H.R. Rep. No. 97-420 (1982) (emphasis added). This recognizes that Congress intended to minimize market disruptions caused by the avoidance of transfers made *by debtors* who were participants in the markets.

> Congress' intent to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries," reflected a larger purpose memorialized in the legislative history's mention of bankrupt "customers" or "other participant[s]" and in the broad statutory language defining the transactions covered. That larger purpose was to "promot[e] finality ... and certainty" for investors, by limiting the circumstances, e.g., to cases of intentional fraud, under which securities transactions could be unwound.

*Tribune*, 946 F.3d at 92 (citations omitted). Thus, legislative history and the policy underlying § 546(e) support a broad reading of § 546(e) and the term "financial participant" as used therein. The Court does not perceive any violence done to the purpose behind § 546(e) by allowing a debtor to be a "financial participant."

[E.2]    has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) . . .

[E.3]    at such time [that is, (i) at the time the entity enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, OR (ii) at the time of the date of the filing of the petition, OR (iii)] on any day during the 15-month period preceding the date of the filing of the petition.[37]

The Samson Defendants have attached declarations in support of the Summary Judgment Motion to demonstrate that, on the Petition Date (September 16, 2015) and 16 days earlier, Samson Investment had mark-to-market positions on swap agreements of over $100 million. In particular, the Defendants attached a declaration of Shane Randolph, a witness with experience in the oil and gas industry focusing on financial risk management, hedging strategies, and derivatives valuation and reporting since 2006.[38]    Mr. Randolph explained that "Samson Investment entered into oil and natural gas swaps and option contracts (including collars) with counterparties to provide protection against future declines in oil and natural gas prices for their forecasted production volumes."[39]    By reviewing trade confirmations and hedge books maintained by Samson Investment prior to its bankruptcy filing, Mr. Randolph opined that the Company's open hedge positions as of the Petition Date

---

[37] The Trustee argues that the Samson Defendants must prove that Samson Investments had the agreements or transactions in the required amounts *on the date of the transfers at issue.*  The language of § 101(22A) clearly sets forth three dates for measuring the amounts of the agreements or transactions:  (i) at the time the entity enters into an agreement or transaction, or (ii) the date of filing of the petition, or (iii) on any day during the 15-month period preceding the date of the filing of the petition.  However, because the Samson Defendants argue that they had agreements or transactions in the requisite amount on the dates of the transfers, as well as on any of the dates in the statute, this issue appears moot.

[38] Randolph Decl., Adv. D.I. 196, ¶ 2 (sealed).

[39] *Id.* at ¶ 18 (sealed).

14

matched the open positions listed in the hedge book as of August 31, 2015 (the "August Book").[40]    The Samson Defendants noted that Mr. Randolph's determinations are consistent with the Debtors' statements in the Declaration of Philip Cook in support of Chapter 11 Petitions and First Day Motions, and the Debtors' Disclosure Statement.[41]

Mr. Randolph also submitted a supplemental declaration stating that, based on his analysis of the December 2011 Hedge Books and trade confirmations setting forth the material terms of the hedging positions of Samson Investment, he concluded that as of December 21, 2011 (the "Closing Date"), Samson Investment was party to commodity swaps in the requisite amounts.[42]

In response, the Trustee argues that Mr. Randolph's declarations do not contain the factual information necessary to support the Summary Judgment Motion. The Trustee claims that, without seeing the calculations underlying Mr. Randolph's assessment, he cannot determine (i) the volume of open positions Mr. Randolph used to value each contract for the September 16, 2015 and August 31, 2015 mark-to-market positions, (ii) the market prices Mr. Randolph used to ascertain the mark-to-market position in each contract, and (iii) the LIBOR rate Mr. Randolph used as the risk-free rate in determining the mark-to-market positions.[43]    Without this

---

[40] *Id.* at ¶ 20-22 (sealed).

[41] Cook Decl., Main Case D.I. 2, ¶ 54; Disclosure St., Main Case D.I. 1884 at 35 ("As of the Petition Date, the hedges were in the Debtor's favor in an aggregate amount of approximately $105 million.").

[42] Randolph Supp'l Decl., Adv. D.I. 215, at ¶ 4 (sealed).

[43] Trustee Br., Adv. D.I. 208, at 26.

information, the Trustee argues that he cannot verify whether Mr. Randolph's calculations (or methodology) are correct or incorrect.

The Trustee further argues that the Samson Defendants have not authenticated the "hedge books" used by Mr. Randolph. In his reply brief, the Trustee asserts the same deficiencies about Mr. Randolph's supplemental declaration.

When the Samson Defendants sought approval for filing the Summary Judgment Motion, the Trustee argued that the motion was premature due to ongoing discovery, yet the Defendants asserted the Summary Judgment Motion "rests entirely on evidence that is beyond dispute" and "no further development of the record is necessary."[44] The Court cannot agree that the record before it is complete. The Trustee is entitled to depose Mr. Randolph and probe his calculations and his conclusions. Based on the scheduling in this case, the Trustee cannot be faulted for not doing so prior to or as part of the briefing schedule for the Summary Judgment Motion.

