IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*, | Case No. 15-11934 (BLS) (Jointly Administered) |
| Debtors. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51524 (BLS) |
| v. | |
| SAMSON ENERGY COMPANY, LLC, *et al.* | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF SAMSON DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT UNDER BANKRUPTCY CODE SECTION 546(e)**

David M. Stern (admitted *pro hac vice*)
Robert J. Pfister (admitted *pro hac vice*)
Samuel M. Kidder (admitted *pro hac vice*)
**KTBS LAW LLP, F/K/A KLEE, TUCHIN,
BOGDANOFF & STERN LLP**
1801 Century Park East, 26th Floor
Los Angeles, California 90067
(310) 407-4000

Sabin Willett (admitted *pro hac vice)*
Andrew J. Gallo (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, Massachusetts 02110
(617) 341-7700

Michael R. Nestor
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
(302) 571-6699

Dated:  March 11, 2022

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I. INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

II. RELEVANT PROCEDURAL BACKGROUND ......................................................................4

    A.    The Initial Motion and Opinion .................................................................4

    B.    Discovery Confirms There is No Genuine Dispute That Samson
          Investment is a Financial Participant .........................................................6

III. STATEMENT OF UNDISPUTED FACTS ............................................................8

IV. ARGUMENT ......................................................................................11

    A.    Applicable Legal Standard ..............................................................11

    B.    Samson Investment Was a Financial Participant ..................................................11

          1.    Definition of "Financial Participant" ...............................................11

          2.    Samson Investment Was an "Entity" ...............................................12

          3.    Samson Investment Had Qualifying Transactions on the Petition
               Date and/or within 15 months Prior to the Petition Date..........................12

               a.    Nature of Qualifying Transactions..................................................13

               b.    Measurement Date of Qualifying Transactions .............................13

               c.    Quantification of Qualifying Transactions ...................................15

          4.    The Evidentiary Issues Raised by the Trustee in Connection with
               the Initial Motion Do Not Preclude Summary Judgment .........................17

               a.    Defendants Have Provided to the Trustee All Data
                    Supporting Mr. Randolph's Calculations .....................................17

                b.    The Hedge Books are Authentic, Accurate, and Reliable .............19

               c.    Samson Investment Did Not Terminate Hedging Contracts
                   Between August 31, 2015 and the Petition Date ..........................21

    C.    All of the Challenged Transfers Were Made in Connection with a
          Securities Contract ...............................................................23

V. CONCLUSION ......................................................................................25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bullock v. Brandywine Sch. Dist.*,
    837 F. Supp. 2d 353 (D. Del. 2011) ..................................................................21

*In re Jevic Holding Corp.*,
    2021 WL 1812665 (Bankr. D. Del. May 5, 2021) ...............................................17

*Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*,
    625 B.R. 291 (Bankr. D. Del. 2020) ........................................................... *passim*

*Parker v. Sch. Dist. of Phila.*,
    823 F. App'x 68 (3d Cir. 2020) .........................................................................21

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    505 B.R. 135 (S.D.N.Y. 2013) ..........................................................................24

**Statutes**

11 U.S.C. § 101(15) ...............................................................................................12

11 U.S.C. § 101(41) ...............................................................................................12

11 U.S.C. § 101(22A) ..................................................................................... *passim*

11 U.S.C. § 101(49) ...............................................................................................23

11 U.S.C. § 101(53B) ...................................................................................4, 10, 13

11 U.S.C. § 546(e) ......................................................................................... *passim*

11 U.S.C. § 561(5) .................................................................................................13

11 U.S.C. § 741(7) .................................................................................................23

**Rules**

Fed. R. Bankr. P. 7056 .......................................................................................1, 11

Fed. R. Civ. P. 56 ...............................................................................................1, 11

L.B.R. 7007-1 ..........................................................................................................1

L.B.R. 7007-2 ..........................................................................................................8

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable by Federal Rule of Bankruptcy Procedure 7056, and Local Rule 7007-1, the remaining Defendants[1] submit this memorandum of law, together with the concurrently filed *Second Supplemental Declaration of Shane Randolph* (the "Supplemental Randolph Declaration") and the *Second Supplemental Declaration of Samuel M. Kidder* (the "Supplemental Kidder Declaration"), in support of their motion for partial summary judgment (the "Motion") under Bankruptcy Code section 546(e). In addition, Defendants rely on the *Declaration of Shane Randolph* [Docket No. 196] (the "Initial Randolph Declaration") and the *Declaration of Samuel M. Kidder* [Docket No. 197] (the "Initial Kidder Declaration") filed on March 9, 2020 in support of the *Samson Defendants' Motion for Summary Judgment Under Bankruptcy Code Section 546(e)* [Docket No. 193] (the "Initial Motion").

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

On December 23, 2020, the Court issued its Opinion[2] on the Initial Motion. The Initial Motion sought summary judgment in Defendants' favor on all remaining counts asserted in the Complaint on the grounds that all of the Debtor-transferors were "financial participants" and thus all challenged transfers made by them were safe-harbored by Bankruptcy Code section 546(e).

The Court granted summary judgment in favor of the Defendants on the key issue in dispute: whether a debtor can be a financial participant within the meaning of section 101(22A).

---

[1]  The Court granted summary judgment as to two Defendants: Stacy Family Delaware Trust and Schusterman 2008 Delaware Trust. *Order Granting in Part and Denying in Part Moving Defendants' Motion for Summary Judgment* [Docket No. 86]. Filings in this adversary proceeding are referred to as "Docket No. __." Filings in the main bankruptcy case are referred to as "Bankr. Docket No. __." Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Complaint* [Docket No. 8].

[2]  The "Opinion" refers to the *Opinion Regarding Cross-Motions for Summary Judgment Under 11 U.S.C. § 546(e)* [Docket No. 292]. Subsequent pin cite references to the Opinion are to the published version, *Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*, 625 B.R. 291 (Bankr. D. Del. 2020). The term "Order" refers to the order thereon [Docket No. 294].

*See* 625 B.R. at 301; Order ¶ 1.  The Court left open the question whether Samson Investment

Company ("Samson Investment") or any of the other Debtor-transferors met the statutory

threshold to qualify as financial participants, primarily because the Trustee stated that he lacked

certain data necessary to "verify whether Mr. Randolph's calculations (or methodology) are

correct or incorrect."  *See* 625 B.R. at 303.

     The Trustee has now had the opportunity to probe Mr. Randolph's calculations and

methodology.  Following the Opinion, the parties engaged in expert discovery.  Mr. Randolph

submitted an expert report and was deposed by the Trustee.  Expert discovery having concluded,

it is now clear that there is no genuine dispute as to whether Samson Investment held swap

agreements in the requisite amount to fit within the definition of financial participant, with the

result that all transfers made by Samson Investment are immunized from avoidance under

section 546(e).

