## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*, | Case No. 15-11934 (BLS)<br>(Jointly Administered) |
| Debtors. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51524 (BLS) |
| v. | |
| SAMSON ENERGY COMPANY, LLC, *et al.*, | |
| Defendants. | |

### SECOND SUPPLEMENTAL DECLARATION OF SAMUEL M. KIDDER

I, Samuel M. Kidder, hereby declare as follows:

1.      I am a partner in the law firm of KTBS Law LLP, f/k/a Klee, Tuchin, Bogdanoff & Stern LLP, co-counsel to the remaining defendants (the "Defendants") in the above-captioned adversary proceeding (the "Adversary Proceeding").  I have been admitted *pro hac vice* in the Adversary Proceeding.

2.      I have personal knowledge of all statements made herein and if called upon to testify, I could and would testify competently to the facts set forth herein.

3.      On February 25, 2022, I took the remote deposition of Richard Grove.  True and correct excerpts of the deposition transcript are attached hereto as **Exhibit S105**.  Among other things, Mr. Grove acknowledged that his expert rebuttal report did not express any opinion regarding Mr. Randolph's calculations as of the Petition Date and as of August 31, 2015.  *See* Grove Transcript at 60:19–23 & 64:4–8.  Mr. Grove confirmed that any analysis regarding the

value of Samson's derivatives as of those dates "would be outside the scope" of Mr. Grove's rebuttal report, *id.* at 67:15–19, and that he has no opinion regarding the values as of those dates, *id.* at 60:24–61:25 & 64:16–19.

4.      When Mr. Grove was asked if he knows why his expert report did not address Mr. Randolph's conclusions regarding the Petition Date Positions, his counsel instructed him not to answer, on the basis that "any answer to that question would have to reveal the substance of communications with counsel." *See id.* at 64:21–66:9.  Similarly, counsel instructed Mr. Grove not to answer the question whether he was "asked to analyze Mr. Randolph's conclusions as of the [P]etition [D]ate and August 31, 2015." *Id.* at 66:16–24.

5.      On May 11, 2021, I remotely attended the deposition of Philip Cook.  True and correct excerpts of the deposition transcript are attached hereto as **Exhibit S106**.  Mr. Cook was involved in "[h]edging strategy and putting hedges on" for Samson Investment and was familiar with Samson Investment's processes for updating and maintaining its hedge books. *See* Cook Transcript at 56:4–19 & 181:18–184:12.  Among other things, Mr. Cook testified that Samson Investment had numerous "controls that gave [him] comfort that what was [in the hedge book] was accurate." *Id*. at 135:6–20.  Mr. Cook stated that Samson Investment updated its hedge book contemporaneously when it entered into hedging transactions. *See id*. at 135:22–136:2 & 183:3–7.  Accordingly, Mr. Cook testified that the Debtors' August 31, 2015 hedge book would reflect all open trades as of that date, and the September 30, 2015 hedge book would reflect all open trades as of that date. *See id*. at 182:9–14 & 183:16–20.

6.      Mr. Cook also testified that he did not recall any terminations of swaps immediately prior to the Petition Date and that Samson Investment did not voluntarily liquidate any of its hedges in the month before the Petition Date. *See id*. at 188:6–13 (noting that

liquidation of hedges prior to the Petition Date "would have been counter to everyone's view"). Mr. Cook did recall at least one counterparty terminating hedges after the Petition Date. *See id.* at 185:15–21.

I declare under penalty of perjury under the laws of the United States, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct and was executed this 10th day of March, 2022.

Samuel M. Kidder

# Exhibit S105

1      IN THE UNITED STATES BANKRUPTCY COURT

2         FOR THE DISTRICT OF DELAWARE

3

4  _____

                       )

5  In re:  SAMSON RESOURCES  )  Chapter 11

  CORPORATION,          )  Case No.

6                    )  15-11934 (BLS)

  Reorganized Debtor.     )

7  _____)

  PETER KRAVITZ, as       )

8  Settlement Trustee of    )

  and on behalf of the     )  Ad. Pro. No.

9  SAMSON SETTLEMENT TRUST   )  17-51524 (BLS)

                    )

10       Plaintiff,      )

                    )

11  vs.                )

                    )

12  SAMSON ENERGY COMPANY,    )

  LLC, et al.          )

13                    )

       Defendants.     )

14  _____)

15

16        DEPOSITION OF RICHARD GROVE

17         (Via videoconference)

18          February 25, 2022

19

20

21

22

23

24  Reported by:  John L. Harmonson, RPR

25  Job No. 205856

1

2

3

4

5                                    February 25, 2022

6                                    10:01 a.m.

