# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>SAMSON RESOURCES CORPORATION,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 15-11934 (BLS) |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST;<br><br>Plaintiff,<br>v.<br><br>SAMSON ENERGY COMPANY, LLC, *et al.*,<br><br>Defendants. | Adv. Pro. No. 17-51524 (BLS)<br><br>**Filed Under Seal**<br>**Pursuant to Adv. Pro. D.I. 118** |

## SAMSON SETTLEMENT TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT UNDER BANKRUPTCY CODE SECTION 546(e)

# **TABLE OF CONTENTS**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ........................... 1

SUMMARY OF ARGUMENT .............................................................................................. 1

COUNTER-STATEMENT OF FACTS ................................................................................. 3

ARGUMENT ............................................................................................................................ 7

    I.    In Order to Be a "Transfer Made By a Financial Participant" Under Section 546(e) the Transferor Must Be a Financial Participant on the Transfer Date ......... 7

        A. The Plain Language of Section 546(e) Supports the Trustee's Position ............ 8

        B. The Trustee's Reading Is Consistent with the Rest of the Code ....................... 13

        C. The Trustee's Position is Also Consistent with the Legislative Intent, Which Is Undermined by the Defendants' Reading of Section 546(e) ............................ 14

    II.   There Is a Genuine Issue of Disputed Fact as to Whether SIC Qualified as a Financial Participant as of the Transfer Date. ....................................................... 15

CONCLUSION ....................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Dabney v. Investment Corp. of Am.*,
    82 F.R.D. 464 (E.D. Pa. 1979) .................................................................................................9

*Hayes v. Morgan Stanley DW Inc.*
    367 B.R. 909, 919 (Bankr. M.D. Ga. 2007) ............................................................................12

*Holliday v. Credit Suisse Securities (USA) LLC*,
    No. 20 Civ. 5404, 2021 U.S. Dist. LEXIS 173359 (S.D.N.Y. Sept. 13, 2021) ...................8, 14

*In re Adam Aircraft Indus., Inc.*,
    510 B.R. 342 (BAP 10th Cir. 2014) ........................................................................................11

*Jonas v. Farmer Bros. Co.*,
    124 B.R. 806 (Bankr. C.D. Cal. 1991) ....................................................................................12

*Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*,
    625 B.R. 291 (Bankr. D. Del. 2020) .........................................................................................2

*Langenkamp v. Moore (In re Republic Fin. Corp.)*,
    75 B.R. 840 (Bankr. N.D. Okla. 1987) ...................................................................................12

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012) ................................................................................................12

### STATUTES AND RULES

11 U.S.C. § 53(a) ...........................................................................................................................11

11 U.S.C. § 101(22A) ...................................................................................................4, 5, 7, 10, 14

11 U.S.C. § 101(53A) ....................................................................................................................11

11 U.S.C. §§ 362(b)(6), (7) & (17) .....................................................................................10, 12, 13

11 U.S.C. § 546(e) (2020) ........................................................................................................ passim

11 U.S.C. §§ 548, 555, 556, 559, & 560 .............................................................................10, 11, 13, 14

Securities Investor Protection Act of 1970 § 5(a)(3) ....................................................................13

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Peter Kravitz, as Settlement Trustee (the "**Trustee**") of and on behalf of the Samson Settlement Trust (the "**Settlement Trust**") established pursuant to the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (with Technical Modifications)* [Bankr. D.I. 2009] submits this memorandum of law in opposition (the "**Opposition**") to the Samson Defendants' *Motion For Partial Summary Judgment Under Bankruptcy Code Section 546(e)* [Adv. Pro. D.I. 346] (the "**Motion**") and the Samson Defendants' *Memorandum in Support of the Motion* [Adv. Pro. D.I. 347] ("**Defs.' Mem.**") filed therewith.

