**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| SAMSON RESOURCES CORPORATION, | |
| | Case No. 15-11934 (BLS) |
| Reorganized Debtor. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST; | |
| | Adv. Pro. No. 17-51524 (BLS) |
| Plaintiff, | |
| v. | **Filed Under Seal** |
| | **Pursuant to Adv. Pro. D.I. 118** |
| SAMSON ENERGY COMPANY, LLC, *et al.*, | |
| Defendants. | |

**SAMSON SETTLEMENT TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................1

SUMMARY OF ARGUMENT ............................................................................................1

COUNTER-STATEMENT OF FACTS ..............................................................................7

    I.   Use of LBO Cash Transfer Proceeds ....................................................11

    II.  Bankruptcy and the Plan Release .........................................................12

    III. Procedural History ...............................................................................13

ARGUMENT ...................................................................................................................14

    I.   Stacy Schusterman Is a Proper Defendant Because the Transfers Were Made for Her Benefit as a Beneficiary of the Relevant Trusts. .............................................14

        A.  Stacy Schusterman clearly received a benefit from the LBO cash transfers ...............................................................................................15

        B.  Stacy Schusterman also received a benefit from the Gulf Coast and Offshore Assets Transfers ...............................................................23

    II.  The Moving Selling Shareholders Are Not Released. ...........................25

    III. The Trustees Are Proper Defendants and Should Not be Dismissed. ...................28

    IV. Material Issues of Fact Remain as to Defendants Stacy Family Trust and Lynn Schusterman. ...................................................................................................29

CONCLUSION ................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

Ames Merch. Corp. v. Nikko Am., Inc. (In re Ames Dep't Stores, Inc.),
    Bankr. No. 01-42217, Adv. Pro. No. 03-08310, 2011 Bankr. LEXIS 991
    (Bankr. S.D.N.Y. Mar. 28, 2011)...........................................................................22

Baldi v. Lynch (In re McCook Metals, LLC),
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ...............................................21, 22, 23, 24

Bodenstein v. Univ. of N. Iowa (In re Peregrine Fin. Grp, Inc.),
    589 B.R. 360, (Bankr. N.D. Ill. 2018) ....................................................................25

Brown v. Phillips (In re Phillips),
    379 B.R. 765 (Bankr. N.D. Ill. 2007) ...............................................19, 20, 21, 23

Dietz v. Spangenberg,
    No. 11-2600, 2013 U.S. Dist. LEXIS 123601 (D. Minn. 2013).............................26

Dr. Ben Branch v. Fed. Deposit Ins. Corp.,
    825 F. Supp. 384 (D. Mass. 1993) .........................................................................21

Halperin v. Moreno (In re Green Field Energy Servs.),
    594 B.R. 239 (Bankr. D. Del. 2018) .......................................................................26

Halperin v. Moreno (In re Green Field Energy Servs.),
    Bankr. No. No. 13-12783, Adv. Pro. No. 15-50262, 2018 Bankr. LEXIS 517
    (Bankr. D. Del. Feb. 27, 2018) ..........................................................21, 24, 26, 28

In re Dreier LLP,
    452 B.R. 451 (Bankr. S.D.N.Y 2011)....................................................................25

In re Hessco Industries,
    295 B.R. 372, (BAP 9th Cir. 2003).........................................................................19

In re International Management Assoc.,
    399 F.3d 1288 (11th Cir. 2005) ..............................................................................25

In re Maestro,
    465 B.R. 576 (Bankr. W.D. Wa. 2011)...................................................................19

In re Meredith,
    527 F.3d 372 (4th Cir. 2008) ..................................................................................25

In re Smurfit- Stone Container Corp.,
    444 B.R. 111 (Bankr. D. Del. 2011) .......................................................................29

*In re Vermont Knitting Co.*,
   98 B.R. 184 (Bankr. D. Vt. 1989) ........................................................................29

*Janvey v. Libyan Investment Authority*,
   840 F.3d 248 (5th Cir. 2016) ..............................................................................25

*Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.)*
   *("Release Opinion")*, 590 B.R. 643 (Bankr. D. Del. Aug. 30, 2018)..............................16, 17

*Official Committee of Unsecured Creditors of Exeter Holding, Ltd. v. Haltman*,
   No. 13-CV-5475, 2018 U.S. Dist. LEXIS 54610 (E.D.N.Y. 2018)........................................32

*Peterson v. Hofmann (In re Delta Phones, Inc.)*,
   Bankr. No. 04 B 823, No. 05 A 1205, 2005 Bankr. LEXIS 2550(Bankr. N.D.
   Ill. 2005)........................................................................................................26

*Russell v. Harper (In re Dearmond)*,
   Bankr. No. 14-50106, Adv. Pro. No. 16-5002, Adv. Pro. No. 16-50032017,
   Bankr. LEXIS 3188 (Bankr. E.D. Tenn. Sep. 21, 2017) ........................................18

*Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*,
   340 B.R. 829 (Bankr. E.D. Mich. Apr. 12, 2006)................................................22

*U.S. on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*,
   841 F. Supp. 899 (D. Minn. 1993) ........................................................................32

*United States v. Heilman*,
   377 Fed. Appx. 157 (3d Cir. 2010) ......................................................................29

## STATUTES AND RULES

26 U.S.C. § 4941 ........................................................................................................31

Bankruptcy Code §§ 544, 546, 550, and 551 ....................................................... passim

Federal Rules of Civil Procedure Rule 30(b)(6) ................................................29, 30

## MISCELLANEOUS

Black's Law Dictionary ..............................................................................29, 30

Our Mission and Values, Charles and Lynn Schusterman Family Philanthropies,
   https://www.schusterman.org/who-we-are/our-mission-and-values ........................................8

Our Story, Charles and Lynn Schusterman Family Philanthropies,
   https://www.schusterman.org/who-we-are/our-story; ............................................................8

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Peter Kravitz, as Settlement Trustee (the "**Trustee**") of and on behalf of the Samson

Settlement Trust (the "**Settlement Trust**") established pursuant to the *Global Settlement Joint*

*Chapter 11 Plan ("Plan") of Reorganization of Samson Resources Corporation and Its Debtor*

*Affiliates (with Technical Modifications)* [Bankr. D.I. 2009] submits this memorandum of law in

support of his opposition (the "**Opposition**") to Samson Defendants' *Motion For Partial*

*Summary Judgment as to Certain Defendants* [Adv. Pro. D.I. 350] (the "**Motion**") and Samson

Defendants' *Memorandum in Support of the Motion* [Adv. Pro. D.I. 351] ("**Defs.' Mem.**") filed

therewith.

## SUMMARY OF ARGUMENT

1.       From the beginning of this case, the Trustee has asserted that the leveraged

buyout of Samson Investment Company ("Samson" or "SIC") in 2011 (the "LBO") was a

fraudulent conveyance because Samson was rendered insolvent by the LBO (both on a balance

sheet basis and because it lacked adequate capital going forward) and because Samson did not

receive reasonably equivalent value for the series of transfers it made in connection with the

LBO.  While Defendants have always blithely claimed that they will prevail on the merits, their

strategy in this case for the last four years has been to throw up all possible roadblocks to prevent

the merits from actually being heard.  Defendants' Motion, and their parallel motion filed

contemporaneously, are a continuation of that strategy.  They are, by the Trustee's count,

Defendants' *fourth and fifth* motions for summary judgment.

