## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SAMSON RESOURCES CORPORATION, | Case No. 15-11934 (BLS) |
| Reorganized Debtor. | |
| PETER KRAVITZ, as Settlement Trustee of and on behalf of the SAMSON SETTLEMENT TRUST; | |
| Plaintiff, | Adv. Pro. No. 17-51524 (BLS) |
| v. | **Filed Under Seal** |
| SAMSON ENERGY COMPANY, LLC, *et al.*, | **Pursuant to Adv. Pro. D.I. 118** |
| Defendants. | |

### PLAINTIFF'S POST-TRIAL BRIEF

Joseph J. Farnan, Jr. (Bar No. 100245)
Joseph J. Farnan, III (Bar No. 3945)
Michael J. Farnan (Bar No. 5165)
**FARNAN LLP**
919 North Market St., 12th Floor
Wilmington, DE 19801
 (302) 777-0300


Dated: November 21, 2022

Thomas E Lauria (*pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
 (305) 371-2700

J. Christopher Shore (*pro hac vice*)
Colin T. West (*pro hac vice*)
Camille M. Shepherd (*pro hac vice*)
Lijun Zhang (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

FACTUAL BACKGROUND ................................................................ 4

    I.    The Evidentiary Record ................................................................ 4

    II.    The Parties .................................................................................... 5

    III.    Standard Valuation of Oil and Gas Assets. ................................... 9

        A.    PRMS Is the Industry Standard for Categorizing Reserves and Resources. ........ 11

        B.    Once Categorized Under PRMS, Reserve Volume Estimates and Cash Flow Projections Are the Next Step for Determining Fair Market Value. .................... 14

        C.    A NAV Can Be Determined Then by Applying Risking Factors to the Cash Flows Estimated for Different Categories of Reserves. ........................................ 15

        D.    PRMS Applies to Conventional and Unconventional Assets Alike. ................. 19

    IV.    Volatility in the E&P Industry ...................................................... 25

    V.    Process Leading to the Transaction ............................................... 28

    VI.    Samson and KKR Rush To Sign And Close .................................. 35

        A.    KKR Fails To Competently Assess Samson's Reserves .................................... 35

    1)    KKR and RPM Cobble Together A Deal Model ................................................ 36

    2)    NSAI's Third-Party Reserve Report Demonstrates the Critical Flaws in KKR's Model ............................................................................................................... 44

    3)    KKR Hamstrings Management Post-Close With An Unreasonable Business Model ................................................................................................................. 49

        B.    KKR Invents A Downside Case With No Downside At All ............................... 53

        C.    Transaction Participants Did Not Independently Corroborate KKR's Business Plan ................................................................................................................ 59

    VII.    Stacy Schusterman Spins Off the Gulf Coast/Offshore Assets to Herself ........................ 63

    VIII.    Samson Closes the Deal and Incurs Significant Secured and Unsecured Debts .. 69

    IX.    Samson Experiences Severe and Immediate Financial Distress Following the Transaction, Leading To Its Bankruptcy .......................................................... 77

LEGAL ARGUMENT ................................................................ 84

I.   The Trustee is Entitled to Judgment that the Challenged Transfers Were Fraudulent ...... 88

     A.   The Trustee Has Standing ................................................................................ 88

     B.   Samson Was Inadequately Capitalized at the Time of the LBO Closing and the
          GoM Asset Transfers ...................................................................................... 94

1)        The Trustee Established That Samson Was Left With Unreasonably Small Capital
          At Close .......................................................................................................... 97

2)        Defendants Failed To Rebut The Trustee's Showing Of Inadequate Capitalization 107

     C.   Samson Was Balance Sheet Insolvent At The Time of the LBO Closing and
          GOM Asset Transfers ..................................................................................... 109

     D.   Samson Did Not Receive Reasonably Equivalent Value for Any of the
          Challenged Transfers ..................................................................................... 115

1)        Value Exchanged for Samson's Onshore Assets ................................................ 116

2)        Value Exchanged for Samson's GoM Assets ..................................................... 118

3)        The Purchase Price As Value ......................................................................... 123

     E.   The Transfers Were of an Interest of the Debtor in Property ........................... 130

II.  The Trustee Is Entitled To Damages ............................................................................. 134

     A.   The Initial Transferees Are Liable .................................................................. 134

     B.   Stacy Schusterman is Liable as the Beneficiary of the Transfers ..................... 135

     C.   Subsequent Transferees of Fraudulently Conveyed Assets Are Liable ............. 142

     D.   Pre-Judgment Interest Payable To The Trustee ............................................... 145

     E.   The Trustee's Recovery ................................................................................. 147

III. The Defendants' Affirmative Defenses Are Meritless .................................................... 149

     A.   The Alleged Assumption of the 2011 SPA Does Not Bar the Trustee's Claims
          ...................................................................................................................... 149

1)        The Plain Language Of The Plan Explicitly Preserves The Trustee's Claims ..... 150

2)        The SPA Has Been Substantially Performed And Is Thus Not Executory .......... 153

3)        Assumption By Omission Does Not Foreclose The Trust's Ability To Bring Its
          Claims ........................................................................................................... 157

     B.   The Transfers By Non-SIC Debtors Do Not Involve Safe-Harbored "Financial
          Participants" .................................................................................................. 160

     C.   Defendants Have Not Shown Intervening Solvency .......................................... 164

     D.   No Damages Offsets or Reductions Are Available ........................................... 169

1)        Defendants Are Not Good-Faith Transferees .................................................... 169

2)        The Settlement Trust Beneficiaries Are Not Estopped From Recovering ........... 173

    E.    Defendants' Remaining Defenses Are Meritless ................................................ 176

1)        The Transfers Are Not Otherwise Safe Harbored ................................................. 177

2)        The Trustee's Recovery Should Not Be "Adjusted In The Interests Of Equity". 179

3)        Defendants' Catchall Affirmative Defense Is Totally Unsupported .................... 180

4)        The Challenged Transfers Were Not Ratified ...................................................... 182

CONCLUSION ............................................................................................................................. 185

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adidas Am., Inc. v. Thom Browne, Inc.*,
No. 21-CV-5615 (JSR) (RWL), 2022 U.S. Dist. LEXIS 191704
(S.D.N.Y. Sep. 21, 2022) ...................................................................................180

*AgroFresh Inc. v. MirTech, Inc.*,
257 F. Supp. 3d 643 (D. Del. 2017) ..................................................................181

*Allonhill, LLC v. Stewart Lender Servs., Inc.*,
2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019) ...........................................125

*Am. Home Mortg. Holding v. Showcase of Agents, L.L.C.*
*(In re Am. Home Mortg. Holding)*,
458 B.R. 161 (Bankr. D. Del. 2011) ..................................................................181

*Ameriserv Fin. Bank v. Commercebank, N.A.*,
2009 U.S. Dist. LEXIS 24559 (W.D. Pa. Mar. 26, 2009) .................................170

*Armstrong v. Collins*,
2010 U.S. Dist. LEXIS 28075 (S.D.N.Y. Mar. 24, 2010) .................................170

*Asarco LLC v. Ams. Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ...........................................................108, 109, 112

*B.E.L.T., Inc. v. Wachovia Corp.*,
403 F.3d 474 (7th Cir. 2005) .............................................................................122

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
520 B.R. 15 (Bankr. S.D.N.Y. 2014) .................................................................152

*Baldi v. Lynch*,
319 B.R. 570 (Bankr. N.D. Ill. 2005) ................................................................138

*Baxter v. Bressman (In re Bressman)*,
874 F.3d 142 (3d Cir. 2017) ..............................................................................181

*BCPM Liquidating LLC v. Pricewaterhousecoopers LLP*
*(In re BCP Management, Inc.)*,
320 B.R. 265 (Bankr. D. Del. 2005) ..................................................................152

*Bishop v. Bishop*,
257 F.2d 495 (3d Cir. 1958) ..............................................................................182

*Blixseth v. Glasser (In re Yellowstone Mt. Club, LLC)*,
   656 F. App'x 307 (9th Cir. 2016) ......................................................................175

*Bonded Fin. Servs. v. European Am. Bank*,
   838 F.2d 890 (7th Cir. 1988) ............................................................................132

*Boston Trading Group, Inc. v. Burnazos*,
   835 F.2d 1504 (1st Cir. 1987)...........................................................................122

*Boyer v. Crown Stock Distrib.*,
   587 F.3d 787 (7th Cir. 2009) ..............................................................................95

*Bradford White Corp. v. Ernst & Whinney*,
   872 F.3d 1153 (3d Cir. 1989)...........................................................................177

*Carroll v. Robert F. Craig P.C. (In re Innovative Commun. Corp.)*,
   507 B.R. 841 (Bankr. D.V.I. 2014)....................................................................90

*Cohen v. Sikirica*,
   487 B.R. 615 (W.D. Pa. 2013)...........................................................................90

*Cox v. NOSTAW, Inc. (In re Cent. Ill. Energy Co-op.)*,
   521 B.R. 868 (Bankr. C.D. Ill. 2014).............................................................122

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
   500 B.R. 464 (W.D. Tex. 2013)...............................................174, 175, 176, 184

*Crystallex Int'l Corp. v. Petróleos de Venez., S.A.*,
   879 F.3d 79 (3d Cir. 2018)...............................................................................131

*Davis v. Schwartz*,
   155 U.S. 631 (1895).........................................................................................122

*Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft*
   *(In re Fah Liquidating Corp.)*,
   572 B.R. 117 (Bankr. D. Del. 2017) ................................................................180

*Finjan, Inc. v. Rapid7, Inc.*,
   No. 18-1519-MN-MPT, 2019 U.S. Dist. LEXIS 105547
   (D. Del. June 25, 2019).....................................................................................182

*Finkel v. Polichuk (In re Polichuk)*,
   506 B.R. 405 (Bankr. E.D. Pa. 2014) ................................................................88

*First State Bank v. Smith*,
   140 P. 150 (Okla. 1914)...................................................................................122

*FirstMerit Bank, N.A. v. Kloysner Grp.*,
   LLC, No. 16-cv-4930, 2017 U.S. Dist. LEXIS 183695 (N.D. Ill. Nov. 6, 2017).................123

*Forman v. Gittleman (In re OpenPeak, Inc.)*,
   Nos. 16-28464 (SLM), 17-01755 (SLM), 2020 Bankr. LEXIS 3463 (Bankr.
   D.N.J. Dec. 10, 2020) .........................................................................................................86

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*,
   595 B.R. 686 (Bankr. D. Del. 2018) ...................................................................................114

*Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*,
   Nos. 16-10202, 17-50662, 2019 Bankr. LEXIS 2311 (Bankr. D. Del. July 25,
   2019) .....................................................................................................................................90

*Halperin v. Moreno*,
   No. 15-50262, 2018 Bankr. LEXIS 517 (Bankr. D. Del. Feb. 27, 2018) ............................137

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
   191 F.3d 813 (7th Cir. 1999) ..............................................................................................182

*IBT Int'l, Inc. v. N. (In re Int'l Admin. Servs.)*,
   408 F.3d 689 (11th Cir. 2005) ............................................................................................141

*Image Masters, Inc. v. Chase Home Finance*,
   489 B.R. 375 (E.D. Pa. 2013) .............................................................................................140

*In re Acequia, Inc.*,
   34 F.3d 800 (9th Cir. 1994) ................................................................................................174

*In re Aerogroup Int'l*,
   601 B.R. 571 (Bankr. D. Del. 2019) ...................................................................................146

*In re Allou Distribs., Inc.*,
   392 B.R. 24 (Bankr. E.D.N.Y. 2008)...............................................................................89, 90

*In re Am. Rehab & Physical Therapy, Inc.*,
   No. 04-14562, 2006 WL 1997431 (Bankr. E.D. Pa. May 18, 2006)....................................170

*In re Am. Tissue, Inc.*,
   2007 Bankr. LEXIS 4004 (Bankr. D. Del. Nov. 20, 2007) .................................................170

*In re Ames Dep't Stores, Inc.*,
   2011 Bankr. LEXIS 991 (Bankr. S.D.N.Y. Mar. 28, 2011) .................................................137

*In re Astria Health*,
   640 B.R. 758 (Bankr. E.D. Wa. 2022).................................................................157, 159, 161

*In re Bluman*,
  125 B.R. 359 (Bankr. E.D.N.Y. 1991)...................................................................154

*In re Bressman*,
  327 F.3d 229 (3d Cir. 2003)....................................................................171, 172

*In re Canal Asphalt, Inc.*,
  No. 15-23094 (RDD), 2017 Bankr. LEXIS 1289
  (Bankr. S.D.N.Y. May 10, 2017) ..........................................................................152

*In re Carrozzella & Richardson*,
  302 B.R. 415 (Bankr. D. Conn. 2003) ...............................................................89, 91

*In re Chase & Sanborn Corp.*,
  813 F.2d 1177 (11th Cir. 1987) ...........................................................................133

*In re Chateaugay Corp.*,
  102 B.R. 335 (Bankr. S.D.N.Y. 1989)...........................................................155, 156

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................................167

*In re Columbia Gas Sys.*,
  997 F.2d 1039 (3d Cir. 1993)...............................................................................133

*In re Consol. Indus. Corp.*,
  No. 4:04-cv-64, 2006 WL 3136924 (N.D. Ind. Oct. 31, 2006) ........................89, 91

*In re Consol. Pioneer Mortg. Entities*,
  211 B.R. 704 (S.D. Cal. 1997)..............................................................................131

*In re Crown Unlimited Mach., Inc.*,
  No. 03-13400, 2005 Bankr. LEXIS 3073 (Bankr. N.D. Ind. Nov. 4, 2005)...........88

*In re DLC*,
  295 B.R. 593 (B.A.P. 8th Cir. 2003)......................................................................89

*In re DSI Renal Holdings, LLC*,
  617 B.R. 496 (Bankr. D. Del. 2020) .....................................................................131

*In re EBC I, Inc.*,
  380 B.R. 348 (Bankr. D. Del. 2008) ......................................................................131

*In re Exide Techs.*,
  607 F.3d 957 (3d Cir. 2010), *as amended* (June 24, 2010)...................153, 154, 155

*In re First Nat'l Parts*,
  2000 U.S. Dist. LEXIS 10420 (N.D. Ill. July 12, 2000).......................................171

*In re Global Protections, USA*,
  546 B.R. 586 (Bankr. D.N.J. 2016) ...................................................................140

*In re Healthco Int'l, Inc.*,
  195 B.R. 971 (Bankr. D. Mass. 1996) ................................................................95

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ................................................................157

*In re Int'l Loan Network*,
  160 B.R. 1 (Bankr. D.D.C. 1993) ................................................................89, 91

*In re Iridium Operating LLC*,
  373 B.R. 283 (S.D.N.Y. 2007)................................................................125, 166

*In re Jones*,
  403 B.R. 228 (Bankr. D. Conn. 2009) ..........................................................89, 91

*In re La Paloma Generating, Co.*,
  588 B.R. 695 (Bankr. D. Del. 2018) ................................................................181

*In re Lewis*,
  574 B.R. 536 (Bankr. E.D. Pa. 2017) ..............................................................131

*In re M. Fabrikant & Sons, Inc.*,
  394 B.R. 721 (Bankr. S.D.N.Y. 2008)..............................................................141

*In re Maguire*,
  11 B.R. 649 (Bankr. W.D. Pa. 1981) ...............................................................179

*In re Mastro*,
  465 B.R. 576 (Bankr. W.D. Wash. 2011) .........................................................137

*In re Maxus Energy Corp.*,
  639 B.R. 51 (Bankr. D. Del. 2022) ................................................................158

*In re Maxus Energy Corp.*,
  641 B.R. 467 (Bankr. D. Del. 2022) ................................................................169

*In re MDIP*,
  332 B.R. 129 (Bankr. D. Del. 2005) ..................................................................86

*In re Meridian Auto. Sys. Composites Operations, Inc.*,
  372 B.R. 710 (Bankr. D. Del. 2007)................................................................145

*In re Midway Games, Inc.*,
  428 B.R. 303 (Bankr. D. Del. 2010) ..................................................................88

*In re Mirant Corp.*,
  334 B.R. 800 (Bankr. N.D. Tex. 2005)...................................................................94

*In re Mongelluzzi*,
  587 B.R. 392 (Bankr. M.D. Fla. 2018) .................................................................171

*In re Morse Tool, Inc.*,
  148 B.R. 97 (Bankr. D. Mass. 1992) .....................................................................95

*In re Mortg. Lenders Network USA, Inc.*,
  406 B.R. 213 (Bankr. D. Del. 2009) .....................................................................146

*In re Network Access Solutions, Corp.*,
  330 B.R. 67 (Bankr. D. Del. 2005) .......................................................................158

*In re O'Day Corp.*,
  126 B.R. 370 (Bankr. D. Mass. 1991) ...........................................................95, 123

*In re Opus East, LLC*,
  528 B.R. 30 (Bankr. D. Del. 2015) ...................................................115, 132, 146

*In re Orion Refining Corp.*,
  424 B.R. 156 (Bankr. D. Del. 2010) .....................................................................146

*In re Oxford Homes, Inc.*,
  180 B.R. 1 (Bankr. D. Me. 1995)..........................................................................124

*In re Parmalat Sec. Litig.*,
  501 F. Supp. 2d 560 (S.D.N.Y. 2007)...................................................................168

*In re Phillips*,
  379 B.R. 765 (Bankr. N.D. Ill. 2007) ............................................................137, 138

*In re Physiotherapy Holdings, Inc.*,
  2016 Bankr. LEXIS 2810 .....................................................................................183

*In re Physiotherapy Holdings, Inc.*,
  No. 13-12965(KG), 2017 WL 5054308 (Bankr. D. Del. Nov. 1, 2017)...............174

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)............................................................................94, 95

*In re Refco, Inc. Sec. Litig. v. CSFB*,
  No. 07 MDL, 2009 U.S. Dist. LEXIS 129944 (S.D.N.Y. Nov. 13, 2009) .............88

*In re Richardson*,
  268 B.R. 331 (Bankr. D. Conn. 2001) .............................................................89, 91

*In re Shenango Grp. Inc.*,
   501 F.3d 338 (3d Cir. 2007)...........................................................................152

*In re Suburban Motor Freight, Inc.*,
   124 B.R. 984 (Bankr. S.D. Ohio 1990)..........................................................107

*In re Syntax-Brillian Corp.*,
   573 Fed. Appx. 154 (3d Cir. 2014)................................................................170

*In re Taylor*,
   228 B.R. 491 (Bankr. M.D. Ga. 1998)..........................................................124

*In re Terry Mfg. Co.*,
   358 B.R. 429 (M.D. Ala. 2006) .....................................................................124

*In re Tops Holding II Corp.*,
   No. 18-22279 (RDD), 2022 WL 6827457
   (Bankr. S.D.N.Y. Oct. 12, 2022) ...........................................121, 129, 130, 178, 179

*In re Tronox Inc.*,
   464 B.R. 606 (Bankr. S.D.N.Y. 2012)................................................173, 174, 184

*In re Vision Metals, Inc.*,
   327 B.R. 719 (Bankr. D. Del. 2005) ..............................................................158

*In re Weinstein Co. Holdings LLC*,
   997 F.3d 511 (3d Cir. 2021)...........................................................................150

*In re Wills*,
   Nos. 05-17977-7, 06-5337, 2008 WL 1840701
   (Bankr. D. Kan. Apr. 23, 2008) .......................................................................89

*In re Yellowstone Mountain Club, LLC*,
   436 B.R. 598 (Bankr. D. Mont. 2010) ...........................................................175

*Jefferson Chem. Co. v. Mobay Chem Co.*,
   267 A.2d 635 (Del. Ch. 1970).......................................................................179

*Kimmelman v. Port Authority of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*,
   344 F.3d 311 (3d Cir. 2003)...........................................................................157

*Kittay v. Atl. Bank (In re Glob. Serv. Grp. LLC)*,
   316 B.R. 451 (Bankr. S.D.N.Y. 2004) ...........................................................169

*Kosmala v. Imhof (In re Hessco)*,
   295 B.R. 372 (B.A.P. 9th Cir. 2003)...............................................................137

*LaSalle Nat'l Bank Ass'n v. Paloian*,
  406 B.R. 299 (N.D. Ill. 2009) ............................................................167

*Lewis Bros. Bakeries Inc. v. Interstate Brands Corp.*
  *(In re Interstate Bakeries Corp.)*,
  751 F.3d 955 (8th Cir. 2014) .....................................................153, 154

*Liebersohn v. IRS (In re C.F. Foods, L.P.)*,
  265 B.R. 71 (Bankr. E.D. Pa. 2001) ..................................................183

*Menotte v. Gassan (In re Tabor)*,
  Nos. 14-20731-EPK, 15-01577-EPK, 2016 Bankr. LEXIS 2315
  (Bankr. S.D. Fla. June 17, 2016)..........................................................88

*Merion Capital LP v. BMC Software, Inc.*,
  2015 WL 6164771 (Del. Ch. Oct. 21, 2015) ...............................125, 126

*Merlin Partners LP v. AutoInfo, Inc.*,
  2015 WL 2069417 (Del. Ch. Apr. 30, 2015) ...............................125, 126

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
  910 F.Supp. 913 (S.D.N.Y. 1995)..........................................................94

*Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*,
  Nos. 16-11596 (KG), 18-50633 (KG), 2019 Bankr. LEXIS 2906
  (Bankr. D. Del. Sep. 16, 2019) ..........................................................180

*Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*,
  368 B.R. 394 (Bankr. D. Del. 2007) ...........................................142, 147

*Montrose Med. Grp. Participating Savings Plan v. Bulger*,
  243 F.3d 773 (3d Cir. 2001)................................................................158

*Moody v. Sec. Pac. Bus. Credit*,
  971 F. 2d 1056 (3d Cir. 1992).................................................94, 95, 107, 108

*Moore v. Bay*,
  284 U.S. 4, 52 S. Ct. 3 (1931)...............................................................88

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
  980 F. Supp. 2d 400 (E.D.N.Y. 2013) ................................................154

*Official Comm. of Unsecured Creditors of Exeter Holding, Ltd. v. Haltman*,
  No. 13-CV-5475 (JS) (AKT), 2018 U.S. Dist. LEXIS 54610 (E.D.N.Y. 2018) ..................144

*Peltz v. Hatten*,
  279 B.R. 710 (D. Del. 2002)........................................................108, 125, 126

*Poole v. N. V. Deli Maatschappij*,
    243 A. 2d 67 (Del. 1968) ................................................................126

*Porter v. NationsCredit Consumer Disc. Co.*,
    2007 U.S. Dist. LEXIS 14328 (E.D. Pa. Feb. 28, 2007) ......................176

*RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Holdings LLC)*,
    Nos. 19-12269 (CTG), 21-51255 (CTG), 2022 Bankr. LEXIS 2352
    (Bankr. D. Del. Aug. 24, 2022) .....................................................180

*Russell v. Harper (In re Dearmond)*,
    Bankr. No. 14-50106, 2017 Bankr. LEXIS 3188
    (Bankr. E.D. Tenn. Sep. 21, 2017)................................................137

*Sears v. Sears (In re Sears)*,
    863 F.3d 973 (8th Cir. 2017) ........................................................154

*Shapiro v. Art Leather, Inc.*,
    340 B.R. 829 (Bankr. E.D. Mich. Apr. 12, 2006)...........................137

*Spyglass Media Grp., LLC v. Bruce Cohen Prods.*
    *(In re Weinstein Co. Holdings, LLC)*,
    997 F.3d 497 (3d Cir. 2021).................................................153, 155

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
    906 A.2d 168 (Del. Ch. 2006)...................................................86, 94

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013)................109, 114, 130, 165, 183

*TrustCo Bank v. Mathews*,
    No. 8374-VCP 2015 WL 295373 (Del. Ch. Jan. 22, 2015)...................86

*U.S. on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*,
    841 F. Supp. 899 (D. Minn. 1993)...............................................144

*United States v. State St. Bank & Trust Co.*,
    520 B.R. 29 (Bankr. D. Del. 2014) ...............................................122

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986)......................................................179

*Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*,
    463 F.3d 1064 (9th Cir. 2006) .....................................................132

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007)............................115, 124, 126, 166

*VFB LLC v. Campbell Soup Co.*,
    No. CIV.A.02-137 KAJ, 2005 WL 2234606 (D. Del. Sept. 13, 2005),
    aff'd, 482 F.3d 624 (3d Cir. 2007) ...................................................................168

*VFB LLC v. Money's Tr. (In re VF Brands, Inc.)*,
    282 B.R. 134 (Bankr. D. Del. 2002) ...............................................................141

*Williams v. Runyon*,
    130 F.3d 568 (3d Cir. 1997)............................................................................177

*Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re ASHINC Corp.)*,
    640 B.R. 1 (Bankr. D. Del. 2022) ...................................................................126

## STATUTES AND RULES

6 Del. C. § 1308(a)...........................................................................................169

6 Del. C. § 2301(a)...........................................................................................146

24 Okla. Stat. Ann. Title 24 §§ 112 - 123 ........................................................86

11 U.S.C. 101(22) ............................................................................................178

11 U.S.C. § 101(5) .............................................................................................88

11 U.S.C. § 101(53B)(A)(vi) ...........................................................................161

11 U.S.C. § 544(b) ..........................................................................84, 86, 90, 183

11 U.S.C. § 544(b)(1) ...............................................................................88, 131

11 U.S.C. § 550(a) ................................................................87, 137, 141, 173, 174

11 U.S.C. § 550(a)(1) ...........................................................................134, 136, 137

11 U.S.C. § 550(a)(2) ......................................................................................142

11 U.S.C § 550(b)(2) .......................................................................................145

5 Debtor-Creditor Law § 42.03 (2021)..............................................................90

Bankruptcy Code §§ 365 and 1123....................................................................156

Bankruptcy Code § 544 .....................................................................................84

Bankruptcy Code § 546(e)..............................................................116, 163, 177, 179

Bankruptcy Code § 548(c)...........................................................................134, 170

Bankruptcy Code § 550 ...................................................................84, 132, 140, 141, 142

Bankruptcy Code § 550(e)..........................................................................169, 172, 173

Bankruptcy Code § 561(a) .........................................................................................162

Del. Code Ann. Title 6, §§ 1301 - 1311......................................................................86

Del. Code Ann. Title 6, § 1302(a) .....................................................................109, 110

Del. Code Ann. Title 6, § 1304....................................................................................90

Del. Code Ann. Title 6, § 1304(a)(2)...........................................................................86

Del. Code Ann. Title 6, § 1305....................................................................................90

Del. Code Ann. Title 6, § 1305(a)................................................................................86

Del. Code Ann. Title 6, § 1310..................................................................................173

Del. Code § 1304 .......................................................................................................170

Delaware Uniform Fraudulent Transfers Act § 1308 ................................................169

Nev. Rev. Stat. § 112.140 - 112.250............................................................................86

Uniform Fraudulent Transfer Act § 8(d) ..................................................................169

## MISCELLANEOUS

5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2022) ......................................................88

Alan N. Resnick, ARTICLE: FINDING THE SHOES THAT FIT: HOW
    DERIVATIVE IS THE TRUSTEE'S POWER TO AVOID FRAUDULENT
    CONVEYANCES UNDER SECTION 544(b) OF THE BANKRUPTCY
    CODE?, 31 Cardozo L. Rev. 205, 210-211 (2009) ...............................................90

H.R. Rep. No. 109-31 (2005)............................................................................163, 165

H.R. Rep. No. 109-31 (2005)......................................................................................163

Report of the President's Working Group on Financial Markets, *Hedge Funds,
    Leverage, and the Lessons of Long-Term Capital Management* (Apr. 28,
    1999) ...................................................................................................................164

U.S. Energy Information Administration, Henry Hub Natural Gas Spot Price,
    *available at* https://www.eia.gov/dnav/ng/hist/rngwhhdD.htm...............................30

Peter Kravitz, as Settlement Trustee (the "**Trustee**" or "Plaintiff") of and on behalf of the Samson Settlement Trust (the "**Settlement Trust**") established pursuant to the *Global Settlement Joint Chapter 11 Plan ("Plan") of Reorganization of Samson Resources Corporation and Its Debtor Affiliates (with Technical Modifications)* [Bankr. D.I. 2009] hereby submits this post-trial brief in accordance with the Court's Pre-Trial Order [Adv. D.I. 369], as revised most recently on August 17, 2022 [Adv. D.I. 397].

## PRELIMINARY STATEMENT

1.      In the five years since the complaint was filed in this Adversary Proceeding, the Trustee has consistently maintained that each of the challenged transfers by the Debtors to the Defendants was a fraudulent conveyance, made while the transferring Debtor was insolvent and inadequately capitalized, in exchange for consideration that was not reasonably equivalent to the amount transferred.   The core allegation of those claims has always been that the KKR business plan created to support its billions in new LBO debt was severely flawed in two ways. *First*, the plan dramatically overstated the volumes of oil and gas that could be profitably extracted from Samson's undeveloped land, and therefore it overstated future cash flows and the present value of the company's key assets. *Second*, KKR's stress cases were unreasonably optimistic, leaving Samson unprepared for, and entirely unable to endure, the prevailing commodity price environment in existence at closing.  When put to his proof at trial, the Trustee established both of these contentions through a detailed exhaustive record of wholly competent evidence.

2.      As to the undeveloped volumes assumed in the KKR plan, the trial evidence clearly shows that the KKR model massively overstated the amount of oil and gas that could profitably be produced from wells drilled after the closing of the Transaction.  Both Dr. Strickland and Mr. Baxter, using information available as of the closing, estimated that cash flows from, and the

present value of, Samson's undeveloped volumes were a small fraction of what the KKR Model optimistically estimated. And, even if the Court "peeks around the corner" from the close of the Transaction, the evidence is undeniable that Samson's volumes and drilling results immediately fell far short of what KKR projected:

- from Mr. Smidt's admission that, as early as 2012, ████████████████████████████ ████████████████████████████████

- to Mr. Cook's testimony that Samson's failure was "[u]ltimately…about the rock," to NSAI's 2012 3P report that was devastating to KKR's volume estimates,

- to Mr. Limbacher's conclusion, two years before the bankruptcy, that Samson could not survive under its existing capital structure because it lacked sufficient profitable drilling inventory.

3.     Strangely, despite inviting the Court to take this "peek around the corner," Defendants effectively ignored all evidence of Samson's immediate collapse into a death spiral and continued to insist at trial that KKR's undeveloped volume estimates and related cash flows were "reasonable."     But Defendants made no attempt to address the critical question "How did KKR get it so wrong?" because they refused to acknowledge the 10.4 trillion cubic foot elephant in the room: that KKR in fact got it very wrong when projecting the cash flows that would result from Samson's post-closing development of undeveloped acreage. And because Samson's ability to satisfy the onerous terms of its new debt was premised on substantial EBITDA generation from new drilling, these errors in the business plan doomed Samson from day one.

4.     As to commodity prices, the other key catalyst to Samson's conflagration, the undisputed trial record shows that the KKR Model failed to project gas price and drilling success scenarios in any way resembling those which Samson experienced nearly immediately after closing. Though Defendants argued, without any expert proof, that such prices and drilling results were simply unforeseeable at closing, the Trustee's expert, Mr. Filsinger, plainly established that the gas prices following closing were a foreseeable continuation of the trend underlying the U.S.

gas markets in the years prior to close, and that it was unreasonable for KKR to fail to consider a scenario in which its gas prices declined below the closing-date spot prices for any period of time, much less any such scenario along with a downside drilling case.  Moreover, through the testimony of Mr. Filsinger, the Trustee further established that the KKR Model's assumption of price stability from fictitious hedges was also unreasonable and prevented the investors from appreciating the reality of a downside scenario and its impact on cash flows and EBITDA covenants.  Most critically, there was <u>zero evidence</u> at trial that KKR, any of its co-sponsors, or any of the company's new lenders ever gave any serious consideration to how Samson could generate sufficient EBITDA to satisfy its loan covenants in the short-term following close in a commodity price environment in which profitable drilling locations were becoming scarcer by the day.

5.      In light of the evidence of these fatal flaws in the KKR Business Plan, it is no surprise that Defendants clung to their market theory of value, under which "fair market value" is simply established by the price agreed to by the transferors and the transferees in the actual conveyance at issue.  But while the purchase price may sometimes be probative of value, that argument does not rescue Defendants here, where profound analytical flaws by one specific market participant (and a group of co-sponsors cutting and pasting that market participant's diligence results) caused the buyers to borrow billions of dollars more than a realistic set of cash flows could ever support.  This is why, as the evidence showed, there was no other bidder in the ballpark of KKR's $7 billon bid by the time of signing, notwithstanding Defendants' attempt to paint the picture of a hot U.S. fracking market and a bidding war for Ms. Schusterman's company.  (And, Defendants' market-based argument is, of course, inapplicable to the Gulf and Offshore asset transfer, where the "purchase price" was not at arm's-length, and where the trial evidence

demonstrates that the appraisals supposedly supporting the purchase price were engineered to reach a pre-ordained result for tax purposes.)

6.     In short, based on all of the evidence presented at trial, and for all of the reasons set forth herein, the Court should find that each of the challenged transfers was a fraudulent conveyance and award damages consistent with the Trustee's unrebutted damages calculations.

## **FACTUAL BACKGROUND**

### I. **The Evidentiary Record**

7.     The Trustee filed his complaint on September 15, 2017, bringing a fraudulent conveyance action arising out of the acquisition of Samson Investment Company ("SIC" and including its debtor affiliates, "Samson") by Samson Resources Corporation ("SRC") through a consortium of equity sponsors led by Kohlberg Kravis Roberts & Co. ("KKR"; collectively, "Sponsors") on December 21, 2011 (the "Transaction").  Defendants subsequently filed seven dispositive motions.  *See* Adv. Pro. D.I. 397 at 3-4 (summarizing dispositive motion practice). Following the disposition of all such motions, the Trustee proceeded to trial on Counts I, III, and IV of the Complaint [Adv. D.I. 1] against Defendants Stacy Schusterman, Lynn Schusterman, Samson Energy Company ("Samson Energy"), the Charles and Lynn Schusterman Family Foundation (the "Foundation"), and        Stacy Family Trust ("SFT") (collectively, the "Defendants").

8.     The Court held trial for twelve non-consecutive days, beginning on September 12, 2022.  At trial, Court heard testimony from nine live witnesses.  The Trustee called three expert witnesses, who submitted both written and live testimony to the Court:  (1) Todd Filsinger, of Filsinger Energy Partners, testifying on issues relating to commodity prices and commodity hedging and their relation to an appropriate stress or downside case; (2) Dr. Richard Strickland, testifying on issues relating to petroleum engineering; and (3) Scott Baxter, of Berkeley Research

Group, testifying on issues of solvency and valuation.  Defendants called additional witnesses who submitted both written and live testimony to the Court:  Drew Phillips, Scott Rowland, Shane Randolph, Stacy Schusterman, Steven Almrud, and Suzanne Roski.

9.    Pursuant to the Pre-Trial Order, the parties agreed to a Statement of Stipulated Facts [Adv. Pro. D.I. 413], which was admitted into evidence without objection.  The Court also accepted into evidence 32 designated deposition transcripts and 1130 trial exhibits.  The parties further made reference to pleadings and proceedings in this adversary proceeding and the underlying Chapter 11 cases.

## II.  **The Parties**

10.    Plaintiff in this action is Mr. Peter Kravitz as Settlement Trustee (the "Trustee"), appointed pursuant to Samson's Plan of Reorganization (the "Plan").  Undisputed Facts ¶¶ 64-65.  Pursuant to the Plan, all pre-petition claims and causes of action of the Debtors' estates against the Defendants were transferred to the Trust to be pursued by the Trustee on behalf of creditors holding Class 5 Claims against the Debtors.  Creditors in that class—collectively holding a total of approximately $2.5 billion in pre-petition unsecured debt—received a distribution under the Plan of $168.5 million and interests in the Trust, entitling them to a pro rata distribution of net recoveries from the Trust based upon the allowed amount of their claims.  [Bankr. D.I. 1884]  Recoveries by the Trust in this action are thus the only remaining source of recovery for the Debtors' unsecured bondholders, contract and lease counterparties, pensioners, trade creditors, and pre-petition professionals.

11.    The Defendants remaining in this action are (1) Stacy Schusterman, Samson's former CEO and owner; (2) Lynn Schusterman, Stacy's mother; (3) Samson Energy Company, a company formed following the Transaction which is owned directly or indirectly by various

Defendants; (4) the Foundation, which was established by Lynn Schusterman and upon whose board Stacy Schusterman serves; and (5) SFT, another trust of which Stacy and Lynn Schusterman served as co-trustees.  What follows is a brief explanation of these Defendants', and related entities', roles in this action.

12.     Prior to the Transaction, the shares of Samson were owned by SFT (Delaware) Management, LLC ("SFTDM"), ST 2008 (Delaware) Management, LLC ("ST 2008"), and the Foundation (collectively, the "Selling Shareholders").  JX-308, at KKR-SAM_0187418.  Among the Selling Shareholders, SFTDM and ST 2008 (collectively, the "Selling LLCs") were 100% owned and controlled by Schusterman 2008 Delaware Trust and Schusterman 2008 Delaware Trust (collectively, the "Selling Trusts").

13.     ***Stacy Schusterman***.  For all relevant periods leading up to the Transaction, Ms. Schusterman sat at the top of Samson's organizational pyramid and exerted control throughout. Ms. Schusterman described her role as "manag[ing] everything" for "the family."  Schusterman Dep. Tr. 223:9-224:13 (Jan. 15, 2021) ("[T]he family sold the shale assets to KKR and the family kept the Gulf Coast and Deepwater [assets]. . . . I manage everything, so to me, the family is I manage everything."); 121:11-14 ("Well, most decisions in Samson were done, you know, kind of on a, I would call a group basis, but I always had the final decision.").

14.     This view was widely shared by Ms. Schusterman's business associates and the relevant parties involved in the Transaction.  All understood that Ms. Schusterman was Samson's owner and later, its "seller" for all practical purposes.  Schusterman Dep. Tr. 223:9-224:13 (Jan. 15, 2021), 121:11-14; Trial Tr. (Phillips) 1493:1-7 ("So I would say, as Chief Executive Officer of Samson Investment Company, [Ms. Schusterman] . . . had the ultimate authority to make decisions for Samson and its subsidiaries."); *see also, e.g.*, PX-876; PX-878; JX-190 ███████

███████████████████████████████████

████ )[1].

15.    The Selling Trusts were controlled by Stacy Schusterman for the benefit of Stacy Schusterman and her three daughters, who were not named in, nor appeared in, this action.  DX-014; DX-136; DX-846, Phillips Trial Decl. ¶¶ 10-14, Ex. A; Trial Tr. (Phillips) at 1480:19-1481:3, 1486:12-1489:19, 1490:13-21; Trial Tr. (Schusterman) at 1732:19-1733:17.  Ms. Schusterman is the only named beneficiary of the Selling Trusts.  *Id.*

16.    Ms. Schusterman was a manager of the Selling LLCs.  Ms. Schusterman signed the Stock Purchase Agreement of the Transaction (the "SPA") as the manager of the Selling LLCs. JX-212 at SEC-00190997.  She also made all material decisions for the Selling Shareholders (and, by extension, their parent Selling Trusts) by herself, rather than through any board of directors, or managers, or any third-party trustee.  *See, e.g.*, Phillips 30(b)(6) (Feb. 19, 2021) Dep. Tr. 132:8-14, 132:22-133:2.  Most notably, following the closing of the Transaction (the "Closing"), Ms. Schusterman directed the Selling LLCs—owned and controlled by the Selling Trusts—as to the use of cash proceeds from the Transaction.  Trial Tr. (Schusterman) at 1763:1-1764:5, 1764:13-19, 1767:15-1768:1, 1839:22-1840:21; Phillips 30(b)(6) (Feb. 19, 2021) Dep. Tr. 286:22-287:2; DX-846, Phillips Trial Decl. ¶¶ 31-32; PX-741, Ex. 2.  Specifically, Ms. Schusterman, continuing to "manage everything," determined that the proceeds from the Transaction should be used to pay taxes for the Selling Trusts and to invest in her new company, Samson Energy.  *See id.*  Indeed, Ms. Schusterman specifically testified that "[a]s a manager of SFTDM, I directed the LLC to make this investment [in Samson Energy Company, using the proceeds from the Transaction,] based on my strong belief at that time."  DX-849, Schusterman Trial Decl. ¶ 47.  Ms. Schusterman also

---

[1]    "Tulip" was the project name for the SIC acquisition.

made investment determinations on behalf of the Foundation, allocating it $180 million in preferred shares in the Transaction and directing the Foundation to purchase SRC debt post-closing.  DX-849, Schusterman Trial Decl. ¶¶ 38, 44.

17.    Ms. Schusterman remains a Defendant in this action as the person "for whose benefit" all of the Challenged Transfers were made, and in her capacity as trustee of SFT.

18.    ***Lynn Schusterman***.  Lynn Schusterman is Stacy Schusterman's mother, and the wife of the late Charles Schusterman, Samson's founder.  Lynn Schusterman did not  testify at trial, directly or through deposition testimony.  At the time of the Transaction, Lynn Schusterman, along with her daughter, served as a co-trustee of SFT.  Stipulated Facts ¶ 14.  Lynn Schusterman remains a Defendant in her capacity as Trustee of SFT.  Ms. Lynn Schusterman did not personally appear at the trial.

19.    ***Samson Energy Company***.  Stacy Schusterman founded Samson Energy following the closing of the Transaction and serves as its CEO.  Ms. Schusterman was the sole individual who directed that Samson Energy Company be capitalized with proceeds from the Transaction.  *See supra* ¶ 16.  Samson Energy also received certain spun-off assets in the Transaction, *see infra* ¶¶ 118-127, 132-33, and remains a Defendant in its capacity as initial transferee of those assets.  Samson Energy also remains a Defendant as a subsequent transferee of certain cash initially transferred from SRC to SFTDM.

20.    ***The Foundation***.  The Foundation was established by Lynn Schusterman and her late husband.  DX-849, Schusterman Trial Decl. ¶¶ 10-11.  Stacy Schusterman served on its board.  *Id.*  The Foundation remains a Defendant as an initial transferee of cash from SRC. Other than through Ms. Schusterman, the Foundation did not testify at trial, directly or through deposition testimony.

21.    **SFT**.  SFT had two co-trustees at the time of the Transaction:  Stacy and Lynn Schusterman.  Stipulated Facts ¶ 14.   SFT remains a Defendant as subsequent transferee of cash initially transferred by SRC to ST 2008.

### III. Standard Valuation of Oil and Gas Assets.

22.    Fundamentally, the claims prosecuted by the Trust at trial center in large part on the fair market value of Samson in December 2011.  Generally, valuations of exploration and production ("E&P") companies like Samson utilize the Income Approaches (including the net asset value method ("NAV Method") and the discounted cash flow approach ("DCF Method")) and the Market Approaches (including "Comparable Company Method" and "Precedent Transaction Method").  *See* Aaron Kibbey, Robert Rasor & Brian Bostwick, *Valuing Oil & Gas Assets: The Complexities and Key Considerations ("Valuing Oil & Gas Assets")*, FINANCE MONTHLY (Jan. 31, 2017) (cited in DX-852, Roski Trial Decl. ¶ 100 n.66).

23.    For large corporate transactions such as this Transaction,[2] the Income Approach is preferred, as it is not always practicable to identify companies and transactions with a set of truly comparable oil and gas assets.  *Id.*; *see also* Trial Tr. (Baxter) 808:15-810:11 ("THE COURT: . . . at its highest level, an oil and gas company that had 5,000 employees and a million and a half acres under lease and 2,000 wells is not necessarily comparable to an oil company that has precisely those numbers if one is in North Dakota and the other one is the Gulf of Mexico or in California or in Texas, et cetera. . . . THE WITNESS:  You are 100 percent correct, Your Honor.").[3]  And of

---

[2]    In assessing market values, it is crucial to distinguish asset transactions from corporate transactions. Trial Tr. (Baxter) 734:24-736:17.  They are "fundamentally different."  *Id.*  Only valuation methodologies applicable to E&P *corporate* transactions are relevant in this case.  *See Id.* at 1331:24-1333:9.

[3]    Neither KKR nor any other Sponsor built up an actual dollar figure valuation of Samson using the Market Approach.  *See*  Trial Tr. (Roski) 2419:7-23 (only mentioning the use of comparables to check the reasonableness of the actual dollar figure valuation arrived using the NAV Approach).  Ms. Roski did not

the Income Approaches, the NAV Method is "[t]he most commonly and widely accepted method to value an oil and gas company."  Trial Tr. (Roski) 2338:17-21, 2339:7-16; *see also* Trial Tr. (Baxter) 802:11-803:12.  It rightly focuses on the fundamentals of the E&P business—locating and digging wells to extract hydrocarbons—and accordingly determines an E&P company's fair market value based on the risk-adjusted valuation of the company's reserves and resources that can be extracted.[4]  *See* Trial Tr. (Strickland) 309:10-310:8; *see also* Trial Tr. (Baxter) 803:14-807:17.

24.     As explained in more detail below, there are three basic steps to an E&P NAV: (1) categorizing reserves and resources to identify different levels of uncertainties in their extraction; (2) estimating volumes and cash flows (based on given pricing assumptions) for the various reserve categories; and (3) applying risk factors to the resulting cash flows.[5]

---

perform such analyses either.  Trial Tr. (Roski) 2297:16-2298:2.  In fact, she did not provide any independent valuation whatsoever.  *Id.*

[4]     At trial, Defendants unsuccessfully attempted to suggest that market participants routinely ignored the fundamentals of asset valuation at the time of the Transaction and instead relied only on shortcuts such as the so-called dollar-per-acre method.  Not true.  Trial Tr. (Baxter) 1071:1-5 (testifying that dollar-per-acre numbers are "output[s]," not "input[s]"); *see also id.* at 1073:7-13, 1088:17-19.  While some market participants might have used this method in small asset deals, it is not a reliable method of valuation in corporate transactions, especially if a 3P reserve analysis is not performed to understand the underlying assets in depth.  *Id.* at 1331:24-1333:9; *see also* Trial Tr. (Roski) 2376:17-2378:7.  As noted, it is crucial to distinguish small asset transactions from large corporate transactions.  *See Supra* ¶ 23 n.2.

[5]     Contrary to claims made by Defendants and their witnesses, there is no double-discounting in either this standard practice in general or in the Trustee's experts' analyses in particular.  As for the standard practice, the use of PRMS in the first step only qualitatively conveys different levels of uncertainties inherent in reserves and resources, whereas the application of risking factors in the third step quantitatively measures such uncertainties to determine fair market value.  With respect to the analyses performed by the Trustee's experts, there is also no double-discounting because, as will be discussed further below, *see infra* ¶¶ 72-94, KKR/RPM's location risking was inadequate to account for the levels of material uncertainties in their broad-brush "Development" category.  Indeed, Ms. Buie testified that the supposedly "risked" locations in the model actually represented the "maximum…locations available," (Buie Dep. Tr. 118:12-22), and the KKR Model itself described its volumes as "unrisked." *see infra* ¶ 189.

## A. PRMS Is the Industry Standard for Categorizing Reserves and Resources.

25.     The value of a given quantity of hydrocarbons in the ground depends, in large part, on the level of certainty with which an operator can expect to profitably extract it.  A market participant could offer to sell an asset that it claims contains 100 million barrels of oil reserves, and potential buyers would have no idea what that actually meant.  *See* Trial Tr. (Strickland) 287:1-289:19.  It could be 100 million barrels of oil reserves that have a 1% chance of recovery, or 100 million barrels that can almost certainly be exploited.  The two possibilities, though, suggest vastly different valuations.

26.     To address these uncertainties of extraction, the oil and gas industry relies on reserve categories to convey relative degrees of certainty, in particular land with expected hydrocarbons under the ground.  Though historically there was not always a consensus as to the definition of each categories, in late 1990s and early 2000s, the industry finally adopted the Petroleum Resources Management System ("PRMS") to consistently and clearly define the categories and convey the uncertainties in reserve estimates.  Trial Tr. (Strickland) 287:1-289:19; *see also id.* at 302:15-20.  The PRMS has since been adopted by "all major companies" in the E&P industry "worldwide," Trial Tr. (Strickland) 289:8-11 (except for Russia),[6] and has become the standard starting point for determining reserve valuations.  *See* Trial Tr. (Strickland) 407:19-23; *see also id.* at 347:17-348:17.

27.     Under PRMS, the term "Reserve" represents quantities of petroleum anticipated to be commercially recoverable by application of development projects under defined conditions.  Trial Tr. (Strickland) 290:2-12.  A Reserve must be "commercially recoverable," meaning the

---

[6]     PRMS categories are not merely used for SEC reporting, as it was PRMS's prevalence in the E&P industry that caused the Securities and Exchange Commission to adjust its rules and regulations to conform to the PRMS—not the reverse.  Trial Tr. (Strickland) 289:12-19.  Therefore, both private and public E&P companies alike use PRMS.

proceeds from recovering the underlying hydrocarbons must exceed the costs of extraction. Trial Tr. (Strickland) 295:15-298:19. It is possible that a particular accumulation of hydrocarbons might exist in a given location but are not commercially recoverable, in which case PRMS would categorize them as Contingent Resources. *Id.* Commerciality depends in large part on commodity price assumptions. *Id.*; *see also id.* at 299:22-300:3, 548:20-549:19. Describing Contingent Resources as Reserves can therefore be materially misleading in the oil and gas industry. *Id.*

28.    Reserves can further be categorized as either Proved Reserves or Unproved Reserves. Trial Tr. (Strickland) 300:10-302:14. Proved Reserves are those quantities of petroleum that can be estimated with reasonable certainty to be commercially recoverable under defined economic conditions, operating methods, and government regulations. *Id.* It is generally understood that there should be at least a 90% probability that the quantities actually recovered for Proved Reserves will equal or exceed the estimate. *Id.* Unproved Reserves are of substantially lower certainty and, depending on their particular level of uncertainty, Unproved Reserves are either Probable Reserves or Possible Reserves. *Id.* Probable Reserves are those additional Reserves which are less likely to be recovered than Proved Reserves, and Possible Reserves are those additional reserves that are even less likely recoverable than Probable Reserves.[7] *Id.* It is generally understood that there should be at least a 10% probability that the actual quantities recovered for 3P Reserves will equal or exceed the 3P estimate. *Id.* Thus, the term "Reserves" encompasses a broad spectrum from Proved Reserves' 90% certainty to 3P Reserves' upper limit of 10% certainty. *Id.*

---

[7]    Total Reserves, including Proved Reserves, Probable Reserves, and Possible Reserves, are often termed as 3P Reserves. Trial Tr. (Strickland) 301:15-21. Relatedly, the sum of Proved Reserves and Probable Reserves is termed as 2P Reserves, and Proved Reserves are called 1P Reserves. *Id.*

29.     In addition to this critical differentiation between Proved and Unproved Reserves, PRMS also provides for subdivisions of reserves within the category of Proved Reserves:  Proved Developed Producing Reserves ("PDP Reserves"), Proved Developed Non-Producing Reserves ("PDNP Reserves"), and Proved Undeveloped Reserves ("PUD Reserves").  *Id.*  These subdivisions denote further differences in development and production status.  PDP and PDNP Reserves represent wells that are producing or can start producing with relatively low additional capital expenditure, whereas PUD Reserves are those that require relatively large capital expenditures for further development.  *Id.*  However, it is important to note that all these three subdivisions fall within the Proved Reserves category, to which a ***high*** degree of confidence is assigned.  In terms of uncertainty, accordingly, PUD Reserves resemble PDP Reserves much more than they do Probable Reserves, let alone Possible Reserves.  Lumping PUD together with Probable or Possible would blur the level of uncertainties implied by the reserve estimates, Trial Tr. (Strickland) 346:10-20, and tend to "vastly overstate" the volumes and values of oil and gas assets. *Id.* at 285:20-286:10.

30.     Finally, when categorizing assets under these PRMS categories, reserve engineers typically use an "inside out" approach to analyze the actual or potential well locations within a given acreage.  Trial Tr. (Strickland) 331:13-334:22, 562:6-563:15.  They start with PDP well locations, delineate the areas adjacent to those wells as potentially for PUD locations, and then investigate areas further away from the PUD locations for Probable and Possible locations.  *Id.* When they move beyond five miles outside of Possible locations, the relevant PDP wells rarely justify assigning any additional reserve locations under PRMS.  Trial Tr. (Strickland) 332:5-12 ("[Y]ou just don't know what the characteristics of the reservoir are at any point as you move further and further away from the known areas.").  Once one moves beyond ten miles, locations

tend to be referred to as "a wildcat," [8] where operators let "rigs run 24/7" and bet on finding something.  Trial Tr. (Strickland) 379:12-382:1.  Further out, as Dr. Strickland explained, it's just a "goat pasture."  *Id.* at 334:18-22.

31.     In short, as a general principle, the farther a drillable location is away from a PDP well, the more uncertainty it entails and, accordingly, the more likely it is designated as an Unproved or even a Resource location.

## B. Once Categorized Under PRMS, Reserve Volume Estimates and Cash Flow Projections Are the Next Step for Determining Fair Market Value.

32.     As a starting point for determining the fair market value of Reserves and Resources, market participants routinely estimate the volumes of oil and gas assets under different PRMS categories and then calculate the discounted present value of the projected cash flows from future productions of those volumes.  Trial Tr. (Strickland) 271:8-17.  E&P companies often generate such reserve volume estimates and their cash flow projections internally, which are typically prepared for operational guidance, public disclosure, and for A&D transactions.  *Id.* at 271:18-272:7.

33.     Alternatively, E&P companies and investors often commission independent reserve engineers to issue "reserve reports," which present a third-party professional's view of volumes estimates and cash flow projections for different PRMS categories.  Such reports can be and are used in A&D transactions to inform deal valuations.  Trial Tr. (Strickland) 271:18-272:7; *see also id.* at 372:10-19; *id.* at 558:3-559:6 (a potential buyer commissioned a reserve report from Dr. Strickland in 2010 in order to use this independent reserve report to determine the purchase price).

---

[8]      Such locations are referred to as wildcats because, given the constancy of exploration, even "at night, the wildcats would be howling," Trial Tr. (Strickland) 380:16-21.

34.     Netherland Sewell & Associates, Inc. ("NSAI") is one of the independent reserve engineering firms with a "[s]tellar" reputation in the E&P industry.  Trial Tr. (Strickland) 276:18-277:23 (also describing NSAI's work product as "highly organized," and "follow[ing] industry standard"); *see also id.* at 593:23-594:1 (concluding that NSAI's work for Samson was "sound and reliable").  In this case, as will be further discussed below, KKR commissioned NSAI to issue a 1P reserve report in 2011 ("2011 NSAI Reserve Report") and a 3P reserve report in 2012 ("2012 NSAI Reserve Report") shortly after the Transaction.  Trial Tr. (Strickland) 278:2-279:3.

## C.  A NAV Can Be Determined Then by Applying Risking Factors to the Cash Flows Estimated for Different Categories of Reserves.

35.     An independent reserve report, like the ones introduced in evidence, shows estimates of reserves, categorized according to PRMS reserve categories, based on the engineer's analysis of the specific locations evaluated.  As Dr. Strickland credibly testified, engineers review maps of the subject acreage on a location-by-location basis, starting from producing locations and working outward, applying their expertise to determine what locations qualify as reserves – *i.e.*, which locations have commercially recoverable hydrocarbons – and the degree of uncertainty associated with extracting those reserves for purposes of assignment into reserve categories. Trial Tr. (Strickland) at 331:13-332:13; PX-888 (Strickland Decl.), Ex. A at ¶¶ 24-30.  Based upon a set of pricing assumptions, the reserve report then converts reserve volumes into cash flows and reduces those cash flows to a present value using a 10% discount. Trial Tr. (Strickland) at 271:12-17.  This figure, though, is definitively *not* intended to show the fair market value of the underlying assets. *Id.* at 368:11-14.  As explained below, the reserve categories convey levels of uncertainty, the cash flows and present values provided in a petroleum engineer's reserve report are unrisked, leaving it to the consumer of the reserve report to apply appropriate risking. PX-888 (Strickland Decl.), Ex. A at ¶¶ 29-31, Ex. B at ¶ 13.

36.     Importantly, the concept of commercial recoverability is dependent on the pricing assumptions applied in a reserve report.  Volumes that will qualify as PUDs based on the NYMEX forward curve prices, for example, may not qualify as reserves at all if the NYMEX forward curve were to fall.   Trial Tr. (Strickland) at 414:10-13, 415:12-416:3, 549:8-19.  The pricing changes would of course not mean that the volumes are no longer in place, or that they would be more difficult to extract.  Rather, the change in categorization simply means that those hydrocarbons would not generate positive cash flows under the new, lower pricing for the relevant projection period.

37.     To finally arrive at a NAV from the predicted cash flows in a reserve report, market participants apply risking factors to the cash flow projections based on different PRMS categories to account for their different levels of uncertainties.  Trial Tr. (Baxter) 734:7-21, 1322:17-1323:1; *see also* Trial Tr. (Strickland) 372:10-373:374:25.   As independent reserve reports issued by reputable independent reserve engineering firms typically provide reliable PRMS categorization and cash flow projections, market participants can then value oil and gas assets by applying appropriate risking factors directly to a reserve report.  Trial Tr. (Strickland) 284:14-16; *see also e.g.*, Smidt Dep. Tr. 36:23-40:14 (Mar. 17, 2021).  In the same vein, to value oil and gas assets as of a specific date of their own choice, market participants can also roll a reserve report back to that date and apply risking factors accordingly, just as Dr. Strickland did in this case.[9]  Trial Tr. (Strickland) 283:8-21, 538:13-18.

---

[9]      As Mr. Almrud testified, "rollbacks are common a occurrence in [the E&P] industry" and he "didn't see anything wrong with" it.  Trial Tr. (Almrud) 2178:15-21; *see also* Trial Tr. (Baxter) 779:5-22 ("We call that in the industry a 'rollback methodology' . . . .  There are a number of circumstances wh[ere] I have needed to do that in M&A to take a given reserve report and roll it back to a given date, what it would have been.").

38.     When risking cash flow projections, two of the most common methods are Reserve Adjustment Factor ("RAF") and Risk Adjusted Discount Rate ("RADR").  PX-888, Strickland Trial Decl. Ex. A ¶ 34.  RAFs are percentage multipliers that market participants use to reduce the cash flows, and RADRs are discount rates that market participants apply in calculating the present value of cash flows derived from reserves.  *Id.* ¶¶ 35-36.  They are both mathematical tools to account for uncertainties—the higher the uncertainties, the more severe the risking factors. Accordingly, discount in value is most significant for Unproved Reserves and Resources, as they typically must be substantially risked to reflect the reality of their uncertainties.   Trial Tr. (Strickland) 378:2-379:10.  This is why market participants often place little to no value on Probable and Possible Reserves, as the "good stuff is in the PDP, PDNP, and PUD" which belong to "the proved category and [are] reasonably certain."[10]  *Id.*; Norton Dep. Tr. 29:12-30:11 ("[P]eople are generally willing to pay . . . less to nothing for unproved.").

39.     At trial, Mr. Baxter followed the foregoing industry-standard NAV methodology and concluded that the NAV indicated Samson was balance-sheet insolvent at the Closing.  Baxter Trial Demo. at 34-41; *see also* Trial Tr. (Baxter) 756:4-778:17.  This NAV methodology started with the 2011 NSAI Reserve Report to estimate Samson's Proved Reserves.[11]  Baxter Trial Demo. at 34.  Because Samson did not have a 3P reserve report before the Transaction, Trial Tr. (Baxter) 758:22-759:2, Mr. Baxter estimated Samson's Unproved Reserves and Resources by giving full credit to the sum estimated by KKR *see* Baxter Trial Demo. at 36, and breaking it down based on

---

[10]     Importantly, this does not mean market participants often place little to no value on <u>undeveloped</u> reserves.  PUDs constitute part of <u>undeveloped</u> reserves, but market participants regard PUDs as "quite valuable" because they are Proved.  Trial Tr. (Strickland) 378:23-379:10.

[11]     The technical analysis in this reserve report was as of September 30, 2011, and it used July 2011 forward curve.  As commodity prices deteriorated in the second half of 2011, using this reserve report is in favor of Defendants.  Trial Tr. (Baxter) 757:10-758:21.

a ratio informed by NSAI's work product, *id.* at 38-40 (explaining why 2011 NSAI Reserve Report and NSAI's interim work product for that report support the ratio used by Mr. Baxter).[12]  *See also* Trial Tr. (Baxter) 759:23-761:1, 769:22-774:1.   Then, based on his industry experience and expertise, Mr. Baxter determined and applied risking factors, *see* Baxter Trial Demo. at 35; *see also* Trial Tr. (Baxter) 766:1-769:7, 775:12-777:16, which fall within a reasonable range of what Dr. Strickland typically applied in his career and of what Mr. Almrud's colleague described as typical in the industry.  *See* Trial Tr. (Strickland) 377:7-9; Trial Tr. (Almrud) 2213:19-2214:7 (discussing an article authored by Mr. Steve Hendrickson of Opportune).[13]  With that, Mr. Baxter valued Samson's reserves and resources at $3,061 million (net of relevant deductions such as taxes and G&A), compared to its debts at closing of $4,372 million.  Baxter Trial Demo. at 50.

40.    Mr. Baxter's valuation conclusion is supported by Dr. Strickland's independent analysis.  Dr. Strickland rolled the 2012 NSAI Reserve Report back to estimate volumes as of the Closing a few months prior.[14]  Defendants did not challenge Dr. Strickland's rollback methodology or results.  Indeed, Defendants' expert, Mr. Almrud, testified that he "didn't see anything wrong with the purpose behind [Dr.] Strickland's approach."  Trial Tr. (Almrud) 2178:15-21.  Based on his rollback, Dr. Strickland estimated Samson's Unproved Reserves as of Closing largely at lower volumes than Mr. Baxter did, which would translate to a lower valuation for Samson if

---

[12]    Mr. Baxter's extrapolation of PUDs to estimate probables and possibles was based on industry standard practices that he has used in his career.  Trial Tr. (Baxter) 759:23-760:13.  While Dr. Strickland's rollback analysis is another industry-standard method, Mr. Baxter focused on "standing on . . . the closing date using what was known or knowable as of that date."  Trial Tr. (Baxter) 779:5-22.

[13]    While Mr. Baxter referenced the risking factors reported in SPEE Survey, he did not use the SPEE risk factors from the survey.  Trial Tr. (Baxter) 767:3-25.  In comparison, Mr. Baxter's risking factors would result in higher valuation than the SPEE survey averages, which Dr. Strickland used for illustrative purposes.  Trial Tr. (Strickland) 376:10-377:2.  Notably, Defendants' experts did not offer any alternative risking factors at trial.

[14]    In his rollback, Dr. Strickland made adjustments to account for the differences in economic parameters between the date of Closing and the date of the 2012 NSAI Reserve Report.  Trial Tr. (Strickland) 359:8-360:23.

incorporated into Mr. Baxter's valuation model.[15]  Trial Tr. (Strickland) 370:12-371:23.  To reach

an illustrative fair market value range, Dr. Strickland also applied risking factors reported in an

industry survey ("SPEE Survey")[16] to illustrate what a reasonable fair market value of Samson's

reserves and resources could be.[17]  Trial Tr. (Strickland) 373:16-23.  Based on the midpoint of this

range, Dr. Strickland concluded that a reasonable illustrative value of Samson's Reserves as of

December 21, 2011 was $2.867 billion.  Strickland Trial Demo. at 16; *see also* Trial Tr.

(Strickland) 375:1-12.  Moreover, applying Mr. Baxter's risk factors (instead of the SPEE risk

factors) to Dr. Strickland's volume estimates, Dr. Strickland calculated a value of Samson's

Reserves of $3.198 billion as of December 21, 2011.  Strickland Trial Demo. at 19.  Samson would

be balance-sheet insolvent under both valuations.[18]

### D.  PRMS Applies to Conventional and Unconventional Assets Alike.

41.     PRMS treats conventional and unconventional assets alike.  Trial Tr. (Strickland)

307:9-308:11 (noting PRMS itself and its guidelines expressly stated their applicability to

unconventional assets); *see also id.* at 594:7-12 ("[T]here was not" "any question in the industry

that the PRMS reserve categories applied to unconventional reserves as of 2011.").  Citing no

---

[15]     At the Court's request, Mr. Baxter can incorporate Dr. Strickland's reserve estimates into his valuation model.  Trial Tr. (Baxter) 780:9-781:2.

[16]     While an ideal determination of appropriate risking factors requires more nuanced investigation, the risking factors reported in the SPEE Survey are "within the reasonable range" that Dr. Strickland would typically apply in his career.  Trial Tr. (Strickland) 374:5-25.

[17]     Dr. Strickland does not offer an opinion on Samson's fair market value.  Trial Tr. (Strickland) 375:1-3.

[18]     To address potential criticism that his illustrative valuation undervalued land that did not fall into "Reserves"—land that with volumes not deemed to be commercially recoverable, Dr. Strickland also presented a scenario where such land was valued at cost, which was Samson's own internal method of valuing all undeveloped land, including PUDs, both for internal and IRS reporting purposes.  Under this scenario, Dr. Strickland added the $1.375 billion cost basis to his illustrative value to arrive at a total value of $4.479 billion—a value which would double-count PUDs.  Trial Tr. (Strickland) 552:9-553:17; *see also* PX-888, Strickland Trial Decl. Ex. A ¶ 97.

authority whatsoever, Defendants' expert Mr. Almrud opined the opposite at trial. Trial Tr. (Almrud) 2191:23-2192:11, 2193:23-2195:13. Relying exclusively on his experience (*Id.*), he testified that, at the time of the Transaction, "[b]uyers pursuing unconventional resources generally did not use PRMS guidelines for valuing assets and creating business plans."[19] Trial Tr. (Almrud) 2190:8-21. But although Mr. Almrud's opinion was based entirely on his experience, Mr. Almrud admitted at trial that, at the time of the Transaction, he had no experience representing successful buyers of unconventional assets. Trial Tr. (Almrud) 2194:11-2195:13.[20] Perhaps reflecting that lack of relevant experience, Mr. Almrud's opinion was contradicted by the record evidence, which established that market practice at the time of the Transaction was to use of PRMS categories, and to apply risking based on those categories, for transactions involving undeveloped, unconventional assets.

42.     One need look no further than this Transaction; the participants themselves used PRMS to various degrees in estimating Samson's unconventional, undeveloped assets.[21] ***First***, in the years leading up to the Transaction, Samson itself worked to build a drilling inventory database using PRMS reserve categories for purposes of a potential sale, and at least some portions of that

---

[19]     It is important to note, however, that Mr. Almrud did not express this opinion concerning conventional, undeveloped assets. Trial Tr. (Almrud) 2190:25-2191:1. As such, he does not dispute applying PRMS to Samson's conventional assets, which include the GoM assets.

[20]     Not only did Mr. Almrud not have relevant successful buy-side experience, his sell-side experience would not have informed him as to how buyers were evaluating the assets, as "[i]t'd be typical that" a "buyer does not share [its] model with the seller." Trial Tr. (Schusterman) 1803:6-7. As such, Mr. Almrud had no material personal knowledge or experience to know how a buyer at the relevant time valued E&P companies.

[21]     A former Samson employee, Scott Rowland, testified that, but for one instance, he never saw a 3P reserve report prepared in connection with any of the transactions that he was involved in. Trial Tr. (Rowland) 1578:11-24. This is a red herring. Mr. Rowland had never engaged on the buy side in any corporate transactions valued at over a billion dollars. *Id.* at 1583:25-1584:17. He also had had zero experience in any leveraged corporate transactions before this Transaction. *Id.* at 1585:6-1586:6. And, having had only worked for Samson, Mr. Rowland has no basis to opine on what other market participants were doing at the relevant time. *Id.* at 1586:15-1587:2.

database were posted to the VDR for use by bidders in the Transaction.  *See* Trial Tr. (Rowland) 1562:4-1563:5; Trial Tr. (Almrud) 2196:19-2198:18; DX-847, Rowland Trial Decl. ¶¶ 30, 48.  In that database, Samson categorized its assets into Proved Reserves, PUD, Probable Reserves, Possible Reserves, and resources.  *E.g.*, PX-12, at SEC-00252039 & SEC-00252046.  Mr. Almrud made no attempt to square this fact with his testimony.  *See* Trial Tr. (Almrud) 2196:19-2198:18.

43.    ***Second***, Samson itself applied risking factors based on PRMS categories in preparing its own bids to acquire unconventional, undeveloped assets prior to the Transaction. Trial Tr. (Almrud) 2209:5-2212:12 ("Typically in a divesture [sic] we will value assets at PDP PV10 [sic], PDNP, including wells in progress at PV15, PUDs at PV20, and probables and possibles at a percentage of the PV20 values."); *see also* JX-15.

44.    ***Third***, KKR initially commissioned NSAI to issue a PRMS-based reserve report for 2P Reserves in the Transaction.  PX-174 ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████; *see also* Trial Tr. (Almrud) 2198:20-2199:4; Trial Tr. (Baxter) 704:9-705:21. ██████████████████████████████████ *See* Smidt Dep. Tr. 36:23-40:14 (Mar. 17, 2021).  KKR later narrowed NSAI's work scope to 1P Reserves only due to the time constraints largely imposed by Samson.  *See* Trial Tr. (Baxter) 704:9-17, 705:7-13.

45.    ***Fourth***, after KKR reduced its initial request to just estimating Samson's 1P Reserves, NSAI used PRMS in issuing its reserve report prior to the Transaction.  The reserve report itself includes NSAI's estimates of Samson's PUDs, which belong to the undeveloped reserve category.  *See generally* JX-431.  Though KKR did not utilize in its model the data in the 2011 NSAI reserve report, that work product also identified Samson's Probable and Possible locations from a list of potential PUD locations provided by the Samson management for

consideration.  Trial Tr. (Strickland) 2482:12-2486:8 (testifying that Samson prepared a list of 3,419 potential PUD locations, among which NSAI identified 813 PUD location, 831 Probable locations, and 78 Possible locations); Trial Tr. (Strickland) 2517:12-21; *see also* PX-894, Strickland Rebuttal Decl. ¶¶ 3-4; Trial Tr. (Almrud) 2199:16-24 (admitting being aware of such work product).

46.     *Fifth*, the Sponsor-led Samson board commissioned the 2012 NSAI Reserve Report immediately after the Transaction, in anticipation of taking Samson public.  Trial Tr. (Almrud) 2199:25-2201:11; *see also* PX-443 ███████████████████████████████████████

███████████████████.  Mr. Almrud testified that "[i]t was no surprise" that Sponsors would want such reserve reports for a potential IPO.  Trial Tr. (Almrud) 2202:2-6.

47.     *Sixth*, various financial participants in the Transaction used PRMS in evaluating Samson's unconventional, undeveloped assets.  Trial Tr. (Almrud) 2195:20-2196:18.  Taking one of many examples, J.P. Morgan built up a cash flow model for Samson in which it used PRMS category of PUD and applied a 50% risking factor.  *Id.*

48.     Finally, even the market evidence Defendants used to cross-examine Baxter undermines Mr. Almrud's opinion.  For example, Defendants raised Exxon's acquisition of XTO, which involved substantial unconventional assets.  Trial Tr. (Baxter) 1046:5-19 (discussing JX-004).  The methodology disclosed in that transaction was "absolutely" "consistent with both classifying reserves and resources using PRMS definitions and applying one of the two standard

industry methodologies for risking those PRMS categories."[22]  Trial Tr. (Baxter) 1320:23-
1323:1.[23]

49.    Simply put, the record is replete with instances in which market participants valued
unconventional, undeveloped reserves using PRMS categories.[24]  To ignore PRMS—as KKR did
and as Defendants now urge in this action—is profoundly flawed.[25]  It reflects the archaic,
"fundamental misunderstanding" on Mr. Almrud's part that an assumed so-called homogeneity of
unconventional assets somehow renders PRMS categories irrelevant.  Trial Tr. (Strickland) 312:9-
319:8; *see also e.g.,* DX-850, Almrud Trial Decl. ¶ 313.

50.    Mr. Almrud's testimony about the lack of usefulness of PRMS reserve categories—
even the PUD category—for undeveloped, unconventional assets was based on a similarly
demonstrably flawed understanding of the underlying geology.  Without citing any industry
sources, Mr. Almrud testified that:

> In most unconventional resource plays, the presence of hydrocarbons is well
> established, and these shale reservoirs would stretch over relatively large areas,
> uninterrupted by structural features or other changes in their rock properties that
> would affect well performance in a statistically meaningful way.  Unlike many
> conventional reservoirs in which the presence of hydrocarbons in commercial
> quantities was unknown from one well to the next, unconventional reservoirs were
> characterized by relative certainty of hydrocarbons across large areas.

---

[22]    Defendants only focused on the disclosure that Barclays Capital in that case used "a range of
discount rates of between 6% and 18%."  As Mr. Baxter explained, this disclosed range does not necessarily
represents the actual risking the parties relied on in making their deal decisions.  Trial Tr. (Baxter) 1321:15-
1322:16.  And, what's more, different asset bases would justify different risking factors, and XTO Energy
is not analogous to Samson.  *Id.* at 1323:2-1324:19.

[23]    Mr. Baxter also provided more evidence showing market participants' use of PRMS and industry-
standard risking factors.  Baxter Trial Demo. at 30-31.

[24]    A colleague of Mr. Almrud's at Opportune, who, unlike Mr. Almrud, is a "competent petroleum
engineer," disagreed with Mr. Almrud on this point.  Trial Tr. (Almrud) 2130:16-2131:7.  That colleague,
Mr. Hendrickson, authored an article in 2016, explaining how to apply risk factors to different PRMS
reserve categories.  Trial Tr. (Almrud) 2212:17-2216:4.  Throughout the entire article, nowhere did Mr.
Hendrickson distinguish conventional and unconventional assets.  *Id.*  This is because the same reserve
valuation methodology principles apply equally to both, as Dr. Strickland testified.

[25]    KKR and Mr. Almrud do not dispute—nor can they—that it is appropriate to use PRMS for
unconventional, underlined developed assets.

DX-850, Almrud Trial Decl. ¶ 313.

51.     As Dr. Strickland testified, however, this view was outdated as of the time of the

Closing.  At the inception of the exploitation of shale gas in the 1990s, there was a view within the

industry that one could drill one well in an unconventional play and duplicate the result across the

entire play.  Trial Tr. (Strickland) 312:9-319:8; *see also id.* at 540:14-23 ("[A]t one point early in

unconventional drilling, there was this idea that the rock was relatively homogeneous and that

you'd find successful commercial locations more or less everywhere you drilled within the

reservoir.").  But the undisputable record evidence is that such thinking quickly became outdated

as technology and exploration progressed.  As horizontal drilling proliferated in the early 2000s,

the science on unconventional resources developed significantly.  Trial Tr. (Strickland) 312:9-

319:8.  By 2005, market participants came to understand that unconventional reservoirs are "a lot

more heterogeneous" "than [they] ever thought."  *Id.*  By the time of the Transaction, in 2011, it

was "widely understood that [] shale reservoirs were highly heterogeneous" "and the[ir] properties

varied widely, varied rapidly in a lateral sense."  Trial Tr. (Strickland) 594:13-595:5.  Other than

Mr. Almrud's conclusory testimony, Defendants did not offer any evidence to the contrary.[26]

52.     More specifically, market participants understood by 2011 that there are certain

areas around PDP wells—typically called "proved areas"—in which a relatively high degree of

homogeneity can be expected, Trial Tr. (Strickland) 312:9-319:8, 540:24-541:13; but once an

operator ventures out away from those proved areas, heterogeneity ramps up.  Trial Tr. (Strickland)

312:9-319:8, 562:7-563:12; *see also* 326:7-336:6 (using Roubaix as an example).  Although an

---

[26]     By contrast to Dr. Strickland's testimony, which was supported by decades of professional
experience, credentials as a petroleum engineer, and citations to industry authority, Mr. Almrud is not a
petroleum engineer and, when rendering his opinion, he did not cite any industry literature.  DX-850,
Almrud Trial Decl. ¶ 313.

operator can still expect a high probability of finding at least some hydrocarbons outside proved areas, whether those hydrocarbons are commercially recoverable is "a complete unknown."  Trial Tr. (Strickland) 314:18-24.  In light of this substantial variance depending on proximity to proved areas, it is all the more important to categorize unconventional assets under PRMS to communicate uncertainties and draw inferences as to value.  Otherwise, market participants have no reasoned basis to determine the assets' value and would in fact be likely to overstate value by failing to account for uncertainties. *See, e.g.*, Trial Tr. (Strickland) 348:23-349:4 ("[Y]ou just can't treat all the volumes that you are going to produce in the future as if they have a common risk profile. They just have different risk profiles.  Failure to do so just overstates the volumes.").  KKR's process, and specifically its decision to ignore PRMS reserve categories, demonstrates precisely how value can be vastly overstated by failing to follow industry standards.

## IV. <u>Volatility in the E&P Industry</u>

53.    The uncertainty with respect to E&P cash flows does not just apply to the ability to extract hydrocarbons from a particular drilling location. Indeed, the enterprise value of E&P companies and market prices for oil and gas are highly correlated, and, as commodity prices have gone up and down, so too have the market values of E&P companies. Given this fact, the E&P business is a very volatile one. *See* Trial Tr. (Baxter) 651:10-19, 692:18-693:2.  That historical volatility in commodity prices is illustrated in the chart reproduced below.



Filsinger Trial Demo. at 1.

54.     Over the past 25 years, as Mr. Filsinger's demonstrative showed, the natural gas

spot prices traded as low as below $2 to above $18, and the oil prices as low below $20 to above

$140.  And, as Mr. Filsinger testified, as prices have risen and collapsed, so too have E&P market

participants' fates, with several cycles of bankruptcies of significant E&P players.  *See generally*

Trial Tr. (Filsinger) at 54:21-82:3.  As Mr. Filsinger testified, these failures are often tied to E&P

companies' failures to match their capital structures to their capital needs, given that the oil and

gas E&P business is also a "deeply capital-intensive" one.  *Id.*; *see also* Trial Tr. (Baxter) 692:18-

693:2, 693:22-695:11; JX-248 at 15.  Where an E&P company lacks the capital to ride out a

depressed commodity market, they can fail, sometimes spectacularly.  How does an E&P market

participant balance that?  "Very carefully."  Trial Tr. (Baxter) 693:2.

55.     From the late 1990s to 2000s, while Stacy Schusterman was its CEO, Samson did

just that.  It "weathered numerous commodity price storms in the U.S. markets by utilizing a

manageable debt load and appropriate capital cushion compatible with necessary capital expenditure." Trial Tr. (Schusterman) 1772:23-1773:4; *see also id.* at 1787:14-17 (Samson's debt to value ratio was on the lower end as compared to competitors in the industry). Before the Transaction, Samson always maintained adequate liquidity and was "never forced to have to go out and drill wells," "buy land," or "sell any assets" even in market downturns when natural gas was in the range of $2 and oil was around $20. Trial Tr. (Schusterman) 1771:19-1773:4, 1784:2-1785:6.

56.    Beginning in the mid-2000s, the shale revolution radically ramped up U.S. natural gas production, rendering natural gas a domestic commodity and de-linking U.S. natural gas prices from globally determined oil prices. Trial Tr. (Filsinger) 68:24-71:17. This drastic increase in supply resulted in a long-term downward pressure upon U.S. natural gas price since 2009, which none of Defendants' experts disputed at trial. *See* Filsinger Trial Demo. at 4-5.

57.    At around the same time, to ride this tide of the shale revolution, Samson amassed a large number of unconventional positions by purchasing assets and leasing mineral rights piecemeal, directly from mineral owners. DX-847, Rowland Trial Decl. ¶¶ 14-16; DX-849, Schusterman Trial Decl. ¶¶ 14-16; *see also* Trial Tr. (Schusterman) 1737:5-9. Through this process, Samson eventually held substantial undeveloped, uncategorized acreage positions that it did not explore (or attempt to "prove") due to limitations of its capital expenditure ("CAPEX"). DX-849, Schusterman Trial Decl. ¶ 20 (noting that the acreages Samson amassed have exceeded its own CAPEX capacity); *see also* Trial Tr. (Schusterman) 1738:4-1740:19 (same). Moreover, although Samson was an operating company, approximately 67% of the acreage positions that it had amassed were of minority or non-operator working interests. PX-894, Strickland Rebuttal Decl. ¶ 17. Where Samson held such positions, Samson did not have control over drilling

decisions. *Id.* Thus, Samson could not decide to drill such acreage if it believed advantageous and, conversely, it could effectively be forced to contribute capital to drill acreage even where such drilling was inconsistent with its business plan or was unsound from a balance sheet perspective.[27] *See id.*

## V. **Process Leading to the Transaction**

58.     In late 2010 and early 2011, rather than engage in further land acquisition or divestiture, Stacy Schusterman floated the idea of selling the entire company with her executive team:  David Adams, Samson's COO at the time; Phil Tholen, Samson's CFO; and Scott Rowland, Samson's Vice President of Business Development.  Trial Tr. (Schusterman) 1741:10-1742:7.  In March 2011, Samson contacted Jefferies & Co. ("Jefferies") to discuss a possible sale of all of its business.  Trial Tr. (Rowland) 1563:6-1564:11, 1565:10-18; Trial Tr. (Schusterman) 1742:8-20; *see also* DX-849, Schusterman Trial Decl. ¶ 25.

59.     Three months later, in June 2011, Jefferies signed an engagement letter to act as Samson's exclusive investment banking advisor.[28]  Trial Tr. (Rowland) 1565:10-18; *see also* DX-849, Schusterman Trial Decl. ¶ 25 (citing JX-22 for a copy of the Jefferies's engagement letter). Mr. Rowland testified that the engagement letter "reflect[ed] [Samson's and Jefferies's] negotiated sense of what the likely market value of [Samson's] asset[s] w[ould] be."[29]  *Id.* at 1589:22-

---

[27]     As Dr. Strickland described, if a working interest holder does not contribute capital when an operator calls for it, the working-interest holder pays a large financial penalty that often effectively forfeits its position. Trial Tr. (Strickland) 2505:22-2507:17.

[28]     None of the Selling Shareholders had their own financial advisor separate and apart from Jefferies. *See* Trial Tr. (Schusterman) 1793:17-1794:9.  Except for a trust and estate attorney who assisted the Foundation, none of the Selling Shareholders had their own legal counsel separate and apart from Samson's counsel. *Id.*

[29]     This of course only reflects a valuation of the GoM assets as of June 2011.  As the commodity prices plunged in the second half of 2011, the valuation for the company and the GoM assets deteriorated. PX-889, Baxter Trial Decl. ¶ 12.  Jefferies's engagement letter in no way indicates a fair valuation of $10 billion for the entire Samson <u>as of closing</u>.  *See* Trial Tr. (Rowland) 1592:24-1593:12 (Jefferies using

1590:13.    Notably, Jefferies's compensation structure as set forth in the engagement letter indicated a $2 billion valuation of Samson's GoM assets.  Trial Tr. (Rowland) 1588:13-1589:21 (comparing the $10 billion success fee threshold for selling the entire company, with the $8 billion success fee threshold for selling Samson excluding the GoM assets).

60.    Throughout the spring and summer of 2011, Samson worked closely with Jefferies to collect data and develop a valuation model ("Jefferies's Model"), in which Jefferies made a sell-side valuation of Samson using data provided by the Samson management.  Trial Tr. (Rowland) 1567:22-1568:12; *see also* Trial Tr. (Schusterman) 1743:12-21.  As discussed below, *see infra* ¶ 77, the key foundational inputs used in KKR's deal model on the buy side appear to have been directly adopted from those presented in Jefferies's Model on the sell side.  *See, e.g.*, Trial Tr. (Strickland) 339:12-344:9, 585:7-14, 2491:19-2492:12.

61.    In July 2011, Jefferies distributed overview materials marketing Samson's business to a comprehensive list of potential buyers to gauge their interest.  *See, e.g.*, JX-027 (including U.S. E&P companies, international E&P companies, and private equity firms).  Only five entities expressed interest in response:  Apache Corporation ("Apache"), Korea National Oil Corporation ("KNOC"), KKR, Occidental Oil and Gas Corporation ("Occidental"), and Blackstone Management Partners LLC ("Blackstone").  As detailed in the chart below, following the submission of bids from some of these parties, through the close of the Transaction, and beyond,

---

pricing assumptions of $5.50 gas and $90 oil as of July 2011); *id.* 1593:24-1594:7 ("There wasn't a mechanism that [Jefferies] could change the terms" if they, through a full-fledged due diligence, later "found out [Samson's] land was worth less than what they assumed" in the preliminary valuations as of July 2011).  For the same reason, Jefferies's preliminary indications of valuation from mid-2011 also have little, if any, indicative value in this case.  *See, e.g.,* DX-847, Rowland Trial Decl. ¶¶ 46-49; DX-849, Schusterman Trial Decl. ¶ 27.  Jefferies did not provide Samson with an updated valuation as the transaction proceeded.  Trial Tr. (Schusterman) 1796:2-1797:13, 1809:6-21.

oil and gas commodity prices in the U.S., and accordingly the valuations of U.S. E&P companies and assets, suffered a precipitous decline.



| | Date | Event | Gas spot price[30] |
|---|---|---|---|
| a | 3/7/2011 | Samson first outreach to Jefferies | $3.73 |
| b | 6/9/2011 | Samson signs Jefferies engagement letter | $4.92 |
| c | 8/6/2011 | Jefferies opens VDR to potential bidders | $4.00 |
| d | 9/8/2011 | Apache submits first bid | $3.99 |
| e | 9/19/2011 | KKR and KNOC submit bids | $3.78 |
| f | 10/11/2011 | KKR and Samson enter into exclusivity agreement | $3.52 |
| g | 10/13/2011 | Apache submits second bid | $3.42 |
| h | 11/22/2011 | Transaction signing | $3.06 |
| i | 12/21/2011 | Deal close | $3.05 |
| j | 2/08/2012 | Bridge loan refinanced | $2.48 |
| k | 2/14/2012 | First Samson board meeting post-close | $2.48 |
| l | 9/7/2012 | Covenant relief under RBL | $2.73 |

---

[30] U.S. Energy Information Administration, Henry Hub Natural Gas Spot Price, *available at* https://www.eia.gov/dnav/ng/hist/rngwhhdD.htm; DX-773

62.    In early August 2011—when the natural gas spot price was at $4.00/MMBTU—each of the five potential buyers was granted access to a virtual data room ("VDR") containing files prepared and compiled by Jefferies related to Samson and its assets.  *See* Trial Tr. (Rowland) 1569:7-13.  Teams from Apache, KKR, and KNOC also met with Jefferies's team and Samson management in person for preliminary diligence.  DX-847, Rowland Trial Decl. ¶¶ 54-55; Trial Tr. (Rowland) 1569:7-1570:10, 1596:2-10; *see also* JX-68.

63.    One month thereafter, only three of the potential buyers submitted bids: KNOC, KKR, and Apache.[31]  Trial Tr. (Roski) 2332:3-7; *see also* DX-849, Schusterman Trial Decl. ¶ 28. Conspicuously missing from the bidders was Blackstone.  In August 2011, for its preliminary diligence, Blackstone appears to have gone as far as to commission a PRMS-based 3P reserve report from Von Gonten, an independent reserve engineering firm similar to NSAI.  Trial Tr. (Baxter) 1143:21-1144:13, 1364:5-1365:3; *see also* Trial Tr. (Almrud) 2206:1-2208:10. Blackstone ultimately decided not to bid at all.  Trial Tr. (Almrud) 2208:11-2209:4.

64.    In a market where "a lot of foreign companies" were "excite[d]" about U.S. shale assets, *see* Trial Tr. (Schusterman) 1740:11-19, KNOC submitted its indicative bid proposal ("KNOC's Offer") on September 19, 2011.  It offered to purchase 100% of the stock of Samson, including the GoM assets, for $5.5 billion.  Trial Tr. (Almrud) 2202:24-2203:7; Trial Tr. (Schusterman) 1748:16-22; *see also* DX-849, Schusterman Trial Decl. ¶ 28; JX-94.  KNOC stated that the $5.5 billion price was for Samson ████████████ and was ████████████ ████████    JX-94, at SEC-00190544.  In determining its $5.5 billion bid price, and like Blackstone, KNOC appears to have at least preliminarily sought to follow the industry standard

---

[31]    All bids noted that they were subject to further due diligence, as Samson's reserves had not yet been vetted in detail by any potential buyer.

practice of putting Samson's acreage into reserve categories and risking them accordingly.  Trial

Tr. (Almrud) 2203:19-2204:20; *see also* JX-68.  Samson did not respond to KNOC's bid.  Trial

Tr. (Schusterman) 1748:23-1749:2, 1801:5-1802:2; *see also* DX-849, Schusterman Trial Decl. ¶

28.

      65.    On the same day, KKR submitted a "non-binding proposal" ("KKR's Offer") to

acquire 100% of Samson's stock, exclusive of the GoM assets:  "The purchase price for all of

[Samson's] stock would be $7.0 billion, 

      JX-92, at SEC-00190540; *see also* DX-847, Rowland Trial

Decl. ¶ 56; DX-849, Schusterman Trial Decl. ¶ 28.  In this non-binding proposal, KKR also stated

that the GoM assets

      JX-92, at SEC-00190540.  KKR further expressed willingness to

.  *Id.* at -541.

      66.    As KKR prepared to make its $7 billion offer, however, its deal team struggled to

justify such a bid.  On September 9, 2011, hours before finalizing their presentation to the

investment committee seeking approval of the bid, the deal team circulated a breakup value

analysis

      JX-80.  That valuation would only

      *Id.* (emphasis added); *see also* PX-129.

67.     Apache's offer ("Apache's First Offer") was submitted on September 8, 2011,[32] when the natural gas spot price was as high as $3.99/MMBTU.  JX-078.  Apache offered $8.1 billion for 100% of Samson's shares, including the GoM assets, plus assumption of $695 million of third-party debt.  JX-78; *see also* DX-849, Schusterman Trial Decl. ¶ 28; Trial Tr. (Baxter) 1260:25-1261:13.  With the assumption of debt, the total price Apache offered for the entire Samson portfolio was approximately $1.8 billion higher than what KKR had offered for Samson excluding the GoM assets.  *See* Trial Tr. (Rowland) 1600:3-12 (admitting that Apache's effective offer price was $8.8 billion for the whole company); Trial Tr. (Schusterman) 1748:12-20 (same); *see also* DX-847, Rowland Trial Decl. ¶ 62.  Ms. Schusterman believed that the GoM assets were worth more than this additional $1.8 billion.  Trial Tr. (Schusterman) 1823:7-1825:10 (admitting that a factor she considered when rejecting Apache's First Offer was her belief that the GoM assets were worth at least $2 billion); *see also* JX-112.  Consequently, Samson counteroffered for $2 billion more.[33]  *See* Trial Tr. (Rowland) 1600:13-19.

68.     As natural gas prices continued to deteriorate starting in late September 2011, not only could Apache not meet Samson's counteroffer, it had to effectively withdraw its First Offer.  *See* Trial Tr. (Rowland) 1601:12-1602:6, 1603:1-55; Trial Tr. (Schusterman) 1800:6-22; *see also, e.g.*, JX-106.  By early October 2011—when the natural gas spot price was $3.52/MMBTU—KKR was the only market participant willing to move forward with a bid for Samson.  Trial Tr. (Rowland) 1604:24-1605:3 ("On October 4th," "KKR was going to be the buyer if there was going

---

[32]     Apache actually submitted two offers to Samson.  The second offer is discussed below.  *See infra* ¶¶ 120-21.

[33]     Stacy Schusterman mentioned that one of the reasons she preferred KKR's Offer was that she "cared a lot about the employees" and believed KKR would keep Samson's employees.  Trial Tr. (Schusterman) 1749:3-1750:20.  But Apache ███████████████████████████████████████████████.  *See* PX-83.  In contrast, the KKR-led board fired more than a hundred Samson employees within one year after the close, including employees who had been with the company for decades.  *See* Undisputed Facts ¶ 58.

to be a transaction."); *see also id.* at 1608:19-25.  In fact, at the time Stacy Schusterman accepted the KKR's Offer, Apache's First Offer had already been "off the table."  Trial Tr. (Schusterman) 1811:13-21; *see also id.* at 1799:19-1800:5.  Ultimately, market conditions forced Apache to withdraw from the process, as Apache "lost $12 billion[, about a third of its market capitalization,] during this six-month time period" from July to December 2011.  Trial Tr. (Baxter) 690:16-691:16 (also noting the significant loss of value for other public E&P companies during the same time period).  With Apache's withdrawal, contrary to Defendants' prior narrative of a robust market for Samson, Samson actually had no viable option other than KKR.

69.     On October 4, 2011, fearing that even KKR would walk away, *see* Trial Tr. (Schusterman) 1752:20-1753:2 ("[T]here was a possibility [KKR]'d try to retrade the deal even further."), Stacy Schusterman accepted KKR's Offer without any formal board meeting.  *See* DX-847, Rowland Trial Decl. ¶ 57; *see also* Trial Tr. (Schusterman) 1795:1-9.  Samson's attempts to raise KKR's offer price fell flat, as KKR was "working hard just to keep the number at [$7] billion."  Trial Tr. (Rowland) 1602:17-1604:2; *see also* Trial Tr. (Schusterman) 1752:18-1753:2.  As noted above, even a month prior, when natural gas prices were still relatively strong, the KKR team had struggled to justify a $7.0 billion bid; once natural gas prices dropped another 13%, the purchase price became even less realistic.  *See* JX-106.  Over the next two months, commodity prices continued to fall.  In late December 2011—when natural gas hovered around $3.00/MMBTU— even Ms. Roski was not aware of any other buyer who would have been willing to pay $7.1 billion for Samson.  *See* Trial Tr. (Roski) 2334:8-14.  KKR, nevertheless proceeded with the transaction even though it no longer made economic sense even under KKR's flawed analysis,  perhaps because, as Ms. Schusterman surmised,  Henry "Kravitz's ego" forced him to get the deal done.  *See* Trial Tr. (Schusterman) 1813:16-1814:12.

## VI. Samson and KKR Rush To Sign And Close

### A.  KKR Fails To Competently Assess Samson's Reserves

70.     As noted above, an accurate understanding of an E&P company's reserves is the critical step to creating any viable business plan for an E&P company.  In the diligence process, it was critical that KKR determine what of Samson's undeveloped land was likely to contain valuable oil and gas assets, and what would be mere "goat pasture," so that the company could determine an appropriate capital structure and allocate its capital accordingly.  As noted, petroleum reserves, when extracted and sold, are what generates an E&P company's cash flows.  Those cash flows are in turn used to fund capital expenditures, which, in the E&P industry, means investing in drilling and necessary investments to extract the oil and gas resources from further undeveloped land.  In turn, this capital expenditure leads to more cash flows resulting from the newly-producing resources that yield oil and gas that can be sold.  It is a virtuous cycle when it works right.

71.     Of course, as Samson quickly learned post-close, the opposite can be true.  If undeveloped reserves do not produce as anticipated, or if the price at which oil and gas can be sold is lower than planned, then an E&P company will have less cash to allocate to capital expenditures.  Fewer drilled wells, in turn, will negatively impact cash flows into the future, as less petroleum can be extracted if a company is not able to invest in drilling. An E&P company will simply not drill, or may obtain less than expected for what they are drilling. This type of compounding problem can foreseeably lead to severe liquidity problems for an E&P business with substantial leverage.  That risk was particularly acute in KKR's business plan for Samson, which was predicated on extracting oil and gas from previously-undeveloped acreage – by definition, a capital-intensive process, layered on top of a new, highly-leveraged capital structure.  The concept of a death spiral for an E&P company, which Defendants did not contest at trial, is discussed more fully below at Section VI.B.

### 1)    KKR and RPM Cobble Together A Deal Model

72.    Despite the critical importance of understanding and protecting against a death spiral, KKR did not approach the task of evaluating Samson's assets in a disciplined manner by applying common principles in the industry.  Nor did KKR engage any of the experienced petroleum engineering firms known in the oil and gas industry to advise them.  Instead, KKR embarked on a highly unorthodox exercise with the help of its own subsidiary, RPM Energy LLC ("RPM"), to evaluate all "Development" assets, which included Unproved as well as PUD reserves. ███████████████████████████████████████████████
████████████████████████████████████. Farley Dep. Tr. 49:23-50:23.  Far from providing independent guidance, ████████████████████████████████████████
████████████████████    Farley Dep. Tr. 55:17-56:16, and wanted "████████████████████
███████    Id. at 54:22-55:9.

73.    The KKR Model was an excel spreadsheet with thousands of cells, with an array of assumptions regarding volumes, revenues, and expenses related to Samson's projected operations and finances post-closing.  Based on those assumptions built into the spreadsheet, the KKR Model projected cash flows from the business from the Closing out 30 years.  The KKR Model also generated a NAV by applying a 10% discount rate, and it also contained post-tax present values using a range of discount rates from 10% to 15%, with no indication as to which discount rate, if any, its authors believed to be appropriate to represent fair market value.  Despite Defendants' attempts to portray the KKR Model as "sophisticated" and "dynamic," it was apparently necessary to make manual changes to the business plan for downside pricing scenarios, which is not consistent with a fully dynamic model.  Trial Tr. (Filsinger) at 94:9-95:15. The ultimate output of the KKR Model was referred to throughout the trial record as the "KKR Business Plan," which was provided to management to execute on post-Closing.

74.     Much of the testimony at trial was devoted to the portion of the KKR Business Plan which projected cash flows that would be generated from Samson's undeveloped assets and the associated assumptions, including the necessary levels of CAPEX, when to drill, and how many wells to drill.   KKR and RPM's method of predicting cash flows from undeveloped assets, however, bore no resemblance to the industry standard of an independent audited reserve analysis, such as the NSAI report for Proved Reserves that was presented to the LBO bank lenders.  *See infra* ¶¶ 86-109.   Instead, RPM reviewed the work of Jefferies and Samson management and developed a custom methodology for predicting what cash flows Samson could realize from its developed and undeveloped acreage.  DX-850, Almrud Trial. Decl. ¶¶ 145-147.  At the outset, this put KKR's reserve analysis on questionable footing, because the sell-side information that KKR and RPM relied upon with respect to that acreage was substantially flawed and incomplete.

75.     Samson only first embarked on a comprehensive effort to identify drilling locations and evaluate its drilling inventory in mid-2010.  Cox Dep. Tr. 55:8-16, 55:20-56:4.  The employees tasked with this effort to assemble a drilling inventory database "really had never done any reserve work before" and "really didn't have any background in this," and were trained "just to . . . give them a working knowledge, not to make them experts in reserve classification." *Id*. at 88:22-90:6. As Samson's engineering manager of the business development department put it: "We never had a substantial amount of time to complete these.  . . . I always felt like this was kind of a rough estimate, that we never really had the chance to polish this up to get it to be very accurate." *Id*. at 91:6-15.   As a result, by the time of the Transaction, Samson's own records of its acreage and reserves needed additional work, under time pressure, in order to be usable for KKR's valuation and business plan. At least with respect to potential PUD drilling locations to be evaluated by

NSAI, the information provided by Samson management was hastily assembled in October 2011 solely for diligence purposes.  *See* PX-205.

76.    Claire Farley, who had a leading role at RPM and KKR in the diligence process, and who later served as interim CEO of Samson post-Transaction, explained that "[t]here was some inaccurate information" provided in diligence, and thus a number of assessments made in diligence "were assessments that we believed to be completely accurate and were not."  Farley Dep. Tr. 173:16-21, 174:18-23.  For example, KKR and RPM discovered post-close that they did not have "the level of detail that we thought we had" about Samson's drilling costs.  *Id*. at 80:3-21, 81:12-82:9.  Further, maps that KKR and RPM relied upon in creating the business plan were inaccurate, and "[w]hen we would drill the location, . . . what was predicted on the map was not what we found in the well."  *Id*. at 176:10-16.  The Sponsors only discovered after Closing that Samson lacked the expected monitoring protocols, and there was a lack of real-time data about drilling.  *Id*. at 63:23-65:7.  Ultimately, Ms. Farley wished that she and others at KKR and RPM had probed more deeply during the diligence period into whether appropriate monitoring was in place prior to sale.  *Id*. at 65:8-66:3.  For his part, Mr. Almrud either was not aware of, or ignored, all of this testimony in reaching his conclusion that the buyers were "adequately informed," Trial Tr. (Almrud) 2139:1-2145:4, though he did opine that he did not see "any gaps in the data" provided to Sponsors. *Id.* at 1951:2-6.

77.    Despite these severe limitations in Samson's own data and assumptions regarding its undeveloped acreage, RPM's work in many instances appears to be a copy and paste. Hersh Dep. Tr. 166:11-15; 203:6-205:3.  For example, KKR and RPM also uncritically incorporated, nearly wholesale, the gross well locations provided by Jefferies in the VDR.  *See* Trial Tr. (Strickland) 322:11-25; *see also* PX-888, Strickland Trial Decl. Ex. A (Opening Report) ¶¶ 72, 73.

With only a few exceptions, KKR and RPM relied on the sellers' assumptions placed in the data room for type curves and EURs.  Trial Tr. (Strickland) at 339:12-342:12 (comparing EURs from data room and KKR model, and observing "I just find the probability vanishingly small that you would get this much similarity."); *see also* Trial Tr. (Strickland) 2489:9-2491:18; Buie Dep. Tr. 61:25-62:5 (Jan. 15, 2020).  And, where there were differences between KKR's and the sellers' EUR assumptions, KKR's were higher in every case, meaning that the purchasers assumed volumes that were higher than what Samson disclosed.  Trial Tr. (Strickland) 342:13-343:20.

78.    Where RPM did build upon the data Samson provided, that analysis was both unusual and deficient.  RPM did understand the concept that the uncertainty of undeveloped acreages increases the farther they are from producing reserves.  *See* Farley Dep. Tr. at 41:21-22 ("███████████████████████████████████████████████████.  Nonetheless, KKR and RPM did not attempt to place any of what they called the "Development" assets into industry-standard, PRMS-defined reserve categories in order to understand and quantify their relative degree of risk. Trial Tr. (Strickland) at 346:1-9.   Instead, in its model, KKR treated all of its Development Assets identically. JX-246; *see also* Trial Tr. (Almrud) at 2189:23-2190:6; Trial Tr. (Strickland) at 345:19-25.  Based on the assumptions in its model, KKR then determined the value of the "Development" assets to be more than $12 billion, which, when combined with the estimated $3.8 billion of developed reserves, and subtracting G&A and other costs, resulted a total NAV of $13.8 billion. JX-246 at "NAV" Tab.

79.    As the Trustee established at trial, it is wholly inappropriate to value an E&P company using a model in which undeveloped locations are lumped together and not differentiated between reserves and resources, and within reserves, into the PRMS reserve categories of PUD, probable and possible. *See, e.g.*, Trial Tr. (Baxter) at 669:14-21 ("[T]hey also violated industry

standards, both PRMS and Securities and Exchange Commission industry standards by grouping

their PUDs, probables, and possibles, and continent resource, and prospective resources into one

bucket[.]").[34]   "When they lump[ed] all these future [Samson] locations and give them a common

[by]-well recovery and don't pay attention to the PRMS categories," they "lost [] the ability to

judge the reserves by levels of uncertainty."   Trial Tr. (Strickland) 346:10-20.   They thus "lost

[their] very first step, which is a very important one, in understanding [Samson's reserve] volumes

. . . and how uncertain they are."   *Id.*   By lumping together all "Development" assets, rather than

categorizing them by PRMS categories with varying probabilities of generating their associated

volume estimates, KKR's model implied a 100% probability of volumes from undeveloped

reserves.   PX-889, Baxter Trial Decl. Ex. A (Opening Report (Pt. 1)), pp. 20-22, Table 3.   Such an

assumption would not even be appropriate for PUDs, let alone for all the remaining undeveloped

acreage that constituted the vast majority of Samson's undeveloped assets.   Because of KKR and

RPM's flawed methodology, "the undeveloped volumes are overstated due to the methodology

and the assumptions that were used" and the overstated volumes "flow straight through to the

values."   Trial Tr. (Strickland) 311:12-25; *see also id.* at 348:23-349:4.

80.    This overstatement of volumes from undeveloped acreage not only inflated KKR's

ultimate NAV conclusion, but also the KKR Model's cash flow projections.   Trial Tr. (Strickland)

349:23-350:21.   KKR's treatment of the "Development" assets "basically communicated to these

market participants was 100 percent of those KKR volumes that they called 'risked undeveloped,'

---

[34]     Both Mr. Baxter and Dr. Strickland opined that KKR's "Development" assets included both
Reserves and Resources.   At trial, Defendants attempted to mischaracterize Dr. Strickland opinions as
indicating KKR's "Development" asset only included Reserves.   Not true.   Trial Tr. (Strickland) 579:1-
581:8.   Dr. Strickland's "opinion is exactly the opposite."   PX-894, Strickland Rebuttal Decl. ¶ 5 ("Based
on my analysis, most of the undeveloped volumes included in the KKR Deal Model would not satisfy the
definition of Proved, Probables, or Possibles based on the NYMEX forward curve that existed as of the
closing date.").

they used 100 percent of those in the cash flow projections that they showed their rating agencies and the lender community." Trial Tr. (Baxter) at 669:1-5.

81.     RPM's approach to modeling drilling locations was likewise severely deficient. RPM determined the total number of wells to be drilled in the KKR Business Plan by first starting with 19,637 total potential gross locations, which was calculated merely by taking total undeveloped acreage and applying arbitrary spacing assumptions to determine the maximum number of potential wells that could be drilled on such acreage, generally without regard to land characteristics. PX-342; Trial Tr. (Strickland) at 325:5-326:6. RPM's technical team then applied certain "location success factors," expressed as percentages on a region-by-region basis, which factored in certain of RPM's high-level assumptions about the land. Trial Tr. (Strickland) at 323:1-325:4. The weighted average of the success factors was 47.5% and, once applied, reduced the 19,637 locations to 9,202 locations. The stated purpose of this process was to determine the total available locations for development. Buie Dep. Tr. 117:7-24, 118:5-22; see also Trial Tr. (Strickland) 348:18-22 ("Q. . . . Did you see anything in the KKR deal model that appeared to you to be a risking of volumes that went into that deal model? A. No, I did not.").

82.     As the Trustee demonstrated at trial, this methodology for categorizing its undeveloped acreage was not remotely akin to applying industry standard risk factors to potential volumes from estimated drillable locations. Specifically, KKR and RPM made two faulty assumptions. The first was that every well in the same sub-region within the model would have the same risk profile. For example, every well in the Niobrara region was treated as having the same level of uncertainty as every other well, notwithstanding obvious distinctions in land characteristics and distances from producing wells. The second was the assumption that every PDP in a region, or every drillable location, would be 100% successful in meeting KKR's expected

result.  KKR's location success factors, however, were "divorced from the physical reality of the rock[s]," and highly improbably assumed that the wells "are all equally determined to be productive no matter where they are located."  Trial Tr. (Strickland) at 321:21-326:6.  Industry-standard risking was *never* performed.  *See* Trial Tr. (Strickland) at 344:10-15.  Instead, the KKR model assumed a 100% probability of volumes from each of the 9,202 wells projected to be drilled.  To project volumes coming from these locations, KKR extrapolated type curves from physically distant areas to massive areas that did not necessarily share analogous characteristics, and simply applied them to all hypothetical drilling locations in a region, resulting in a model that "vastly overstates the volume of oil and gas that can be produced."  *Id.* at 336:7-339:11.  Even assuming that KKR accurately calculated 9,202 drillable locations, because of the other flaws in KKR's analysis, namely the lack of industry-standard risking and the assumption that all wells drilled will perform like existing producing wells, "the volumes are still too high."  *Id.* at 350:7-21.

83.    In one dramatic example, the KKR Model took the EUR from *one well* in a sub-region to the south of the Powder River Basin and applied a type curve from that one well to estimate volumes from *753* hypothetical wells in undeveloped locations.  Trial Tr. (Strickland) 2492:13-2504:1.  And those 753 locations were not even in the same sub-region as that one well was—they are a "very far distance."  Trial Tr. (Strickland) 2501:21-2502:20.  As Dr. Strickland testified:

> To determine a reliable type curve and EUR that can be used to project production in other wells, the sample size must be sufficient and the sample wells must be analogous to the projected locations.  In terms of sample size, relevant literature generally recommends, in most commonly observed situations, a minimum of between 35 and 130 wells, depending on the variability in the sample size, in order to reliably project well performance.  Further, in order to be analogous to the locations whose volumes are being projected, the sample wells must be in reasonable proximity to the projected locations, generally not more than a few miles away and ideally within what is known as the "proved area," which is not the same as the extent of an entire reservoir.

PX-894, Strickland Rebuttal Decl. ¶ 11; Trial Tr. (Strickland) 2592:25-2596:4 ("[B]ecause . . . the reservoir is so heterogeneous and the properties vary so much, . . . when you find an area that produces well and you have success there and you continue to drill there, then you can make a decent type curve, but that applies around that region.  As soon as you move away from that region, first of all, you just don't know because there's no wells.  But even if there are some wells, just the odds on that quality of a rock continuing over very wide spaces is—is quite low.").[35]

84.     Moreover, far from being immaterial to overall value, the estimated volumes just from the 753 locations assumed for the Niobrara region, projected from the type curve of a single well, contributed ***$584 million*** to KKR's NAV.  Trial Tr. (Strickland) 2644:1-7.  And, as Dr. Strickland testified, though this was one dramatic example, it reflected the KKR Model's use of the performance of a small number of producing wells to project volumes for hundreds or thousands of undeveloped locations, far away from the wells used to create the type curve.  This approach was, as Dr. Strickland testified, "fraught with problems and uncertainty," Trial Tr. (Strickland) 2497:1, and "far outside the bounds of accepted industry practice," PX-894, Strickland Rebuttal Decl. ¶ 13.

85.     Thus, as the Trustee demonstrated at trial, the manner in which the KKR model was built was completely at odds with industry standards and resulted in the drastic overestimation of expected hydrocarbon volumes, which then flowed through the KKR Model and resulted in a valuation and going-forward business plan that were dramatically inflated and unachievable.

---

[35]     Though it was the least of the problems with KKR's approach to estimating volumes for the Niobrara formation, Dr. Strickland testified that the type curve applied to the 753 locations was poorly drawn and would have overstated projected volumes *even from just the single well upon which it was based*.  Trial Tr. (Strickland) 2498:16-2500:17.

2)    **NSAI's Third-Party Reserve Report Demonstrates the Critical Flaws in KKR's Model**

86.    While KKR and RPM were creating their model using their own methodology, the reserve engineers at NSAI were preparing a traditional reserve report using accepted, conventional methodologies.  In any E&P transaction, lenders "usually require" an audited reserve report, which includes industry-standard, PRMS estimates of the reserves they are lending against, and, as KKR's co-sponsor Crestview noted, market participants also ███████████████████ ███████████████" PX-216 at CRE-SAM_0021944.  Because KKR was going to seek bank financing in connection with the Transaction, a PRMS report was necessary, and KKR asked NSAI to evaluate Samson's proved reserves in what one NSAI professional described as "████ ███████████████████" PX-257; PX-159; PX-174.[36]  On November 16, 2011, NSAI issued its report estimating all of Samson's Proved Reserves, including PUDs, because they too were part of the lending base. *See, e.g.,* PX-279.

87.    KKR treated NSAI's independent work product as a formality for the bank lenders' benefit.  Even with the NSAI estimate of PDPs in hand, KKR did not use it.  Instead, KKR stuck with its in-house estimate of PDP volumes, which was 25% greater than NSAI's initial estimate. Trial Tr. (Baxter) 674:7-17; PX-889, Baxter Trial Decl, Ex. A (Opening Report (Part 1)) at pp. 19-20, Table 2.

88.    KKR did not incorporate NSAI's estimates of PUDs into its model either. Critically, it also failed to calibrate its own projections of the lumped-together "Development" assets using the results of NSAI's PUD analysis.  Samson management submitted for NSAI's

---

[36]    In an apparent reversal of a prior directive, KKR told NSAI not to include any assessment of probable reserves, and suggested that ███████████████████████████ JX-121.

review over 3,000 locations to consider as potential PUDs, of which 813 locations were deemed

by NSAI to be PUDs.  Trial Tr. (Strickland) 2482:12-2486:8 (testifying that Samson prepared a

list of 3,419 potential PUD locations, among which NSAI identified 813 PUD location, 831

Probable locations, and 78 Possible locations).  Armed with the same information from Samson

management, as discussed above, KKR did not make any effort to differentiate between

undeveloped locations at all.   If one infers meaning from KKR's generalized "risk" factors (using

development assets risked at 60% or greater as a rough proxy for PUDs), KKR's model implied

7,011 PUD locations to NSAI's 813.  There is no evidence in the record, however, that KKR

adjusted its estimates in response to, or even investigated, this glaring ten-fold discrepancy

between its assumptions regarding the quality of Samson's undeveloped acreage and the work of

the independent, highly-regarded petroleum engineers at NSAI.

89.    The total risked value of all PUDs identified by NSAI prior to the Closing was $650

million, as Mr. Baxter calculated applying reasonable and non-controversial[37] risk factors to

NSAI's pre-close PUD estimates (which were unrisked).  PX-889, Baxter Trial Decl. Ex. A

(Opening Report Part 1), ¶ 93.  Yet, as even Defendants admit, KKR's "Development" category

(all land less PDP and PDNP) accounted for $5 billion of the purchase price.  PX-377.  So, as a

matter of simple arithmetic, all but $650 million of the $5 billion in "Development" assets was

attributable to Samson's Unproved Reserves.  By volume, PUDs made up only 9% of KKR's

---

[37]    Other than Mr. Almrud's assertion, without relevant experience or other support, that market participants did not make use of the PUD category for valuation purposes, Defendants did not seriously attempt to challenge Mr. Baxter's specific RAF for PUDs.  And Mr. Baxter's 70% RAF applied to Samson's PUDs was more generous that the ███ RAF applied by the lender banks, *compare* Baxter Trial Demo. at 35, *with e.g.*, JX-220, at Sampson_Kravitz00000417, as well as the midpoint of the 50-80% RAFs that, according to Mr. Steve Hendrickson, the petroleum engineer who consulted for Mr. Almrud and Defendants, is an appropriate range for PUDs.  PX-891.

"Development" category, as shown in the table below.  PX-889, Baxter Trial Decl. Ex. A (Opening

Report Part 1), ¶ 41.



Baxter Trial Demonstrative p. 29.  The remainder of Samson's undeveloped assets were, by

definition, significantly less likely to be profitably extracted, produced, and marketed than the

PUDs.  Again, though, there is no evidence that KKR in any way incorporated or considered

NSAI's conclusions, or their troubling implications for KKR's plan to extract value from the

Development assets.

90.    The subsequent 2012 NSAI Reserve Report, which was a full 3P report, makes

clear just how badly KKR had constructed its model.  After close, likely in anticipation of a

potential IPO, PX-222 at KKR-SAM_0189432, KKR commissioned NSAI to conduct an estimate

of Samson's 3P reserves as well.  PX-443, at NSAI16491-31134.  This report, with an "as of" date

of six-months after Closing, confirmed that the inconsistency between KKR/RPM's deal model

and the accepted PRMS and risking factors approach is not a mere subjective difference of opinion

within a reasonable range of approaches.

91.     Viewing KKR's estimates of undeveloped volumes through the framework of the industry standard of applying risk factors to the various PRMS categories, KKR's location success factor "risking" was obviously deficient.  Dr. Strickland, doing KKR's work for them, divided the 19,637 gross locations from RPM's model into three categories:  (1) locations in regions where RPM applied a success factor of 60% or greater; (2) locations in regions where RPM applied a success factor between 30% and 59%; and (3) locations in regions where RPM applied a success factor of less than 30%.  Such percentages roughly correspond to the RAFs that industry participants would apply to PUDs, Probables, and Possibles, respectively.  *See* Trial Tr. (Strickland) 354:24-357:5.  Dr. Strickland then concluded that RPM's application of success factors was, roughly, the equivalent of assuming that, of the 19,637 total gross locations, 7,011 were PUDs, 6,590 were Probables, and 6,036 were Possibles.  These estimates, however, do not comport with any reality of Samson's reserves as assessed by NSAI.

92.     As shown in the table below, NSAI's 2012 analysis (which Dr. Strickland rolled back to just before the Transaction), estimated that the number of locations in each of these three PRMS categories was only a small fraction—about 15%—of the implied KKR/RPM estimates. While RPM's "location risking" was the rough equivalent of assuming 7,011 PUD locations, 6,590 probable locations, and 6,036 possible locations, NSAI's estimates (as appropriately adjusted by Dr. Strickland to make them current as of just before the Transaction) were 1,024 PUD locations, 950 probable Locations, and 1,104 possible locations over the entire portfolio of Samson's undeveloped assets.  *See* Trial. Tr. (Strickland) 352:15-357:5

| Regions | Gross Well Locations | | |
|---|---|---|---|
| | 60% or greater | 30% to 59% | Less than 30% |
| Powder River Basin | 2,114 | 2,480 | 2,374 |
| Bakken Core and Emerging | 1,498 | 3,737 | 2,741 |
| Granite Wash | 282 | 304 | 547 |
| Fort Union | 817 | - | - |
| Haynesville | 799 | - | - |
| Bossier | 384 | - | - |
| Cotton Valey | 148 | - | - |
| Pure Wash | 504 | - | - |
| Cana Core, Emerging and Woodford | 466 | - | - |
| Permian | - | 69 | - |
| Total | 7,011 | 6,590 | 6,036 | Total: 19,637 |
| | PUD | Probable | Possible |
| NSAI Gross Well Locations | 1,024 | 950 | 1,104 | Total:  3,078 |

Table 4: Gross Well Locations Grouped by KKR Risk Factor

Strickland Trial Demo. at 11; *see also* PX-888, Strickland Trial Decl., Ex. A at ¶ 60, Table 4.

93.     As Dr. Strickland opined, "[d]ifferences of this magnitude go beyond qualified evaluators' difference of opinion about geology and reservoir extent."  PX-888, Strickland Trial Decl., Ex. A at ¶ 61.  Further, KKR's deal model projections "are not credible when we compare them… to NSAI estimates."  Trial Tr. (Baxter) at 668:5-7.  In sum, Samson's undeveloped acreage was simply not of the quality assumed in the KKR model.

94.     Defendants made no serious effort at trial to rebut the substance of Dr. Strickland's volume estimates in his rollback analysis, other than Mr. Almrud's unsourced assertion that PRMS categories were not used by the market for undeveloped, unconventional assets, an assertion that was refuted by all the objective evidence.  *See supra* ¶¶ 41-52.  Indeed, Mr. Almrud testified that he did not rebut the results of Dr. Strickland's rollback and that he "didn't see anything wrong with the purpose behind [Dr.] Strickland's approach."  Trial Tr. (Almrud) 2178:15-21.

### 3) KKR Hamstrings Management Post-Close With An Unreasonable Business Model

95.    The volume estimates from Samson's undeveloped acreage went beyond a "snapshot" of valuation—they went directly to the ability of Samson to survive post-Closing.  As Mr. Baxter testified without contradiction, the cash flows in KKR's business model were overwhelmingly to be derived from new well production post-Closing, with projected EBITDA from new wells rising from $358 million in year one, to $2 billion by year five. Baxter Trial Demonstrative, at 43. In order to extract this value from the land, the Sponsors assumed that Samson would need to invest over $900 million in capital expenditure in the first year alone, increasing over time to nearly $1.5 billion annually.  *Id.* And, as was entirely unrebutted by Defendants at trial, each year's new drilling would necessarily be funded by reinvesting the cash generated by the prior year's performance, which itself was to come largely from the exploitation and sale of previously undeveloped assets.  As summarized in the table below, KKR expected Samson's management post-Closing to generate an ever-increasing proportion of its post-close EBITDA from new drilling, increasing every year until undeveloped assets generated over 70% of Samson's EBITDA.

| KKR EBITDA Projections | | | | | |
|---|---|---|---|---|---|
| $ million | 2012 | 2013 | 2014 | 2015 | 2016 |
| PDP (Hedged)[1] | $657 | $637 | $648 | $673 | $688 |
| Undeveloped | $358 | $730 | $1,205 | $1,665 | $2,001 |
| Total EBITDA[2] | $1,014 | $1,367 | $1,853 | $2,338 | $2,689 |
| % of EBITDA from Undeveloped | 35% | 53% | 65% | 71% | 74% |
| Drilling Capex[3] | $936 | $1,248 | $1,396 | $1,479 | $1,444 |

Baxter Trial Demonstrative, p. 43.

96.     Embedded in KKR's volume estimates were significantly better drilling results than Samson had ever experienced historically, assuming a 100% drilling success rate (compared to Samson's 93% historical rate) and initial production ("IP") rates that were materially higher than Samson's historical IP rates.  PX-889, Baxter Trial Decl. Ex. A (Opening Report (Part 1)), at p. 27; Ex. C (Baxter Sur-rebuttal Report), at pp. 18-20.  The chart below summarizes the extent to which the KKR Business Plan expected results in excess of Samson's historical well performance:



PX-889, Baxter Trial Decl. Ex. A (Opening Report (Part 1)) at p. 29, Table 7.  There was no evidence that any increased performance post-Closing was because KKR expected Samson to improve its performance in this regard.  *See* Trial Tr. (Baxter) at 754:8-756:3.  In short, the base case of KKR's model in which every well would be above average massively overestimated Samson's viable locations and expected results, and therefore also overestimated at base case just how much cash Samson would create post-close to meet its business plan.

97.     This business plan left little margin for error.  "[T]he Samson transaction . . . business plan is based on, you know, an aggressive drilling program.  So, you've got to have the EBITDA to fund the drilling program."  Trial Tr. (Filsinger) at 78:10-13.  And, as discussed further

below, in order to service its substantial debt load and maintain compliance with its debt covenants, the KKR Business Plan assumed that Samson would only attain its continued EBITDA uplift from undeveloped assets, leaving it with no choice but to drill out of the gate, no matter the commodity price environment, in order to satisfy its debt obligation.  This assumption, though, was fraught with risk.  At trial, relying on his thirty-year experience working with "hundreds" of oil and gas operators, Trial Tr. (Baxter) 2603:8-2604:20, Mr. Baxter testified:

> Q.  And what are the primary factors that go into a—decisions of operators when they're faced with a downside price scenario?
>
> A.  There['re] t[w]o primary decision[s]—decisions and factors that factor into that decision as to whether to drill or not in a downside pricing scenario:  One is the amount of balance sheet financial flexibility that that operator has.  And number two, it's where that operator's assets are located geographically and which basins and what those specific break-even price points are in those respective geographic basins, those two primary factors.
>
> Q.  Okay. You mentioned flexibility on the balance sheet.  What do mean by that?
>
> A.  What I mean by 'flexibility on the balance sheet' is you can have two operators that are technically competent, but one may be Occidental that has a financial flexibility on the balance sheet.  If they encounter a downside pricing scenario, they—
>
> THE COURT:  They have resources to ride it through.
>
> THE WITNESS:  That can just go pencils-down, Your Honor, exactly.  They don't have to drill, they can just not drill.  They can just wait.  They don't have any time pressure on debt or covenants or anything like that to force them to drill.  But if you take an operator like Samson, even though they're technically competent to drill, they have no choice but to drill because now they have [$]3.6 billion in debt and they've got to meet those debt covenants . . . .  So they have such balance sheet pressure and financial pressure on them, they have no choice but to drill in a downside scenario.

Trial Tr. (Baxter) 2604:21-2606:5; *see also id.* at 753:4-11, 782:13-23, 785:19-789:17, 2606:7-2610:21; Baxter Trial Demo. at 43.

98.    Mr. Filsinger also testified that, in a downside commodity case, the need to drill new wells to implement the KKR Business Plan would predictably set Samson on a path to failure: "Again, as you put pressure on your EBITDA you are putting pressure on your CapEx, and as you put pressure on your CapEx it's going to put pressure on your drilling plan.  So it's going to go in the opposite direction and put additional pressure on your EBITDA and it's kind of a circular problem."  Trial Tr. (Filsinger) 2446:20-2447:3.

99.    At trial, Defendants attempted to blame Samson's management post-close for a failure to execute on KKR's business plan, arguing that if management had only performed according to plan, it could have averted a death spiral.  This is incorrect and contradicted by the evidence.  As the Trustee established at trial, it was KKR's business plan, and not management, that led to Samson's failure.  *See* Trial Tr. (Strickland) at 2504:2-2407:17 (noting that business plan overstated volumes, and that management executed on the drilling plan to the extent permissible under joint operating agreements).  Because of the capital structure that KKR imposed on the business, post-close, Samson's management was compelled to drill, no matter the price environment, in order to generate EBITDA to meet debt covenants.  Further, one of the central assumptions of the KKR Business Plan was that, no matter where Samson drilled in the sub-region, there would be a 100% success rate in generating a PDP with an EUR equivalent to the EURs of the historical producing wells used to generate the type curve. A November 10, 2012 email between Jonathan Smidt and Ash Upadhyaya at KKR summed up the situation perfectly: ████

████████████████████████████████████████████████████████

████████████████████████    JX-377.  And, as Mr. Baxter testified, any failure to execute the business plan lay solidly at the feet of the business plan's architects:

Q.  And if management went out because they were compelled to and drilled in the [$1.83 gas] market, would you consider it a failure if when those wells came online, they were not profitable?

A.  Not at all.  This is—this is not the fault of management.  This is normal industry volatility.  Management didn't ask for the 100 percent assumption in the model that every single well that they would drill, A, would hit; and that you would hedge 80 percent of it and be able to roll that hedges irrespective of the environment despite this volatility.  This has—this is flawed from the decisions that were modeled and at the board level, not the management.  Again, the only thing that changed is the board.  I would not blame management at all for this.

Trial Tr. (Baxter) 1336:14-1337:14; *see also* PX-894, Strickland Rebuttal Decl. ¶ 15 ("[KKR's] business plan—especially its estimates of undeveloped volumes (and cash flows to be realized from those volumes)—was highly unreasonable.  Because of the faulty assumptions [in KKR's business plan,] it should have come as no surprise that [Samson] underperformed its projected drilling results.").  Indeed, Dr. Strickland testified that, "in the first half of 2012," "Samson's drilling program generally followed the [KKR's] business plan."  PX-894, Strickland Rebuttal Decl. ¶ 16; *see also* Trial Tr. (Strickland) 2504:21-2505:14.[38]

## B.  KKR Invents A Downside Case With No Downside At All

100.    Because of the nature of KKR's business plan for Samson, particularly its emphasis on new production from undeveloped assets, it was critical that Samson ensure that it have sufficient liquidity to weather downside scenarios, especially in light of the substantial uncertainty surrounding future commodity prices and drilling results.  "The combination of volatile commodity pricing and the need to continue to borrow money to fund new drilling can lead to a

---

[38]     It is also important to note that Samson's management in any event would not have much discretion in making drilling decisions in many cases as "Samson was the non-operating working-interest holder for approximately 67% of its leases."  PX-894, Strickland Rebuttal Decl. ¶ 17.  "Where Samson was not the operator, capital expenditures in these locations were largely outside of Samson's control…. Thus, to the extent that Samson's non-operated leases were governed by such provisions, it is difficult to fault management for capital expenditures made with respect to such leases."  *Id.*

liquidity problem that is sometimes referred to as the 'death spiral.'" PX-887, Filsinger Trial Decl

Ex. A (Opening Report) ¶ 18.  In a death spiral, "commodities are depressed so you don't have the

CapEx to do your drilling program. You start getting pressure on your debt levels, and so you have

to cut some CapEx. And so, when you cut CapEx, you shrink your revenue base and then that

continues and when you finally get to where you can't pay your debt off, you end up potentially

cutting additional CapEx, selling assets, but at the end, [you're] shrinking your base and it's

eventually a death spiral." Trial Tr. (Filsinger) at 79:7-20; *see also* Upadhyaya Dep. Tr. 49:2-9

("Volatility in commodity prices can create significant changes in asset value, which can change

your loan to value coverage.  So, if commodity prices drop drastically, you can find yourself in an

overlevered position, breaching debt covenants and – basically breaching debt covenants, and that

can be a problem.").    As Apache's CEO Steven Farris testified, "[f]or oil companies that [] can

be a kiss of death. . . . You get overleveraged and prices go down, you have a real problem getting

out of it." Farris Dep. Tr. 84:7-12. And, as Mr. Filsinger testified without contradiction, the only

way out of such a spiral is an unexpected recovery in commodity prices or an equity infusion.

Trial Tr. (Filsinger) 78:21-79:6.  As discussed below, prices never recovered enough for Samson

to extract itself from its death spiral, and despite Defendants' claims that the Sponsors "believed"

that the company was solvent for years after Closing, there is no evidence in the record that any

sponsor ever offered to, or did contribute any additional capital.

101.    At trial, Defendants did not rebut any testimony concerning the phenomenon of,

causes for, or risks and effects of an E&P company's death spiral; their experts did not testify

about a death spiral at all.  Instead, Defendants pointed to the fact that Samson suffered a slow,

rather than immediate, demise, arguing that Samson obtained covenant relief, was able to refinance

its debt, sold assets, and raised second-lien capital. *See, e.g.*, DX-852, Roski Rebuttal Trial Decl.

¶¶ 181-185, 188-194.  But these reactive events describe the death spiral exactly – over time, a company encounters difficulties with its debt obligations, is ultimately forced to slash its business plan or sell assets to survive, all but sacrificing its future earning potential until it ultimately fails.  Thus, the duration of Samson's death spiral does not mean that it was anything but inevitable that Samson would fail.  Indeed, as  discussed below, Mr. Limbacher accurately foresaw in September 2013 that Samson could survive for two years, but no longer, under its existing capital structure.  That Samson indeed survived for two more years is not evidence of Samson's financial health and solvency over that period.

102.    When looking, then, at "adequate" capitalization of an E&P company, it is critical to consider reasonable downside commodity price scenarios in particular to ensure that an oil and gas business will remain viable as a going concern.    No one disputes this.  Indeed, KKR understood at the time it was negotiating the Transaction the necessity of considering Samson's leverage in light of a potential stress case scenario, because █████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████" PX-222 at -0189421.  KKR also understood and appreciated from the outset that ████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ DX-275.  Despite these stated goals, KKR failed to construct a business plan or utilize a capital structure that ever properly accounted for the very foreseeable commodity price risk that KKR knew could cripple its highly-leveraged oil and gas company.

103.    To be clear, the KKR Model did include certain stress case assumptions, both for commodity prices and drilling results. Critically, however, KKR's investor presentations failed to

include a scenario in which both downside commodities and downside drilling scenarios occurred simultaneously. Trial Tr. (Filsinger) at 90:16-21; *see also* Trial Tr. (Roski) at 2316:24-2317:4.  It was not reasonable for KKR to run its downside scenarios in isolation in this manner.  Trial Tr. (Filsinger) at 91:5-13 ("I think as we learned painfully in the early 2000's you need to multifactor sensitivities to a downside where you [] have production pressure as well as commodity pressure."); 104:17-105:1.  Nor was there any evidence at trial that KKR itself ever internally considered downside drilling and downside commodity scenarios in tandem.

104.    Moreover, KKR did not determine its downside commodity prices based on any market fundamentals, but instead seemed to choose arbitrary round numbers at various levels below actual market prices.  Trial Tr. (Filsinger) at 86:14-88:19; 91:21-24; 92:7-16; 252:22-253:7.  As spot prices declined, KKR simply dropped is stress prices to a level below spot prices, with one key exception:  in the weeks before signing, as spot prices approached, and ultimately reached, KKR's final $3.00 gas stress case, KKR never lowered its stress price below $3.00.   Defendants presented no evidence at trial showing any rational bases underlying KKR's stress case price assumptions.

105.    There is also record evidence showing that KKR may have reverse-engineered its stress case assumptions to avoid unfavorable outcomes and the possibility of a stalled deal.  The KKR associate responsible for the deal model testified that KKR's Investment Committee likely would not have approved the transaction had it been presented with a downside case that resulted in Samson violating its debt covenants, nor would co-investors likely have signed on to co-invest with KKR if shown such a downside case. Rashid Dep. Tr. 307:20-309:9; *see also* Upadhyaya Dep. Tr. 81:12-82:2 (testifying that it would not be "prudent to go forward with a transaction" where the "downside case showed that the . . . company would violate debt covenants").

106.    In one example of this reverse-engineering, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    *See* JX-138; PX-340; *see also* Trial Tr. (Filsinger)

92:12-16.  With respect to natural gas, as noted, as spot prices declined from around $4.42 in July

to around $3.57 in October, KKR generally maintained its gas stress case at some level

meaningfully below the spot price.  However, as natural gas spot prices reached $3.00 in the days

leading up to the signing of the SPA, KKR never reduced its stress case gas price below $3.00.

Trial Tr. (Filsinger) 92:17-93:10.  Thus, despite a near-constant decline in gas prices from July to

December 2011, KKR's stress case model did not even allow for the possibility that gas prices

could ever decline below the spot price on the day of signing the deal.   This was not a reasonable

downside assumption.  Trial Tr. (Filsinger) 93:3-7.

107.    Worse still, KKR's unreasonably optimistic commodities-only stress case assumed

the existence of commodity hedges that did not actually exist, and which vastly exceeded the

company's actual hedge position in place.  Given the prevailing commodity prices at closing, those

hedge assumptions were not reasonable.  Trial Tr. (Filsinger) at 100:9-101:12.  Specifically, the

model assumed that, as of closing, Samson would have hedged 80% of its PDP for 5 years at a 5%

discount to the NYMEX forward curve as it existed at the time of any given version of the KKR

Model.    JX-199 at KKR-SAM_0158012; Trial Tr. (Randolph) 1659:14-1660:8.    KKR

acknowledged to a co-investor, who ultimately exited the deal, that ████████████████

████████████████████████████████████    JX-199 at KKR-

SAM_0158012.  Nonetheless, KKR never accounted for the possibility that, by the time they

owned the company and had the opportunity to implement hedges, the modeled hedge prices would

no longer be available.  Trial Tr. (Filsinger) 100:9-101:12.  That is, though the purposes of hedges

is to plan for downside scenario, their hedging assumptions did not account for the possibility that

prices would decline *at all*.  Nor did KKR model a downside case for its banks or investors that

assumed no new hedges would be in place, and as a result, those banks "when they saw downsides,

they saw a mitigating factor of hedges that were not in place."  Trial Tr. (Filsinger) 240:14-23.

KKR's failure to model a downside case that comported with the hedges it had in place meant that

KKR's business plan unreasonably failed to account for the full effects of a downside commodity

price environment.  *See* Trial Tr. (Filsinger) 237:19-238:12, 244:16-245:12, 2443:12-2444:2.

███████████████████████████████████████████████

██████████████████████████████████████    *See* Smidt Dep. Tr. 177:5-

181:19 (Mar. 17, 2021).

108.    Defendants attempted at trial once again to pin the failure to implement hedges on

Samson's new management for their alleged failure to implement KKR's hedging playbook.  But

the evidence is clear that the Sponsors never had an actual hedge execution plan in the model, and

there was disagreement among the sponsors, not management, regarding hedge execution both

pre- and post-close.  *See, e.g.*, PX-887, Filsinger Trial Decl. ¶¶ 81-82.  Regardless the reason for

the failure to implement, the reality was that this mismatch between the KKR Model's hedging

assumptions and the reality of Samson's hedging position post-closing ran substantial business

risk with every passing day that the hedge assumptions were not realized.  Trial Tr. (Filsinger) at

2447:4-17 (sponsors "absolutely" should have foreseen this risk).  Moreover, the notion that

management should simply have implemented the hedge volumes KKR had modeled despite the

fact that available hedge prices had declined substantially ignores that doing so would have left

Samson far worse off in a downside scenario than what KKR projected.  As Mr. Filsinger testified

without contradiction, if Samson were to belatedly put in hedges according to what KKR had modeled, in a declining price environment, it would "put pressure on the EBITDA because you just decreased your hedging profile.  You just lost 29 percent, almost 30 percent of what you projected.  So your EBITDA is under pressure, you have significantly less [income], you are going to have to cut back.  It's going to put pressure on your debt, as well as your covenants and you are going to have to cut back your CapEx." Trial Tr. (Filsinger) at 2445:25-2446:13.

109.    Ultimately, KKR's failure to consider the possibility that gas prices might decline following the Transaction as part of its hedge modeling, despite the fact that gas prices had steeply and steadily declined for the five-month period leading to the Transaction, combined with what KKR conceded was an inadequate level of hedging at the time of the transaction, was a critical and foreseeable error.  This combined with KKR's deeply flawed reserve analysis, as discussed *supra* ¶¶ 78-99, doomed Samson from day one.

### C. Transaction Participants Did Not Independently Corroborate KKR's Business Plan

110.    At trial, to offset the impact of KKR's failings, Defendants  pointed to the co-Sponsors' decision to contribute $4 billion in capital to sponsoring the Transaction, as well as the banks' decision to provide funding, as competent evidence of the reasonableness of KKR's business plan.  But this "corroboration" justification is without basis and incorrectly assumes that all of these parties were similarly motivated to ensure that Samson would be able to pay all debts as they became due post-close.

111.    As noted above, the lending banks insisted on an independent PRMS classification of the *proved* reserves that would secure their capital.  The valuation of the rest of Samson's unproved asset base had no effect on their decision to extend financing, as their loan was secured by Samson's Proved Reserves only.  JX-256, at -228, -245.  In short, these banks' willingness to

fund was a function of the third-party audited $3.5 billion of Samson's developed reserves, not KKR's assumed $12 billion of undeveloped assets.  In fact, the banks were largely indifferent to the glaring deficiencies in KKR's valuation of the undeveloped acreage because the banks did not intend to keep any portion of the unsecured bridge loan on their books for a meaningful period of time. Dierker Dep. Tr. 159:7-13 ("We would have not expected to maintain meaningful exposure for any long period of time."); JX-248 at 15.  And JPM's credit approval document shows that, while JPM was comfortable that Samson would repay its first-lien debt, the ███████████████ ███████████████████████████████████████████████████████ including the unsecured debt.  JX-183, at -493.[39]

112.    Another member of the lending syndicate, Morgan Stanley, contemporaneously prepared an internal downside case ████████████████████████████ ██████████████████████████████████ JX-248, at -564.  Morgan Stanley further foresaw ██████████████████████████████████ ██████████████████████████████ Id.  At trial, Mr. Almrud admitted that he had not been aware of Morgan Stanley's forecasted covenant breach when he offered his opinion that the "vetting" of the transaction by the banks indicated that the business plan was reasonable.  Mr. Almrud further admitted that Morgan Stanley's projection of a covenant breach in a downside scenario "was contrary to [his] testimony" in his deposition that such a projection by a member of the lender group might have jeopardized the transaction.  Trial Tr. (Almrud) 2160:13-24; 2162:12-17.  In short, the participation of "the banks" and their decision to

---

[39]    Though this model may have assumed somewhat higher debt than was actually incurred immediately at Closing, the model results did not support a transaction value of $7 billion.

fund first-lien debt, backed by an independent reserve report for the assets securing their loans, do not evidence that the market agreed with KKR's bid or its business plan.

113.    As to the equity investors, KKR's co-sponsors were given as few as two weeks from learning of the deal to committing to fund their equity. One co-sponsor, Natural Gas Partners ("NGP") euphemistically remarked, "███████████████████████████." Hersh Dep. Tr. 164:18-23.  In light of this, the co-sponsors' diligence largely piggy-backed off of KKR's work product.  NGP "had never met the management team" as they considered their investment in Samson in November 2011. *Id.* at 54:17-20.   Another co-sponsor, Crestview, noted in its investment committee memoranda that they were relying on what they incorrectly understood was months' worth of diligence by KKR, writing that ████████████████████████████████ ████████████████████████████████████████████████████████

PX-216 at CRE-SAM_0021941.

114.    NGP also had contemporaneous reservations about its participation as co-sponsor. A key investment professional at NGP, and later Samson board member, Scott Gieselman, believed at the time ████████████████████████████████ Gieselman Dep. Tr. 141:5-143:3.  NGP's CEO, Ken Hersh, was initially a proponent of the deal at NGP.  But, he testified that ████████████████████████████████ ██████████████. Hersh Dep. Tr. 166:11-15; 203:7-205:3.  Just days before the Transaction was signed, ████████████████████████████████████████ ██████████████ a valuation clearly consistent with balance-sheet insolvency as of the Transaction. JX-160 at -516; *see also* Hersh Dep Tr. 175:13-177:7, 187:19-188:9.  Had NGP relied on its own work, it would not have supported a $7 billion purchase price, but eleven days later, NGP signed on to the SPA, instead relying on KKR's model to support a $7.1 billion purchase price.  And,

even as others at NGP came to adopt KKR's unsound valuation and business models, Mr.

Gieselman 

Gieselman Dep. Tr. at 86:11-23.

115.    The record reflects that Itochu, another co-sponsor of the deal, was for its part primarily motivated by its own collateral interests, rather than the merits of the equity investment itself.  Itochu contributed $1 billion to the transaction, but expected to earn back more than that through an "offtake" agreement pursuant to which Itochu would have the right to purchase certain oil and gas volumes from Samson. *See* PX-875.  According to KKR's co-founder, Mr. Kravis, the offtake rights were ███████████████████████████ *Id.*

116.    Moreover, not all potential co-sponsors who KKR approached simply accepted KKR's model and went through with the deal. ████████████ a potential co-sponsor, held an ████████████ as KKR's purchase price changed. JX-199 at KKR-SAM_0158013; *see also* Upadhyaya Dep. Tr. 112:19-113:14. It requested and received ████████ ██████████████, ████████████. JX-199; Smidt Dep. Tr. 168:6-8.

117.    In short, although Defendants attempted to portray the KKR model and business plan as reviewed and endorsed by professionals at a long list of sophisticated equity sponsors, the evidence at trial did not bear that out.  Rather, participants were nearly entirely dependent on what KKR told them in an extremely condensed timeframe, and what KKR told them was either incorrect or misleading.  *See, e.g.*, Trial Tr. (Baxter) at 668:17-669:21 (explaining the "material issues with how this deal was communicated to the rating agencies and the lender communications"); *Id.* 669:25-670:4 ("[I]t's my opinion that the rating agencies and the lending

community were given, at best, inadequate information. My opinion . . . is, even that it was misleading to an informed astute market participant in the rating agencies or the lender community."); *see also* Trial Tr. (Roski) at 2359:24-2360:23.   At bottom, only a handful of professionals at KKR meaningfully vetted the key assumptions underpinning the $7 billion Transaction, and they were catastrophically wrong.

### VII.   Stacy Schusterman Spins Off the Gulf Coast/Offshore Assets to Herself

118.   As noted, KKR's bid excluded the GoM assets.  The Trustee established at trial that Samson's GoM Assets could have exchanged hands in an arms' length transaction in the Fall of 2011 at a price above $2 billion, but they did not, because Ms. Schusterman elected not to sell them.  *See* Trial Tr. (Schusterman) 1836:14-20.

119.   Notwithstanding Ms. Schusterman's decision, various participants in the Transaction sale formed views as to the value of the GoM assets that are instructive here.  On the sell-side, Stacy Schusterman personally valued the GoM assets at in excess of $2 billion.

> Q. . . . [O]nce you started working with Jefferies on the valuations, way back in the middle of the summer of 2011, you personally didn't want to get less than $2 billion for Gulf Coast and Deepwater, right?

> A. . . .  Yes, I don't believe I would have taken less than [$]2 billion.

Trial Tr. (Schusterman) 1820:12-18; *see also* Trial Tr. (Schusterman) 1825:2-10 (admitting that a factor she considered when rejecting Apache's First Offer was her belief that the GoM assets was worth at least $2 billion).  So, too, did Ms. Schusterman's management team.  On September 28, 2011, Ms. Schusterman asked five members of her inner circle: "the question of the day—what price would you BUY the [Gulf Coast and Offshore Assets] for?"[40]  JX-102.  Phil Schmucker,

---

[40]   This poll was not a purely academic exercise.  At that time, Ms. Schusterman faced a real choice— not just a theoretical one—between accepting KKR's bid (thus keeping the GoM assets to herself), and accepting Apache's bid (thus selling the GoM assets along with the rest of the company).  *See* Trial Tr. (Schusterman) 1819:19-1820:1.

Samson's Senior Vice President of Operations, replied $3.3 billion.  Trial Tr. (Schusterman) 1820:2-11.  Brent Cox, Samson's Manager of Engineering for the Business Development Department, replied $2.5-2.8 billion.  Trial Tr. (Schusterman) 1814:18-1815:19.  Rene Richard, Vice President in charge of Samson's Offshore assets, whose view on the value of the relevant assets Ms. Schusterman "would respect," replied "approximately $2.1 billion for a buy case."  Trial Tr. (Schusterman) 1817:14-1818:5.  And David Adams, Samson Chief Operating Officer, replied at least $2 billion.  Trial Tr. (Schusterman) 1825:15-1826:12.

120.    On the buy-side, in an offer separate and apart from its all-company offer, Apache offered to purchase the GoM assets for $2.5 billion.[41]  On October 13, 2011, Apache sent Samson an offer to purchase (i) Samson's GoM assets for $2.5 billion, and (ii) Samson's Mid-Continent division for $1.5 billion, in all cash or in combination of cash and Apache stock ("Apache's Second Offer").  JX-119; *see also* Trial Tr. (Rowland) 1605:4-10.  The two subject assets of the offer were understood to be severable.  *See, e.g.*, Trial Tr. (Rowland) 1606:19-1607:1; Trial Tr. (Schusterman) 1831:10-13.  At that time, nothing prevented Samson from simultaneously proceeding with KKR's offer and selling the GoM assets to Apache.  *See generally* JX-114.[42]  In fact, Jefferies advised Samson of that option, and KKR was amenable to such a dual transaction.  *See* Trial Tr. (Rowland) 1606:13-21; JX-106 ("Dual transaction in which we sale [sic] the company to KKR and attempt to sell the Gulf Coast and Deepwater to Apache."); JX-92, at -541 (KKR writing, ██████████████████████████████████████████████████████████████

---

[41]    KKR also agreed that "████████████████████████████████████████," which Apache did, might "████████████████████████████████████████"  JX-92, at -540.

[42]    Defendants argue that Samson management lacked the bandwidth to carry out a dual transaction. But the Samson management team obviously had the bandwidth to effect the retention of the GoM assets by procuring two appraisal reports through sophisticated corporate machinations detailed later in this section.  Trial Tr. (Schusterman) 1820:19-1823:6.  Even assuming the Samson management were too overextended, nothing prevented them from exploring the possibility of selling the GoM assets to Apache immediately after closing the Transaction with KKR.  *See* Trial Tr. (Rowland) 1607:9-15.

███ . . . .").  Yet, Ms. Schusterman made no attempt to engage with Apache in response to this Second Offer, or even just to keep that offer warm, Trial Tr. (Schusterman) 1835:1-16, 1838:6-10, ostensibly because it was not "a number [Stacy Schusterman would] take."  JX-128.

121.    Apache's bid and Samson's ask could have formed a deal on the GoM assets, but Stacy Schusterman simply wanted to keep the GoM assets for herself and "stay in the business." Trial Tr. (Schusterman) 1750:14-15.  In so doing, Ms. Schusterman and her deputy Mr. Tholen withheld these offers and their views of their reservation price for the GoM assets from the appraisers who were engaged to "value" the GoM assets for tax purposes.  *See infra* ¶¶ 123-27, 216-18. Moreover, Ms. Schusterman kept the Foundation—the only shareholder who had an independent committee to approve the Transaction, *see* Trial Tr. (Schusterman) 1827:14-1828:4— in the dark about the Apache offer and thus deprived it of the opportunity to monetize its interest in the GoM assets.  Ms. Schusterman never apprised the Foundation of her team's internal valuations, never informed it of Apache's Second Offer, never advised it about the potential benefits of owning the GoM assets, never notified it of the deal structure and the purchase price of the GoM assets set forth in the SPA, and in fact never even sent the Foundation a copy of the final SPA.  Trial Tr. (Schusterman) 1790:7-9, 1817:9-13, 1827:11-13, 1829:2-7, 1830:15-20, 1831:1-1834:11, 1836:21-1838:10, 1838:21-1839:17.

122.    By not engaging in a sale process, Stacy Schusterman successfully "retain[ed]" the GoM assets for herself.  Trial Tr. (Schusterman) 1818:20-1819:7.  Two days before the closing, and as an integral condition to close the KKR Transaction, the GoM assets were transferred to Defendant Samson Energy Company.  Trial Tr. (Baxter) 1152:16-1153:2.[43]  As purported "consideration," Stacy Schusterman agreed to cancel certain subordinated notes held by her trusts

---

[43]    *See id.* 1352:8-19 (explaining why the Transaction was unitary despite the two-day temporal gap).

in Samson in a principal amount of about $553 million.[44]  Trial Tr. (Baxter) 1152:16-1153:2.  In

reality, no matter how the purchase price of the GoM assets was set, those subordinated notes

would have to be canceled or contributed back to Samson by the terms of the deal with KKR; in

other words, the GoM purchase price would not have any impact on the aggregate consideration

the parties exchanged under the SPA.  Trial. Tr. (Phillips) 1524:6-1528:6; *see generally* JX-92

███████████████████████████; *see also* Tholen Dep. Tr. 45:24-47:10 (Jan. 12, 2021)

(testifying that "[n]obody" wanted to assume the subordinated notes).  Simply put, while this

spinoff was structured as an asset sale for income tax purposes,[45] Stacy Schusterman testified that

the transaction "wasn't a sale," Schusterman Dep. Tr. 222:25-223:24, but just her "keeping" the

GoM assets.  Trial Tr. (Schusterman) 1750:14.

123.    At trial, Defendants fought to admit two GoM appraisal reports, in which Duff &

Phelps ("Duff") and Stout Risius Ross ("SRR") prepared valuations of GoM assets for purposes

of U.S. income tax reporting.[46]  JX-432; JX-433; Trial Tr. (Schusterman) 1842:2-9 (testifying that

the appraisal reports were not commissioned "for the purpose in any way of providing [Samson]

with information as to whether or not it should agree to spin the [GoM] assets off to Samson

Energy Corporation for any particular price"); Trial Tr. (Phillips) 1505:9-18; *id.* at 1528:1-6

(admitting that the practical impact of the appraisal reports was only tax considerations); *see also*

Tholen Dep. Tr. 51:10-63:6 (Jan. 12, 2021); Scott Dep. Tr. 265:4-266:5 (Jan. 21, 2021) (limiting

---

[44]    These subordinated notes were not themselves the result of any capital infusion.  Rather, they were issued in exchange for certain equity redemptions made by the Selling Shareholders in 2008 and mid-2011 preceding the Transaction.  DX-829; DX-830; DX-831; Trial Tr. (Baxter) 825:14-826:16.

[45]    Although the GoM transaction was structured, at least on paper, as a transfer of LLC interests, Trial Tr. (Phillips) 1460:2-1462:9, Mr. Baxter opined that the economic nature of the deal was an asset transaction, and he valued GoM transaction as such.  Trial Tr. (Baxter) 1356:5-1359:7, 1360:4-1361:10.

[46]    Defendants otherwise offered no expert testimony as to the value of the GoM assets.

the use of Duff's report exclusively for tax-related purposes); Reiff Dep. Tr. 211:10-212:12 (Nov. 13, 2020) (same for SRR's report).

124.    Before the appraisals were even commissioned, Stacy Schusterman's managers determined the purchase price of the GoM assets to be around $533 million, which was so set to cap Samson's taxable gain on the sale of the GoM assets to Samson Energy.  Trial Tr. (Phillips) 1498:10-1500:24; Trial Tr. (Schusterman) 1842:10-1843:5.  An early draft of the SPA specifically pinned the purchase price of GoM assets at $533 million.  Trial Tr. (Phillips) 1498:10-1500:24; *compare* JX-198, at SEC-00249952 (§ 7.7), *with* JX-115, at SEC-00290004 (§ 7.6); *see also* Tholen Dep. Tr. 34:23-50:4 (Jan. 12, 2021).  The Sponsors, apparently concerned about the validity of this arbitrary $533 million number before relevant taxing authorities, insisted on an indemnification of up to $1 billion potential tax liability if the IRS later found the GoM assets were worth more than $533 million.  Trial Tr. (Phillips) 1497:19-1502:21; JX-198, at SEC-00249959 (§ 9.1), SEC-00249962 (§ 9.8); *see also* Tholen Dep. Tr. 51:10-63:6 (Jan. 12, 2021).

125.    Later, to shroud this arbitrary $533 million number with  the additional veneer of credibility, it was determined that the SPA could not just dictate the GoM Assets' purchase price; instead, it should have the appearance of sourcing the purchase price from an independent appraisal.  Trial Tr. (Phillips) 1500:25-1501:25.  Even with this additional veneer, however, it was necessary that the appraisal results minimize KKR's potential tax liability and Samson's indemnity obligations.  *See* Trial Tr. (Phillips) 1502:1-21.

126.    Stacy Schusterman's deputies succeeded in their goal.  Critically, Mr. Phillips and Mr. Tholen withheld from the two appraisers' materials in their possession indicating a higher valuation of the GoM assets, including Apache's Second Offer, Stacy Schusterman's reaction to Apache's Second Offer, Samson management's views on valuation that they communicated to

Stacy Schusterman, and even Samson's internal materials on the GoM assets that were presented to potential bidders in August 2011. Trial Tr. (Phillips) 1508:1-1517:15; *see also* Tholen Dep. Tr. 154:11-159:13, 160:2-165:18, 165:22-180:9 (Jan. 12, 2021). They also emphasized to the appraisers the risks of pending litigation that they had elsewhere characterized as immaterial and expected to have a full chance of prevailing.[47] Trial Tr. (Phillips) 1518:9-1522:20; *see also* Trial Tr. (Baxter) 1178:3-1179:6, 1361:22-1363:3; Tholen Dep. Tr. 195:6-200:13 (Jan. 12, 2021); JX-291 at SEC-00195135. They excluded people most familiar with the GoM assets from working with the appraisers, such as Mr. Rene Richard, Samson's Executive Vice President in charge of the GoM assets before the Transaction and the COO and CEO of Samson Energy after the Transaction, and Mr. Paul Beale, Samson's Vice President in charge of the Gulf Coast Division. Trial. Tr. (Phillips) 1517:11-16; *see also* Richard Dep. Tr. 40:18-41:15 (Nov. 6, 2020); Tholen Dep. Tr. 126:19-128:21, 205:22-211:21 (Jan. 12, 2021); Scott Dep. Tr. 169:15-170:10 (Jan. 21, 2021); Reiff Dep. Tr. 218:8-17 (Nov. 13, 2020).

127.    Following these efforts of Ms. Schusterman's managers, Duff's and SRR's appraisal reports came in under $533 million. Trial Tr. (Phillips) 1522:25-1523:2. Both reports specifically conditioned their conclusions on the untenable assumption that the appraisers had received complete and accurate information. Scott Dep. Tr. 254:23-255:21 (Jan. 21, 2021) ("Our

---

[47]    Samson's management had conveyed to the appraisers that ████████████████████████ ██████████████████████████████████████████████████ JX-432, at -344; JX-433, at -772. As a result, each of the appraisers included, as part of their valuations, ██████████████████ ████████████ JX-432, at -1351; JX-433, at -789. Just six weeks after Closing, however, Samson Energy, which had acquired the GoM assets, prepared financial statements for at least one potential creditor representing that the "management does not believe any potential loss which may result from this litigation w[ould] be material to the company's financial position or results of operations." Trial Tr. (Phillips) 1519:17-1522:20 (referring to JX-291). JX-291 is a financial statement prepared contemporaneous to Closing, and Defendants have offered no explanation as to why this statement deviated radically from what Mr. Phillips and Mr. Tholen told the appraisers.

conclusion is dependent on such information being complete and accurate in all material respects. We will not accept responsibility for the accuracy and completeness of such provided information."); Reiff Dep. Tr. 210:16-211:9 (Nov. 13, 2020) ("[W]e . . . relied on the accuracy and completeness of [the provided] information"). Learning the appraisal result well before their two appraisers officially issued the reports, Mr. Jonathan Smidt at KKR congratulated the Samson management team, "Well done!" Trial Tr. (Phillips) 1523:11-1524:5.

### VIII.    Samson Closes the Deal and Incurs Significant Secured and Unsecured Debts

128.    As noted here, in the three months between bid and signing, there had been $1.3 billion erosion in deal value due to the drop in natural gas prices alone. Trial Tr. (Baxter) at 681:1-682:1. As a result of NSAI's reserve report, the Sponsors had credible information indicating that, as of Closing, "the undeveloped assets were overstated by $3.9 billion -- that's a big number." Trial Tr. (Baxter) at 667:7-9. But even as commodities prices deteriorated and KKR conducted diligence and developed its model, the purchase price was not adjusted to reflect any of those circumstances as of the time of close. Trial Tr. (Baxter) at 679:1-25.

129.    On or around November 18, 2011, Stacy Schusterman, acting on behalf of all Selling Shareholders, negotiated with KKR on the final deal terms of the Transaction. Trial Tr. (Schusterman) 1755:13-20. Despite commodity price erosion, KKR agreed to "pay" the Selling Shareholders an additional consideration of 180,000 cumulative preferred shares in the new company, which would have an initial liquidation preference of $180 million (the "Preferred Shares"). *See* Trial Tr. (Schusterman) 1755:17-7. Co-sponsors were ███████ at the purchase price increase. JX-189; *see also* PX-308.

130.    On November 22, 2011, the parties signed the SPA. Undisputed Facts ¶ 35. Samson held no formal board meeting on the sale. *See* Trial Tr. (Schusterman) 1789:5-10.

131.    In the SPA, Samson represented and warranted, among other things, that the "underlying non-interpretative factual data used in the preparation of the [NSAI] Reserve Report was, at the date of the Reserve Report, correct in all respects," but only to the extent that whatever inaccuracies there may be "would not, individually or in the aggregate, have a Material Adverse Effect."  JX-198 § 3.15.  No representations were made by the Selling Shareholders about the economics of the Unproved Reserves.  In any event, no representations survived past Closing.  *Id.* § 14.1.  In other words, the Sponsors gave away any recourse against the Selling Shareholders for any inaccuracy concerning Samson's undeveloped land which was placed into the VDR and around which the entire deal was constructed.

132.    The SPA provided for the transfers of the GoM Assets to Samson Lone Star, LLC ("Lone Star"),[48] Samson Offshore Company, LLC ("Offshore"), and Samson Concorde Gas Intrastate, LLC ("Concorde").[49]  *See* JX-198.  Then, pursuant to the SPA, the membership interests of these three entities were transferred to Samson Energy, ostensibly in exchange for the cancellation of the Stockholder Subordinated Notes.  *See* Undisputed Facts ¶ 3; *see also* Trial Tr. (Phillips) 1460:2-23.  As explained above, these provisions were simply machinations to keep the GoM assets with Stacy Schusterman.  *See supra* ¶¶ 119-127.

133.    Additionally, the SPA also provided for certain "Selling Stockholder Transactions," by which certain miscellaneous assets, including Samson's private jet, would be transferred to Samson Energy, purportedly in exchange for the remaining $19,666,000 in outstanding Stockholder Subordinated Notes.  JX-198 § 10.9.

---

[48]    Lone Star later changed its name to Samson Exploration, LLC ("Samson Exploration"), a named Defendant.

[49]    Concorde is not a named defendant. Concorde later merged into Samson Exploration in or around September 2013.

134.    On December 21, 2011, the Transaction closed.   Undisputed Facts ¶ 40.   The transfers comprising the Transaction are diagrammed further below. *See infra* ¶¶ 135-140; *see also* JX-308.

135.    More specifically, the Closing was executed with multiple key steps spanning over several weeks.  From November 28, 2011 through early December, Samson restructured its GoM assets in preparation of the Transaction.  *Id.* at KKR-SAM_0187402.  On December 15, 2011, the various Stockholder Subordinated Notes were aggregated to SFTDM, which in turn contributed them to Samson Energy.  *Id.*; *see also id.* at KKR-SAM_0187418 (Exhibit 9, ███████ ████████ reproduced below).



136.    On December 19, 2011, Samson Energy transferred the Subordinated Notes to Samson Investment to be allocated as follows: (1) $487,666,000 was given in exchange for the GoM Assets; and (2) the remaining balance of approximately $ 65,334,000 was treated as a

contribution to the capital of Samson.  *Id.* at KKR-SAM_0187402 to -403 █████████

███████████████████████████████████████████████████████████████

███████████ ; *see also id.* at KKR-SAM_0187419 (Exhibit 10, ███████████

███████████████████████████████████████████ reproduced

below).[50]



137.    On December 21, 2011, Samson Investment (1) entered into a $2.25 billion revolving secured reserve-based loan (the "RBL") and immediately drew $1.345 billion for the Closing; and (2) borrowed $2.25 billion in unsecured debt financing (the "Bridge Loan").  *Id.* at KKR-SAM_0187403; *see also id.* at KKR-SAM_0187420 (Exhibit 11, ███████████ ███████████" reproduced below).  Samson Investment then transferred $2.75 billion in cash to the Selling Shareholders to redeem 89,393,801 outstanding shares of Samson.  *Id.* Meanwhile, SRC, the shell company Sponsors formed to close the Transaction, transferred $3,566,361,770 cash and $180 million newly issued Preferred Shares to the Selling Shareholders in exchange for the remaining 116,929,402 shares of SIC.[51]  *Id.*

---

[51] ████████████████████████████████████████████████████
████████████████████████████████████████  JX-308, at KKR-SAM_0187403.



138.    To sum up, the Selling Shareholders took home in excess of $7 billion in cash, along with other consideration like the GoM Assets.  To purchase Samson's shares from the Selling Shareholders, SRC paid $1,440,306,523.50 to SFT (Delaware) Management LLC ("SFTDM"), $981,038,692.00 to ST 2008 (Delaware) Management LLC ("ST 2008"); and $1,145,016,554.50 to the Charles and Lynn Schusterman Family Foundation (the "Foundation").  Undisputed Facts ¶ 5 n.2.  For redeeming the other shares of Samson, Samson Investment paid $1,044,062,838.00 to SFTDM, $750,014,761.00 to ST 2008, and $955,922,401.00 to the Foundation.  Undisputed Facts ¶ 6 n.3.  In addition, pursuant to Stacy Schusterman's direction, all the Preferred Shares—whose value eventually went to zero—were allocated to the Foundation, in lieu of the cash to which the Foundation was otherwise entitled.  Trial Tr. (Schusterman) 1851:3-18; Undisputed Facts ¶ 38;

*see also* Trial Tr. (Schusterman) 1852:1-1854:20.[52]  As to those Preferred Shares, the evidence is

clear that Ms. Schusterman's unilaterally decided, without any consultation with the Foundation,

to allocate 100% of such Shares to the Foundation, with Ms. Schusterman's family trusts receiving

their *pro rata* share of the additional cash that would have otherwise gone to the Foundation.  Trial

Tr. (Schusterman) 1812:20-1813:3, 1850:23-1851:14; Phillips 30(b)(6) Dep. Tr. 127:24-128:20,

132:22-137:22; *see also* PX-880.

139.    Though the details of the flow-of-funds and organizational changes are somewhat

complex, the net effect on the Samson enterprise was simple:  Samson's GoM assets had been

severed and transferred, its debt load had increased from approximately $695 million to more than

$4 billion (including long-term funded debt of $3.6 billion), it was left with only $126 million cash

on hand, and it had a new set of owners who were unfamiliar with its business and who had little-

to-no experience actually running an E&P company.  The chart below reflects Samson's pre- and

post-Transaction structure, based in part on financial statements reflected inDX-492[53], comparing

Samson's cash and long-term debt at June 30, 2011 and December 31, 2011.

---

[52]    The Cash Transfers, Preferred Shares, and the numbers of shares purchased and redeemed as provided by the SPA in connection with the Transaction are laid out in the Undisputed Facts.  Undisputed Facts ¶ 41.

[53]    DX-492 at pp 1, 26 (Exhibit F).



140.    From a holistic balance sheet perspective, the only thing that happened to the Samson enterprise in the Transaction was that it increased outstanding debt from $555 million to $3.6 billion (plus additional RBL "availability"), lost more than $550 million in cash, and divested its GoM assets in exchange for subordinated debt.  And, while the Selling Shareholders took home billions in cash, Samson was left with unprecedented levels of debt, including a $2.25 billion RBL and a $2.25 billion Bridge Loan.  The Bridge Loan was subsequently refinanced on February 8, 2012, through the issuance of 9.75% Senior Unsecured Notes due February 15, 2020 (the "Unsecured Notes").  Undisputed Facts ¶ 44.  But it was not just the amount of debt that doomed Samson post-Closing.  It was the terms of that debt.  As became critical after the Closing, pursuant to the RBL Credit Agreement, Samson Investment covenanted that it would "not permit the Consolidated Total Debt to Consolidated EBITDAX Ratio" (the "Debt/EBITDA Ratio") for any quarter in 2012 to exceed 5.00 and that for any quarter in 2013 to breach 4.75.  JX-256 § 10.11. And, all of the transferring Debtors, including SRC, guaranteed Samson Investment's obligations

under the RBL Credit Agreement.  JX-257, at -590.[54]  Thus, for any of the Samson companies to survive, they had to comply with a broad set of debt terms.  They never did.

**IX. Samson Experiences Severe and Immediate Financial Distress Following the Transaction, Leading To Its Bankruptcy**

141.    As even Defendants concede, the Court may "peek around the corner" from the Transaction date when assessing Samson's financial condition as of the Closing.  That peek reveals the predictable result of an impossibly optimistic business plan, premised on inflated volume assumptions, on a highly-leveraged company in a volatile commodity price environment.

142.    In January 2012, Samson took out its bridge financing in favor of an RBL.  The roadshow presentation to potential lenders, however, relied on the same deficient information as the KKR Model, and was *still* not updated in the month following the Closing.  The RBL roadshow presentation touted Samson's Net Risked Resource Potential – ██████████████████████████ ████████████████████████████████████████████████████████████████████████  *See, e.g.,* PX-370 at 38.  The slides describing Samson's ████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████  JX-273 at 13, 14.  Moreover, the bondholder roadshow presentation, while similar in many respects to the presentation given to bridge lenders only a month prior, simply omitted ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████  *Compare* DX-415 at 41 (Bridge lender roadshow), *with* JX-289 (RBL roadshow).  Rather than show KKR's work, the RBL roadshow presentation summarily rested, as Defendants do here,

---

[54]    As explained below, because SRC's only material assets was an equity interest in an insolvent Samson Investment, it too was insolvent by virtue of its guarantee of billions in loan obligations under the RBL Credit Agreement.  In addition, SRC ultimately provided a guarantee of the Unsecured Notes.  [Bankr. D.I. 1884 at 36]; DX-838, at p. 7.

on the purchase price as Samson's valuation: ████████████████████████████
████████████████████    JX-289 at 8.   Further, in marketing the bond debt, Samson's
roadshow presentation touted its █████████████████████████████ and stressed
that  Samson  was  ██████████████████████████████████  that  was
████████████████████████████████████████████████████████████
██████████████████████████████    *Id.* at 30.   The roadshow presentation,
however,  does  not  actually  disclose  projected  cash  flow  scenarios  under  any  stress  case
environment  or  otherwise  state  specifically  which  "depressed  commodity  prices"  Samson  could
supposedly withstand for "extended periods."  And, although the roadshow presentation was dated
January 30, 2012, when gas was trading at $2.71, there was no evidence that Samson or its
Sponsors  ever  evaluated,  much  less  disclosed,  a  scenario  with  gas  prices  below  $3.00.   On
February 8, when the bonds were issued, gas was trading at $2.48.[55]

143.     Despite the roadshow materials, Samson's financial distress was evident as of the
first meeting of its new board in February 2012.  The materials for that meeting, circulated on
February 11, 2012, indicated that Samson was already underperforming relative to the Sponsors'
projections.   JX-301 at KKR-SAM_0114412.   The board deck—six weeks after close—
acknowledged that the prevailing market of weak gas prices were a root cause of Samson's poor
performance:



---

[55]     Notwithstanding Samson's hard sell to lenders, the bond financing was harder to obtain than KKR
had expected. Co-sponsor representatives at NGP observed that taking out the bridge was ████████
████████████████████████████████████████████████████ PX-462. Crestview
likewise  concluded  that  ████████████████████████████████  DX-549 at CRE-
SAM_0015783.

██████████████████████████████████████████████████████
████████

*Id.*

144.    In fact, Samson's revenue generation in the first two months after the closing of the

Transaction was so negative to projections that, after reviewing the board materials, Ken Hersh,

who was a member of Samson's board at the time, concluded that ████████████████████

████████████    JX-367 at NGP00003898; *see also* Gieselman Dep. Tr. 105:24-106:4 ████

██████████████████████████████████████████████), 114:3-22 ████

██████████████████████████████████████.   Claire Farley, another KKR

professional (who later served as Samson Investment's interim CEO) similarly recalled that

Samson Investment was████████████████████████████████████████████

██████████████████████████████    Farley Dep. Tr. 125:7-25.

145.    Samson's financial outlook did not recover as 2012 proceeded.  In desperate need

to increase liquidity and lower costs of capital in the Spring of 2012, Samson began to explore the

sale of its "crown jewel" assets in the Bakken region.   *See* JX-326.  Those assets ultimately sold

for $680 million, but the sale was of little help to solve Samson's cash flow problems.  KKR later

observed that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████" PX-631

at 3; *see also* JX-377 ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████.

146.    By July 2012, due to its poor performance, Samson was already expected to breach the RBL Credit Agreement's 5.00 debt-to-EBITDA ratio covenant, and the CFO, Phil Cook, advised the Board that Samson would need to seek covenant relief for the next 18 months.  JX-344 at SAMS0148417.   In September 2012, the RBL lenders agreed to that relief, temporarily raising the debt-to-EBITDA ratio from 5.00 to 5.75 through 2013.    JX-356 at KKR-SAM_0155026; JX-436.   That relief came at a cost, however, because as part of the agreement, Samson had to issue $1 billion in new second-lien debt (the "Term Loan"), which was used to pay down the RBL and which resulted in an increase in Samson's cost of borrowing.  *Compare* JX-363, *with* JX-256; *see also* Cook Dep. Tr. 53:22-54:4. These events—the sale of producing assets and restriction of credit at higher costs—were telltale sign of a death spiral.

147.    And, as a death spiral predicts, the relaxed secured debt covenants and cash from the Bakken sale did not alleviate the downward trajectory of the business.  Only two months after issuing the Second Lien Term Loan, in November 2012, Samson's board materials warned of another expected covenant breach in the coming year.  PX-624 at KKR-SAM_0208338 ("██████

████████████████████████████████████████████████████████

████████").  As KKR observed in its November 2012 update.████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ PX-631 at 3 (emphasis in original).

148.    It was clear to KKR at this point that servicing Samson's overwhelming debt load was crippling the business: ████████████████████████████████████

████████████████████████████    ████████████████████████████

████████████████████████████████ *Id.* at 5.

149.    Desperate to streamline Samson's business to maintain covenant compliance at the end of 2012, the Sponsors considered further asset sales, *id.* at 4, seeking further amendments or refinancing, and even an equity infusion.  *Id.* at 5. KKR's co-sponsors even asked that KKR eliminate its monitoring fee in light of Samson's dire financial condition.[56]  *Id.* at 4.   Ultimately, the Sponsors fired Samson's CEO, David Adams, and laid off approximately 100 employees, including 6 other officers and 11 managers at year-end 2012.  JX-378 at KKR-SAM_0208742; Undisputed Facts ¶ 58.  In preparation for Samson's November 2012 board meeting, KKR board members hoped that these dire financials would ███████████████████████  JX-377.

150.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Smidt Dep. Tr. 257:17-258:24.

But, as Mr. Smidt observed in a November 2012 internal KKR email, █████████████

████████████████████████████████████████████████████████

████████████  JX 377.

151.    But, as KKR was finally coming around to realize at the end of 2012, Samson's undeveloped acreage simply did not permit Samson to invest capital profitably.  As Mr. Smidt testified, in reference to his November 2012 "death spiral" email the KKR Model had overestimated Samson's undeveloped volumes and drilling success:

████████████████████████████████████████████████

████████████████████████████████████████████

…

---

[56]    KKR instead suggested that Samson ████████████████████████████████████
████████████████████████  PX-361 at 4.

███████████████████████████████████

Smidt Dep. Tr. 254:20-25; 255:23-256:6.    Mr. Cook, Samson's CFO, echoed Mr. Smidt's

testimony that Samson's drilling inventory was simply not what KKR projected it to be.    In

reference to the financial difficulties in 2012 leading to layoffs and the firing of the CEO, Mr.

Cook testified

> Ultimately, it was about the rock…[I]n each basin, there are better spots to be than
> others  And in our industry we call it being in the core of the core, which is the
> absolute best rock which produces the best results regardless of price. These – this
> asset at Samson, there was very little rock that we would call the core of the core.
> And as we were coming through 2012 and 2013, I think that the operations team…
> began to become aware that some of the returns that they had been expecting were
> not going to be able to be achieved.

Cook Dep. Tr. 32:19-33:11.    And, despite his opinion that the KKR volume estimates were

"reasonable," Mr. Almrud conspicuously failed to reconcile this opinion with the evidence that

Samson's failure was largely due to the fact that KKR's undeveloped volume projections simply

could not be achieved in reality.

152.    After firing its CEO at the end of 2012, Ms. Farley of KKR served as interim CEO

for four months until being replaced by a new permanent CEO Randy Limbacher in April 2013.

Limbacher Dep. Tr. 14:23-25, 21:11-20.    While she noted in the now-famous 1:55 a.m. email that

she was working on a 5-year plan that showed profitability, she never finalized it.    *See* DX-615.

Once on board, Mr. Limbacher immediately realized that the assets acquired in the Transaction

"had not been adequately de-risked" and that KKR had overestimated the risked development

potential of Samson's assets.    Limbacher Dep. Tr. 26:14-30:16, 151:5-24.    In other words, sixteen

months after the Transaction closed, Samson's CEO concluded that Samson *still* did not know

enough about its "Development" assets to know their value or to formulate a profitable development plan.

153.    As a result of his analysis, Mr. Limbacher instituted a de-risking project to determine the actual value of Samson's undeveloped assets.  In September 2013, Samson's management presented its de-risking analysis to the board.  PX-670.  As Mr. Cook testified, "ultimately the team that figured out what the productivity of [Samson Investment's] rock was going to be was Randy Limbacher . . . and the folks that worked for [him]."  Cook Dep. Tr. 33:23-34:2.  Mr. Limbacher's team concluded that, based on Samson's existing inventory (now just 21 months after close), Samson could only survive for two years without additional equity capital or an increase in commodity prices, neither of which was anticipated.  Limbacher Dep. Tr. 171:19-173:4.  Even then, after that two-year runway ran out, Samson would be unable to service its debt. *Id.*  One board member's takeaways from that September 2013 board meeting were that Samson Investment would not be ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████    Gieselman Dep. Tr. 126:12-127:23.  Again though, there was no evidence that any Sponsor (or anyone else) was ever willing to provide new equity to fund their investment thesis.

154.    Defendants attempted to argue at trial that KKR's and the other Sponsors' continued failure to acknowledge the death spiral—i.e., their internal positive marks of their investment in Samson post-closing—was evidence of Samson's solvency at the time of the Transaction.  If anything, these positive equity valuations undermine Defendants' solvency argument.  KKR and NGP, for example, continued to assign ████████████████ to Samson *even after* Mr. Limbacher had informed the board that the company was failing and would file for bankruptcy in two years.  *See, e.g.*, DX-649; DX-650; DX-661; DX-675.  The fact that the

Sponsors continued to assign a positive equity valuation after this time only further demonstrates that their view of Samson's value was severely flawed all along.  If the Sponsors genuinely believed in Samson's business prospects and undeveloped acreage, they should have been willing to contribute additional equity capital after Mr. Limbacher warned them that such an infusion would be necessary for Samson to survive.  Whatever the case, Mr. Limbacher's clear message, in September 2013, that Samson could not survive under its existing capital structure cannot be reconciled with Defendants' strained argument that Samson would not have filed for bankruptcy but for the decline in oil prices in late *2014*.[57]  Defendant Pre-Trial Brief at 43.

155.    Mr. Limbacher's assessment in September 2013 turned out to be exactly correct: the company ultimately filed for bankruptcy almost exactly two years later, in September 2015. As Mr. Limbacher later observed, reflecting on his 2013 assessment and the subsequent events leading to the bankruptcy: "Yeah.  Yeah, I think that's [] the way it basically played out." Limbacher Dep. Tr. 180:23-181:11.

## LEGAL ARGUMENT

156.    As set forth in his pre-trial brief, the Trustee's claims at trial concerned Counts I, III, and V of the Complaint, each seeking recovery on constructively fraudulent transfers arising from the Transaction.  The Trustee's claims are brought pursuant to Bankruptcy Code Sections 544 and 550.  Section 544(b) allows a trustee to void a transfer of property of the debtor or any obligation incurred by the debtor that is voidable "under applicable law," provided a "triggering creditor" exists, into whose shoes the trustee may step for avoidance purposes.  11 U.S.C. § 544(b).

---

[57]      In their Pre-Trial Brief, Defendants attempt to blame the bankruptcy entirely on OPEC's decision to open the spigot, citing to the Disclosure Statement as "proof" of the same.  Defendant Pre-trial Brief at 43.  To be clear, the Disclosure statement says no such thing and, in fact, all the OPEC prices did was accelerate the death spiral, shortening the runway to Samson's bankruptcy.

Four voidable transfers (the "Challenged Transfers") remain, as summarized below for the Court's convenience:[58]

| Initial Transferee | Assets Transferred | Transferor and Stated Purpose of Initial Transfer | Current Disposition |
|---|---|---|---|
| Charles and Lynn Schusterman Family Foundation (the "Foundation") | $1,145,016,554 | From SRC, for stock purchase | Claim against the Foundation. |
| ST 2008 (Del.) Management LLC ("ST 2008")<br><br>*Trust Beneficiaries: Stacy Schusterman, et al.* | $981,038,692 | From SRC, for stock purchase | Claim against Stacy Schusterman as the §550(a)(1) beneficiary of the transfer.<br>Claim against SFT as subsequent transferee.<br>Claim against Stacy and Lynn Schusterman as trustees of SFT.<br>Dismissed as against ST 2008. [Adv. D.I. 388] |
| SFT (Del.) Management LLC ("SFTDM")<br><br>*Trust Beneficiaries: Stacy Schusterman, et al.* | $1,440,306,523 | From SRC, for stock purchase | Claim against Stacy Schusterman as the §550(a)(1) beneficiary of the transfer.<br>Claim against Samson Energy as subsequent transferee.<br>Dismissed as against SFTDM. [Adv. D.I. 388] |
| Samson Energy<br>*Transfer Beneficiaries: Stacy Schusterman, et al.* | Membership Interests in Samson Exploration and Samson Offshore;<br><br>Selling Stockholder Transaction Assets[59] | From various Debtors, in exchange for transfer/cancellation of Subordinated Notes | Claim against Samson Energy.<br>Claim against Stacy Schusterman as the §550(a)(1) beneficiary of the transfer. |

---

[58]    The amounts of the Challenged Transfers listed here do not include certain relatively small amounts that were part of the "gross cash consideration" under the SPA that, rather than being transferred to the shareholders directly, were used to satisfy certain liabilities on the shareholders' behalf and are therefore also claimed as damages.

[59]    As identified in Schedule 10.9 of the Disclosure Schedule of the Executed SPA.  JX 212.  Among the Selling Stockholder Transaction Assets, Lear 45 jet airplane (FAA Cert. No. N45KH) was initially

157.    Here, the Trustee asserts that the applicable law for purposes of Section 544(b) is the law of Delaware, the state of incorporation and reorganization for SRC.[60]  Delaware has adopted the Uniform Fraudulent Transfer Act ("UFTA").  *See* 6 Del. Code Ann. tit. 6, §§ 1301 - 1311 (Delaware UFTA).  As enacted in Delaware, the UFTA broadly requires a plaintiff asserting a constructive fraudulent conveyance to satisfy two elements to prevail: (i) that the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer; and (ii) that the transferor failed to receive reasonably equivalent value for the assets transfers.  *See* Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 198 (Del. Ch. 2006).[61]  Insolvency as of the transfer date can be shown in one of three ways: (i) the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer ("Balance Sheet Test"), (ii) the debtor was engaged or was about to engage in a business or transaction for which any property remaining with the debtor was unreasonably small capital ("Capital Adequacy Test") or (iii) the debtor intended to incur, or believed (or reasonably should have believed) it would incur, debts beyond its ability to pay as such debts matured ("Cash Flow Test").

---

transferred from Samson International, Ltd, a subsidiary of Samson Investment, to SWF, LLC.  SWF, LLC was then merged into Samson Energy.  [Adv. D.I. 197, ¶ 13, Ex. KKK]

[60]    Under Delaware's choice-of-law rules, the law of the state with the "most significant relationship" to the controversy applies for fraudulent transfer claims.  *See TrustCo Bank v. Mathews*,  No. 8374-VCP 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015).  While the law of Oklahoma (the headquarters of Samson) or the law of Nevada (the state of incorporation of SIC) could arguably apply, the substantive law governing the Trustee's claim would be the same regardless of which state's law applies, as Delaware, Oklahoma, and Nevada have all adopted the UFTA.  *See* Del. Code Ann. tit. 6, §§ 1301 - 1311 (Delaware UFTA); 24 Okla. Stat. Ann. tit. 24 §§ 112 - 123 (Oklahoma UFTA); Nev. Rev. Stat. § 112.140 - 112.250 (Nevada UFTA).  Accordingly, since there is no real conflict between the choice of law, the Court may utilize the law of the forum state, Delaware.  *See Forman v. Gittleman (In re OpenPeak, Inc.)*, Nos. 16-28464 (SLM), 17-01755 (SLM), 2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020) ("[W]hen there is no real conflict between the choice of law, the Court may utilize the law of the forum state.").  In any event, the analysis would be the same under Nevada or Oklahoma law.

[61]    The Trustee's burden of proof for its Delaware constructive fraudulent conveyance claims is a preponderance of the evidence. *See In re MDIP*, 332 B.R. 129, 132 (Bankr. D. Del. 2005).

158.   To the extent that a transfer is avoided under Section 544, Section 550(a) permits the Trustee to recover the property transferred or the value of such property from the initial transferee of such transfer or the entity for whose benefit such transfer was made; or any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550(a).

159.   At trial, the Trustee established that the Debtors that made the Challenged Transfers were each insolvent at the time of, or became insolvent as a result of, the Challenged Transfers, both under the Balance Sheet Test and the Capital Adequacy Test.  *See infra* ¶¶ 173-207. With respect to reasonably equivalent value, the Trustee proved at trial that all of the three cash transfers were given in exchange for equity in a company whose total asset value was far less than the amount of cash transferred, assuming arguendo that an effective cancellation of shares by Defendants constitutes "value" to the debtor.  *See infra* ¶¶ 208-233.

160.   The Trustee also showed at trial that the GoM assets were "exchanged" for valueless Subordinated Notes in what Ms. Schusterman acknowledged was not actually a "sale" at all.  Schusterman Dep. Tr. 222:25-223:2; *see infra* ¶¶ 213-222.

161.   Finally, in addition to the $1,145,016,554.50 cash transfer from SRC directly to the Foundation, and the GoM asset transfer by certain Samson Debtors directly to Defendant Samson Energy, the Trustee demonstrated that Defendant Stacy Schusterman was the person for whose benefit SRC transferred $2,421,345,215.50 to two single-member LLCs controlled by Ms. Schusterman.  *See infra* ¶¶ 243-249.

I.      **The Trustee is Entitled to Judgment that the Challenged Transfers Were Fraudulent**

    **A. The Trustee Has Standing**

162.    The Trustee established at trial the existence of "triggering creditors" to confer standing on the Trustee to avoid the Challenged Transfers.  *See* Trial Tr. (Court's Decision on Triggering Creditors) at 2117:11-2123:5.

163.    Section 544(b)(1) allows a trustee to stand in the shoes of "a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title" to avoid a transfer of the debtor's property or an incurrence of an obligation by the debtor that such creditor could have avoided under nonbankruptcy law.  11 U.S.C. § 544(b)(1); 5 Collier on Bankruptcy ¶ 544.01 (16th ed. 2022).  The trustee may use this "strong arm power" to exercise the rights that such a creditor would have against the debtor under state fraudulent transfer laws.  *Id.*; *see also, e.g., In re Midway Games, Inc.*, 428 B.R. 303, 322-23 n.13 (Bankr. D. Del. 2010).  A single creditor with an allowable claim may avoid the entirety of a fraudulent transfer for the benefit of all unsecured creditors, regardless of the size of that creditor's interest.  *See, e.g., Moore v. Bay*, 284 U.S. 4, 52 S. Ct. 3 (1931); *In re Refco, Inc. Sec. Litig. v. CSFB*, No. 07 MDL, 2009 U.S. Dist. LEXIS 129944, at *41-42 (S.D.N.Y. Nov. 13, 2009).

164.    Section 544 "permits the trustee to exercise the rights of 'a creditor holding an unsecured claim that is *allowable.*'" 11 U.S.C. § 544(b)(1) (emphasis added).  It does not require that claim to be allowed. The only prerequisite to having an allowable claim is that the creditor have a right to payment. 11 U.S.C. § 101(5).  In other words, the creditor must be owed money as of the date of the petition." *In re Crown Unlimited Mach., Inc.*, No. 03-13400, 2005 Bankr. LEXIS 3073, at *3 n.2 (Bankr. N.D. Ind. Nov. 4, 2005); *see also* 5 Collier on Bankruptcy ¶ 544.06; *Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 430-31 (Bankr. E.D. Pa. 2014); *Menotte v. Gassan (In re Tabor)*, Nos. 14-20731-EPK, 15-01577-EPK, 2016 Bankr. LEXIS 2315, at *6-7 (Bankr. S.D.

Fla. June 17, 2016); *In re Wills*, Nos. 05-17977-7, 06-5337, 2008 WL 1840701, at *2 (Bankr. D. Kan. Apr. 23, 2008).  As this Court recognized, allowed claims are also "allowable."  Trial Tr. (Court's Decision on Triggering Creditors) at  2118:4-7; *see also In re Allou Distribs., Inc.*, 392 B.R. 24, 31–32 (Bankr. E.D.N.Y. 2008).  This Court has held that such allowable and allowed claims may include unobjected-to proofs of claim that, by operation of 11 U.S.C. § 502, are deemed allowed.  Trial Tr. (Court's Decision on Triggering Creditors) at 2117:21-24; *see also In re Allou*, 392 B.R. at  31–32; *In re Richardson*, 268 B.R. 331, 334 (Bankr. D. Conn. 2001); *In re Int'l Loan Network*, 160 B.R. 1, 18 (Bankr. D.D.C. 1993).

165.    The existence of an allowable unsecured claim pursuant to section 544(b) is determined as of the petition date of a debtor's case. *See, e.g., In re DLC*, 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003).  As this Court held, there is "an undisputed record of many, many allowed claims as of the petition date," thus, "we certainly have a demonstrated record as of the petition date."  Trial Tr. (Court's Decision on Triggering Creditors) at 2118:25-2119:3.  Specifically, the Court considered the existence of proofs of claim as to which no objection has been lodged and were deemed allowed under the bankruptcy code.  Trial Tr. (Court's Decision on Triggering Creditors) at 2117:20-24; *See also In re Jones*, 403 B.R. 228, 233–34 (Bankr. D. Conn. 2009); *In re Consol. Indus. Corp.*, No. 4:04-cv-64, 2006 WL 3136924, at *7 (N.D. Ind. Oct. 31, 2006); *In re Carrozzella & Richardson*, 302 B.R. 415, 421 (Bankr. D. Conn. 2003); *In re Richardson*, 268 B.R. at 334; *In re Int'l Loan Network*, 160 B.R. at 18.  As the Court held, "having looked at the claims register and, again, having at least taken a quick review of the proofs of claim that were identified on the very helpful website that you have with the proofs of claim, I approach this with a high level of confidence that there is a triggering creditor that exists as of the petition date."  Trial Tr. (Court's Decision on Triggering Creditors) at 2122:13-18.  Despite protesting that the claims

allowance process in the underlying chapter 11 case was somehow prejudicial to them,[62] Defendants produced no evidence to rebut the existence of unsecured creditors at each of the Debtors as of the petition date.

166.    Under section 544(b)'s "applicable law" – here, the Delaware UFTA – in seeking to avoid a constructively fraudulent transfer on the basis of balance sheet insolvency, a trustee must also show that the triggering creditor also held a claim at the time of the December 2011 transfer date.[63] Del. Code Ann. Tit. 6, § 1305; *see also* 5 Debtor-Creditor Law § 42.03 n.38 (2021) ("In general, when the relevant financial condition is insolvency, the transaction is voidable only by creditors existing at the time of the transfer. When the condition asserted is inadequate capital or inability to pay debts as they become due, the transaction is also voidable by subsequent creditors."); Alan N. Resnick, ARTICLE: FINDING THE SHOES THAT FIT: HOW DERIVATIVE IS THE TRUSTEE'S POWER TO AVOID FRAUDULENT CONVEYANCES UNDER SECTION 544(b) OF THE BANKRUPTCY CODE?, 31 Cardozo L. Rev. 205, 210-211 (2009). Such a "transfer date" triggering creditor need not hold the same claim at the transfer date as at the petition date; the creditor must simply have a right to payment on both dates. *See In re Allou Distribs.*, 392 B.R. 24, 34 (Bankr. E.D.N.Y. 2008); *Carroll v. Robert F. Craig P.C. (In re Innovative Commun. Corp.)*, 507 B.R. 841, 848-49 (Bankr. D.V.I. 2014); *Cohen v. Sikirica*, 487 B.R. 615, 628 (W.D. Pa. 2013); 3 Collier Bankruptcy Practice Guide ¶ 63.03 (2022) ("while this

---

[62]    Defendants have argued that the claims allowance process raised "constitutional" problems and violated their due process rights. *See* D.I. 410 at 49 n. 49.  But as creditors of the Debtors themselves, the Defendants had an opportunity to participate and be heard in the main bankruptcy case.

[63]    The Trustee's unreasonably small capital claim, however, is avoidable by any petition date unsecured creditor, regardless of whether such entity was a creditor at the transfer date.  Del. Code Ann. Tit. 6, § 1304;  *Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*, Nos. 16-10202, 17-50662, 2019 Bankr. LEXIS 2311, at *9 (Bankr. D. Del. July 25, 2019) (holding that Trustee's identification of 10 creditors with allowable claims as of the Petition Date, and not the transfer date, were sufficient triggering creditors under Delaware UFTA § 1304(a)(1)).

[triggering] creditor must be the same creditor on both dates (or an assignee who succeeds to the creditor's avoidance rights), the creditor does not have to hold the same claim on both dates.").

167.    The Trustee submitted competent evidence of multiple such creditors at trial, as this Court observed: "I am satisfied that the trustee has offered evidence of triggering creditors as of the transfer date[.]"    Trial Tr. (Court's Decision on Triggering Creditors) at 2119:18-20. Specifically, the Trustee showed that Samson Resources Corporation, the transferor of the $3.57 billion purchase cash transfer, had numerous triggering creditors as of the Closing.    Moody's Investor Service, Inc. ("Moody's") held a petition date claim, as shown by its timely filed proof of claim attaching a written agreement with Samson Resources Corporation and invoice.[64]    POC No. 2638.  Moody's ███████████████████████████████████████████████████████████████ ███████████████████████████████████████ PX-394████████████████████████████ ████████████████████████████████████████; *see also* Trial Tr. (Baxter) at 671:13-672:4.  Moody's transfer date claim against SRC is further corroborated by the fact that Moody's was paid out of an account that was set up for "Company Stock Sale – SRC – To be used when the cost is associated with the sale and should burden Samson KKR 100%." PX-493 █████████████████████████████████████████; PX-426 █████████████████ ███████████████████████████████████.  The Department of Treasury (the "IRS") is another SRC triggering creditor, having properly submitted a proof of claim against SRC that was later satisfied. POC No. 2700; [D.I. 2421, Ex. A ("Notice of Full Satisfaction" listing Claim No. 2700)].    SRC plainly had obligations to the IRS as of the transfer date.    Intralinks, Inc. also timely filed an

---

[64]        Proofs of claim, of which the Court may take judicial notice, are competent evidence to establish the existence of a triggering creditor. *In re Jones,* 403 B.R. 228, 233–34 (Bankr. D. Conn. 2009); *In re Consol. Indus. Corp.,* No. 4:04-cv-64, 2006 WL 3136924, at *7 (N.D. Ind. Oct. 31, 2006); *In re Carrozzella & Richardson,* 302 B.R. 415, 421 (Bankr. D. Conn. 2003); *In re Richardson,* 268 B.R. at 334; *In re Int'l Loan Network,* 160 B.R. at 18

unsecured claim against SRC, which was not objected to and thus is presumed allowed. POC No. 2802.

168.    The Trustee also showed that the four debtor-transferors that effectuated the Gulf Coast and Offshore spinoff transfers likewise have triggering creditors. Debtor Samson Resources Company owed Citation 2002 Investment Limited Partnership working interest disbursements as of the transfer date. PX-366 (███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████).[65] Citation 2002 Investment Limited Partnership also held a petition date claim against Samson Resources Company which was satisfied post-petition. POC No. 1672 (Unsecured claim attaching invoice for $65,746.03 of working interest revenue); [D.I. 2948, Ex. A ("Notice of Full Satisfaction" listing Claim No. 1672)]. BP America likewise was owed oil and gas proceeds as of the transfer date and timely filed a proof of claim against Samson Resources Company. See PX-366 ████████████████████████████████████; POC No. 1599. BP America's unsecured claim also asserts amounts owing dating back prior to the transfer date. See id., Ex. 3 (█████████████████████████████). BP America's claim against Samson Resources Company was resolved by stipulation and allowed. Dkt. 3042. Flow-Zone LLC timely filed a proof of claim against Samson Resources Company asserting an unsecured claim based on unpaid invoices dating back to before the transfer date. POC No. 2040.

---

[65]    Working interest and mineral payments that were payable in the month of December 2011 would not have been paid until after the transfer on December 21. *See* Dkt. 7 ¶¶ 12, 19 (explaining that mineral payments were paid on 25th of each month, working interest disbursement checks were generated on the 20th of the month and remitted on the 25th of the month). Thus, these amounts evidence a right to payment that existed as of the transfer date on the 21st.

169.    Debtor Samson Contour Energy E&P LLC owed Tennessee Gas Pipeline Company on the same claim as of both the transfer and petition date. POC No. 50 (unobjected-to proof of claim attaching invoice dated 11/19/2008); *see also* [D.I. 213, Schedule G (Samson Contour Energy E&P LLC schedules listing contracts with Tennessee Gas Pipeline)]. Regency Field Services LLC had a petition date claim against Samson Contour Energy E&P that was listed on Debtors' schedules.  *See* [D.I. 213, Schedule F]; *see also* POC No. 2065.  Regency Field Services, LLC's right to payment arose under a gas gathering agreement that predated the Transaction transfers.  PX-711.

170.    Debtor Samson Lone Star LLC had numerous unsecured claimants as of the transfer and petition dates. One such claimant, Liberty County Services LLC, timely filed an unobjected-to proof of claim asserting a right to payment for invoices dating back to before the transfer date. POC No. 2778.  BP America filed a proof of claim asserting claims for, among other things, joint interest amounts owing from an audit of the months 1/2010 – 12/2011 – that is, a right to payment as of the transfer date.  POC No. 1834.  BP America's claim was resolved and allowed by stipulation.  [D.I. 2995; 3041].  Exterran timely filed an unobjected-to proof of claim attaching invoices for a Texas Sales Tax audit dating back prior to the transfer date.  POC No. 2166.

171.    Finally, Debtor Samson-International, Ltd. had an unsecured claimant, Learjet, Inc., as of the petition date.  POC 1978 (proof of claim attaching invoice for $610 for annual subscription); [D.I. 215, Schedule G (Debtors' schedules noting 3/14/2012 Learjet, Inc. parts agreement with Samson-International, Ltd.)].  As such, the only claim being brought against Samson-International is a claim of unreasonably small capital.

172.    Although Defendants contended at trial that the claims of certain transfer date creditors might not suffice as "allowable" claims, they offered no evidence at trial to rebut any of the foregoing or to establish any legitimate defense to those creditors' claims.

## B.    Samson Was Inadequately Capitalized at the Time of the LBO Closing and the GoM Asset Transfers

173.    Under the Capital Adequacy test, a plaintiff can establish insolvency by showing that the debtor was engaged, or was about to engage, in a business or transaction for which any property remaining with the debtor was unreasonably small capital. *See Trenwick Am. Litig. Tr.*, 906 A.2d at 198. The concept of unreasonably small capital "denotes a financial condition short of equitable insolvency" and is "aimed at transferees that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995); *Moody v. Sec. Pac. Bus. Credit*, 971 F. 2d 1056, 1064 (3d Cir. 1992).

174.    The Capital Adequacy test centers on reasonable foreseeability: "The critical question is whether the parties' projections were reasonable at the time of the transaction." *In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000); *Moody*, 971 F.2d at 1073. In assessing the reasonableness of a company's projections, courts will consider the methodology underlying the projections was sound and whether the projections were based on "supportable assumptions and logically consistent computations." *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005*)*. Moreover, while reference to hindsight is not necessary, "[a]ctual performance of the debtor following the transaction is evidence of whether the parties' projections were reasonable." *In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000).[66]

---

[66]    It is undisputed that, post-close, Samson failed to live up to the Sponsors' projections, under market conditions that were prevailing as of the time of the Transaction. *See supra* ¶¶ 141-55.

175.    Critically, a company's projections must incorporate some margin of error to account for financial and operational difficulties that are likely to arise, including interest rate fluctuations and general economic downturns.  *Moody*, 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise . . . and . . . incorporate some margin for error"); *In re Healthco Int'l, Inc.*, 195 B.R. 971, 981 (Bankr. D. Mass. 1996) ("[t]o be reasonable, the projections must leave some margin for error").  Accordingly, projections may be found unreasonable if they fail to incorporate some capital cushion to account for foreseeable fluctuations in a company's prevailing operating and financial markets.  *See In re Morse Tool, Inc.*, 148 B.R. 97, 125-26, 133 (Bankr. D. Mass. 1992) (projections were unreasonable because they provided no room for "normal fluctuations in the business cycle"); *see also In re O'Day Corp.*, 126 B.R. 370, 406-07 (Bankr. D. Mass. 1991) (rejecting argument that unforeseen factors were cause for debtor's decline where "labor problems, cost variances and cyclicality in the industry were the major contributors to O'Day's fiscal woes and were manifest and readily predictable prior to the LBO"); *In re Morse Tool*, 148 B.R. at 122 (finding projections unreasonable where the person who negotiated on behalf of a target corporation in a LBO was relying on "market's cooperation for the full seven-year period" and "counting on luck" in preparing projections).  Accordingly, where a company's projections show that it is "naked to any financial storms that might assail it," it is likely left with unreasonably small capital.  *Boyer v. Crown Stock Distrib.*, 587 F.3d 787, 795 (7th Cir. 2009).

176.    In sum, in assessing capital adequacy, courts must consider a host of factors, including historical leverage, capital needs in the relevant industry, and actual access to cash to withstand difficulties that may arise.  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000).  At trial, the Trustee presented unrebutted evidence that, prior to the Transaction,

Samson was <u>over</u>-capitalized relative to its peers.  *See* Trial Tr. (Schusterman) at 1782:3-1787:17.

Immediately following the Transaction, the company was left significantly <u>under</u>-capitalized,

especially relative to its prior position.  *See* JX-248 at 15 (Morgan Stanley credit review noting



JX-185 at 13 (BAML Leveraged Finance Committee

presentation noting

; JX-168 at 34 (Barclays memo noting that Samson

. The Trustee further established,

without dispute, that the oil and gas E&P business is particularly capital-intensive, and in order to

succeed in this industry any company would need sufficient access to funding in order to invest

sufficient CAPEX to generate new EBITDA.  *See* Trial Tr. (Baxter) 692:22-693:2 ("So there's

several problems with putting a lot of debt on in this industry, it can be really problematic.  This

is a very volatile industry."  THE COURT: "But it's also a deeply capital-intensive industry.  So

how do you balance that?"  THE WITNESS: "Very carefully."), 694:17-695:1; Trial Tr. (Filsinger)

at 2446:3-2447:3; DX-735 ("Access to capital is the lifeblood of exploration and production

companies."); JX-248 at 15 (Morgan Stanley credit review noting

. And, as noted, KKR's business plan

for Samson likewise shared this premise.  *See supra* ¶¶ 95-99.

177.    On the other hand, in terms of capital available to Samson as of the Closing to realize on the KKR business plan, Defendants could only point to undrawn funding under the RBL. There was no evidence presented at trial that Samson could have sought or obtained financing from any other source, and there was no evidence of any potential or actual equity infusion from the Sponsors.  But, as noted below, that RBL was subject to severe restrictions by its lenders in the event that Samson faltered out of the gate.  *See infra* ¶ 193.  As set forth below, considering KKR's projections, in light of the relevant industry circumstances and historical data, leads to the inevitable conclusion that Samson was left with inadequate capital at close.

### 1)      The Trustee Established That Samson Was Left With Unreasonably Small Capital At Close

179.    The evidence at trial established that KKR's deal model assumptions were unreasonable, resulting in a business plan that left no margin for error or ability to withstand foreseeable market fluctuations, thus supporting a finding of unreasonably small capital.

180.    *First*, with respect to Samson's ability to withstand reasonable downside scenarios, Mr. Filsinger testified that KKR's Model did not reflect any reasonable downside because it relied on inflated stress case commodity price assumptions and failed to consider the effect of pressure to drill new wells in a downside scenario.  *See* Trial Tr. (Filsinger) at 91:5-96:9.  The evidence admitted at trial established that future commodity prices, a key input into cash flow projections in the E&P industry, are highly volatile and difficult to predict.  *See* Trial Tr. (Baxter) at 694:1-22. Further, it is undisputed that the volume of oil and gas that will be profitably drilled in undeveloped locations is highly uncertain.  *See* DX-850, Almrud Trial Decl. ¶¶ 192-204.  Based on these considerations, industry participants understood and acknowledged the importance of evaluating projections not just based on a base case scenario, but also based on reasonably foreseeable downside (or stress) case scenarios that take into account reasonable uncertainty as to commodity

prices and volumes.  Mr. Filsinger further testified that, once reasonable adjustments were made

to the hedging and pricing assumptions used in KKR's stress case, and using KKR's own downside

drilling scenario, KKR's own model showed a company that was clearly unable to meet its debt

covenants.  *See* Trial Tr. (Filsinger) at 105:17-106:5.  As set forth in the table below, Mr.

Filsinger's adjusted KKR Model projected that, under a realistic downside case, Samson would

violate its covenants in 2014, 2016, 2017, 2018, 2019, 2020, and 2021, and exceed its credit facility

balance beginning in 2015 and continuing every year thereafter.

| Numbers are in $Million | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | 859 | 880 | 966 | 1,092 | 1,105 | 1,152 | 1,158 | 1,054 | 998 | 997 |
| Net Interest Expense | (226) | (241) | (265) | (295) | (326) | (355) | (376) | (384) | (388) | (395) |
| Other | 3 | (12) | (19) | (26) | (41) | (24) | (35) | (51) | (49) | (12) |
| Cash Flow from Operations | 635 | 627 | 682 | 771 | 738 | 773 | 747 | 619 | 561 | 591 |
| | | | | | | | | | | |
| Drilling Capex | (684) | (848) | (966) | (1,114) | (963) | (1,125) | (907) | (674) | (629) | (708) |
| Other Capex | (72) | (30) | (30) | (30) | (30) | (18) | (18) | (18) | (18) | (18) |
| Levered Free Cash Flow | (121) | (251) | (314) | (373) | (255) | (370) | (177) | (72) | (86) | (135) |
| | | | | | | | | | | |
| Credit Facility Balance | 1,471 | 1,722 | 2,227 | 2,607 | 2,862 | 3,231 | 3,409 | 3,481 | 3,566 | 3,702 |
| Debt/EBITDA Ratio | 4.3x | 4.5x | 4.6x | 4.4x | 4.6x | 4.8x | 4.9x | 5.4x | 5.8x | 6.0x |
| Net Debt/EBITDA Ratio | 4.2x | 4.4x | 4.5x | 4.3x | 4.5x | 4.7x | 4.8x | 5.3x | 5.7x | 5.9x |
| Credit Agreement Covenant | 5.0x | 4.8x | 4.5x | 4.5x | 4.5x | 4.5x | 4.5x | 4.5x | 4.5x | 4.5x |

Filsinger Demonstrative at 14; *see also* Filsinger Trial Decl. Ex. A at 60 (Table 7); Trial Tr.

(Filsinger) at 105:2-16.  Based on this assessment, Mr. Filsinger concluded that, "looking at a

reasonable downside case with downside drilling oil and gas, this business would not survive. . .

. you wouldn't make it through those downsides to capture the upside."  Trial Tr. (Filsinger) at

105:17-106:5.

181.    Mr. Baxter likewise adjusted the KKR Model, using his own volume assumptions,

and incorporating Mr. Filsinger's downside case assumptions.  Mr. Baxter's volume assumptions

were based on NSAI's PRMS-categorized reserve estimates that were known to the Sponsors prior

to deal close.  First, Mr. Baxter utilized the same volumes from the November 2011 NSAI Reserve

Report as his unrisked volume assumptions of PDP, PDNP, and PUDs. *See, e.g*., Trial Tr. 669:24-

770:03; Onshore Report, Table 27 (p. 71). Then, as he explained at length during trial, Mr. Baxter

estimated his unrisked Probable and Possible volume assumptions using the November 2011 NSAI

Reserve Report. See Trial Tr. 770:04-772:13; Baxter Trial Demonstrative at slide 38. Finally, Mr.

Baxter subtracted the PUDs, Probables, and Possibles volume assumptions from KKR's total

volumes to arrive at his unrisked Contingent Resources assumption. See Trial Tr. 775:15-18 ;

Baxter Trial Demonstrative at slide 37.  With these assumptions, Samson's outlook was even more

dire than Mr. Filsinger expressed; as summarized in the table below, the KKR Model projected

covenant violations nearly immediately post-Closing:

| [A] | [B] | [C] | [D] | [E] |
|---|---|---|---|---|
| *$ in millions* | | 2012 | | |
| | **31-Mar** | **30-Jun** | **30-Sep** | **31-Dec** |
| 1. Total Net Debt | 3,470 | 3,455 | 3,441 | 3,430 |
| 2. LTM Adjusted EBITDA | 906 | 726 | 576 | 466 |
| 3. BRG Adjusted (Annualized) EBITDA | 466 | 466 | 466 | 466 |
| **4. Net Debt/EBITDA (Using LTM Adjusted EBITDA)** | **3.8x** | **4.8x** | **6.0x** | **7.4x** |
| **5. Net Debt/EBITDA (Using BRG Annualized EBITDA)** | **7.5x** | **7.4x** | **7.4x** | **7.4x** |
| 6. RCF Covenant Ratio | 5.0x | 5.0x | 5.0x | 5.0x |
| **7. *Covenant Violation (Using LTM Adjusted EBITDA)*** | *No* | *No* | *Yes* | *Yes* |
| **8. *Covenant Violation (Using BRG Annualized EBITDA)*** | *Yes* | *Yes* | *Yes* | *Yes* |

Baxter Trial Demonstrative at 46; *see also* Baxter Trial Decl., Ex. A (Onshore Report) at 118,

Table 51; Trial Tr. (Baxter) at 800:10-22.

182.    Both Mr. Baxter and Mr. Filsinger modeled compliance with Samson's EBITDA

covenants for an important reason – violation of debt covenants can be the beginning of a death

spiral for an E&P company operating with reliance on an RBL.  *See* Trial Tr. (Baxter) at 787:15-

788: 19.  As the Trustee showed at trial, KKR's business plan was fundamentally premised on

Samson's periodic ability to draw on the $1 billion of availability from its RBL credit facility in

order to feed the virtuous cycle of capital expenditure leading to increased revenues from new

production. *See id.* at 789:18-790:20.  Mr. Baxter, without contradiction, described exactly what

would result if Samson's lenders cut off its access to its RBL: "they do not have the ability to draw down that billion of dry powder. It's still on paper, a revolver, but practically speaking, they cannot access it." *Id.* at 792:9-793:2; *see also id.* at 793:3-7 (this would have been commonly known in the industry at the time of the Transaction). Thus, evaluating Samson's compliance with its EBITDA covenants was critical to determine whether the business plan was viable. *See* Trial Tr. (Filsinger) at 87:12-17. This is corroborated by the fact that all of the Sponsors' stress case scenarios evaluated whether the company would remain in compliance with EBITDA covenants. *See, e.g.*, JX-127 at 15; PX-343 at 13.

183.    In response, the Defendants' witnesses provided no testimony as to what a reasonable downside case would be for Samson. Mr. Almrud did not provide the Court with any independent analysis on what constituted reasonable downside assumptions at the time of the Transaction. All he offered were selected observations. He *observed* that the NYMEX forward curves were higher than KKR's downside pricing assumptions, but did *not* opine as to what magnitude of a difference from the NYMEX forward curve would be a reasonable stress case assumption. *See* DX-850, Almrud Trial Decl. ¶¶ 247-255; *see also, e.g.*, Trial Tr. (Almrud) 2015:25-2016:9 (describing that a stress case should be "informed by" and determined "in relation to" a base case, but without providing an opinion on a reasonable way to create a stress case in relation to a base case); *id.* at 2017:10-21 (describing different shapes of stress case price assumptions that one can use without opining as to a reasonable stress case for the Transaction).[67]

---

[67]    To the extent Mr. Almrud provided an opinion on what a reasonable stress case would be, he appears to have opined that stress case price assumptions should only denote "the average prices that [one] would receive along [the forecasted] time period." Trial Tr. (Almrud) 2018:3-17. This would not be a stress case at all. Trial Tr. (Filsinger) 2440:5-2441:17 ("The market consensus is not what the purpose of the stress case is. The stress case is to look at what is the potential downside and what is your impact on liquidity in the operation of a business. It's what happens if the market consensus on your view doesn't take place.")

He *observed* that certain research reports issued by banks did not contradict KKR's stress case price assumptions, but did *not* analyze the methodologies underlying those research reports or opine as to their reasonableness.   DX-850, Almrud Trial Decl. ¶¶256-57.   Mr. Almrud also *observed* that the stress case price assumptions used by the parties involved in the Transaction were consistent with KKR's assumptions, but he again fell short of opining on their reasonableness.   *Id.* at 258-66.   But, as the Trustee's expert did opine, market participants' downside scenarios are not *per se* reasonable. *See* Trial Tr. (Filsinger) 233:5-19 ("I think we've seen consistently, as I've testified here today, that [banks] have not been [correct about how to look at downside stress scenarios] and many times they'll adopt positions to get deals done.").   Mr. Almrud's aggregation of selected observations, with no expert analysis, cannot rebut Mr. Filsinger's thorough statistical analysis of foreseeable downside commodity price scenarios based on decades of experience and built up based on market fundamentals.

184.    Nor did Mr. Randolph's testimony establish the reasonableness of the KKR Deal Model's downside case. *See* Trial Tr. (Randolph) at 1720:9-12 (not providing opinions as to whether KKR's stress case pricing assumptions or reasonable). Mr. Randolph was only retained by Defendants to opine as to the reasonableness of KKR's hedging assumptions, and explicitly did not provide any opinion as to reasonable stress case pricing or drilling assumptions. *See* Trial Tr. (Randolph) at 1720:13-24. Nevertheless, Mr. Randolph's trial testimony contains a collection of views that commodity prices could recover, implicitly suggesting that the KKR Model's assumptions were reasonable on that basis.   DX-848, Randolph Trial Decl. ¶¶ 78-98.   While this is outside the scope of Mr. Randolph's opinion, Mr. Randolph missed the point.   Whether some market participants were optimistic about a gas price recovery—while perhaps relevant to a base case—is irrelevant to a stress case.   To determine stress pricing, the goal is not to "pick what the

majority of people think might happen." Trial Tr. (Filsinger) 232:21-25 (Filsinger also testifying that if he did "that in 2000," he would "be out of business."). A stress case should model what happens "if the pessimists are right." Trial Tr. (Randolph) at1726:6-8. While one "can never divorce [oneself] from what is going on in the marketplace," Trial Tr. (Filsinger) 84:20-22, a stress case should "look at the fundamentals, look at the history, look at where [a company is] in the market, and do a reasonable downside case," like Mr. Filsinger did here.[68] *Id*.at 233:01-03

185.    Finally, while Ms. Roski's trial declaration assembles the Transaction participants' stress cases and criticizes Mr. Baxter for "failing to consider" this as evidence that KKR's stress case assumptions were reasonable, Ms. Roski did not provide any opinion of her own as to reasonable stress case assumptions. Trial Tr. (Roski) 2385:5-15. Ms. Roski conceded that she was not competent to provide any such opinion. Trial Tr. (Roski) 2315:7-2318:15; *see also id.* at 2306:10-25. And, Ms. Roski offered no rebuttal to Mr. Filsinger's testimony at all. Trial Tr. (Roski) at 2385:25-2386:21. Thus, neither Ms. Roski nor any other witness testifying for Defendants could establish that KKR's Deal Model left a reasonable margin for error in the event that a reasonable stress case manifested itself post-Closing.

186.    *Second*, the Trustee established at trial that KKR's business plan for Samson was tantamount to "counting on luck" that the company would succeed. Specifically, Mr. Baxter demonstrated just how small Samson's margin for error was, by making modest adjustments the KKR Model's initial production ("IP") and drilling success rates. *See* Trial Tr. (Baxter) at 799:5-19. In particular, by making only two simple adjustments in KKR's downside pricing case model ($3 gas/$60 oil) to adjust Samson's assumed IP rates back to their historical averages, and to adjust

---

[68]    While Mr. Randolph republished second-hand opinions from analysts at the time of the Transaction, Mr. Filsinger himself provided the basis for many analysts' views of market fundamentals and informed their downside pricing cases. Trial Tr. (Filsinger) 97:3-98:1. Mr. Filsinger used the same methodology to forecast the downside commodity prices in the market at the time as he did in his expert analysis of a reasonable stress case for this Transaction. *Id.*

Samson's historical drilling success rates to 93%, and leaving all other assumptions in place, the

KKR Model projected that Samson would experience a default under the First Lien Facility's debt-

to-EBITDA ratio covenant in 2013 and in 2014, as summarized in the table below:

| [A] | [B] | [C] | [D] | [E] |
|---|---|---|---|---|
| $ in millions | 2012 | | | |
| | 31-Mar | 30-Jun | 30-Sep | 31-Dec |
| 1. Total Net Debt | 3,494 | 3,505 | 3,515 | 3,526 |
| 2. LTM Adjusted EBITDA | 961 | 836 | 740 | 685 |
| 3. BRG Adjusted (Annualized) EBITDA | 685 | 685 | 685 | 685 |
| 4. Net Debt/EBITDA (Using LTM Adjusted EBITDA) | 3.6x | 4.2x | 4.7x | 5.1x |
| 5. Net Debt/EBITDA (Using BRG Annualized EBITDA) | 5.1x | 5.1x | 5.1x | 5.1x |
| 6. RCF Covenant Ratio | 5.0x | 5.0x | 5.0x | 5.0x |
| 7. Covenant Violation (Using LTM Adjusted EBITDA) | No | No | No | Yes |
| 8. Covenant Violation (Using BRG Annualized EBITDA) | Yes | Yes | Yes | Yes |

Baxter Trial Demonstrative at 45; *See also* Baxter Trial Decl. Ex. A (Onshore Report) at 67, Table

24; Trial Tr. (Baxter) at 799:5-19.  In response, Mr. Almrud waited until the middle of the trial to

offer, for the first time, his relatively trivial critiques about these two adjustments.  Trial Tr.

(Almrud) 2040:8-2044:19, 2047:16-2048:14.[69]

187.    *Third*, under any pricing scenario, the KKR Model grossly overstated the amount

of cash that Samson's undeveloped assets would generate post-Closing.  As addressed more fully

below, *see infra* ¶¶ 197-204 (addressing balance sheet insolvency), Dr. Strickland and Mr. Baxter

testified that the KKR Model significantly overstated the amount of cash to be realized from

volumes of Samson's reserves and failed to apply industry-standard risking.  Trial Tr. (Strickland)

308:22-311:25.  In particular, KKR/RPM's success factors for location counts were divorced from

---

[69]     Specifically, he testified that Mr. Baxter should have used Samson's historical IP rates for a shorter
time period and should have selected higher historical success rates.  Trial Tr. (Almrud) 1987:12-1996:25.
This is a nonissue, because the projections would have shown that Samson would default under the First
Lien Facility's debt-to-EBITDA ratio covenant by around 2013, regardless of the success rate.  Trial Tr.
(Baxter) 2614:5-2615:16; *see also* Baxter Rebuttal Demo. at 1.

the physical reality of Samson's unconventional assets; they applied to massive areas type curves from distant areas that are barely analogous to Samson's undeveloped locations; they adopted EUR assumptions from Jefferies without any further risking; and they failed to apply industry-standard risking based on PRMS categories.  *See supra* ¶¶ 86-94; *see also* Trial Tr. (Strickland) 320:9-345:1,  346:1-348:17,  348:23-349:4,  351:24-352:14,  353:4-11,  2487:10-2488:8,  2488:9-18, 2492:13-2504:1, 2596:5-2598:23.    Mr. Filsinger's and Mr. Baxter's adjustments to KKR's downside case, IP rates, or drilling success rates referenced above do not even factor in this overstatement of volumes.

188.    Defendants, on the other hand, provided no credible testimony to support the KKR Model's volume assumptions.  Ms. Roski offered no opinions as to the substance of those volume assumptions, even in the portions of her opinion that were stricken.  As for Mr. Almrud, when he submitted his report and reached his conclusion that the KKR Model's cash flows were "reasonable," he had not evaluated or formed an opinion as to the reasonableness of the key volume assumptions in the KKR model that would have been necessary to arrive at this conclusion about the reasonableness of the cash flows.  Trial Tr. (Almrud) 2148:6-2157:13.  He had not formed an opinion, for example, that the blended "location risking" average of 47.5% was reasonable, Trial Tr. (Almrud) 2155:15-2156:14, or that the type curves applied to the 9,000-plus undeveloped locations in the model were reasonable, *id.* at 2152:2-21.  In the middle of the trial, Mr. Almrud submitted a declaration that attempted to add, in conclusory fashion, the opinions regarding the volume assumptions that were missing from his original report.  [*See* Adv. Pro. D.I. 430, ¶¶ 7-10]  But this late attempt to backfill his analysis only undermined Mr. Almrud's ultimate "reasonableness" conclusion by demonstrating that he reached this ultimate conclusion first, prior to performing the necessary underlying analysis.  *See id.*  In any event, each of these new "sub-

conclusions" regarding the reasonableness of the individual assumptions are themselves conclusory and lacking in necessary analysis.  Instead, Mr. Almrud simply noted the materials he reviewed and then, without further reasoning, concluded that the relevant KKR assumption was "reasonable," providing no explanation as to why he reached this conclusion.  [*See, e.g.*, Adv. Pro. D.I. 432, ¶¶ 183, 191, 196, 204]  In light of this process, Mr. Almrud's bare-bones new opinions should not be credited, nor should his overall conclusion regarding the reasonableness of the cash flows.

189.    Even worse, Mr. Almrud's understanding of KKR's process was materially deficient.  For example, he opined that KKR/RPM risked their volume estimates by using mean type curves and EURs, and also by applying success factors to the number of undrilled locations.  Trial Tr. (Almrud) 2001:5-2006:13.  But as a matter of elementary statistics, using a mean is not risking.  Trial Tr. (Strickland) 2491:19-2492:12 ("I have never heard of" "anyone describing [the] process of taking the mean of a type curve or a EUR and calling that a risk[ed] type curve or a risk[ed] EUR.").  And, as Dr. Strickland testified, KKR/RPM's broad-brush success factors were markedly inadequate to account for risks inherent in reserve estimates.  Trial Tr. (Strickland) 323:5-336:6.  In fact, KKR's model itself expressly described its volume estimates as "unrisked," and Mr. Almrud could not square that fact with his testimony.  *See* Trial Tr. (Almrud) 2136:10-22.

190.    Defendants have also claimed that the Sponsors adequately risked Samson's projected cash flows, referring to KKR/RPM's location risking.  But even if this location risking were adequate to accurately project volumes over time (and it was not), KKR never performed any risking of Samson's ability to generate EBITDA post-close on the timeline the KKR Model anticipated.  At trial, the Trustee presented unrebutted evidence of the daunting hurdle that Samson

management faced post-close:  KKR's business plan dictated that Samson needed to generate at least $95 million in EBITDA from undeveloped wells in the first year following the Transaction in order to remain in covenant compliance.  *See* Trial Tr. (Baxter) at 782:8-23; *see also* Baxter Trial Demonstrative at 43.  That quantum of EBITDA from undeveloped wells only increased with every year post-close.  *Id.* To further increase the hurdle, this projection assumed commodity prices as of November 11, 2011; in the event that commodity prices were lower than modeled (as they were leading up to and after close), EBITDA from PDPs would be lower than the KKR Model projected, which only increased the EBITDA that needed to be generated from undeveloped land.  Trial Tr. (Baxter) at 784:11-787:14.  As discussed, the KKR Model was also premised on unrealistically optimistic volume and production rate assumptions for all acreage.  *See supra* ¶¶ 95-96.  Moreover, in many plays, Samson held nonoperator working interests, which meant that the drilling in those wells was outside of Samson's control, and instead at the mercy of the operators.  *See* Trial Tr. (Strickland) 2505:15-2507:17.  As a result, there was a significant business risk at close that any of these factors critical to Samson's ability to achieve its EBITDA targets could go awry.

191.    In the event that Samson was unable to generate EBITDA as expected, there was no fallback cash on hand for management to use for development CapEx – each year's CapEx was dependent on the prior year's EBITDA.  Trial Tr. (Baxter) at 788:20-789:17.  Thus, an EBITDA "miss" in this critical first year risked setting Samson on a path to a death spiral.  *Id.* at 787:15-788:19.  As noted below, failing to achieve EBITDA targets would also cut off Samson's access to additional capital.  *See infra* ¶182.  Thus, it is a known risk for any E&P company that results might come in under its EBITDA targets.  *Id.* at 783:7-10.  Nonetheless, Defendants presented no evidence that KKR seriously accounted for the possibility that, for whatever reason, Samson would

not be as successful in the first few years as the business plan had anticipated. There was no evidence that KKR assessed the risk that, even if they had correctly projected the aggregate *amount* of volumes to come out of Samson's wells, they might miss the *timing* of the KKR Model's projections. Indeed, there was no evidence that KKR modeled Samson's cash flows if it was unable to deliver results on KKR's timeline. Thus, the KKR Model failed to "account for difficulties that are likely to arise . . . and . . . incorporate some margin for error," and thus, left Samson with unreasonably small capital. *Moody*, 971 F.2d at 1073.

### 2) Defendants Failed To Rebut The Trustee's Showing Of Inadequate Capitalization

192. As noted above, Defendants have argued that Samson's ability to operate and borrow capital post-close, as it prolonged its death spiral, indicates that Samson was not inadequately capitalized. *See* Adv. Pro. D.I. 410 at 40-41. But Defendants presented no admissible evidence that Samson was adequately capitalized; they offered no expert valuation or testimony from fact witnesses disputing the Trustee's characterization of Samson's financial condition. Thus, Defendants have not carried their burden of rebutting the Trustee's evidence that Samson was inadequately capitalized in the Transaction. *See In re Suburban Motor Freight, Inc.*, 124 B.R. 984, 1000 (Bankr. S.D. Ohio 1990) ("Of further significance to the Court's analysis is the fact that the Shareholders have not placed into dispute, through affidavits or otherwise, the criticality of Suburban's financial condition on and after the Closing. At this point, the Shareholders had the burden of rebutting the trustee's assertion. . . .They failed to do so.").

193. Defendants do point to Samson's undrawn liquidity under the RBL at close as evidence of "additional liquidity" showing that Samson was adequately capitalized. Adv. Pro. D.I. 410 at 40. But, a theoretically available line of credit is not necessarily dispositive of capital adequacy. Rather, as here, "[i]f projections are unreasonable, . . . it will follow that the debtor was

left with an unreasonably small capital even though it may not have exhausted its credit." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1072 (3d Cir. 1992).  Moreover, Defendants did not establish at trial that Samson's undrawn liquidity was actually available to it post-close.  Rather, as the Trustee showed, in a declining commodity price environment, "your ability to draw down that dry powder on that revolver decreases rapidly."  Trial Tr. (Baxter) at 791:4-8.  Leading up to and following close, it is undisputed that Samson would have foreseeably been operating in such a commodity price scenario.  *See* Trial Tr. (Filsinger) at 2447:18-2449:2. If commodity prices were lower than assumed in the business plan, or if Samson otherwise failed to deliver the EBITDA upon which its borrowing base was premised, it risked redetermination by the RBL lenders, effectively cutting off its access to the undrawn liquidity altogether. Trial Tr. (Baxter) at 792:9-793:2 ("I[f] there's a redetermination and it's negative, they do not have the ability to draw down that billion of dry powder.  It's still on paper, a revolver, but practically speaking, they cannot access it.").  The reality of these strings attached to Samson's RBL availability was known or knowable to any sophisticated investor at the time.  *Id.* at 793:3-7.  Accordingly, the Trustee established that this undrawn capacity on Samson's RBL at close did not translate to "available financing" in the prevailing circumstances at close, and any belief to the contrary would not have been reasonable.  *See Peltz v. Hatten*, 279 B.R. 710, 746 (D. Del. 2002) (considering, for purposes of adequate capitalization, "whether USN's expectations that it could again access the capital markets were unreasonable.")

194.    Nor is a company's survival for a particular period of time post-transfer dispositive of its capital adequacy.  *See Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 398-99 (S.D. Tex. 2008) ("The fact that ASARCO did not file bankruptcy until over two years after the transfer is not dispositive.").  As set forth above, *see supra* ¶ 101 & *infra* ¶ 294,  it is expected that Samson

would be able to prolong the inevitable by taking ███████████████████████████
█████████████████████████████████ JX-248 at 15.  But, where a debtor

survived for years "primarily because it took drastic measures to do so, such as . . . monetizing

insurance policies, and stopping some operations altogether," its "ability to avoid a total collapse"

does not show that its cash flow was sufficient to meet its capital needs.  *Id.* (noting that, as of the

transfer, ASARCO might accurately have been described as insolvent and "doomed to failure.");

*see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 322 (Bankr. S.D.N.Y.

2013) (rejecting argument that Tronox was adequately capitalized simply because it was able to

"put off the day of reckoning[.]").

195.    In short, the Court can and should find that, as Mr. Baxter clearly and

unambiguously testified, "I have no doubt about it, that . . . if you had modeled it properly . . .

[t]here is no doubt that they would not have been able to pay their debts as they came due and

would, eventually – even with the death spiral, it was foreseeable."  Trial Tr. (Baxter) 1295:6-17.

### C.    Samson Was Balance Sheet Insolvent At The Time of the LBO Closing and GOM Asset Transfers

196.    While the Court need not reach the Balance Sheet Test because the "unreasonably

small capital" test is satisfied, the evidence admitted at trial also supports a finding that Samson

was balance sheet insolvent at the time of, or as a result of, the Challenged Transfers.  Under the

Balance Sheet Test, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of

the debtor's assets, at a fair valuation."  Del. Code Ann. tit. 6, § 1302(a).  Thus, the central

determination for insolvency is a comparison of the fair market value of Samson's assets at the

time of the Transaction to its debts on that date.

197.    The Trustee established at trial that each of the Debtors that made the Challenged

Transfers were insolvent at the time of the Challenged Transfers under the Balance Sheet Test.

Fundamentally, balance sheet insolvency was established through the testimony of Mr. Baxter and Dr. Strickland regarding volumes and risking. Mr. Baxter and Dr. Strickland each independently opined that the KKR model grossly overstated reserve volumes and failed to apply industry-standard risking, and, when properly risked, the assets were worth far less than the Transaction price intimated.

198.    Specifically, Mr. Baxter opined that Samson's assets as of the Closing had a value of $2.8 billion, based on a weighted average of two income-based valuations (a net asset value ("NAV") and a discounted cash flow ("DCF") analysis), and two market-based valuations (comparable public companies and precedent M&A transactions). *See* Trial Tr. (Baxter) at 802:2-816:1. Mr. Baxter testified that his income approaches were premised on his estimates of Samson's reserves, based on information available at the time of the Transaction, broken down by PRMS category, to which he then applied industry standard risking, to arrive at his NAV and DCF valuations. *See id.*

199.    Mr. Baxter first calculated a NAV by valuing Samson's reserves, according to PRMS categories, at a total of $4.5 billion. *See* Trial Tr. (Baxter) at 804:2-16. He ascribed a midpoint value of $443 million to Samson's contingent resources. *Id.* at 804:17-805:7. From Samson's assets, Mr. Baxter then subtracted the value of current and long-term liabilities, capital expenditures, G&A expenses, KKR's monitoring fee, and mandatory preferred debt.[70] *Id.* at 805:13-806:20.

---

[70]    While Ms. Roski critiqued Mr. Baxter's deduction of the KKR monitoring fee and the preferred stock, Mr. Baxter explained that these deductions were appropriate. Specifically, the KKR monitoring fee was a liability in place at closing, just as Samson's debt was, and the preferred stock was mandatorily redeemable and was, accordingly, treated as a liability on Samson's balance sheet. *See* Trial Tr. (Baxter) at 2616:4-2617:16.

200.    Finally, Mr. Baxter assessed the fair market value of Samson at closing by calculating a weighted average of his NAV, DCF, and market-based valuations according to what is appropriate within the industry.[71]  Trial Tr. (Baxter) at 802:8-22.  Subtracting the value of Samson's debt from the midpoint of his valuation of Samson's assets, he opined that Samson's equity value at close was negative $1 billion, as summarized in the table below:



Baxter Trial Demonstrative at 48; *see also* Baxter Trial Decl. Ex. A (Opening Report (Pt. 1)) at 44, Table 15; Trial Tr. (Baxter) at 803:9-22.  Based on his analysis, Mr. Baxter concluded that the company did not pass the balance sheet test for insolvency as of the Closing.  *See* Trial Tr. (Baxter) at 803:13-22; 815:25-816:1.

---

[71]    While NAV is the standard within the industry, Mr. Baxter considered other valuation methods for thoroughness.  Trial Tr. (Baxter) at 802:8-12; 806:22-807:17.

201.    Dr. Strickland opined as to the volumes of Samson's oil and gas reserves as of the date of the Transaction, based on reasonable adjustments to "roll back" NSAI's June 2012 reserve estimates to the Transaction date.  Dr. Strickland testified that he conducted a roll back analysis that approximated as closely as possible the full estimates for proved and unproved reserves that would have been included in a 3P report prepared in 2011.  *See* Trial Tr. (Strickland) at 283:8-16; *id.* 357:11-358:7.  Applying average risk factors from an industry survey by SPEE, Dr. Strickland reached an illustrative value range with a midpoint value of Samson's reserves of $2.86 billion at the time of the Transaction.  *See* Trial Tr. (Strickland) at 373:8-374:4.

202.    Defendants' only meaningful attempt to challenge Mr. Baxter's and Dr. Strickland's analyses regarding volumes and risking was Mr. Almrud's testimony that market participants did not use PRMS categories, or risking factors such as RAFs and RADRs, to value undeveloped, unconventional assets.  DX-850, Almrud Trial Decl. ¶¶ 312-314.  At trial, however, the Trustee showed that Mr. Almrud failed to consider substantial evidence that market participants, including those involved in the Samson Transaction itself, routinely used PRMS categories and RAFs and/or RADRs to value such assets.  Trial Tr. (Almrud) 2195:20-2216:4.  In short, Mr. Almrud's testimony was not compatible with the record evidence.

203.    Having focused on methodology, Mr. Almrud did not meaningfully challenge the specific volume assumptions or RAFs applied by Mr. Baxter or Dr. Strickland.  In fact, with respect to Dr. Strickland's rollback analysis, Mr. Almrud testified that "rollbacks are common occurrence in [the O&G] industry" and he "didn't see anything wrong with the purpose behind [D]r. Strickland's approach."  Trial Tr. (Almrud) 2178:15-21.  This is notable because, although Defendants challenged Mr. Baxter's method of estimating the volumes of probable and possible reserves, they cannot deny that those estimates were more favorable to the Defendants than Dr.

Strickland's estimates of volumes in those same categories, which were unchallenged.  And as for risking, the Trustee showed at trial that the RAFs and illustrative RADRs used by Mr. Baxter for his valuation were clearly within the range of risk factors used in the market, *see, e.g.*, Trial Tr. (Strickland) 377:3-9, including those used by Mr. Almrud's own consultant in this case.  Trial Tr. (Almrud) at 2212:17-2216:4.

204.    Defendants, in contrast, ultimately offered no expert opinion as to the actual fair market value of Samson's assets.[72]  Mr. Almrud testified regarding the reasonableness of the cash flows in the KKR Model, but he did not form an opinion as to fair market value, or a reasonable discount rate to apply to the KKR Model's cash flows.  Thus, for example, Mr. Almrud was unable to testify that any of the various discount rates shown in the KKR Model – 10%, 12%, or 15% – was more reasonable than any other for determining FMV.  Trial Tr. (Almrud) 2134:17-2138:3.  This is critical, because as the model itself shows, the NPV of the cash flows is extremely sensitive to the discount rate applied.  Selecting the 15% discount rate from the KKR Model  resulted in a NPV of $4.9 billion, or approximately $2.3 billion less than the purchase price, using November 11, 2022 pricing, and using volume assumptions that were based on *July* pricing.[73]  *Id.*  As the Court heard throughout trial, commodities prices became steadily worse from July through the December 21, 2011 closing, and that reduced Samson's reserve volumes.  *See, e.g.*, Trial Tr. (Baxter) 678:21-; 682:1, 696:11-697:15.  Again, Mr. Almrud had no opinion as to whether the KKR Model's application of a 15% discount rate was reasonable, and, indeed, Samson itself

---

[72]    Ms. Roski did not offer a valuation opinion, has no expertise in valuing an O&G company, Trial Tr. (Roski) 2300:3-2306:25, and her lay critiques of Mr. Baxter's work are fully addressed in Mr. Baxter's sur-rebuttal report and rebuttal trial declaration.  *See generally* PX-889, Ex. C; PX-895, Baxter Rebuttal Trial Decl.

[73]    Mr. Almrud admitted that RPM's location risking, one of the key drivers of KKR's volume estimates, was dependent on pricing.  Trial Tr. (Almrud) 2137:20-2138:3.

valued its undeveloped assets using a range of discount rates between ▮▮▮▮▮▮ shortly after the Transaction.  *See, e.g.*, PX-611.

205.    Rather than have any of their witnesses attest to Samson's fair market value at the time of the Transaction, Defendants relied entirely on their theory that Samson's fair market value was the $7.108 billion sale price, and thus, Samson was balance sheet solvent on that basis alone. *See* Defendants' Pre-Trial Br. 33-34.    But, while a particular transaction may be relevant to assessing the fair market value of an asset, it is well established that the transaction price itself does not establish fair market value.  *See FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 595 B.R. 686 (Bankr. D. Del. 2018) (finding a constructive fraudulent conveyance, and rejecting defendants' theory that the purchase price, premised on an anticipated gaming license that the transferor had not received at the time of the transfer, was a fair reflection of fair market value); *In re Tronox Inc.,* 503 B.R. at 302-03 ("The market as a whole, no matter how efficient or inefficient, cannot be relied on to determine solvency or insolvency . . . there is no substitute for a solvency analysis."). *see also infra* ¶¶ 223-33.

206.    Fundamentally, according to Defendants, even if one accepts that KKR materially erred in structuring the Transaction and overpaid for Samson's assets that they then burdened with substantial debt, that is not a risk to be borne by the Selling Shareholders.    But, as between the Selling Shareholders, who Defendants contend fully participated in the negotiations over the purchase price and helped KKR construct their business plan, and the company's creditors, who were never consulted in connection with the Transaction that primed them with several billion dollars in secured debt, the choice is clear.    The risk of KKR's catastrophic error falls on the Selling Shareholders, who extracted value from an insolvent company, at the creditors' expense.

207.    Thus, as demonstrated above, the only competent evidence admitted at trial established that on December 21, 2011, Samson incurred liabilities of approximately $4.3 billion, far exceeding the $2.79-2.86 billion fair market value of its assets, thereby rendering Samson insolvent under the Balance Sheet Test.

## D.    Samson Did Not Receive Reasonably Equivalent Value for Any of the Challenged Transfers

208.    The Trustee has also demonstrated at trial that Samson did not receive reasonably equivalent value for the Cash Transfer or the GoM Asset Transfers.  "To determine whether 'reasonably equivalent value' was exchanged, courts first determine whether the debtor received any 'value' in the transaction. The Court then must determine whether the value received was 'reasonably equivalent' to what the debtor transferred."  *In re Opus East, LLC*, 528 B.R. 30, 83 (Bankr. D. Del. 2015) (citations omitted).  While reasonably equivalent value "does not require a dollar-for-dollar exchange," *id.,* the court must compare what was transferred with what was received by the debtor to determine whether the debtor received roughly the value it gave.  *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007).

209.    While the Sponsors devised a complicated corporate structure in effectuating the Transaction, there were fundamentally only two transfers that took place at close. One was an exchange of Sponsor and bank cash for interests in SIC; the other was an exchange of the GoM Assets for the Subordinated Notes.  As discussed below, each was for less than fair consideration and for less than reasonably equivalent value.

210.    Even more simplistically, the lack of reasonable equivalent value can be seen from a comparison of the balance sheet of the Samson enterprise before, and immediately after, the Transaction.  From a balance sheet perspective, the fact that Samson's equity changed hands is immaterial.  Following the Transaction, Samson's assets decreased, because it no longer owned

the GoM assets, and its cash position decreased from $632 million to $226 million.  On the other hand, Samson's liabilities dramatically increased, because it took on billions of dollars of new debt.  This holistic comparison makes clear that the Samson enterprise received no balance sheet value from this transaction.   As a result, if the Transaction were avoided, the Selling Shareholders would receive no reduction in damages to the extent of the value of the shares they tendered, because those shares provided no quantifiable benefit to Samson's enterprise balance sheet.  Nevertheless, as set forth below, the Trustee has calculated damages conservatively in favor of Defendants by giving them credit for the full value of the shares they surrendered in the Transaction. *See infra* ¶239.

### 1)    Value Exchanged for Samson's Onshore Assets

211.    At trial, the Trustee established that each of the Cash Transfers was made in exchange for less than fair consideration and less than reasonably equivalent value.  In particular, Mr. Baxter testified that the SIC stock Samson received was worth approximately $4.1 billion less than the approximately $7 billion in cash it transferred to the Sellers.  *See* Trial Tr. (Baxter) at 665:7-12.  This delta of nearly $3 billion serves as the basis for the Trustee's damages calculation.  Adjusting this figure pro rata to determine the damages on a transfer-by-transfer basis, and to account for the Court's prior ruling that the transfers by SIC are safe harbored under Section 546(e) of the Code, Mr. Baxter concluded that the total pro-rated damages amount (*i.e.,* the difference between the amount transferred and the amount received) was exactly $2.4 billion (before pre-judgment interest).  *See* Trial Tr. (Baxter) at 665:13-18.

212.    Defendants did not attempt to rebut any aspect of Mr. Baxter's calculations with any calculations of their own.  Rather, they critiqued various component parts to Mr. Baxter's underlying valuations, ultimately without success.  In particular, Mr. Almrud, despite years of

experience in the E&P business, did not opine on Samson's fair market value.  Trial Tr. (Almrud) 2131:11-2132:12.  And, without any experience in the industry whatsoever, Trial Tr. (Roski) 2300:3-2311:22, Ms. Roski criticized Mr. Baxter for using the industry-standard practice that KKR/RPM failed to follow, challenged Mr. Baxter's analysis that naturally flowed from such industry-standard practice, [74] faulted Mr. Baxter for selecting comparable companies and transactions based on overlapping revenues,[75] and disagreed with his use of the relevant equity value multiples.  DX-852, Roski Trial Decl. ¶¶ 78, 81-83, 85-91, 98, 107, 128-138.  Elsewhere, she quibbled about Mr. Baxter's deduction of KKR monitoring fees, Samson's mandatorily redeemable preferred shares, selection of a WACC slightly higher than the one of her preference, and certain customary discounts applicable to Samson.  Id. ¶¶ 79, 92-95, 112-127.  Mr. Baxter addressed these criticisms in his sur-rebuttal expert report issued last year, to which Ms. Roski did not offer any material responses at trial, even though she otherwise testified to a number of new rebuttal opinions.  See generally PX-895, Baxter Rebuttal Decl. (largely referring back to PX-889, Baxter Trial Decl., Ex. C).  Ultimately, Defendants' affirmative valuation argument was

---

[74]     For example, Ms. Roski opined that "Mr. Baxter's projections do not reflect Samson Onshore's stated strategy in 2011 to increase its oil production relative to gas" because he reduced Samson's CAPEX by applying industry-standard risking factors.  DX-852, Roski Trial Decl. ¶¶ 81-83.  This opinion makes no sense.  First, a reduction in CAPEX based on the expected uncertainties of extracting oil and gas favors Defendants by increasing Samson's fair market value.  Second, Ms. Roski seems to blame Mr. Baxter for not speculating on how Samson would tear apart KKR's business plan as of the closing date and simply adjust according to the post-closing market environment, id. at ¶¶ 82-83, but Mr. Baxter rightly did not use any hindsight.  Finally, Mr. Baxter simply applied industry-standard risking factors based on the nature of Samson's assets—if Samson's vast undeveloped acreages were so uncertain that deserve high risking, then the accordingly risked CAPEX is just a natural consequence of Mr. Baxter applying a standard methodology.  See Trial Tr. (Almrud) 2183:15-2186:1 (addressing a similar attack).  And that methodology is reasonable because, contrary to what KKR did, a reasonable operator would not have blindly thrown CAPEX onto wildcats or goat pastures especially in a market downturn.

[75]     The oil and gas E&P industry has specific norms when it comes to the use of the Market Approach, and a nuanced investigation of the comparability of the underlying assets is essential.  Mr. Baxter's selection of comparable companies and transactions based on overlapping revenue did just that.  Trial Tr. (Baxter) 808:15-811:10, 814:20-815:20.

simply that KKR's purchase price was the only valuation necessary.  As set forth below, *see infra*
¶¶ 223-33, Defendants are wrong.

### 2)    Value Exchanged for Samson's GoM Assets

213.    As noted, the Trustee established that the GoM assets, transferred immediately
before the Transaction, had a fair market value of $846 million as of Closing.  Valuing the assets
using a weighted combination of NAV, DCF, Public Companies, and M&A Transactions
approaches, Mr. Baxter determined an equity value range of $735-$957 million, as summarized in
the table below:



Baxter Trial Demonstrative at 59; *see also* PX-889, Baxter Trial Decl. Ex. B (GOM report) at 12,
table 1;   Trial Tr. (Baxter) at 665:19-25.

214.    In exchange for this $846 million in assets, the sole consideration Samson received
was in the form of cancellation of Subordinated Notes which had been issued to Ms. Schusterman

or her trusts in exchange for the redemption of equity, not any capital infusion. *See supra* n.44.

Mr. Baxter opined that, because Samson was insolvent as of the Transaction, the Subordinated

Notes did not have "any economic value." *See* Trial Tr. (Baxter) at 826:21-827:8. Accordingly,

while Notes in the amount of $533 million were "redeemed" purportedly in exchange for the GoM

assets, as a practical matter, the redemption of those Notes provided no value to Samson. *See id.*

Consequently, Mr. Baxter opined that Samson received $0 in actual value in exchange for its

transfer of assets worth $846 million. Trial Tr. (Baxter) at 665:19-25; PX-889, Baxter Trial Decl.

Ex. B (GOM report) at 14. Moreover, because the agreement with KKR contemplated a purchase

of Samson exclusive of its GoM Assets, the Notes were required to be "redeemed" in order to

effectuate the Transaction. This cancellation of Notes was not actual, meaningful consideration

received in exchange for Samson's GoM assets. Rather, any purported "exchange" of the notes

for the GoM assets was a mere accounting fiction.

215.    Unlike the transfer of onshore assets to KKR, Defendants do not argue that the

GoM assets' value was established by an arms'-length transaction price. Nor could they, because,

as Ms. Schusterman acknowledged in her deposition: "That wasn't a sale. That was just us keeping

the [GoM] assets." Schusterman Dep. Tr. 222:25-223:2. Defendants also failed to provide any

admissible expert testimony regarding the reasonably equivalent value of the GoM Assets at all.

Specifically, the Defendants failed to put forward any expert testimony regarding:

- The fair market value of Samson's onshore assets;

- The fair market value of Samson's GoM assets; or

- The fair market value of the Subordinated Notes.

216.    Rather than put forward any expert testimony to rebut Mr. Baxter's $846 million

valuation, Defendants attempted to rely on the deposition transcripts of the witnesses from Duff &

Phelps and Stout Risius Ross, the two firms who performed appraisals of the GoM Assets (the "Appraisers").  As an initial matter, it was established at trial that (1) those appraisals were performed purely for tax purposes, *see* Trial Tr. (Schusterman) 1842:2-9; Trial Tr. (Phillips) 1505:9-18; *id.* at 1528:1-6; and (2) they were outcome-driven, with Samson withholding a substantial amount of material information from the two Appraisers that would have indicated significantly higher values than what the Appraisers ultimately concluded.  *See supra* ¶¶ 123-27. By way of example, both Appraisers applied significant litigation discounts in reaching their valuations, but Samson did not disclose to the Appraisers that they did not believe there was any material litigation that would diminish the value of the GoM assets, as Samson Energy represented to a potential creditor in financial statements just months after the LBO.  Trial Tr. (Phillips) 1518:9-1522:20; *see also* Trial Tr. (Baxter) 1178:3-1179:6, 1361:22-1363:3; JX-291.

217.    What's worse, the Appraisers in many material respects simply accepted what was fed to them by Samson without challenge.  For instance, the Appraisers did not have the legal expertise necessary to independently evaluate the litigation risks, and they exclusively relied on Samson's in-house and external counsel.  *See* Scott Dep. Tr. 159:23-162:5, 230:22-234:13, 280:9-284:11 (Jan. 21, 2021); Reiff Dep. Tr. 191:23-197:13 (Nov. 13, 2020).  As a result, it is unclear what, if any, method was used to calculate the exact litigation discounts applied.  *See* Scott Dep. Tr. 284:12-288:21, 328:23-331:25 (Jan. 21, 2021); Reiff Dep. Tr. 191:23-197:13 (Nov. 13, 2020).

218.    Moreover, neither Duff nor SRR equipped itself with internal or third-party reserve engineering expertise necessary to independently value the GoM Assets.  Duff's appraisal report recognizes that "the subject assets' engineering and management reserve reports" "were the

primary source of information to build the cash flow projections" necessary for DCF valuation.[76] Scott Dep. Tr. 290:13-293:3 (Jan. 21, 2021).  Yet, Duff did not have any of its petroleum engineers to review this data, and it simply adopted Samson's reserve analysis.  *Id.*; *see also id.* at 81:18-82:15, 271:10-273:15 (testifying that the only two major independent analyses Duff performed for its DCF valuation were updating the cash flow projections with new commodity prices and computing WACC).  SRR's appraisal report was more forthright:  It expressly states that "Samson does their own reserves estimation" and, accordingly, the SRR did not staff anyone qualified to perform reserve estimation or ask for any third-party opinion.  Reiff Dep. Tr. 76:14-77:3, 143:4-144:6 (Nov. 13, 2020); *see also id.* at 163:9-164:8, 167:21-168:22, 179:11-180:18, 183:17-185:12.

219.    The Court should not credit the Duff and SRR appraisals as credible valuations of the GoM Assets.  The Appraisals simply reproduce inaccurate information provided by Ms. Schusterman's team in order to reverse-engineer a specific result.  *See supra* ¶¶ 123-27. Ultimately, the "'garbage in/garbage out' risk inherent in this division of labor materialized" in the Duff and SRR valuations, and the Court should accordingly grant them no weight.  *In re Tops Holding II Corp.*, No. 18-22279 (RDD), 2022 WL 6827457, at *23 (Bankr. S.D.N.Y. Oct. 12, 2022) (disregarding "inflated" valuation from valuation firm whose engagement letter "stated that it was not responsible for v[e]rifying the accuracy of the information that [the company] provided it, including the existence and amount of [the company's] contingent liabilities.").

220.    On the other side of the ledger, Defendants put forth no competent evidence establishing that the Subordinated Notes had any value at all in the context of the Transaction. Instead, Defendants rely on the legal argument that cancellation of a loan to an insolvent company

---

[76]    This also affected Duff's market comparable analysis because metrics used for comparison pertained to Proved Reserves.  *See* Scott Dep. Tr. 294:20-296:20 (Jan. 21, 2021).

(or out of the money debt) constitutes a payment on valid antecedent debt (and therefore a transfer for value). They reason that, if this were not the legal result, all preferential transfers would also be constructively fraudulent, citing various cases from other jurisdictions in support of their argument. *See* Defendants' Pre-Trial Br. 58-59. But Defendants' authority supports only the general proposition that there is a difference between preferential payments made with the last of a debtors money to satisfy an antecedent debt and constructively fraudulent transfers. *See Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) (explaining that fraudulent conveyances are distinct from unfair, preferential payments made with the last of a debtors money); *Davis v. Schwartz*, 155 U.S. 631, 639 (1895) (noting that a preferential payment in satisfaction of debt, which has the effect of hindering creditors, is not necessarily unlawful); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477-78 (7th Cir. 2005) (explaining the difference between preferential transfers and fraudulent conveyances – that payment of an antecedent loan constitutes reasonably equivalent value, which can make such a transfer preferential but not constructively fraudulent); *Cox v. NOSTAW, Inc. (In re Cent. Ill. Energy Co-op.)*, 521 B.R. 868, 873 (Bankr. C.D. Ill. 2014) (noting that a debtor's transfer of funds in satisfaction of its own debt constitutes "value" and is not constructively fraudulent); *First State Bank v. Smith*, 140 P. 150, 152 (Okla. 1914) (distinguishing fraudulent transfer claims from preferential transfers). None of these cases involved the situation at hand in which a debtor received cancellation of a loan that it could not have paid, and none of these authorities stand for the proposition that canceling an insolvent debtor's antecedent debt constitutes satisfaction of an antecedent debt (or that cancelation of antecedent debt provides value the same way payment of antecedent debt does).

221.    Indeed, consistent with common sense, courts have found that notes which cannot be repaid due to the debtor's insolvency have no value. *See, e.g.*, *United States v. State St. Bank*

& *Trust Co.*, 520 B.R. 29, 84 (Bankr. D. Del. 2014) (indicating that junior notes had no value

where, at the time the Plan was being proposed and confirmed, the noteholders and management

knew that the value of the assets was insufficient to pay anything to the junior noteholders);

*FirstMerit Bank, N.A. v. Kloysner Grp.*, LLC, No. 16-cv-4930, 2017 U.S. Dist. LEXIS 183695, at

*2 (N.D. Ill. Nov. 6, 2017) (describing "uncollectable debt obligations that had little to no value

at the time they were exchanged because the debtors were all likely insolvent" as "worthless

obligations"); *Murphy v. Meritor Savings Bank (In re O'Day Corp.*), 126 B.R. 370, 397 (Bankr.

D. Mass. 1991) (concluding that the cancellation of certain intercompany notes did not provide

fair consideration, as the signatories to the notes did not contemplate their repayment from

operations).

222.    Accordingly, the evidence admitted at trial establishes the absence of the exchange

of *any* consideration for the GOM Assets, let alone consideration amounting to reasonably

equivalent value.

### 3)    The Purchase Price As Value

223.    As to the value of the onshore assets, rather than putting forward actual expert

valuation testimony, Defendants' only argument at trial was that the $7.2 billion purchase price

demonstrates, *ipso facto*, the Debtors received reasonably equivalent value.    But while

theoretically probative, the purchase price here is plainly not dispositive, as Defendants

erroneously argued in their opening statement.  Trial Tr. (Willett) 37:7-38:7.  Defendants point to

the sale price as establishing the fair market value of SIC and claim that SIC's stock was worth

what SRC paid for it.  *See* Defendants' Pre-Trial Br. 26-30.  Defendants argue strenuously for the

"primacy of market evidence," and caution that, to question the sale price is to "put the market

itself on trial." D.I. 410 at 26, 29. Ultimately, Defendants have to "ride or die" on a bright-line rule because the evidence in the record cannot support the price KKR paid.

224.    As a threshold matter, it is well established that fraudulent transfer cases are fact-intensive, and each case must turn on its own facts. *See, e.g., In re Terry Mfg. Co.*, 358 B.R. 429, 434 (M.D. Ala. 2006) ("Actions to set aside alleged fraudulent conveyances are fact-intensive by nature."); *In re Taylor*, 228 B.R. 491, 497 (Bankr. M.D. Ga. 1998) (same); *In re Oxford Homes, Inc.*, 180 B.R. 1, 9 (Bankr. D. Me. 1995) ("Whether a transaction is within or without the purview of fraudulent transfer principles is a function of its own facts and the applicable law."). The facts established at trial make clear that blind reliance on *one* market data point is inappropriate.

225.    In support of their market price theory, Defendants selectively quote *Campbell Soup* as holding that "the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *See* Defendants' Pre-Trial Br. 26. But, Defendants elide the critical qualifying language to that holding: "[a]bsent some reason to distrust it . . ." *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("***Absent some reason to distrust it***, the market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'") (emphasis added). As the Trustee established at trial, there are multiple "reason[s] to distrust" the sale price KKR paid for Samson's assets. *See supra* ¶¶ 70-109. Thus, unlike the plaintiff in *Campbell Soup,* the Trustee established in detail the ways in which KKR's valuation was materially incorrect, and the corresponding impact of these errors on Samson's concluded value. *C.f. VFB Ltd. Liab. Co. v. Campbell Soup Co.*, 482 F.3d 624, 634 (3d Cir. 2007) ("For its appeal to succeed, VFB must show that on March 30, 1998, the Specialty Foods Division was *clearly* worth less than $ 500 million. Yet it never engages with the relevant numbers in any detail, explaining by how much Campbell's various

manipulation techniques affected its statistics, or by how much the statistical inflation affected VFI's market capitalization. Its approach is simply to note that Campbell played with its operations and suggest that the market capitalization numbers may have been wrong to some undetermined degree.").[77]

226.    Defendants further rely on *Peltz v. Hatten,* but that court too did not uncritically accept the transaction price, and considered the parties' "reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time." *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), aff'd, 60 F. App'x 401 (3d Cir. 2003).    Such reasoned expert judgments, market support, and reasonable perceptions about growth, risks, and the market are not part of Defendants' evidentiary record here.

227.    In particular, Defendants introduced no evidence showing there was a robust market for Samson's onshore assets.    The unrebutted evidence is that KKR was the only bidder left, in a collapsing market, when it submitted its preliminary $7 billion bid that ultimately became the purchase price.    Defendants' reliance on cases in which the sale price at issue was reached after an extensive bidding process is thus misplaced.    *See Allonhill, LLC v. Stewart Lender Servs., Inc.*, 2019 WL 1868610, at *40 (Bankr. D. Del. Apr. 25, 2019) (referencing "extensive marketing process and negotiations"); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *1 (Del. Ch. Oct. 21, 2015) (noting "thorough and vigorous sales process"); *Merlin Partners LP v.*

---

[77]    Likewise, the Trustee's proof does not suffer from the same defects as those in *Iridium*, another case upon which Defendants heavily rely.    Notably, Iridium's solvency experts had a pervasive "credibility problem" that the Trustee's experts do not share. 373 B.R. at 294, 352. The *Iridium* court found that the plaintiff had not met its burden of proving insolvency because its experts (i) did not "confront[] valuations implied by the public markets," (ii) did not "test and validate their valuation opinions by utilizing any accepted methodologies other than the discounted cash flow approach to value," and (iii) "based their opinion on restated cash flow projections that were tailored for litigation purposes well after the commencement of [the] adversary proceeding." *Id*. at 293, 352.

*AutoInfo, Inc.*, 2015 WL 2069417, at *17-18 (Del. Ch. Apr. 30, 2015) (noting "competitive and fair auction").  Moreover, many of these cases are further inapposite as they considered the value of publicly-traded companies' stock or debt.  *See, e.g., VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007); *Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re ASHINC Corp.)*, 640 B.R. 1 (Bankr. D. Del. 2022); *Poole v. N. V. Deli Maatschappij*, 243 A. 2d 67 (Del. 1968); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015); *Merlin Partners LP v. AutoInfo, Inc.*, 2015 WL 2069417 (Del. Ch. Apr. 30, 2015).

228.    Nor did the purchase price here reflect "reasoned judgments about the value of the assets."  *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002).  The evidence at trial showed that the purchase price between this specific buyer and this specific seller did not reflect the actual fair market value of Samson's assets at all.  Defendants failed to offer any evidence that KKR actually performed any analysis whatsoever that actually justified a $7.2 billion purchase price.  The closest they came was to present certain post-tax present values shown in one tab the KKR Model.  Trial Tr. (Almrud) 1976:1-1977:4; *see also* Almrud Trial Demo. at 17.  As explained above, however, the KKR Model shows a wide-range of post-tax present values depending on the discount rate applied, and the model itself is agnostic as to the appropriate discount rate.  And, all of the present values shown in the KKR Model were significantly below the $7.2 billion purchase price except for the one applying a 10% discount rate to all of Samson's assets, including its entire undeveloped inventory.  *See* Almrud Trial Demo. at 17.  Such a discount rate is patently inappropriate as applied to undeveloped assets, as the Trustee's experts demonstrated, and as confirmed by the voluminous evidence showing that *Samson itself* used significantly higher discount rates to value its undeveloped assets, both pre- and post-Transaction.  *See, e.g.*, Trial Tr. (Almrud) 2212:17-2216:4; *id.* at 2209:5-2212:12; JX-15; JX-80; PX-611.  Even Mr. Almrud, who did provide certain opinions

regarding the KKR Model, expressly declined to defend a 10% discount rate or to offer any opinions regarding an appropriate discount rate.  Trial Tr. (Almrud) 2135:19-22.

229.    Defendants did not offer evidence of any actual KKR analysis justifying the purchase price because they could not.  At opening, Defendants suggested the reason KKR did not testify in defense of their work was that KKR was beyond the subpoena power of this Court and thus could not be compelled to appear at trial.  Trial Tr. (Opening) at 44:13-24.  But Defendants offered no evidence that they had even asked any KKR or Sponsor witness to appear at trial, or that any such witness refused this request.  Further, Defendants offer no explanation for why they did not simply ask for witnesses to appear remotely.  This hole in the record confirms that the Trustee has been right all along: the KKR business plan is indefensible, as was its $7 billion purchase price based on preliminary diligence that was done in August and early September of 2011 before gas markets collapsed.  *See supra* ¶¶ 65-66, 69.  Even at the time, the "analysis" justifying KKR's bid appears to have been outcome driven, as KKR's analysts could only justify a $5.6 billion value immediately prior to submitting their proposal to the investment committee.  As Mr. Rashid wrote to Mr. Smidt on September 9, 2011 – just hours before the deal team submitted their recommendation to the investment committee – ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    *See supra* ¶ 66 (quoting JX-80).  Apparently striving to arrive at a higher value, the deal team ultimately ignored Mr. Rashid's "reasonable" assumption and recommended a $7 billion bid, which is what KKR submitted and which ultimately led KKR to pay $7.2 billion at closing.  At trial, Mr. Almrud admitted that he was unaware of this

communication or that KKR had considered scenarios valuing Samson's undeveloped inventory using a 16% discount rate.  Trial Tr. (Almrud) 2135:23-2136:5.

230.    Moreover, the $7 billion September bid was premised on significantly higher commodity prices than existed at the time of Closing, and the bid was submitted prior to NSAI performing its 1P reserve report.  With a lower price environment and the results of NSAI's 1P report in hand, Scott Gieselman and Graig Glick of NGP stated in an internal NGP communication that ████████████████████████████████████  *See* PX-265.  Even Samson understood that $7 billion was no longer justifiable in light of changed conditions.  *See supra* ¶ 69.  Instead, at signing, KKR agreed to a purchase price *increase* of $180 million in preferred shares, leading to the ultimate purchase price of $7.18 billion.  *See supra* ¶ 129.  In short, there was zero analysis by KKR or any of the other members of the buyer consortium that supported a $7 billion purchase price at the time of closing.

231.    Ultimately, KKR's business plan was based on significant analytical errors that resulted in an inflated volumes and, accordingly, inflated cash flows.  As set forth in detail above, KKR's model inflated the expected cash flows in the base case scenario by: (1) uncritically adopting the total drillable locations from the sellers; (2) failing to categorize reserves and resources based on PRMS categories; (3) failing to apply risking based on PRMS categories and instead applying woefully inadequate success factors; (4) directly adopting fundamental assumptions for EURs and type curves from the sellers; and (5) failing to update the pricing assumptions when the commodity prices deteriorated significantly.  *See supra* ¶¶ 70-99.

232.    Defendants further suggest that KKR's purchase price was "corroborated" by the lenders' and other equity investors' own independent assessment of value.  *See* [Adv. Pro. D.I. 410 at 30-33].   Initially, the evidence is clear that the lenders and co-sponsors did not independently

value Samson's assets, and rather relied on KKR's assessment of the value of Samson's assets. *See supra* ¶¶110-17.   Thus, their participation in the Transaction does not remediate KKR's inadequate valuation methodology.   Moreover, the lenders *did* ensure that Samson was adequately valued – only to the extent of their investment, which was secured against Samson's 1P reserves. *See supra* ¶ 86, 111. Accordingly, secured lenders' decision to participate in the transaction is not evidence of Samson's financial condition overall. *See In re Tops Holding II Corp.*, No. 18-22279 (RDD), 2022 WL 6827457, at *26 ("Credit analysis focuses on the risk of non-payment of the proposed loan, which may or may not include handicapping whether the borrower is, or may foreseeably become, insolvent. The risk of non-payment is why lenders insist on collateral and the pricing of their loans; that risk may be quite different than the risks faced by unsecured creditors . . . : secured loans by their very nature may pay out in full, with interest, even if the borrower is insolvent. And, of course, credit assessments have been known to be wrong, especially if the information upon which they are based is incomplete or incorrect. . . . It is plausible, given the senior secured status of almost all the loans, that the lenders assumed they were being appropriately compensated notwithstanding the risk that those more junior in the capital structure would not be paid their debts.").   Members of the bank financing group also had financial motivations unrelated to the Transaction itself, such as remaining in KKR's deal pipeline, which generated significant fees for the banks.  *See, e.g.,* JX-184 at -23 ██████████████████████████████████ ████████████████████████████████ JX-168 at 3 (Barclays approval committee memo noting at the outset that ██████████████████████████████████ ████████████████████████████████. Defendants similarly offered no evidence of equity sponsors' independent judgment of Samson's value, except for the mere fact of those equity sponsors' participation in the deal, which says nothing about the ultimate value of

Samson's assets.  *See In re Tops Holding II Corp.*, 2022 WL 6827457, at *26 ("Under circumstances where ignorance and greed could plausibly have colored Begain's investment judgment, the fact of its investment cannot serve as a proxy for solvency and reasonable capitalization . . . . To treat a private equity investment like this as rendering implausible the risk of the issuer's insolvency would cast our equity markets in an Oz-like the emerald glow.").[78]   In sum, these "'market participants' had interests which were unique and caused them to be hardly representative of the market.'"  *In re Tronox Inc.*, 503 B.R. at 303   (noting secured lenders' expectation they would be paid in full before any unsecured claims, as well as the fees earned and anticipated in the future from Apollo's deal pipeline).

233.    In short, while the purchase price in an arm's length transaction can sometimes be probative of fair market value, it simply is not here.

## E.    The Transfers Were of an Interest of the Debtor in Property

234.    It is undisputed that, as part of the Transaction, the Debtors transferred property to the Selling Shareholders in the form of $1,145,016,554 in cash to the Foundation, $981,038,692 in cash to ST 2008, $1,440,306,523 in cash to SFTDM, and the GoM Assets and assorted other transaction assets including a Lear 45 jet airplane to Samson Energy. In their pre-trial brief, as their sole challenge to this element of the Trustee's claims, Defendants argued that the Trustee

---

[78]    Defendants also presented evidence of various personal investments made by employees of the sponsor group or Samson management.  Defendants have not established that any of these equity contributions were informed, knowing investments; the only trial witness who made such an investment conceded he did not receive any materials concerning KKR's business plan, its projections, or the company's leverage.  Trial Tr. (Rowland) 1610:7-1611:16.  And, even if informed, such decisions to invest in the transaction are likewise not competent valuation evidence.  *See In re Tops Holding II Corp.*, 2022 WL 6827457, at *26 (Bankr. S.D.N.Y. Oct. 12, 2022) (observing that equity contributions by management "also plausibly suggest that the management group might view the purchase price as a fair trade for the opportunity to continue to receive outsized returns, one way or the other, regardless of the potential harm to unsecured creditors. Moreover, even without such a reason, retaining a senior job, now under one's own control, would be a strong motive for such an equity investment by management[.]")

cannot show that Defendants 'put[] assets otherwise available to creditors [of SRC] out of their reach,'" and thus fails to show that the fraudulent conveyances transferred "an interest of the debtor in property," an element of a §544(b)(1) claim. *See* Defendants' Pre-Trial Br. 45-47 (emphasis omitted).[79] There is no dispute that the Debtors had an interest in the GoM Assets when those assets were spun off to Ms. Schusterman; Defendants' argument instead pertains solely to the cash component of the transfers. Specifically, Defendants argue that SRC never had an actual interest in the cash that was transferred by SRC to the selling shareholders, because that cash was under KKR's control even when those funds were in SRC's accounts. *See id.*

235.    Defendants are factually incorrect. Defendants' argument is largely premised on the Funds Flow Memorandum (DX-500, 501) which directed Mr. Ash Upadhyaya, an officer of KKR, to direct SRC's bankers to effectuate transfers to consummate the SPA. *See* Defendants' Pre-Trial Br. 45-47. But Defendants ignore that the Funds Flow Memorandum makes clear that Mr. Upadhyaya was to take all actions in his capacity as authorized representative of SRC, and not of any of the sponsor group funds. *See* DX-500, 501, Schedule I (listing Mr. Upadhyaya as "███████████████████████████████████████████████████████"), Sections 8.2.a ("████████████████"), 8.10 ("████████████"), 8.15 ("██████████"), 8.16 ("████████████"). Therefore, to use Judge Posner's analogy that Defendants cite, if Mr. Upadhyaya had decided on December 21, 2011 to direct SRC's banker at JP Morgan to

---

[79]    The cases Defendants cite in support of their argument are inapplicable here. Half of these cases do not involve the "interest of a Debtor in property" issue at all, addressing the scope of available damages for a prevailing fraudulent transfer claim (*In re DSI Renal Holdings, LLC*, 617 B.R. 496 (Bankr. D. Del. 2020); *In re Consol. Pioneer Mortg. Entities*, 211 B.R. 704 (S.D. Cal. 1997)), or the value of property for purposes of reasonably equivalent value (*In re EBC I, Inc.*, 380 B.R. 348 (Bankr. D. Del. 2008). The remaining cases are factually distinguishable. For example, *In re Lewis*, 574 B.R. 536 (Bankr. E.D. Pa. 2017) focused on the key fact that the funds bypassed the debtor entirely and could not have passed through his hands, and *Crystallex Int'l Corp. v. Petróleos de Venez., S.A.*, 879 F.3d 79 (3d Cir. 2018) was decided based on the fact that the relevant transfer in that case was made by a non-debtor.

"invest . . . in lottery tickets or uranium stocks" with the funds in the SRC account, he would have done so on behalf of SRC, not the Sponsor Group, and SRC would thus have "put the money to [its] own purposes." *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893-94 (7th Cir. 1988).   That SRC's authorized agent chose to uphold SRC's contractual obligations under the SPA, rather than engage in an illegitimate scheme, and directed SRC's banks to effectuate the transfers outlined in the Funds Flow Memorandum, does not evince a lack of control by SRC over the funds that it transferred.

236.   Defendants also seek to rely on cases in which courts found that an entity's agent or trustee did not have dominion or control over funds when executing transfers at another's direction. These cases, though, considered the issue of whether an entity had control over funds in determining whether that entity was an "initial transferee" under section 550.   *See, e.g.*, *Bonded Fin. Servs.*, 838 F.2d at 893  (bank was legally required to follow its client's directions about how funds on account should be used); *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1070 (9th Cir. 2006) (administrator was designated by the Federal Communication Commission to collect, pool, and disburse the universal service support funds contributed by telecommunications carriers).[80]  As such, these cases are inapposite; the issue here is not whether SRC's authorized agent Mr. Upadhyaya or SRC's banker at JP Morgan had dominion or control over the funds, but whether the funds in SRC's bank account were *SRC*'s property.   They indisputably were.

---

[80]     Defendants cite *Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 100 (Bankr. D. Del. 2015) as "collecting cases" accepting the *Bonded Financial* test for dominion and control, but the cases cited address dominion and control in a different context (for purposes of defining a section 550 "transferee") and the parties found not to have dominion or control in those cases were an escrow agent, an insurance broker, a creditor's committee, and an insurance company administering a debtor's 401(k) plan.

237.    Defendants also rely on inapposite cases decided based on highly specific facts and circumstances not applicable here. *In re Chase & Sanborn Corp.* involved a money laundering scheme by the debtor's president, who borrowed funds through a personal loan, deposited those personal funds in an account opened only days before solely for the purpose of laundering the money, withdrew the funds almost immediately thereafter, and then used the funds to satisfy his personal liabilities.  813 F.2d 1177 (11th Cir. 1987). There was no indication that the debtor ever held legal or equitable title to the funds; the only basis for suggesting that the corporation might have an interest in the property was the debtor's fleeting possession of the money when it passed in and out of an account in the debtor's name.  The court found that "the actual connection between the funds and the debtor was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed." *Id.* at 1182.  Looking beyond the particular transfer to the "entire circumstances of the transaction", the court determined that the money belonged to the debtor's president, and that he, not the debtor, controlled the money. *Id.*  Similarly inapposite, the Court's holding in *In re Columbia Gas Sys.* relied on the statutory mechanism created by Federal Energy Regulatory Commission tariff orders, which required the debtor to collect refunds from upstream suppliers and remit the funds to its customers. 997 F.2d 1039 (3d Cir. 1993).  The court found that this statutory mechanism created a trust relationship, where the funds received by debtor were held in trust for customers, the ultimate intended beneficiaries of the transfers, and were not property of its bankruptcy estate. *Id.* at 1061-62.  These cases were decided in the context of facts and circumstances not present here and do not, as Defendants suggest, support a finding that SRC lacked control over the property that were transferred.

238.    Accordingly, the Trustee has established that all assets, including the cash transferred by SRC which was under SRC's control, were interest in property of a debtor.

## II.  **The Trustee Is Entitled To Damages**

239.   Having established that the Challenged Transfers are avoidable, the Trustee can recover from (i) initial transferees of the transferred assets, (ii) Stacy Schusterman as a beneficiary of the Trust Cash Transfers and the GoM Transfers, and (iii) subsequent transferees of transferred assets.  As noted above, the Trustee could have proceeded with a damages theory that afforded Defendants no credit whatsoever for the consideration they provided, requiring them to establish that they took in good faith for value, and seek a replacement lien pursuant to section 548(c). However, giving Defendants the benefit of the doubt, all of the Trustee's damages calculations for the transfers of Samson's onshore assets give Defendants credit for the value of the shares they exchanged.  Specifically, Mr. Baxter calculated the selling shareholders' *pro rata* interest, commensurate with overall enterprise value.  In addition to his unrebutted damages amounts, the Trustee is entitled to pre-judgment interest on its damages, calculated as of the December 2011 Transfer date running to the date of judgment.

### A.  The Initial Transferees Are Liable

240.   Because the Challenged Transfers are all avoidable pursuant to Section 544, the Trustee may first recover property transferred to each of the "initial transferee[s] of" the Challenged Transfers (or the value thereof).  11 U.S.C. § 550(a)(1). Here, the Trustee is entitled to damages from The Foundation and Samson Energy. Both entities remain as Defendants in this action, and the Trustee is entitled to recover from each as initial transferees.

241.   The following facts were undisputed at trial.  SRC transferred $1,145,016,554.50 together with preferred shares of SRC that had an initial liquidation preference of $180 million to The Foundation in exchange for 40,645,612.60 shares of SIC.  Undisputed Facts ¶¶ 38, 41.  At trial, Stacy Schusterman attested to this transfer, specifically characterizing the stock allocation as

"a safe investment." Trial Tr. (Schusterman) at 1756:9; *see also id.* at 1756:2-4 ("[KKR] lowered the cash consideration by 180 million, and we agreed to take 180 million in preferred stock."); DX-849, Schusterman Trial Decl. ¶ 46 ("The sale proceeds were delivered to the accounts of the Selling Shareholders, SFTDM, ST 2008, and the Foundation."). Drew Phillips, current manager of certain Selling Shareholders and CFO of various Samson entities, testified similarly. *See* DX-846, Phillips Trial Decl. ¶¶ 6-8, 24 ("At the Closing, as part of the purchase price, the Foundation received $180,000,000 of preferred shares in SRC."). In exchange, The Foundation received 19.7% of the cash transferred by SRC to the Selling Shareholders. Thus, based on its *pro rata* share of the $4.137 billion delta between the purchase price cash and the fair market value of Samson's assets, the Foundation is liable for $814,987,829.20 in damages, before pre-judgment interest.

242. In addition, Samson Energy was the initial transferee of the GoM Assets and the Selling Stockholder Transaction Assets pursuant to the Executed SPA. Undisputed Facts ¶¶ 3, 4; Trial Tr. (Phillips) at 1453:16-19 ("[Samson Energy Company is] the entity that had purchased the Gulf Coast and Offshore membership interests."); *id.* at 1460:6-23. As recipient of the GoM Assets, Samson Energy is liable as direct transferee[81] for damages equaling the difference between the Fair Market Value of the GoM Assets and the value exchanged: $846,000,0000, before pre-judgment interest.

### B.  Stacy Schusterman is Liable as the Beneficiary of the Transfers

243. The Trustee seeks to recover $2.4 billion from Stacy Schusterman, not as an initial transferee but as a person who was "the entity for whose benefit [the alleged fraudulent] transfer

---

[81]    As set forth further below, Samson Energy was also a subsequent transferee of a portion of the purchase cash, and is additionally liable on that basis. *See infra* ¶¶251-52.

was made[.]"   11 U.S.C. § 550(a)(1).   The evidence at trial proved that SRC transferred $1,440,306,523.50 and $981,038,692.00 respectively to SFTDM and ST 2008, two of the Selling Shareholders, to purchase their shares of SIC in connection with the Transaction.   Undisputed Facts, ¶ 41; DX-846 (Phillips Trial Decl.) ¶ 22; DX-500.   As a result, those Selling Shareholders' *pro rata* shares of the purchase price were 21.52% and 15.46%, respectively.   Damages based on this *pro rata* share of the $4.137 billion delta between the purchase price cash and the fair market value of Samson's assets are $890,133,451.15 (SFTDM) and $639,437,785.43 (ST 2008), totaling $1,529,581,236.58 in damages from Stacy Schusterman as beneficiary of those two transfers, before pre-judgment interest.   As beneficiary of the GoM transfer, Ms. Schusterman is also liable for damages equaling the difference between the Fair Market Value of the GoM Assets and the value exchanged: $846,000,0000, before pre-judgment interest.   In total, Ms. Schusterman as beneficiary[82] is liable for $2,375,571,236.58 in damages, before pre-judgment interest.

244.   The evidence at trial confirmed that the transfers from SRC to SFTDM and ST 2008 were indisputably made for Ms. Schusterman's benefit.   At the time of the sale, Ms. Schusterman was the only named beneficiary of Schusterman 2008 Delaware Trust and Stacy Family Delaware Trust (the "Selling Trusts"), the entities that 100% owned and controlled their respective subsidiary LLCs, ST 2008 and SFTDM (the "Selling LLCs").[83]   DX-014, Art. 1.2; DX-136, Art. 1.2; DX-846 (Phillips Trial Decl.) ¶¶ 10-14, Ex. A; Trial Tr. (Phillips) at 1480:19-1481:3, 1486:12-1489:19, 1490:13-21; Trial Tr. (Schusterman) at 1732:19-1733:17.   Ms. Schusterman also had the power to appoint, or not appoint, successor trustees to the Selling Trusts, and to remove trustees

---

[82]   Ms. Schusterman is also liable for $71 million, before pre-judgment interest, in her capacity as trustee of SFT, a subsequent transferee of transferred funds.   *See infra* ¶¶253-54.

[83]   One of the Selling LLCs was formed after KKR's bid and just prior to signing, on October 28, 2011.   *See* PX-886.   Prior to that formation, as Samson's management represented to their auditors, the corresponding Selling Trust was one of Samson's three owners.   PX-885.

from those trusts.  DX-014; DX-136.  On the basis of Stacy Schusterman's status as a beneficiary

of these two Selling Trusts alone, she is a person "for whose benefit" the transfers were made and,

therefore, is a proper defendant under Section 550(a)(1).  *See Russell v. Harper (In re Dearmond)*,

Bankr. No. 14-50106, 2017 Bankr. LEXIS 3188, *26 (Bankr. E.D. Tenn. Sep. 21, 2017) (finding

individual liable for fraudulent transfer to trust because, as trust beneficiary, she was a person for

whose benefit transfer was made and observing that "[c]ourts have found that the beneficiary of a

trust may be considered a person for whose benefit a transfer into a trust is made, and may be held

strictly liable under § 550(a)(1)" (quotations omitted)); *In re Mastro*, 465 B.R. 576, 614-15 (Bankr.

W.D. Wash. 2011) (finding trust beneficiary to be proper "for whose benefit" defendant under

Section 550(a) with respect to transfer to trust and collecting cases); *Kosmala v. Imhof (In re

Hessco)*, 295 B.R. 372, 377-78 (B.A.P. 9th Cir. 2003) (same); *see also In re Phillips*, 379 B.R.

765, 786-87 (Bankr. N.D. Ill. 2007) (beneficiary of trust was proper "for whose benefit" defendant

where the transfer was a mortgage payment on real property owned by the trust).

245.    The Trustee also established at trial that, as beneficiary, Ms. Schusterman received

an "actual, quantifiable, and accessible" benefit from the transfers, and thus the transfers to the

Selling Trusts are recoverable from Ms. Schusterman on that basis.  *See Halperin v. Moreno,* Adv.

Pro. No. 15-50262, 2018 Bankr. LEXIS 517, at *3 (Bankr. D. Del. Feb. 27, 2018).  To the extent

that the *Halperin* test applies,[84] Ms. Schusterman clearly received such a benefit.  *First,* the

challenged transfers conferred an "actual" benefit on Ms. Schusterman because they

---

[84]    Other courts have found that the mere intention of the transferor to provide a benefit to the
defendant is enough. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 2011 Bankr. LEXIS 991, at *18 (Bankr.
S.D.N.Y. Mar. 28, 2011) (citing *In re Enron Creditors Recovery Corp.*, 407 B.R. 17, 33 (Bankr. S.D.N.Y.
2009)); *Shapiro v. Art Leather, Inc.*, 340 B.R. 829, 834 (Bankr. E.D. Mich. Apr. 12, 2006).  The Trustee
established at trial that Ms. Schusterman is the intended beneficiary of the transfers. *See* DX-014; DX-136;
Phillips Trial Decl. ¶¶ 10-14, Ex.A; Trial Tr. (Phillips) at 1480:19-1481:3, 1486:12-1489:19, 1490:13-21;
Trial Tr. (Schusterman) at 1732:19-1733:17

unquestionably increased Ms. Schusterman's net worth by increasing the value of Ms. Schusterman's interest in the corpus of the trusts as beneficiary, and the establishment of the trust—for which Ms. Schusterman and her descendants were beneficiaries—also minimized tax exposure and provided protection from creditors.  Trial Tr. (Schusterman) at 1849:10-1850:1; *see also, e.g., In re Phillips*, 379 B.R. at 786.   *Second*, the challenged transfers provided a "quantifiable" benefit to Ms. Schusterman: under the trust agreements, Ms. Schusterman benefitted from (and continues to benefit from) the full amount of the funds the Trustee seeks to disgorge, which are quantifiable.  Ms. Schusterman directed the flow of funds to her benefit, and Defendants presented no evidence that Ms. Schusterman's control was limited to only a subset of funds.  *See Baldi v. Lynch*, 319 B.R. 570,  591–592 (Bankr. N.D. Ill. 2005).   *Third,*  the transfers provided Ms. Schusterman an "accessible" benefit: Ms. Schusterman was a manager of the Selling LLCs and a trustee of the Selling Trusts that were 100% owners of the Selling LLCs, and had the practical ability under the trust documents to direct the proceeds of the transfers in any way she chose.  *Id.* at 592 (accessibility requirement met by defendant's control over recipient LLC); DX-849 (Schusterman Trial Decl.) ¶ 9; Trial Tr. (Schusterman) at 1732:19-1733:19.  Indeed, Ms. Schusterman did, in fact, access the transferred funds, personally directing that the funds in her trust would be used to invest in her new company, Samson Energy, and to pay taxes for the Selling Trusts.  *See supra* ¶¶ 13-16 (collecting evidence).

246.    For the same reasons, Ms. Schusterman is also the person "for whose benefit" the Gulf Coast/Offshore transfers were made.  The GoM Assets were transferred to Samson Energy, a newly formed LLC, prior to closing.  Schusterman Trial Decl. ¶ 54.  As set forth above, and as established at trial, SFTDM was, at the time of the transfer, the 100% owner of Samson Energy as its sole member. DX-846 (Phillips Trial Decl.) ¶¶ 31-32, Ex. B; DX-849 (Schusterman Trial Decl.)

¶ 54. On a practical level, the transfer of the GoM Assets was understood to be nothing less than Ms. Schusterman acquiring—or in her words, "keeping"— an entire E&P company.  Schusterman Dep. Tr. 222:25-223:24.  The benefit to Ms. Schusterman of receiving an entire E&P company was clearly "actual," in the sense that the benefit was actually received, and not merely intended. It was also quantifiable, as the quantum of the benefit to Ms. Schusterman is merely a function of (i) the value of the Gulf Coast and Offshore Assets, and (ii) Ms. Schusterman's interest in Stacy Family Delaware Trust, which is the 100% owner of SFTDM.   Finally, the benefit to Ms. Schusterman was "accessible."  She controlled Samson Energy as its Chief Executive Officer, and she had (and has) an equity interest in Samson Energy through her status as the sole named beneficiary of Stacy Family Delaware Trust, the ultimate owner of Samson Energy at the time of the transfer.  DX-849 (Schusterman Trial Decl.) ¶ 58; DX-846 (Phillips Trial Decl. ¶¶ 10-14, Ex.A; Trial Tr. (Phillips) at 1480:19-1481:3, 1486:12-1489:19, 1490:13-21; Trial Tr. (Schusterman) at 1732:19-1733:17.

247.    Defendants attempted to argue at trial that Ms. Schusterman was merely a passive recipient of value controlled by trustees. But the record is clear that Ms. Schusterman has long had actual control over the entities that effectuated the Transaction.[85]  *See supra* ¶¶ 13-16 (collecting evidence).   Defendants also pointed to unnamed "descendants" of Ms. Schusterman who are beneficiaries of the trusts, arguing that Ms. Schusterman is but "one of many contingent beneficiaries."  [Adv. Pro. D.I. 410, at 52].  The existence of other beneficiaries, however, does not make the benefit to Ms. Schusterman any less actual, quantifiable, or accessible; if that were

---

[85]    Prior to the Transaction, the Selling LLCs were not treated as legally distinct, but were instead understood to be merely the "business name" of the Selling Trusts that controlled them.  PX-880, at -553 & -55.  Further, as a practical matter, in assessing the benefit received by a trust beneficiary, there is no difference between a cash transfer directly to the trust or a cash transfer to a LLC vehicle that is wholly owned by the trust: both equally increase the value of the beneficiaries' stake in the trust.

the case, the Trustee would only need to have sued those beneficiaries as well, a result that Ms. Schusterman hardly could have advocated for.  But, in any event, those beneficiaries' absence from this action is not some oversight by the Trustee; it is a result of Defendants' discovery conduct.  The relevant Trust documents naming Ms. Schusterman's "descendants" as beneficiaries were only disclosed in April of this year, long after the close of discovery, in connection with Defendants' last summary judgment motion.  [Adv. Pro. D.I. 365 (Supplemental Phillips Declaration)]; *see also* [Adv. Pro. D.I. 362 (Seventeenth CMO & Signed Scheduling Order) (Document production deadline of May 15, 2019, and fact discovery completion date of April 30, 2021)].  Regardless, but for the Transaction, the other beneficiaries of Ms. Schusterman's trusts would have received no quantifiable value at all.  In short, the Selling Trusts and Selling LLCs that received the proceeds "for the benefit of" Ms. Schusterman are the same entities that have always acted for the benefit of Ms. Schusterman and provided capital to her business ventures as needed, both before and after the Transaction.

248.    Defendants also attempted in their pre-trial brief to resurrect an argument that failed at the summary judgment phase, asserting that the release of the initial transferees would "cut off the chain" and therefore preclude recovery against other potential Section 550 defendants, including defendants "for whose benefit the transfer was made."  *See* D.I. 410 at 54.  But nothing in any of the cases upon which Defendants rely contradicts the weight of authority, including as articulated in numerous cases within this Circuit, that "[a]voidability is an attribute of the transfer rather than that of the creditor."  *In re Global Protections, USA*, 546 B.R. 586, 619 (Bankr. D.N.J. 2016) (internal citations and quotations omitted); *see also Image Masters, Inc. v. Chase Home Finance*, 489 B.R. 375, 398 n.18 (E.D. Pa. 2013) (agreeing with "cases that have held that § 550 does not render recovery from a subsequent transferee dependent on a prior action or recovery

against the initial transferee."). *VF Brands*' holding, cited by Defendants, that "[u]nder section 550 of the Bankruptcy Code, in order to recover against a mediate or intermediate transferee, the claimant must establish that the transfer is a voidable fraudulent conveyance vis-à-vis the initial transferee," is entirely consistent with this rule.    D.I. 410 at 54 (quoting *VFB LLC v. Money's Tr. (In re VF Brands, Inc.*), 282 B.R. 134, 139 (Bankr. D. Del. 2002)).    "In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof."    *IBT Int'l, Inc. v. N. (In re Int'l Admin. Servs.)*, 408 F.3d 689, 703 (11th Cir. 2005); *see also id.* at 708 (holding that "Section 550(a) does not mandate a plaintiff to first pursue recovery against the initial transferee and successfully avoid all prior transfers against a mediate transferee.")    Indeed, at least one court, relying on *VF Brands*, concluded that "a trustee [may] pursue a subsequent transferee when he is unable to sue the initial transferee."    *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 746 (Bankr. S.D.N.Y. 2008).    Thus, applying *VF Brands*, because the Trustee has established that the Challenged Transfers are avoidable, he is entitled to recover damages from all section 550 defendants. [86]

---

[86]    Not only does *VF Brands'* holding not preclude recovery here, but the reasoning in that case further supports the Trustee's position. In *VF Brands*, a litigation trust brought constructive fraudulent conveyance claims against certain banks in connection with a payment made to VFB, a debtor in another bankruptcy. The trustee did not bring fraudulent conveyance claims against VFB, however, because the court had previously held that such claims were subordinated pursuant section 510(b) in the *VFB* bankruptcy and therefore were to receive no distribution even if successful.    *In re VF Brands, Inc.*, 282 B.R. at 136, 137. VFB sought to enjoin the trustee's lawsuit against the banks, arguing that the lawsuit against the banks was an attempt to circumvent the subordination ruling.    *Id.* at 137.    Judge Walrath rejected this argument, however, reasoning that the litigation trust was "simply seeking a recovery from someone whom it asserts is liable to it, in addition to [VFB].    This is no different from a creditor who is free to pursue collection of its claim from a guarantor of that debt, even if the primary debtor has discharged the claim in bankruptcy." *Id.* Judge Walrath further noted that the Plan did not release the banks from any direct claims by creditors, and that to enjoin litigation against the bank would effectively grant them third-party releases beyond the scope of the Plan.    *Id.*   at 137-38.    In other words, if anything, Judge Walrath's reasoning supports the Trustee's position, which is that he may recover damages for avoidable transfers against any type of section 550 defendant not specifically released by the Plan, notwithstanding that he may not collect from other potential defendants, including initial transferees.    Because the section 550 Defendants here have not been specifically granted releases in the Plan, they may not avoid liability on the basis of releases granted to other third-parties.

249.    The other case Defendants cite, *Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, is also consistent with this principle, holding that recovery against the section 550 defendants in that case was not available because the transfer itself was not avoidable. 368 B.R. 394, 407 (Bankr. D. Del. 2007). But, *Miller* does not support Defendants' contention that an entity-specific defense applicable only to the initial transferee somehow makes the transfer not avoidable as to others. [87] Thus, Defendants' argument that the release of the initial transferee "cuts off" the Trustee's ability to pursue claims against other Section 550 defendants is unfounded. Simply, nothing in the Plan's releases prevents the Trustee from pursuing recovery against Ms. Schusterman, as beneficiary, or against other subsequent transferees.

## C.  Subsequent Transferees of Fraudulently Conveyed Assets Are Liable

250.    The Trustee may also recover the Challenged Transfers or the value thereof from "any immediate or mediate transferee" of an initial transferee.  11 U.S.C. § 550(a)(2).  Here, the Trustee seeks to recover a certain portion of the Challenged Transfers from at least two such subsequent transferees: Samson Energy and SFT.

251.    It is undisputed that Samson Energy received at least $800 million in Transaction proceeds through a capital contribution from SFTDM, one of the Selling Shareholders, which had received $2,484,369,361.50 in cash proceeds from the Transaction.  Undisputed Facts ¶¶ 41, 45; Trial Tr. (Phillips) at 1464:8-9 ("Almost immediately following the transfer of those membership

---

[87]    Defendants' argument appears to be primarily based on the following quote taken out of context from *Miller*: "Because the Trustee cannot avoid the transfer to the initial transferee, TIAA, the Trustee cannot recover against the mediate transferee, MDC." D.I. 410 at 54 (quoting *Miller v. McCown De Leeuw & Co. (In re Brown Sch.)*, 368 B.R. 394, 407 (Bankr. D. Del. 2007)).  A review of the *Miller* opinion makes clear, however, that that court did *not* hold that a defense specific to the initial transferee should preclude recoveries for that transfer against other potential section 550 defendants; rather, the court merely held that the transfers at issue were not recoverable vis-á-vis the beneficiary in that case *for the same reason* that they were not recoverable vis-á-vis the initial transferees: because the trustee in *Miller* had already conceded that *transfers themselves* were not avoidable.  *Miller,* 368 B.R. 394, 407 (Bankr. D. Del. 2007).

interests, [SFTDM] invested $800 million in Samson Energy Company as a capital infusion."). At

trial, Mr. Phillips testified to additional contributions made after the sale by Selling Shareholders

SFTDM and ST 2008:

> Q. Can you describe, just briefly, the history of the ownership structure of
> SEC, Samson Energy Company, the entity in the yellow box here, since the sale --
> since the sale?
>
> A. So, right after the sale, again, the only member was SFTDM. Shortly
> after that, ST 2008, the other LLC, contributed a small amount of capital and
> became a minority interest member in Samson Energy Company. And then, over
> time, SFTDM and ST 2008 contributed even more capital, more capital beyond the
> 800 million that I mentioned. And then, in December of 2015, the Stacy Family
> Trust also contributed about $150 million into Samson Energy Company and its
> subsidiaries.

Trial Tr. (Phillips) at 1465:18-1466:4; *see also* DX-846, Phillips Trial Decl. ¶ 11 (stating SFTDM

and ST 2008 "have invested significantly in Samson Energy."); *id.* ¶ 31 ("Immediately following

the 2011 Acquisition, SFTDM, which was Samson Energy's sole member at the time, made an

initial contribution of $800 million in cash as equity capital to Samson Energy to fund development

of the GC/OS Assets.")  Similarly, Ms. Schusterman testified as to these transfers:

> Q. All right. Now, you mentioned a moment ago that one of the shareholders, SFT
> Delaware Management, put money into Samson Energy at the outset of that
> company's existence. Do you remember how much money that was?
>
> A. $800 million.
>
> Q. And why did it put that money into Samson Energy?
>
> A. Because it was money that was needed to, you know, implement the pursuit of
> all of the opportunities.
>
> Q. Okay. Over time did other entities make equity investments in Samson Energy?
>
> A. Yes, ST 2008 Delaware Management.

Trial Tr. (Schusterman) at 1767:15-1768:1.

252.    Ms. Schusterman was also aware, and testified, that the $800 million that "came to

Samson Energy came from the sale transaction." *Id.* at 1841:5-10; *see also* DX-849, Schusterman

Trial Decl. ¶ 47 ("SFTDM invested $800 million of its sale proceeds as equity capital in Samson Energy . . . [as well as] additional loans to, and equity investments in Samson Energy."); *id.* ¶ 48 ("ST 2008 . . . over time, invested the balance of its proceeds in various investments, including additional debt and equity investments in Samson Energy.").

253.    Likewise, material evidence exists in the record showing that SFT was a subsequent transferee of the proceeds from the Transaction.  Before the Transaction, in 2011, ST 2008's bank account carried a zero balance.  *See* PX-881 at -487.  However, the record indicates and Drew Phillips testified that ST 2008 has transferred funds to SFT after the Transaction.  For example, on June 24, 2013, ST 2008 transferred $26 million to SFT. PX-883 at -169.  And on April 4, 2014, ST 2008 transferred $45 million to SFT. PX-884 at -974; *see also* DX-846, Phillips Trial Decl. at ¶ 38.

254.    As to other subsequent transferees, both Stacy Schusterman and Lynn Schusterman remain as Defendants in their capacity as trustees of SFT.  [Adv. Pro. D.I. 388, at 19]; *see also* Trial Tr. (Schusterman) at 1854:17-20 ("[M]y understanding is that the current defendants are the foundation, me personally, and the Stacy Family Trust, not the Delaware one, the Stacy Family Trust Oklahoma, and, oh, yes, my mom is co-trustee of SFT.").  Therefore the Trustee may seek recovery from either in addition to SFT as subsequent transferees. *See, e.g., Official Comm. of Unsecured Creditors of Exeter Holding, Ltd. v. Haltman*, No. 13-CV-5475 (JS) (AKT), 2018 U.S. Dist. LEXIS 54610, *22-23 (E.D.N.Y. 2018) (finding trustee to be proper defendant in fraudulent conveyance action in respect of trust property); *U.S. on Behalf of F.T.C. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 841 F. Supp. 899, 903-04 (D. Minn. 1993) (same).  SFT and its trustees are liable for $71 million in damages, before pre-judgment interest, for this subsequent transfer.

255.    At trial, Defendants for the first time seemed to argue in support of a defense that the Selling Shareholders' subsequent transfers of sale proceeds to affiliates are not recoverable because value was provided in exchange, either in the form of cancellation of debt in the case of the transfers by ST 2008 to SFT (*see* DX-846 (Phillips Trial Declaration) at ¶ 38) or in the form of equity interests in the case of the transfers by SFTDM to Samson Energy (*see* DX-846 (Phillips Trial Declaration) at ¶ 31).    The Section 550(b)(2) defense, however, is only available to subsequent transferees who take in good faith and without knowledge of the voidability of the transfer avoided. 11 U.S.C § 550(b)(2); 5 Collier on Bankruptcy ¶ 550.03[02] (16th ed. 2022) ("[C]ourts have found a lack of good faith in a variety of factual circumstances, including where the transferee had knowledge of the transferor's unfavorable financial condition at time of transfer; . . . a receiver did not give value for a failed bank's assets and had at least constructive notice of avoidability of transfers; and the transfer was to an insider with control over corporation finances.") Thus, the defense does not apply here, where SFT and Samson Energy, as affiliates within the Schusterman enterprise controlled by Ms. Schusterman, had knowledge of all relevant facts relating to the voidability of the initial transfers. *See infra* at ¶¶296-300.    Defendants have not carried their burden of establishing that SFT or Samson Energy took (1) for value, (2) in good faith and (3) without knowledge of the voidability of the transfer.    *See* 5 Collier on Bankruptcy ¶ 550.03[05] (16th ed. 2022) (noting that burden is on transferee to establish elements of section 550(b) defense).

### D.  Pre-Judgment Interest Payable To The Trustee

256.    Lastly, because the Trustee's claims arise under Delaware law, the Delaware statutory rate of pre-judgment interest should apply.    *See In re Meridian Auto. Sys. Composites Operations, Inc.*, 372 B.R. 710, 726 (Bankr. D. Del. 2007) ("The determination of the appropriate

rate of interest to be awarded is within the Court's discretion."); *In re Aerogroup Int'l*, 601 B.R. 571, 598-99, 598 n.191 (Bankr. D. Del. 2019) ("If the right to recovery arises under state law, state law also governs the availability of prejudgment interest."); *see also In re Mortg. Lenders Network USA, Inc.*, 406 B.R. 213, 247 (Bankr. D. Del. 2009) (awarding prejudgment interest in accordance with the rate under New York law on a claim to recover servicing advances under state law); *In re Orion Refining Corp.*, 424 B.R. 156, 170 (Bankr. D. Del. 2010) (granting prejudgment interest in accordance with the rate set forth under Louisiana law on a state breach of contract claim brought in an adversary proceeding).  Under Delaware law, the Trustee is entitled to collect interest at a rate of the federal rate plus 5%, compounding quarterly.  *See* 6 Del. C. § 2301(a).  To date, Defendants have not suggested, much less requested, any other pre-judgment interest rate, nor offered any contrary evidence in support of the application of such a rate.

257.    Accordingly, the Trustee seeks pre-judgment interest at the Delaware statutory rate of the federal rate plus 5%, compounded quarterly, running from the date of the Transaction close, December 21, 2012, through entry of judgment. *In re Opus E., LLC,* 528 B.R. 30, 109 (Bankr. D. Del. 2015), *aff'd*, 2016 U.S. Dist. LEXIS 42955 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017) (awarding a trust prejudgment interest on the fraudulent transfer claims from the date of the transfer until paid); *In re Ashinc Corp.*, No. 12-11564 (CSS) (Bankr. D. Del. May 4, 2021) (ECF Nos 4149) (awarding Litigation Trustee prejudgment interest at the applicable state law statutory rate of the federal rate + 5%, compounded quarterly, on breach of contract claim running from the date of the breach to judgment); *see also In re Ashinc Corp.*, No. 13-50530-CSS (Bankr D. Del. May 1, 2020) [ECF 712].

**E.    The Trustee's Recovery**

258.    As set forth above, Mr. Baxter calculated that the difference between the total cash

portion of the purchase price[88] and the fair market value of the Samson's assets was $4.137 billion.

[Baxter Declaration, Ex. A at ¶ 111; *see also supra* at ¶ 243.  The three Selling Shareholders' *pro*

*rata* shares of the SIC stock held and transferred at closing was:  34.76% by the Foundation,

27.27% by ST 2008, and 37.97% by SFTDM.[89] [Adv. Pro. D.I. 413 (Undisputed Facts) at ¶ 41].

SRC paid 56.67% of the purchase price (with SIC, whose transfers were determined to be safe-

harbored, paying the remaining 43.33%).  Thus, applying this 56.67% to the shareholders' *pro*

*rata* shares of Samson stock, the selling shareholders' *pro rata* shares of just the SRC portion of

the cash purchase price were:  19.7% to the Foundation, 15.46% to ST 2008, and 21.52% to

SFTDM.   Based on these unrebutted figures, damages arising from the cash transfers associated

with the Samson onshore transaction are set forth below.

| Damages Associated With Transaction (Onshore) | | |
|---|---|---|
| **Defendant(s)** | **Selling Shareholder and its *Pro Rata* Share of SRC's Portion of the Purchase Price** | **Damages:  Pro Rata Share of $4.137 billion** |
| **The Foundation** | The Foundation: 19.7% | **$814,987,829.20**, plus pre-judgment interest. |
| **Stacy Schusterman**, as transfer beneficiary | ST 2008: 15.46% | **$639,437,785.43**, plus pre-judgment interest. |
| **Stacy Schusterman**, as transfer beneficiary | SFTDM: 21.52% | **$890,133,451.15**, plus pre-judgment interest |

---

[88]    Of the $6.928 billion that made up the cash portion of the purchase price, $6,316,361,770.00 was transferred directly to the selling shareholders.  D.I. 413 (Undisputed Facts) at ¶¶ 5-6, 41.  The remaining amount was transferred to third-parties for the benefit of the selling shareholders and their beneficiaries to pay the seller's debt, expenses, etc.  *Id.*

[89]    *Pro rata* shares have been calculated by dividing the shared transferred by each seller by the total number of shares transferred.

259.    As also set forth *supra* at ¶¶ 250-55, the sellers made certain subsequent transfers of cash they received in connection with the Transaction.   The damages associated with those subsequent transfers, which overlap with the damages shown above,[90] are set forth below.

| Damages Associated With Subsequent Transfers | | |
|---|---|---|
| Defendant(s) | Subsequent Transferor and Amounts Transferred | Damages |
| **Samson Energy** | SFTDM: $800,000,000.00 | **$800,000,000.00**, plus pre-judgment interest. |
| **Stacy Family Trust** **Stacy and Lynn Schusterman** as trustees of SFT | ST 2008: $71,000,000.00 | **$71,000,000.00**, plus pre-judgment interest. |

260.    Finally, the Trustee is also entitled to damages arising from the transfer of the GoM Assets, as set forth below.

| Damages Associated With GoM Transfers | | |
|---|---|---|
| Defendant(s) | Difference between FMV of GoM Assets and Value Exchanged | Damages |
| **Samson Energy** **Stacy Schusterman**, as transfer beneficiary | $846,000,000.00[91] | **$846,000,000.00**, plus pre-judgment interest. |

---

[90]     The Trustee is not seeking double-recovery of these damages.

[91]     PX-889 (Baxter Trial Decl.) at ¶ 13.

## III.    The Defendants' Affirmative Defenses Are Meritless

261.    Defendants have made reference to a number of technical affirmative defenses over time in various pleadings and proceedings.  The fact that these defenses were not included in any of Defendants' *seven* seriatim dispositive motions prior to trial is indicative of the weakness of those defenses.  Indeed, as set forth below, any remaining affirmative defenses are either without legal merit or are not supported by record evidence.

### A.    The Alleged Assumption of the 2011 SPA Does Not Bar the Trustee's Claims

262.    For the first time in their pre-trial brief, Defendants argued that the SPA is an "executory contract" that was assumed under the Plan and that, by virtue of such assumption, the Trustee's Claims are barred.  *See* Adv. Pro. Dkt. 410 at 61-63.  To support that contention, Defendants do not point to any order of this Court specifically providing for the assumption or rejection of the SPA.  Rather, they point to the boilerplate language in section V.A of the Plan, which provides   that, unless specifically rejected, all "executory contracts" are assumed.  To continue, Defendants argue, because the SPA does not appear in any schedule rejecting executory contracts, it was legally assumed as of the Effective Date of the Plan.  In conclusion, Defendants argue, because the SPA was implicitly assumed, the Trustee may not seek to avoid any aspect of the Transaction subsumed in the SPA.

263.    Defendants' arguments fail for three reasons: (1) the plain language of the Plan makes clear that no assumption could take place if it affected the Settlement Trust's claims; (2) the SPA was not an executory contract; and (3) even if it were assumed, its purported assumption does not bar the Trustee's Claims.

264.    As an initial matter, the Defendants' argument is particularly odd as the SPA does not appear in any of the 3,392 pages filed by the Debtors identifying executory contracts and

unexpired leases,[92] and the Defendants' argument seeks a result that is directly contrary to the clear and unequivocal reservations in the Plan and other Plan documents of all claims in connection with the 2011 Acquisition.  As Judge Ambro recognized in the *Weinstein* cases, Defendants' argument amounts to a "gotcha" – that just because the SPA was never explicitly assumed or rejected, the Reorganized Debtors inadvertently assumed it and thereby stripped the Trustee of the Fraudulent Transfer Claims that were so conspicuously preserved in the Plan.  *See In re Weinstein Co. Holdings LLC*, 997 F.3d 511, 519 (3d Cir. 2021) ("Ultimately, the Investors' arguments amount to a 'gotcha' – that Spyglass accidentally purchased the Investment Agreements due to a foot fault.").

### 1) The Plain Language Of The Plan Explicitly Preserves The Trustee's Claims

265.    But it is not just a failed "gotcha" here, it is a failed argument.  At the outset, in their pretrial discussion of section V.A of the Plan, Defendants improperly excise key operative language in Section V.A with ellipses.  Section V.A in relevant part states that "*except as otherwise provided in the Plan*, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors[.]"  Plan (JX-410), § V.A. (emphasis added).  Critically, having elided out the "except as" phrase in their brief, Defendants do not even address what is "otherwise provided in the Plan."

266.    What is, in fact, provided in the Plan is a series of preservations of all causes of action relating to the Transaction that Defendants say were barred the moment the Plan went

---

[92]    These documents include the assumption and rejection schedules in the Plan Supplement and Schedule G.

effective.    Specifically, the Plan preserves the Debtors' causes of action relating to the 2011

Acquisition in the following places:

- Plan (JX-410), § I.A.171 (Settlement Trust Causes of Action) [93]

- Plan (JX-410) § IV.N (Preservation of Causes of Action);

- Plan (JX-410) § Art. I.A.174 (Settlement Trust Retained Causes of Action); [94]

- Plan (JX-410) § VII.A (Compromise and Settlement of Claims, Interests, and Controversies);

- Plan (JX-410) § VII.B (Discharge of Claims and Termination of Interests);

---

[93]    Specifically, Settlement Trust Causes of Action:

means (a) all Claims and Causes of Action held by or on behalf of any Debtor (or any assignee of any Debtor) against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties) concerning, or on account of, the 2011 Acquisition and/or any transfer of an interest of any Debtor in property provided for thereunder, including any Claims to recover the value of such transferred property, Claims arising under the Bankruptcy Code, state fraudulent transfer statutes and claims arising under state law based upon negligence, breach of fiduciary duty, lender liability, Avoidance Actions, and/or other similar Claims concerning the 2011 Acquisition, and (b) the Settlement Trust Retained Causes of Action.

Plan (JX-410), § I.A.171.

[94]    Specifically, Settlement Trust Retained Causes of Action:

means all Claims and Causes of Action (including Avoidance Actions) held by or on behalf of any Debtor against any Entity (except for any Claims or Causes of Action, alleged or otherwise, against the Released Parties), excluding any Entity intended to do business with the Reorganized Debtors that the Debtors or the Reorganized Debtors (as applicable) identify as being costly or burdensome to replace in writing to the Committee on or before the Initial Effective Date.    For the avoidance of doubt, the Settlement Trust Retained Causes of Action shall not include Claims or Causes of Action that are (a) are against any Entity that is a counterparty to an Executory Contract or Unexpired Lease assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code excluding such Executory Contracts or Unexpired Leases assumed and assigned to a purchaser pursuant to an Asset Sale, (b) are on account of or arising under any contract or lease entered into after the Petition Date, (c) are on account of any of the Debtors' postpetition ordinary-course-of business accounts receivable, (d) are against any Governmental Unit (including, without limitation, on account of tax refunds), and (e) are based solely on postpetition conduct, give rise to pose petition damages, and have not yet been discovered by the Debtors.

Plan (JX-410), § I.A.174.

- Plan (JX-410) § I.A.18 (Definition of "Causes of Action");

- Confirmation Order [D.I. 2019] ¶ 118 (Preservation of Causes of Action).

267.    Under black-letter contract law, specific provisions in a Plan control over the general.  *See, e.g.*, *In re Shenango Grp. Inc.*, 501 F.3d 338, 344 (3d Cir. 2007) ("In construing a confirmed plan of reorganization, we apply contract principles."); *In re Canal Asphalt, Inc.*, No. 15-23094 (RDD), 2017 Bankr. LEXIS 1289, at *14 (Bankr. S.D.N.Y. May 10, 2017) ("Under New York law where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls." (citation omitted)).  Because the Plan specifically preserves actions arising from the 2011 Acquisition, that language controls over any other general language in the Plan, such as section V.A's blanket assumption of unspecified executory contracts. *See Baeshen v. Arcapita Bank B.S.C.(c)* (*In re Arcapita Bank B.S.C.(c)*), 520 B.R. 15, 25 (Bankr. S.D.N.Y. 2014) (collecting cases) ("But all of the provisions cited by the Plaintiffs are generic clauses, none of which specifically address the treatment of the Funds in question. Under well-established contract principles, the specific language of the Plan relating to the treatment of the Plaintiffs' claims trumps the general language contained in the reservations of this Court's jurisdiction."); *BCPM Liquidating LLC v. Pricewaterhousecoopers LLP* (*In re BCP Management, Inc.*), 320 B.R. 265, 273 (Bankr. D. Del. 2005) (holding that despite certain general language in the plan, "the Plan contain[ed] more specific provisions delineating those causes of action intended to be preserved upon confirmation of the Plan" and that such language "demonstrate[d] a clear intent to preserve all claims against [a party]").

268.    Notwithstanding any of the foregoing, it is Defendants' contention that, on the day the Plan went effective, each of the specifically preserved causes of action was barred.  If that were

to be the case, the Plan would need to so specifically provide.  It did not.  Thus, Defendants'

assumption defense fails right out of the gate.

### 2)      The SPA Has Been Substantially Performed And Is Thus Not Executory

269.     Even if section V.A of the Plan were to control, the SPA was simply not executory,

and could not have been assumed.  The test for determining whether a contract is executory is

whether, under applicable state law, "each side has at least one *material* unperformed obligation

as of the bankruptcy petition date."  *Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re*

*Weinstein Co. Holdings, LLC)*, 997 F.3d 497, 504 (3d Cir. 2021) (emphasis added).  The contract

at issue here, the SPA, is governed by New York law. *Id.*; JX-212 at SEC00190991.  Thus, under

New York law, the SPA would only be executory if it still "contained at least one obligation for

[each party] that would constitute a material breach [] if not performed."  *In re Exide Techs.*, 607

F.3d 957, 962 (3d Cir. 2010), *as amended* (June 24, 2010).

270.     A "material breach," under New York Law, is "a breach which is so substantial as

*to defeat the purpose of the entire transaction*." *Id.* (emphasis added); *see also In re Weinstein*,

997 F.3d at 506 (same).  On the flip side, once a contract has been substantially performed, any

subsequent breach would not be considered a material one.  *Lewis Bros. Bakeries Inc. v. Interstate*

*Brands Corp. (In re Interstate Bakeries Corp.)*, 751 F.3d 955, 962 (8th Cir. 2014) ("Substantial

performance and material breach are interrelated concepts: Substantial performance is the

antithesis of material breach; if it is determined that a breach is material, or goes to the root or

essence of the contract, it follows that substantial performance has not been rendered, and further

performance by the other party is excused.").  Substantial performance under New York law takes

into consideration several factors, "including the ratio of the performance already rendered to that

unperformed, the quantitative character of the default, the degree to which the purpose behind the

contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance." *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 411 (E.D.N.Y. 2013).

271.    The indisputable essence of the SPA is a $7 billion stock sale.  That transaction closed and was consummated in 2011.  Parties' Stipulated Facts [Adv. Pro. D.I. 413] at ¶¶ 5-6. Notably, the SPA itself states that the performance of all obligations of both the Selling Shareholders and the Purchaser shall have been performed in all material respects at or prior to the Closing Date.  *See* JX-212 at SEC-00190983 (Art. XI 11.2(b)) and SEC-00190984 (Art. 11.3(b)).

272.    As a result, any obligations which survived the closing of the Transaction cannot render the SPA executory because they do not relate to the central purpose of the transaction – a $7 billion sale of the business.  *See In re Exide*, 607 F.3d at 964 (concluding the sale agreement was not executory and noting that "the Use Restriction does not relate to the purpose of the Agreement – which is that Exide would transfer its industrial battery business and the concomitant assets and liabilities to EnerSys and EnerSys in exchange would pay Exide about $135 million."); *In re Interstate Bakeries Corp.*, 751 F.3d at 962 (concluding that the sale agreement was not executory "because the essence of the agreement here was the sale of IBC's Butternut bread and Sunbeam bread business operations"); *Sears v. Sears (In re Sears)*, 863 F.3d 973, 978 (8th Cir. 2017) (concluding the sale agreement was not executory because "[t]he primary purpose of the sale agreement was to effect the sale of Searses' stock to AFY and Korley.  The Searses substantially performed their obligations by surrendering their stock to Korley and AFY."); *In re Bluman*, 125 B.R. 359, 363 (Bankr. E.D.N.Y. 1991) ("Moreover, considering the facts and circumstances of this particular case it becomes even more apparent that the Contract is no longer executory. It is one for the sale of a business. Its primary objective was accomplished when the

Debtor turned over title to the assets. Although the Debtor is currently obligated to abide by the terms of a covenant not to compete, the restrictive covenant is ancillary to the bargained-for agreement to convey the business."); *In re Chateaugay Corp.*, 102 B.R. 335, 350 (Bankr. S.D.N.Y. 1989) (concluding the contract was not executory based on the finding that indemnification obligations are "*de minimis* and remote in the context of the overall [] Agreements" because the "Agreements were for the one-time sale of tax benefits"); *see also In re Weinstein*, 997 F.3d at 507 (concluding the contract was not executory because "[a]t a high level, the essence of the Cohen Agreement was for Cohen to produce the Picture in exchange for money. Thus, he contributed almost all his value when he produced the movie.")

273.    Defendants point to only one obligation they contend was outstanding as of the Effective Date of the Plan: the indemnification provisions of the SPA.    But, just as the indemnification provisions within the agreements at issue in *Weinstein* and *Exide*, indemnities are "ancillary after-thoughts" and "immaterial" to the purpose of a sale and purchase agreement such as the SPA. *See Weinstein*, 997 F.3d at 507 ("Also immaterial is Cohen's obligation to indemnify TWC against third-party claims arising from the breach of his representations, warranties or covenants"); *In re Exide*, 607 F.3d at 964 ("[T]he Indemnity Obligation…do[es] not outweigh the factors supporting substantial performance.").    Indeed, far from being the "root" or "essence" of the sale transaction, the indemnities are merely a contractual consequence of the agreement to enter into the sale transaction itself.    *In re Chateaugay Corp.*, 102 B.R. 335, 347-48 (Bankr. S.D.N.Y. 1989) (holding a tax benefit transfer agreement is not executory where a party's failure to fulfill obligations related to indemnification obligations stemming from the agreement would not affect any of the economic and possessory rights in the property).

274.     Furthermore, while Defendants have not made such a showing,[95] the volume of pending matters potentially giving rise to indemnity claims and the parties' performance of indemnification obligations since the Closing Date could not transform the SPA's indemnification provisions into an obligation that, if breached, would be a material breach of the SPA or would cause it to be implicitly assumed.  *In re Chateaugay Corp.*, 102 B.R. at 348 ("[A]n obligation by Debtors to defend and indemnify alone without any other material remaining obligations is insufficient to characterize these [tax benefit transfer] Agreements as executory.").  Indeed, no evidence has been submitted to the Court that the indemnification provisions were the "root" or the "essence" of the sale transaction.[96]  Moreover, indemnification provisions are standard in almost every sale agreement, and a term that no reasonable party would exclude from its contract – but a breach of that term does not amount to a rescission under state law – just a breach that leads to a damages claim against the breaching party.

275.     Moreover, the actions of the parties during the chapter 11 case support that the SPA was never an executory contract of any Debtor that needed to be assumed or rejected.  As discussed above, Defendants' argument is based solely on catchall language in the Plan stating that executory contracts not explicitly rejected are deemed assumed.[97]  Although they never say it, Defendants'

---

[95]     As the Court ruled in its letter dated September 7, 2022 [Adv. Pro. D.I. 425], Defendants cannot rely upon any of the late produced documents or testimony that might evidence any ongoing performance pursuant to the SPA's indemnification provision.

[96]     That Stacy Schusterman answered a line of leading questions at trial that the indemnification provisions were "important" does not make it an executory obligation as of effective date of plan.  Trial Tr. (Schusterman) at 1756:19-1758:20. Just because a contract provision is subjectively important to a party does not mean it is the central purpose of a transaction.

[97]     Specifically, the Plan( (JX-410), § V.A) states:

> On the Final Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases . . . .

argument must be based on the fact that the SPA was neither rejected during the cases nor it is on the list of 222 pages of rejected executory contracts and unexpired leases in the Plan Supplement. But the SPA also does not appear on the 409 pages of *assumed* executory contracts filed in the Plan Supplement nor on the 2,760 pages of executory contracts and unexpired leases in the Debtors' Schedule G filed during the chapter 11 cases.  The SPA was never subject to any specific motions to assume or reject, and there was no evidence produced at trial regarding why it was not placed on either of the relevant schedules.

### 3)    Assumption By Omission Does Not Foreclose The Trust's Ability To Bring Its Claims

276.    Finally, even if the Plan provided for an implicit assumption of the SPA, Defendants wrongly suggest that it is "well established" that contract assumption bars *all* avoidance actions for transfers made pursuant to an assumed contract.  Adv. Pro. Dkt. 410 at 61 (emphasis added).  Simply, while the Defendants may be correct as to preference actions (such as that at issue in *Kimmelman v. Port Authority of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 314 (3d Cir. 2003)), the same is not true for fraudulent transfer claims.  *In re Astria Health*, 640 B.R. 758, 769 (Bankr. E.D. Wa. 2022) (holding that assumption of an executory contract did not extinguish fraudulent transfer claims, noting that "[i]n the fraudulent transfer context, the case law is less developed" than in the preference context).

277.    In each of the cases cited by Defendants, the debtor at issue affirmatively moved during its chapter 11 case to assume the underlying contract or lease that was thereafter the subject of the fraudulent transfer action, and in each,the court ultimately granted such relief after affording all parties in interest the chance to be heard.  Understandably, when later presented with a challenge to the transactions under such assumed contracts, those courts invoked the law of the case doctrine or judicial estoppel as a basis for barring such challenges.  *In re HH Liquidation, LLC*, 590 B.R.

211, 270, 283 (Bankr. D. Del. 2018) (committee was judicially estopped from bringing a breach of fiduciary duty claim because the underlying leases were assumed by motion during the chapter 11 cases and the committee did not object); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) (assumption of employment agreements through a contested matter where committee had an opportunity to object was law of the case and therefore the committee was judicially estopped from seeking to claw back payments made pursuant to the employment agreements); *In re Vision Metals, Inc.*, 327 B.R. 719, 724 (Bankr. D. Del. 2005) (debtor was judicially estopped from attempting to void an agreement as constructively fraudulent based on its prior assumption of the contract).

278.    Judicial estoppel precludes a party from obtaining relief under one theory and later taking a contradictory position. *See In re Maxus Energy Corp.*, 639 B.R. 51, 65-66 (Bankr. D. Del. 2022) ("The basic principle of judicial estoppel ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.") (internal citations omitted).  The three part test in the Third Circuit is that: (1) two legal positions taken by the party must be irreconcilably inconsistent; (2) bad faith must be the basis for the change in position; and (3) judicial estoppel is not to be used unless that remedy is "tailored to address the harm identified" and no lesser sanction is adequate for that purpose.  *See Montrose Med. Grp. Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001).

279.    The judicial estoppel test fails here at the first prong – the SPA was not listed on the Debtors' Schedule G, the SPA was not listed on the Plan Supplement assumption schedule, and the SPA was not listed on the Plan Supplement rejection schedule.  Beyond the alleged application of the catchall language of the Plan (which can hardly be considered a legal position

for purposes of judicial estoppel), there is zero evidence in the record that any party in interest in the case has taken any position with respect to the SPA's assumption – until Defendants brought it up in their pre-trial brief.

280.    Finally, in a recent decision, the Bankruptcy Court for the Eastern District of Washington found that, notwithstanding the explicit assumption of a contract, a full-throated and clear reservation of claims in the relevant confirmation order overcame any claim of judicial estoppel or ratification of the contract by the debtor. *In re Astria Health*, 640 B.R. 758, 769 (Bankr. E.D. Wash. 2022) (holding that assumption of an executory contract did not extinguish fraudulent transfer claims seeking to avoid transfers and obligations under such contract). In *Astria Health*, the debtors entered into a servicing agreement prepetition with a third party, Cerner, that they wanted to assume postpetition. *Id.* at 763-64. The debtors also maintained that Cerner engaged in certain "representations and actions" prepetition that rose "to the level of fraud and misrepresentation." *Id.* at 763. The debtor and Cerner agreed on an arrangement whereby the agreement would be assumed and all other issues would be preserved for settlement or litigation at a later date. *Id* at 764. After the plan was confirmed embodying this agreement, litigation ensued. *Id.* at 764-65. During summary judgment, Cerner argued that the debtors' assumption of the contract waived the rights at issue in the adversary proceeding. *Id.* at 769. The *Astria Health* court rejected this argument on a number of grounds including that the assumption could not ratify the contract such that the debtors' claims were waived and the explicit preservation language preserved the debtors' claims. *Id.* at 769-74. In other words, where claims related to a contract were specifically preserved, assumption in itself could not defeat previously contemplated (and preserved) challenges of such contract, including fraudulent transfer claims. *Id.* at 769

(assumption under 365 itself does not "ossify[y] an agreement against a latent defect or an attack otherwise available under applicable nonbankruptcy law.").

281.    Defendants have presented no evidence in support of their position that would show, for example, that the various stakeholders involved in Plan negotiations in this case or drafting ever intended to assume the SPA (or any part of it) and, by doing so, knowingly waived the claims related to the Transaction.

282.    To the contrary, just as in *Astria Health*, and as discussed above, there is an abundance of evidence that the Plan preserved the causes of action relating to unwinding the transactions under the SPA.  Thus, because it is unequivocally clear that the Trustee's Fraudulent Transfer Claims were preserved in the Plan, assumption of the SPA, if it even occurred, does not preclude the Trustee from bringing the Fraudulent Transfer Claims because they were specifically preserved in the Plan.

283.    For all the foregoing reasons, the Trustee is not barred by the assumption provisions of the Plan from bringing its claims.

### B.    The Transfers By Non-SIC Debtors Do Not Involve Safe-Harbored "Financial Participants"

284.    Defendants initially moved for summary judgment arguing that all debtor-transferors were "financial participants" – SIC by virtue of its own swaps and the other transferors as guarantors of SIC's swaps – and thus, the Challenged Transfers were safe-harbored.  [Adv. Pro. D.I. 194]  Following the Court's determination that a debtor may be a "financial participant" under the Code, Defendants again moved for summary judgment, arguing only that SIC was a "financial participant" and presenting expert evidence of the value of SIC's swap positions.  [Adv. Pro. D.I. 347]  Then, at trial, Defendants sought to revive their initial summary judgment argument that the debtor-transferors other than SIC are "financial participants" merely because they *guaranteed* the

hedging agreements in which Samson Investment had a gross mark-to-market position exceeding $100 million. *See* Adv. Pro. D.I. 410 at 63-64. Defendants presented no trial evidence of the value of guarantees of SIC's swap agreements. Trial Tr. (Randolph) at 1721:5-15. And, it is undisputed that none of the remaining transferors had a gross mark-to-market position exceeding $100 million in the relevant hedging agreements. *Id.*; *see also* Adv. Pro. D.I. 204 ¶ 6. Defendants' argument thus must be a legal one – that, by virtue of their guarantee of the credit facility, these Debtors also guaranteed all of Samson Investment's swap agreements, thereby qualifying the RBL as a "swap agreement" and rendering these Debtors parties to the relevant swap agreements and thus making them "financial participants" as defined in section 101(22A). Adv. Pro. D.I. 410 at 63.

285.    At most, Defendants can show that the five guarantor transferors are deemed *parties* to Samson Investment's swap agreements. A mere party to a "swap agreement" is not thereby entitled to the safe harbor, however. While guarantees may be "swap agreements", *see* section 101(53B)(A)(vi), this does not mean that parties to guarantees also "have" the underlying swap agreements that are subject to the guarantees, let alone have them in the same amount as the principal holder. On its face, the definition of "financial participant" does not include entities who are "parties to swap agreements" in which *another* entity has a mark-to-market position exceeding the $100 million threshold. Rather, section 101(22A) only covers an "*entity*" that itself "*has* the gross mark-to-market *position* . . ." exceeding $100 million. In other words, the entity in question must itself hold the qualifying position to be "financial participant."

286.    Moreover, section 101(53B), defining "swap agreement," makes clear that a guarantee of a swap agreement is only deemed a swap agreement to the extent of damages associated with the swap as measured in accordance with section 562 of the Code. *See* 11 U.S.C. § 101(53B)(A)(vi) (defining a swap agreement to include "any guarantee or reimbursement

obligation by or to a swap participant or financial participant in connection with any agreement or transaction referred to in any such clause, *but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.*") (emphasis added) Defendants have not shown that there were any damages associated with the relevant swap agreements, let alone damages exceeding the relevant thresholds specified in the definition of financial participant.

287.    Defendants' concession[98] that none of these five transferors themselves held the requisite mark-to-market positions is dispositive here.  As a matter of common sense, a guarantor of swap agreement, which can only ever realize the downside of an agreement, could never have a mark-to-market position in a swap agreement in which its affiliate principal obligor has a *positive* mark-to-market position.  Virtually all of SIC's swaps upon which Defendants rely had positive value for SIC.  In the case of a swap agreement that is "in the money" from the perspective of primary obligor – *i.e.*, an agreement in which the primary obligor has a positive mark to market position – a *guarantor* of that primary obligor  cannot conceivably have *any mark-to-market position at all* in that swap agreement, *positive or negative*.  That is because the guarantor, by definition, has no ability to realize the upside of the swap agreement.  So, for the guarantor, there is no mark to market value in an "in the money" swap agreement, positive or negative, to add toward a gross position.  As a result, Defendants' position is that an entity who indisputably does not meet either of the express statutory prongs in the definition of "financial participant" should

---

[98]    Defendants stipulated in connection with their motion for summary judgment that, other than in their capacity as guarantors, none of the remaining transferors "had, at the date of the filing of the petition, gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) of the Bankruptcy Code with the debtor or any other entity (other than an affiliate) at the petition date or on any day during the 15-month period preceding the date of the filing of the petition." Adv. Pro. D.I. 204 ¶ 6.

nonetheless be deemed a financial participant under an unexpressed *third* prong in section 101(22A) – *i.e.*, a "guarantor of any of the foregoing."

288.    Ultimately, Defendants' attempt to characterize the other Debtor transferors' guarantees as conferring "financial participant" status also conflicts with the overall statutory scheme and relevant legislative history of the 546(e) safe harbor.  The legislative history indicates that guarantees are included within the definition of "swap agreement" and other financial products for a limited purpose: "[The inclusion of guarantees related to swap agreements] ensures that any such agreement, arrangement or enhancement is itself deemed to be a swap agreement, and therefore *eligible for treatment as such for purposes of termination, liquidation, acceleration, offset and netting* under the Bankruptcy Code, the FDIA and the FCUA. . . . A security agreement or arrangement or guarantee or reimbursement obligation related to a 'swap agreement,' 'forward contract,' 'commodity contract,' 'repurchase agreement' or 'securities contract' *will be such an agreement or contract only to the extent of the damages in connection with such agreement* measured in accordance with Section 562 of the Bankruptcy Code (added by the Act)."  H.R. Rep. No. 109-31, at 129 (2005) (emphasis added).  There is no indication that the inclusion of guarantees in the definition of swap agreements was ever intended to expand the rights of parties to those guarantees, and certainly no indication that such inclusion was somehow intended to expand the definition of "financial participant" for purposes of section 546(e).  Rather, their inclusion ensures that swap agreements and their related enhancements are treated consistently with respect to netting and damages.[99]

---

[99]    The legislative history further supports the Trustee.  The President's Working Group on Financial Markets ("Working Group") drafted legislation that largely formed the basis of the amendments to the Bankruptcy Code at issue here, including the addition of "financial participant," the expansion of "swap participant," and the inclusion of "financial participants" within section 546(e)'s covered entities.  *See* H.R. Rep. No. 109-31, at 20 (2005).  The Working Group made clear that, while certain contracts were entitled "special rights," such as section 546(e)'s safe harbor protections, "[a] major caveat is that these rights are

289.    Ultimately, Defendants' contention is that a potentially infinite number of entities engaging in fraudulent transfers may benefit from a financial participant's protections by guaranteeing or providing credit enhancements to an affiliate that has the qualifying mark-to-market position.  This reading, apart from having no basis in the text of the statute, would lead to absurd results, extending section 546(e)'s protections to entities that could have little, if any, interaction with or impact on the financial markets.  In this case, the same mark-to-market position would be used six times to insulate six parties, even though each one of those six parties obviously could not have had 100% of the exposure of a single swap agreement.  If anything, if multiple contractual parties could rely on the same swap agreement, then the mark-to-market position associated with that contract would need to be apportioned among the parties in some rational way for purposes of determining whether each party constitutes a "financial participant."    But Defendants could not concede such a distribution among transferor entities because there is simply not enough exposure to go around.    For example, if the alleged $123,467,838 mark-to-market value of the positions at the Petition Date here were divided equally among the six transferors (SIC and its five guarantors), each of those transferors would have only $20,577,973 in mark-to-market positions individually, far less than the $100 million needed to qualify as a "financial participant."

### C.  Defendants Have Not Shown Intervening Solvency

290.    While not pleaded as an affirmative defense, Defendants throughout trial have referenced certain circumstantial evidence that they suggest demonstrates that Samson was solvent for a period of time post-close, and thus, was neither balance sheet insolvent nor inadequately

---

available for these contracts only if the party meets specific criteria . . . ."  Report of the President's Working Group on Financial Markets, *Hedge Funds, Leverage, and the Lessons of Long-Term Capital Management* (Apr. 28, 1999), at E-4 to E-5, *available at* https://www.cftc.gov/sites/default/files/tm/tmhedgefundreport.htm (last visited Nov. 20, 2022).

capitalized as a result of the Transaction.   For example, Defendants introduced evidence of certain of the Sponsors' subjective beliefs as to Samson's profitability, KKR employees' personal investments in the Transaction, or the trading prices of Samson's notes post-close, as evidence of Samson's financial condition.   None of this constitutes competent evidence of solvency.

291.    In the most stark example, Defendants' opening began with a discussion of Ms. Farley's February 2013 2 a.m. email.  Trial Tr. (Opening 31:25-35:23.  Defendants thus started the trial with the assertion that this one email establishes that Samson was "not insolvent, 14 months after the sale." *Id.* at 33:23.   But, in context, this email shows nothing more than Ms. Farley's late-night assurances that the company could be turned around, in response to a query by a senior employee of one of Samson's equity investors with seats on Samson's board.   This was not, as Defendants mischaracterized it, "speaking to a peer." *Id.* at 34:25.  Ms. Farley was advocating for her job.  Defendants further asserted that, in advocating for that job, Ms. Farley presented her business plan to the board weeks later. *Id* at 35:18-20.  But, there is no evidence that Ms. Farley *ever* created an actual, finished business plan.  Rather, the plan she references in her email is conspicuously marked ████████████ JX-383 at -078.  Nor did Defendants show that Ms. Farley's plan to achieve a 1.5X return on the initial investment was ever implemented. *See* PX-652 ████████████████████  Indeed, Ms. Farley was replaced as CEO only a few months after her email.   JX-385.   In any case, even if this e-mail represented Ms. Farley's subjective belief regarding the viability of the company post-Closing, it would not be not meaningful evidence of solvency.  As Judge Gropper in *Tronox II* observed in response to a similar argument – she "had no choice but to do [her] best under the circumstances." *In re Tronox Inc.*, 503 B.R. at 307-08 (finding that "while many in Tronox's management were 'hopeful' about

Tronox's prospects, others saw disaster on the horizon," and that "the optimism of some of Tronox's management is no better proof of solvency than the despair of others").

292.    Likewise, the equity sponsors' post-closing marks of their investment for reporting purposes are not admissions of the company's financial condition, nor are they evidence of the value of the company.  As an initial matter, evidence of equity sponsors' views on Samson's solvency is simply not admissible as an admission of the Debtor.  In any event, the Sponsors' marks are not evidence of the value of the company.  Had the equity sponsors actually believed the company was solvent and poised to survive, one would obviously have expected to see equity infusions to help the company survive until commodities prices rebounded.  Again, though, there is no record evidence that any such additional equity was ever offered.

293.    Nor is mere reference to the prices at which Samson's bonds traded between the Transaction and filing for bankruptcy competent evidence of solvency.   As purported evidence that "no one thought [Samson] was insolvent," Defendants note that "[t]he unsecured notes continued to trade above par." Defendants Pre-trial Brief at 18. However, mere anecdotal evidence of bonds trading hands is not evidence here.  First, such evidence does not indicate whether the sales were public or private.  If private, the bonds could have traded in an inter-fund transfer, merely an accounting matter, and not an indication of the value assigned to the bonds by a well-informed buyer and seller in the marketplace.  Second, even if the bonds traded on the public market, the cases Defendants rely on illustrate that market evidence is reliable only "[a]bsent some reason to distrust it." *VFB LLC*, 482 F.3d at 633; *In re Iridium Operating LLC*, 373 B.R. at 293, 303 (crediting market defense where the markets "were reasonably well informed as to Iridium's operating characteristics and constraints," but recognizing the court "has the broad discretion to find that the markets somehow were distorted and did not fairly reflect the underlying enterprise

value of Iridium"); *see also In re Chemtura Corp.*, 439 B.R. 561, 586 n.106 (Bankr. S.D.N.Y.

2010) (stating that market evidence is not always the best indicator of value "since, as I saw in the

Global Crossing and Adelphia cases on my watch, financial accounting techniques . . . or fraud

can give the marketplace a distorted impression of a company's worth"; market evidence is not

reliable where there is "a suggestion that the company's financials or projections are inflated or

misleading"); *LaSalle Nat'l Bank Ass'n v. Paloian*, 406 B.R. 299, 352 (N.D. Ill. 2009) ("[A]

preference for contemporaneous market evidence is by no means a requirement, and even where

available, contemporaneous data does not preclude a court from assigning greater weight to expert

testimony, particularly where, for example, the methodology employed at the time was itself faulty

or biased."). Here, Defendants have presented no evidence at all of an adequately informed market

with meaningful float, and Defendants experts have offered no formal analysis or opinion that the

market for Samson's unsecured notes was efficient.   On the other hand, the Trustee has established

that market participants were not receiving the full story of Samson's financial condition. *See, e.g.*,

Trial Tr. (Baxter) at 669:25 ("[I]t's my opinion that the rating agencies and the lending community

were given, at best, inadequate information. My opinion is, even that it was misleading to an

informed astute market participant in the rating agencies or the lender community."); *see also* Trial

Tr. (Roski) at 2360:01-23.   Moreover, Defendants have not presented sufficient evidence to

corroborate the unsecured notes' trading prices as an indication of Samson's solvency post-

Closing.   In toto, Defendants have offered only two print-outs from a Bloomberg terminal, and an

expert summary of the notes' ratings by credit rating agencies.   *See* DX-517, DX-840, Roski Decl.

¶¶ 183-185.   But, Defendants' expert, Ms. Roski, did not ultimately draw any conclusions as to

Samson's value based on this information; rather, she only opined that "Mr. Baxter erred . . . by

not examining" this data.   Roski Decl.   ¶ 181.   Thus, unlike the prevailing defendants in the

authorities they cite, Defendants did not offer any expert solvency analysis that would "serve to corroborate the value" indicated by the "market" evidence. *VFB LLC v. Campbell Soup Co.*, No. CIV.A.02-137 KAJ, 2005 WL 2234606, at *27 (D. Del. Sept. 13, 2005), aff'd, 482 F.3d 624 (3d Cir. 2007) (noting that "Dr. Luehrman's analysis was persuasive and confirm[ed] that the stock price of VFI at the time of the Spin-off was reasonable."); *see also In re Iridium*, Case No. 01-02952 (JMP) (March 19, 2007 Trial Transcript) (Bankr. S.D.N.Y. 2007) (Defendants' expert Den Uyl testifying to how he incorporated market price data in his solvency analysis and market transaction approach).

294.    Moreover, the mere fact of Samson's survival for three years following the Transaction is not evidence of its solvency during that period.  The unrebutted evidence at trial showed that an E&P company can exist for some period in a downward spiral, long after it is doomed to fail.    That is because the sheer, substantial cash generating asset bases of E&P companies can enable them to continue operations and pay their debts for a period of time as they struggle to stay afloat.  Indeed, the evidence shows that a struggling E&P company would not file for bankruptcy the moment it first violated a lien covenant; it would instead sell assets and cut capital expenditures, putting "a Band-Aid on a major artery wound."  Trial Tr. (Baxter) 1343:25. Here, Defendants presented no evidence at trial that Samson's death spiral persisted for too long, or that an E&P company cannot survive for years while mired in a death spiral.  Rather, the unrebutted evidence was that a company can flounder in a death spiral for many years. *See* Limbacher Dep. Tr. at 171:19-173:4, 180:23-181:11.  And, the amount of time it took for Samson to file a bankruptcy petition has no bearing on whether, or for how long, Samson was solvent.  *See In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 577 n.108 (S.D.N.Y. 2007) ("Simply because a company is insolvent does not mean it necessarily will file for bankruptcy." (internal citation

omitted)); *Kittay v. Atl. Bank (In re Glob. Serv. Grp. LLC)*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004)(noting that insolvent companies may continue to operate because "[t]he fiduciaries of an insolvent business might well conclude that the company should continue to operate in order to maximize its 'long-term wealth creating capacity,' or more generally, its enterprise value."); *see also supra* ¶ 194.

295.    In sum, the record evidence that Defendants advance here is a far cry from what would carry the day to establish that "the market functioned properly and determined the fair market value of SIC." Adv. Pro. D.I. 410 at 29.

### D.  No Damages Offsets or Reductions Are Available

#### 1)    Defendants Are Not Good-Faith Transferees

296.    As one of their many purported defenses, Defendants argue that any remedies or recoveries to the Trustee should be barred or precluded, in whole or in part, or must be reduced or impressed with a lien in favor of Defendants, because they acted in good faith. Defendants make two good-faith affirmative defenses, one under section 8(d) of the Uniform Fraudulent Transfer Act, or any other analogous applicable provisions in any state law, and the other under section 550(e) of the Bankruptcy Code and any other applicable provisions and state laws. [Dkt. 369, ¶¶ 6, 8] The evidence at trial proved that Defendants are not entitled to avail themselves of any affirmative defense involving good faith.

297.    Under Section 1308 of the Delaware Uniform Fraudulent Transfers Act, "[a] transfer or obligation is not voidable under §1304(a)(1) of this title against a person who took in good faith and for a reasonably equivalent value." 6 Del. C. §1308(a). As an affirmative defense, the burden is on Defendants to show that they are entitled to the good-faith exception. *See In re Maxus Energy Corp.*, 641 B.R. 467, 510 n.14 (Bankr. D. Del. 2022) (citing DUFTA §1308 and

noting that "[u]nder both the UFTA and Section 548(c) of the Bankruptcy Code, the transferee bears the burden of establishing good faith" (quotations and citation omitted)); *see also In re Syntax-Brillian Corp.*, 573 Fed. Appx. 154, 161-62 (3d Cir. 2014) ("It is not essential that the Trust aver that the [defendant] had culpable knowledge of any underlying scheme to defraud or acted in bad faith.  Reading a bad faith element into §548(a)(1) or 6 Del. Code § 1304 would only serve to shift the burden on the good faith defense, requiring the representative of the bankruptcy estate to prove the transferee did not act in good faith, in derogation of the statutory language.").

298.    Whether a transferee has operated in good faith is evaluated on a case-by-case basis. *See In re Am. Rehab & Physical Therapy, Inc.*, No. 04-14562, 2006 WL 1997431, at *19 (Bankr. E.D. Pa. May 18, 2006) ("The Bankruptcy Code does not define . . . 'good faith transferee.' *Collier* has observed that because the question of good faith arises in varied circumstances, the term defies an easy or precise definition. Accordingly, courts generally evaluate good faith defenses on a case-by-case basis."). "In order to establish the element of good faith [under the UFTA], the transferee must prove that he received the conveyance in objective good faith." *Armstrong v. Collins*, 2010 U.S. Dist. LEXIS 28075, at *59-60 (S.D.N.Y. Mar. 24, 2010) (citation omitted).  When evaluating a good-faith defense, courts look to "what the transferee objectively knew or should have known, such that [it] does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer." *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 U.S. Dist. LEXIS 24559, at *15-16 (W.D. Pa. Mar. 26, 2009) (quotations omitted); *see also In re Am. Tissue, Inc.*, 2007 Bankr. LEXIS 4004, at *25 (Bankr. D. Del. Nov. 20, 2007) (noting Third Circuit established that defense of good faith "is not available if the transferee has knowledge of facts that would lead a reasonable person to believe that the property was recoverable by a debtor").  Indeed, the Third Circuit has clearly ruled that "[i]f a transferee possesses knowledge of facts that suggest

a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge." *In re Bressman*, 327 F.3d 229, 236 (3d Cir. 2003); *see also In re Mongelluzzi*, 587 B.R. 392, 413 (Bankr. M.D. Fla. 2018) (good-faith defense is unavailable to defendants who "just did not want to ask too many questions because they did not want to know too much"); *In re First Nat'l Parts*, 2000 U.S. Dist. LEXIS 10420, at *19 (N.D. Ill. July 12, 2000) ("[A] transferee cannot stick its head in the sand, clinging to its subjective belief while purporting to ignore signs of fraud or insolvency on the part of the transferor.").

299.    For the reasons stated previously, Defendants have not met their burden to warrant application of the good-faith defense.  Nor could they, as the evidence established at trial indicated the Defendants had sufficient knowledge to place them on "inquiry notice of the voidability of the transfer."  The Defendants plainly knew that the oil and gas market was volatile; that the market for natural gas through 2011 was rapidly declining; that, as of September 2011, "the [market was] indicating that perhaps this isn't the best time to do a deal."  JX-104; Trial Tr. (Schusterman) 1795:10-1796:17.  Ms. Schusterman knew that the Sponsors were putting [$4 billion] in leverage on Samson at close, and she had access to the credit agreements regarding that debt.  *See* Trial Tr. (Schusterman) 1759:20-1760:4.  Ms. Schusterman also knew that that post-Closing leverage was many times more than Samson had ever incurred.  Trial Tr. (Schusterman) at 1784:18-1785:6. Notwithstanding, Ms. Schusterman made no effort to determine whether or not the company could ever meet this new amount of leverage.  Trial Tr. (Schusterman) at 1866:11-14 ("[A]s far as you know, the company took no steps to ensure that KKR was not overly leveraging the company to the detriment of the unsecured creditors, right? A.  Right.").  And the sellers more generally made no efforts to make sure that SRC could service the amount of debt it was undertaking in the

Transaction, and took no steps to review the KKR model or ensure the accuracy of its inputs or projections. Trial Tr. (Schusterman) 1858:4-1860:3. Most critically, the Defendants never requested that Jefferies refresh their valuation after July 2011, and the Defendants never commissioned a solvency or fairness opinion:

> Q. Did any of the selling shareholders—that's you [Stacy Schusterman] and the Foundation – ever commission a solvency opinion before the transaction closed?
>
> A. No.
>
> Q. Did either of your two trusts commission a solvency opinion before the transaction closed?
>
> A. They aren't my trusts, but the trust did not commission a solvency.
>
> Q. Okay. Did any of the LLCs, between the trusts and the company, ever commission a solvency opinion before the transaction closed?
>
> A. No.
>
> Q. Did the foundation ever commission a solvency opinion before the transaction closed?
>
> A. No.
>
> Q. Did any of these entities that I've just named ever commission a fairness opinion from anybody?
>
> A. I don't recall receiving one.

Trial Tr. (Schusterman) at 1810:6-23. Ms. Schusterman simply assumed that Samson's unsecured creditors "would be fine," but admitted "that was based on no analysis that [she] had seen." Trial Tr. (Schusterman) at 1864:7-1865:1. This is precisely the type of "sit[ting] on . . . heels" that a defendant cannot do, *see Bressman*, 327 F.3d at 236, and it certainly does not entitle any Defendants to shield their actions under the defense of good faith.

300. Defendants similarly have failed to show they are entitled to a good-faith defense under Section 550(e). Under Section 550(e), "a good faith transferee has a lien on the property transferred to the extent the transferee made certain improvements to the property after the transfer

and before avoidance." 5 Collier on Bankruptcy ¶ 548.09[4] (16 ed.).  As stated above, Defendants have presented no evidence that they acted in good faith; and Defendants made no attempt to adduce evidence that they made any improvements to transferred property.   Accordingly, Defendants are not entitled to a lien under Section 550(e).

### 2) The Settlement Trust Beneficiaries Are Not Estopped From Recovering

301.    Defendants noted in passing in their pre-trial brief that "any judgment entered against them must be reduced to the extent of those trust beneficiaries estopped to benefit from them."  Adv. Pro. D.I. 410 at 51 n.50.  As with any affirmative defense, Defendants bear the burden of proving that the Trust beneficiaries' recoveries should be estopped.  For the following reasons, any argument Defendants make on this point will be unavailing.

302.    First, there is no statutory equitable bar to recovery. Defendants cite, without elaboration, the supplementary provision of DUFTA.[100] But Defendants do not point to any precedent supporting the use of this provision to equitably estop recovery, and the Trustee knows of none.  The case law Defendants cite in their pre-trial brief suggests reliance on section 550(a) to limit Trust beneficiaries' recovery, but this is misplaced.  Indeed, there is a "virtually universal [construction of Section 550(a)'s "for the benefit of the estate" clause] among courts that have substantively considered the issue" that Section 550(a) sets "a minimum floor for recovery in an avoidance action," but not "any ceiling on the maximum benefits that can be obtained once that floor has been met."  *In re Tronox Inc.*, 464 B.R. 606, 614 (Bankr. S.D.N.Y. 2012) (collecting

---

[100]    Specifically, Del. Code Ann. tit. 6, § 1310 states:

Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency or other validating or invalidating cause, supplement its provisions.

cases).[101] This Court has similarly recognized this consensus view, declining to limit the amount of recovery to creditors under 550(a) even where the potential recovery would exceed the total amount of creditors' claims, noting that "[w]ere the Court to rule otherwise, it would mean that if Defendants are in fact liable for the fraudulent transfer, they would keep most if not all of the transferred money." *In re Physiotherapy Holdings, Inc.*, No. 13-12965(KG), 2017 WL 5054308, at \*7 (Bankr. D. Del. Nov. 1, 2017).  The court stated that it could not "countenance such an inequitable result if liability exists." *Id.*; *see also, e.g.*, *In re Acequia, Inc.*, 34 F.3d 800, 812 (9th Cir. 1994) (declining to limit recovery under Section 550(a) to prevent a windfall to the estate, indicating that "the [estate] has a greater equitable claim to the transferred funds than does [the defendant wrongdoer]").  Similarly here, if the Court were to estop any Trust beneficiaries' recovery and reduce judgment against the Defendants, the liable defendants would simply keep the funds, an ultimate result that this court has deemed "inequitable." *In re Physiotherapy Holdings*, 2017 WL 5054308, at \*7.

303.    The two out of circuit cases that Defendants cite for their argument that the Trust beneficiaries may be estopped from recovering are inapposite.  For instance, Defendants cite *Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 467 (W.D. Tex. 2013), a case in which lenders who had actively participated in the fraudulent transaction were precluded from recovering. In that case, however, there was ample evidence that those lenders "had full knowledge" of the transaction structure and the risks of the transaction.  *Id.* at 482.  Importantly, multiple representatives of the lenders had "expressly testif[ied] that they were not defrauded in the" transaction and that they thoroughly understood the terms of the loan. *Id.* at 478-79. The court

---

[101]    The *Tronox* court noted that a case defendants relied on in support of a recovery cap under section 550(a) was "decided on 'extremely unusual facts'" and largely for state public policy issues. *Id.* at 617 (citing *In re Murphy*, 331 B.R. 107, 121 (Bankr. S.D.N.Y. 2005)).

therefore barred recovery under equitable principles, indicating that if those lenders recovered, their "high risk investment" would "pay off in the form of a massive windfall" and they would "recoup the bulk of the loan they made with full knowledge of the risk," ultimately "[h]aving made off like bandits" and "fac[ing] no prospect of liability for their actions." *Id.*; *see also id.* at 482 n.11 ("The goal is, ultimately, to make the estate whole. The trouble arises when the estate is comprised primarily of claims derivative of a wrongdoer with no independent right to recovery, particularly when the wrongdoer has been released from liability by the confirmed plan.") (emphasis and internal citation omitted).

304.    As the *Crescent Resources* court noted, "[t]he one consistent vein traveling through all" cases considering equitable bars to recovery was "the fact-specific nature of the inquiry," and that "[i]t is therefore instructive to consider the factual circumstances of [the] case, and the equitable impact of the Trust's potential recovery." *Id.* at 482.  Applying this fact-specific inquiry here, there is no basis to reduce the Trust's potential recovery.  *First*, there is no evidence that Trust is seeking to recover on behalf of "wrongdoers" who cannot recover in equity.[102]  *Second,* unlike in *Crescent Resources*, there is no record evidence of any Trust beneficiary who stands to recover has ever disavowed that it was defrauded.  In fact, to the contrary, the Trust has established that misleading information concerning the Transaction was communicated to market participants (which included Trust beneficiaries), leaving them insufficiently informed to gain a full

---

[102]    Defendants also rely on another extreme case involving potential recovery by a bad actor. *In re Yellowstone Mountain Club, LLC*, 436 B.R. 598 (Bankr. D. Mont. 2010). There, the court found that the *in pari delicto* defense barred prepetition lenders from recovery where the lenders' "naked greed combined with . . . complete disregard for the Debtors . . . shock[ed] the conscience of [the] court." *Id.* at 677-78 (quotations omitted).  In any event, this decision was ultimately reversed by the Ninth Circuit, which indicated that "[t]he lenders may have been reckless in issuing their loans, but such wrongdoing is not comparable in degree or kind to [the defendant's] wrongdoing." *Blixseth v. Glasser (In re Yellowstone Mt. Club, LLC)*, 656 F. App'x 307, 311 (9th Cir. 2016). Therefore, Defendants' reliance on *In re Yellowstone* is inapposite, and the relevant portion of the opinion is no longer good law.

understanding of the risk. *See, e.g.*, Trial Tr. (Baxter) at 668:23-669:21 (explaining the "material issues with how this deal was communicated to the rating agencies and the lender communications"); *Id.* 669:25 ("[I]t's my opinion that the rating agencies and the lending community were given, at best, inadequate information. My opinion is, even that it was misleading to an informed astute market participant in the rating agencies or the lender community."); *see also* Trial Tr. (Roski) at 2360:01-23.   Finally, a recovery for the Trust in this case would not give rise to anything like the "massive windfall" contemplated in *Crescent Resources*.[103]   Therefore, even if *Crescent Resources* bound this Court, Defendants have presented no evidence supporting a reduction in Trust beneficiaries' recovery.

### E.  Defendants' Remaining Defenses Are Meritless

305.    Defendants have made reference to a number of additional technical affirmative defenses over time.   However, those defenses have never been briefed or argued beyond conclusory statements in Defendants' Answer or the pre-trial order.   It is, therefore, the Trustee's position that, because the Defendants made no effort or attempt to establish these defenses before or at trial, they have been waived.   *Porter v. NationsCredit Consumer Disc. Co.*, 2007 U.S. Dist. LEXIS 14328, at *10 (E.D. Pa. Feb. 28, 2007) ("The Third Circuit has held that a party waives an affirmative defense when it does not attempt to establish the defense before or at trial and that merely the defense in an answer is insufficient to avoid waiver.   The rationale behind this rule is that it would be 'grossly unfair to allow a [party] to go to the expense of trying a case only to be

---

[103]     In *Crescent Resources*, the lenders at issue had already received "ownership of Crescent and several hundred million dollars in loan payments" and thus, in the court's view, the "lenders will have stolen Crescent Resources" and "made off like bandits."   *Crescent Res.,* 500 B.R. at 482-83.   Here, the unsecured creditors have to date received only pennies on the dollar, and in no sense can be said to be seeking to "steal" the debtor or its value.

met by a new defense after trial.'" (citing and quoting *Bradford White Corp. v. Ernst & Whinney*, 872 F.3d 1153, 1161 (3d Cir. 1989); *Williams v. Runyon*, 130 F.3d 568, 574 (3d Cir. 1997))).

306.   Because Defendants have stayed silent with respect to these defenses, the legal and factual bases of these remaining defenses remain unclear.   However, out of an abundance of caution and to respond to any last-minute attempt by the Defendants to cure a waiver, the Trustee briefly responds to these defenses, to the extent they are intelligible, below.

### 1)   The Transfers Are Not Otherwise Safe Harbored

307.   Having brought two summary judgment motions seeking to safe-harbor the Challenged Transfers on a theory that they involved "financial participants," Defendants have failed to otherwise move for relief under section 546(e).   Nor did Defendants make any such argument in their pre-trial brief.   Defendants stated in the pre-trial order that, in addition to the above-referenced safe harbor defense, they "intended to present evidence proving" that "[t]o the extent one or more transfers qualify either as settlement payments or transfers made in connection with a securities contract made by or to or for the benefit of a financial institution or financial participant, Plaintiff cannot avoid such transfers."   [Adv. Pro. D.I. 369 at 6-7 (Affirmative defense no. 4)].   No such evidence was presented at trial.

308.   As relevant to Defendants' articulation of this affirmative defense, section 546(e) provides: "the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . financial institution [or] financial participant, . . . or that is a transfer made by or to (or for the benefit of) a . . . financial institution [or] financial participant, . . . in connection with a securities contract, as defined in section 741(7)[.]"  11 U.S.C. § 546(e).  There is no basis for the transfers to be safe-harbored from avoidance on such grounds.  As set forth above, the non-SIC transferors who guaranteed SIC's

swap contracts were not, themselves, financial participants. Nor were they "financial institutions."

Accordingly, this safe harbor defense is not available.

309. A "financial institution" is defined under the Bankruptcy Code as:

(A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a "customer", as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or

(B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940 [15 USCS §§ 80a-1 et seq.].

11 U.S.C. 101(22). Defendants have not articulated which entities they contend are "financial institutions." However, it is evident from the record that the Transaction was not a transfer "by or to (or for the benefit of)" such an entity.

310. Defendants "have not identified an agency or custody agreement between" any participants in the Transaction, nor have they offered evidence of one, and thus have failed to identify a qualifying participant. *In re Tops Holding II Corp.*, 2022 WL 6827457, at *36. To the extent Defendants intend to rely on transaction documents such as the funds flow memo to argue that the mere fact of funds being deposited in a bank account on behalf of a transferor or transferee renders that entity a "financial institution," this would be insufficient. A bank's receipt of proceeds from a transfer on behalf of a customer does not evince that the bank is "acting as an agent or custodian" for that customer. *See id.* at *37 ( "[Defendants] instead rely simply on the Flow of Funds Memoranda that show proceeds of the private notes were intended to be deposited in 2009 and 2012 into [transaction participants'] bank accounts . . . . However, without more, a bank account holder's relationship with its bank is merely a creditor-debtor relationship[.]"). Defendants

have presented no evidence showing that the "general rule" that "the relation between a bank and its depositor is that of debtor and creditor, not of agent and principal," *id.*, should not apply.  Nor can Defendants make a showing that any transaction participant's bank is a "custodian," a term that "is separately defined in the Bankruptcy Code, and by its plain terms that definition clearly would not apply to a depositor/bank relationship." *Id.* at *38.

311.    To find a "financial institution" by virtue of a bank's facilitating a transaction, without more, would be to shield from avoidance virtually every transfer made in connection with a securities contract, since undoubtedly some party to almost any transaction would rely on a "financial institution" to help carry out routine functions such as making payment on a check or receiving a wire transfer.  Certainly every private LBO would be so immunized, a result neither intended by the legislature nor consistent with the law of this Circuit.  *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir. 1986).  The only avoidable transactions under such a theory would be one in which *every* participant showed up to closing with the apocryphal suitcase full of cash or physical assets to exchange.  Section 546(e) cannot be read to produce such an absurd result.

### 2)    The Trustee's Recovery Should Not Be "Adjusted In The Interests Of Equity"

312.    Defendants have previously asserted in conclusory form that "recovery on some or all of the claims in the Complaint should be barred, reduced or impressed with a lien or otherwise adjusted in the interests of equity."  [Adv. Pro. D.I. 397 at 8 (affirmative defense no. 7)].  There is no reason, in law or in equity, that would require this Court to adjust any recovery awarded to the Trustee, if that is what the Court ultimately rules.  Moreover, it is a well-settled principle that "[e]quity abhors a forfeiture."  *In re Maguire*, 11 B.R. 649, 651 (Bankr. W.D. Pa. 1981); *see also Jefferson Chem. Co. v. Mobay Chem Co.*, 267 A.2d 635, 637 (Del. Ch. 1970) ("Equity, of course,

abhors a forfeiture.  And it is not obliged to permit a party to get the advantages which a forfeiture

would give him.").

### 3)    Defendants' Catchall Affirmative Defense Is Totally Unsupported

313.    Defendants list as an affirmative defense that "Plaintiff's claims are barred or

limited by the doctrines of unjust enrichment, waiver, estoppel, and laches." [Adv. Pro. D.I. 397

at 8 (affirmative defense no. 10)].  All of these defenses are inapplicable and lack any evidentiary

support in the record.

314.    Unjust enrichment describes "the unjust retention of a benefit to the loss of another,

or the retention of money or property of another against the fundamental principles of justice or

equity and good conscience."  *RPA Asset Mgmt. Servs., LLC v. Siffin (In re MTE Holdings LLC)*,

Nos. 19-12269 (CTG), 21-51255 (CTG), 2022 Bankr. LEXIS 2352, at \*24 (Bankr. D. Del. Aug.

24, 2022).  It requires a showing of (1) an enrichment; (2) an impoverishment; (3) a relation

between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence

of a remedy at law.  *Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, Nos. 16-11596 (KG),

18-50633 (KG), 2019 Bankr. LEXIS 2906, at \*31 (Bankr. D. Del. Sep. 16, 2019); *see also Emerald

Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re Fah Liquidating

Corp.)*, 572 B.R. 117, 130-31 (Bankr. D. Del. 2017).

315.    As with their other remaining defenses, Defendants have failed to develop any

argument that the Trustee's claims are barred under the principle of unjust enrichment.  In this

context, they would be hard pressed to do so.  Unjust enrichment is typically brought as a claim,

and Defendants do not purport to seek any restitution of some conferred benefit.  *See Adidas Am.,

Inc. v. Thom Browne, Inc.*, No. 21-CV-5615 (JSR) (RWL), 2022 U.S. Dist. LEXIS 191704, at \*20

(S.D.N.Y. Sep. 21, 2022) ("This 'defense' is nonsensical. . . . unjust enrichment typically appears

as a claim, not a defense.").  To the extent that Defendants are arguing that the trustee *would* be unjustly enriched should they succeed on their claims, that too would be incorrect for the reasons already articulated above.

316.    Waiver is the "intentional relinquishment of a known right." *Am. Home Mortg. Holding v. Showcase of Agents, L.L.C. (In re Am. Home Mortg. Holding)*, 458 B.R. 161, 174 (Bankr. D. Del. 2011).  The standards for proving waiver "under Delaware law are quite exacting." *AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 659 (D. Del. 2017) (internal quotation omitted).  For instance, "[i]ntention forms the foundation" of the waiver defense and such intention "must appear clear from the record evidence." *Id.* at 660 (quotations omitted).  Further, since waiver is an "intentional relinquishment or abandonment of a known right ... [courts] must indulge every reasonable presumption against [it]." *In re La Paloma Generating, Co.*, 588 B.R. 695, 717 (Bankr. D. Del. 2018).  Defendants have not specified why, or even how, the affirmative defense of waiver is applicable to any element of the Trustee's claims.  They have failed to describe at what point and it what manner the Trustee relinquished its right to recover on the fraudulently transferred assets.  Accordingly, Defendants have not met the "exacting" standards to make a showing of waiver by the Trustee.

317.    Laches is an equitable defense developed "to protect defendants against unreasonable, prejudicial delay in commencing suit." *Baxter v. Bressman (In re Bressman)*, 874 F.3d 142, 149 (3d Cir. 2017) (internal quotation omitted).    It applies in "extraordinary circumstances" and the Defendants bear the burden of proving (1) "inexcusable delay" in commencing the suit and (2) "prejudice resulting to" them "from such delay." *Id.*; *see Am. Home Mortg. Holding v. Showcase of Agents, L.L.C. (In re Am. Home Mortg. Holding)*, 458 B.R. 161, 173 (Bankr. D. Del. 2011) ("The delay must substantially, materially, or seriously prejudice[] the

debtors' ability to prepare its defense," and "[p]rejudice requires a showing that the delay harmed the ability to prepare a defense by resulting in documentary evidence or key witnesses no longer being available or witnesses who are available no longer having a recall of relevant facts.") (quotation omitted).  Defendants have not made any showing that would entitle them to a defense of laches and warrant the extraordinary relief.

318.    Moreover, laches is barred by the unclean hands doctrine.  Namely, "he who comes into equity must come with clean hands." *Bishop v. Bishop*, 257 F.2d 495, 500 (3d Cir. 1958). This bar "stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice." *Finjan, Inc. v. Rapid7, Inc.*, No. 18-1519-MN-MPT, 2019 U.S. Dist. LEXIS 105547, at *18 (D. Del. June 25, 2019) (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999)).  Further "while equity does not demand that it[s] suitors shall have led blameless lives, . . . it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Bishop*, 257 F.2d at 500.  Thus, as relevant here, "[e]quity will not ordinarily aid a person to secure relief from a situation which results from the conveyance of his property in fraud of creditors or other persons claiming it." *Bishop*, 257 F.2d at 500.  Defendants' participation in a constructively fraudulent transaction means that they cannot avail themselves of the laches defense.

319.    And finally, as set forth above, the Trustee and Trust beneficiaries are not estopped from recovery. *See supra* ¶¶ 301-04.

### 4)    The Challenged Transfers Were Not Ratified

320.    Finally, Defendants raise the affirmative defense that "Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification." [Adv. Pro. D.I. 397 at 8 (affirmative defense no. 11)].  Ratification is "the act of knowingly giving sanction or affirmance to an act which would

otherwise be unauthorized and not binding." *In re Physiotherapy Holdings, Inc.*, 2016 Bankr. LEXIS 2810, at *48. The allegedly ratifying party must have had "knowledge of the material facts surrounding the transaction." *Id*. Defendants have not made any showing that the doctrine of ratification is applicable to bar the Trustee's claims.

321.    While Defendants have not made their ratification argument explicit in any briefing, to the extent the ratification defense is that certain Trust beneficiaries may not recover because they ratified the Transaction, that defense fails.

322.    At trial, Defendants presented no evidence that any Trust beneficiaries, or holders of Samson's notes specifically, participated in the Transaction, much less ratified it.  Nor did Defendants present evidence linking transaction participants to current Trust beneficiaries, such as by establishing how many interests in the Trust are held by original Transaction participants. Defendants advanced no evidence that any creditor "actually participated in structuring the transaction that damaged creditors." *In re Tronox Inc.*, 503 B.R. at 276 (rejecting ratification defense seeking to disqualify bondholder triggering creditors).

323.    Fundamentally, to the extent Defendants seek to contest Trust beneficiaries' ability to recover, this argument is tantamount to an end-run around *Moore v. Bay*.  It is well-established that, under *Moore v. Bay,* "a trustee could avoid an entire transfer under § 544(b) without regard to the size of the claim of the unsecured creditor whose rights and powers the trustee was asserting.  'In other words, an entire transfer can be set aside even though the creditor's claim is nominal and, moreover, the recovery of the trustee is for the benefit of all creditors including those who had no right to avoid the transfer.'"  *Liebersohn v. IRS (In re C.F. Foods, L.P.)*, 265 B.R. 71, 86 (Bankr. E.D. Pa. 2001) (quoting 5 COLLIER ON BANKRUPTCY P544.09[5] (1998)). And, although Defendants have not made such a showing, this would be the case even "when, as

contemplated by the rule, the recovery goes to benefit other creditors who could not have avoided the transfer themselves, perhaps because they were complicit in the fraud." *Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 481 (W.D. Tex. 2013). And, as set forth above, there is likewise no reason to reduce the Trustee's recovery on any theory of estoppel. *See supra* ¶¶ 301-04.

325.    Further, if Defendants sought to challenge the Trust's ability to pursue recovery on behalf of unsecured creditors, this would have been the proper subject of a Plan objection, and not an ultimate defense to liability. The Plan documents were clear on the Trustee's causes of action, and the beneficiaries of any recovery, *see supra* ¶ 266. The Plan and Trust documents do not contain any caveat specifying that that recovery by any particular holder should be reduced by some amount under certain circumstances. To imply an after-the-fact cap on recovery from a settlement trust in this manner would impede negotiated resolutions among creditors at Plan confirmation, which is incompatible with the code's policy of facilitating a fast and equitable reorganization. *See In re Tronox Inc.*, 464 B.R. at 617 ("Any such tie between avoidance recovery and plan distribution would impede a settlement of the type incorporated in Tronox's plan by refusing to afford a creditor who has taken a litigation risk a prospect of a possible recovery beyond that creditor's individual damages. It would encourage endless valuation litigation and effectively impose a requirement, not found in the statute, that a judgment in the avoidance action precede plan confirmation. . . . [T]his would undoubtedly require debtors to delay filing plans of reorganization until completing all potential litigation and would violate chapter 11's policy of facilitating a fast and equitable reorganization.") There is no reason to effectively modify the Plan now and alter the parties' carefully-negotiated settlement, years after the fact, particularly absent

any factual showing by Defendants that any unsecured creditor beneficiary of the trust acted inequitably.

## CONCLUSION

As established at trial, the Challenged Transfers are avoidable as constructive fraudulent transfers because they rendered Samson insolvent and inadequately capitalized at close, and because Samson did not receive reasonably equivalent value for such transfers.

As such, the Trustee respectfully requests that the Court enter judgment: (1)  against Defendant Stacy Schusterman in the amount of not less than $2,375,571,236.58, or in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment; (2) against Defendant Lynn Schusterman, in her capacity as trustee of SFT, in the amount of not less than $71,000,000.00, or in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment; (3) against Defendant Samson Energy Company in the amount of not less than $1,646,000,000.00, or in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment; (4) against Defendant the Foundation in the amount of not less than $814,987,829.20, or in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment; (5) against Defendant SFT in the amount of not less than $71,000,000.00, or in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment; and (6) against Defendant Stacy Schusterman, in her capacity as trustee of SFT, in the amount of not less than $71,000,000.00, or

in such amount to be determined at trial, with pre-judgment interest at the Delaware statutory rate of the federal reserve rate + 5%, from December 21, 2011 through entry of judgment.

Dated: November 21, 2022

Respectfully submitted,

**FARNAN LLP**
*/s/ Michael J. Farnan*
Joseph J. Farnan, Jr. (Bar No. 100245)
Joseph J. Farnan, III (Bar No. 3945)
Michael J. Farnan (Bar No. 5165)
919 North Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
farnan@farnanlaw.com
jjfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Thomas E Lauria (*pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone:    (305) 371-2700
tlauria@whitecase.com

J. Christopher Shore (*pro hac vice*)
Colin T. West (*pro hac vice*)
Camille M. Shepherd (*pro hac vice*)
Lijun Zhang (*pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:    (212) 819-8200
cshore@whitecase.com
cwest@whitecase.com
camille.shepherd@whitecase.com
lijun.zhang@whitecase.com

*Attorneys for the Settlement Trustee*