## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SAMSON RESOURCES CORP., *et al*[1]<br>　　　　　Reorganized Debtors. | Chapter 11<br><br>Case No. 15-11934 (BLS) |
| PETER KRAVITZ, as Settlement Trustee of<br>and on behalf of the SAMSON<br>SETTLEMENT TRUST<br><br>　　　　　Plaintiff,<br>　　v.<br><br>SAMSON ENERGY CO., LLC, *et al.*<br><br>　　　　　Defendants. | Adv. Pro. No. 17-51524 (BLS)<br><br>Re: D.I. 1, 462, 463 |

Michael J. Farnan, Esquire
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE  19801

J. Christopher Shore, Esquire
Colin T. West, Esquire
White & Case, LLP
1221 Avenue of the Americas
New York NY  10020

*Counsel to the Settlement Trust*

Michael S. Neiberg, Esquire
Young, Conaway Stargatt & Taylor, LLP
1000 King Street
Wilmington, DE  19801

Sabin Willett, Esquire
Morgan Lewis & Bockius LLP
One Federal Street
Boston, MA 02100

David M. Stern, Esquire
KTBS Law LLP
1808 Century Park East, 26th Floor
Los Angeles, CA  90067

*Counsel to the Defendants*

---

[1] The Reorganized Debtors in these post-confirmation chapter 11 cases include: Geodyne Resources, Inc., Samson Contour Energy Co., Samson Contour Energy E&P, LLC, Samson Holdings, Inc., Samson-International, Ltd., Samson Investment Company, Samson Lone Star, LLC, Samson Resources Company, and Samson Resources Corporation.

## OPINION[2]

This is the Court's opinion following a three-week trial in a suit originally seeking recovery of alleged fraudulent transfers totaling approximately $7.2 billion arising out of the 2011 sale of Samson Investment Company ("SIC") by its owners, the Schusterman family, to a private equity consortium.  The Plaintiff alleges that the purchasers vastly overpaid for the business, thereby enriching the Schustermans to the detriment of creditors of the company.  By paying over twice what he alleges was the fair market value of the company, the Plaintiff contends that the new owners were obliged to burden the Company with more debt than it could service, giving rise to a death spiral that led ultimately and directly to the company's bankruptcy filing in 2015.  For the reasons that follow, the Court finds and concludes that the Plaintiff has failed to prove that the consideration paid in connection with the 2011 acquisition of SIC did not reflect its fair market value at the time.  Accordingly, judgment will be entered for the Defendants on all counts.

## INTRODUCTION

This is an unusual case.  Bankruptcy courts have seen no shortage of litigation relating to companies that failed shortly after an acquisition.  Typically, claims are brought against an acquiror who is alleged to have larded unsustainable debt upon the target company while simultaneously siphoning cash from the entity via dividends.  Alternatively, the courts have seen a multitude of suits against former parent corporations, alleging that a spin-off of a subsidiary was engineered by the parent to rid itself of unproductive assets and resulted in an undercapitalized new entity destined for prompt failure.

---

[2] This Opinion constitutes the Court's findings of fact and conclusions of law in this core proceeding pursuant to Fed. R. Bank. P. 7052.

Here, suit has been brought against the former owners of SIC to recover proceeds they received in selling the company in 2011 to a private equity consortium led by Kohlberg Kravis Roberts & Co. Plaintiff's theory of recovery of the sale proceeds, as a fraudulent transfer, rests on two propositions: First, Plaintiff has developed an expert valuation report to demonstrate that the sale process was so flawed that the price paid turned out to be more than twice the value of the company. And second, that once the sale closed, the newly-acquired company was almost immediately placed into a catastrophic death spiral on account of the debt taken on in the deal, and also as a result of mistakes and errors alleged to have been made by the investor group in putting together the post-acquisition business plan.

It is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market. A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process. This standard places primacy on the reliability of a transaction where parties have evaluated risk and reward and placed their own money on the line. Buyers and sellers may be right or wrong about what the future may hold, but the value is fixed and conclusively established by the price paid at closing. Under this approach, the opinion of a valuation expert, invariably influenced by hindsight, is by definition less reliable than a closed sale by market participants. As a practical matter, it is incumbent on a party challenging the value of a sold asset to demonstrate that the marketing and sale process was irretrievably tainted or deeply flawed.

As will be discussed in exhaustive detail below, the marketing and diligence process here was thorough and comprehensive, run on both sides by some of the most sophisticated investors and professionals in the world. At bottom, Plaintiff's case is premised on the proposition that the Schustermans were obliged to temper their demands and to second guess the judgment of the

purchasers as to how much to pay, and how to operate the business following the closing.  That

is not our law.  The Schustermans were entitled – and expected – to clamor and negotiate for as

much consideration as the buyers would agree to deliver.  The buyers, likewise, were free to

push for reductions in price, to bargain and to structure the deal in whatever fashion they

believed would lead to success in the years following the closing.

Obviously, it did not all work out:  approximately four years after the closing, the

company filed for bankruptcy relief.  But that fact does not mean the sale process was flawed or

the price unfair.  Risk is an inescapable feature of commercial transactions.  Here, the

Schustermans placed a healthy, thriving business up for sale; the buyers presumably concluded

that they got a good deal and could grow the business to new heights of profitability.  Their

failure to accomplish their goals does not mean that the Schustermans must now pay back the

sale proceeds they received.  Put bluntly, the Schustermans are neither the guarantor nor the

insurer of the future success of the business they sold.

## BACKGROUND

### The Bankruptcy Case

Samson Resources Corporation ("SRC")[3] and its affiliates filed voluntary petitions for

relief under Chapter 11 in this Court on September 16, 2015.  An unsecured creditors committee

was duly appointed shortly after the petition date.  After many months of negotiation and

litigation, this Court entered an Order[4] confirming the Debtors' plan of reorganization (the

"Plan")[5] on February 13, 2017.

---

[3] For ease of reference, albeit at the expense of precise specificity, the Court will refer to the pre-sale entity, which was owned by the Schusterman family, as "SIC."  The post-sale entity, which was owned by the KKR-led consortium and ultimately filed for bankruptcy relief in 2015, will be referred to as "SRC."
[4] Main Case Docket No. 2019.
[5] The Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and its Debtor Affiliates (the "Plan") was filed on February 10, 2017.  Main Case Docket No. 2005.

Among other things, the confirmed Plan provided for the creation of the Samson Settlement Trust. The Trust was funded with cash in the approximate amount of $168 million and also received ownership of, and the right to prosecute, certain estate causes of action. Of particular relevance here are the causes of action arising out of the 2011 sale of the company by its founders, the Schusterman family, to a private equity consortium.[6]

On September 15, 2017, the Trustee of the Samson Settlement Trust filed his Complaint commencing this adversary proceeding. Plaintiff in this action is Mr. Peter Kravitz as Settlement Trustee (the "Trustee" or the "Plaintiff"), appointed pursuant to the Plan.[7] The Defendants consist of individual members of the Schusterman family and certain family trusts that, prior to the 2011 sale, owned or held the stock of SIC.

Under the Plan, all pre-petition claims and causes of action of the Debtors' estates against the Defendants herein were transferred to the Trust to be pursued by the Trustee on behalf of creditors holding Class 5 general unsecured claims under the Plan. The Complaint seeks recovery for alleged fraudulent transfers arising out of the acquisition of SIC by a consortium of equity sponsors led by Kohlberg Kravis Roberts & Co. ("KKR," and collectively with the other equity participants, the "Sponsors").[8] That sale, described in detail below, closed on December 21, 2011 (the "Transaction").

Prior to the trial in this matter, the Defendants filed seven separate dispositive motions.[9] Following rulings by the Court on all such motions, several of the original Defendants were

---

[6] This sale transaction is described in exhaustive detail *infra*.

[7] Undisputed Facts ¶¶ 64-65.

[8] The Court notes that suit has not been brought against KKR or other sponsors of the 2011 transaction. The record reflects that any claims or causes of action against these parties were released under the confirmed Plan.

[9] *See* Adv. Pro. Docket No. 397 at 3-4 (summarizing dispositive motion practice). The trial proceeded on three remaining counts: (i) Count I, seeking to avoid and recover certain cash transfers for the redemption or purchase of SIC stock (defined in the Complaint as the "LBO Fraudulent Cash Transfers") as constructive fraudulent transfers under 11 U.S.C. §§ 544 and 550 and applicable state law; (ii) Count III, seeking to avoid and recover certain asset transfers (defined in the Complaint as the "LBO Fraudulent Asset Transfers") under 11 U.S.C. §§ 544 and 550 and

dismissed out of the litigation for a variety of reasons, including being released from liability under the Plan or being protected by the safe harbor provisions of 11 U.S.C. § 546(e). The Defendants remaining in this suit are collectively referred to as the "Schustermans" or the "Defendants."[10]

The Court conducted twelve days of trial beginning on September 12, 2022. At trial, the Court heard live testimony from nine witnesses. The Trustee called three expert witnesses who collectively offered their opinions regarding the proper valuation of SIC in 2011.  The Plaintiffs' witnesses were: (1) Mr. Todd Filsinger of Filsinger Energy Partners, testifying on issues relating to commodity prices and commodity hedging and their relation to an appropriate stress or downside case; (2) Dr. Richard Strickland, testifying on issues relating to petroleum engineering; and (3) Mr. Scott Baxter of Berkeley Research Group, testifying on issues of solvency and valuation.  Mr. Baxter provided expert testimony as to the valuation model he prepared for this trial.

In response, Defendants called witnesses who submitted both written and live testimony to the Court.  The Defendants' primary witnesses were Ms. Stacy Schusterman, a fact witness describing the circumstances surrounding the negotiation and documentation of the Transaction; Ms. Suzanne Roski, a valuation expert testifying in rebuttal to the valuation report of Mr. Baxter; and Mr. Steven Almrud, an investment banker offering testimony as to the sufficiency of the sale process and related due diligence, as well as SRC's post-Transaction business plan.  Importantly, the Defendants' witnesses did not prepare or offer to the Court a traditional expert valuation case to counter that presented by the Trustee.  Instead, the Defendants' evidentiary case focused

---

applicable state law; and (iii) the corresponding claims under Count V seeking the recovery of fraudulent transfers under 11 U.S.C. § 550.

[10] The remaining Defendants are Samson Energy Company, LLC ("Samson Energy"); Stacy Schusterman; Lynn Schusterman; the Charles and Lynn Schusterman Foundation; and the Stacy Family Trust.

almost entirely on setting forth the factual record of the negotiations and due diligence efforts associated with the 2011 Transaction. Defendants' case rests largely on the proposition that the actual sale results provide a more accurate and reliable indicator of SIC's value in 2011 than the Plaintiff's expert valuation report prepared long after the deal closed.

Pursuant to the Pre-Trial Order, the parties agreed to a Statement of Stipulated Facts,[11] which was admitted into evidence without objection. The Court also accepted into evidence 32 designated deposition transcripts and 1130 trial exhibits. Following the close of evidence in late September 2022, each side prepared and filed comprehensive Proposed Findings of Fact and Conclusions of Law.[12] Closing arguments occurred over the course of a full day on December 8, 2022. This matter is ripe for disposition.

**The Evidentiary Record**

The dispute in this case goes to the actual value of SIC in 2011. The Defendants contend that the sale price negotiated and ultimately paid by KKR and the Sponsors to the Schustermans – approximately $7.2 billion – represented the fair market value of the company at that time. Likewise, the Defendants contend that the consideration provided by the Schustermans essentially to retain the Gulf Coast and Offshore Business[13] represented the fair market value of those assets as part of the Transaction. The Plaintiff responds that KKR and its partners in the acquisition failed to properly vet the Transaction, and ultimately paid far in excess of the $2.7 billion he alleges Samson Onshore[14] was worth. As described more fully below, the Plaintiff contends that KKR and the Sponsors were so enthusiastic to do the deal that they ignored obvious red flags and otherwise failed to properly conduct the due diligence necessary to

---

[11] Adv. Pro. Docket No. 413.
[12] Adv. Pro. Docket No. 462 and 463.
[13] Described and defined *infra.*
[14] Described and defined *infra.*

ascertain the true value of SIC before making their bid.  He also suggests that the many equity

Sponsors and lenders (and their respective professionals) joining KKR in the deal likewise failed

to investigate the Transaction either out of deference to KKR's storied reputation, or out of a

desire to earn the large fees that would come from a multibillion-dollar deal.

To frame this dispute, the Court will first set out the record developed at trial by the

Defendants regarding the process employed in negotiating the Transaction in 2011.  Following

that, the Court will turn to the Plaintiff's valuation case, which adheres to traditional

methodologies and offers expert testimony regarding the enterprise value of SIC in 2011.  We

turn now to the sale process.

**SIC Begins the Sale Process**

In the late 1950s, Charles Schusterman, a Tulsa native, began his career both selling oil

field salvage equipment and acquiring and operating oil wells.[15]  In 1971, he founded Samson

Resources Company, and then formed SIC. He led the companies until shortly before his death

in 2000.

Stacy Schusterman, Charles Schusterman's daughter, joined SIC in 1988, became a

director in 1989, and a vice president in 1991.  In 1999, she became a co-chief executive, and

was elected chairman of the board of SIC when her father died in December 2000.  Ms.

Schusterman testified that she held the role as co-CEO until early 2005, and then served as CEO

and chairman of the board of directors of SIC until December 21, 2011.[16]

Prior to the Transaction, SIC was one of the largest privately held oil and gas exploration

and production ("E&P") companies in the United States.  It possessed assets primarily located in

---

[15] Schusterman Decl. ¶¶ 3-4 [DX-849].
[16] *Id*. ¶ 8.

the Rocky Mountains, Mid-Continent, and East Texas regions.[17]  At the time of the Transaction, SIC owned, among other assets, (i) a substantial portfolio of conventional producing vertical wells and conventional acreage across many major US basins, (ii) a substantial portfolio of producing horizontal wells in unconventional fields, and (iii) millions of net acres of undeveloped, unconventional reserves and resources (hereinafter, referred to as "Samson Onshore").

Apart from these assets, SIC owned certain interests in exploration projects being undertaken in the Gulf of Mexico (hereinafter referred to as the "Gulf Coast and Offshore Business").[18]  There were two divisions:  (i) the Gulf Coast division, located in the Gulf Coast region in Louisiana and Texas, consisting of a limited number of producing conventional wells, and an inventory of seismic information and speculative prospects;[19] and (ii) the Offshore division, which was comprised of non-operated interests in offshore prospects located in the Gulf of Mexico that were still years away from possible production.[20]

Senior managers at SIC, led by Ms. Schusterman, began to explore a potential sale of SIC in or around March 2011.[21]  The record indicates that SIC's interest in a sale was not a reflection of poor economic performance by the company:  it was not in or approaching a liquidity crisis or otherwise struggling.[22]  Rather, the testimony demonstrated that SIC personnel observed other large deals in the industry being done at the time and determined to test the waters.

SIC started the process by contacting several investment banking firms in March 2011 to advise it as it considered whether to sell, and at what price.  Jefferies & Co. ("Jefferies") was

---

[17] Stipulated Facts, ¶ 16.
[18] Schusterman Decl. ¶ 19 [DX849]; *see* JX-041 at KKR-SAM_0022076-077.7
[19] Rowland Decl. ¶ 39 [DX-847].
[20] *Id.* ¶ 40.
[21] *Id.* ¶ 21; *see* JX-011 at JEFF00019454.
[22] Schusterman Decl. ¶ 23 [DX-849].

among those contacted by SIC, and the record indicates it was among the most experienced

investment banking firms in the upstream oil and gas sector, with particular familiarity and

experience in unconventional assets. As the Defendants' witness Mr. Almrud described at trial,

"Jefferies was probably one of the best [sell-side bankers] in the business."[23]  Jefferies knew the

marketplace intimately, having advised on "70% of all onshore U.S. E&P transactions greater

than $1.0 billion since 2008."[24]

    In response to the inquiry, Jefferies sent SIC a preliminary information request

identifying basic information Jefferies would need to provide a detailed analysis.  Jefferies

assembled a core deal team of 14 professionals to work on the project for a potential marketing

process.[25]  After several months, SIC determined to hire Jefferies to serve as its investment

banker.

    A June 9, 2011 engagement letter between Jefferies and SIC established Jefferies'

compensation structure.[26]  Jefferies would receive a percentage of the transaction value up to a

certain base threshold, and thereafter increasingly higher percentages if the transaction value

exceeded the base threshold. Section 4(c) of the engagement letter set the compensation structure

for a transaction that excluded the Gulf Coast and Offshore Business (i.e., what became the

ultimate sale structure). Jefferies was to receive 0.283% of any transaction value below $8.0

billion; the first bonus level thereafter provided for Jefferies to receive 1.00% of the transaction

value between $8.0 billion and $8.5 billion; and the deal contemplated successively higher

percentages for Jefferies for higher transaction values. Importantly, the engagement letter reflects

---

[23] Trial Tr. (Almrud) 1950:4-7.
[24] JX-012 at JEFF00014151; 154; 157.
[25] *See, e.g.*, DX-102 at JEFF00019383, 385; DX-103; JX-017; JX-018; Cox Dep. 244:15-245:7.
[26] Stipulated Facts ¶ 23.

that Jefferies appears to have estimated that the floor for a purchase price for SIC was at least $8 billion, as its contractual upside didn't kick in before that price.[27]

Throughout the marketing process, Jefferies advised SIC as to the range of values that SIC might expect to fetch in a sale. Jefferies' preliminary analysis in March 2011 showed an implied valuation range for the entire company of between $7 to $10 billion.[28] Jefferies' ensuing valuations up to and through the summer of 2011 consistently fell within this same range.[29]

Jefferies worked with SIC to build a virtual data room ("VDR") where potential purchasers could access information on SIC and its assets.[30]  Senior SIC personnel were directly involved in this exercise, and they helped compile information for Jefferies to populate the VDR.[31]  The VDR included over 1,000 individual folders and files. Asset-specific data was organized by region, and included the technical, commercial, marketing, and financial documents a potential buyer would require and rely on in performing an independent analysis of SIC. Jefferies also established individual data rooms for interested parties, so that they could request additional information not included in the VDR and perform targeted diligence according to their specific needs.[32]

The VDR opened to potential bidders on August 6, 2011 and was updated on an ongoing basis, including to provide data and information requested by potential buyers.  The VDR included an enormous mass of information:  SIC management presentations; commercial and

---

[27] *Id.* § 4(a)-(c).
[28] JX-012 at JEFF00014160.
[29] Jefferies, however, advised Ms. Schusterman that the Gulf Coast and Offshore Business would be less interesting to buyers in the current market because they involved conventional producing assets, exploration drilling, and speculative seismic shoots, making them uncertain and capital-intensive.  Schusterman Decl. ¶ 26 [DX-849]; *see* JX-22 at TRUST 00184135 (Jefferies engagement letter containing fee schedules premised on transactions excluding one or both businesses).
[30] Stipulated Facts ¶ 24.
[31] Trial Tr. (Rowland) 1566: 16-21.
[32] *See, e.g.*, DX-190 at JEFF00022133; Trial Tr. (Almrud) 1950:13-17.

corporate information, including general and administrative expenses, financial and accounting information, tax information, and regional production and cost data by major division; land information, undeveloped net acreage schedules, area maps, and shape files; financial and marketing; activity maps for SIC and competitors, production curves for all wells, field photos, and geologic and engineering data.[33] Mr. Cox, SIC's Engineering Manager for the Business Development Department, testified that building and maintaining the VDR "was a dynamic process," and SIC and Jefferies worked to "continuously update the data room so that the most current information was out there and available for potential purchasers."[34]

Jefferies identified a range of potentially interested buyers and held discussions with numerous potential prospects. Five entities ultimately signed non-disclosure agreements, including: Apache Corporation ("Apache"), Korea National Oil Corporation ("KNOC"), and KKR.  The NDAs operated to afford those parties access to the VDR to conduct initial due diligence.[35] Jefferies designed a "two-step" process, whereby interested parties could conduct initial due diligence and submit bids or expressions of interest.  After that, it was expected that an exclusivity arrangement would be signed with the most promising bidder, who would then conduct deeper due diligence leading up to the potential closing of a deal.[36] Jefferies had originally estimated a 14-week period between when potential buyers would first gain access to the data room and the closing of a sale.  KKR and other interested parties first accessed the data room on August 7, 2011,[37] and the sale closed on December 21, 2011 – approximately 19 weeks later.