Because there is a genuine dispute about the material facts underlying whether Samson Investment had the requisite agreements or transactions to meet the definition of a financial participant in § 101(22A), the Summary Judgment Motion must be denied in part. However, because the record is incomplete, there is no basis to grant the Trustee's Cross-Motion dismissing the Defendants' ninth affirmative defense based on § 546(e). The Trustee's Cross-Motion also must be denied.[45]

---

[44] Def. Reply in Support of Motion for Leave to File Motion for Summary Judgment under Bankruptcy Code § 546(e), Adv. D.I. 183, at 2.

[45] At oral argument, the Trustee suggested that the Court's decision on the legal issues in the Summary Judgment Motion might be advisory if facts were disputed. "Federal courts have no

(C)   <u>Can a guarantor of a swap agreement be a financial participant?</u>

The Samson Defendants argue that Samson Tulip, which made the Purchase Cash Transfer, and the other Debtor-transferors involved in the Asset Transfer are also "financial participants" under § 101(22A) because, as guarantors of Samson Investment's swap agreement liability, Samson Tulip and the other Debtor-transferors are also entities who, on the relevant date, had swap agreements with another entity in the qualifying amounts.   The main premise underlying this argument is that the Code defines "swap agreements" in § 101(53B) to include guarantees as follows:

(53B) The term "swap agreement" –
   (A) means - -
      (i)    any agreement, including the terms and conditions incorporated by reference in such agreement, which is - -
          . . . .
          (VII) a commodity index or a commodity swap, option, future, or forward agreement;
          . . . . or
      (vi)  any security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in clause (i) through (v), ***including any guarantee*** or reimbursement obligation by

---

jurisdiction to render advisory opinions.  Put another way, they 'may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts."   *In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 421(3d Cir. 2013) (quoting *Chafin v. Chafin*, 568 U.S. 165, 133 S.Ct. 1017, 1023, 185 L.Ed.2d 1 (2013)).  The Third Circuit has also determined:

> The precise analytical contours of what constitutes an advisory opinion, however, are less than clear. For example, Fed.R.Civ.P. 12(b)(6) allows a court to resolve certain legal disputes in advance of factual disputes. Even though allowing discovery and conducting a hearing on the facts could have provided an alternative, and perhaps in some sense narrower, ground for resolving the suit, a court can still consider a legal issue that, if decided in the defendant's favor, would be dispositive on a motion to dismiss. Doing so conserves both the court's and the parties' resources.

*McDonald v. Master Fin., Inc. (In re McDonald)*, 205 F.3d 606, 608 (3d Cir. 2000).  The legal issues underlying the § 546(e) dispute as raised in the Summary Judgment Motion certainly affect the rights of the parties here regarding the effect of the safe harbor defense.  Even though some facts are in dispute, they are hardly hypothetical, and resolution of the legal issues may still aid in conserving the court's and the parties' resources.

> or to a swap participant or financial participant in connection with any
> agreement or transaction referred to in any such clause, but not to
> exceed the damages in connection with any such agreement or
> transaction measured in accordance with section 562. [46]

The Samson Defendants argue that because Samson Tulip and the other Debtor-transferors, as guarantors, held "swap agreements," they also fit within the definition of financial participants in § 101(22A).

The Trustee disagrees with the Samson Defendants' claim, arguing that reading § 101(22A) and § 101(53B) together leads to an absurd result that allows any number of entities to gain protection by falling within the definition of financial participant based on the same agreements or transaction. In other words, the Trustee argues that each entity must have the requisite amount of qualifying agreements or transactions on its own.

The plain language of § 101(53B) includes guarantees in the definition of swap agreements, but then limits those guarantees to an amount "not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562." Section 562 provides, in pertinent part:

> If a trustee rejects a swap agreement . . or if a . . . financial participant
> . . . or swap participant liquidates, terminates, or accelerates such
> contract or agreement, damages shall be measured as of the earlier of
> - -
>     (1)    the date of such rejection; or
>     (2)    the date or dates of such liquidation, termination, or
> acceleration. [47]

---

[46] 11 U.S.C. § 101(53B)(A)(i)(VII) and (A)(vi).
[47] 11 U.S.C. § 562(a).

As discussed above, at this point the record is not complete regarding the amount of the requisite agreements and transactions on the appropriate dates. Moreover, there is no information about whether and when such agreements were liquidated, terminated, or accelerated and the impact, if any, of those actions on the amount of the requisite agreements and transactions.  A more developed record is needed before the Court can determine whether Samson Tulip or the other Defendant-transferors, as guarantors of the swap agreements, fit within the definition of "financial participant."  Accordingly, the Court will deny the Samson Defendants' request for summary judgment on the issue of whether Samson Tulip and the other Debtor-transferors fall within the definition of financial participant based upon their swap agreement guarantees.

CONCLUSION

For the reasons set forth above, the Court concludes that (i) the definition of financial participant in Code § 101(22A) does not exclude debtors; (ii) issues of material fact remain to determine whether Samson Investment had agreements or transactions in the requisite amount to meet the definition of "financial participant," and (iii) issues of material fact remain about whether Samson Tulip and the other Debtor-transferors, who guaranteed Samson Investment's swap agreements, meet the definition of "financial participant."

The Samson Defendant's Summary Judgment Motion will be granted, in part, and denied, in part.  The Trustee's Cross-Motion for Summary Judgment will be

denied.  The parties shall confer and submit an appropriate Order consistent with

this Opinion under certification within 14 days of the date hereof.


FOR THE COURT:


BRENDAN LINEHAN SHANNON
United States Bankruptcy Judge


Dated:  December 23, 2020