     This Motion is narrower than the Initial Motion.  Pursuant to the Scheduling Order, this

Motion is limited to the question whether Samson Investment – and not any of the other Debtor-

transferors – is a financial participant.[3]  It is built on two simple propositions, which together

establish that the transfers by Samson Investment alleged in the Complaint fall into section

546(e)'s safe harbor.

     ***First***, Samson Investment was a "financial participant" as that term is defined in section

101(22A).  Samson Investment was directly a party to Qualifying Transactions (as defined

below) that, as of the Petition Date and on August 31, 2015 (*i.e.*, a "day during the 15-month

period preceding the" Petition Date, 11 U.S.C. § 101(22A(A))), met the statutory threshold of

---

[3]    *See* Docket No. 340 ¶ 2(d).  Whether Debtors other than Samson Investment are financial participants by virtue of their guarantees of Samson Investment's swap agreements is not before the Court on this Motion.

section 101(22A)(A).  Specifically, as of such dates Samson Investment held commodity swaps and commodity options with gross mark-to-market positions of not less than $100,000,000.  *See* Part IV.B, *infra*.  Neither the Trustee nor his retained expert has provided any evidence to the contrary.  *See* Part II.B, *infra*.

> ***Second***, the Redemption Cash Transfer (as defined below) made by Samson Investment[4] was made "in connection with a securities contract" that was "made before the commencement of" the bankruptcy case.  11 U.S.C. § 546(e).  The transfer was made on December 21, 2011, in connection with the SPA,[5] which is indisputably a "securities contract."  *See* Part IV.C, *infra*.

There are no material factual disputes as to either of these propositions.  Each Defendant is alleged either to have received an avoidable transfer from Samson Investment or to be a downstream transferee of such a transfer.[6]  The Court should enter partial summary judgment in favor of all Defendants on the issue whether Samson Investment is a financial participant, based on Defendants' Ninth Specific and Affirmative Defense, with the result that Redemption Cash Transfer is not avoidable.  *See Samson Defendants' Answer and Specific Defenses* [Docket No. 80] at 27.

---

[4]  Defendants also contend that Samson Investment was the functional transferor of the Asset Transfers (as defined in the Initial Memorandum).  *See* Initial Memorandum at 10–13.  The Court disagreed with Defendants' position, *see* 625 B.R. at 296 n.11, and Defendants do not seek to re-litigate that question in connection with the instant Motion.  If the Court determines that Samson Investment is a financial participant and it is ultimately determined that Samson Investment was the transferor with respect to the Asset Transfers, those transfers, too, would be safe-harbored under section 546(e).

[5]  "SPA" refers to the Stock Purchase Agreement, dated as of November 22, 2011, among SRC, Samson Investment, and the Selling Shareholders (each as defined below).  The SPA is referred to as the "Stock Purchase Agreement" in the Complaint.

[6]  Certain of the Defendants have today moved for summary judgment pursuant to the *Motion of [Certain Defendants] for Summary Judgment* (the "Release and Non-Transferee MSJ").  If that motion and this one are granted, the Foundation and Samson Energy will be the only Defendants remaining in the case, with the Foundation's potential exposure being reduced to the $1.145 billion transferred to it by SRC (as defined below).  *See also* note 33.

## II. <u>RELEVANT PROCEDURAL BACKGROUND</u>

### A.    The Initial Motion and Opinion

Given the time that has passed since the Court issued the Opinion, a brief review of the proceedings that culminated in the Opinion is useful.

The Initial Motion sought summary judgment in Defendants' favor on all remaining counts in the Complaint because all of the Debtor-transferors were financial participants within the meaning of Bankruptcy Code section 101(22A) and thus any transfers by them are safe-harbored under Bankruptcy Code section 546(e).  *See, e.g.*, Initial Memorandum[7] at 2–4.  Like the instant Motion, the Initial Motion contended that Samson Investment was a financial participant because it was the counterparty to commodity swaps and commodity options with gross mark-to-market value in excess of $100 million as of the Petition Date (or, alternatively, as of August 31, 2015).  *See* Initial Memorandum at 13–22.  On this point, Defendants relied on the Initial Randolph Declaration, which established the value of Samson Investment's positions as of each of those two dates.  *See id.* (citing Initial Randolph Declaration ¶¶ 37–38).[8]

The Trustee opposed the Initial Motion primarily on legal grounds.  Specifically, the Trustee disputed that the debtor itself can be a financial participant within the meaning of section 101(22A).  *See* Docket No. 208 ("<u>Trustee Opposition</u>") ¶¶ 24–34.  The Trustee also argued that the "time of the transfers" – not the Petition Date or August 31, 2015 – was the appropriate measurement date for determining financial participant status.  *Id.* ¶¶ 35–40.  In addition to these legal arguments, the Trustee raised certain procedural and evidentiary complaints about the

---

[7]    The "<u>Initial Memorandum</u>" refers to the *Memorandum in Support of Samson Defendants' Motion for Summary Judgment Under Bankruptcy Code Section 546(e)* [Docket No. 194].

[8]    The Initial Motion also asserted that all of the other Debtor-transferors were also financial participants by virtue of their guarantees of Samson Investment's swap obligations.  *See id.* at 22–27 (citing, *inter alia*, 11 U.S.C. § 101(53B)(A)(vi)).  Pursuant to the agreed Scheduling Order, Defendants do not reprise that argument here, but preserve it for trial.

Initial Motion and the Initial Randolph Declaration.  The Trustee contended that he did not have sufficient time and/or information to test the veracity of Mr. Randolph's calculations.  *Id.* ¶¶ 47–52.[9]

On December 23, 2020, the Court issued the Opinion.  The Court agreed with Defendants on the key legal question in the Initial Motion, "conclud[ing] that the plain text and structure of the Code's definition of financial participant does not exclude debtors."  625 B.R. at 301.  The Court held, however, that issues of fact may have remained as to whether Samson Investment had Qualifying Transactions in the requisite amount to be a financial participant.  *Id.* at 301–03.  Specifically, the Court gave credence to two evidentiary concerns raised by the Trustee:

- "[T]he Trustee argues that Mr. Randolph's declarations do not contain the factual information necessary to support the Summary Judgment Motion. The Trustee claims that, without seeing the calculations underlying Mr. Randolph's assessment, he cannot determine (i) the volume of open positions Mr. Randolph used to value each contract for the September 16, 2015 and August 31, 2015 mark-to-market positions, (ii) the market prices Mr. Randolph used to ascertain the mark-to-market position in each contract, and (iii) the LIBOR rate Mr. Randolph used as the risk-free rate in determining the mark-to-market positions.  Without this information, the Trustee argues that he cannot verify whether Mr. Randolph's calculations (or methodology) are correct or incorrect."  *Id.* at 302–03.