7

8

9          Deposition of RICHARD GROVE, taken via

10   videoconference with the witness and all parties

11   appearing remotely, pursuant to the Federal Rules

12   of Civil Procedure, subject to such stipulations

13   as may be recited herein or attached hereto,

14   before John L. Harmonson, a Registered

15   Professional Reporter and Notary Public of the

16   State of New York, who officiated in

17   administering the oath to the witness.

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2


 3    On behalf of Plaintiff:

 4         White & Case
           1221 Avenue of the Americas
 5         New York, NY 10020
           BY:  Colin West, Esq.
 6              Lijun Zhang, Esq.

 7


 8    On behalf of Defendants:

 9         Morgan, Lewis & Bockius
           One Federal Street
10         Boston, MA 02110
           BY:  Rhonda Yacawych, Esq.

11

12         Klee, Tuchin, Bogdanoff & Stern
           1801 Century Park East
13         Los Angeles, CA 90067
           BY:  Samuel Kidder, Esq.
14              David Stern, Esq.

15

16

17

18

19    ALSO PRESENT:

20         MARK LAUER, ESQ., Samson
           JOSH SCHULTE, Opportune
21         JOEL CORIAT, Videographer

22

23

24

25
```

1                       R. GROVE

2          with the report, I don't want the witness to

3          disclose the substance of communications we

4          had related to matters that aren't contained

5          in your report.  But you can answer the

6          question as asked.

7               THE WITNESS:  In connection with this

8          report, I did not review or use any of the

9          subsequent confirmations that might have

10         existed.

11     BY MR. KIDDER:

12         Q.   Have you reviewed those subsequent

13     confirmations in other capacities?

14               MR. WEST:  And I will instruct the

15          witness not to answer.

16               MR. KIDDER:  We'll reserve rights on

17          that.

18               MR. WEST:  Okay.

19     BY MR. KIDDER:

20         Q.   In connection with this report, did

21     you review any of Samson's hedge books from 2015?

22         A.   Not in connection with this report,

23     no.

24         Q.   In any other context?

25               MR. WEST:  Same instruction.

1                      R. GROVE

2    BY MR. KIDDER:

3         Q.    Let's turn to Paragraph 4 of

4    Mr. Randolph's report.  Let me know when you're

5    there.

6         A.    I'm on Paragraph 4 of Mr. Randolph's

7    report, yes.

8         Q.    And do you see that it says that as of

9    the petition date, the gross mark-to-market value

10   of the petition date positions aggregated across

11   counterparties was $123,467,838?

12        A.    I see that.

13        Q.    Do you understand what Mr. Randolph is

14   referring to when he says petition date

15   positions?

16        A.    I understand that he's referring to

17   positions held by Samson as of September 16,

18   2015.  That's clear from the face of his report.

19        Q.    Your report does not express any

20   opinion regarding Mr. Randolph's conclusion about

21   the gross mark-to-market value of petition date

22   positions as of the petition date, does it?

23        A.    It does not.

24        Q.    Do you have any opinion regarding

25   Mr. Randolph's conclusion as to the gross

Page 61

1                           R. GROVE

2    mark-to-market value of the petition date

3    positions as of the petition date?

4            MR. WEST:  I'll just object, and I

5        want to instruct the witness not to disclose

6        the substance of any communications with

7        counsel.  So that's the instruction.

8            THE WITNESS:  So in answer to the

9        question, I do not have an opinion that I'm

10       expressing in my report.

11   BY MR. KIDDER:

12       Q.    Do you have any opinion at all?

13           MR. WEST:  I'm going to -- well, let

14       me instruct the witness this way:  To the

15       extent that any opinion you may have -- and

16       I just don't know whether the witness does

17       or does not have an opinion.  But to the

18       extent that any opinion you may have is the

19       product of work performed at our direction

20       that is not within the scope of your report,

21       I would instruct the witness not to answer.

22           THE WITNESS:  So I think the answer to

23       the question is I have not formed an opinion

24       with respect to the Paragraph 4 of

25       Mr. Randolph's report.

1                      R. GROVE

2   BY MR. KIDDER:

3        Q.    Do you intend to offer any opinion

4   with respect to the conclusion in Paragraph 4 of

5   Mr. Randolph's report?

6             MR. WEST:  Object to form.

7             Go ahead.

8             THE WITNESS:  Not in the report that I

9        have written thus far.

10  BY MR. KIDDER:

11       Q.    My question was:  Do you intend in the

12  future to offer any opinion regarding the

13  conclusions in Paragraph 4 of Mr. Randolph's

14  report?

15            MR. WEST:  The witness can answer.  I

16       will just again instruct the witness not to

17       disclose the substance of communications we

18       may have had regarding this topic.  But you

19       can answer that question if you know the

20       answer and if you can.

21            THE WITNESS:  So the answer to that

22       question is I don't know.  If I'm

23       instructed, asked to do so and I'm able to

24       do so, I would be prepared to do so.  But I

25       have not included any opinion in my report

1                        R. GROVE

2        with respect to the petition date positions

3        nor have I formed an opinion as of now on

4        those positions.

5    BY MR. KIDDER:

6        Q.    Have you been asked to offer any

7    opinion regarding the gross mark-to-market value