## SUMMARY OF ARGUMENT

1. The Trustee files this Opposition contemporaneously with his Opposition to Defendants' parallel Motion for Summary Judgment as to Certain Defendants (and incorporates by reference that Opposition and supporting papers). As explained in more detail in the Trustee's other Opposition, Defendants' two motions together seek to eliminate five of the seven transfers at issue in this fraudulent conveyance case from consideration at trial. This Motion alone, seeking partial summary judgment exclusively under section 546(e) of the Bankruptcy Code ("Section 546(e)"), seeks to insulate three cash transfers totaling $2.78 billion from any fraudulent conveyance challenge. Defendants claim they are entitled to this relief based on their theory, unsupported by any case law, that a transfer can qualify as a "transfer made by a financial participant" even if the transferor was a *non*-financial participant at the time of the transfer and only met the statutory definition of "financial participant" years later, as of the petition date.

2. This is the second time the parties have briefed the issue of the appropriate time for determining an entity's status as "financial participant" for purposes of Section 546(e). This

issue was first raised in Defendants' memorandum of law in support of its third motion for summary judgment [Adv. Pro. D. I. 194], in which Defendants argued that the subset of transfers at issue in this case made by debtor Samson Investment Corporation ("SIC") qualify for the safe harbor of Section 546(e) because SIC met the definition of "financial participant" as of the September 16, 2015 petition date.  Among other responses, the Trustee argued that, whether or not SIC was a "financial participant" as of the petition date is irrelevant because, for a transfer to be "made by a financial participant" under Section 546(e), the transferor must be a financial participant as of the *transfer* date.  Here, the transfer date is December 21, 2011 (the "Transfer Date"), when Stacy Schusterman directed the sale of SIC to a KKR-led sponsor group for $7.2 billion.

3. In its December 23, 2020 opinion (the "2020 Opinion"), the Court expressly declined to reach the timing question, believing it to be moot based on Defendants' assertion (raised belatedly only after the Trustee filed his opposition) that SIC also qualified as a financial participant as of the Transfer Date.  *Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*, 625 B.R. 291, 302 n.37 (Bankr. D. Del. 2020).  But, as Defendants concede, the issue is now live because the Trustee's expert—the former CEO of the International Swaps and Derivatives Association ("ISDA")—opines that SIC did *not* meet the definition of "financial participant" as of the Transfer Date.  The Defendants also concede that, because the experts are in disagreement, the issue of whether SIC qualified as a financial participant as of the Transfer Date cannot be resolved at the summary judgment stage and, therefore, the Court must now address the dispute regarding the meaning of Section 546(e)'s phrase "transfer by a financial participant."

4. The Trustee's argument is as straightforward as it is logical.  "Transfer made by a financial participant" means just what it says: a transfer made by a party that is a financial

participant. By contrast, under Defendants' strained reading, a transfer made by a party that is *not* a financial participant can retroactively *become* a "transfer made by a financial participant" if the transferor later—even years later—meets the statutory definition. As set forth below, Defendants' interpretation is unnatural, conflicts with the unanimous interpretations of nearly identical grammatical constructions elsewhere in the Bankruptcy Code, and is completely at odds with the legislative purpose of providing market participants in the financial sector with "certainty" and "predictability" with respect to their transactions. The Court should deny the Motion.

## COUNTER-STATEMENT OF FACTS

5. On December 21, 2011, a consortium of equity sponsors led by Kohlberg Kravis Roberts & Co. (the "Sponsors") consummated a leveraged buyout (the "LBO") of SIC, an oil and natural gas exploration and production company, with a purchase price of approximately $7 billion. *See generally* Zhang Decl. Ex. A (KKR-SAM_0187397). As part of the LBO, among other transfers, SIC transferred $2.75 billion in cash to the selling shareholders on the Transfer Date. *Id.* at -403. As of the Transfer Date, SIC held certain hedging instruments, including swaps, to hedge its exposure to commodity prices. Zhang Decl. Ex. B (JPMSRC0004185, at -401–06).

6. Following the LBO, SIC immediately found itself in financial distress from which it never recovered. *See, e.g.*, Zhang Decl. Ex. C (NGP00003897, at -898); Zhang Decl. Ex. D (KKR-SAM_0204954, at -954). On September 16, 2015 (the "Petition Date"), SIC and its affiliates filed for bankruptcy. On the Petition Date, SIC continued to hold hedging instruments, including swaps, to hedge its exposure to commodity prices. Defs.' Mem., at 15-17.