2.       It is now clear, however, that no matter the outcome of these dual motions, the

merits of the Trustee's claims will be heard at trial.  At that trial, the Trustee will offer, among

others, the expert opinion of Scott Baxter of Berkeley Research Group ("BRG").  Mr. Baxter will

testify that, based on an independent valuation using industry standard methodologies, Samson was insolvent at the time of the LBO and received billions less than reasonably equivalent value for both the LBO cash transfers and the contemporaneous Gulf Coast and Offshore spinoff assets ("Gulf Coast and Offshore Assets").  With respect to the LBO, discovery has confirmed that the Sponsors allocated ███████████████████████████████████████████████

Shortly after the LBO, however, a third-party engineering report commissioned by the Sponsors confirmed what could have, and should have, been known before the LBO:  Samson's undeveloped acreage was worth only a tiny fraction of that amount and the Sponsors' flawed in-house methodology led them to overpay—using unsecured creditors' cash—by billions.  The Trustee's experts will also demonstrate that, despite the sustained decline in natural gas prices that has occurred in the six months leading up to closing, the Sponsors failed to consider any scenario in which gas prices declined any further, for any period of time.  The impact of the Sponsors' failure to consider reasonable stress case scenarios was compounded by their patently unreasonable assumption ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

> 3.     Defendants' experts, on the other hand, will not provide any independent valuation of Samson's assets, based on industry standard methodologies or otherwise.  Nor will they even opine as to the substantive reasonableness of the core assumptions that the Sponsors relied upon to determine the purchase price.  Instead, Defendants' experts approach this case as if they were defending against a breach of professional duty claim, not the fraudulent conveyance claim sounding in insolvency and lack of equivalent value that the Trustee actually asserts.  Defendants have also declined to provide any expert opinion whatsoever regarding the

Gulf Coast and Offshore Asset transfers.  If they are even permitted to testify, instead of providing meaningful valuation opinions to counter the Trustee's experts, Defendants' experts' opinions will mostly consist of a *post hoc* stamp of approval on the sale process and an endorsement of the academic and professional credentials of the professionals involved in the sale.  Fundamentally, Defendants' position is that smart, rich professionals do not engage in constructive fraudulent transfers, a position which no court has ever endorsed.

4.     Aware of the significant challenges they face at trial, Defendants now make one final attempt to eliminate many of the relevant transfers from consideration at trial.  As shown in the table below, this case currently concerns seven initial transfers: six cash transfers and, broadly speaking, one asset transfer:

|  | TRANSFEROR | TRANSFEREE | TRANSFEREE OWNER/BENEFICIARY | AMOUNT |
|---|---|---|---|---|
| 1. | Samson Resources Corp. ("SRC") | Charles and Lynn Schusterman Family Foundation ("CLSFF" or "the Foundation") | N/A | $1.145 billion |
| 2. | SRC | ST 2008 (Del.) Management LLC ("ST 2008") | 100% Owner: Schusterman 2008 Delaware Trust<br><br>Trust Beneficiaries:  Stacy Schusterman, et al. | $981 million |
| 3. | SRC | SFT (Del.) Management LLC ("SFTDM") | 100% Owner: Stacy Family Delaware Trust<br><br>Trust Beneficiaries:  Stacy Schusterman, et al. | $1.44 billion |
| 4. | SIC | Foundation | N/A | $986 million |
| 5. | SIC | ST 2008 | 100% Owner: Schusterman 2008 Delaware Trust<br><br>Trust Beneficiaries:  Stacy Schusterman, et al. | $750 million |

| | | | | |
|---|---|---|---|---|
| 6. | SIC | SFTDM | 100% Owner: Stacy Family Delaware Trust<br><br>Trust Beneficiaries:  Stacy Schusterman, et al. | $1.044 billion |
| 7. | Various Debtors | Samson Energy Company ("Samson Energy") | 100% Owner: SFTDM<br><br>Transfer Beneficiaries: Stacy Schusterman, et al. | Membership Interests in Samson Exploration and Samson Offshore |

5.      In their parallel motion [Adv. Pro. D.I. 346, 347], Defendants seek to remove transfers 4, 5 and 6 from the case based on the technical defense that those transfers are safe harbored under Section 546(e) of the Code because SIC was a "financial participant" as of the petition date (the "Safe Harbor Motion").  By this Motion, also based on purely technical defenses, Defendants seek to eliminate transfers 2 and 3 and, overlapping with the Safe Harbor Motion, transfers 5 and 6, based on their arguments that (i) the transferees of such transfers were Released Parties under the Plan, despite there being no genuine dispute that no such release was ever intended, and (ii) the beneficiaries of such transfers are not persons "for whose benefit" such transfers were made under Section 550(a)(1) of the Code.  Importantly, though Defendants concede that, no matter the outcome of these two last motions, this case will proceed to trial to determine, at a minimum, the merits of the Trustee's claims as to transfers 1 and 7.  In fact, this case should proceed to trial with respect to all seven transfers because Defendants are not entitled to summary judgment on any of their theories.

6.      In the instant Motion, Defendants make the extraordinary assertion that Stacy Schusterman should be dismissed from the case on the theory that she was not the "beneficiary" of the proceeds of the 2011 sale of the company she owned and controlled, even though she was

literally the "beneficiary" of the trusts that, via their single-member LLCs, received the proceeds. The argument is so untenable that Defendants effectively conceded the point in 2018, when they sought to have a series of individual defendants, but *not* Ms. Schusterman, dismissed from the case on the grounds that they did not benefit from the transfers.  Ultimately, the parties stipulated to the dismissal without prejudice of claims against those individuals based on their sworn certification that they were not direct or indirect beneficiaries of the transfers.  Ms. Schusterman did not provide any such certification.  Around the same time, Ms. Schusterman moved for summary judgment with respect to the *Gulf Coast and Offshore Assets transfers only*, on the grounds that she was not a recipient or beneficiary of those asset transfers.  She did *not* attempt to claim that she was not the beneficiary of the transfer of the cash proceeds of the $7 billion sale of her own company, as she does now.  That series of motions in 2018 reflects that, from the outset this case, Defendants accepted and acknowledged what was undeniable:  As a trust beneficiary of both of the relevant selling trusts, Ms. Schusterman is a proper defendant with respect to the cash transfers in the LBO.

7.    Why Defendants have now changed their mind and believe it is appropriate to revisit this long-settled issue is a mystery, especially since their current position is against the weight of overwhelming case law holding that a trust beneficiary is, of course, the beneficiary of transfers made to a trust for purposes of Section 550(a)(1) of the Code.  The fact that, as is common with high-net-worth individuals, Ms. Schusterman used a legal framework of trusts and trust manager vehicles to hold the sale proceeds on her behalf does not shield her from fraudulent conveyance liability.  To the contrary, the "for whose benefit" language in Section 550 exists precisely to prevent the true beneficiaries of fraudulent transfers from evading liability.  Notably, just as in 2018, Ms. Schusterman has not even submitted a declaration affirming that she has not

received a benefit from the cash transfers (because no such affirmation could truthfully be made).  The Court should reach the same conclusion that Defendants themselves apparently reached in 2018 and decline to dismiss Ms. Schusterman as a defendant.

8.    Defendants also ask the Court to rule that the single-member LLCs (i.e., SFTDM and ST 2008), which held the shares of Samson and then the sale proceeds on behalf of the family trusts and their beneficiaries, should be found to be Released Parties under the Plan, leaving the Foundation as the sole selling shareholder remaining as a defendant.  By pursuing this defense, Ms. Schusterman seeks to exploit her own decision, just before the LBO closed, to direct that the preferred share portion of the LBO consideration—the consideration that was worthless because Samson was rendered insolvent by the LBO—would go entirely to the Foundation, while the family trusts, through their wholly owned LLCs SFTDM and ST 2008, would receive all cash.  There is no dispute that Ms. Schusterman made this decision unilaterally on behalf of all three selling shareholders, including the Foundation, without any semblance of a process, in conspicuous contrast to her earlier recusal from the Foundation's decision-making in connection with the LBO because of an acknowledged conflict of interest.  At heart, Ms. Schusterman now makes the choice to assert the defense of release on behalf of her family trusts, but not the Foundation, on the theory that the term "holders of Preferred Interests" as used in the Plan release carve out, leaving the Foundation high-and-dry as the sole non-released selling shareholder.

9.    Defendants' release defense fails, however, because it is based on an exceedingly narrow interpretation of the word "holders" and ignores the facts established in discovery that the Moving Selling Shareholders, in fact, exercised control over the Preferred Interests at closing,

which is enough to make them "holders."  Thus, Defendants' effort to leave the Foundation as

the sole remaining selling shareholder defendant must fail.