---

[33] Almrud Decl. ¶ 90(i) [DX-850]; DX-183 at SEC-00240662.
[34] Cox Dep. 253:10-16.
[35] Stipulated Facts ¶ 25.
[36] Trial Tr. (Almrud) 1952:15-24.
[37] Stipulated Facts ¶ 27.

**Events Leading to KKR's Bid and Exclusivity Agreement.**

    **A.**    **The Core KKR Team**.

KKR was founded in 1976 and is a leading global investment firm with a strong reputation in the oil and gas industry, among many other fields.[38] The record reflects that in 2011 KKR was devoting considerable resources toward doing deals in the oil and gas industry. In November 2010, approximately a year before bidding on SIC, KKR had announced a partnership with RPM Energy LLC ("RPM"), a company with deep experience and resources in the oil and gas industry.[39] The stated purpose of this partnership was for RPM to assist KKR in the evaluation and development of unconventional acreage. In an October 25, 2010 press release announcing its joint venture with RPM, KKR indicated that it would, through the joint venture, target large unconventional plays and extend KKR's oil and gas strategy. In early 2011, just when SIC was exploring a sale, KKR was seeking shale opportunities.[40]

KKR assembled an experienced internal team to pursue a deal to acquire SIC. "Marc Lipschultz was the global head of energy and infrastructure . . . [and] Jonathan Smidt was a principal in the energy group."[41] Mr. Lipschultz would head the overall team, and Mr. Smidt was the "quarterback of [the Samson Onshore] transaction."[42] Two of the founders of KKR (Henry Kravis and George Roberts) were also personally involved in KKR's effort to acquire

---

[38] "[T]hey were KKR[;] when the phone rang, you answered it." Trial Tr. (Almrud) 1945:21; 1945:24-1946:5.

[39] RPM was established in 2010 by Claire Farley and David Rockecharlie. Prior to forming RPM, both Ms. Farley and Mr. Rockecharlie had extensive E&P experience: Ms. Farley spent close to two decades at Texaco, where she held various positions, including President of North American Production and President of Worldwide Exploration and New Ventures. Ms. Farley had also served as co-head of Jefferies Energy Group and as CEO of Randall & Dewey – an advisory firm to the oil and gas sector on acquisitions and divestitures. Mr. Rockecharlie previously served as co-head of Jefferies' Energy Group and as an executive for El Paso Corporation, a large public energy company. Prior to the Sale, Mr. Rockecharlie had been involved in the due diligence for over 100 oil and gas companies, including those involved in unconventional drilling. Farley Dep. 24:2-4; Rockecharlie Dep. 11:5-10.

[40] Lipschultz Dep. 223:17-24.

[41] Trial Tr. (Almrud) 1946:10-12.

[42] Trial Tr. (Almrud) 1946:13.

SIC.[43]  Others on the KKR team included Ash Upadhyaya, a trained petroleum engineer who oversaw the construction of the financial model that KKR used in connection with the Transaction and performed quality control of the model on behalf of KKR.[44]

### B. KKR Initial Diligence

KKR began its initial due diligence after receiving access to the VDR in early August 2011. KKR initially downloaded the entire VDR to its own servers, and, along with its consultants, was active in the VDR over the ensuing three months.  On August 8-9, 2011, SIC senior management gave a presentation to KKR and RPM at Jefferies' offices in Houston.[45]  Mr. Rowland, the Vice President of Business Development for SIC, provided an overview of the company, and division heads described each business unit.  The management presentations included detailed information for each of SIC's key operating divisions and basins, as well as technical data, including logs, isopach maps, and structure maps.  Jefferies also provided an executive summary presentation that included detailed volume and cash flow projections for SIC.[46]  Later in August, KKR and RPM met with the separate regional teams of SIC to "discuss development plans and economics, prospect analysis and assumptions underlying the business plan presented by the company in greater depth."[47]

From these initial meetings, KKR began developing its own comprehensive financial model built in Microsoft Excel (the "Deal Model").[48]  According to Zohair Rashid, a KKR employee who assisted Mr. Upadhyaya in constructing the Deal Model,[49] KKR initially relied on

---

[43] Almrud Decl. ¶ 76 [DX-850]; JX-006 at SEC-00190140.
[44] Trial Tr. (Almrud) 1947:2-4.
[45] Rowland Decl. at ¶ 54 [DX-847].
[46] JX-041.
[47] JX-124 at KKRSAM_0156659.
[48] DX-166.
[49] *See* Rashid Dep. 30:25-31:4; 233:8-11,

Jefferies' "presentations as inputs to the model."[50] KKR then modified and thereafter regularly updated its own Deal Model to reflect the results of its own analysis and diligence process.[51]

During this initial due diligence period, KKR (with the support of RPM) also performed an assessment of SIC's undeveloped acreage by reviewing maps, type curves, historical well performance, and other technical data provided by SIC and Jefferies. In evaluating this data, RPM developed its own risk assumptions for undeveloped locations and other value assumptions, all of which were eventually incorporated into the Deal Model.[52]

In September 2011, three of the parties that had conducted preliminary diligence submitted written bids: Apache, KKR, and KNOC.[53]  Apache offered $8.8 billion for the entire company (inclusive of the Gulf Coast and Offshore Business), consisting of $8.11 billion in cash, or in a combination of cash and Apache common stock, and the assumption of approximately $700 million in debt.[54] KNOC submitted a bid of $5.5 billion for the entire company.[55] KKR submitted its bid on or around September 19, 2011 (the "KKR Bid")[56] offering $7 billion for the stock of SIC, with the proviso that the Gulf Coast and Offshore Business would not be acquired.[57]

Ms. Schusterman testified that SIC did not respond to the KNOC bid because she believed it was a "low-ball offer" that was not a serious bid and did not reflect an accurate value of the entire company.[58] SIC made oral counteroffers to the Apache bid and the KKR Bid after

---

[50] Rashid Dep. 22:16-23:2.
[51] Trial Tr. (Almrud) 1965:18-24.
[52] Almrud Decl. ¶ 110(b) [DX-850]; JX152 at KKR-SAM_0115081.
[53] Stipulated Facts ¶¶ 28- 30.
[54] Stipulated Facts ¶ 28.
[55] JX-091.
[56] JX-092 at SEC-00190539.
[57] Stipulated Facts ¶ 29.
[58] Schusterman Decl. ¶ 28 [DX849].

having several discussions internally, and with Jefferies. Apache declined to raise its bid.  KKR also declined to raise its bid at this stage.

The record reflects that Ms. Schusterman and the SIC management team were disappointed with the offers that were submitted.[59]  The Schustermans considered declining all of the offers should negotiations fail to yield what they regarded as a fair price.[60]  Indeed, the record showed some ambivalence by the Schustermans about selling at all. In an October 4, 2011 email to Ms. Schusterman, Mr. Rowland also suggested that one other option was to "shut the [sale] process down and wait for a better day."[61]  Though she leaned toward "walking" away from the deal, on or about October 4, 2011, Ms. Schusterman decided to meet with Mr. Lipschultz of KKR to see "how solid they [KKR] are at this number [$7 billion]."[62]

Ms. Schusterman testified that she regarded a potential KKR acquisition favorably for several reasons.  First, SIC was a family-owned company, founded by her father, and she testified that she placed weight on the fact that the KKR structure would preserve substantially all of the jobs related to the acquired divisions.  Additionally, the company would continue to be headquartered in and maintain a presence in Tulsa.  Finally, the KKR proposal provided an opportunity for the Schustermans to remain involved in the oil and gas business by retaining the Gulf Coast and Offshore Business,[63] since KKR's Bid showed it was not interested in acquiring that part of the business.

---

[59] Schusterman Decl. ¶¶ 28-31 [DX-849].
[60] JX-104; JX-105 at SEC-00190573; JX-106 at SEC-00190571.
[61] JX-106 at SEC-00190572.
[62] *Id*. at SEC-00190571.
[63] Schusterman Decl. ¶ 31 [DX-849].

Ultimately, negotiations proceeded with the KKR Bid, although Ms. Schusterman testified that she remained "ambivalent" at the time.[64]  On October 11, 2011, KKR signed an exclusivity agreement with SIC.

**KKR's "Second Phase" Due Diligence.**

After entering into the exclusivity agreement, both due diligence and negotiations ramped up markedly.  SIC management met with KKR and RPM, shared information, and answered questions.  On October 11-12, 2011, KKR, RPM and the SIC management team met in Tulsa for an in-depth, area-by-area review of a proposed drilling and business plan for Samson Onshore (the "Business Plan"). The meeting reviewed drilling plans for each region, marketing and midstream plans, hedging strategy and practices, management decision making processes and reporting systems, and developed a separation plan for the Gulf Coast and Offshore Business. Mr. Rowland testified that KKR wanted "to get buy-ins from the [management] team" on the proposed Business Plan because KKR "wanted to keep the team together," and that KKR had "access to whoever they wanted to talk to within Samson." [65]  By November 4, 2011, Jefferies had logged at least 152 information requests from KKR for additional information.[66]

In this second phase, KKR and RPM performed "deep technical diligence."  The diligence exercise involved a host of advisors working on KKR's behalf, [67] including:

| KKR Advisors | Service | Function |
|---|---|---|
| RPM | Engineering and Technical Services | • Led review of development plan |
| Netherland, Sewell & Associates Inc. | Reserve Engineering Audit or/ Reviewer | • Prepared 1P reserve report |

---

[64] Schusterman Decl. ¶ 32.
[65] Trial Tr. (Rowland) 1570:24-1571:6.
[66] *See, e.g.,* PX-197.
[67] *See* Almrud Decl. ¶ 79 (Table 9) [DX-850]; JX-127 at KKR-SAM_0040245; JX-186 at KKRSAM_0177375; JX-145 at CRE-SAM_0036434; JX-168 at BARC_001458.

| Deloitte | Tax/Structuring, Accounting, IT Systems | • Reviewed financials and IT systems |
|---|---|---|
| Bentek Energy LLC | Marketing | • Provided overall evaluation of the North American gas, NGL, and oil markets, identified market risks associated with SIC's assets and development plans, and provided analysis of current and future differentials and marketing terms |
| Aon M&A Solutions / Capstone | Insurance | • Review of insurance programs |
| Environ | Environmental | • Confirmed no material or unusual environmental issues during the diligence process |
| Simpson Thacher & Bartlett LLP | Legal and Land/Title | • Performed spot checks of land records and titles<br>• Reviewed the systems and practices of the land department of SIC |
| Tri Energy Asset Management | Land/Title | • Determined that SIC's land and title records were well kept, accurate and in line with industry practice. |

RPM was heavily involved in the technical aspects of the due diligence.

The technical diligence RPM personnel performed included:

- Reviewing all geologic and other data, including subsurface maps;
- Spot checking volumetrics across areas to support well spacing and performance assumptions;
- Creating location maps from public data to spot existing wells;
- Reviewing industry activity and researching industry information for overall assumption comparisons;
- Reviewing historical actual costs and SIC's forecasts for capital efficiency; and
- Incorporating all diligence learnings into updated percentage of locations valued, type curves, capital, and pace assumptions.[68]

Based on this work, RPM developed, revised, and updated the type curves, risking percentages,

capital projections, and pace assumptions in KKR's financial model (discussed in further detail

below).[69] KKR and RPM conducted "[d]eep dive[s]" into each existing SIC development area,

---

[68] *See* Almrud Decl. ¶¶ 119-120 [DX-850].
[69] Almrud Decl. ¶ 121 [DX-850].

including the Bakken, Mid-Continent, Powder River Basin, Green River Basin and East Texas.[70]
These diligence presentations set out the geological characteristics of each area, provided maps
identifying drilling prospects, and detailed the specific aspects of the Business Plan for each area
(after applying risk factors based upon historic oil in place, drilling results on offsetting or
nearby acreage, etc.). The estimates that were ultimately fed into the Deal Model were also
broken out by subregion within each area.[71]

During its second phase of diligence, KKR and its advisors also worked extensively on
the continued development of its Deal Model. The Deal Model spread over 95 tabs, allowed for
the sensitization of hundreds of variables and allowed inputs and estimates to be changed and
fine-tuned, permitting multiple sensitivities to be run.[72] Mr. Upadhyaya, a petroleum engineer
and KKR employee, provided constant quality assurance and control of the Deal Model,
ensuring "that it was functioning properly . . . [and] to make sure that the Model reflected . . . the
group's view of what should go into the model."[73] "Deloitte also review[ed] the Model, just to
make sure there was another set of eyes that looked at the Model and nothing was missed . . .
[and] it passed the QA/QC of Deloitte as well."[74]

The function of the Deal Model was to present a projection of future cash flows of  the
SIC assets to be acquired, based upon all of the known or knowable inputs at the time, along with
assumptions as to relevant future events, such as commodity pricing.[75] The Deal Model and the
Business Plan were based on KKR's strategy, ultimately shared by the other equity investors in
the Transaction, to use SIC's existing commodity production and cash flow, which was largely

---

[70] DX-267; JX-130; JX-131.
[71] DX-267 at KKRSAM_0088855-56.
[72] Almrud Decl. ¶ 147 [DX-850]; DX-183.
[73] Upadhyaya Dep. 30:21-31:8.
[74] *Id.* 234:5-16.
[75] Almrud Decl. ¶ 42 [DX-850].

driven by natural gas and natural gas liquids, to reinvest in the oil well development program. From August 2011 through December 2011, over 100 separate iterations of the Deal Model were created.[76]

A fundamental premise of the KKR strategy was that substantially all of the existing management and field personnel who best understood Samson Onshore's assets and operations would stay on after closing of the sale. KKR placed considerable significance on the track record of the SIC management team, citing the team's strengths as a highlight of the investment opportunity.[77] For example, Ms. Farley of RPM testified that SIC management's commitment to remaining with the company and implementing the Business Plan was "imperative to KKR's decision to invest."[78] On the other side, as noted above, Ms. Schusterman testified that it was personally important to her that the current SIC employees have the opportunity to keep their jobs.[79]

**The Other Equity Sponsors Performed Extensive Diligence and Independently Vetted the Business Plan and Deal Model**

For ease of reference, the Court has collectively referred to the equity purchasers of Samson as "KKR." In fact, as described in detail below, three other investors – Crestview Tulip Investors LLC ("Crestview"), Natural Gas Partners ("NGP") and Itochu Corporation ("Itochu") – contributed approximately $1.89 billion of the equity consideration paid for Samson.[80] The evidentiary record developed at trial reflects that co-investors Crestview, NGP and Itochu each

---

[76] Almrud Decl. ¶ 150 [DX-850]; Trial Tr. (Almrud) 1965:20-21.
[77] JX-221 at KKR-SAM_0143513, 524; JX-209 at CRE-SAM_0040223; JX-177 at NGP00022636, 661; JX232 at KKR-SAM_0031184 (Presentation to Standard & Poor's).
[78] Farley Dep. 77:18-78:11.
[79] Trial Tr. (Schusterman) 1749:3-1750:13; Schusterman Decl. ¶¶ 30-31 [DX-849].
[80] DX-500 at SAMS0040439-445, 458-459. A syndicate of financial institutions provided loans totaling $3.595 billion. DX-500 at SAMS0040434. The lender's due diligence review and analysis is dismissed *infra*.

performed their own substantial and independent due diligence on SIC and reached their own conclusions of value that supported the Transaction.

### A. Crestview

Crestview is a private equity firm that had $4 billion in assets under management at the time of the Transaction.[81]  Its funds ultimately contributed $350 million in equity towards the sale, of which $100 million was syndicated.[82]  The record indicates that this was a significant investment for Crestview and one of the largest investments Crestview had made up to that point. At the time of the Sale, Crestview was concentrating on potential shale investments.  Mr. Delaney, a partner at Crestview, testified that the "general view of the marketplace" for shale investments in 2011 "was one of significant growth, and I think from an investment standpoint, there was a strong view that there were lots of potential opportunities to invest money profitably in the marketplace."[83]

As part of Crestview's diligence, it hired Tudor Pickering & Holt & Co. ("TPH"), a leading investment bank based in Houston specializing in the oil and gas industry, to advise on the technical aspects of the transaction, evaluate the opportunity and "refine [Crestview's] geological and operational assumptions."[84]  Three separate memoranda detailing its diligence and analysis were prepared by TPH for Crestview's investment committee.[85]

Following the initial internal approval process, Crestview's diligence continued. Crestview "reviewed diligence reports and spoke[] with a number of third-party transaction advisors," including Deloitte, NSAI, Simpson Thacher, Bentek, and Aon.[86] A team from

---

[81] DX-409 at JPMSRC-0011246.
[82] DX-500 at TRUST00040439-444, 458-459; Delaney Dep. 22:3-8.
[83] *Id.* 19:25-20:12.
[84] *Id.* 40:4-41:18; JX-145 at CRESAM_0036419, 434.
[85] JX-145; JX-162; and JX-191.
[86] JX-162 at CRESAM_000036193; Delaney Dep. 90:2-10.