- "The Trustee further argues that the Samson Defendants have not authenticated the 'hedge books' used by Mr. Randolph."  *Id.* at 303.

For these reasons (and only these reasons), the Court concluded that the record before it was incomplete and held that "[t]he Trustee is entitled to depose Mr. Randolph and probe his calculations and his conclusions."  *Id.*

---

[9]    The Trustee also cross-moved for summary judgment in his favor on Defendants' safe harbor affirmative defense based on the same facts and arguments set forth in opposition to the Initial Motion.  *See* Docket No. 207.

**B.      Discovery Confirms There is No Genuine Dispute That Samson Investment is a Financial Participant**

Mr. Randolph prepared an expert report (the "Randolph Expert Report") dated July 27, 2021.  *See* Supp. Randolph Decl. ¶ 3.  The Randolph Expert Report employed the same analysis and reached the same conclusions as the Initial Randolph Declaration, and included all of the backup data the Trustee asserted should have been included in the Initial Randolph Declaration.  *Id.* ¶¶ 3–4.[10]

The Trustee retained an expert witness, Richard Grove, to rebut the Randolph Expert Report.  Critically, Mr. Grove's report did not in any way challenge Mr. Randolph's conclusions regarding the value of Samson Investment's hedge positions as of the Petition Date and as of August 31, 2015.[11]  Instead, Mr. Grove limited his report to two discrete (and, in Defendants' view, unfounded) critiques of Mr. Randolph's conclusions regarding the value of Samson Investment's positions as of December 21, 2011 (the "Transfer Date") – a date that is not relevant under section 101(22A).  Mr. Grove confirmed in his recent deposition that he has no opinion regarding the value of the Petition Date Positions as of the Petition Date or August 31, 2015.[12]  He further confirmed that any opinion regarding "Mr. Randolph's conclusions about values as of the [P]etition [D]ate and August 31, 2015, would be outside the scope of [Mr.

---

[10]   The Randolph Expert Report also included, in the interest of completeness, calculations demonstrating that Samson Investment met the financial participant thresholds as of the "transfer date" (even though Defendants contend that date is not relevant), consistent with the *[First] Supplemental Declaration of Shane Randolph* [Docket No. 215] filed in response to the Trustee's cross-motion.  Those computations are not relevant to this Motion.

[11]   *See* Feb. 25, 2022 Grove Dep. Tr. ("Grove Transcript") at 60:19–23 (Mr. Grove's agreement that his report "does not express any opinion regarding Mr. Randolph's conclusion about the gross mark-to-market value of [P]etition [D]ate positions as of the [P]etition [D]ate") & 64:4–8 (same regarding Mr. Randolph's conclusions as of August 31, 2015).  Relevant excerpts of the Grove Transcript are attached as Exhibit S105 to the Supplemental Kidder Declaration.

[12]   *See id.* at 60:24–61:25 (Petition Date) & 64:16–19 (August 31, 2015).

Grove's] report."[13]  When pressed, Mr. Grove declined, per his counsel's instructions, to provide

any opinion as to Mr. Randolph's conclusions regarding the Petition Date Positions.[14]  As a

result, Mr. Randolph's calculations of the values of Samson Investment's Petition Date

Positions, both as of the Petition Date and August 31, 2015, are not in genuine (or any) dispute.

      Although Mr. Grove does not challenge Mr. Randolph's calculations as of the Petition

Date and as of August 31, 2015, his report does take issue with Mr. Randolph's methodology for

determining the gross mark-to-market value of Samson Investment's swap agreements as of the

Transfer Date.  *See generally id.* at 210:21–212:10; *see also* Supp. Randolph Decl. ¶¶ 13–14

(summarizing dispute as to methodology).  That dispute is academic for purposes of this Motion,

because (i) the Transfer Date is irrelevant for the reasons set forth below, and (ii) on the Petition

Date and on August 31, 2015, the gross mark-to-market value of the Petition Date Positions

exceeds the statutory threshold (*i.e.*, $100 million) even if Mr. Grove's methodology is utilized.

*See* Supp. Randolph Decl. ¶ 14 & Exs. S103 & S104.  That is presumably why Mr. Grove's

report is silent as to the gross mark-to-market value of the Petition Date Positions.

      The Trustee has now had ample opportunity to probe Mr. Randolph's methodology and

calculations through expert discovery.  The ***only*** error the Trustee has found is a minor

calculation issue with respect to Samson Investment's "extendible option" transactions (the

"Extendible Options"), which Mr. Randolph addressed and resolved through a March 2, 2022

supplement to his expert report.  *See* Supp. Randolph Decl. ¶¶ 5–6.  That issue had a total impact

of just $41,866 in gross mark-to-market value as of the Petition Date and $66,352 in gross mark-

to-market value as of August 31, 2015, *see id.* ¶ 6 – amounts that are not material to the financial

---

[13]  *Id.* at 67:15–19.

[14]  *See id.* at 64:21–66:24.

participant threshold.

In sum, with all fact and expert discovery now concluded, the Trustee has not disputed

Mr. Randolph's conclusion that Samson Investment met the financial participant threshold as of

both the Petition Date and as of August 31, 2015.  It is, therefore, appropriate for the Court to

address the narrow issues left open in the Opinion and hold that Samson Investment is indeed a

financial participant and all transfers by it are unavoidable.

### III.  STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 7007-2(b)(i)(E), Defendants set forth the following as the

undisputed facts supporting relief.

1.    Two of the Debtors, Samson Investment and Samson Resources Corporation, *f/k/a*

Tulip Acquisition Corporation ("SRC"), made cash transfers in the total amount

of $6,316,361,770 to Defendants SFT (Delaware) Management, LLC

("SFTDM"),[15] ST 2008 (Delaware) Management, LLC ("ST 2008"), and the

Foundation (collectively, the Foundation, SFTDM, and ST 2008 are referred to as

the "Selling Shareholders").  Samson Investment was the transferor of $2.75

billion to redeem shares of its stock held by the Selling Shareholders (the

"Redemption Cash Transfer").  Complaint ¶¶ 48 & 110; *see also Declaration of*

*Jeremy Rabinowitz in Support of the Samson Defendants' Motion to Dismiss*

[Docket No. 22] ("Rabinowitz Declaration") ¶¶ 7 & 8.  SRC was the transferor of

$3,566,361,770 to purchase shares of Samson Investment stock held by the

---

[15]    SFT (Delaware) Management, LLC is referred to in the Complaint as "SFT," but that term risks confusion with co-defendant Stacy Family Trust (undefined in the Complaint), and thus the entity is referred to herein and in the Release and Non-Transferee MSJ as SFTDM.  ST 2008 (Delaware) Management, LLC is referred to in the Complaint as "ST," but for clarity is referred to herein and in the Release and Non-Transferee MSJ as "ST 2008."