8    of the petition date positions?

9            MR. WEST:  And just to clarify, I will

10        let him answer if he's been asked to provide

11        an opinion either in the form of a report or

12        in the form of testimony as of today.  You

13        can answer that question.

14            THE WITNESS:  So in answer to that

15        question, I have not been asked to offer an

16        opinion in my report with respect to the

17        petition date positions, nor have I been

18        asked to testify as of now with respect to

19        the petition date positions.

20    BY MR. KIDDER:

21        Q.    Let's look now at Paragraph 5 of

22    Mr. Randolph's report.  Do you see where it says

23    that as of August 31, 2015, the gross

24    mark-to-market value of the petition date

25    positions aggregated across counterparties was

1                         R. GROVE

2    $120,442,343?

3        A.    Yes, I see that.

4        Q.    And your report does not express any

5    opinion regarding Mr. Randolph's conclusion about

6    the gross mark-to-market value of Samson's hedge

7    contracts as of August 31, 2015, does it?

8        A.    That's correct.

9        Q.    Do you have any opinion regarding

10   Mr. Randolph's conclusion as to the gross

11   mark-to-market value as of August 31, 2015?

12            MR. WEST:  I'm just going to give the

13       witness the exact same instruction I gave

14       related to the questions concerning

15       Paragraph 4.

16            THE WITNESS:  So I have not included

17       an opinion with respect to the petition date

18       positions as of August 31, 2015, nor have I

19       formed an opinion at this point.

20   BY MR. KIDDER:

21       Q.    Do you know why your report doesn't

22   respond to Mr. Randolph's conclusions about

23   values as of the petition date and August 31,

24   2015?

25            MR. WEST:  Objection.

1                    R. GROVE

2         To the extent you can answer without

3    disclosing the substance of communications

4    with counsel, you can.  But you should

5    exclude from your answer any knowledge you

6    may have one way or the other that is based

7    on conversations with counsel.

8         And let me put it this way.  I'm going

9    to be a little more clear.  I'm not going to

10   let the witness testify today about the

11   decisions made in coordination with counsel

12   regarding the scope of his opinion if that's

13   what you're getting at.  So -- and I think

14   you are.  So with that understanding, I'm

15   going to direct the witness not to answer

16   that question.

17        MR. KIDDER:  I'm not asking for the

18   substance of any communications with

19   counsel.  I'm just asking if he knows -- if

20   he knows why his report does not address

21   Mr. Randolph's conclusions about values as

22   of the petition date and August 31, 2015.

23        MR. WEST:  Yeah, I just happen to know

24   that any answer to that question would have

25   to reveal the substance of communications

1                         R. GROVE

2          with counsel.  So I'm going to instruct the

3          witness not to answer as to decisions made

4          regarding the scope, which I know personally

5          were made in coordination with counsel.

6     BY MR. KIDDER:

7          Q.    Mr. Grove, are you going to follow

8     your counsel's instruction?

9          A.    I am.

10         Q.    Were you asked to analyze

11    Mr. Randolph's conclusions as of the petition

12    date and August 31, 2015?

13              MR. WEST:  Objection and instruct the

14         witness not to answer.

15    BY MR. KIDDER:

16         Q.    Did you review Mr. Randolph's

17    calculations regarding the gross mark-to-market

18    value of Samson's derivatives as of the petition

19    date and as of August 31, 2015?

20              MR. WEST:  Objection.  And I will

21         instruct the witness not to answer to the

22         extent he may or may not have reviewed the

23         positions at the direction of or in

24         coordination with counsel.

25    BY MR. KIDDER:

1                        R. GROVE

2        Q.    In connection with this report, did

3    you review Mr. Randolph's calculations regarding

4    the gross mark-to-market value of Samson's

5    derivatives as of the petition date and

6    August 31, 2015?

7                MR. WEST:  I think now phrased that

8          way, Mr. Grove, you can answer that

9          question.

10               THE WITNESS:  In connection with this

11         report, the scope of this report, I did not

12         need to review Mr. Randolph's calculations

13         as of August 31, 2015.

14   BY MR. KIDDER:

15       Q.    So any opinion you may or may not have

16   about Mr. Randolph's conclusions about values as

17   of the petition date and August 31, 2015, would

18   be outside the scope of this report?

19       A.    That is correct.

20       Q.    In connection with this report, did

21   you look for errors in Mr. Randolph's

22   calculations as of the petition date and

23   August 31, 2015?

24               MR. WEST:  Phrased like that, once

25         again you can answer the question.  Don't

1                        R. GROVE

2    point of view to look at the gross mark-to-market

3    value of a portfolio.

4         Q.    Is gross mark-to-market reporting used

5    for regulatory reporting?

6         A.    It is.

7         Q.    Is it used for financial reporting?

8         A.    Typically reporting is on the basis

9    of -- again, where netting is enforceable, where

10   counterparties are subject to laws of the sort in

11   the United States that recognize and enforce the

12   contractual netting provisions of ISDA, typically

13   those exposures are reported agreement by

14   agreement on a net basis, not on a gross basis.