7.      Two years ago, on March 9, 2020, Defendants filed the predecessor to this Motion arguing that, under Section 546(e), the Trustee cannot avoid any of the transfers at issue here because all debtor-transferors qualified as financial participants in one way or another as of the Petition Date and on August 31, 2015 (*i.e.*, a date within 15 months before the Petition Date, *see* 11 U.S.C. § 101(22A)(A)).  [Adv. Pro. D.I. 193, 194]  At that time, the Trustee filed its cross-motion for summary judgment, arguing that only the Transfer Date is relevant for Section 546(e). [Adv. Pro. D.I. 207, 208]  Only thereafter did Defendants assert that all debtor-transferors also qualified as financial participants on August 31, 2015.  [Adv. Pro. D.I. 214]  In its 2020 Opinion, this Court agreed with Defendants that the Bankruptcy Code's definition of "financial participant" did not exclude debtors, but otherwise denied the rest of Defendants' motion.  *See generally 2020 Opinion*, 625 B.R. 291.

8.      In the 2020 Opinion, the Court observed that the statutory definition of "financial participant" sets forth three dates on which a party could meet the definition—"(i) at the time the entity enters into a[n] . . . agreement [or transaction], or (ii) at the time of the date of the filing of the petition, or (iii) on any day during the 15-month period preceding the date of the filing of the petition." *Id.* at 301-02.  But the Court did not resolve the parties' statutory dispute regarding whether a *transfer* can qualify as a "transfer made by . . . a financial participant" under Section 546(e) if the transferor only retroactively met the definition of "financial participant."  *See id.* at 302 n.37.  Instead, the Court stated: "[B]ecause the Samson Defendants argue that they had agreements or transactions in the requisite amount on the dates of the transfers, as well as on any of the dates in the statute, this issue appears moot." *Id.*

9.      The parties then engaged in additional discovery.  In the expert discovery phase, Defendants submitted the expert report of Shane Randolph, who opines as to the amounts and

values of SIC's hedging positions as of the Petition Date, August 31, 2015, as well as the Transfer Date. *See generally* Zhang Decl. Ex. E (Mr. Randolph's expert report dated as of July 27, 2021). The Trustee then submitted the expert rebuttal report of Richard Grove of Rutter Associates. *See generally* Zhang Decl. Ex. F (Mr. Grove's expert report dated as of October 20, 2021). Mr. Grove is the former Chief Executive Officer of the International Swaps and Derivatives Association ("ISDA"), the organization whose published agreements govern the hedging contracts at issue. *Id.* ¶ 8. As the Trustee contends that the Transfer Date is the only relevant date for purposes of this dispute, Mr. Grove's opinion focuses on the December 21, 2011 Transfer Date and disputes Mr. Randolph's valuation methodologies and his conclusions as to that date. *Id.* ¶¶ 1-4.

10.  As to the Transfer Date, Mr. Grove opines that SIC's gross dollar value in notional amount as of the Transfer Date ("Transfer Date Notional Amount") was ███████ and its gross mark-to-market value (aggregated across counterparties) as of the Transfer Date ("Transfer Date MtM Values") was ███████ neither of which passed the section 101(22A) thresholds. Zhang Decl. Ex. F ¶¶ 2, 4. In contrast, Mr. Randolph opines that SIC's swap contracts exceeded both thresholds under 11 U.S.C. 101(22A): the $1 billion gross notional threshold and the $100 million gross MtM threshold. Zhang Decl. Ex. E ¶¶ 8-11. Specifically, Mr. Randolph opined that SIC's Transfer Date Notional Amount was ███████ and its Transfer Date MtM Value was ███████ Zhang Decl. Ex. E ¶¶ 8, 10. Mr. Grove disputes Mr. Randolph's conclusions as to both of those thresholds. Zhang Decl. Ex. F ¶¶ 1-4.