10.     In sum, and as explained in detail below, Defendants' efforts to eliminate the

majority of the cash transfers from this case based solely on their technical defenses must fail.

## COUNTER-STATEMENT OF FACTS

11.     On December 21, 2011, a consortium of equity sponsors led by Kohlberg Kravis

Roberts & Co. (the "Sponsors") consummated a leveraged buyout of Samson, an oil and natural

gas exploration and production company that had been privately owned and successfully

operated by the Schusterman family since the 1970s.  At the time of the LBO, Stacy

Schusterman was SIC's Chairman and Chief Executive Officer, and she owned or controlled

100% of SIC's common stock through three entities: SFTDM, ST 2008, and the Foundation.  *See*

Zhang Decl. Ex. G (KKR-SAM_0127587, at -622).  Ms. Schusterman does not dispute she was

the "seller" in the LBO for all practical purposes.  *See, e.g.*, Zhang Decl. Ex. H (Schusterman

Dep. Tr. 223:9-224:13 (Jan. 15, 2021) ("[T]he family sold the shale assets to KKR and the

family kept the Gulf Coast and Deepwater. . . . I manage everything, so to me, the family is I

manage everything.")); *see also, e.g.*, Zhang Decl. Ex. I (SEC-00190753); Zhang Decl. Ex. J

(SEC-00190018); Zhang Decl. Ex. K (KKR-SAM_0188149 ████████████████████

████████████████████████████████████████████████

12.     Two of the selling shareholders, SFTDM and ST 2008 (together, the "Moving

Selling Shareholders") were LLCs that were 100% owned and controlled by their respective

trusts, Stacy Family Delaware Trust and Schusterman 2008 Delaware Trust (the "Selling

Trusts").  Declaration of Drew Phillips in Support of Motion for Summary Judgment as to

Certain Defendants [Adv. Pro. D.I. 352] ("2022 Phillips Decl."), ¶¶ 7 & 8.  SIC deemed the

Selling Trusts to be the real sellers and the SFTDM and ST 2008 were only the real sellers'

███████████████████████ *E.g.*, Zhang Decl. Ex. L (SEC-00272549, at -553 & -554 ██████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████. At the time of the sale, Stacy Schusterman, together with

other family members, was a named beneficiary of both trusts.  Zhang Decl. Ex. M (Phillips

Dep. Tr. 32:18-33:20, 277:10-278:4 (Nov. 13, 2020)).

13.     The third selling shareholders was the Foundation, a charitable foundation. Right

before the LBO, it was assigned 35% of SIC's outstanding common shares from other entities

owned/controlled by Ms. Schusterman.  Zhang Decl. Ex. M (Phillips Dep. Tr. 287:10-288:21);

Zhang Decl. Ex. N (SAMS0153099, at -100).  At the time of the sale, Ms. Schusterman was a

board member of the Foundation.  Zhang Decl. Ex. O (Phillips Dep. 30(b) (6) Tr. 142:7-16 (Feb.

19, 2021)).

14.     Stacy Schusterman began to pursue a sale of Samson in early 2011.  Zhang Decl.

Ex. P (SEC-00189200, at -201 & -202).  In order to sell 100% of Samson to the Sponsors, the

Foundation needed to consent to the sale and to sell its shares.  Ms. Schusterman recognized,

however, that (1) she had a conflict of interest as a board member of the Foundation and (2) the

Foundation did not have the requisite expertise to evaluate the LBO.  Zhang Decl. Ex. Q (SEC-

00289966 █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Zhang

Decl. Ex. M (Phillips Dep. Tr. 284:23-285:13).  She therefore recused herself from the

Foundation's decision-making process and formed an independent committee to review and approve the LBO.  Zhang Decl. Ex. Q (SEC-00289966).

15.     On the eve of signing the LBO, the Sponsors, led by KKR, agreed to Ms. Schusterman's last-minute demands and, in addition to approximately $7 billion in cash consideration, agreed to provide the selling shareholders with preferred shares that had an initial liquidation preference of $180 million.  Zhang Decl. Ex. K (KKR-SAM_0188149, at -149 & -151); *see also* Zhang Decl. Ex. R (NGP00006101).  The Stock Purchase Agreement (the "SPA")

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████          Zhang Decl. Ex. S (SEC-00249904, at -923).

16.     Ms. Schusterman had the "ultimate decision-making authority" with respect to the allocation.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 132:22-133:2).  Exercising this ultimate decision-making authority on behalf of the all three selling shareholders, *id.* at 133:11-15, Ms. Schusterman decided to allocate 100% of the preferred shares to the Foundation.  Zhang Decl. Ex. L (SEC-00272549, at -551).  Acting on behalf of the selling shareholders, Ms. Schusterman could have allocated the preferred shares *pro rata* among the three selling shareholders, or in any other manner, but she decided to allocate all preferred shares to the Foundation.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 133:3-15; 135:2-137:22); *see also* Zhang Decl. Ex. H (Schusterman Dep. Tr. 58:23-59:23).  The $180 million in preferred shares allocated to the Foundation resulted in a dollar-for-dollar decrease in the cash that the Foundation would have otherwise received for the sale of its shares.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 127:24-128:20).

17.    In contrast to her recusal from the Foundation's decision to sell SIC shares, Ms. Schusterman did not delegate this authority on the allocation of the preferred shares to the Foundation's independent committee or to anyone other than herself. *Id.* at 152:5-17.  There is no evidence in the record that the Foundation's independent committee actually participated in the allocation decision.

18.    The LBO closed pursuant to Ms. Schusterman's allocation decision.  On December 21, 2011, SRC transferred a total amount of approximately $6.5 billion in cash (the "LBO Cash Transfers"),[1] plus $180 million in preferred shares, to the selling shareholders against redemption and delivery by the selling shareholders of approximately 206 million shares of SIC common stock.  Zhang Decl. Ex. G (KKR-SAM_0127587, at -622).  The consideration to the sellers was allocated as follows: SFTDM received $2,484,369,361.50 in cash; ST 2008 received $1,731,053,453.00 in cash; and the Foundation received $2,100,938,955.50 in cash and 180,000 preferred shares with an initial liquidation preference of $1,000 per share. *Id.*; Zhang Decl. Ex. S (SEC-00249904, at -999).

19.    At the time of the transfer, Stacy Schusterman was a manager of SFTDM, as well as trustee of the Stacy Family Delaware Trust, which owned 100% of SFTDM.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 32:4-6, 270:15-20); 2022 Phillips Decl. ¶ 7.  At the time of the transfer, Stacy Schusterman was also a manager of ST 2008, as well as trustee of the Schusterman 2008 Delaware Trust, which owned 100% of ST 2008.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 34:13-16, 270:15-20); 2022 Phillips Decl. ¶ 8.

---

[1]    The $7 billion cash consideration equated to about $6.5 billion in cash transferred as a result of the agreed adjustments to the purchase price.

I.    **Use of LBO Cash Transfer Proceeds**

20.    In connection with the LBO, SFTDM formed Samson Energy on November 29, 2011 to receive, immediately prior to the closing of the LBO, the Gulf Coast and Offshore Assets that were owned by SIC and its subsidiaries.  Zhang Decl. Ex. A (KKR-SAM_0187397, -399).

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

*see id.* at -418; *see also* Zhang Decl. Ex. S (SEC-00249904, at -921 & -950–952). Ms. Schusterman did not view this as a purchase but rather as her "keeping" those assets.[2]  Zhang Decl. Ex. H (Schusterman Dep. Tr. 222:18-224:13 ("That wasn't a sale.  That was just us keeping the [Gulf Coast and Offshore] assets . . . [T]he family sold the shale assets to KKR and the family kept the Gulf Coast and [Offshore assets] . . . I manage everything, so to me, the family is I manage everything.")).  Right after the LBO, Ms. Schusterman became Samson Energy's Chief Executive Officer.  Zhang Decl. Ex. T (SEC-00245337).