Crestview traveled to Houston on November 8 and 9, 2011 to meet with SIC's senior management team. Crestview was "impressed with the team and believe[d] Samson ha[d] a deep bench of management and technical talent to execute the development plan."[87]

The record reflects that Crestview modeled the investment independently. Certain of its assumptions were more conservative than KKR's, including in risking production from the development acreage, which was "risked based on extensive due diligence and input from RPM and TPH."[88] As Crestview wrote:

> Based on input from TPH, Crestview's assumptions on well locations are slightly more conservative than those developed by RPM. The acreage was risked most heavily in areas with the least historical data. Although wells drilled in these areas may ultimately perform as management predicts, or better, we took a conservative view of these locations.[89]

Based on TPH's feedback, Crestview also developed downside and upside operating cases that incorporated the risking of development acreage.  In seeking final approval of its investment committee, the Crestview team ran a revised downside case in late November 2011 that risked the development acreage more heavily as compared to its original downside case.[90]

Mr. Delaney testified that Crestview would not have made a $350 million investment without performing adequate due diligence.   He testified that, in his estimation, Crestview's due diligence process was rigorous and thorough.[91]  He personally supported the deal at the time and testified that he believed Crestview had made a good investment.[92]

---

[87] JX-162 at CRE-SAM_00036193.
[88] JX-145 at CRE-SAM_0036425.
[89] *Id.* at CRE-SAM_0036434; *see also* Delaney Dep. 45:7-11.
[90] JX-191 at CRE-SAM_0048746.
[91] Delaney Dep. 23:25-24:5.
[92] Delaney Dep. 24:6-25:5.

### B. NGP

Co-investor NGP, an energy-focused private equity firm, inserted itself into the sale process on or around November 1, 2011 when it affirmatively reached out to KKR about participating in the transaction after the Wall Street Journal publicized the potential deal. At the time, NGP was a $7.2 billion family of investment funds making direct investments in private energy enterprises.

KKR responded favorably to NGP's outreach, and NGP immediately commenced its own expedited evaluation of the proposed deal.  NGP's initial due diligence for the Transaction included attending management presentations in Houston with the full SIC executive team and reviewing the due diligence and technical work already performed by the KKR team.[93]  NGP also engaged in extensive consultations with the management teams of its own oil and gas portfolio companies that were already active in the areas where SIC's activity was focused. These consultations "focused on single well economic assumptions (EURs [estimated ultimate recovery], capex), appropriate risk factors that capture acreage quality, recent offset operator intelligence and upside potential."[94] Thereafter, the record reflects that NGP prepared its own net asset valuation that incorporated NGP's independent risking of the unconventional assets.

NGP developed its own downside and upside cases that sensitized the risk of the development acreage, and forecast investment returns across those cases under different pricing scenarios.  NGP also closely reviewed the proposed debt structure and the Business Plan for the post-Transaction entity, stating: "Conservative debt ratios and light covenants with long-term

---

[93] JX-177 at NGP00022696.
[94] *Id.*

debt will provide runway development and value creation. This is not a typical leveraged buyout."[95]

The record indicates that NGP did not solely rely on SIC's or KKR's risking assumptions, but instead prepared its own location risking assumptions for each Subarea.[96] The record indicates that NGP risked the development acreage more heavily than KKR, giving credit to only 38% of the potential drilling locations in its base case valuation.[97]

Ultimately NGP approved the investment, describing the Business Plan for SIC's assets as "consistent with NGP's strategy" and represented a "standard acquisition and exploitation business plan[.]"[98]  NGP considered the purchase price a "fair valuation on existing assets."[99] Mr. Kenneth Hersh, the founder and CEO of NGP testified that NGP firmly believed at the time that it "would make money on the deal."[100]

### C. Itochu

At the time of the Transaction, co-investor Itochu was a large strategic investor with diverse, international investments and a specific energy division focused on the development of natural resources, including crude oil and natural gas. It ultimately contributed $1.04 billion in equity toward the Transaction.  Its diligence process began in early October 2011 with the

---

[95] DX-384 at NGP00042404.
[96] JX-177 at NGP00022668.
[97] *Id.* at NGP00022649 (compared to approximately 48% in KKR's base case NAV (*see* JX-175)).
[98] DX-384 at NGP00042404.
[99] *Id.*
[100] Hersh Dep. 21:7-12.  The Court notes that the Plaintiff emphasizes the testimony of Mr. Scott Geiselman, a senior executive of NGP at the time of the transaction.  He testified that he had voiced significant reservations or misgivings about moving forward with the deal because "[it] was a leveraged buyout, using a lot of debt, which is historically, at least in my experience at the time and consistent with where it is today, just not a – not a sound way to buy oil and gas companies.  And I thought the nature of the transaction with other investors leading it was going to be problematic for us as well, as a passive investor."  Geiselman Dep. Tr. at 86:11-23.  It turns out that he was proven correct, but his reservations do not demonstrate a flawed or inadequate due diligence effort; instead, it shows the rigor with which each of the Sponsors considered all available data in making its decision to invest.

engagement of a number of advisors, including Evercore Partners, an investment banking firm that advised Itochu throughout the due diligence and sale process.[101]

The record reflects that the independent diligence requests from Itochu's team covered accounting, tax, legal, and environmental issues. Consistent with the approach of the other co-investors with KKR, Itochu's information requests focused on SIC's asset base, including addressing reserve reports, technical and operational data, acreage maps, type curves, and rig counts. The record reflects that, throughout the last quarter of 2011, Itochu and its advisors scheduled frequent calls with KKR and advisors.  In-person meetings were held in October and November 2011 with representatives from Itochu and KKR, the SIC management team and scores of independent advisors.[102]

**The Participating Lenders' Diligence Process**

The Transaction contemplated that the equity Sponsors led by KKR would pay approximately $4.145 billion of cash equity; the Sponsors planned to finance the balance of the purchase price by raising $3.595 billion of debt from a consortium of lenders (hereinafter referred to as the "Participating Lenders").  The lending piece of the Transaction consisted of a $2.25 billion reserves-based loan ("RBL") (of which $1.35 billion was to be drawn at closing) and a $2.25 billion unsecured loan.[103] The unsecured loan was intended to be a bridge facility, as the purchasers planned to issue unsecured notes to take out this $2.25 billion loan shortly after the Transaction closed.  As discussed more fully below, the new owners were indeed able to

---

[101] Almrud Decl. ¶ 283 [DX-850].
[102] *Id.* ¶ 285.
[103] JX-273 at KKR-SAM_0037521.

successfully issue and sell unsecured notes into the market in early 2012 (the "Unsecured Notes").

The Participating Lenders consisted of 24 Wall Street banks, led by JPMorgan as administrative agent under the RBL and the unsecured loan, with Bank of America ("BofA") and Wells Fargo as co-leads.[104]  Other Participating Lenders included Barclays, Bank of Montreal, Citibank, Credit Suisse, Goldman Sachs, Morgan Stanley, RBC, and UBS.[105]  These Lenders were all deeply experienced in oil and gas lending and trading.[106] They were participants in the largest reserve-based loans in the energy sector at the time of the sale, and they all had experience evaluating, sizing, and pricing their loan products in this industry.  The record developed at trial demonstrated that all of the Participating Lenders had substantial existing portfolios of secured debt to oil and gas companies, and all had experience in bridging loans and ultimately issuing debt instruments such as the Unsecured Notes.[107]

Hundreds of professionals worked in the due diligence teams on behalf of the Participating Lenders. JPMorgan's "working group" list included participants from ten of the Participating Lenders and totaled 211 individuals from these ten banks alone.[108]  JPMorgan's team consisted of at least 24 individuals who "receive[d] all distributions" and were thus "pretty involved" in the "day-to-day flow" of the deal.[109] That team included an in-house petroleum engineer who reviewed and analyzed the reserve reports and "[d]id the analytics that are associated with the asset-backed lending borrowing base for determination."[110] All of this was consistent with JPMorgan's "standard underwriting for an oil and gas asset," and the record

---

[104] Almrud Decl. ¶ 37 [DX-850].
[105] *Id.* at ¶ 37 (Table 1); DX-547.
[106] Almrud Decl. ¶ 287 [DX-850].
[107] *Id.* at ¶ 288.
[108] JX-219.
[109] Dierker Dep. 18:21-19:5.
[110] *Id.* at 33:11-24.

indicates that JPMorgan was comfortable with the level of diligence performed and lending money against those assets.[111]

BofA performed similarly exhaustive diligence.  Its deal team included 22 individuals. The record reflects that the bank held "[m]any, many dozens" of team meetings in connection with the diligence process, as well as several meetings with SIC's management team and KKR's professionals.[112]  BofA ultimately satisfied itself that SRC – the post-sale entity -- would be able to repay the funds it was borrowing, including being able to issue the Unsecured Notes in the open market immediately after the closing to refinance the bridge loan.

Another lender, BBVA, likewise ran its own models and conducted its own engineering review before committing to fund the RBL and unsecured bridge loan.[113] Other Participating Lenders also performed extensive diligence as evidenced by internal credit approval memos entered into evidence that authorized the lending commitments.[114]  In those credit memos, the various Participating Lenders cited the following strengths or mitigating factors: (i) diversity of land holdings; (ii) ability to sell assets; (iii) immediate liquidity and access to additional liquidity; (iv) significant inventory of development locations; and (v) experienced management team.[115]  In addition, the Lenders noted SRC's anticipated access to significant additional capital following closing, if it were necessary. For example, Citibank's approval memorandum

---

[111] *Id.* at 65:4- 20.
[112] Maultsby Dep. 34:9-24.
[113] DX-505 at BBVA-DEF-001151.
[114] *See* JX-168 (Barclays); DX-446 (BB&T); JX-118 (Bank of Montreal); DX-412 (Capital One); DX-290 (Citibank); DX-244 (Credit Suisse); DX-419 (Goldman Sachs); DX-443 (ING Capital) JX-176 (Mizuho); JX-248 (Morgan Stanley); DX-359 (RBC); DX-447 (SMBC); JX-220 (TD Bank); DX-448 (UMB Bank); DX-426 (US Bank).
[115] Roski Decl. ¶ 186 ("Lender Assessment of Credit Risk" table) [DX-852].

elaborated on its comfort with respect to SRC's projected cash flow and mitigants even in the event of a weak commodity price environment in the future.[116]

The Court notes that in the context of the $2.25 billion unsecured loan, those Participating Lenders directly risked their own capital. If the post-Transaction issuance of the Unsecured Notes was not successful, those Lenders were exposed to unsecured credit risk to SRC for up to eight years. As noted, the record reflects that these Lenders in fact successfully launched a process to sell the Unsecured Notes to investors that closed on February 8, 2012, soon after closing of the Transaction.[117]

**Closing the Transaction**

In the weeks leading to the November 22, 2011 signing of the sale agreement, negotiations were difficult and Ms. Schusterman testified candidly that tempers sometimes became frayed.[118] Neither party was under any compulsion to transact. While Ms. Schusterman was "intrigued by the marketplace and felt a duty to shareholders and employees, many of whom were beneficiaries of a value-based employee incentive plan, to explore a potential sale[,]" she was "equally determined that if the marketplace would not yield a fair price, [she] would not recommend that [they] agree to sell."[119] Compounding those difficulties, KKR sought to lower the purchase price by $180 million in early November 2011.[120] The Schustermans refused to lower the purchase price and made it clear that they would be willing to walk away from the deal.[121]

---

[116] DX-290 at CBNA00002505; *see also id.* at CBNA00002506 ("In the event [Samson Onshore] needed to reduce leverage, it would sell into a deep and liquid M&A market."); JX-183 at JPMSRC-0024494 (JPMorgan credit approval document, noting "[s]trong liquidity, with a projected $1.1B of unused availability under the revolver at close").
[117] Almrud Decl. ¶ 40 [DX-850].
[118] Schusterman Decl. ¶ 36 [DX-849].
[119] *Id.* at ¶ 24.
[120] JX-173 at KKR-SAM_0113342.
[121] *Id.*; JX-170 at SEC-00190779.

In a November 15, 2011 email exchange between Ms. Schusterman and Mr. Lipschultz of KKR, Ms. Schusterman wrote "[f]rom my perspective, the deal has only improved for you guys: oil prices are way up and infinitely hedgeable … EBITDA is higher than what you forecast. Debt markets are better. You are getting a bunch of acreage that you haven't had to put value on plus PDP in the Permian [that NSAI] didn't include in the PDP report."[122] Mr. Lipschultz answered, in part, "Thanks for the message Stacy. We wholeheartedly agree that [SIC] is a spectacular company, and we want to acquire it."[123]

Senior KKR representatives shared similar views internally at KKR. On November 15, 2011, Marc Lipschultz and Jonathan Smidt wrote to their superiors at KKR, co-founders George Roberts and Henry Kravis, about the status of negotiations.  They noted Ms. Schusterman's reluctance to lower the bid price, and their plan to travel to Tulsa to try to "work this all out."[124] In response, both Mr. Roberts and Mr. Kravis emphasized the attractiveness of the deal. To Mr. Roberts, KKR had "a good deal at a good price[.]"[125]  Mr. Kravis echoed these sentiments: "We are this close on [Samson]. Don't screw it up. (Be reasonable). As I told you today, if I were in her shoes, [and] wanted $8 billion, but only got $7 billion, I would not move either. It is a good collection of assets which we can do a lot with."[126]

After an extensive in-person negotiation on November 18, 2011, the parties reached agreement, bridging the economic gaps by agreeing to issue to the Schustermans $180 million in preferred shares of SRC as part of the sale considerations.[127] The Court observes that Ms. Schusterman's willingness to accept the preferred shares in SRC – instead of cash – that would

---

[122] *Id.* at SEC-00190779.
[123] *Id.* at SEC00190778.
[124] JX-173 at KKRSAM_0113341-342.
[125] *Id.* at KKRSAM_0113341.
[126] *Id.*
[127] Schusterman Decl. ¶ 38 [DX-849].

be behind all of the debt taken on by SRC at the time of the Transaction indicates a belief that the

company would be solvent and there would be positive equity returns on a post-sale basis.

The following day, Mr. Lipschultz described the final negotiations to the KKR

Investment Committee:

> Last night we reached an agreement with Stacy Schusterman the owner of [Samson]. It was a really tough 8 hour negotiation. She was very emotional after their 40th Anniversary party the night before and was quite ambivalent about selling the business which made it really challenging.[128]

On November 22, 2011, the Schustermans signed the sale agreement.[129]  The Transaction closed

on December 21, 2011 (the "Closing Date").

**KKR's Belief in Its Investment**

The record demonstrates that KKR believed that it would get a positive return on its

equity investment,[130] and viewed the acquisition as an opportunity to acquire and develop SIC's

shale assets and to realize a substantial profit in a two-to-five-year time horizon through an

IPO.[131]  Internal KKR presentations soliciting investments from within the firm and outside

investors referenced KKR's expectation of achieving a substantial profit through an IPO.[132]

---

[128] JX-109 at KKR-SAM_0188149.

[129] *See* JX-198; Stipulated Facts ¶ 35.

[130] Upadhyaya Dep. 235:16-20; Lipschultz Dep. 207:7-19.

[131] JX-274 at KKR-SAM_0057113.

[132] *See e.g.*, JX-221 at KKRSAM_0143530. Members of the KKR and RPM teams invested their own personal funds in the equity, including:
   • Marc Lipschultz - $1,000,000, Lipschultz Dep. 207:20-209:3 (describing this as a "sizable investment in an individual transaction for [him]" and one which reflected his view that this was "an attractive investment").
   • Jonathan Smidt - $500,000, Smidt Dep. 291:4-292:3 (describing this as "the most [he had] ever invested in a KKR transaction at that time").
   • Claire Farley - $1,000,000, Farley Dep. 240:6-22 (indicating that her $1 million personal investment reflected her views on the opportunity).
   • Ash Upadhyaya - $50,000, Upadhyaya Dep. 211:21-212:12; 227:13-228:16 (describing his investment at the time as "not an insignificant amount of money for [him]" and indicative of his favorable views of the investment).

Ms. Farley of RPM was impressed by SIC, excited about the deal, and believed it to be an excellent investment.[133] As of the Closing Date, Mr. Lipschultz stated that SRC had a "conservative capital structure" and believed that SRC could withstand commodity price fluctuations, which was one of the focuses of KKR's modeling.[134] Others, like Mr. Rockecharlie of RPM, viewed SRC as "well prepared": "We had plans in place and . . . a long-term strategy, so in general, I believe I would have been comfortable on December 21st with where we stood."[135]

**The Gulf Coast and Offshore Business Transaction**

As noted above, the KKR Bid did not include the Gulf Coast and Offshore Business.[136] Instead, those assets were transferred to Samson Energy Company ("Samson Energy") prior to the Closing Date through a series of corporate actions.[137]  In advance of Closing, SIC caused the assets and liabilities of the Gulf Coast and Offshore Business to be aggregated within three of SIC's subsidiaries.[138] Samson Energy was formed from these subsidiaries on November 29, 2011 to acquire the membership interests of the Gulf Coast and Offshore Business.[139] SFTDM, a trust created by members of the Schusterman family, was the sole member of Samson Energy at the time of its formation.[140]  SFTDM held three Shareholder Subordinated Notes with a combined principal amount of $553,000,000 that had been previously issued by SIC to the Schustermans in exchange for the repurchase of certain shares of SIC stock in 2008 and 2011.[141]  The deal

---

[133] Farley Dep. 238:18-239:9.
[134] Lipschultz Dep. 296:14- 297:21.
[135] Rockecharlie Dep. 252:5-10.
[136] Stipulated Facts, ¶ 29.
[137] Stock Purchase Agreement, Art. VII, JX-198 at SEC-00249950-57.
[138] Phillips Decl. ¶ 25 [DX-846]; Stock Purchase Agreement §§ 7.1 – 7.4 [JX-198].
[139] Phillips Decl. ¶ 41 [DX-846]; Stock Purchase Agreement § 7.2(d) [JX-198].
[140] Phillips Decl. ¶ 31 [DX-846].
[141] Phillips Decl.[DX-846]  ¶¶ 27-29 [DX-846].  SFTDM acquired one of the Shareholder Subordinated Notes from another entity, LSIT (Delaware) Management, LLC.  DX-829.  The Shareholder Subordinated Notes were classified as long-term debt in SIC's audited financial statements.  Phillips Decl. [DX-846] ¶ 28. The notes were subordinate

contemplated that SFTDM would contribute and effectively forgive these Notes in exchange for the Gulf Coast and Offshore Business.  More specifically, SFTDM assigned the three Shareholder Subordinated Notes to Samson Energy as an equity contribution.[142] On December 19, 2011, Samson Energy transferred the Shareholder Subordinated Notes to SIC in exchange for membership interests in the subsidiaries that owned the Gulf Coast and Offshore Business (the "GC/OS Transfers").[143] Following the transfer, the Shareholder Subordinated Notes were cancelled.[144]

Prior to the Closing, two separate national accounting and advisory firms (Duff & Phelps, LLC and Stout Risius Ross, LLC) were retained to provide independent fair market valuations of the membership interests in the Gulf Coast and Offshore Business that were transferred to Samson Energy.[145] Because they were valuing equity interests, and not just assets, the valuations considered both the assets and  liabilities.[146]  The Duff & Phelps valuation, less SIC's tax basis in the Gulf Coast and Offshore Business, would be used to determine any gain or loss on the transaction for income tax purposes, and would also establish the initial tax basis for Samson Energy.[147]  The record suggests that a higher valuation could potentially mean more tax liability to SIC as a result of the transfer but would also set a higher tax basis for Samson Energy, which

---

only to SIC's funded debt obligations and were pari passu with other unsecured obligations of company.  Trial Tr. (Phillips) 1473:19-1474:6.