Selling Shareholders (the "SRC Cash Transfer" and, together with the

Redemption Cash Transfer, the "Cash Transfers").  Complaint ¶¶ 2 & 110;

Rabinowitz Decl. ¶¶ 11 & 12.

2.      The Cash Transfers were made in order to carry out the parties' promises in the

SPA dated as of November 22, 2011, which is a securities contract.  The SPA

provides in Recital C, "The Selling Shareholders desire to sell to Purchaser, and

Purchaser desires to purchase from the Selling Shareholders, [206,323,203 shares

of Samson Investment's common stock]."  Sections 2.1 and 2.2 of the SPA

contain the parties' promises to sell the Shares upon a defined date (the

"Closing") in consideration of the "Cash Transfers."  Complaint ¶¶ 2 & 110;

Rabinowitz Decl. ¶¶ 5, 6, 7, 8, 11 & 12.

3.      The Debtors commenced their chapter 11 cases on September 16, 2015 (the

"Petition Date").  Complaint ¶ 103.

4.      The Debtors were "an independent oil and gas company focused on the

exploration, development, and production of natural gas and oil."  *Disclosure

Statement [Etc.]* [Bankr. Docket No. 1884] ("Disclosure Statement") at 5.  Like

other companies in that sector, "the Debtors routinely entered into hedging

arrangements with certain counterparties to provide partial protection against

declines in oil and natural gas prices."  *Id.* at 35.  "[S]uch hedging arrangements

often took the form of oil and natural gas price collars[16] and swap

agreements[17]."  Disclosure Statement at 35; *see also* Initial Randolph Decl. ¶ 18.

5.    At all times pertinent to this Motion, Samson Investment's swap agreements

consisted of commodity swaps and commodity options.  Initial Randolph Decl.

¶¶ 18 & 20.

6.    "As of the Petition Date, the hedges were in the Debtors' favor in an aggregate

amount of approximately $105 million."  Disclosure Statement at 35; *accord*

*Declaration of Phillip Cook in Support of Chapter 11 Petitions and First Day*

*Motions* [Bankr. Docket No. 2] ("Cook Declaration") ¶ 54; *see also* Initial

Randolph Decl. ¶ 38; Supp. Randolph Decl. ¶ 7.

7.    As of the Petition Date, Samson Investment had gross mark-to-market positions in

commodity swaps and commodity options of a value of $123,425,972.  Supp.

Randolph Decl. ¶ 7.[18]  Even using the methodology espoused by Mr. Grove, the

gross mark-to-market value of Samson Investment's commodity swaps and

commodity options was $112,012,097 as of the Petition Date.  Supp. Randolph

Decl. ¶ 14.

8.    As of August 31, 2015 (*i.e.*, a date within 15 months before the Petition Date),

Samson Investment had gross mark-to-market positions in commodity swaps and

---

[16]    A "price collar" is a combination of commodity options.  *See* Initial Randolph Decl. ¶ 16.

[17]    For purposes of this Motion, the term "swap agreement" is used as defined in the Bankruptcy Code and thus includes, *inter alia*, "commodity swaps" and "commodity options," 11 U.S.C. § 101(53B)(A)(i)(VII), and "any combination" of the foregoing, *id.* § 101(53B)(A)(iii).

[18]    This figure is $41,866 lower than the corresponding amount in the Initial Randolph Declaration.  *See* Initial Randolph Decl. ¶ 36.  The difference is attributable to Mr. Randolph's updated calculations with respect to the Extendible Options.  *See* Supp. Randolph Decl. ¶¶ 6–7.

commodity options of a value of \$120,375,991.  *Id.* ¶ 7.[19]  Even using the

methodology espoused by the Trustee's expert, the gross mark-to-market value of

Samson Investment's commodity swaps and commodity options was

\$109,674,680 as of August 31, 2015.  Supp. Randolph Decl. ¶ 14.

## IV. <u>ARGUMENT</u>

### A.    Applicable Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (made applicable by Rule

7056 of the Federal Rules of Bankruptcy Procedure), summary judgment should be granted if

there is no genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law.  *See* Opinion, 625 B.R. at 297 (surveying and quoting controlling authority).

### B.    Samson Investment Was a Financial Participant

#### 1.    Definition of "Financial Participant"

As the Opinion held:

> The definition of financial participant found in Bankruptcy Code § 101(22A) can
> be broken down as follows:
>
> [A]    any entity that
>
> [B.1]   at the time it enters into a securities contract …
>
>        OR
>
> [B.2]   at the time of the date of the filing of the petition,
>
> [C]    has one or more agreements or transactions described in § 561(a)
>        [including swap agreements][20]
>
> [D]    with the debtor or any other entity (other than an affiliate)

---

[19]    This figure is \$66,352 lower than the corresponding amount in the Initial Randolph Declaration.  *See*
Initial Randolph Decl. ¶ 37.  The difference is attributable to Mr. Randolph's updated calculations
with respect to the Extendible Options.  *See* Supp. Randolph Decl. ¶¶ 6–7.

[20]    Collectively, such agreements or transactions are referred to herein as "<u>Qualifying Transactions</u>."

[E.1]    of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) …

OR

[E.2]    has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) …

[E.3]    at such time [see B.1 or B.2 above] OR on any day during the 15-month period preceding the date of the filing of the petition.

625 B.R. at 298–99 (citing 11 U.S.C. § 101(22A)(A)).[21]

### 2.    Samson Investment Was an "Entity"

Samson Investment was a corporation.[22]  A corporation is an entity.  11 U.S.C. §§ 101(15) & (41).  As a matter of plain text, that ends the inquiry.  The Trustee, however, contended in his opposition to the Initial Motion that "debtors cannot be 'financial participants.'"  Trustee Opp. ¶ 24.  Following extensive briefing and oral argument on this issue, the Court rejected the Trustee's argument and held that, as a matter of law, a debtor can be a financial participant for purposes of sections 101(22A) and 546(e).  *See* 625 B.R. at 301.  Accordingly, Samson Investment qualifies as an "entity" for purposes of the safe harbor.