15              If one had exposures to a counterparty

16   in a jurisdiction like the People's Republic of

17   China, for example, where netting is not

18   recognized to be enforceable, it would be another

19   story.  But in the United States, that would not

20   be used typically.

21        Q.    Can you please generally summarize the

22   difference between your methodology and

23   Mr. Randolph's methodology when it comes to

24   calculating the gross mark-to-market value of

25   Samson's hedge transactions?

1              R. GROVE

2         MR. WEST:  Object to form.

3         THE WITNESS:  So Mr. Randolph has

4    calculated on a transaction-by-transaction

5    basis the positive value and negative value

6    as the case may be of each of the individual

7    transactions.  And he has then summed those

8    calculations to come up with a total gross

9    number.

10         I have used his valuations, those

11   positives and negatives, but I've calculated

12   the gross mark-to-market agreement by

13   agreement in recognition that the

14   transactions with each of Samson's

15   counterparties was entered into under a

16   single master agreement which by its terms

17   states that each of the agreements and all

18   of the transactions under that agreement

19   constitute a single agreement.

20         So my methodology nets the

21   transactions with each of Samson's

22   counterparties to calculate the

23   mark-to-market value of each of those

24   agreements and then takes the -- because

25   we're talking about a gross total, it takes

1                      R. GROVE

2         the absolute value of the marks of each of

3         those agreements and sums them up.

4    BY MR. KIDDER:

5         Q.    And when you talk about Samson's

6    master agreements, you're referring to ISDA

7    agreements; correct?

8         A.    ISDA agreements between Samson and its

9    various bank counterparties, yes.  All ISDA

10   agreements is the master agreements.

11        Q.    And I think we may have covered this

12   earlier but I'll ask again.  Is it possible to

13   have multiple swap agreements under the same ISDA

14   agreement?

15        A.    It's possible to have multiple

16   transactions.  That's the term that ISDA uses,

17   multiple transactions under a single agreement.

18   In fact, an ISDA master agreement can have

19   anywhere from one to an infinite number of

20   transactions entered into under that umbrella

21   master agreement, all of which then constitute a

22   single agreement.

23        Q.    So you could have, for example, one

24   swap transaction and one option transaction under

25   the same ISDA agreement?

1

2                    REPORTER CERTIFICATE

3

4    STATE OF NEW YORK:

5

6         I, JOHN L. HARMONSON, a Notary Public for

7    and within the State of New York, do hereby

8    certify:

9         That RICHARD GROVE, the witness whose

10   examination is hereinbefore set forth, was duly

11   sworn and that such examination is a true record

12   of the testimony given.

13        That prior to the conclusion of the

14   deposition, review and signature of the

15   transcript was requested.

16        I further certify that I am not related to

17   any of the parties to this action and that I am

18   in no way interested in the outcome of this

19   matter.

20        IN WITNESS WHEREOF, I have hereunto set my

21   hand this 1st day of March, 2022.

22

23                      *John L. Harmonson*

24   _____
                      John L. Harmonson

25

# Exhibit S106

1          IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF DELAWARE
2
     In re:  SAMSON           §
3    RESOURCES CORPORATION,    §    Chapter 11
                               §    Case No.
4    Reorganized Debtor.       §    15-11934 (BLS)
                               §
5                              §
                               §
     PETER KRAVITZ, as         §
6    Settlement Trustee of     §
     and on behalf of the      §
7    SAMSON SETTLEMENT TRUST    §
                               §
8              Plaintiff       §    Ad. Pro. No.
                               §    17-51524 (BLS)
9    VS.                       §
                               §
10   SAMSON ENERGY COMPANY,    §
     LLC, et al.               §
11                             §
               Defendants      §
12   _____ §

13

14

15

16          REMOTE VIDEOTAPED DEPOSITION OF

17                    PHILIP COOK

18                   Dallas, Texas

19              Tuesday, May 11, 2021

20

21

22

23    Reported by:

24    MICHEAL A. JOHNSON, RDR, CRR

25    JOB NO. 192335

 1

 2                    May 11, 2021

 3                    9:13 a.m.

 4

 5

 6        Remote Videotaped Deposition of PHILIP

 7   COOK, held at the location of the witness, Dallas,

 8   Texas, before Micheal A. Johnson, a Registered

 9   Diplomate Reporter, Certified Realtime Reporter,

10   and Notary Public of the State of Texas.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              REMOTE APPEARANCES

2   WHITE & CASE
    Attorneys for Plaintiff
3        1221 Avenue of the Americas
         New York, NY 10020
4   BY:   COLIN WEST, ESQ.
          LINDSEY CHERNER, ESQ.
5

6

7   MORGAN LEWIS & BOCKIUS
    Attorneys for Defendants
8        One Federal Street
         Boston, MA 02110
9   BY:   P. SABIN WILLETT, ESQ.
          RHONDA JO YACAWYCH, ESQ.
10        NAKISHA DUNCAN, ESQ.

11

12
    KTBS LAW
13  Attorney for Defendants
         1801 Century Park East
14       Los Angeles, CA 90067
    BY:   SAMUEL KIDDER, ESQ.
15

16
    ATTORNEY AT LAW
17  Attorney for the Witness
         6911 Brookshire Drive
18       Dallas, TX 75230
    BY:   REGINA HIMELFARB, ESQ.
19

20
    VIDEOGRAPHER:
21
         Mark Von Lanken
22

23  ALSO PRESENT:

24       Mark Lauer, Samson General Counsel

25
```