11.  With respect to the Transfer Date Notional Amount, Mr. Grove disagrees with Mr. Randolph's methodology because it is based on the sum of the dollar value of the notional quantities for all calculation periods specified for each of SIC's hedging positions. *Id.* ¶ 2.

According to Mr. Grove, "[t]his methodology is inconsistent with the common understanding of the term 'notional' across the derivatives market and has the effect of significantly inflating the total dollar value in notional amount of" the Transfer Date Notional Amount. *Id.* The appropriate methodology, Mr. Grove opines, should use the notional quantity per calculation period without summing them up across calculation periods, and this is how market participants have calculated dollar values in notional amount across the derivatives markets of various underlying assets.[1] *Id.*

12. As to SIC's Transfer Date MtM Values, Mr. Randolph added up the absolute values of the MtM value of each of SIC's hedging positions within each of its swap agreements as of the Transfer Date to reach an aggregate MtM value of all the positions. *Id.* ¶ 4. According to Mr. Grove, however, this methodology "is not appropriate" if "the goal is to calculate the gross MtM in [SIC]'s derivatives agreements (aggregated across counterparties)." *Id.* Instead, Mr. Randolph should have "(a) calculated a single MtM value for each of the ISDA Master Agreements between [SIC] and its various bank counterparties based on the [hedging positions as of the Transfer Date] that formed a part of each such agreement, and (b) then aggregated the absolute values of the MtM value of each ISDA Master Agreement across counterparties." *Id.* Mr. Grove opines that only this methodology can be squared with the "single agreement" principle of ISDA Master Agreements, by which all of SIC's hedging positions as of the Transfer

---

[1]   Posit a one-year oil swap with 12 monthly calculation periods in which the notional quantity per calculation period is 28,000, 30,000, or 31,000 barrels of oil depending on the calculation period (i.e., depending on the number of days in each month). Mr. Randolph calculates the dollar value in notional amount of the swap as if the dollar value in notional quantity of the swap equates to the sum of the dollar value of the notional quantities per calculation period for all calculation periods, resulting in a calculation based on 365,000 barrels of oil. The appropriate methodology that is consistent with the common understanding in the industry, however, should calculate the dollar value in notional amount of the swap based on the notional quantity per calculation period, *i.e.*, a maximum of 31,000 barrels of oil.

Date are governed. *Id.* ¶¶ 62-66. Therefore, for both SIC's Transfer Date Notional Amount and its Transfer Date MtM Values, Mr. Grove opined that Mr. Randolph's calculation methodologies are flawed and that, using industry standard terminology and methodologies, SIC's Transfer Date Notional Amount and Transfer Date MtM Values would be under the thresholds set forth in the definition of "financial participant" in 11 U.S.C. § 101(22A). *See generally id.*

13.  Mr. Randolph elected not to respond to Mr. Grove's opinions in a sur-rebuttal report, even though the Trustee consented to allow him to do so. [Adv. Pro. D.I. 340].

## ARGUMENT

**I.  In Order to Be a "Transfer Made By a Financial Participant" Under Section 546(e) the Transferor Must Be a Financial Participant on the Transfer Date.**

14.  Section 546(e) provides in relevant part that "a trustee may not avoid a . . . transfer made by . . . a . . . financial participant . . . in connection with a securities contract." A transfer made by a non-financial participant, on the other hand, is not immunized under this provision, regardless of whether the transferor later becomes a financial participant. Based on this plain reading, summary judgment must be denied because, as Defendants concede, there is a genuine dispute about whether SIC was a financial participant at the Transfer Date.

15.  In their Motion and supporting memorandum, Defendants' opening salvo is that this Court has already in effect ruled, in its 2020 Opinion, that transfers by non-financial participants are safe harbored under Section 546(e), so long as they become financial participants as of the Petition Date. Defs.' Mem., at 14-15. Defendants are wrong. The Court made no such determination, and Defendants inaccurately characterize the Court's 2020 Opinion. In a footnote, the Court merely observed that the <u>definition</u> of "financial participant," Bankruptcy Code § 101(22A), sets forth three dates, including the Petition Date, for measuring whether the entity may qualify as a financial participant, a fact that was never in dispute. *2020 Opinion*, 625