21.    Ms. Schusterman used proceeds received from the LBO to capitalize and fund her new company Samson Energy.  *See* Zhang Decl. Ex. H (Schusterman Dep. Tr. 30:23-32:6 ("I know that [] Samson Energy was capitalized with proceeds [from the LBO].")); Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 208:14-24 ("[The proceeds that ST 2008 received from the LBO was] invested in Samson Energy Company.")).  SFTDM capitalized Samson Energy with approximately $800 million of its LBO proceeds and became Samson Energy's first member. [Adv. Pro. D.I. 50, ¶ 8]; *see also* Zhang Decl. Ex. U (Exhibit 2 to Defendants' Supplemental Response to Plaintiffs' First Set of Interrogatories).  In 2012, ST 2008 made a capital contribution of $487,666 to Samson Energy [Adv. Pro. D.I. 50, ¶ 8].  In late 2015, Samson

---

[2]    The issue of what, if any, value those notes had as of the LBO is reserved for trial.

Energy further accepted a total of approximately $213 million in equity contributions from ST 2008 and Stacy Family Trust ("SFT"). *Id.* Shortly thereafter, SFT assigned its membership interests to another entity, TFS Services, LLC ("TFS"). *Id.* ████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Zhang Decl. Ex. U, at 3.

22.    Ms. Schusterman also directed the use of some of the proceeds of the LBO Cash Transfers to pay the taxes of the two Selling Trusts of which she was a beneficiary.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 286:22-287:21).

## II.    Bankruptcy and the Plan Release

23.    Just six weeks after closing, one member of the Sponsors ████████████████

████████████████████████ Zhang Decl. Ex. C (NGP00003897).  Just 11 months after closing, some of the KKR professionals who had orchestrated the LBO ████████████████

████████████████████████████████ Zhang Decl. Ex. D (KKR-SAM_0204954).  At the end of 2012, Samson fired its CEO and laid off nearly ████ employees, including ████████████████ Zhang Decl. Ex. V (KKR-SAM_0208740, at -742).  In September 2013, based on a fresh evaluation of Samson's undeveloped assets, Samson's new CEO concluded that Samson could not survive more than two years without an infusion of new equity capital, *see* Zhang Decl. Ex. W (NGP00023202, at -219); Zhang Decl. Ex. X (Limbacher Dep. Tr. 171:19-173:4 (Mar. 10, 2021)), a forecast that proved accurate.  Zhang Decl. Ex. X (Limbacher Dep. Tr. 180:23-181:11 ("Yeah, I think that's—that's the way it basically played out.")).  On September 16, 2015, Samson filed for bankruptcy.  Ultimately, Samson's unsecured creditors—holding $2.5 billion in unsecured claims—recovered only pennies on the dollar.

24.    The Debtors' First Plan specifically provided that "unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the Debtors shall not release any

Avoidance Actions arising out of or related to the 2011 Acquisition." [Bankr. D.I. 15, at 26]  As Debtors' counsel said in the very first discussion with the Court on the release provisions, the initial plan on file "reserved" causes of action against "*the parties that sold the company*." Zhang Decl. Ex. Y (09/18/15 Hr'g Tr. 69:18-20 (emphasis added)).  A detailed explanation of the relevant history of the plan and plan release language is set forth in the Trustee's Memorandum of Law at Adv. Pro. D.I. 67.

25.      Ultimately, the confirmed Plan's definition of "Released Party" expressly excluded "*the Debtors' directors or officers before the 2011 Acquisition or the holders of the Preferred Interests.*"  *Kravitz v. Samson Energy Co., LLC (In re Samson Res. Corp.) ("Release Opinion")*, 590 B.R. 643, 650-51 (Bankr. D. Del. Aug. 30, 2018) (emphasis in original).

## III.    Procedural History

26.      On January 12, 2018, Defendants' filed a motion to dismiss all claims against certain individual members of the Schusterman family on the grounds that those individuals had not received or benefitted from any of the transfers at issue.  [Adv. Pro. D.I. 23]  In that motion, Defendants did not seek relief on behalf of Stacy or Lynn Schusterman.  *Id.*  That motion was resolved by a stipulation that the claims against those moving individuals would be dismissed without prejudice, conditioned on a sworn certification that they did not benefit from the transfers.  [Adv. Pro. D.I. 41]  Neither Stacy Schusterman nor Lynn Schusterman executed such a certification.  *Id.*

27.      Then, almost four years ago, on May 23, 2018, Defendants filed two motions for summary judgment.  [Adv. Pro. D.I. 45, 48]  The first motion sought summary judgment in favor of Ms. Schusterman but only as to claims in relation to the transfers of the Gulf Coast and Offshore Assets.  [Adv. Pro. D.I. 49, at 7-8]  Defendants argued there that Ms. Schusterman

should face no liability for those claims because she did not receive a benefit from the transfer of the Gulf Coast and Offshore Assets. *Id.* In that motion, Defendants did not seek a summary judgment on any other Trustee's claims, nor did they dispute that Ms. Schusterman benefited from LBO Cash Transfers. *See generally id.* This Court did not rule on that motion.

28.    The second motion was filed by Defendants Stacy Family Delaware Trust, Schusterman 2008 Delaware Trust, SFTDM, ST 2008, SFT, Samson Exploration, LLC ("Samson Exploration"), Samson Offshore, LLC ("Samson Exploration"), and Samson Energy. [Adv. Pro. D.I. 46, at 1]  In an August 30, 2018 Opinion (the "2018 Opinion"), this Court granted the motion only with respect to Stacy Family Delaware Trust and Schusterman 2008 Delaware Trust, and denied it as to the rest of the movants. [Adv. Pro. D.I. 82]  In particular, this Court agreed with the Trustee that the record had not been sufficiently developed with respect to whether SFTDM and ST 2008 were in fact "holders of Preferred Interests." [Adv. Pro. D.I. 82, at 15-16]

## **ARGUMENT**

### I.    **Stacy Schusterman Is a Proper Defendant Because the Transfers Were Made for Her Benefit as a Beneficiary of the Relevant Trusts.**

29.    On a motion for summary judgment, "the court must draw all inferences in favor of the non-movant and where the non-moving party's evidence contradicts the movant's[,] the nonmovant's must be taken as true." *In re Campbell*, 2015 WL 3919514 at *2 (Bankr. D. Del. 2015) (internal quotation omitted).  The Court should therefore assume, for purposes of this Motion, the validity of the Trustee's substantive factual assertions regarding fraudulent conveyance, including the expert opinions highlighted above that:

- Samson was balance sheet insolvent on the date of the LBO;

- Samson had unreasonably small capital as of the date of the LBO;

- Samson did not receive reasonably equivalent value for the LBO Cash Transfers, and in fact received value that was billions of dollars less than the LBO Cash Transfers; and

- Samson did not receive reasonable equivalent value for the Gulf Coast and Offshore Asset transfers.

### A. Stacy Schusterman clearly received a benefit from the LBO cash transfers.

30.     As set forth above, Defendants filed two motions for summary judgment in 2018 seeking, respectively, (1) dismissal of certain individual defendants, but *not* Stacy Schusterman, on the theory that they did not benefit directly or indirectly from the challenged transfers, and (2) dismissal of the claim against Ms. Schusterman relating to the Gulf Coast and Offshore Asset transfers only (Count IV), on the theory that Ms. Schusterman did not benefit from those transfers.  As an initial matter, even setting aside the inefficiency of Defendants' practice of filing *seriatim* motions for summary judgment in this case generally, it is not clear why the Court should even entertain Defendants' current Motion to the extent it now seeks dismissal of the Trustee's claim against the *same* defendant on the *same* "lack of benefit theory," but with respect to different transfers (the LBO Cash Transfers).  Splitting the same argument into two summary judgment motions, filed years apart, crosses into a new level of wastefulness and should not be indulged.

31.     Since 2018, discovery in this case has only made Defendants' argument weaker, as it has not only confirmed that Ms. Schusterman was a beneficiary of the Selling Trusts, but also that she used her control position to access the cash proceeds to make investments on her behalf, including large investments in her new company, Samson Energy.  *See supra* ¶¶ 12, 21-22.  Without any basis to explain away these inconvenient facts, Defendants have simply decided to ignore them.