[142]  Phillips Decl. [DX-846] ¶¶ 26, 30 [DX-846].

[143]  Schusterman Decl. ¶¶ 54-55 [DX-849]; Rowland Decl. ¶ 7 [DX-847]; Phillips Decl. ¶¶ 26, 30 [DX-846].

[144]  Phillips Decl. ¶ 30 [DX-846]; *see also* DX-829; DX-830; DX-831.

[145]  Phillips Decl. ¶ 51 [DX-846]. There was no coordination between the appraisers. Scott Dep. 109:9-16.  Reiff Dep. 62:24-63:18. There is no evidence that either appraiser knew that the other was preparing an appraisal. Trial Tr. (Phillips) 1475:6-1476:1.

[146]  JX-432 at DP_Samson_0001301 (Duff & Phelps) ("As part of our valuation process, we reviewed these potential liabilities and incorporated the estimated impact they may have on the subject assets."); JX-433 at SEC-00276731 (Stout) ("We conducted the following procedures, among others [in our valuation analysis]: … assessed the probability of the outcomes of certain litigation … in order to estimate the present value of future expected losses or recoveries from litigation.").

[147] Phillips Decl. [DX-846] ¶52.

could result in less future tax liability to Samson Energy as the higher tax basis is depreciated or depleted.[148]

Mr. Tholen and Mr. Phillips of SIC led a team that provided the documents and information requested by each accounting firm and spoke to their representatives as necessary.[149] They provided information kept in the ordinary course of SIC's business activities, including information about pending litigation related to the Gulf Coast assets.[150] Duff & Phelps valued the Gulf Coast and Offshore Business as of December 1, 2011 at $445 million,[151] and Stout valued them (as of the same date) at $459 million.[152]  Based upon these independent and contemporaneous valuations, Defendants contend that the Schustermans' contribution of the Shareholder Notes in the amount of $553 million exceeded the value of the Gulf Coast and Offshore Business they acquired.

**THE PLAINTIFF'S EVIDENCE**

The Trustee's case is predicated upon the contention that Business Plan based on KKR's Deal Model was fatally flawed and placed SRC almost immediately into a "death spiral," which inexorably led to its collapse and bankruptcy filing in 2015.[153]  As noted above, the Trustee's evidence included testimony from three expert witnesses, each of whom provided both written

---

[148] *Id.*

[149] Phillips Decl. [DX-846] ¶55.

[150] *Id.*

[151] JX-432 at DP_Samson_001299 (the "Duff & Phelps Valuation").  More particularly, Duff & Phelps stated that the valuation attributed $351 million to the Gulf Coast division and $94 million to the Offshore division.  *Id.* at DP_Samson_001303-1305.

[152] JX-433 (the "Stout Valuation"). Stout's valuation attributed $338.595 million for the Gulf Coast division and $120.467 for the Offshore division. JX-433 at SEC-00276726.

[153] The term "death spiral" was described by one of the Trustee's experts, Mr. Baxter, by referring to internal communications among Samson board members in which one member characterized a "death spiral" as "a commonly referred-to term in oil and gas companies where if you reduce your level of activity because production naturally declines every year, you can get caught in a spiral where if you don't have enough activity and are not able to meet your debt service obligations . . . more cash is being swept away towards debt services obligations, which puts even less cash towards CAPEX, and it's a spiral that inevitably leads to the death of the company." Baxter Onshore Report, at 62-63, ¶ 104.

and live testimony:  (1) Scott Baxter of Berkeley Research  Group, who testified on issues of

solvency and valuation; (2) Dr. Richard Strickland, who testified on issues relating to petroleum

engineering; and (3) Todd Filsinger of Filsinger Energy Partners, who testified on issues relating

to commodity prices and commodity hedging and their relation to the Business Plan and an

appropriate stress or downside case.

**The Baxter Expert Report**

Mr. Baxter[154] prepared an expert report dated July 27, 2021 (and amended it on August

23, 2021) which has two parts: (i) an analysis of the Samson Onshore Transaction (the "Baxter

Onshore Report"),[155] and (ii) an analysis of the Samson GoM Transaction (the "Baxter GoM

Report"), *i.e.,* the transfer of the Gulf Coast and Offshore Business to Samson Energy. [156]  Mr.

Baxter also prepared a sur-rebuttal report on December 17, 2021 (the "Baxter Sur-Rebuttal

Report").[157]

The Baxter Onshore Report sets forth Mr. Baxter's opinions that: (i) SRC was insolvent

as of the Closing Date of the LBO,  and (ii) the fair market value of the assets acquired in the

LBO was not reasonably or even remotely equivalent to the fair market value of consideration

paid to the Schustermans by the Sponsors.[158]

---

[154] Mr. Baxter is a Managing Director of the Global Energy Group of BRG, with over 30 years of energy investment
banking experience.  Baxter Decl. at 2, ¶ 3 [PX-889].  He has been a primary advisor in executing over $200 billion
worth of corporate mergers and acquisitions, restructurings, private equity capital raises, and independent fairness
opinions to special committees.  *Id.*
[155] PX-889, Ex. A (the "Baxter Onshore Report").
[156] PX-889, Ex. B (the "Baxter GoM Report").
[157] PX-889, Ex. C (the "Baxter Sur-rebuttal Report").
[158] Baxter Decl. at 5-8, ¶¶ 9-10 [PX-889].

## a.  Insolvency

### (1) *Balance Sheet Test*

Mr. Baxter evaluated SRC's solvency under the Balance Sheet Test by calculating and comparing the fair market value of the assets to the fair market value of the liabilities on a going concern basis for SRC, as of December 2011, using different valuation methodologies.[159] Those methodologies were the Net Asset Value Method ("NAV Method"),[160] Discounted Cash Flow Method ("DCF Method"),[161] and Guideline Public Company Method ("Public Companies Method").[162]  Mr. Baxter then weighted the results of those valuation methodologies according to his own 30-year career experience and by industry standard methodology weightings.[163] Based on these weightings, Mr. Baxter subtracted the value of  SRC's debt from the midpoint of

---

[159] Baxter Onshore Report, at 43, ¶ 72; at 90, ¶ 145.

[160] Baxter Onshore Report, at 95, Table 39.  This table shows the value of SRC's total assets in a range of $2.514 billion (low) to $3.827 billion (high).  When those numbers are compared to the value of the total liabilities and preferred shares of $4.372 billion, Mr. Baxter calculated a negative equity value range for SRC with a midpoint of ($1.311) billion.

[161] The Corporate DCF Method measures the present value of expected future unlevered free cash flows. *Id.* at 97, ¶ 162. Mr. Baxter projected SRC's annual unlevered free cash flows for a period of ten years, then discounted those cash flows to the valuation date using the WACC [weighted average cost of capital] as the present value discount rate. *Id.; see also* at 98, Table 40, and at 99, Table 41. Next, he calculated a terminal value at the end of the ten-year period and also discounted that back to present value using the WACC. Then, he "sums the PVs of the annual unlevered free cash flows and the PVs of the terminal values to arrive at the Enterprise FMV." *Id.* at 100, ¶ 168.  He then subtracted the debt and preferred stock that were on the balance sheet as of the Closing Date to arrive at a fair market value for SRC's equity value as a going concern as of the Closing Date. *Id.; see also* at 100, Table 42.  Finally, Mr. Baxter applied a WACC sensitivity analysis (in favor of the Defendants) and calculated the fair market value for the equity value range, which shows a negative equity value of ($1.2) billion. *Id.* at 102, ¶ 171; at 103, Table 43.

[162] Mr. Baxter's Samson Onshore Report describes the Public Companies Analysis as follows:
> A Public Companies Analysis attempts to derive the value of a company based on a relative comparison with other public companies with similar assets, operating metrics, and financial characteristics.  Under this methodology, the total enterprise value ("TEV") for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate outstanding amounts of preferred securities, minority interests and debt for such company.  Then multiples are derived from the comparable companies and applied to the relevant metrics for the company being valued.

*Id.* at 104, ¶ 172. Mr. Baxter's Public Companies Analysis showed that SRC's equity value `had a slightly positive FMV of $242.0 million based on his weightings. *Id.* at 110, ¶ 184; at 111-12, Table 47.

[163] Baxter Onshore Report, at 43, ¶ 72; at 91, ¶152.

his valuation of SRC's assets and opined that, as of the Closing Date, the fair market value of

SRC's liabilities exceeded the fair market value of its assets by approximately $1 billion.[164]

### (2) *Capital Adequacy Test*

Mr. Baxter also determined that SRC was insolvent under a capital adequacy test.

Because he calculated that the Transaction increased SRC's debt from $645 million in 2010 to

$3.6 billion as of the Closing Date at the end of 2011, Mr. Baxter opined that there were

insufficient assets to provide any reasonable certainty that SRC would be able to repay its debts

or sustain itself as a going concern, particularly in light of reasonably foreseeable volatile

commodity pricing scenarios.[165]  Mr. Baxter's "Covenant Analysis" calculates quarterly

projections based on KKR's own stress case pricing assumptions, and examines the impact over

eight quarters to determine if SRC was likely to break a debt covenant on its first lien debt in the

event that a downturn occurred.[166]  The Covenant Analysis showed that SRC would violate the

revolving credit facility's covenant ratio by the third quarter of 2012, which Mr. Baxter asserted

indicated that SRC was too thinly capitalized.[167]  Mr. Baxter also used the assumptions to

calculate whether SRC would be able to generate sufficient cash flows to service its higher debt

of $3.6 billion.[168]  His analysis found that SRC would be unable to generate sufficient unlevered

cash flow to pay interest after just one year following the Closing Date.[169]  The foregoing, plus

other tests, led Baxter to conclude that SRC had entered a "death spiral" within 12 months after

the Closing Date.[170]

---

[164] *Id.* at 44, Table 15.
[165] *Id.* at 52, ¶ 85.  *See also id.* at ¶¶ 85-105.
[166] Baxter Onshore Report, at 53-54, ¶¶ 90-95, Tables 19 and 20.
[167] *Id.*
[168] *Id.* at 57-61, ¶¶ 96-100, Tables 21 and 22.
[169] *Id.*
[170] *Id.* at 63-65. ¶ 105.

### (3) *Cash Flow Test*

Mr. Baxter also opined that, as of the Closing Date, SRC was insolvent under the Cash Flow Test, since SRC had incurred debts beyond what it should have reasonably foreseen was within its ability to pay as those debts became due.[171] Mr. Baxter noted that several factors considered under the Capital Adequacy Test also applied to the Cash Flow Test. For example, his Covenant Analysis showed that SRC could last only about 9 months before breaking a debt covenant on the first lien loan.[172] Moreover, Mr. Baxter asserted that a death spiral may commence if a company is selling assets to improve short-term liquidity, which is something SRC did when it nearly breached a covenant in the third quarter of 2012, and then sold a significant portion of its Bakken asset position.[173]

### b. Reasonably Equivalent Value

Mr. Baxter's reasonably equivalent value analysis concluded that the Schustermans, as sellers, received $6.928 billion in cash at closing in return for assets with a fair market value of only $2.791 billion, resulting in a deficit of more than $4.1 billion.[174]

### The Trustee's Evidence of Fatal Flaws in the Deal Model

Recognizing the significant gap between the amount paid to the Schustermans and Mr. Baxter's valuation of SRC, the Trustee submitted evidence to detail the "fatal flaws" his witnesses found in the Deal Model or Business Plan. The Trustee contends that KKR failed to follow industry standards in performing the three steps required to value SRC under a NAV Method:[175] (i) categorizing reserves and resources to identify different levels of uncertainties in

---

[171] *Id.* at 65, ¶ 106.
[172] *Id.* at 65, ¶ 107.
[173] *Id.* at 65, ¶ 107.
[174] Trial Tr. (Baxter) 665:7-12; Baxter Onshore Report, at 69, Table 26.
[175] The Trustee claims the NAV Method is the best way to value an E&P company because it focuses on the fundamentals of the E&P business - - locating and digging wells to extract hydrocarbons - - and accordingly

their extraction; (ii) estimating volumes and cash flows (based on reasonable pricing

assumptions) for the various reserve categories; and (iii) applying appropriate risk factors to the

resulting cash flows.

**(i)**    **Categorizing reserves and resources**

At trial, Dr. Strickland provided testimony for the Trustee regarding the Petroleum

Resources Management System ("PRMS"), which was developed by the oil and gas industry to

help define categories of oil and gas reserves by describing the relative degree of certainty for

extraction and recovery of those reserves.[176]  The PRMS terms include the following:

- "**Reserve**" represents quantities of petroleum anticipated to be commercially recoverable by application of development projects under defined conditions.[177]

- "**Proved Reserves**" are those quantities of petroleum that can be estimated with reasonable certainty to be commercially recoverable under defined economic conditions, operating methods, and government regulations.[178] "Reasonable certainty" means proved reserves have about a 90% chance of recovery.[179]
  - Proved Reserves have subcategories to denote further differences in development and production status, including Proved Developed Producing Reserves  ("PDP Reserves"), Proved Developed Non-Producing Reserves ("PDNP"), and Proved Undeveloped Reserves ("PUD Reserves").[180]

- "**Unproved Reserves**" are quantities of petroleum that have substantially lower certainty of being commercially recoverable and, depending on the level of uncertainty, are either "Probable Reserves" or "Possible Reserves."[181]  Probable reserves have a 50% probability of being recovered and possible reserves have a 10% chance of recovery.[182]

---

determines an E&P company's fair market value based on the risk-adjusted valuation of the company's reserves and resources that can be extracted. *See* Trial Tr. (Strickland) 309:10-310:8; *see also* Trial Tr. (Baxter) 803:14-807:17.
[176] Trial Tr. (Strickland) 287:1–289:19.  The PRMS has been adopted by "all major companies" in the E&P industry worldwide (except for Russia).  *Id.* at 289:8-11.  The Securities and Exchange Commission also adjusted its definitions to conform to the PRMS. *Id.* at 289:12-19.
[177] Trial Tr. (Strickland) 290:2-12.
[178] Trial Tr. (Strickland) 300:10-302:14.
[179] *Id.* at 300:19-301:4.
[180] *Id.* at 301:22-302:14.
[181] *Id.* at 300:10-302:14.  The total of all Reserves (Proved Reserves, Probable Reserves and Possible Reserves) are referred to as 3P Reserves. Trial Tr. (Strickland) 301:15-21. Proved Reserves and Probable Reserves are 2P Reserves, and Proved Reserves are 1P Reserves.  *Id.* at 301:15-21.
[182] *Id.* at 301:5-14.

- "**Contingent Resources**" are petroleum quantities that are not commercially recoverable.  "**Prospective Resources**" are petroleum quantities that may be discovered.[183]

Further, when categorizing assets under the PRMS categories, Dr. Strickland testified that reserve engineers typically analyze actual and potential well locations within a given area by starting with existing, producing wells and working outward from those.[184]  For example, one starts with an operating, producing well location and then delineates areas adjacent to that well as potential PUD locations, and then investigate areas further away from the PUD locations for Probable and Possible locations.[185]  The further one moves from the producing, operating well, the less confidence there is in performance: more than five miles outside of a Possible location rarely justifies assigning any additional reserve locations under PRMS.[186]  More than 10 miles beyond a Possible location is referred to as "a wildcat" where operators let "rigs run 24/7" and bet on finding something.[187]  Further away, in Dr. Strickland's words, is just a "goat pasture."[188]

(ii)    **Estimating volumes and cash flows**

Oil and gas companies may commission independent engineers to issue "reserve reports" to obtain a third-party professional's analysis of a specific area.  Dr. Strickland's trial testimony, described above, details the engineers' process for categorizing locations using PRMS.  Then, based upon a set of pricing assumptions, the reserve report converts reserve volumes into cash flows, discounted to present value.[189]  Dr. Strickland testified that reserve reports can be used to for operational guidance, public disclosure, or acquisitions.[190]

---

[183] Trial Tr. (Strickland) 298:3-8; 300:11-18.
[184] *Id.* at 331:13-334:22. Strickland Decl., Ex. A ¶¶24-30 [PX-888].
[185] Trial Tr. (Strickland) 331:13-334:22.
[186] *Id.* at 332:5-12.
[187] *Id.* at 379:12-382:1.
[188] *Id.* at 334:18-22.
[189] *Id.* at 271:12-17.
[190] *Id.*

In this case, KKR commissioned Netherland Sewell & Associates, Inc. ("NSAI") to prepare a 1P reserve report in November 2011 (before Closing), and a 3P reserve report in 2012 (after the Closing Date).[191] Again, for clarity's sake, a 1P reserve report refers only to Proved Reserves. A 3P reserve report refers to all reserves (Proved Reserves, Probable Reserves, and Possible Reserves) and is, by definition, more comprehensive than a 1P reserve report.