### 3.    Samson Investment Had Qualifying Transactions on the Petition Date and/or within 15 months Prior to the Petition Date

Section 101(22A) entails three questions that determine whether an entity is a financial participant.  The first is whether the entity had Qualifying Transactions (*i.e.*, element "[C]" of the definition quoted above).  The second is whether it had those Qualifying Transactions on a

---

[21]    The Court added the bracketed letters, which do not appear in the statute, for clarity.

[22]    *See* Voluntary Petition [Docket No. 1], Bankr. Case No. 15-11940.

relevant date (*i.e.*, elements [B], and [E.3]) .  The third is whether the Qualifying Transactions

met a relevant dollar threshold as of such date (*i.e.*, element [E.2]).

### a.       Nature of Qualifying Transactions

On the first question, section 101(22A) includes "swap agreements" within the class of

Qualifying Transactions.  The section cross-references section 561(5), which in turn relies on

section 101(53B)(A).  Section 101(53B)(A) defines "swap agreements" to include, *inter alia*,

"any agreement, including the terms and conditions incorporated by reference in such

agreement, which is … a commodity swap, option, future, or forward agreement."  11 U.S.C.

§ 101(53B)(A)(i)(VII).

The Qualifying Transactions to which Samson Investment was party were commodity

swaps and commodity options.  Initial Randolph Decl. ¶¶ 18 & 20.  Accordingly, Samson

Investment's Qualifying Transactions were all "swap agreements" within the meaning of section

101(53B)(A).  The Trustee did not dispute this point in connection with the Initial Motion.

### b.       Measurement Date of Qualifying Transactions

Among the alternatives for the applicable measurement date are "the date of the filing of

the petition" and "any day during the 15-month period preceding the date of the filing of the

petition …."  11 U.S.C. § 101(22A)(A).

The Initial Randolph Declaration assessed the relevant dollar amounts of Samson

Investment's Qualifying Transactions on September 16, 2015 (the Petition Date) and August 31,

2015 (a date within the 15 months preceding the Petition Date).  Initial Randolph Decl. ¶¶ 36–

37.  Under the plain language of the statute, both of those dates are appropriate dates on which

to measure the value of Samson Investment's Qualifying Transactions.

The Trustee has taken the position, however, that the safe harbor applies only if the

applicable entity had Qualifying Transactions in excess of the statutory threshold ***as of the date***

*of the transfer sought to be avoided* (*i.e.*, the Transfer Date).  *See, e.g.*, Trustee Opp. ¶ 36.

Defendants explained in their opposition to the Trustee's cross-motion for summary judgment

why the Transfer Date is not an appropriate measurement date at all, much less the ***only***

appropriate measurement date.  *See Samson Defendants' Opposition to Trustee's Cross-Motion*

*for Summary Judgment [Etc.]* [Docket No. 214] at 3–8.  In short, the Trustee's "Transfer Date"

theory is directly contrary to the text of the Bankruptcy Code, which defines a "financial

participant" as "an entity that, **[1]** at the time it enters into a securities contract … ***or* [2]** ***at the***

***time of the date of the filing of the petition***, has one or more [swap agreements meeting

applicable dollar thresholds] … at such time or **[3]** ***on any day during the 15-month period***

***preceding the date of the filing of the petition***."  11 U.S.C. § 101(22A) (emphasis added).  The

statute is written in the disjunctive, so any of the three dates will suffice.

The Court noted that the statute "clearly" sets forth three dates ***in the disjunctive*** –

referring to the question whether requisite amounts existed on the Transfer Date as a "moot"

issue, in light of the Defendants' proof concerning "the dates in the statute:"

> The Trustee argues that the Samson Defendants must prove that Samson
> Investment had the agreements or transactions in the required amounts ***on***
> ***the date of the transfers at issue***.  The language of § 101(22A) clearly sets
> forth three dates for measuring the amounts of [Qualifying Transactions]:
> at the time the entity enters into an agreement or transaction, ***or*** (ii) the
> date of filing of the petition, ***or*** (iii) on any day during the 15-month
> period preceding the date of the filing of the petition.  However, because
> the Samson Defendants argue that they had agreements or transactions in
> the requisite amount ***on the dates of the transfers***, ***as well as on any of the***
> ***dates in the statute***, this issue appears moot.

625 B.R. at 302 n.37 (first emphasis in original; second emphasis added).

Although the Court is correct that Defendants contend that Samson Investment met the

statutory thresholds as of the Transfer Date (as well as the dates mentioned in the statute), it

need not consider whether that is in fact a "measurement date," or what the measurement would

be on that date.  The Court was correct in its view that satisfaction of the test on any one of the

dates in the statute is sufficient.  The Trustee's expert, Mr. Grove, disputes Mr. Randolph's

conclusions regarding the values of Samson Investment's Qualifying Transactions as of the

Transfer Date, but he ***does not dispute*** Mr. Randolph's methodology or conclusions regarding

the Petition Date and August 31, 2015.  *See* Part II.B, *supra*.  Thus, if the Court agrees with

Defendants that one or both of the latter two dates is an appropriate date on which to measure

the value of Samson Investment's Qualifying Transactions, it will obviate the need for the Court

and the parties to wade into the expert dispute regarding the relevance or value of Samson

Investment's positions on the Transfer Date.[23]  Accordingly, the Court should apply the statute

as written and reject the Trustee's "Transfer Date" theory.

### c.      Quantification of Qualifying Transactions

The final question is whether the swap agreements met one of the dollar thresholds set

out in section 101(22A)(A).  The statutory dollar value thresholds include, *inter alia*, "gross

mark-to-market positions of not less than $100,000,000" on either the Petition Date or any day

within the 15 months prior to the Petition Date.  There is no genuine dispute that the

$100,000,000 gross mark-to-market value test was met on the Petition Date and on August 31,

2015 (*i.e.*, the end of the month preceding the Petition Date).

Mr. Randolph reviewed all of Samson Investment's trade confirmations, the core

evidence of its swap agreements, to determine the material terms of each swap agreement.  *See*

Initial Randolph Decl. ¶ 20.  Mr. Randolph determined that Samson Investment's open positions

---

[23]    To be clear, this Motion does not seek a determination that Samson Investment met the financial
        participant test as of the Transfer Date.  If the Court determines, contrary to the plain language of the
        statute, that the Transfer Date is the *only* applicable measurement date, the Defendants will prove at
        trial that Samson Investment and all of the other Debtor-transferors were financial participants as of
        the Transfer Date.

in swap agreements on the Petition Date were identical to its open positions on August 31, 2015.