1                 P. COOK - 5/11/2021

2         A.    No.

3         Q.    Do you ever recall any discussions

4    about the company's hedging program in 2012 not

5    achieving the prices that had been projected at

6    the time of the LBO?

7         A.    No.  I mean, no, that's an odd

8    question, but no.

9         Q.    Okay.  Well, let me back up a little

10   bit.  Did you have any understanding that at the

11   time of the LBO, KKR had made certain assumptions

12   about the prices and the levels of its expected

13   hedges?

14        A.    Well, we were hedged when I got there.

15   I don't know what their expectations were with

16   respect to where they could put the hedges in

17   place at, but the market's the market.  So I don't

18   know what their expectations were versus where we

19   were hedged.

20        Q.    Right.  I mean, that was going to be

21   my next question.  Did you ever recall any

22   discussions of the prices at which the hedges were

23   ultimately put in place, being much lower than

24   what KKR had been -- had projected at the time of

25   the LBO?

1                    P. COOK - 5/11/2021

2         A.   No, never had that conversation, to my

3    knowledge anyway.

4         Q.   What involvement did you personally

5    have with the company's hedging program during the

6    time -- during the entire time you were CFO up

7    until the bankruptcy?

8         A.   So hedging when I got there was the

9    responsibility of the marketing group, which

10   reported directly to Dave Adams.  After the

11   reorganization at the beginning of 2012, the

12   marketing group reported to me.  And so I was

13   involved in hedging activities from sort of that

14   point in time forward.

15        Q.   When you said you were involved in

16   hedging activities, you were involved in hedging

17   strategy?

18        A.   Hedging strategy and putting hedges

19   on.

20        Q.   Do you -- are you able to summarize

21   for me your overall philosophy as it related to

22   hedging starting from that point when the hedging

23   function started reporting to you?

24        A.   Well, I have a long history of being a

25   hedger, so I'll describe my philosophy as being a

1                    P. COOK - 5/11/2021

2   BY MR. WEST:

3        Q.   Okay.  Do you recall any issue with

4   hedge accounting at the company at the time you

5   joined?

6        A.   No.

7             MR. WEST:  Okay.  That's all I have

8   subject to potential follow-up on Mr. Willett's

9   questions.

10                    EXAMINATION

11  BY MR. WILLETT:

12       Q.   Good afternoon, Mr. Cook.

13       A.   Hello.

14       Q.   Again, my name is Sabin Willett.  I

15  represent the defendants in this case and I wanted

16  to follow up with some questions based on this

17  morning's testimony.

18            If you have it handy, could you find

19  your declaration again, which was Exhibit 589.

20       A.   Okay.

21       Q.   Was this the first time that you

22  submitted a so-called first day affidavit or

23  declaration in a bankruptcy case?

24       A.   Yes.

25       Q.   Did you have an understanding of what

1                    P. COOK - 5/11/2021

2    its significance is in a bankruptcy case?

3        A.    I suppose.  I suppose.

4        Q.    Did you under -- well, strike it.

5             What did you -- you mentioned earlier

6    that you based this in large measure on

7    information that you received from many different

8    sources; is that fair?