B.R. 291, at 302 n.37. As to the Trustee's actual argument—that Section 546(e) only immunizes "transfers made by financial participants" and not "transfers made by entities who later qualify as financial participants as of the Petition Date"—the Court expressly declined to reach this issue, finding that it was apparently moot because Defendants had asserted (belatedly) that SIC qualified as of the Transfer Date. *Id.*

16.     This issue is now live, however, as Mr. Grove has opined that SIC did not qualify as a financial participant as of the Transfer Date. Indeed, even Defendants concede that the issue of whether SIC qualified as a financial participant as of the Transfer Date cannot be resolved on summary judgment. Defs.' Mem., at 15 n.23. Thus, the Court must now decide the question that it declined to reach in its 2020 Opinion: Does Section 546(e)'s protection of "transfer[s] made by . . . a . . . financial participant" provide a safe harbor to a transfer made by a non-financial participant that only later becomes a financial participant as of the Petition Date? As set forth below, under a plain language reading, and in accordance with the Section's legislative purpose, the answer is clearly "no."

        **A.**     **The Plain Language of Section 546(e) Supports the Trustee's Position.**

17.     In order for "market participants to have certainty, finality, and predictability in the securities markets," Section 546(e) immunizes from avoidance actions transfers with certain features. *Holliday v. Credit Suisse Securities (USA) LLC*, No. 20 Civ. 5404, 2021 U.S. Dist. LEXIS 173359, *9 (S.D.N.Y. Sept. 13, 2021). Relevant here, and omitting ellipses, Section 546(e) provides a safe harbor for "a transfer made by a financial participant in connection with a securities contract." Under a natural reading, a transfer is not a "transfer made by a financial participant" unless the transferor is a financial participant at the time of the transfer. Otherwise, it is a transfer made by a non-financial participant. The relevant features of the transfer do not change if a party attains financial participant status after the transfer, such as on the petition date.

18. There appears to be no case law addressing this specific issue, though, as set forth below, there is case law interpreting nearly identical grammatical constructions in the Bankruptcy Code consistent with the Trustee's interpretation. But, just from a plain usage perspective, the Trustee's interpretation is the only natural one. For example, in the context of attorney-client privilege, in determining whether a communication *to an attorney* seeking legal advice is privileged, the relevant time for determining a person's status as an attorney is, of course, at the time of the communication. A communication cannot retroactively qualify as a privileged because the layperson recipient became an attorney years after the communication. *See, e.g.*, *Dabney v. Investment Corp. of Am.*, 82 F.R.D. 464, 465, 466 (E.D. Pa. 1979) (confidential communications made to a law student or law school graduate who has not yet been admitted to the bar found not to be privileged).[2] A natural reading of Section 546(e) here leads to the same result: The 2011 transfers by SIC were not "transfers made by a financial participant" if SIC was not a financial participant as of the Transfer Date, whether or not SIC later qualified as a financial participant under the statutory definition.[3]

---

[2] Similarly, work-product would of course not be consider "attorney work-product" that was "prepared *by an attorney*" if the preparer only became an attorney after preparing the work product.

[3] In their earlier briefing on this issue, the parties traded competing football analogies. The Trustee argued that, under a natural reading, "the most touchdown passes thrown by a Denver Broncos quarterback" is 300, by John Elway, who threw all 300 touchdowns *as* a Denver Broncos quarterback. [Adv. Pro. D.I. 208, at 18] The answer would *not* be Peyton Manning's 539 touchdown passes, since he was only a Denver Broncos quarterback for his final 140 touchdowns. *Id.* In response, Defendants posed their own analogy: "True or False? Hall of Fame quarterback John Elway threw 300 touchdown passes for the Denver Broncos," asserting that the answer is true despite the fact John Elway was not in the Hall of Fame when he threw his touchdowns. [Adv. Pro. D.I. 214, at 6 n.8] But this is a false analogy because, unlike "Denver Broncos quarterback" status or "financial participant" status, Hall of Fame status *can only ever be achieved after the fact.*