32.     Indeed, Defendants' argument that Stacy Schusterman is not a person "for whose benefit" the LBO Cash Transfers were made completely fails to address or even mention the fact that Ms. Schusterman is a *literal beneficiary* of the trusts that, through their wholly owned LLCs, sold the shares and received the cash consideration.  On the basis of Stacy Schusterman's status as a beneficiary of the two Selling Trusts alone, she is a person "for whose benefit" the transfers were made and therefore a proper defendant under Section 550(a)(1).  *See Russell v. Harper (In re Dearmond)*, Bankr. No. 14-50106, Adv. Pro. No. 16-5002, Adv. Pro. No. 16-50032017, Bankr. LEXIS 3188, *26 (Bankr. E.D. Tenn. Sep. 21, 2017) (finding individual liable for fraudulent transfer to trust because, as trust beneficiary, she was a person for whose benefit transfer was made and observing that "[c]ourts have found that the beneficiary of a trust may be considered a person for whose benefit a transfer into a trust is made, and may be held strictly liable under § 550(a)(1)") (internal quotations and citations omitted); *In re Maestro*, 465 B.R. 576, 614-15 (Bankr. W.D. Wa. 2011) (finding trust beneficiary to be proper "for whose benefit" defendant under Section 550(a) with respect to transfer to trust and collecting cases); *In re Hessco Industries*, Inc., 295 B.R. 372, 377-78 (BAP 9th Cir. 2003) (finding individual beneficiaries of transferee trusts to be entities "for whose benefit" the relevant transfers were made); *see also Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 786-87 (Bankr. N.D. Ill. 2007) (beneficiary of trust was proper "for whose benefit" defendant where the transfer was a mortgage payment on real property owned by the trust).  Defendants, who do not address the issue of Ms. Schusterman's status as trust beneficiary, do not cite any case to the contrary.

33.     This result is not changed by the fact that the LBO Cash Transfers were not directly made to the two Selling Trusts, but rather to the Moving Selling Shareholders that were 100% owned by the Selling Trusts.  The record is clear that the Moving Selling Shareholders

were mere instrumentalities of the trusts, were controlled by Ms. Schusterman, and, acting at Ms. Schusterman's behest, used the proceeds to make large investments in Ms. Schusterman's new company, defendant Samson Energy.  *See supra* ¶¶ 12, 16-17, 19, 20-22.  Documents produced in discovery confirm that, internally, Defendants always considered the Selling Trusts to be the true owners of Samson prior to the LBO.  *See supra* ¶ 12; *see also, e.g.*, Zhang Decl. Ex. Z (SAMS0564209, at -225–28 & -236–39



Zhang Decl. Ex. AA (SEC-00195905

)); Zhang Decl. Ex. BB (SEC-00190001, at -001, -002, & -003 (

And, as a practical matter, in assessing the benefit received by a trust beneficiary, there is no difference between a cash transfer directly to the trust or a cash transfer to a LLC vehicle that is wholly owned by the trust: both equally increase the value of the beneficiaries' stake in the trust.

34.      *In re Phillips* is instructive.  In what was ultimately determined to be a fraudulent transfer, the debtor paid off the mortgage on property that was 100% owned by a trust.  *Id.* at 786-87.  The Court found that the beneficiary of the trust was a proper "for whose benefit" defendant under Section 550(a)(1), notwithstanding that (i) the beneficiary herself did not receive the transfer, (ii) the cash was not transferred to the trust of which she was a beneficiary, but instead to the mortgagee bank, and (iii) the trust beneficiary did not directly own the property that was the subject of the mortgage.  *Id.*  Despite these facts, the court determined that the

beneficiary received an actual, quantifiable benefit in the form of "a dollar for dollar increase in *her equity position* in the Burr Ridge Property as a result of the Debtor's transfer." *Id.* at 786 (emphasis added). The court's reference to the beneficiary's "equity position" in the property, despite the fact she did not own the property directly but instead was a beneficiary of the trust that owned the property, was in clear recognition of the fact that a trust beneficiary receives a tangible benefit where, as here, the value of the trust's property is increased.[3]

35.    Defendants do not even mention Ms. Schusterman's status as beneficiary of the Selling Trusts and therefore do not attempt to address the effect of such status on the question of whether Ms. Schusterman is a person "for whose benefit" the LBO Cash Transfers were made. Instead, Defendants invent a standard that the "test" is "generally" only met under certain limited circumstances, such as where a third party's liability or debt is immediately reduced by the transfer, or where the third party is a junior creditor whose position is immediately improved by the pay-down of senior debt. Defs.' Mem., at 14. Similar attempts to limit "for whose benefit" liability have been deemed to "afford section 550(a)(1) far too limited a scope." *Dr. Ben Branch v. Fed. Deposit Ins. Corp.,* 825 F. Supp. 384, 401 (D. Mass. 1993).

36.    Defendants cite *Halperin v. Moreno (In re Green Field Energy Servs.)*, Bankr. No. No. 13-12783, Adv. Pro. No. 15-50262, 2018 Bankr. LEXIS 517 (Bankr. D. Del. Feb. 27, 2018) for the proposition that, to be a proper "for whose benefit" defendant, the benefit to such defendant must be "actual, quantifiable, and accessible," adopting the standard applied by the court in *Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 590-91 (Bankr. N.D. Ill.

---

[3]    The record in *Phillips* is unclear as to whether the trust beneficiary was, at the time of the transfer in question, also a mortgagor with respect to the mortgage that was paid down. *See generally In re Phillips*, 379 B.R. 765. But whether the beneficiary was a mortgagor was clearly not relevant to the court's decision, as the court focused on the increase in value of the beneficiary's interest in the real property by virtue of her status as trust beneficiary. *Id.* at 786-87.

2005).  To the extent the standard adopted by *Halperin* applies here,[4] the transfer of billions in

cash into LLCs that were 100% owned by the Selling Trusts clearly provided an actual,

quantifiable, and accessible benefit to Ms. Schusterman as a beneficiary of the Selling Trusts.

37.     The benefit to Ms. Schusterman as trust beneficiary was clearly an "actual"

benefit, as demonstrated in the *McCook* case that originated the "actual, quantifiable, and

accessible" standard applied in *Halperin*.  The requirement of an "actual" benefit is simply

meant to distinguish a "merely intended one."  *McCook*, 319 B.R. at 591.  Some courts have

indeed held that the "for whose benefit" language of Section 550 only concerns the intent of the

transferor.[5]  The court in *McCook* criticized such decisions and, by way of illustration,

considered a hypothetical "fraudulent transfer of $100,000 from an individual debtor to his

attorney, with directions to deposit the money into a trust fund for the debtor's children, followed

by an embezzlement of the funds by the attorney."  *Id.*  The *McCook* court was persuaded by the

argument that imposing liability on the children in such a scenario could be seen as a deprivation

of due process because they did not actually receive the intended benefit because the funds were

embezzled.  *Id.*  The baseline assumption of the hypothetical, of course, was that the benefit to

the children would have been "actual" if the money had actually been deposited into the trust of

which the children were beneficiaries.  This should end the inquiry.  Nothing more is meant by

---

[4]     The *Halperin* decision is not controlling, and it appears to be the only decision by a bankruptcy court anywhere in the Third Circuit to have ever applied this standard.  Other courts have found that the mere intention of the transferor to provide a benefit to the defendant is enough.  *See infra*.

[5]     *See, e.g.*, *Ames Merch. Corp. v. Nikko Am., Inc. (In re Ames Dep't Stores, Inc.)*, Bankr. No. 01-42217, Adv. Pro. No. 03-08310, 2011 Bankr. LEXIS 991, *18 (Bankr. S.D.N.Y. Mar. 28, 2011) ("[S]ome courts have considered the intent of the parties to the transaction . . . . (citing *Enron Creditors Recovery Corp. v. J.P. Morgan Sec. (In re Enron Creditors Recovery Corp.)*, 407 B.R. 17, 33 (Bankr. S.D.N.Y. 2009))); *Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 340 B.R. 829, 834 (Bankr. E.D. Mich. Apr. 12, 2006) ("The Court agrees with the Ninth Circuit's holding in *Bullion Reserve*, as the correct and more natural reading of the words used in § 550(a)(1).  Thus, if the Trustee avoids one or more of the transfers at issue in this case, the Trustee must then demonstrate that Debtor intended to benefit Art Leather in making the transfer(s) to GE Capital.").

the "actual" benefit requirement than that the alleged beneficiary actually receive value, and such

an "actual" benefit is clearly received if the transfer "increases the beneficiary's assets,"

including by increasing the value of the property of a trust of which the defendant is beneficiary.