> (iii)    **Applying risk factors to resulting cash flows**

The reserve report is not intended to show the fair market value of the underlying assets because the cash flows and present value are unrisked, leaving it to the reader of the reserve report to develop and apply its own appropriate risk factors based on the PRMS categories' different levels of uncertainty.[192] Mr. Baxter testified that valuation experts typically use two methods for risking the projected cash flows derived from upstream E&P reserves: (a) Risk Adjustment Factors ("RAFs"), and (b) Risk Adjustment Discount Rates ("RADRs").[193] "Practitioners use RAFs and RADRs to factor into the valuation and free cash flow projections various market risks inherent in the development and ultimate profitability of oil and gas reserves" including, but not limited to: commodity price uncertainties, operating expense overrun risks, mechanical failure risks, production timing risks, profitability and margin risks, drilling capital expenditure and completion cost overrun risks, and regulatory environmental risks.[194]

---

[191] Trial Tr. (Strickland) 278:2-279:3.

[192] *Id.* at 368:2-14; Strickland Decl., Ex. A at ¶¶ 29-31 [PX-888].

[193] Baxter Onshore Report, at 12-13, ¶ 26. The RAF and RADR market valuation "riskings" are in addition to the PRMS commercial and technical reserve probability riskings applied to reserves.

[194] *Id.* at 13, ¶ 29. Mr. Baxter cited one particular industry source - - the Society of Petroleum Evaluation Engineers ("SPEE") that documents RAFs and RADRs. *Id.* at 13, ¶ 27.

**Opinions regarding the Deal Model's Flaws**

Mr. Baxter's expert report explains the gap between the sale price and his calculation of the assets' fair market value, in part, by opining that KKR's projections and analysis overstated the value of SRC's developed assets by $400 million and overstated the value of SRC's undeveloped assets by $3.9 billion.[195] Mr. Baxter identified what he deemed to be significant problems in the KKR Deal Model which led to an overstated value of SRC's developed assets (*viz.,* PDP Reserves) as including: (i) the Deal Model estimated PDP volumes at more than 25% higher than NSAI's calculation for PDPs in the November 2011 1P Reserve Report, and KKR did not revise its estimates downward to align with that Report;[196] and (ii) the Deal Model did not adjust its pricing assumptions despite the continued downward movement in forward curve prices for oil and gas during the period of due diligence (July 2011 to December 2011).[197]

Both Mr. Baxter and Dr. Strickland also assert that a primary reason the Deal Model resulted in an inflated value of SRC is that KKR and the Sponsors overstated the value of the company's undeveloped assets by $3.9 billion. The Trustee's experts claimed that the overstatement was caused by the following flaws in the Deal Model:

(1)     The Deal Model includes a category of "Development Assets" that did not differentiate between undeveloped volumes according to PRMS standards.[198] By lumping the future locations together without separating them into PRMS categories with varying probabilities of generating their associated volume estimates, the experts contend the Deal Model effectively implied a 100% probability of volumes from undeveloped

---

[195] Trial Tr. (Baxter) 670:5-19.
[196] Baxter Onshore Report, at 19-20, ¶ 42 and Table 2.
[197] *Id.* at 30-33, ¶¶ 52-54
[198] Trial Tr. (Strickland) 345:19-346:20.

reserves.[199]  The overstatement of volumes from undeveloped acreage not only inflated KKR's NAV conclusion, but also would have inflated the Deal Model's cash flow projections.[200]  Moreover, Mr. Baxter testified that the Deal Model's projections were simply not credible when compared to NSAI estimates.[201]

(2)     The Deal Model overestimated the per-well initial production ("IP") rates, which did not credibly equate to SRC's own historical performance in their respective basins or to other industry offset operators in their basins.[202]  Overestimating per-well IP rates was further compounded because those assumed IP rates were applied to thousands of projected new wells.[203]

(3)     The Deal Model failed to apply industry standard market cash flow risking measures, such as the RAFs and RADRs documented by the Society of Petroleum Evaluation Engineers, to arrive at their valuation and free cash flow projections.[204]  KKR presentations modeled Risked Undeveloped Reserve present values with discount rates between PV10% (usually standard for PDP) and only up to PV15% (usually standard for PUDs), although industry standards would have indicated discount rates ranging from PV11% (for PDP) to PV16% (for PDNPs) to PV22% (for PUDs) to PV34% (for Probables) and to PV41% (for Possibles).[205]

---

[199] Baxter Onshore Report, at 20-22, Table 3.
[200] Trial Tr. (Strickland) 349:23-350:21.
[201] Baxter Onshore Report, at 17, ¶¶ 40-41, Table 1.  Table 1 shows that the KKR Projections' total Risked Undeveloped Reserves category was over 4.2x higher than NSAI's undeveloped reserves. *Id.*  Table 1 also showed that the volume of reserves that KKR characterized as PUDs and provided to NSAI for review in an Aries database were 5.9x higher than what NSAI actually agreed with them and identified as PUDS in the November 2011 NSAI Report.
[202] Baxter Onshore Report at 27-28, ¶¶49-50, Tables 6 and 7.
[203] *Id.*
[204] *Id.* at 23, ¶ 46.
[205] *Id.* at 23-25, ¶¶ 46-67, Table 4.

(4)     Similar to the problem that resulted in overstating the developed reserves, the Deal Model also did not adjust its pricing assumptions for the undeveloped reserves, despite the continued downward movement in forward curve prices for oil and gas during the period of due diligence (July 2011 to December 2011).[206]  Commodity prices, especially gas which represented  85% of Samson's production, dropped materially between July 1, 2011 and the Closing Date on December 21, 2011.[207]

In addition to overstating the values of the developed and undeveloped areas, the Trustee claimed that KKR's unrealistic projections overestimated SRC's ability to generate free cash flows (especially in a downside commodity price environment) which impacted its ability to spend capital to drill new wells and, consequently, negatively impacted its ability to service its debt.[208]  Even in the first year after Closing, Mr. Baxter claimed SRC fell short of its projected Drilling and Completion ("D&C") CAPEX, and that rate continued to decline in the following years up to 50% and 60% shortfalls in CAPEX  in 2013 and 2014, and over 86% shortfall in 2015.[209]  Mr. Baxter opined: "If an upstream E&P company cannot fund their CAPEX program to replace their production, they are in a death spiral given the depleting nature of their assets, they will begin breaching covenants, not be able to service their total interest expense, and it is only a matter of time until they are highly likely to file for bankruptcy …."[210]

Mr. Baxter's testimony painted a picture of a post-closing entity doomed to fail because the basic economics of SRC did not, in 2012, account for eminently foreseeable challenges.  Mr. Filsinger likewise testified that the Deal Model did not provide investors with a reasonable stress

---

[206] Baxter Onshore Report, at 33-34, ¶¶ 55-57.
[207] *Id.* at 33, ¶ 55.
[208] Baxter Onshore Report, at 37, ¶ 66.
[209] *Id.* at 38-39, ¶68 and Table 13.
[210] *Id.*

case in which both downside commodity pricing and downside drilling[211] scenarios occurred simultaneously.[212]  Further, KKR's November 2011 downside commodity price stress case used gas prices at $3, which the Trustee alleges was not a reasonable stress price, given that the market was already trending toward that price at the time.[213]  Mr. Filsinger also observed that he suspected KKR may have reverse-engineered its stress case assumptions to avoid unfavorable outcomes and the possibility of a stalled deal.[214]

Finally, Mr. Filsinger testified that he believed that KKR's stress case assumed the existence of commodity hedges that did not exist as of the Closing Date and which, in his opinion, far exceeded the company's actual ability to hedge at that time.  Mr. Filsinger testified that, given the prevailing commodity prices at closing, those hedge assumptions were neither reasonable nor possible.[215]  Specifically, the Model assumed that, as of closing, SRC would have hedged 80% of its PDP for 5 years at a 5% discount to the NYMEX forward curve as it existed at the time of any given version of the Deal Model.[216]  Mr. Filsinger testified that KKR did not account for the possibility that, by the time they owned the company and had the opportunity to implement hedges, the modeled hedge prices would no longer be available.[217]  Ultimately, the Trustee claims, SRC was not able to lock in the hedges assumed in the model and ended up far

---

[211] A downside drilling case considers the impact if production from the wells is reduced.  Trial Tr. (Filsinger) 89:11-90:11.

[212] Trial Tr. (Filsinger) 90:17-21.  Mr. Filsinger also testified that in preparing stress cases, it is reasonable to use multifactor sensitivities showing a downside in production pressure as well as commodity pressure.  *Id.* at 91:5-13.

[213] Trial Tr. (Filsinger) 92:24-93:10.

[214] Filsinger  Decl. ¶¶ 48-49; ¶ 52 [PX-887].

[215] Trial Tr. (Filsinger) 100:9-101:12.

[216] JX-199 at KKR-SAM_0158012; Trial Tr. (Randolph) 1659:14-1660:16.  On the other hand, Mr. Randolph testified that the hedging plan was reasonable.  *Id.*  He noted that the hedging plan was not starting from zero because there was a "substantial hedge book that came over with the company and so Samson's hedge book - - so it's executing - - this hedging plan is executing additional hedges to reach 80 percent hedge coverage and doing that at a price that's within a 5 percent discount of the then current NYMEX forward curve." *Id.* at 1660:2-8.

[217] Trial Tr. (Filsinger) 100:9-101:12.

more exposed to commodity price risk than its Deal Model or Business Plan ever contemplated.[218]

**The Trustee's Evidence Regarding the Gulf Coast and Offshore Business**

The Trustee presented evidence that, when working with Jefferies in 2011, Ms. Shusterman believed that the Gulf Coast and Offshore Business had a value in excess of $2 billion.[219] In October 2011, Apache sent SIC an offer to purchase (i) SIC's Gulf Coast and Offshore Business for $2.5 billion, and (ii) SIC's Mid-Continent division for $1.5 billion, in all cash or in combination of cash and Apache stock.[220] The two assets in the Apache offer may have been severable,[221] but SIC decided not to pursue two transactions (one with KKR for Samson Onshore and one with Apache for the Gulf Coast and Offshore Business) simultaneously.[222] Instead, Ms. Schusterman decided to "stay in the business" and keep the Gulf Coast and Offshore Business.[223]

As a condition to closing the KKR Transaction, SIC transferred the Gulf Coast and Offshore assets to Samson Energy Company and, in consideration for those assets, Samson Energy returned certain outstanding notes owed by SIC in the principal amount of $553 million, which were then canceled.[224] The Trustee argues that the notes actually had no value because KKR's bid did not include assumption of those notes, so he asserts that those notes would have been canceled or contributed back to SIC.

---

[218] *See* Smidt Dep. Tr. 177-5-181:19 (Mar. 17, 2021).
[219] Trial Tr. (Schusterman) 1820:12-18. On September 28, 2011, Ms. Schusterman asked members of her management team the "question of the day - - what price would you BUY the [Gulf Coast and Offshore Business] for?" JX-102. The answers received ranged from $2 billion to $3.3 billion. Trial Tr. (Schusterman) 1814-1826.
[220] JX-119 ("Apache's Second Offer").
[221] Trial Tr. (Schusterman) 1831:10-13.
[222] Trial Tr. (Rowland) 1606:13-18, 1607:2-15; Trial Tr. (Schusterman) 1820:19-1821:3.
[223] Trial Tr. (Schusterman) 1750:14-20.
[224] Trial Tr. (Baxter) 1152:16-1153:2.

In December 2011, two appraisal companies (Duff & Phelps and Stout) prepared appraisals of the Gulf Coast and Offshore Business for tax purposes.[225] The Trustee asserts that information indicating a higher valuation of the Gulf Coast and Offshore Business's assets were not provided the appraisers, including Apache's offer, Stacy Schusterman's reaction to that offer, SIC management's views on valuation, and SIC's internal materials on the Gulf Coast and Offshore Business that were presented to potential bidders in August 2011.[226]  Also, SIC management provided the appraisers with information about the risks of pending "material" litigation that was elsewhere characterized as "immaterial."[227]  The Trustee argues that the two appraisals were completed based on incomplete and inaccurate information.

Mr. Baxter analyzed the equity fair market value of the GoM Transaction (*i.e.*, the transfer of the Gulf Coast and Offshore Business to Samson Energy).[228]  He used four valuation methodologies to arrive at his value:  (i) the Net Asset Value Method;[229] (ii) Discounted Cash Flow Method;[230] (iii) Guideline Public Company Method;[231] and (iv) Asset Mergers & Acquisitions Transactions Method.[232]  Mr. Baxter then weighted the four valuation methodologies based on his 30-years' experience to arrive at his conclusion that the equity fair

[225] JX-432; JX-433.  The sale agreement included a provision requiring Schusterman to indemnify KKR or SRC for any taxes attributable to gain due to the Gulf Coast and Offshore Business transactions in excess of $122 million. JX-198 at SEC-00249959 (§ 9.1).
[226] Tholen Dep. 154:11-159:13, 160:2-180:9; Trial Tr. (Phillips) 1508:1-151:15.
[227] Trial Tr. (Phillips) 1518:9-1522:299; Tholen Dep. 195:6-200:13 (Jan. 12, 2021).
[228] PX-889, Ex. B (the "Baxter GoM Report").
[229] Baxter GoM Report, at 33-37.  Mr. Baxter's NAV Analysis calculated the Risked Fair Market Value of the assets ranging from a low of $845 million, to a medium at $997 million, to a high of $1.2 billion.  The Risked Fair Market Value of the Liabilities was determined to be $40 million, so the Equity Value Range was between $804 million to $1.16 billion, with an Equity Value Midpoint of $957 million. *Id.* at 36, Table 12.
[230] Baxter GoM Report, at 37-44. Mr. Baxter's DCF Analysis determined an equity value range between $724 million and $860 million, with a midpoint of $792 million. *Id.* at 43, Table 16.
[231] *Id.* at 44-52; Mr. Baxter's Public Companies Analysis determined an Implied Equity Value range between $578 million and $602 million, with a midpoint value of $578 million.  *Id.* at 51, Table 19.
[232] Baxter GoM Report, at 53-56.  Mr. Baxter's M&A Transaction Analysis determined an Equity value of $583 using the BRG weighting.  *Id.* at 55, Table 21.

market value (on a going concern basis) of SIC's Gulf Coast and Offshore Business was $846 million (midpoint estimate) at the time of the GoM Transaction.[233]

Mr. Baxter noted that the Duff & Phelps and Stout appraisals deducted large amounts related to pending litigation.[234]  He also noted that there were no significant pending litigation disclosure notes on risk factors in SIC's financial statements either before or after the GoM Transaction; instead, the financial statements included express language stating that any pending litigation would not be material.[235] Mr. Baxter concluded that no deduction for pending litigation was warranted.[236]

Mr. Baxter then opined that SIC did not receive reasonably equivalent for the Gulf Coast and Offshore Business from the Schustermans/Samson Energy.  The consideration "paid" by the Schustermans/Samson Energy to SIC in exchange for the Gulf Coast and Offshore Business were the returned or forgiven subordinated notes and, Mr. Baxter assigned a fair market value of zero dollars to the subordinated notes for three reasons:

(1)     In his Onshore Report, Mr. Baxter estimated the equity fair market value of the Samson Onshore Transaction to be a negative $984 million, which implies a fair market value of zero for the Subordinated Notes as of December 21, 2011, or as of December 19, 2011 (the respective transactions' closing dates).  The Subordinated Notes were ranked below the Debtor's senior debt obligations (both secured and unsecured debt obligations).

(2)     Mr. Baxter believed there was no reason KKR and the other Sponsors would have purchased Samson Onshore subject to the Subordinated Notes without a corresponding $553 million decrease in the purchase price since, in that scenario, the LBO Buyer Consortium's equity would sit behind an additional $553 million in liabilities.  So, to consummate the Transaction at the actual purchase price of approximately $7 billion, the Schustermans would have had to cancel the Subordinated Notes.

---

[233] *Id.* at 12, Table 1.
[234] Baxter GoM Report, at 27.
[235] *Id.* citing SIC Consolidated Financial Statements for Years Ended June 30, 2011 and 2010.
[236] *Id.* at 28.

(3)     Ms. Stacey Schusterman testified in her deposition that she did not think they paid anything for the GoM Assets, saying "the family sold [Samson Onshore] and the family kept the Gulf Coast and Deepwater." [Schusterman Dep. Tr. at 223, 22-24 (Jan. 15, 2021)].  When asked how it was determined what consideration would be given to SIC in exchange for the GoM Assets, Ms. Schusterman testified that  "I don't think it was an issue, because KKR was just buying the shale [onshore] assets, so it didn't matter what we paid, other than I think for taxes." [*Id.* at 291:9-15].[237]

## DISCUSSION

### I.     Samson Onshore

In Count I of his Complaint, the Plaintiff seeks to recover monies from the Defendants on the theory that the cash payments made in connection with the 2011 Transaction were avoidable fraudulent transfers.  The parties agree that Delaware law governs this dispute.[238]  Delaware has adopted the Uniform Fraudulent Transfer Act ("UFTA").[239] As enacted in Delaware, the UFTA broadly requires a plaintiff asserting a constructive fraudulent transfer to satisfy two elements to prevail: (i) that the transferor failed to receive reasonably equivalent value for the asset transferred; and (ii) that the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer.[240] Reasonably equivalent value can be shown either by the results of a marketing and sale process, or by an expert valuation exercise.  Insolvency as of the transfer date

---

[237] *Id.* at 13.

[238] Under Delaware's choice-of-law rules, the law of the state with the "most significant relationship" to the controversy applies for fraudulent transfer claims. *See TrustCo Bank v. Mathews*, No. 8374-VCP, 2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015). While the law of Oklahoma (the headquarters of Samson) or the law of Nevada (the state of incorporation of SIC) could arguably apply, the substantive law governing the Trustee's claim would be the same regardless of which state's law applies, as Delaware, Oklahoma, and Nevada have all adopted the UFTA. *See* Del. Code Ann. tit. 6, §§ 1301 - 1311 (Delaware UFTA); 24 Okla. Stat. Ann. tit. 24 §§ 112 - 123 (Oklahoma UFTA); Nev. Rev. Stat. § 112.140 - 112.250 (Nevada UFTA). Accordingly, since there is no real conflict between the choice of law, the Court may utilize the law of the forum state, Delaware. *See Forman v. Gittleman (In re OpenPeak, Inc.)*, Nos. 16-28464 (SLM), 17-01755 (SLM), 2020 Bankr. LEXIS 3463, at *84-85 (Bankr. D.N.J. Dec. 10, 2020) ("[W]hen there is no real conflict between the choice of law, the Court may utilize the law of the forum state."). In any event, the analysis would be the same under Nevada or Oklahoma law.