*See id.* ¶ 22.  He concluded that, on the Petition Date and on August 31, 2015, Samson

Investment had gross mark-to-market positions of $123,425,972 and $120,375,991,

respectively.  Supp. Randolph Decl. ¶ 7.

Mr. Randolph's conclusions are corroborated by "hedge books" maintained by Samson

Investment as of August 31, 2015, and September 30, 2015.  Initial Randolph Decl. ¶¶ 21 & 40.

Those hedge books note "net" mark-to-market positions as of August 31, 2015 in excess of

$100 million.  *Id.* ¶ 40 & Ex. J.  As Mr. Randolph explains, the "gross" mark-to-market value of

an entity's positions is necessarily equal to or greater than the "net" mark-to-market value of its

positions.  That is because the calculation of "gross" mark-to-market value measures the

absolute value of each of the entity's positions (*i.e.*, accords equal value to negative and positive

positions), whereas its net position may, in some cases, involve setting off "in the money"

against "out of the money" positions.  *See id.* ¶¶ 30–34.  Accordingly, a swap agreement

portfolio with a net mark-to-market value of at least $100,000,000 necessarily has a gross mark-

to-market value of at least $100,000,000.  *Id.*

Mr. Randolph's determinations are consistent with what the Debtors themselves advised

the Court in filings that this Court accepted – the Cook Declaration and the Disclosure

Statement – in granting relief, including plan confirmation.  Specifically, the Debtors and Mr.

Cook represented that "[a]s of the Petition Date, the hedges were in the Debtors' favor in an

aggregate amount of approximately $105 million."  Disclosure Statement at 35; *accord* Cook

Decl. ¶ 54.  The Debtors' statement makes clear that they were quantifying net mark-to-market

values ("in the Debtors' favor"), which, as Mr. Randolph explains, means that the gross mark-to-market value could not be less than those amounts.[24]

As noted above, the Trustee's expert, Mr. Grove, has not disputed Mr. Randolph's calculations and conclusions with respect to the Petition Date and August 31, 2015.  There remains as to those calculations no "genuine issue for trial," 625 B.R. at 305, making them an appropriate predicate upon which to grant summary judgment.

### 4.    The Evidentiary Issues Raised by the Trustee in Connection with the Initial Motion Do Not Preclude Summary Judgment

In opposition to the Initial Motion, the Trustee identified three issues that supposedly created an issue of fact as to the value of Samson Investment's positions on the Petition Date and on August 31, 2015: (i) the Initial Randolph Declaration did not include certain backup data that the Trustee claimed he needed to "verify" Mr. Randolph's calculations; (ii) the Trustee questioned the authenticity and reliability of the hedge books attached to Mr. Randolph's Initial Report; and (iii) the Trustee speculated that Samson Investment might have terminated some of its swap agreements shortly before the Petition Date.  As set forth below, subsequent events have confirmed what Defendants told the Court nearly two years ago: none of these issues is an obstacle to summary judgment.

### a.    Defendants Have Provided to the Trustee All Data Supporting Mr. Randolph's Calculations

The Trustee elected not to depose Mr. Randolph in connection with the Initial Motion[25] and instead opposed the motion on the basis that the Initial Randolph Declaration was

---

[24]    The Debtors' statements bind the Trustee, as his "right to assert claims against the Defendants is derivative of the rights of the Debtors …. The Trustee succeeds to the rights of the Debtors and is bound by the stipulations, admissions and waivers made by the Debtors pre-conversion."  *In re Jevic Holding Corp.*, 2021 WL 1812665, at *8 (Bankr. D. Del. May 5, 2021).  *See also* Initial Memorandum at 21–22.

[25]    *See Declaration of David M. Stern* [Docket No. 224] ¶¶ 5–6.

supposedly missing "numerous pieces of factual information necessary to determine Samson Investment's mark-to-market positions [,] includ[ing] such necessary information as (1) the volume of open position Mr. Randolph used to value each contract for both the September 16, 2015 and the August 31, 2015 mark-to-market positions; (2) the market prices Mr. Randolph used to ascertain the mark-to-market position in each contract; and (3) the LIBOR rate Mr. Randolph used as the risk-free rate in determining the mark-to-market positions." Trustee Opp. ¶ 48. The Trustee asserted that "[w]ithout such calculations, the Trustee cannot independently verify whether Mr. Randolph's calculations (leaving aside his methodology) are correct or incorrect." *Id.*

In response to the Trustee's criticism, Mr. Randolph's expert report attached four exhibits that collectively included all of the underlying data Mr. Randolph used to value the Qualifying Transactions as of the Petition Date and as of August 31, 2015. *See* Supp. Randolph Decl. ¶ 4. Those exhibits (as amended solely to address Mr. Randolph's minor corrections regarding the Extendible Options) are attached to the Supplemental Randolph Declaration as Exhibits S94-A through S97-A. *See id.* ¶¶ 4, 9–11 & Exs. S94-A–S97-A. For each contract that Mr. Randolph valued, Exhibits S94-A through S97-A collectively display, among other things, the volume of open position, the market price, and the risk-free rate that Mr. Randolph used to value such contract. *See id.* ¶¶ 9–10.

All of this data was provided to the Trustee on July 27, 2021, with Mr. Randolph's expert report, thus giving the Trustee access to all the information needed to "independently verify whether Mr. Randolph's calculations (leaving aside his methodology) are correct or incorrect." Trustee Opp. ¶ 48. Despite having access to all of this information, the Trustee's expert, Mr. Grove, does not dispute (indeed, declined even to discuss) Mr. Randolph's

calculations or conclusions with respect to the Petition Date and August 31, 2015.  *See* Part II.B,

*supra*.

### b.    The Hedge Books are Authentic, Accurate, and Reliable

The Trustee criticized Mr. Randolph for relying on "unauthenticated" hedge books to

determine which positions Samson Investment held as of the Petition Date and August 31, 2015.

Trustee Opp. ¶ 50.[26]  The Trustee stated that "Defendants have not provided any evidence that

these documents – which again have not been produced or even identified[27] – were the final

versions of the documents Defendants claim them to be, how they were prepared, or by whom."

*Id.*

The Trustee's arguments about the Hedge Books were a sideshow when first raised in

2020, as confirmed by subsequent developments.  Mr. Randolph did not rely on the Hedge

Books to calculate the gross mark-to-market value of the Qualifying Transactions.  He

determined the terms of Samson Investment's hedge positions by reviewing the actual trade

confirmations setting forth the terms of each position.  *See* Initial Randolph Decl. ¶¶ 19–20.