9        A.    That's correct.

10       Q.    What did you do to satisfy yourself

11   that the information presented to the court was

12   accurate?

13            MR. WEST:  Objection, form.

14       A.    You know, we had many advisors,

15   lawyers, staff pulling together information and we

16   sat down and met about this document on a number

17   of occasions, reviewed it together.  At the end of

18   the day, it goes to, you know, the knowledge of

19   the people that pulled the information together.

20   BY MR. WILLETT:

21       Q.    So let's turn to page -- sorry,

22   paragraph 54, which is the paragraph that talks

23   about hedging.  Let me know when you're there.

24       A.    Okay.  I'm there.

25       Q.    Okay.  If we go to that sentence about

1                    P. COOK - 5/11/2021

2  hedging, you say:  As of the Petition Date, the

3  hedges currently stand in Samson's favor in an

4  aggregate amount of approximately 105 million.

5            Correct?

6       A.    That's correct.

7       Q.    Now, that's just a reference to open

8  hedges, right?  That doesn't refer to anything

9  that's been terminated?

10       A.    That's correct.

11       Q.    And would that -- I think you said

12  that this was net, by which I understood that was

13  netting out hedges in which you're out of the

14  money against hedges in which you are in the

15  money, right?

16       A.    I'm making that assumption, because it

17  says the aggregate amount.

18       Q.    Yeah.  And is it fair to say that if

19  we took the face amounts of hedges in the money

20  and hedges out of the money and added them

21  together, they would have to be either equal or

22  greater to that $105-million number?

23            MR. WEST:  Objection to form.

24       A.    I'm not sure I understand the

25  question.

1                  P. COOK - 5/11/2021

2  BY MR. WILLETT:

3        Q.   So if you had -- for example, if the

4  books showed at this point hedges in the money of

5  $115 million and hedges out of the money of

6  $10 million, you would have said that you had an

7  aggregate amount of approximately 105 million,

8  right?

9        A.   That's the way I would think about it,

10  yes.

11       Q.   Okay.  So if there were literally no

12  hedges out of the money, then the total of the

13  amount in the money would be the same as the

14  aggregate amount, right?

15            MR. WEST:  Objection.

16       A.   Yes.

17  BY MR. WILLETT:

18       Q.   Okay.  But if there were -- if there

19  were some hedges out of the money, then adding the

20  face amount of out of the money and in the money

21  hedges would have to result in a number greater

22  than 105 million; is that fair?

23            MR. WEST:  Objection.

24       A.   I guess if you take the absolute value

25  of them and add them together, yes.

1                    P. COOK - 5/11/2021

2   BY MR. WILLETT:

3        Q.   Okay.  Now, what did you do to satisfy

4   yourself that this was an accurate statement?

5             MR. WEST:   Objection.

6        A.   So we had a hedge book.  We confirmed

7   our hedge book on a monthly basis with our

8   counterparties.  We, for financial reporting

9   purposes, had these hedges on the financial

10  statements, and the accounting group as well as

11  the finance group were involved in determining

12  that the valuations were correct.

13            We ultimately had auditors that came

14  in and audited our books and records and

15  determined that they were correct.  So we had a

16  whole process around hedges and I really, as I sit

17  here today or even then, would not have questioned

18  what the hedge book told me, because we had

19  controls that gave me comfort that what was there

20  was accurate.

21  BY MR. WILLETT:

22       Q.   So in addition to the controls you

23  mentioned, was it the practice of Samson to input

24  information into the hedge book contemporaneously

25  with when a hedge went on?

1                       P. COOK - 5/11/2021

2           A.   Yes.

3           Q.   And then would you each month adjust

4      the hedge book by whatever the mark to market

5      change was, if any --

6           A.   Yes.

7           Q.   -- from the last month?

8                MR. WEST:  Objection.

9      BY MR. WILLETT:

10          Q.   Now, if you had -- if Samson had not

11     filed for bankruptcy in September 2015 and you had

12     simply wanted to know what is the company's net

13     hedge position today, would you have done anything

14     different than what you did to prepare this

15     declaration?

16               MR. WEST:  Objection.

17          A.   No.

18     BY MR. WILLETT:

19          Q.   Could you turn back to paragraph 4 of

20     the declaration.  Take a moment just to review it

21     to yourself and let me know when you're ready for

22     a question.

23                    (Witness reviews document.)

24          A.   Okay.

25

1                    P. COOK - 5/11/2021

2   carrying in and carrying out when it comes to

3   CAPEX?

4        A.   Yes.

5        Q.   And what does that refer to?

6        A.   I mean, it's a pretty simplistic

7   concept for people that don't do accruals, but it

8   is the amount of capital that is coming into the

9   year from the previous years versus the amount of

10  capital that is going out of the year versus what

11  should have been on the balance sheet.