19.     In contrast, Defendants ask the court to focus on section 101(22A)'s definition of "financial participant" in isolation from that term's use in Section 546(e). It is true, but also irrelevant, that under section 101(22A), the petition date (including a 15-month lookback period) is *one* of the times when an entity can qualify as a financial participant. As explained below, there are numerous other provisions in the Code that use the term "financial participant" in which the entity's status as of a petition date would clearly be relevant. But the issue before the Court is not whether SIC *ever* met the definition of a financial participant. The issue is whether the December 21, 2011 transfers by SIC relevant to this case were "transfers made by a financial participant." In order to answer that question, the Court must determine whether SIC was a financial participant on that date.

20.     In effect, Defendants' proposed reading is that one should look to any definition of any type of entity in Section 101 in complete isolation from the rest of the Code, determine that a particular entity satisfies the definition, and then assume that any Code provision using that definition applies to that particular entity, without regard for context, including obvious temporal limitations imposed by the provision. The failure of Defendants' proposed textual analysis can be easily demonstrated by looking to other examples from the Code, including examples using constructions nearly identical to Section 546(e)'s "transfer made by or to [defined entity]" construction. Three such examples are discussed below: (1) "Insider," as used in Section 548(a)(1)(B)(ii)(IV); (2) "Stockbroker," as used in Section 546(e); and (3) "Financial participant," as used in Section 362, not 546(e).

21.     <u>Insider</u>: Section 548(a)(1)(B)(ii)(IV) imposes fraudulent conveyance liability, regardless of insolvency, for transfers made and obligations incurred where the debtor "made such transfer to . . . an insider . . . or incurred such obligation to . . . an insider." Case law is

hardly required to confirm that the relevant time for determining a person's insider status for purposes of this provision is the time of the relevant transfer or obligation.  *See In re Adam Aircraft Indus., Inc.*, 510 B.R. 342, 352 (BAP 10th Cir. 2014) (observing that "§ 548 focuses on insider status both at the time of the transfer and when the obligation was incurred" and finding that Section 548(a)(1)(B)(ii)(IV) did not apply because the transferee ceased being an insider before debtor incurred obligations to him and made transfers to him).  This is the obvious, natural and correct interpretation of Section 548(a)(1)(B)(ii)(IV), **notwithstanding** the fact that under the Code's definition of "insider," standing alone, a person could qualify as an "insider" on multiple dates, including the date of the relevant transfer, the petition date, or any other date. 11 U.S.C. § 53(a).  According to Defendants' logic, and simply looking to the definition without regard to the context in which the defined term is used in the relevant Code provision, a transferee would be liable if the transferee qualified as an insider on *any* date, before or after the relevant transfer or obligation.

22. <u>Stockbroker</u>: Even within Section 546(e) itself, other examples from the long list of transferors and transferees who give rise to a safe harbored transfer helpfully demonstrate why the Trustee's reading is correct.  For instance, assuming the other criteria are met, a transfer is safe harbored under 546(e) if it is "a transfer made by or to . . . a . . . stockbroker."  Under a natural reading, "transfer to a stockbroker" means that the transferee must be a stockbroker at the time of the transfer, not years later.  It could not be reasonably argued that Section 546(e) allows a pre-petition individual debtor, concerned about some of her past transactions being held to be constructive fraudulent transfers in bankruptcy, could immunize those transactions by expanding her business qualifications so that she qualified as a "stockbroker" under 11 U.S.C. § 101(53A) on the eve of her bankruptcy.  Indeed, when applying Section 546(e) to transactions involving