*Id.* Here, the LBO Cash Transfers unquestionably increased Ms. Schusterman's assets by

increasing the value of Ms. Schusterman's interest in the corpus of the trust as beneficiary.

38.     Indeed, the benefit to Ms. Schusterman was even more direct and tangible than

the benefit at issue in *McCook*, where the court found that the "actual, quantifiable and

accessible" standard was satisfied.  There, the debtor transferred the contractual right to purchase

a smelting plant to an LLC in which the defendant had a 56% equity interest.  *Id.* at 580.

Notwithstanding that the fraudulently transferred property was not cash (as is the case here), or

even tangible property, the court had no trouble finding that the defendant received an "actual

benefit" from the transfer: his share of the value of the assets that were ultimately purchased

pursuant to the contractual right.  *Id.* at 592.  Moreover, the decision in *McCook* directly

contradicts Defendants' suggestion that a person cannot be a proper "for whose benefit"

defendant by virtue of the defendant's "indirect" interest in the transferred property, such as

where the defendant owns equity in the transferee entity.  *See*  Defs.' Mem., at 14-15.  Similarly,

an "indirect" interest by virtue of being a beneficiary of a trust whose interest in the trust

property increases in value as a result of the transfer is no bar to a finding of an "actual benefit."

The court in *In re Phillips*, discussed *supra*, applied the same "actual, quantifiable and

accessible" standard and found that that that the transfer to the mortgagee bank provided an

"actual" benefit to the beneficiary of the trust that owned the real property because it had the

effect of increasing the beneficiary's "equity position" in the property—i.e., the value of her

interest in the trust that held the real property.  *In re Phillips*, 379 B.R. at 786.

39.     The benefit of the LBO Cash Transfers to Ms. Schusterman as trust beneficiary is also "quantifiable."  The adoption by some courts of the "quantifiable" requirement simply recognizes that "fraudulent conveyance recovery is a form of disgorgement," so the benefit to a particular defendant, if it is to be disgorged, must be quantifiable.  *McCook*, 319 B.R. at 591.  As such, this requirement is easily satisfied here.  The total benefit to the trust beneficiaries of the two trusts is the amount transferred to SFTDM and ST 2008: approximately $4.2 billion.  The quantifiable benefit to Ms. Schusterman herself merely depends on her exact interest in the corpus of the trust, which can be determined at trial.  At this stage, "[t]he Trustee need only show the benefit received *can be* quantified to establish ultimate beneficiary status. *Halperin,* 2018 Bankr. LEXIS 517, at *7 (emphasis added).

40.     Finally, the benefit to Stacy Schusterman of the $4.2 billion in cash transfers was also clearly "accessible" to her.  Ms. Schusterman was a manager of the Moving Selling Shareholders and a trustee of the Selling Trusts that were 100% owners of the Moving Selling Shareholders. *See supra* ¶ 19.  Nothing more is required to show an accessible benefit. *McCook*, 319 B.R. at 592 (accessibility requirement met by virtue of defendant's control over LLC that received the assets).  Moreover, not only was the benefit "accessible," Ms. Schusterman *actually accessed it*, most notably by directing that a substantial portion of the LBO Cash Transfers be invested in her new company Samson Energy, *see supra* ¶ 21, but also by using the cash to pay taxes on behalf of the Selling Trusts of which she was a beneficiary, *see supra* ¶ 22.

41.     The cases Defendants cite in support of their argument that Ms. Schusterman did not receive an "actual, quantifiable, and accessible" benefit from the transfer of $4.2 billion in cash to her family trusts via wholly owned LLCs that she controlled are inapposite.  As noted, Defendants do not cite any cases involving benefits received as a result of defendant's status as

beneficiary of a transferee trust, let alone cases where, as here, the benefit of the transfer accrued 100% to the trust beneficiaries. And the cases Defendants do cite do not at all resemble the situation here, in which the alleged transfer beneficiary controlled the transferred assets and received an immediate benefit from the transfer in the form of an increase in the value of her interest in the Selling Trusts.[6]

42.    In a footnote, Defendants cite a series of cases supposedly standing for the proposition that transfer beneficiary status is not automatically conferred on a defendant "merely because it is a direct or indirect equity holder of an initial transferee," presumably referring to the formality of the Selling Trusts 100% equity ownership in the Moving Selling Shareholder LLCs. Defs.' Mem., at 14 n.18). While some cases do indeed reach this conclusion, "merely" is the operative word in such cases.[7] Again, none of those cases even remotely resemble a situation

---

[6]    For example, in *Bodenstein v. Univ. of N. Iowa (In re Peregrine Fin. Grp, Inc.)*, the trustee unsuccessfully asserted *at trial* that challenged transfers to a non-profit foundation that existed to solicit, receive and manage funds for a university were actually made "for the benefit" of the university under Section 550(a)(1). 589 B.R. 360, (Bankr. N.D. Ill. 2018). In that case, however, the university did not control the funds, and it had only a conditional right to benefit from the funds. *Id.* This is fundamentally different from the situation here, where Ms. Schusterman received an immediate benefit from the LBO Cash Transfers in the form of an increase in her family trusts assets' value, and where she actually exercised control of the funds to invest them in Samson Energy and pay the trusts' taxes. *Id.* Defendants also cite *In re Dreier LLP*, but the vague and conclusory allegations at issue there, regarding a benefit based on the agency relationship between defendant and transferee made on information and belief," are not at all analogous to the clear and concrete evidence of the benefit that Stacy Schusterman received as a result of her status as trust beneficiary and manager of the transferee entities. 452 B.R. 451 (Bankr. S.D.N.Y 2011).

[7]    *See, e.g., Janvey v. Libyan Investment Authority*, 840 F.3d 248, 264, 266 (5th Cir. 2016) (parent corporation not transfer beneficiary of transfer to subsidiary corporation where "[t]here is nothing to indicate that [parent] had or exercised any significant control over [subsidiary], either generally or with specific regard to" the specific transaction at issue); *In re Meredith,* 527 F.3d 372, 376 (4th Cir. 2008) (no transfer benefit liability where, after a fact-intensive inquiry, the court determined that the supposed benefit amounted to "for a brief period of time, the [defendant being the] nominal owner of a business effectively controlled by her husband" without receiving any actual value); *In re International Management Assoc.*, 399 F.3d 1288, 1293 (11th Cir. 2005) (no transfer beneficiary liability where the transfer actually diminished the value of assets controlled by defendant so the "only 'benefit' was the winning of 100% control over depleted assets."); *Dietz v. Spangenberg*, No. 11-2600, 2013 U.S. Dist. LEXIS 123601 (D. Minn. 2013) (defendant not a transfer beneficiary issue where the *only* allegation of an alleged benefit was that defendant was a 1% owner of a transferee, with no evidence presented regarding

like the one here, involving transferees that are 100% owned by, and clearly mere instrumentalities of, their trust owners, and further involving complete control of such transferees by the beneficiary defendant.

43.    Even in *Halperin*, on which Defendants heavily rely, the court found a genuine issue of triable fact as to defendant's transfer beneficiary status where the defendant was a 50% owner and manager of LLCs that received avoidable monetary transfers from the debtor.  2018 Bankr. LEXIS 517, at *4-5.  Further, the court's ultimate ruling that the defendant was not the transfer beneficiary was based on *evidence at trial* that the transferees were special purpose vehicle entities that did not generate profits, did not pay defendant a salary, and that did not make any payments at the direction of defendant.  *Halperin v. Moreno (In re Green Field Energy Servs.)*, 594 B.R. 239, 288-89 (Bankr. D. Del. 2018).