[239] *See* 6 Del. Code Ann. tit. 6, §§ 1301 – 1311 (Delaware UFTA).

[240] *See* Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 198 (Del. Ch. 2006). The Trustee's burden of proof for its Delaware constructive fraudulent conveyance claims is a preponderance of the evidence. *See In re MDIP, Inc.*, 332 B.R. 129, 132 (Bankr. D. Del. 2005).

can be shown in one of three ways: (i) a balance sheet test, (ii) a capital inadequacy test, or (iii) a

cash flow test.

   A. <u>Reasonably Equivalent Value</u>

   The threshold requirement for proving a fraudulent transfer here is whether the price paid

for SIC in 2011 constituted the fair market value of the enterprise at the time of the sale.  The

analytical framework for considering questions of reasonably equivalent value in this Circuit

may be summed up as follows:

> The Bankruptcy Code does not define "reasonably equivalent value," and courts
> "have rejected the application of any fixed mathematical formula to determine
> reasonable equivalence."[241] Rather, the Third Circuit employs a "common sense"
> approach and has held that "a party receives reasonably equivalent value for what
> it gives up if it gets roughly the value it gave."[242]  In conducting this analysis, a
> totality of the circumstances may be examined.[243] Relevant circumstances include
> the market value of the transfer, whether the parties dealt at arms' length, and
> whether that transferor acted in good faith.[244]

   "[F]air value, in the context of a going concern, is determined by the fair market price of

the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period

of time to pay the debtor's debts."[245] A wealth of authority teaches that when a willing buyer and

a willing seller transact, both being at arms' length, neither being under compulsion to buy or

sell, and both having reasonable knowledge of relevant facts, the sale price establishes fair

---

[241] *Miller v. Black Diamond Capital Mgmt., L.L.C. (In re Bayou Steel BD Holdings)*, 642 B.R. 371, 291 (Bankr. D. Del. 2022) (quoting *Off'l Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders North America, Inc.)*, 405 B.R. 527 546 (Bankr. D. Del. 2009)).

[242] *Id.* (quoting *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (internal quotation marks omitted)); *see also  Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Freuhauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) (analyzing the value surrendered and gained as a result of a transfer to determine "whether the debtor got roughly the value it gave.").

[243] *Id.* (citing *In re SRC Liquidation LLC*, 581 B.R. 78, 97 (D. Del. 2017), *aff'd*, 765 F. App'x 726 (3d Cir. 2019).

[244] *Id.* (citing *Mellon Bank, N.A. v. Off'l Comm. of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139, 153 (3d Cir. 1996)).

[245] *In re Trans World Airlines, Inc.*, 203 B.R. 890, 895 (D. Del. 1996), rev'd on other grounds, 134 F.3d 188 (3d Cir. 1998) (citations omitted).

market value.[246] "The easiest and most accurate way to determine the amount of money for

which an asset can be exchanged is to do just that – exchange the asset for money or, put more

plainly, sell it."[247]

The primacy of market evidence of value is well settled in this Circuit.[248] The Delaware

District Court concluded as follows:

> When sophisticated parties make reasoned judgments about the
> value of assets that are supported by then prevailing marketplace
> values and by the reasonable perceptions about growth, risks, and
> the market at the time, it is not the place of fraudulent transfer law
> to reevaluate or question those transactions with the benefit of
> hindsight.[249]

Similarly, Judge Gross observed that the "best evidence" of fair market value is the actual price

negotiated by a willing buyer and a willing seller after an extensive marketing process and

negotiations.[250] Even more recently, Judge Sontchi concluded that "[o]bjective evidence from

the public debt market is a more reliable measure of value than the subjective estimates of an

expert witness[]."[251]

---

[246] AMERICAN SOCIETY OF APPRAISERS, Definitions of Value Relating to MTS Assets,
https://www.appraisers.org/disciplines/machinery-technical-specialties/appraiser-resources/definitions-of-value; *see
also* SHANNON PRATT & ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND
APPRAISAL OF CLOSELY HELD COMPANIES 41-42 (McGraw Hill, 5th ed. 2007) (same).
[247] Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 AM. BANKR. INST. L. REV. 1, 1
(2012).
[248] *E.g., VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) (holding that "the market price is a more
reliable measure of the stock's value than the subjective estimates of one or two expert witnesses" (citation and
quotation marks omitted)).
[249] *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002), aff'd, 60 F. App'x 401 (3d Cir. 2003).
[250] *Allonhill, LLC v. Stewart Lender Servs., Inc. (In re Allonhill, LLC)*, 2019 WL 1868610, at *40 (Bankr. D. Del.
Apr. 25, 2019), *aff'd in part*, 2020 WL 1542376, at *11 (D. Del. Mar. 31, 2020) (affirmed as to fraudulent transfer
ruling), *reconsideration denied*, 2020 WL 6822985 (D. Del. Nov. 20, 2020).
[251] *Youngman v. Yucaipa Am. Alliance Fund I, L.P. (In re ASHINC Corp.)*, 640 B.R. 1, 51 (Bankr. D. Del. 2022).
*See also Poole v. N. V. Deli Maatschappij*, 243 A. 2d 67, 70 n.1 (Del. 1968) (defining "[f]air market value ... as the
price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances,
after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the
buyer to buy"); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *1 (Del. Ch. Oct. 21, 2015) ("I
find it appropriate to look to the price generated by the market through a thorough and vigorous sales process as the
best indication of fair value under the specific facts presented here."); *Merlin Partners LP v. AutoInfo, Inc.*, 2015
WL 2069417, at *17-18 (Del. Ch. Apr. 30, 2015) ("Where, as here, the market prices a company as the result of a

The inquiry looks at circumstances as they existed at the time of the challenged transfer and asks "whether the debtor got roughly the value it gave."[252]  Approximately $7.108 billion was paid for the Samson Onshore stock. Thus, to prove the absence of reasonably equivalent value, the Trustee had to prove that Samson Onshore's stock was worth substantially less than that sum.

As noted above, the parties to this dispute have taken differing approaches to this element of the case.  Plaintiff has offered an expert opinion fixing the valuation of SIC at approximately $2.7 billion.  The Defendants, by contrast, contend that the sale process and the price set thereby provide overwhelming and dispositive evidence of the value of Samson in 2011.  Importantly, the Defendants assert that if the Court concludes that the sale process was properly conducted, there is no reason even to reach the Plaintiff's valuation case.

The Schustermans, on the one hand, and the purchasers led by KKR, on the other, were at arms' length. Nothing in the extensive record suggests that either party was under any compulsion to transact:  the Schustermans faced neither imminent defaults nor a liquidity crisis. Indeed, Ms. Schusterman testified at length that she was often close to walking away.  The purchasers consisted of sophisticated, well-capitalized firms, represented by capable professionals and each seeking a profit.

The evidence that the parties, and in particular the purchasers, were reasonably informed as to the relevant facts is overwhelming. The Court has herein spent pages cataloguing the staggering resources dedicated to vetting and analyzing this deal.  The Sponsors and the

competitive and fair auction, the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value." (citation and quotation marks omitted)).
[252] *Fruehauf Trailer Corp.*, 444 F.3d at 213.

Participating Lenders: (i) had the necessary experience and competence, and did the necessary work to become reasonably informed about the assets, (ii) were advised by highly competent specialists who diligently investigated the business risks of SIC, (iii) themselves diligently sought to establish value under appropriate valuation techniques, including net asset valuation, comparable trading multiples, and comparable M&A transactions, (iii) performed stress-case analyses incorporating appropriate downside risking, and (iv) closed with substantial liquidity and a level of debt within normal ranges.

At trial, the Trustee did not offer evidence that seriously disputed that the elements of a fair market transaction were satisfied here. His primary criticisms of the sale and marketing process fall into several categories.  First, and most easily disposed of, are the numerous conclusory and unsupported statements suggesting that KKR and its fellow purchasers were heedless or reckless in their zeal to buy the Schustermans' company. In the Complaint, for example, the Trustee alleges that the Schustermans "simply preyed upon" KKR and the Sponsors, and that KKR – and particularly Henry Kravis, KKR's co-founder and "the son of an Oklahoma oil engineer" – were "pie-eyed" at the prospect of acquiring SIC.[253]  Similarly, Mr. Filsinger testified at trial that the financial commitments and support expressed by the Participating Lenders was a likely result of the enthusiasm of "salesmen" at those institutions to pursue and land any deal.[254]

The record recounted at length above does not support any finding that the participants in the Transaction – buyers AND sellers – were anything other than clear-eyed businesspeople, focused on developing and vetting a deal that gave them the best return they could negotiate for. The Trustee's characterization of the Sponsors as either indifferent to obvious red flags or

---

[253] Adv. Pro. Docket No. 8 at ¶ 4.
[254] Trial Tr. (Filsinger) at 221:12-24 ("Keep in mind, they're in sales mode.").

disinclined to investigate where they were putting their money finds no support in the extensive evidentiary record here.

The other arguments offered by the Trustee are similarly unavailing. Mr. Baxter in particular (1) criticizes KKR's failure to obtain a 3P reserve report before closing the deal; (ii) questions the sufficiency of a marketing approach that yielded only three offers; and (iii) asserts that the deal should have been renegotiated or abandoned in November 2011 in light of the falling gas prices. The Court will address each of these propositions in turn.

As discussed *supra*, the Petroleum Resource Management System provides a set of industry-accepted standards and definitions for use in valuing oil and gas assets. These assets fall broadly into categories defined as Proven, Probable and Possible. A report that analyzes all three of these categories is called a 3P report; and a report that only looks to Proven reserves is called 1P report.

In advance of the Closing, KKR and the Sponsors commissioned NSAI to provide them with a 1P report. It was anticipated that NSAI would prepare a 3P report shortly after the Closing. Mr. Baxter and Dr. Strickland both expressed surprise and dismay that the buyers were willing to proceed with the Transaction without having a 3P report in hand. At bottom, both of these witnesses contend that a 3P report was a critical element of due diligence, and that the failure to obtain such a report was a glaring error that deeply tainted the sale process.

The record developed at trial established the importance and utility of a 3P report in this industry. However, the evidence does not demonstrate that a current 3P report is a *sine qua non* for a sale or a proper sale process. Here, the Court is impressed by the proverbial dog that didn't bark: none of the Sponsors or the Participating Lenders requested, required, or demanded the preparation of a 3P report before moving forward with the transaction. These parties had every

opportunity to make such a request in the 19 weeks that SIC was on the market, and they all had every incentive to get it right.

In any complex commercial transaction, there will always be information that is unavailable or that parties elect not to pursue or obtain. A party seeking to challenge a sale process must do more than point to items that would have been wise to have or to consider. Here, hindsight might tell us that it would have been a good idea to get a 3P report. But the failure to require it cannot be said to fatally undermine the integrity of a sale process where the actual participants did not demand it and had no shortage of other critical and relevant data to evaluate.

The Trustee next takes issue with the overall process by which Jefferies took SIC to market. Specifically, Mr. Baxter noted that only three offers were received after a solicitation that was presumably widely disseminated. The Trustee contends that a proper marketing effort would have yielded more interest, and he suggests that the timeline set by Jefferies (as SIC's investment banker) was too short to timely test the market.

In response, the Defendants recite that Jefferies was the leading investment banker at the time in this space, and that it was properly motivated by its engagement letter to implement a process that would canvass the marketplace and yield the highest offer. Importantly, the Trustee does not identify any potential bidder that was frozen out or excluded from the sale process. There is no suggestion that any of the bidders (Apache, KNOC and KKR) or any potential bidder asked for more time to conduct due diligence or put together a bid. Jefferies constructed a marketing and solicitation process that it originally estimated would take fourteen weeks from start to finish. In the end, the process actually took nineteen weeks – over a third longer than the original schedule.

The Trustee's criticism of the "rushed" sale process is also difficult to square with his contention that the buyers paid over twice what SIC was worth. It seems unlikely that a longer process, with more bidders and time for negotiation, would have led to a dramatically lower bid more in line with what the Trustee says the company was worth. It is possible, perhaps, but in the Court's experience a longer and broader process is typically associated with an expectation of a higher sale price.

Finally, the Trustee asserts that KKR and the Sponsors should have abandoned, or radically renegotiated, the deal in November and December 2011 on account of low prices in the oil and gas market. Mr. Baxter testified that, in his experience, it is not unusual for M&A participants in the oil and gas industry to walk away from an acquisition where current prices make a transaction attractive or feasible:

Mr. Baxter:    I have seen a lot of transactions where you can have a handshake deal and the prices are in free-fall and the two CEOs have to break it. I've seen deals that are under [a sale agreement] and your prices are under free-fall and the buyer just says, look – [ ] I can't. And they're just looking at the break-up fee saying, like, I know I'm cutting a check for $5 million or $50 million, but I can't go through with this acquisition. … You don't want to close something if the value at closing is materially different than what you did –

The Court:    What you signed up for.

Mr. Baxter:    Correct.[255]

The Court has little doubt that a lot of people wish this deal had been abandoned in November 2011. But the record demonstrates that all parties were acutely aware of the effect of oil and gas prices on SIC's business, and the Deal Model and Business Plan each accounted for pricing volatility in a famously cyclical industry. KKR and the Sponsors directed advisors with deep experience to formulate a Business Plan that would allow for inevitable swings in prices,

---

[255] Trial Tr. (Baxter) 687:15-6887.

and the record shows that the Sponsors and Participating Lenders all independently evaluated the projections and the attendant market risk.  There is no suggestion that pricing volatility was ignored or that the Schustermans manipulated or misled the buyers in any respect.  The buyers were fully informed, cognizant of the ever-present uncertainty attendant to predicting the future, and they chose to close the Transaction.  As noted repeatedly above, neither the Schustermans nor the Sponsors were under any compulsion to transact.  The failure of KKR and the Sponsors to walk away from the deal, on account of a risk that was clearly visualized and accounted for, does not undermine the conclusion that the sale process here was open and fair.

Against the evidence of a purchase price reached after a prodigious negotiation between parties with their own skin in the game, the Trustee offered a theoretical valuation constructed a decade after the fact, "with the benefit of hindsight,"[256] and "for the purpose of litigation."[257] He rested his valuation case on the hindsight opinions of litigation experts.  Even where not infected by hindsight, such opinions amount, at best, to the expressions of the witness's disagreement with fair market value. That is, they reflect the witness's judgment as to how he, more than a decade post-Sale, would have assessed the same facts differently from the parties to the actual Transaction. This is precisely what courts reject when actual market-based evidence is available.[258]

B. Insolvency

The Court has concluded that the evidence demonstrates that the buyers gave reasonably equivalent value for Samson Onshore and, therefore, the Trustee cannot meet both elements

---

[256] *Peltz*, 279 B.R. at 738.
[257] *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 548 (D. Del. 2005).
[258] *See Allonhill*, 2019 WL 1868610, at *40 (finding that expert's "after-the-fact valuation cannot be substituted for the parties' actual agreement on value"); *Hechinger*, 327 B.R. at 548 ("[B]ecause valuation is, to a great extent, a subjective exercise dependent upon the input of both facts and assumptions, the court will give deference to 'prevailing marketplace values,' rather than to values created with the benefit of hindsight for the purpose of litigation." (internal citation omitted)).

required for avoiding fraudulent transfers under the UFTA.  Although it is not necessary to reach

the issue of insolvency, in the interest of completeness, the Court will address the Trustee's

arguments and evidence that the Transaction left the SRC inadequately capitalized, overburdened

with debt, and doomed to collapse in a death spiral shortly after Closing.

Under the UFTA, insolvency as of the transfer date can be shown in one of three ways:

(i) the debtor was insolvent on the date of the transfer or became insolvent as a result of the

transfer (the "Balance Sheet Test"); (ii) the debtor was engaged or was about to engage in a

business or transaction for which any property remaining with the debtor was unreasonably small

capital (the "Capital Adequacy Test"); or (iii) the debtor intended to incur, or believed (or

reasonably should have believed) it would incur, debts beyond its ability to pay as such debts

matured (the "Cash Flow Test").

1.  Balance Sheet Test

Under a balance sheet test, "[a] debtor is insolvent if the sum of the debtor's debts is

greater than all of the debtor's assets, at fair valuation."[259]  The Trustee argued that SRC was

insolvent under a balance sheet test based on Mr. Baxter's expert report.  Mr. Baxter calculated

the fair market value of the assets based on a weighted average of two income-based valuations

(a net asset value ("NAV") and a discounted cash flow ("DCF")), and two market-based

valuations (comparable public companies and precedent M&A transactions).[260]  From the asset

value, Mr. Baxter subtracted the value of current and long-term liabilities, capital expenditures,

G&A expenses, KKR's monitoring fee, and mandatory preferred debt,[261] and determined that, as

---

[259] Del. Code Ann. tit. 6, § 1302(a).
[260] Trial Tr. (Baxter) 802:2-816:1.  More detail about Mr. Baxter's valuation is set forth, *supra.*, in the Section entitled "Plaintiff's Evidence."
[261] Trial Tr. (Baxter) 805:13-806:20.

of the Closing Date, the fair market value of Samson's liabilities exceeded the fair market value of its assets by almost $1 billion.[262]

The Trustee faulted the Defendants for not offering any expert opinion on the fair market value of Samson's assets. The Defendants, however, assert that this case does not involve a "battle of experts" that often occurs outside the context of an actual sale, where witnesses may debate the most appropriate trading comparables, discount rates in a WACC calculation, and the like. Instead, the Defendants argue that the Sale established the fair value of the assets. Again, courts have determined that "[f]air value, in turn, 'is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'"[263]

The Defendants assert that the fair value established by the Sale was $7.587 billion, consisting of (i) $7.108 billion (the price paid for SIC's stock on the Closing Date), and (ii) $479 million in net debt refinanced through the sale.[264] SIC's total debt as of the Closing Date was $3.595 billion.[265] Therefore, the Defendants claim that SIC was solvent as of the Closing Date with an equity value (*i.e.,* solvency cushion) of $3.992 billion. Moreover, the Defendants point out that SRC's only asset as of the Closing Date was SIC stock, and SRC had no material debts other than its guaranties of SIC's obligations.[266] Therefore, the Defendants argue that SRC was also solvent – and even applying some substantial discount to market value would still leave both SIC and SRC solvent.