Those trade confirmations were obtained from Samson Investment's counterparties via third-

party discovery and authenticated by custodian declarations.[28]  Mr. Randolph used the trade

---

[26]   The "hedge books" to which the Trustee referred were the "August Book" and the "September Book" (together, the "Hedge Books"), excerpts of which were attached as Exhibit J and Exhibit K, respectively, to the Initial Randolph Declaration.

[27]   The Hedge Books were both "produced" and "identified" to the Trustee via secure file transfer on or about July 12, 2019 (nine months before the Initial Motion was filed).  The August Book and the September Book were produced by the reorganized debtor, Samson Resources Corporation, and bear Bates labels SAMDSUB00058107 and SAMDSUB00058108, respectively.  The Bates labels do not appear on the excerpts attached to the Initial Randolph Declaration because the files were produced natively.

[28]   *See* Initial Kidder Decl. ¶ 4 & Exs. Q–BBB (describing how trade confirmations were obtained from third party financial institutions and attaching copies of trade confirmations) & Docket Nos. 172 & 175 (custodian declarations with respect to trade confirmations).

confirmations – not the Hedge Books – to determine the nature and terms of Samson

Investment's Qualifying Transactions.  The Hedge Books corroborate Mr. Randolph's

conclusions, but were not necessary to reach them.

Nevertheless, it is now indisputable that the Hedge Books are authentic and reliable for

the following reasons:

- The transactions and terms listed in the Hedge Books are consistent with the trade confirmations reviewed by Mr. Randolph.  In other words, for each trade, the Hedge Books display the same trade terms (term, volume, etc.) as the applicable trade confirmation itself.  This "confirm[s] that [the Hedge Books] accurately record the commercial trade terms of Samson Investment's open hedge positions …."  Initial Randolph Decl. ¶ 22.

- Subsequent to the Opinion, Sharolyn Whiting-Ralston, General Counsel and Corporate Secretary of the reorganized debtors, signed a custodian declaration authenticating the Hedge Books. *See* Docket No. 296.  Ms. Whiting-Ralston certified under oath that the Hedge Books are "the original or duplicate of the original records in the custody of SRC" and were (i) "made at or near the time of the occurrence of the matters set forth therein by – or from information transmitted by – a person with knowledge of those matters," (ii) "kept in the ordinary course of SRC's regularly conducted business activity," and (iii) making such records was a regular practice of that activity."  *Id*.

- Subsequent to the Opinion, the Trustee noticed the deposition of Philip Cook, the Chief Financial Officer of Samson Resources Corporation in 2015. *See* Docket No. 268.  Mr. Cook confirmed the accuracy of the Hedge Books, testifying that protocols were in place to ensure that the Debtors' August 31, 2015 hedge book accurately reflected all open trades entered into prior to August 31, 2015, and the September 30, 2015 hedge book accurately reflected all open trades entered into prior to September 30, 2015.  May 11, 2021 Cook Dep. Tr. ("Cook Transcript") at 182:9–14 & 183:16–20.[29]

---

[29]  Mr. Cook was involved in "[h]edging strategy and putting hedges on" for Samson Investment and was familiar with Samson Investment's processes for updating and maintaining its hedge books. *See* Cook Transcript at 56:4–19 & 181:18–184:12.  He testified that Samson Investment had numerous "controls that gave [him] comfort that what was [in the hedge book] was accurate." *Id*. at 135:6–20 (describing how Samson Investment (i) confirmed its hedge book on a monthly basis with its counterparties, (ii) deployed personnel from its accounting group and its finance group to ensure that the hedge book was accurate; and (iii) "ultimately had auditors that came in and audited our books and records and determined that they were correct.").  Mr. Cook also testified that Samson Investment

*(footnote continued)*

c.    **Samson Investment Did Not Terminate Hedging Contracts Between August 31, 2015 and the Petition Date**

Related to the Trustee's argument about the reliability of the Hedge Books, the Trustee claimed that "Mr. Randolph's [Initial] Declaration does not include evidence that the hedging contracts he relies on were actually open (*i.e.*, not terminated) as of the petition date."  Trustee Opp. ¶ 49.  The Trustee speculated that "[i]t would not be surprising if an insolvent debtor, in the weeks leading up to a bankruptcy filing, terminated in-the-money swap agreements to improve its cash position …." *Id.*

The Trustee's speculation is contrary to all evidence.[30]  To determine which positions were open as of the Petition Date (September 16, 2015), Mr. Randolph compared the August Book (which listed Samson Investment's positions as of August 31, 2015) to the September Book (which listed Samson Investment's positions as of September 30, 2015).  *See* Initial Randolph Decl. ¶ 22.  He confirmed that the (prepetition) August Book and the (postpetition) September Book showed identical open positions, except for five "Terminated Swaps" that appeared in the August Book but not the September Book, indicating that the Terminated Swaps were terminated during the month of September 2015.  *Id.*  Multiple undisputed sources of evidence show that the Terminated Swaps were terminated ***after*** the Petition Date (*i.e.*, they were ***open*** as of the Petition Date):

---

updated its hedge book contemporaneously when it entered into hedging transactions. *See id*. at 135:22–136:2 & 183:3–7.  Relevant excerpts of the Cook Transcript are attached to the Supplemental Kidder Declaration as Exhibit S106.

[30]  It is also legally insufficient to defeat the Motion.  "In response to a summary judgment motion, a litigant cannot rely on suspicions, simple assertions, or conclusory allegations .…  Nor can a summary judgment motion be defeated by speculation and conjecture .…" *Parker v. Sch. Dist. of Phila.*, 823 F. App'x 68, 72 (3d Cir. 2020) (citations omitted); *Bullock v. Brandywine Sch. Dist.*, 837 F. Supp. 2d 353, 364 (D. Del. 2011) ("The non-movant's burden is rigorous: it 'must point to concrete evidence in the record'; mere allegations, conclusions, conjecture and speculation will not defeat summary judgment." (citation omitted)).

- The 2015 Annual Report of Samson Resources Corporation and Subsidiaries (including Samson Investment) (the "Annual Report") states that "three counterparties elected to early terminate certain [commodity derivative contracts] shortly **after** the Bankruptcy Filing …." Initial Randolph Decl. ¶ 24 & Ex. L. The Annual Report's reference to "three counterparties" is consistent with the number of counterparties to the Terminated Swaps. *Id.* ¶ 24;[31] *see also* note 24 (binding effect of statements by Trustee's predecessor).