12       Q.   So in any given financial period,

13  you're going to pay some CAPEX bills that were

14  incurred the previous year, right?

15       A.   Yes.

16       Q.   And you're also going to incur some

17  bills that you don't actually pay and are paid in

18  the next year, right?

19       A.   If your accruals are proper, you

20  should have accounted for it.

21       Q.   Okay.  I wanted to go back to your

22  first day declaration.  I think that is 589.  If

23  you're not able to find it easily, we can put

24  another version in the chat.

25       A.   Got it.

1                    P. COOK - 5/11/2021

2          Q.    I just wanted -- going back to

3    paragraph 54.  I just wanted to confirm that the

4    counterparty on the callers and swap agreements

5    that you're referring to here is -- the direct

6    counterparty is Samson Investment; is that right?

7                MR. WEST:   Objection.

8          A.    Yes, Samson Investment is where the

9    credit facility was.

10   BY MR. WILLETT:

11         Q.    And then there are a number of

12   guarantors who guaranteed that obligation?

13         A.    That's right, all the subsidiaries.

14         Q.    Okay.  Do you know who it was that had

15   input in the hedge book for an actual trade when

16   one was made?

17         A.    Not -- I mean, no, I don't.

18         Q.    Okay.  I think you said earlier that

19   the hedge books were updated at least monthly?

20         A.    Yes.

21         Q.    So this bankruptcy was commenced in

22   September of 2015 between two month ends.  I just

23   wanted to focus on those month ends for a moment.

24                Would the August 31st, 2015, hedge

25   book, the one just before the filing date, have

1                    P. COOK - 5/11/2021

2  been created on or about August 31st?

3              MR. WEST:  Objection.

4        A.   It would have been as of August 31st.

5  BY MR. WILLETT:

6        Q.   So would it have been created shortly

7  after August 31st?

8              MR. WEST:  Objection.

9        A.   I guess -- it's -- yes.  It's a

10 living, breathing document, a hedge book is.  So

11 any hedges that were entered into prior to

12 August 31st would be in that hedge book and

13 anything entered after would be after.

14 BY MR. WILLETT:

15       Q.   So let's see if we can't -- maybe I

16 can improve my understanding.  If somebody enters

17 into a hedge in mid-month, is there a notation

18 made in the hedge book at that point?

19       A.   For that -- if you entered into a

20 hedge, let's say, on August the 15th, you're

21 entering into that hedge in a future month.  So it

22 wouldn't be reflected in the August book.  A hedge

23 that you entered into in July, maybe.

24       Q.   Okay.

25       A.   Depends on what month you're entering

1                    P. COOK - 5/11/2021

2    into the hedge.

3        Q.    Maybe put it this way.  At the point

4    where an actual hedge is entered into, would

5    somebody make an entry into the book for the point

6    where that hedge would become effective?

7        A.    Yes.

8        Q.    And then at each month end, would you

9    revise and update the mark to market?

10       A.    Yes.

11       Q.    And that would have been true after

12   the bankruptcy commenced as well, right?

13            MR. WEST:  Objection.

14       A.    Yes.

15   BY MR. WILLETT:

16       Q.    So the September 30th, 2015, hedge

17   book would have been updated in the same way that

18   the August 31st one was; is that right?

19            MR. WEST:  Objection.

20       A.    Yes.

21   BY MR. WILLETT:

22       Q.    Okay.  You mentioned earlier, and I

23   passed by it quickly, unfortunately, you mentioned

24   the controls that were in place just to be sure

25   that your hedges are recorded accurately.  Can you

1                    P. COOK - 5/11/2021

2   describe those for me again?

3       A.   Our hedge book at Samson was

4   maintained in Excel.  It was compared to on a

5   monthly basis mark to markets that we got from our

6   counterparties.  And it was reconciled to the

7   extent that we were not in balance with our --

8   whatever -- JPMorgan or whoever held the hedge

9   told us.  We had a limited group of people that

10  had access to it.  I don't know what else to say

11  about it.  It was a pretty typical hedge book, not

12  dissimilar to what I have today currently.

13      Q.   And was there any significance in the

14  accuracy of the hedge book to any sort of

15  reporting requirements that you had at Samson?

16           MR. WEST:  Objection.

17      A.   I mean, there are GAAP requirements to

18  how you record hedges, assets and liabilities.

19  BY MR. WILLETT:

20      Q.   And so is it important that the hedge

21  book be accurate so that you can prepare accurate

22  financial statements?

23           MR. WEST:  Objection.

24      A.   Yes.  And is also, obviously, reviewed

25  and audited by our independent auditors.