putative stockbrokers, courts have naturally inquired whether the defendants qualified as stockbrokers *at the time of the challenged transactions*. *See Hayes v. Morgan Stanley DW Inc. (In re Stewart Fin. Co.)*, 367 B.R. 909, 919 (Bankr. M.D. Ga. 2007) ("[Morgan Stanley DW, Inc.] clearly had at least two 'customers' at the time of the subject transfers . . . . In addition to having at least two customers, it is clear that MSDW also engaged in the business of effecting transactions in securities."); *Jonas v. Farmer Bros. Co.*, 124 B.R. 806, 817 (Bankr. C.D. Cal. 1991) ("Comark was a 'stockbroker' when the subject transactions with [the defendant Farmer Brothers Company] were 'settled' (i.e., by the payment on June 9, 1982) . . . ."); *See also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (noting that Madoff Securities held itself out to the defendants in that case as a firm engaged in the business of effecting transactions in securities, so the defendants had every right to avail themselves of all the protections afforded by section 546(e)); *Langenkamp v. Moore (In re Republic Fin. Corp.)*, 75 B.R. 840, 845-46 (Bankr. N.D. Okla. 1987) (holding that the purchasers of the debtor's thrift certificates did not count as the debtor's customers and, consequently, the debtor was not a stockbroker with regard to the relevant transactions; section 546(e) was thus not triggered). There is no reason why Section 546(e) should be read differently when the transaction involves an alleged "financial participant."

23.     <u>Financial Participant (as used in Section 362)</u>: The use of "financial participant" itself in other Code provisions confirms that Defendants' reading is illogical and unworkable. Section 362(b)(6) provides an exception to the automatic stay allowing certain entities, including financial participants, to exercise certain contractual rights, including with respect to a debtor's

collateral, post-petition.[4] Under Defendants' interpretation, one could conclude that, as long as an entity satisfied the definition of "financial participant" at any time in history, that entity would be a "financial participant" always and for all purposes and would have a roving relief from automatic stays regardless of whether the entity qualified as a financial participant at the petition date, or even as of the date the of the relevant contract with the debtor.

### B.    The Trustee's Reading Is Consistent with the Rest of the Code.

24.     Contrary to the arguments Defendants made in connection with their first motion on this issue, the Trustee's reading of Section 546(e) would not render any portions of the definition of "financial participant" superfluous.  The determination of a party's financial participant status as of the petition date would still be relevant for the numerous other provisions of the Bankruptcy Code in which "financial participant" is used.  For example, sections 362(b)(6), (7), and (17) of the Bankruptcy Code provide exceptions to the automatic stay for financial participants and other specified entities to exercise their contractual rights under certain types of agreements.  11 U.S.C. §§ 362(b)(6), (7) & (17).  In context, it is logical and consistent with a natural reading of those provisions that an entity's status as a "financial participant" would be determined as of the petition date, since the petition date is when the automatic stay would otherwise prohibit the exercise of the contractual rights in question. *See also*, *e.g.*, 11 U.S.C. §§ 555, 556, 559, & 560.

---

[4]    Section 362(b)(6) provides: "(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—(6) under subsection (a) of this section—of the exercise by a . . . financial participant . . . of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts[.]"

25.  Ignoring the use of "financial participants" elsewhere in the Code, Defendants argued previously that the Trustee's reading of Section 546(e) "would erase one of section 101(22A)'s three alternative measurement dates from the statute" and argue further that "[h]ad Congress intended this result, it easily could have clarified in section 101(22A) that, for purposes of Section 546(e) only, the petition date may not be used as a measurement date." [Adv. Pro. D.I. 214, at 6]  This argument is illogical.  Just as Congress did not need to clarify in the definition of "insider" that, for purposes of Section 548(a)(1)(B)(ii)(IV), an entity may not qualify as an "insider" on any date other than the date of the relevant transfer or obligation, there was no need for a similar clarification here.  In both cases, the use of the defined term in the actual provision makes the relevant qualification date clear.  And, because there are other uses of "financial participant" in the Code where the context indicates that the petition date is a relevant measurement date, the Trustee's interpretation does not "erase" anything.