44.     Based on the authority and facts set forth above, the Court should rule definitively that Stacy Schusterman's status as trust beneficiary renders her a person "for whose benefit" the LBO Cash Transfers were made.  At a minimum, however, based on this record, the court cannot grant summary judgment to Defendants on this issue, as it cannot be plausibly contended that there is not at least a genuine outstanding issue of material fact regarding the benefit that Ms. Schusterman received from the LBO Cash Transfers.

### B. Stacy Schusterman also received a benefit from the Gulf Coast and Offshore Assets Transfers.

45.     For the same reasons, Stacy Schusterman also received an actual, quantifiable, and accessible benefit from the transfer of the Gulf Coast and Offshore Assets.  The Gulf Coast

---

defendant's access to the alleged benefit); *Peterson v. Hofmann (In re Delta Phones, Inc.)*, Bankr. No. 04 B 823, No. 05 A 1205, 2005 Bankr. LEXIS 2550(Bankr. N.D. Ill. 2005) (defendant not a transfer beneficiary issue where the primary alleged benefit arose from a subsequent transfer, not the initial transfer).

and Offshore Assets were transferred to Samson Energy, a newly formed LLC.  As set forth

above, and as conceded by Defendants, SFTDM was, at the time of the transfer, the 100% owner

of Samson Energy as its sole member.  *See supra* ¶ 21.  As set forth above, in the seminal

*McCook* decision, the court found that an individual who held partial equity in an LLC to be

liable as a transfer beneficiary with respect to the transfer of an intangible contrary right to the

LLC.

46.     On a practical level, the transfer of the Gulf Coast and Offshore Assets was

understood to be nothing less than Ms. Schusterman acquiring—or in her words, "keeping"— an

entire oil and gas company.  *See supra* ¶ 20.  The benefit to Ms. Schusterman of receiving an

entire oil and gas company was clearly "actual," in the sense that the benefit was actually

received, and not merely intended.  *Id.* ¶¶ 20-21.  It was also quantifiable, as the quantum of the

benefit to Ms. Schusterman is merely a function of (i) the value of the Gulf Coast and Offshore

Assets, which will be determined at trial in any event, and (ii) Ms. Schusterman's interest in

Stacy Family Delaware Trust, which is the 100% owner of SFTDM.  *Id.* ¶ 20.  Finally, the

benefit to Ms. Schusterman was accessible.  She controlled Samson Energy as its Chief

Executive Officer, *see supra* ¶ 20, and she had (and has) an equity interest in Samson Energy

through her status as beneficiary of Stacy Family Delaware Trust, the ultimate owner of Samson

Energy at the time of the transfer.  Nothing more is required to show an accessible benefit.

47.     At a minimum, there is a triable issue of fact regarding whether Stacy

Schusterman is an ultimate beneficiary of the Gulf Coast and Offshore Asset transfer.  *See*

*Halperin,* 2018 Bankr. LEXIS 517, at *7-8 (finding that Trustee had satisfied the "quantifiable"

prong and that material of issues fact remained regarding the question of whether the defendant's

benefit was "actual" and "accessible," where Defendant was a 50% owner and manager of LLCs that received avoidable monetary transfers from the debtor).

## II.    The Moving Selling Shareholders Are Not Released.

48.     The definition of "Released Parties" in the Plan expressly carves out such "holders of Preferred Interests."  Defendants' argue that the Moving Selling Shareholders— SFTDM and ST 2008—were not released under the Plan because, among other reasons, they were never "holders of Preferred Interests."  Defs.' Mem. at 10-11.  In its 2018 Opinion, the Court did not resolve this issue, determining that the record had not been sufficiently developed and that "[i]f the record were to establish that SFTDM and ST 2008 were in fact holders of Preferred Interests, then they would be excluded from the release under the Plan."  [Adv. Pro. D.I. 82, at 15]   Since the Court issued its 2018 Opinion,[8] discovery has established that the Moving Selling Shareholders *were* holders of Preferred Interests, not because they has bare legal right to receive the Preferred Shares, but rather because they actually exercised control over the Preferred Shares.  *See supra* ¶¶ 15-18.  As set forth below, such exercise of control makes the Moving Selling Shareholders "holders of the Preferred Interests."

49.     While the term "Preferred Interests" is defined in the Plan as the redeemable preferred stock issued in connection with the LBO, the term "holders" is not defined.  Where a contractual term is undefined, it is appropriate to look to dictionary definition to ascertain the plain meaning.  *See In re Smurfit- Stone Container Corp.*, 444 B.R. 111, 124 (Bankr. D. Del. 2011) ("To ascertain the plain meaning of a phrase, courts commonly look to dictionaries."); *see*

---

[8]     In a footnote to the 2018 Opinion, the Court stated that it found "unavailing" the Trustee's contention that having a *mere* "unexercised right to receive Preferred Shares" was sufficient to render the Moving Selling Shareholders "holders" of such Preferred Shares. *Id.* at 16 n.9 (emphasis added).  While the Trustee reserves all rights to challenge that ruling, as noted, the record establishes actual, not hypothetical, exercise of those rights.

*also United States v. Heilman*, 377 Fed. App'x 157, 220 (3d Cir. 2010).  The definition of "holder" is "someone who has legal possession of a negotiable instrument and is entitled to receive payment on it"; "a person with legal possession of a document or title or an investment security"; or "someone who possesses or uses property."  Black's Law Dictionary, "Holder" (11th ed. 2019).  Thus, the definition of "holder" necessarily incorporates the definition of possession.  "Possession," in turn, is "[t]he fact of having or holding property *in one's power*; the exercise *of dominion* over property; …. something that a person owns *or controls.*"  Black's Law Dictionary, "Possession" (11th ed. 2019) (emphasis added); *see also In re Vermont Knitting Co.*, 98 B.R. 184, 188 (Bankr. D. Vt. 1989) ("To possess, a transitive verb, means to gain or exert influence or control, dominate; to cause to own (or) hold something, such as property").

50.    The definition of "possession" therefore includes "control."  The Moving Selling Shareholders were "holders" of the Preferred Interests because they controlled the disposition of Preferred Interests immediately prior to closing.  As noted above, the SPA ███████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████  Just before closing, Stacy Schusterman, together with her advisors, and admittedly acting on behalf of *all three selling shareholders*, deliberated as to how to allocate the Preferred Interests.  *See supra* ¶¶ 15-18.  Ultimately, all three selling shareholders, including the Moving Selling Shareholders, exercised their control over those Preferred Interests and directed that they be allocated to the Foundation.  *Id.*  The Moving Selling Shareholders further admitted at their Rule 30(b)(6) deposition that they had the power to, and did, direct the disposition of the Preferred Interests.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 132:8-133:15).  Thus, the Moving Selling Shareholders exercised control over the Preferred Interests and thereby met the definition of "holders."