---

[262] Trial Tr. (Baxter) 803:9-12; Baxter Onshore Report, at 44, Table 15.
[263] *Weisfelner v. Blavatnik (In re Lyondell Chemical Co.)*, 567 B.R. 55, 109 (Bankr. S.D.N.Y. 2017) (quoting *Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) and *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996)).
[264] DX-500 at TRUST00040461, 473.
[265] Stipulated Facts, ¶ 6.
[266] JX-257.

This Court agrees with the Defendants that the Trustee challenged the market but did not show that its mechanisms failed. As set forth at length above, there is overwhelming evidence that KKR and the Sponsors, all of which had extensive experience in oil and gas investments, did extensive due diligence and formed the view that their equity investment in excess of $4 billion would return substantial value to them. The Trustee did not carry his burden of proving that the equity investment was worthless the minute the Transaction closed.

2. Capital Adequacy Test

The Trustee's main theory is that Samson Onshore was inadequately capitalized, so that in late 2011, SRC was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.[267] Unreasonably small capital typically refers to the inability to generate sufficient profits to sustain operations.[268] "[A] central consideration when determining whether a transaction leaves a company with unreasonably small capital is whether the parties' projections used in facilitating the transaction were reasonable."[269] "[A] court must consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made."[270]

The Trustee claims that the Business Plan, based on the Deal Model, was founded on unrealistically optimistic assumptions that resulted in a business plan that left no margin for error or ability to withstand foreseeable market fluctuations. First, the Trustee's witnesses testified that the Business Plan did not reflect any reasonable downside or stress case scenarios for an

---

[267] Del. Code Ann. tit. 6, § 1304(a)(2).
[268] *Lyondell*, 567 B.R. at 109 (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)).
[269] *Lyondell*, 567 B.R. at 110 (quoting *Moody*, 971 F.2d at 1073) (internal punctuation omitted).
[270] *MSF/Sun Life Trust - High Yield Series v. Van Dusen Airport Serv. Co, L.P.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

industry in which future commodity prices are highly volatile and difficult to predict.[271]  Second,

the Trustee also claims that the Business Plan left such little room for error that even small

adjustments to the initial production and drilling success rates (to be more in line with SIC's

historical rates)[272] would project that the company would experience a default under the First

Lien Facility's debt-to-EBITDA ratio covenant in 2013 and 2014.[273] And, third, the Trustee

asserted that the Business Plan grossly overstated the amount of cash that SRC's undeveloped

assets would generate post-Closing. Mr. Baxter also testified that, if SRC failed to generate

EBITDA as expected, there was no fallback cash on hand for management to use for

development.[274] This evidence, the Trustee argues,  proves that KKR's Business Plan was

unreasonable as it did not properly account for risks and difficulties that were likely to arise post-

closing and, therefore, left SRC was seriously undercapitalized.

In response, the Defendants presented evidence to demonstrate that KKR and the

Sponsors prepared stress cases that reasonably accounted for foreseeable risks.[275]  KKR ran

numerous sensitivities and stress pricing cases during their diligence process.[276]  KKR and RPM

developed downside cases that projected lower volumes for undeveloped assets by risking

---

[271] Mr. Filsinger testified that, once reasonable adjustments were made to the hedging and pricing assumptions used in KKR's stress case, and using KKR's own downside drilling scenario, KKR's own model showed a company that would be unable to meet its debt covenants starting in 2014 and would exceed its credit facility balance in 2015 and continuing every year thereafter. Trial Tr. (Filsinger) 105:17-106:5; Filsinger Trial Decl. Ex. A at 60 (Table 7). Mr. Baxter likewise adjusted the Deal Model (using what he deemed to be more reasonable volume assumptions based, partly, on the November 2011 NSAI's 1P Report and layering in Mr. Filsinger's pricing and hedging assumptions) and determined covenant violations almost immediately post-Closing. Trial Tr. (Baxter) 769:24-772:13; 800:10-22; Baxter Onshore Report, at 118, Table 51.
[272] The Defendants, however, argue that the historical drilling success rate used by Mr. Baxter was based on a success rate for the entire company, including the Gulf Coast and Offshore Business, and is not a reasonable historical drilling success rate to apply to the Onshore Business. Trial Tr. (Almrud) 1992:23-1996:4.
[273] Trial Tr. (Baxter) 799:5-19; Baxter Onshore Report, at 67, Table 24.
[274] Trial Tr. (Baxter) 788:20-789:17.
[275] Trial Tr. (Almrud) 2014:1-13.  "The Deal Model was highly adaptable and allowed the user to easily run different pricing scenarios. When presenting results of the Deal Model both internally and to potential outside investors, KKR typically presented multiple pricing cases that were within a reasonable range of the NYMEX curve both for upside and downside potential."  Almrud Decl. ¶ 230 [DX-850]; see also ¶¶ 231-233; ¶¶ 241-255.
[276] Almrud Decl. ¶ 233 [DX-850]; JX-186 at KKR-SAM_0177384.

certain areas more significantly than the KKR "base case" based on RPM's technical review and understanding of individual areas.[277] KKR also accounted for downside price risk in the Deal Model by running stressed commodity price cases.[278] Ms. Roski testified that the Deal Model's base case left SIC with sufficient cushion to withstand substantial downside risk for production and commodity prices.[279]

Other equity investors also ran various pricing cases and sensitivities to come to their own conclusions as to the reasonableness of the Business Plan.[280] Crestview, for example, developed downside and upside operating cases that sensitized the risking of development acreage.[281] NGP also developed downside and upside cases that sensitized the risking of the development acreage, and forecast investment returns across those cases under different pricing scenarios.[282]

At least 11 of the Participating Lenders also performed their own due diligence, utilizing their own in-house or external petroleum engineers.[283] As evidenced in their credit memos, the

---

[277] Almrud Decl. ¶ 201; *see also* ¶¶ 267-270 [DX-850].

[278] The stress case that KKR most widely shared with potential investors prior to the Closing assumed flat commodity prices of $3.00/MMBtu for gas and $70.00/Bbl for oil through the first five years after the Closing Date, with 1.5% annual escalation thereafter. Almrud Decl. ¶ 241 [DX-850]; Trial Tr. (Almrud) 2017:22-2018:2. Mr. Almrud opined that the KKR Stress Case was a reasonable downside pricing case based upon prevailing market views at the time, as evidenced by (i) NYMEX price curves; (ii) analyst forecasts; and (3) stress pricing considered by other participants in the Transaction. Almrud Decl. ¶ 246; *see also* ¶¶ 241-266 [DX-850].

[279] Roski Decl. ¶ 163 [DX-852]; JX-221 at KKR-SAM_0143565.

[280] Almrud Decl. ¶ 258 [DX-850].

[281] JX-145 at CRE-SAM_0036432.  In seeking final approval on November 21, 2011, Crestview ran a revised downside case that risked the development acreage more heavily as compared to its original downside case.  JX-191 at CRE-SAM_0048746,

[282] JX-177 at NGP-00022642-644.

[283] *See* Maultsby Dep. 67:12-25 (BAML's in-house petroleum engineer independently reviewed reserves and anticipated production); Bowen Dep. 50:11-16 (confirming that BBVA's in-house engineer reviewed the assets); DX-446 at BBT-00000622 (noting Engineering Cash Flows analysis prepared by BB&T's third-party engineer); JX-118 (Bank of Montreal credit memorandum prepared by, *inter alia*, Senior Petroleum Engineer); DX-412 at CAPITALONE003923 (Capital One credit memorandum noting that CONA Energy Technical Services reviewed and made adjustments to the NSAI reserve report); JX-183 at JPMSRC-0024492 (JPMorgan credit approval document, noting involvement of engineer); JX-176 at MIZUHO_DEF000009 (Mizuho credit memorandum indicating petroleum engineer prepared a borrowing base summary report for the bank); DX-359 at RBCSE_0018367 (RBC credit memorandum, referring to "engineering memorandum that was prepared by RBC's in-house engineer); DX-447 at SMBC-DEF-001810 (SMBC credit memorandum, noting review of NSAI reports by SMBC's "independent engineering consultant"); JX-220 at Sampson_Kravitz00000416 (TD Bank credit

Participating Lenders prepared their own stress cases using different approaches and assumptions, including their own stress case prices.[284]  Mr. Almrud noted that the Participating Lenders' stress cases support the reasonableness of the Deal Model's stress case.[285]

The Trustee argued that the Participating Lenders' analyses does not independently corroborate the reasonableness of the Business Plan because the Lenders based their willingness to fund the Transaction only on the value of Samson Onshore's Proved Reserves, which secured their loan.[286]  The Trustee claims the banks "were largely indifferent to the glaring deficiencies in KKR's valuation of the undeveloped acreage because the banks did not intend to keep any portion of the unsecured bridge loan on their books for a meaningful period of time."[287]  It is not disputed that the Participating Lenders contemplated that the $2.25 unsecured loan made at closing would be a bridge to an early 2012 refinancing with unsecured notes.[288]  However, as the Defendants noted, as of the Closing Date, the Participating Lenders has no assurance that the loan would or could in fact be taken out by the issuance of notes into the marketplace.

Ms. Roski further noted that the independent diligence and analysis performed by the Participating Lenders supported their determination that Samson Onshore was an acceptable credit risk and its leverage was within an acceptable range.[289]  The Participating Lenders cited, among others, the following strengths or mitigating factors: (i) 80% hedging plan; (ii) diversity

---

memorandum, noting that "risk factors are based on recommendations from our consulting engineer); DX-426 at USBANK-DEF-00738 (US Bank credit memorandum, noting that "[r]eserve risk is mitigated by the Better than Average (PDR 4) engineering risk assigned by USB's Engineers, as fully detailed in the Engineering Memo").
[284] Almrud Decl. ¶ 263 [DX-850] (compiling gas stress prices from Participating Lender credit memos).
[285] *Id.* at ¶¶ 260-266. The Participating Lenders' stress pricing for gas were escalating (as opposed to the Deal Model's stress case which was flat) and were, on average, above the $3.00 Deal Model stress price; while the Participating Lenders' stress pricing for oil was, on average slightly lower than the $70 KKR stress price. *Id.* at ¶¶ 264, 266.
[286] JX-256 at JPMSRC0004228, -245.
[287] Plaintiff's Post-Trial Brief (Adv. Pro. Docket No. 463) at 60 (citing Dierker Dep. Tr. 159:7-13 ("We would have not expected to maintain meaningful exposure for any long period of time").
[288] JX-271 at KKR-SAM_0037521; JX-296 at JPMSRC-0014045.
[289] Roski Decl. ¶ 186 [DX-852].

of land holdings; (iii) ability to sell assets; (iv) immediate liquidity and access to additional liquidity; (v) significant inventory of development locations; and (vi) experienced management team.[290]

The parties also sparred extensively over the Business Plan's hedging assumptions. The KKR hedging plan was to hedge 80% of forecasted PDP for five years (2012 to 2016) at a price within a 5% discount to the current NYMEX forward curve.[291] The Trustee criticized the Business Plan for relying on the existence of commodity hedges that did not actually exist as of Closing and, therefore, left the company exposed to volatility and potentially continuing declining prices.[292] However, the Defendants' expert, Mr. Randolph, explained that "[i]t is not unusual for a financial model to assume the hedging plan will be in place as of the closing date even if, as a practical matter, it is understood that it may take a short period of time after the closing date for the hedging plan to be fully executed."[293] Mr. Randolph opined that Samson Onshore could have reached the 80% hedge volume target within four weeks – and possibly within just a few days – after the Closing Date.[294]

The Trustee's expert, Mr. Filsinger, opined that the KKR hedging plan was unreasonable, given the prevailing commodity prices at closing.[295] Mr. Filsinger's analysis concluded that "KKR's assumed additional hedges were unachievable immediately after Deal Close …"[296] and he determined that it would take Samson Onshore four months post-closing to execute the

---

[290] Roski Decl. ¶ 186 ("Lender Assessment of Credit Risk" table) [DX-852]

[291] JX-199 at KKR-SAM_0158012; Trial Tr. (Randolph) 1659:15-1660:8. "Forecasted PDP" is shortened reference to forecasted PPD, PDP, PDMP and WIP, since PDP represents about 95 per cent of those volumes. *Id.* at 1659:22-1660:1. NYMEX refers to the New York Mercantile Exchange. Randolph Decl. at ¶ 5 n. 6 [DX-848].

[292] Filsinger Rebuttal Decl. ¶¶ 7-8 [PX-892].

[293] Randolph Decl. ¶ 77 [DX-848].

[294] Trial Tr. (Randolph) 1670:23-1671:13. Mr. Randolph noted that his opinion was based on his personal experience in the marketplace, actual trades executed by SIC on December 13, 2011 and December 21, 2011, and indicative hedging quotes provided by bank trading desks prior to the Closing Date. *Id.*

[295] Trial Tr. (Filsinger) 100:9-101:12.

[296] Filsinger Decl. Ex. A ¶ 83 [PX-887].

volume of hedges need to reach 80%.[297]  This four-month assumption projected significant cash flow impairment in Samson Onshore's Business Plan.

Mr. Randolph testified that Mr. Filsinger's conclusion was flawed for a number of reasons.  First, Mr. Filsinger concluded that there was insufficient market liquidity to absorb Samson Onshore's planned hedge volumes, but he erroneously based this conclusion on his analysis of the size of the NYMEX future market.[298]  Mr. Randolph pointed out that upstream oil and gas companies (including Samson Onshore) typically transact hedges on the domestic OTC [over the counter] market, which is significantly larger than the NYMEX futures market for domestic energy commodity derivatives and could have easily accommodated SRC's planned hedging program.[299]

Second, Mr. Filsinger based his four-month assumption on SIC's hedge volumes in the "month" prior to Closing, although the two trades identified were executed just eight days apart.[300]  There was no indication that the number of hedges executed by SIC prior to the Closing Date represented the *maximum* amount of hedges SIC could have executed.[301]  If the pace of hedging in the eight-day period were carried forward after Closing, Mr. Randolph concluded Samson Onshore could reach the hedge target in approximately four weeks, not four months.[302]

---

[297] Filsinger Decl. Ex. A ¶ 84 [PX-887].

[298] *Id.* at ¶¶ 73-74 ("In order to determine whether sufficient liquidity existed in the market to execute such a large volume of hedges at the time of Deal Close, I reviewed the average daily transaction volumes and open interest for [NYMEX futures] relative to the outstanding volumes needed to meet the KKR Hedging Target, as of the Deal Close.").

[299] Randolph Decl. ¶19, 36-49; Trial Tr. (Randolph) 1665:1-1666:22.  Mr. Filsinger denies that he ignored the OTC market and argues that OTC trades effect the NYMEX natural gas prices and impact trades.  Filsinger Sur-Rebuttal Report at ¶¶ 14-16 [PX-887 Ex. B].

[300] Trial Tr. (Randolph) 1682:10-1683:18.

[301] Trial Tr. (Randolph) 1683:19-1684:2.  Mr. Filsinger's assumptions also were inconsistent with indicative hedging quotations received from both JPMorgan and BAML prior to the Closing date, which Filsinger dismissed as "sales mode." Trial Tr. (Filsinger) 221:18-20.  Mr. Randolph testified that, in his experience, banks do not provide hedging quotes that they are unable to execute, noting that the banks are regulated and there are implications if one gives "pie-in-the-sky" quotes. Trial Tr. (Randolph) 1680:10-1681:12.

[302] Trial Tr. (Randolph) 1682:13-1685:2.

Third, Mr. Filsinger criticized the KKR hedging plan because it used the forward curve (less a 5% discount) to model hedge execution prices in a stress case scenario.[303]  Mr. Filsinger asserted that future hedge prices should be modeled at a stressed version of the forward curve, consistent with the current declining commodity price environment.[304]  Mr. Randolph disagreed, declaring that "oil and gas companies, even in a stress case, generally model assumed hedges in their cases based upon the available forward curve, as that is the best known and knowable price (as of the date the model is run) at which hedges can likely be executed."[305]

Mr. Randolph ran four scenarios using KKR's stress case prices for gas and oil.[306]  In each of the scenarios, the Deal Model yielded positive free cash flow in 2016 and each year thereafter, with no breaches of the borrowing limit or debt-to-EBITDA covenant under the RBL at any point in the projected period.[307]  Using the same scenarios with the base case drilling schedule, and assuming the company put no additional hedges post-Closing, Mr. Randolph also calculated positive equity returns over a 10-year period.[308]  Mr. Randolph opined that KKR's hedging plan was reasonable and could have been executed shortly after the Closing Date, had the board chosen to do so.[309]

---

[303] Filsinger Rebuttal Decl. ¶¶ 12-16 [PX-892].

[304] Id. ¶¶ 13-14.

[305] Randolph Decl. ¶21; see also ¶¶ 103-104 [DX-848].

[306] Id. at ¶ 25.

[307] Id. at ¶ 26-31.

[308] Id. at ¶ 32.

[309] Trial Tr. (Randolph) 1670:7.  In January 2012, KKR and other members of the SRC Board recommended placing additional natural gas hedges for 2012 and 2013.  JX-285.  On January 4, 2012, two weeks after the Closing Date, Samson Onshore had the opportunity to execute a sizeable hedge, but an NGP board member recommended against hedging, commenting that "I think that this is the low point in the gas curve's year.  We have done plenty for right now. … Just hold tight for a bit longer …the short squeeze will happen and we will get the pricing we want!" JX-277.  Again, on February 18, 2012, the member expressed similar sentiment to David Adams, SRC's CEO: "[G]as will come back.  Don't panic.  Just be smart, preserve our optionality there.  When gas goes back to 4.50 on the strip, I don't want to have done the wrong thing at the wrong time.  Patience … we have seen this movie before[.]" JX-305 at NGP00009024.