- Correspondence from Bank of Montreal, one of the three counterparties to the Terminated Swaps, refers to a "Notice of Event of Default and Designation of Early Termination Date dated September 17, 2015" (*i.e.*, the day after the Petition Date), which confirms that the Terminated Swap to which Bank of Montreal was the counterparty was open as of the Petition Date. *See* Initial Kidder Decl., Ex. DD (BMO_000352).

- Mr. Cook testified that he did not recall any terminations of swaps immediately prior to the Petition Date and that Samson Investment did not voluntarily liquidate any of its hedges in the month before the Petition Date. *See* Cook Transcript at 188:6–13 (noting that liquidation of hedges prior to the Petition Date "would have been counter to everyone's view"). Mr. Cook did recall at least one counterparty terminating hedges after the Petition Date, *see id*. at 185:15–21, which is consistent with the Annual Report and the above-referenced Notice of Event of Default from Bank of Montreal dated September 17, 2015.

All of the foregoing establishes that the open positions reflected in the August Book remained open as of the Petition Date and were properly included in Mr. Randolph's calculation of the gross mark-to-market value of Samson Investment's hedge positions as of the Petition Date.[32]

---

[31] Although Mr. Cook did not recall during his May 2021 deposition the particulars of post-petition hedge terminations, he did testify that he participated in the preparation of the Annual Report and believed it was accurate. Cook Transcript at 185:23–187:16.

[32] In any event, even if all of the Terminated Swaps had been terminated before the Petition Date (they were not), it would not matter: Even if those agreements are excluded, Samson Investment was party to swap agreements with gross mark-to-market value of $101,058,682 (*i.e.*, in excess of the $100,000,000 threshold) as of the Petition Date. *See* Supp. Randolph Decl. ¶ 8. If the Terminated Swap with Bank of Montreal (which, as discussed above, was indisputably terminated *after* the Petition Date) is included in the gross mark-to-market calculation and the rest of the Terminated Swaps are excluded, the gross mark-to-market value of Samson Investment's swap agreements was at least $103,919,772 as of the Petition Date. *See id.*

**C.    All of the Challenged Transfers Were Made in Connection with a Securities Contract**

To qualify for the safe harbor, a transfer by or to (or for the benefit of) a financial participant must be made "in connection with a securities contract, as defined in section 741(7)." 11 U.S.C. § 546(e).  Section 741(7) provides that a "'securities contract' means … a contract for the purchase, sale or loan of a security …."  The term "security," in turn, is defined in section 101(49)(A)(ii) to include "stock."

In connection with the Initial Motion, the Trustee did not dispute that all of the challenged transfers, including the Redemption Cash Transfer, were made "in connection with" a securities contract.  Defendants adopt and incorporate by reference the legal argument set out in pages 27–29 of the Initial Memorandum regarding the "in connection with a securities contract" prong of the statute and will not belabor the point here.  In short, this element is satisfied because the SPA was, among other things, a promise to sell common stock for money.  That is the essence of a "securities contract."

As alleged in the Complaint:

> The Stock Purchase Agreement called for the implementation of the transaction through both (1) a stock redemption, in which Samson Investment would redeem its own stock owned by the Selling Shareholders; and (2) a stock sale, in which the Selling Shareholders would sell the remaining stock in Samson Investment to Samson Resources Corporation [*i.e.*, Samson Tulip], a newly formed corporation formed by the Sponsors to own Samson Investment.  The Selling Shareholders would ultimately be paid over $6.3 billion in cash, in addition to preferred stock with an initial aggregate liquidation preference of $180 million.

Complaint ¶ 39; *see also id.* ¶ 48 (further describing stock redemption by Samson Investment).

The Redemption Cash Transfer was made "in connection with" the SPA, in that Samson Investment was contractually obliged to make the transfer by the SPA.  *See* SPA §§ 2.1(a) ("[E]ach Selling Stockholder agrees to transfer … to the Company in redemption of such Shares,

a portion of the Shares … owned by such Selling Stockholder as set forth opposite such Selling Stockholder's name on Annex A hereto, and the Company shall redeem such Shares[.]") & 2.2 (providing payment for the stock being tendered and sold pursuant to sections 2.1(a) and 2.1(b)). Where, as here, the underlying agreement expressly requires the transfer at issue to be made in exchange for common stock, the "in connection with" prong is satisfied. *See, e.g.*, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 505 B.R. 135, 145 (S.D.N.Y. 2013) ("[T]he Court concludes that section 546(g)'s requirement that a transfer be made 'in connection with any swap agreement' simply means that the transfer must be related to such an agreement.").

Accordingly, the Redemption Cash Transfer was indisputably made "in connection with" a securities contract.

*[Remainder of page intentionally left blank]*

## V.  CONCLUSION

Section 546(e) immunizes from avoidance any "transfer … made by … a … financial participant … in connection with a securities contract … that is made before the commencement of the case …."  Samson Investment was a financial participant by virtue of the swap agreements to which it was directly a party.  As there is no genuine dispute as to the material facts, the Court should grant the Motion and enter partial summary judgment in Defendants' on the issue whether Samson Investment is a financial participant such that any challenged transfers made by it, including specifically the Redemption Cash Transfer of $2.75 billion, are safe-harbored and, therefore, unavoidable under section 546(e).[33]

March 11, 2022                                      Respectfully submitted,


                                                   /s/ Michael R. Nestor
David M. Stern (admitted *pro hac vice*)           Michael R. Nestor (No. 3526)
Robert J. Pfister (admitted *pro hac vice*)        YOUNG CONAWAY STARGATT & TAYLOR, LLP
KTBS LAW LLP, F/K/A KLEE, TUCHIN,                   Rodney Square, 1000 North King Street
BOGDANOFF & STERN LLP                              Wilmington, Delaware 19801
1801 Century Park East, 26th Floor                 (302) 571-6699
Los Angeles, California 90067
(310) 407-4000                                     Sabin Willett (admitted *pro hac vice*)
                                                   Andrew J. Gallo (admitted *pro hac vice*)
                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                   One Federal Street
                                                   Boston, Massachusetts 02110
                                                   (617) 341-7700


                          *Counsel for Defendants*

---

[33] Two of the recipients of the $2.75 billion Redemption Cash Transfer – SFTDM and ST 2008 – were completely released under the Plan, as set forth in the Release and Non-Transferee MSJ.  Assuming summary judgment is granted in full in favor of SFTDM and ST 2008 pursuant to the Release and Non-Transferee MSJ, the distinct impact of this Motion will be to eliminate approximately $956 million of the claim against the Foundation (*i.e.*, the portion of the Redemption Cash Transfer that the Foundation received), reducing that claim to approximately $1.145 billion.  *See* Complaint ¶ 110; *see also* note 6.