1                    P. COOK - 5/11/2021

2    BY MR. WILLETT:

3         Q.   And to what extent do the

4    counterparties themselves have access to or at

5    least a view of what you're maintaining in your

6    hedge book?

7         A.   Well, they didn't have our hedge book,

8    but they know what positions we have on with them.

9         Q.   And each month they would, in effect,

10   tell you how they were recording those positions?

11        A.   Yes.

12        Q.   I think you said you recalled one

13   hedge being terminated by a counterparty after the

14   bankruptcy filing.  Was that right?

15        A.   As we -- I think as -- yes, as we

16   filed.  I think it was Goldman.

17        Q.   Okay.  Was it only one?

18        A.   When you say one, I think it was one

19   counterparty.  There may have been multiple

20   hedges.  I don't have a clear recollection of

21   that.

22        Q.   Okay.

23             MR. WILLETT:  Can you, Rhonda, call up

24   SAMDSUB 55727.

25             MS. YACAWYCH:  It's loading now, and

1                    P. COOK - 5/11/2021

2    this will be Exhibit 598.

3                    (Deposition Exhibit 598 marked for

4    identification.)

5    BY MR. WILLETT:

6        Q.    Let me know when you have it,

7    Mr. Cook.

8        A.    I've got it.

9        Q.    Okay.  This appears to be the 2015

10   Annual Report of Samson Resources Corporation and

11   Subsidiaries.

12       A.    Yeah.

13       Q.    Were you still with Samson when this

14   was prepared?

15       A.    Yes.

16       Q.    Okay.  Did you have a role in its

17   preparation?

18       A.    Yes.

19       Q.    All right.  Let's go to page 18.

20       A.    When you say page 18, page 18 of the

21   financial statements or --

22       Q.    Yes.  I think it's page 25 of the PDF.

23   At the top of the page, there's a heading that

24   says Termination of Commodity Derivative

25   Contracts.

1                    P. COOK - 5/11/2021

2         A.    Okay.   This is going to tell us

3    exactly what happened.

4         Q.    Do you have the page?

5         A.    I'm working on it.

6         Q.    Okay.

7         A.    Okay.

8         Q.    Just review the first paragraph to

9    yourself, you don't have to read it out loud, let

10   me know when you've had a chance to do that.

11              (Witness reviews document.)

12        A.    Okay.

13   BY MR. WILLETT:

14        Q.    Okay.   Does this -- I take it this

15   document is accurate, as far as you know?

16        A.    Yes.

17        Q.    No reason to believe that the

18   statement about three terminations is inaccurate,

19   right?

20        A.    No.   But it also doesn't refresh my

21   memory to any extent.

22        Q.    Okay.

23        A.    So just being honest with you.

24        Q.    Well, that's fair enough.   Okay.   If I

25   suggested to you BMO and Morgan Stanley in

1                    P. COOK - 5/11/2021

2    addition to Goldman, would that refresh your

3    memory as to the counterparties that terminated

4    post petition?

5         A.   No.

6         Q.   Okay.  Now, do you recall any

7    terminations of swaps immediately prior to

8    bankruptcy?

9         A.   No.

10        Q.   And did Samson voluntarily liquidate

11   any of its hedges in the month before bankruptcy?

12        A.   I do not believe so.  That would have

13   been counter to everyone's view.

14        Q.   Okay.  What I'd like to do, Mr. Cook,

15   is take a short break, which may help me shorten

16   up what I have left to be able to finish up.  I'm

17   going to actually suggest ten minutes this time,

18   if that's okay with you.

19        A.   Yeah.  Great.  Thank you.

20             MR. WILLETT:  Let's go off the record,

21   then.

22             THE VIDEOGRAPHER:  We are off the

23   record.  The time is 2:47.

24             (Recess taken from 2:47 p.m. CDT to

25   3:01 p.m. CDT)

1                P. COOK - 5/11/2021

2            MR. WILLETT:  Yes.

3            THE VIDEOGRAPHER:  We are off the

4    record.  The time is 3:14.

5                (Deposition concluded at

6    3:14 p.m. CDT)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3    STATE OF _____)
                             )
4                            )   ss.:
                             )
5    COUNTY OF _____)

6

7              I, MICHEAL A. JOHNSON, a Notary

8    Public within and for the State of Texas, do

9    hereby certify:

10             That PHILIP COOK, the witness whose

11   deposition is hereinbefore set forth, was duly

12   sworn by me and that such deposition is a true

13   record of the testimony given by such witness.

14             I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto

19   set my hand this 18th day of May, 2021.

20

21

22   _____

23             MICHEAL A. JOHNSON, RDR, CRR

24

25