   C.   **The Trustee's Position Is Also Consistent with the Legislative Intent, Which Is Undermined by the Defendants' Reading of Section 546(e).**

26.  As this Court correctly observed in its 2020 Opinion, Congress's overarching purpose in limiting, through Section 546(e), the circumstances in which securities transactions could be unwound was "'to promot[e] finality . . . and certainty' for investors . . . ." 2020 Opinion, 625 B.R. 291, at 301 n.36 (quoting *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 92 (2d Cir. 2019)).  Other courts have similarly recognized that Congress intended for "market participants to have *certainty, finality, and predictability* in the securities markets." *Holliday*, 2021 U.S. Dist. LEXIS 173359, at *9 (emphasis added).  Congress's intent would clearly be fulfilled under the Trustee's reading, as market participants would be able to accurately predict *at the time of a transaction* whether the transaction would qualify for Section 546(e)'s safe harbor.  That is, in deciding whether to enter into a transaction, they could, as a

general matter, have sufficient certainty and predictability, based on their knowledge regarding their own business and their counterparty's business, to assess whether the transaction at issue would qualify for the Section 546(e) safe harbor.

27. Defendants' reading, on the other hand, would fundamentally conflict with Congress's intent—injecting uncertainty where Congress expressly wanted to minimize it—because parties would *not* be able to predict whether their transactions would be safe harbored. Under Defendants' reading, for example, a party could determine that a transaction would not qualify for the safe harbor at that time, but the transaction could still qualify years later, as of the petition date, based on the happenstance that the counterparty entered into the requisite level of swap agreements and became a financial participant before the petition date. Similarly, under Defendants' reading, a non-debtor transferee's Section 546(e) fortunes could change based on the happenstance that the debtor transferor obtained a Series 7 license and became a stockbroker years after the transaction in question. Such scenarios clearly do not serve Congress's intent of certainty and predictability. Indeed, Defendants' interpretation could lead parties to make transaction decisions based on speculation about whether one of the parties might or might not be a qualifying entity in the future, a result that is clearly at odds with congressional intent. The only thing certain and predictable about Defendants' interpretation is that it would inevitably lead to abuse, as parties could immunize their own transaction years after the fact, on the eve of bankruptcy, by, for example, qualifying as a stockbroker on the day before the petition date. There is nothing in the legislative record to support that result.

**II.    There Is a Genuine Issue of Disputed Fact as to Whether SIC Qualified as a Financial Participant as of the Transfer Date.**

28. As Defendants concede, the Trustee disputes Defendants' calculation regarding the amount and value of SIC's hedge contracts, and therefore whether SIC qualified as a

financial participant, as of the Transfer Date. Defs.' Mem., at 15. Defendants further clarify that they do not claim they are entitled to summary judgment with respect to SIC's status as a financial participant as of the Transfer Date, recognizing that this would require the Court to resolve the expert dispute. *Id.* at 15 n.23. Therefore, if the Court agrees with the Trustee's statutory argument in Section I, *supra*, summary judgment must be denied.

## **CONCLUSION**

For the foregoing reasons, there is a genuine and material issue of disputed fact regarding whether the relevant transfers are subject to the safe harbor provision of Section 546(e). Summary judgment should therefore be denied.

| | |
|---|---|
| Dated: April 15, 2022 | Respectfully submitted,<br><br>**FARNAN LLP**<br><br>*/s/ Michael J. Farnan*<br>Joseph J. Farnan, Jr. (Bar No. 100245)<br>Joseph J. Farnan, III (Bar No. 3945)<br>Michael J. Farnan (Bar No. 5165)<br>919 North Market St., 12th Floor<br>Wilmington, DE 19801<br>Telephone: (302) 777-0300<br>Facsimile: (302) 777-0301<br>farnan@farnanlaw.com<br>jjfarnan@farnanlaw.com<br>mfarnan@farnanlaw.com<br><br>Thomas E Lauria (*pro hac vice*)<br>**WHITE & CASE LLP**<br>Southeast Financial Center, Suite 4900<br>200 South Biscayne Blvd.<br>Miami, FL 33131<br>Telephone:     (305) 371-2700<br>Facsimile:     (305) 358-5744<br>tlauria@whitecase.com<br><br>J. Christopher Shore (*pro hac vice*)<br>Colin T. West (*pro hac vice*)<br>1221 Avenue of the Americas<br>New York, NY 10020<br>Telephone:     (212) 819-8200<br>Facsimile:     (212) 354-8113<br>cshore@whitecase.com<br>cwest@whitecase.com<br><br>*Attorneys for the Settlement Trustee* |