51.     Even under a narrower definition of "possess," the Moving Selling Shareholders would still be "holders of Preferred Interests."  One of the definitions of "holder" cited above is a person with "legal possession of an investment security."  A "legal possessor" is defined as "[o]ne with the legal right to possess property, such as a buyer under a conditional sales contract, as contrasted with the legal owner who holds legal title."  Black's Law Dictionary, "Legal possessor" (10th ed. 2014).  Based on the facts established in discovery set forth above, the Moving Selling Shareholders were undeniably "legal possessors," and thus "holders," of the Preferred Interests because they had the legal right to possess the Preferred Interests under the Stock Purchase Agreement, no matter how one defines "possess."  As they admitted in their Rule 30(b)(6) deposition, prior to closing, the Moving Selling Shareholders could have allocated the Preferred Interests among themselves in any manner they saw fit, including *pro rata* among the selling shareholders.  Zhang Decl. Ex. O (Phillips 30(b)(6) Dep. Tr. 132:8-133:15, 135:14-137:22).[9]

52.     Finally, it should be noted that Ms. Schusterman's decision to act on behalf of the Foundation to allocate the preferred shares to the Foundation in lieu of an equivalent amount of cash, notwithstanding that she had an acknowledged conflict of interest, may have constituted inappropriate self-dealing under 26 U.S.C. § 4941 (defining self-dealing to mean "any direct or indirect . . . transfer to, or use by or for the benefit of, a disqualified person[, including a

---

[9]     The Trustee is aware of the Court's 2018 Opinion and its comment in a footnote regarding its view of the lack of ambiguity of the term "holders of Preferred Interests."  [Adv. Pro. D.I. 82, at 16 n.9]  However, to the extent the Court reconsiders whether the term is ambiguous, the Trustee reiterates (and incorporates the supporting record) that the extrinsic evidence indisputably favors the Trustee's reading.  [*See generally* Adv. Pro. D.I. 67]  In particular, in the First Day Declaration of Debtors' CFO Phil Cook, Mr. Cook references "securing an agreement with members of the Schusterman family, the original founders of Samson (together with certain related parties, the "Schustermans") in their capacities *as holders of preferred shares in Samson*."  [Bankr. D.I. 2 ¶ 13 (emphasis added)]  As used here, "Schustermans" can only refer to the selling shareholders collectively.  [*See* Adv. Pro. D.I. 67 at 10]

foundation manager,] of the income or assets of a private foundation."). At the time of the LBO, the Foundation owned about 34.76% of SIC shares to be purchased. If the preferred shares and cash had been allocated ratably among the three selling shareholders, the Foundation would have received prorated cash of $1.19 billion and prorated preferred shares of $62.57 million. Zhang Decl. Ex. G (KKR-SAM_0127587, at -622). Instead, as a result of Ms. Schusterman's allocation decision, the Foundation in fact received only about $1.07 billion cash and all of the $180 million preferred shares, which for purposes of the pending motion are assumed to be worthless. *Id.* The difference of $117 million between $1.19 billion cash that the Foundation would have received under a *pro rata* allocation and the $1.07 billion that the Foundation actually received was "transfer[red] to," and/or "use[d] by or for the benefit of" the SFTDM and ST 2008 and, ultimately, Stacy Schusterman. *See* 26 U.S.C. § 4941. Under these circumstances, interpreting "holders of Preferred Interests" to exclude the Moving Selling Shareholders would allow Ms. Schusterman to profit a second time from what appears to be an impermissible self-dealing transaction under the tax code.

53.     For all of these reasons, the Moving Selling Shareholders were actually "holders of Preferred Interests," and the Court should therefore reject Defendants' argument that the Moving Selling Shareholders are Released Parties under the Plan.

**III.     <u>The Trustees Are Proper Defendants and Should Not be Dismissed.</u>**

54.     Defendants seek dismissal of the trustees of the trust defendants solely on the basis that the trust defendants have been (or in the case of SFT, should be) dismissed from the case, but they do not cite any authority in support of this argument. Defs.' Mem. at 20-21. To be clear, none of the Trustees meet the definition of "Released Parties." Further, where property controlled by a trust is the subject of a fraudulent conveyance action, the trustees of such trust are proper defendants. *See, e.g. Official Comm. of Unsecured Creditors of Exeter Holding, Ltd. v.*

*Haltman*, No. 13-CV-5475 (JS) (AKT), 2018 U.S. Dist. LEXIS 54610, *22-23 (E.D.N.Y. 2018) (finding trustee to be proper defendant in fraudulent conveyance action in respect of trust property); *U.S. on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 841 F. Supp. 899, 903-04 (D. Minn. 1993) (same).  Here, the cash proceeds of the 2011 LBO transferred to SFTDM and ST 2008, which were 100% controlled by Stacy Family Delaware Trust and Schusterman 2008 Delaware Trust, respectively, remain subject to recovery in this action because (1) such cash provided a benefit to Stacy Schusterman as beneficiary of those trusts (*see supra* Section I) and (2) SFTDM and ST 2008, which directly received the cash for the benefit of the trusts and their beneficiaries, are not released (*see supra* Section II).  Therefore, the trustees of Stacy Family Delaware Trust (Stacy Schusterman and Lynn Schusterman) and the trustees of the Schusterman 2008 Delaware Trust (Stacy Schusterman, C. Phillip Tholen, and Wilmington Savings Fund Society, FSB), named in their capacity as such, remain proper defendants.

## IV.    Material Issues of Fact Remain as to Defendants Stacy Family Trust and Lynn Schusterman.

55.    There is material evidence in the record that SFT was a subsequent transferee of the proceeds from the LBO.  Zhang Decl. Ex. CC (SEC-00281150, at -169 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Zhang Decl. Ex. DD (SEC-00278956, at -974 (▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* Zhang Decl. Ex. EE (SEC-00283486, at -487 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  On this basis alone, summary judgment as to SFT is unwarranted.

56.    Further, though the record is not entirely clear, Defendants' internal documents suggest that SFT was deemed to have been involved in the LBO Cash Transfers and received a benefit.  For example, in allocating the proceeds among different selling shareholders,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

 Zhang Decl. Ex. AA (SEC-00195905 ( ); *see also*, *e.g.*, Zhang Decl. Ex. BB (SEC-00190001, at -001, -002, & -003 ); Zhang Decl. Ex. M (Phillips Dep. Tr. 45:20-46:9 )

. Therefore, even apart from SFT having received a subsequent transfer, there are material issues of fact regarding SFT's role and potential benefits from the initial transfer. SFT therefore remains a proper defendant.

57.     The record is also in dispute as to Lynn Schusterman's role. However, given the uncertainty and ambiguity in Defendants' deposition testimony regarding the beneficiaries of the Selling Trusts,[10] and Lynn Schusterman's decision not to execute a declaration affirming that she did not receive any value from the transfers at issue (either in 2018 or in connection with this Motion), material issues of fact preclude summary judgment as to Lynn Schusterman.[11]

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied, except to the extent it seeks dismissal of claims against Samson Exploration and Samson Offshore.

---

[10]     Mr. Phillips, one of the officers in charge of the Schusterman family office (and Defendants' 30(b)(6) witness) testified (in his individual capacity) that with respect to a trust he identified as the "Schusterman Family Delaware Trust," members of the Schusterman family were the beneficiaries, but he could not identify such families with certainty.  Zhang Decl. Ex. M (Phillips Dep. Tr. 32:18-33:20)

[11]     The Trustee acknowledges that, under the Court's 2018 Opinion, Samson Exploration, LLC ("Samson Exploration") and Samson Offshore, LLC ("Samson Offshore") would be deemed  "affiliates" of certain debtors and therefore would be released in accordance with the Court's interpretation of the relevant Plan release provisions.   The Trustee, however, reserves all rights, including appellate rights, with respect to its claims against Samson Exploration and Samson Offshore.

Dated: April 15, 2022                    Respectfully submitted,

                                         **FARNAN LLP**

                                         */s/ Michael J. Farnan*
                                         Joseph J. Farnan, Jr. (Bar No. 100245)
                                         Joseph J. Farnan, III (Bar No. 3945)
                                         Michael J. Farnan (Bar No. 5165)
                                         919 North Market St., 12th Floor
                                         Wilmington, DE 19801
                                         Telephone: (302) 777-0300
                                         Facsimile: (302) 777-0301
                                         farnan@farnanlaw.com
                                         jjfarnan@farnanlaw.com
                                         mfarnan@farnanlaw.com

                                         Thomas E Lauria (*pro hac vice*)
                                         **WHITE & CASE LLP**
                                         Southeast Financial Center, Suite 4900
                                         200 South Biscayne Blvd.
                                         Miami, FL 33131
                                         Telephone:     (305) 371-2700
                                         Facsimile:     (305) 358-5744
                                         tlauria@whitecase.com

                                         J. Christopher Shore (*pro hac vice*)
                                         Colin T. West (*pro hac vice*)
                                         1221 Avenue of the Americas
                                         New York, NY 10020
                                         Telephone:     (212) 819-8200
                                         Facsimile:     (212) 354-8113
                                         cshore@whitecase.com
                                         cwest@whitecase.com

                                         *Attorneys for the Settlement Trustee*