The Defendants also assert that Samson Onshore's access to capital post-Closing supports their position that Samson Onshore was adequately capitalized.  As noted in the Participating Lenders' credit memoranda, Samson Onshore had access to significant additional capital post-Closing, including (i) approximately $1 billion of liquidity, including cash and $900 million of availability under the RBL; (ii) a significant asset base it could monetize through drilling or asset sales; and (iii) access to additional financing and the ability to restructure its existing financing.[310]  Moreover, Samson Onshore successfully issued $2.25 billion in unsecured notes in February 2012 to take out the bridge loan, and the record reflects that those notes traded over par well into 2014.[311]

Further evidence of Samson Onshore's capital adequacy is that the company did not file for Chapter 11 until September 16, 2015 - - nearly four years after the Closing Date.[312]  Internal valuation reports and analyses prepared by members of the Investor Group from 2012 through the end of 2013 showed their belief that Samson Onshore had positive equity value.[313]  But by

---

[310] Roski Decl. ¶188;  ¶¶ 189-194 [DX-852].  *See also, e.g.,* X-290 at CBNA00002505, 2506 (Citibank's approval memorandum stated: "In the event [Samson Onshore] needed to reduce leverage, it would sell into a deep and liquid M&A market."); JX-183 at JPMSRC-0024494 (JPMorgan credit approval document, noting "[s]trong liquidity, with a projected $1.1B of unused availability under the revolver at close.").

[311] JX-273; DX-517; Roski Decl. ¶ 185 [DX-852].

[312] *Burtch v. Opus, LLC (In re Opus East, LLC)*, 698 F. App'x 711, 715 (3d Cir. 2017) (quoting *In re Joy Recovery Tech. Corp.*, 286 B.R. 54.76 (Bankr. N.D. Ill. 2002))("Generally, courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction.");  *see Moody v. Security Pacific Business Credit, Inc.*, 127 B.R. 958, 985 (W.D. Pa. 1991) *aff'd*, 971 F.2d 1056 (3d Cir. 1992)(no undercapitalization when creditors were paid for twelve months after transaction);  *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Serv. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995)(finding no undercapitalization when the company was a viable going concern eight months after LBO); *Fidelity Bond & Mtg., Co. v. Brand*, 371 B.R. 708, 728 (affirming bankruptcy court's findings as to adequacy of capitalization because, *inter alia.*, the debtor did not file its bankruptcy petition for more than 14 months after the challenged transaction and serviced its debt during that time); *In re Ohio Corrugating Co.*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (finding no undercapitalization when creditors were paid for ten months).

[313] *See* JX-313 at KKR-SAM_0180597 (as of March 17, 2012, KKR valued SRC's equity value at over $4.3 billion); PX-531 at KKR-SAM_0209523 (as of June 15, 2012, KKR valued SRC's equity value at over $4.2 billion); DX-579 at KKR-SAM_0209540 (as of September 28, 2012, KKR valued SRC's equity value at over $3.2 billion); DX-622 at KKR-SAM_0209544 (as of March 31, 2013, KKR valued SRS's equity value at over $3.3 billion); DX-638 at KKR-SAM_0209537 (as of June 30, 2013, KKR valued SRC's equity at $3.1 billion); JX-389 at NGP00024534 (as of July 2013, NGP placed a positive equity value on its investment); PX-677 at KKR-SAM-0209529 (as of September 30, 2013, KKR valued SRC's equity at $3.2 billion); DX-650 at NGP00009271 (as of October 1, 2013, NGP placed a positive equity value on its investment); DX-661 at KKR-SAM_0209516 (as of December 31, 2013,

February 2013 (just over a year after Closing), Samson Onshore was experiencing difficulties

including (i) a decline in commodity prices; (ii) various operational issues; (iii) cost overruns;

and (iv) difficulties with managerial monitoring and performance reporting.[314]  Notwithstanding

these challenges, Ms. Farley (who became CEO of SRC in February 2013) stated her belief that

(a) the equity value in SRC at the end of 2013 was still in excess of $2 billion; and (b) with some

execution improvements the Investor Group could develop a plan to receive a 2x return on the

equity investment.[315]

      According to the Defendants, Samson Onshore's downfall was caused by a protracted

cycle of falling commodity prices.[316]  When the company filed for Chapter 11 relief in 2015, Mr.

Cook testified in his First Day Declaration that low commodity price declines were the primary

reason for Samson Onshore's bankruptcy filing:

> A number of unexpected and unprecedented challenges have crippled Samson's
> ability both to sustain its leveraged capital structure and to commit the capital
> necessary for exploration and production.  The continuation of dramatically low
> natural gas prices, a steep drop in the price of oil, and general market uncertainty
> have created an incredibly challenging operation environment for all exploration
> and production companies.  In just the last 12 months, the price of oil dropped by
> more than 50 percent - - from approximately $92 a barrel as of September 15, 2014
> to below $50 a barrel as of September 15, 2015.  With the price of natural gas at
> historic lows, the commodity price decline has created the perfect storm
> necessitating immediate action to restore the health of the company.[317]

---

KKR valued SRC's equity value at over $2.0 billion); DX-674 at NGP00037092 (at the end of 2013, NGP placed a positive equity value on its investment).

[314] Farley Dep. 159:25-161:7.

[315] Farley Dep. 263:25-264:7; 162:8-16.

[316] Shortly after the Closing date, natural gas prices declined by approximately 40%.  Roski Decl. ¶ 201 [DX-852]. While spot prices had declined in the months leading up to the Closing date, a continued decline was not reasonably anticipated. *Id.*  For example, in December 2011 the U.S. Energy Information Administration forecasted less than a 5% chance that prices would decline to the level they actually did from January through April 2012 (the lowest price). *Id.* Oil prices crashed in 2014.  Beginning in June 2014, an oversupply shock pushed oil prices steeply lower. Roski Decl. ¶ 204 [DX-852].  In November 2014, OPEC met and decided to maintain production levels, notwithstanding the oversupply.  This decision resulted in the longest sustained collapse of oil prices in history.

[317] Cook Decl. ¶ 4 [DX-736].

The conflicting evidence before the Court demonstrates two competing views of the capital adequacy (or inadequacy) of Samson Onshore: one view prepared at the time of the transaction and one view prepared as part of this litigation. As other courts have observed, absent some firm basis for rejection, management's projections that were prepared and accepted in the "deal marketplace" (i.e., with the consensus of investors and lenders whose capital is risked against the accuracy of those projections) will not be replaced with those developed for litigation.[318] The record is replete here with examples of the thoroughness and professional expertise used in developing the Business Plan based on the Deal Model (as confirmed by the rigorous independent analyses performed by each of the Sponsors and the Participating Lenders) and the hedging plan. The record points to other credible reasons for Samson Onshore's decline into bankruptcy four years after the Transaction.[319] Thus, after a comprehensive review of the copious record before it, the Court concludes that the Business Plan for Samson Onshore developed by the Deal Model and tested in the "deal marketplace" was reasonable and prudent at

---

[318] "When there is 'substantial evidence presented to show that the [b]usiness [p]lan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations,' a '[b]usiness [p]lan constitutes a fair, reasonable projection of future operations' and 'alternative projections of future operations should be rejected.'" *Iridium*, 373 B.R. at 348 (quoting *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr. N.D. Tex. 2005)); "Courts further recognize that '[a] powerful indication of contemporary, informed opinion as to value' comes from private investors who '[w]ith their finances and time at stake, and with access to substantial professional expertise, [ ] concluded at the time [ ] that the business was indeed one that could be profitably pursued.'" *Id.* (quoting *Brandt v. Samuel, Son & Co. (In re Longview Aluminum, L.L.C.)*, 2005 WL 3021173, * 7 (Bankr. N.D. Ill. July 14, 2005); *see also Lyondell*, 567 B.R. at 111 ("In addition to looking at management's projections, courts also look to the views of the market, in particular, sophisticated investors involved in a transaction."); *Burtch v. Opus, LLC (In re Opus East, LLC)*, 528 B.R. 30, 55 (Bankr. D. Del. 2015) ("[P]rojections created by expert witnesses for litigation purposes are inherently suspect."); *VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606, *29 (D. Del. Sept. 13, 2005) *aff'd*, 482 F.3d 624 (3d Cir. 2007) ("[A]n expert lacks credibility when an underlying solvency analysis is based on projections that 'fly in the face of what everyone … believed' during the time period in question."); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, *15 (Del. Ch. June 4, 2004) (stating that "post hoc litigation-driven forecasts have an untenably high probability of containing hindsight bias and other cognitive distortions" (citation and quotation marks omitted)).

[319] The Court places significant weight on the representations in the First Day Declaration that recited the circumstances that led to SRC's bankruptcy. Those listed causes were fundamentally the depressed prices in the market for oil and gas. Nowhere in that Declaration, submitted under penalty of perjury and with the purpose of affording candid disclosure and context to the Court, is there any mention of the consequences or knock-on effects of the 2011 Transaction.

the time of the Transaction.  The Trustee has failed to carry his burden of proving that the Transaction left Samson Onshore with unreasonably small capital.

3.  Cash Flow Test

The third prong for proving insolvency under the UFTA is whether the debtor intended to incur, or believed (or reasonably should have believed) it would incur, debts beyond its ability to pay as such debts matured (known as the "cash flow test" or "equitable insolvency"). "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."[320]

In *Moody*, the Third Circuit concluded that the district court properly determined that a leveraged buy-out did not leave the debtor with unreasonably small capital.[321]  The Court then observed that "[b]ecause we assume the notion of unreasonably small capital denotes a financial condition short of equitable insolvency, it follows that the transaction did not render the debtor equitably insolvent either."[322]  Likewise, the Court concludes here that the same evidence considered in the inadequate capital analysis above demonstrates that the Transaction did not leave SRC equitably insolvent.

**II.   The Gulf Coast and Offshore Business**

In Count III of the Complaint, the Trustee seeks to recover monies from the Defendants on the theory that the transfer of the Gulf Coast and Offshore Business to Samson Energy made in connection with the 2011 Transaction was an avoidable fraudulent transfer.  The same legal

---

[320] *Lyondell*, 567 B.R. at 111 (quoting 5 COLLIER ON BANKRUPTCY  548.05[3][c] (16ᵗʰ ed. 2010) (citing cases)).
[321] *Moody*, 971 F.2d at 1075.
[322] *Id.*

standard discussed in detail above applies here: under the Delaware UFTA, the Trustee must prove two elements to prevail on the constructive fraudulent transfer claim: (i) that the transferor failed to receive reasonably equivalent value for the asset transfers; and (ii) that the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer.[323]

As discussed more fully in the background, the KKR Bid did not include the Gulf Coast and Offshore Business. Therefore, the sale agreement provided for the transfer of the Gulf Coast and Offshore Business (i.e., all assets and liabilities associated with those businesses) to Samson Energy prior to the Closing Date through a series of corporate actions. In return, Samson Energy transferred three notes to SIC with a combined principal amount of $553 million (the "Shareholder Subordinated Notes").[324] Following the transfer, the Shareholder Subordinated Notes were cancelled.[325]

The Trustee's fraudulent transfer theory is that SIC transferred its Gulf Coast and Offshore Business, which he suggests was worth at least $846 million, to Samson Energy (for the benefit of the Schustermans) in exchange for the Subordinated Shareholder Notes that had no value. For the reasons set forth below, the Court concludes that the Trustee has failed to prove a lack of reasonably equivalent value or that the transfer rendered SIC insolvent.

A.    Reasonably Equivalent Value

The Trustee's valuation expert, Mr. Baxter, determined that the Gulf Coast and Offshore Business had a fair market value of $846 million as of the Closing Date.[326] Mr. Baxter

---

[323] *See* Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.,* 906 A.2d 168, 198 (Del. Ch. 2006). The Trustee's burden of proof for its Delaware constructive fraudulent conveyance claims is a preponderance of the evidence. *See In re MDIP*, 332 B.R. 129, 132 (Bankr. D. Del. 2005).

[324] The Shareholder Subordinated Notes had been initially issued by SIC in exchange for certain shares of SIC stock repurchased by SIC from its shareholders in 2008 and June 2011. Phillips Decl. ¶28 [DX-846].

[325] DX-834 at SEC-00245885; *see also* DX-829, DX-830, DX-831.

[326] As other evidence of fair market value, the Trustee also references a letter dated October 13, 2011 from Apache to SIC offering to purchase the assets of the Gulf Coast and Offshore Business for $2.5 billion. JX-119 (the "October Letter"). The October Letter was received after SIC had entered into an exclusivity agreement with KKR.

calculated the value using a weighted combination of NAV, DCF, Public Companies and M&A Transactions approaches and determined an equity range of $735-$957 million, with $846 million as the equity value midpoint.[327]  Mr. Baxter also testified that the cancellation of the Shareholder Subordinated Notes was not meaningful consideration for the Gulf Coast and Offshore Business because, in his view, those Notes did not have any economic value and the exchange was an accounting fiction.[328]  Mr. Baxter gave three reasons for assigning a zero value to the Shareholder Subordinated Notes: (i) his valuation determined that SIC had a negative equity fair market value as of the Closing Date and, therefore, he determined that the Notes (which were ranked below SIC's senior debt obligations) were "underwater" and had no value; (ii) he believed the Sponsors would not have purchased Samson Onshore subject to the Notes without a corresponding $553 million decrease in the purchase price; and (iii) Stacey Schusterman testified in her deposition that she did not think anything was paid for the Gulf Coast and Offshore Business – instead, she said the family sold Samson Onshore and kept the Gulf Coast Assets.[329]

In response, the Defendants offered evidence of two contemporaneous appraisals of the fair market valuations of the memberships interests in the Gulf Coast and Offshore Business, each prepared just prior to the Closing.  The appraisals were performed by two separate national

---

Apache stated: "We are willing to pay $4.0 Billion for three of Samson's divisions as follows:  (i) $2.5 Billion for the Gulf of Mexico Deepwater and Gulf Coast divisions and (ii) $1.5 Billion for the Mid-Continent division.  *Id.* at JEFF00018093. The October Letter also provided that SIC would have to indemnify Apache for any litigation, and that Apache did not yet have approval from its board of directors. JX-119 at JEFF00018093, JEFF00018095. SIC management testified that he questioned the sincerity of the offer and thought it might be an attempt to disrupt the deal SIC was working on with KKR. Tholen Dep. 146:4-147:6; 151:22-152:5. No one at SIC followed up to determine if Apache's offer was severable to permit SIC to simultaneously move forward with a sale of the Gulf Coast and Offshore Business assets to Apache while negotiating with KKR.  *Id.* 147:20-149:15. The Court finds that the October letter is too preliminary and indefinite to be useful in determining the fair market value of the Gulf Coast and Offshore Business.

[327] Baxter GoM Report, at 12, table 1; Trial Tr. (Baxter) at 665:19-25.

[328] Baxter GoM Report, at 14. Trial Tr. (Baxter) at 665:19-25; 826:21-827:8.

[329] Baxter GoM Report, at 14, ¶¶19-21.

accounting and advisory firms (Duff & Phelps, LLC and Stout Risius Ross, LLC) who worked independently.[330]

Duff & Phelps valued the Gulf Coast and Offshore Business as of December 1, 2011 at $445 million, assigning $351 million to the Gulf Coast division and $94 million to the Offshore division.[331]  Stout Risius Ross LLC valued the Gulf Coast and Offshore Business as of December 1, 2011 at $459 million, assigning $338.595 million to the Gulf Coast division and $120.467 to the Offshore division.  Both firms testified in depositions about their firms' qualifications and provided details about the processes used to arrive at the fair market value conclusions.[332]

The Defendants argued that, with some adjustments (such as deducting certain corporate overhead), Mr. Baxter's valuation was not materially different from the contemporaneous appraisals offered by the Defendants.  The Defendants also argued that Mr. Baxter's valuation failed account for items such as litigation risk and well casing collapse risk, which were considered by the Defendants' appraisal firms.[333]

Mr. Phillips, SIC's Vice President of Tax and Payroll who transitioned to Vice President of Accounting, Reporting and Tax for Samson Energy, testified that the Shareholder Subordinated Notes were classified as long-term debt in SIC's audited financial statements and were always treated as debt.[334]  Mr. Phillips testified that the Shareholder Subordinated Notes would not have been cancelled as part of the Transaction if they had not been exchanged for the Gulf Coast and Offshore Business in advance of Closing.[335]

---

[330]  Phillips Decl. ¶ 51 [DX-846].
[331]  JX-432 at DP_Samson_0001299, DP_Samson_0001303-1305.
[332]  *See generally* Scott Dep. dated 1/21/2021 and Reiff Dep. dated 11/13/2020.
[333]  JX-155 at SAMS0095610, SAMS0095631-32.
[334]  Phillips Decl. ¶ 28 [DX-846].
[335]  Trial Tr. (Phillips) 1474:21-1475:5.

The Court finds that the two contemporaneous appraisals of the Gulf Coast and Offshore Business are better evidence of the equity value of that business in December 2011 than a valuation prepared in hindsight.  Moreover, the Court respectfully disagrees with Mr. Baxter's assessment that the Shareholder Subordinated Notes had zero value.  For all of the reasons provided above in consideration of the Samson Onshore Transaction, the Court does not find that SIC was insolvent or rendered insolvent by the Transaction. There is no evidence before the Court that the Notes would have been cancelled as part of the Samson Onshore Transaction or that the Schustermans would have simply walked away from over a half-billion dollars for nothing. Therefore, the Notes had value.  The Court concludes that the record does not support the Trustee's argument that reasonably equivalent value was not given in exchange for the Gulf Coast and Offshore Business.

B.    Insolvency

The Defendants argue that the transfer of the Gulf Coast and Offshore Business to Samson Energy took place on December 19, 2011, which was two days prior to the Closing Date for Samson Onshore (i.e., before any money was paid for SIC stock and before any of the Debtors incurred any of the Transaction debt) and, therefore, there is nothing in the record to show that this transfer left the Debtors insolvent or inadequately capitalized.  However, even assuming, without deciding, that it is appropriate to consider both the Samson Onshore and the Gulf Coast and Offshore Business transfers together, the Trustee's allegations have no merit. For all of the reasons discussed *supra*., the Court has concluded that evidence before it does not

support a finding that SRC was balance sheet insolvent, inadequately capitalized, or equitably

insolvent on the Closing Date.

## <u>CONCLUSION</u>

The Plaintiff has brought suit to avoid and recover proceeds from allegedly fraudulent

transfers.  It was his burden to establish, by a preponderance of the evidence, both insolvency

and that reasonably equivalent value was not exchanged.

For the reasons stated above, the Court finds that the Plaintiff has failed to carry his

evidentiary burden for the relief he seeks.  Judgment will be entered for the Defendants on all

counts.  The parties are requested to confer and submit a proposed judgment order within seven

days of the date hereof.

BY THE COURT:

Dated: Wilmington, DE
      June 14, 2023
                                Brendan Linehan Shannon
                                United States Bankruptcy Judge